UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| HOUGHTON MIFFLIN | : Case No. 12-_____ (___) |
| HARCOURT PUBLISHING COMPANY, *et al.*,[1] | : |
| | : Joint Administration Pending |
| Debtors. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF WILLIAM F. BAYERS
PURSUANT TO RULE 1007-2 OF THE LOCAL
BANKRUPTCY RULES FOR THE SOUTHERN DISTRICT OF
NEW YORK IN SUPPORT OF FIRST-DAY MOTIONS AND APPLICATIONS**

I, **WILLIAM F. BAYERS**, hereby declare as follows:

1.      I serve as executive vice president and general counsel of Houghton

Mifflin Harcourt Publishing Company ("HMH"), a corporation organized under the laws

Massachusetts, and an affiliate and the primary operating company of the above captioned

debtors and debtors-in-possession (collectively, the "Debtors," and together with their non-

debtor affiliates, the "Company").  I have served in this capacity since May of 2007.  Although

the Debtors are each independent legal entities, I serve as a director for each of them, other than

HMH Holdings (Delaware), and given the coordination of their business as an integrated group

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are
Houghton Mifflin Harcourt Publishing Company (6030), Houghton Mifflin Harcourt Publishers Inc. (7305),
HMH Publishers, LLC (7173), Houghton Mifflin Holding Company, Inc. (2898), Houghton Mifflin, LLC
(2961), Houghton Mifflin Finance, Inc. (2812), Houghton Mifflin Holdings, Inc. (0674), HM Publishing Corp.
(5843), Riverdeep Inc., a Limited Liability Company (9612), Broderbund LLC (6113), RVDP, Inc. (2557),
HRW Distributors, Inc. (4902), Greenwood Publishing Group, Inc. (4537), Classroom Connect, Inc. (3282),
ACHIEVE! Data Solutions, LLC (7499), Steck-Vaughn Publishing LLC (6929), HMH Supplemental Publishers
Inc. (7571), HMH Holdings (Delaware), Inc. (6372), Sentry Realty Corporation (6742), Houghton Mifflin
Company International, Inc. (9100), The Riverside Publishing Company (0173), Classwell Learning Group Inc.
(9252), Cognitive Concepts, Inc. (5986), Edusoft (9992), and Advanced Learning Centers, Inc. (2861).

of companies, my position with Houghton Mifflin Harcourt Publishing Company and as a

director has allowed me to become generally familiar with the day-to-day operations, business

and financial affairs of the Debtors as a group.

2.     I submit this declaration pursuant to Rule 1007-2 of the Local Rules for

the United States Bankruptcy Court for the Southern District of New York (the "Local Rules") in

support of the Debtors' petitions for relief under title 11 of the United States Code, 11 U.S.C.

§§ 101 et seq. (the "Bankruptcy Code"), filed as of the date hereof (the "Petition Date"), and the

Debtors' contemporaneously filed requests for relief in the form of motions and applications (the

"First-Day Motions").  I have reviewed the Debtors' petitions and the First-Day Motions, or have

otherwise had their contents explained to me, and it is my belief that the relief sought therein is

essential to ensure the uninterrupted operation of the Debtors' business and the success of the

Debtors' reorganization.

3.     Except as otherwise indicated, the facts set forth in this declaration are

based upon my personal knowledge, my review of relevant documents, information provided to

me by employees working under my supervision, or my opinion based upon experience,

knowledge, and information concerning the operation of the Debtors and their industry as a

whole.  I am authorized to submit this declaration on behalf of each Debtor, and if called upon to

testify, I would testify competently to the facts set forth herein.  Unless otherwise indicated, the

financial information contained in this declaration is unaudited.   Such financial information is

also presented on a consolidated basis for the affiliated Debtors in these cases.

4.     On the date hereof, the Debtors commenced reorganization cases in this

Court pursuant to chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  This declaration

is intended to provide a summary overview of the Company and its circumstances.  Specifically,

Part I provides an overview of the Company's business. Part II provides a description of the Company's organizational structure, financial performance, and prepetition indebtedness. Part III addresses the circumstances leading to the filing of these Chapter 11 Cases. Part IV contains descriptions of the First-Day Motions. Part V contains information required by Local Rule 1007-2 to the extent not otherwise provided herein.

## I.

### The Company's Business

**A.   Houghton Mifflin Harcourt Publishing Company and Affiliated Debtors**

5.      HMH is the primary operating company. It is an affiliate with each of the other Debtors in these Chapter 11 Cases, as defined in section 101(2) of the Bankruptcy Code.

6.      HMH maintains its principal corporate office at 222 Berkeley Street, Boston, MA 02116. HMH also leases a New York office at 215 Park Avenue South, New York, NY 10003. I am advised and believe that venue in this Court is proper. HMH's New York office is used as a sales office for the Debtors, where approximately 60 full-time employees work. Additionally, approximately 15 of the Debtors' employees are sales representatives who work from their homes in New York. Finally, the Debtors maintain investments accounts with Morgan Stanley, located in Manhattan.

7.      The Debtors are the leading provider, with an estimated addressable market share of over 41%, of educational content, technology and professional services to the elementary and secondary school market in the United States, including a full range of comprehensive curriculum, supplemental and service offerings. The Debtors are organized along two business divisions: Education and Trade and Reference. Presently, the Debtors employ approximately 3,300 employees nationwide - 3,275 of which are full time employees. The Education business is the largest division, and represented approximately 90% of the

Debtors total revenue for the year ended December 31, 2011.  The Education offices are located

in Boston, MA, Orlando, FL, Evanston, IL, Austin, TX, Wilmington, MA, Rolling Meadows, IL,

Portsmouth, NH and Dublin, Ireland.  Trade and Reference sells and licenses book rights to

paperback publishers, book clubs, web sites, and other publishers and electronic businesses in the

U.S. and abroad.  The Trade and Reference main offices are located in New York and Boston.

       8.     The Debtors have a long-standing expertise in teaching and instructional

strategy and the design and creation of print and electronic learning materials across all grade

levels.  The Debtors distribute their solutions in multiple formats, including print and digital

curriculum, technology platforms, assessment tools and services.  The Debtors believe that the

solutions are a mission critical tool for school systems as they increasingly focus on outcomes-

based learning and teaching solutions that reach students both in the classroom and at home.  The

Debtors believe they are a leader in the transformation of the traditional educational materials

market and have the opportunity to increase revenue and profitability by selling innovative

solutions through a comprehensive and integrated approach to educating children.

       9.     The Debtors offer a diverse portfolio of digital and print products and

services, including textbooks, digital learning content, assessment tools, technology platforms,

related social media and mobile applications, standardized and customized tests, professional

development and school reform services, and a wide range of trade and reference titles.  The

Debtors' portfolio includes well-known brands such as *Curious George*, *The Lord of the Rings*,

*Polar Express* and *Peterson Field Guides*, and the Debtors' content is published under widely-

recognized trade names including Holt McDougal, Rigby, Harcourt, Great Source, Earobics,

SkillsTutor, Steck-Vaughn, Riverside Publishing, Edusoft, Heinemann, Riverdeep, Broderbund,

McDougal Littell and Saxon.  To maximize the Debtors' reach and ability to connect with

parents and students who are increasingly focused on the digital world, the Debtors also distribute content through consumer websites such as Amazon and through mobile applications.

### B.    The Company's Customers

10.    The Debtors have a large and diverse customer base ranging from wholesale distributors to individual schools.  The principal markets for the K-12 suite of products are elementary and secondary public school districts in the United States, and multiple International customers in Asia, Europe and Africa.  The Debtor's products are sold to state and local public entities, large private and parochial school systems, and individual schools and educational institutions in all 50 U.S. states.  The Company provides products and services to over 65,000 schools in 11,000 school districts, and 7,000 other customers.  Trade and Reference customers include some of the largest retail (online and in-store) and wholesale book distributors in the U.S.  The international division customer base includes both large and local wholesale book distributors.

### C.    The Company's Vendors

11.    The Company has numerous vendor relationships that support the Company's business.  In 2011, the Company purchased goods and services worth over $870 million from more than 12,000 vendors worldwide[2].  The Company's liability to vendors in April 2012 totaled an estimated $129 million to approximately 6,000 vendors.

12.    There are two primary vendors which provide business process outsourcing to the Company.  Other crucial vendors include paper and printing products suppliers.  The April 2012 liability to vendors for the Company's manufacturing and printing

---

[2]    This total excludes insurance and utility vendors.

operations totaled approximately $11 million to approximately 55 manufacturing and printing

vendors.

13.     Annually, the Company owes royalty related payments to more than 4,000

authors, publishers and literary agents.  The April 2012 payables totaled approximately $30

million to about 4,355 authors and literary agents.

14.     The Company also utilizes professional services providers which provide

tax, accounting, financial, legal and advertising services.  April 2012 liability to professional

services providers totaled approximately $2.8 million for 93 vendors.

15.     The vast majority of  liability to transportation, distribution and shipping

vendors results from the inbound and outbound freight transportation of the Company's

products.  For the year ended December 2011, the company spent $39 million in freight costs to

approximately 35 vendors and $8.1 million for the first four months of 2012 to 23 vendors.  The

Company outsources to a freight management services company to coordinate its transportation

billing.  The April 2012 liability for transportation and shipping, packaging supplies, and

warehouse equipment totaled approximately $684,000 to about ten (10) vendors.

16.     The Company utilizes vendors for content development, editorial design,

translation services, web design, permission and copyrights, and other publishing processes and

services.  In addition to their in-house experts, the Company utilizes freelance and per diem

professionals.  The April 2012 liability to the aforementioned publishing processes and services

vendors totaled approximately $5.7 million to approximately 240 vendors.

17.     The Company utilizes vendors to manage travel, entertainment and

employee benefits.  The majority of travel and entertainment expenditures are coordinated

through one primary credit card vendor that streamlines the expense billing process.  The April

2012 liability related to travel, entertainment and employee benefits-related vendors totaled approximately $346,000 to about 28 vendors.

18.     Vendors provide property management, rent, security and facility maintenance to the Company for office facilities and warehouses. The April 2012 liability to these vendors totaled approximately $293,000 to about 19 firms.

19.     Information technology related vendors include internet technology service providers, software and software licensing, computers and IT consulting. The April 2012 liability to vendors for information technology services totaled approximately $230,000 million to 14 firms.

## II.

### The Company's History, Organizational Structure, Financial Performance and Prepetition Indebtedness

### A.     History and Organizational Structure

20.     The corporate structure chart, attached hereto as Exhibit A, provides a general overview of the relationship of the Debtors to each other.

21.     The formation of the current group of operating entities originated when HM Rivergroup PLC, which operated several entities using the Riverdeep trade name, acquired Houghton Mifflin Holding Company, Inc. from a consortium of private equity owners in December 2006.  Houghton Mifflin Holding Company, Inc. was a premier publisher in the U.S. public school market (known as Kindergarten to Grade 12 or "K-12"), offering a diverse portfolio of products and services, including textbooks, workbooks, supplemental materials, teaching guides, various types of standardized and customized tests, professional assessment products, a range of trade and reference titles, as well as educational software programs.

22.     In 2007, the combined entity operating primarily under the Houghton

Mifflin name ("Houghton Mifflin") acquired certain assets of Harcourt Education Inc. and shares

of certain sister companies ("Harcourt Education") from Reed Elsevier plc to form the current

group of legacy Riverdeep, Houghton Mifflin and Harcourt Education businesses now operating

under the Houghton Mifflin Harcourt brand.  At the time, Harcourt Education was also a leading

publisher of K-12 educational content, providing a full range of basal and supplemental

programs to U.S. classrooms.  Harcourt Education had a long-standing reputation for expertise in

pedagogic design and the creation of new instructional materials across all grade levels.  The

combination of Houghton Mifflin and Harcourt Education united two of the most successful and

established educational book publishers in the United States, forming the second largest player in

the K-12 publishing segment based on revenue.  Both Houghton Mifflin and Harcourt Education

demonstrated strong track records in capturing market share, growing their product bases and

streamlining operations.  Over the years each has invested significant capital to update and

expand the range of their textbooks and printed and digital supplemental product offerings.

During this same period, the businesses invested in significant research and development to

upgrade and expand their book bags as well as increase their ability to cost-effectively customize

their products.

23.     As a result of the global financial crisis, recession-driven decreases in state

spending and significant purchase deferrals, on March 9, 2010, the Debtors completed an out-of-

court restructuring of certain indebtedness and an upper-tier reorganization.  As part of the

reorganization, Riverdeep Interactive Learning, an Irish company and the previous parent

company of the group ("RIL"), entered into a series of transactions, including a $650 million

rights offering, that ultimately resulted in HMH Holdings and its subsidiaries no longer being

subsidiaries of RIL.  In the out-of-court restructuring, the then-existing first lien lenders received approximately 90% of the equity of HMH Holdings (pre-dilution from the rights offering) in exchange for converting $2 billion of debt and the then-existing mezzanine lenders received approximately 10% of the equity and warrants to purchase up to an additional 12.5% of the incremental value above a specified equity value (in each case, pre-dilution from the rights offering) in exchange for converting $2 billion of debt.  In addition, HMH used the proceeds from the rights offering in which certain then-existing first lien lenders and mezzanine lenders participated to pay transaction fees, accrued cash interest and fund cash on the balance sheet.

B.      **Financial Performance**

24.     The commercial activity of the Company is carried out mainly through HMH and additional activity is carried out by Greenwood Publishing Group, Inc. ("Greenwood"), the Riverside Publishing Company ("Riverside") and Advanced Learning Centers, Inc. ("ALC").

25.     For the year ended December 31, 2011, combined revenue and adjusted EBITDA for the Company was approximately $1.295 billion and $238 million, respectively.  For the year ended December 31, 2011, EBITDA for HMH, Greenwood, Riverside and ALC was $182.5 million, $43.7 million, $39 million and $3.5 million, respectively.

C.      **The Debtors' Prepetition Indebtedness**

26.     The Debtors' principal liabilities consist of the following:

First Lien Credit Facility

27.     Our existing senior secured credit facilities with a syndicate of lenders and Citibank, N.A., as administrative agent, and as collateral agent, provide a (i) fully funded revolving credit facility in the outstanding principal amount of $235.8 million that matures on December 12, 2013, under which the commitments have been terminated and the outstanding

loans have been effectively converted into term loans (the "First Lien Revolving Facility"), and

(ii) a term loan facility in the outstanding principal amount of $2.571 billion that currently

matures on June 12, 2014 (the "First Lien Term Facility" and, together with the First Lien

Revolving Facility, the "First Lien Credit Facility").  The First Lien Credit Facility is fully drawn

with no further borrowings available thereunder.  Borrowings under our First Lien Credit Facility

bear interest at a rate per annum equal to, at our option, either (a) a base rate determined by

reference to the higher of (1) the prime rate and (2) the federal funds effective rate plus 0.5%, or

(b) the eurodollar rate determined by reference to the costs of funds for U.S. dollar deposits for

the interest period relevant to such borrowing adjusted for certain additional costs, in each case

plus an applicable margin.  The current applicable margin for loans under the First Lien Credit

Facility is 6.25% per annum for base rate borrowings and LIBOR borrowings and increases by

0.25% per annum each August and February to a maximum applicable margin of 6.50%.

> 28.     The First Lien Credit Facility is guaranteed by HMH Holdings, and certain

of its subsidiaries, and secured by substantially all of the assets of certain members of the group

of operating companies.

Prepetition Senior Secured Notes

> 29.     On May 26, 2011, HMH Publishers, Inc. and HMH issued $300 million of

8-year 10.5% Notes (the "Prepetition Senior Secured Notes" and, together with the First Lien

Credit Facility, the "Prepetition Secured Debt").  The Prepetition Senior Secured Notes mature

on June 1, 2019.  The notes are senior secured obligations that rank equally in right of payment

with the First Lien Credit Facility and all of the Debtors' other existing and future senior

indebtedness and are senior in right of payment to any of our existing and future subordinated

indebtedness.  The notes are guaranteed on a senior secured basis by HMH Holdings, its

subsidiary, HMH Publishing Company, and all of the direct and indirect subsidiaries of HMH

Publishing Company that guarantee, or act as co-borrowers under, the First Lien Credit Facility.

The notes are structurally subordinated to all of the liabilities and preferred stock of each of the

subsidiaries that do not guarantee or co-issue the notes.  The outstanding principal amount of the

Prepetition Senior Secured Notes is $300 million.

Receivables Facility

30.     On August 4, 2010, HM Receivables Co. II, LLC, a non-Debtor Delaware

limited liability company and direct wholly-owned special purpose subsidiary of HM Publishing

Corp. (the "Receivables Subsidiary"), entered into the Receivables Funding and Administration

Agreement (the Receivables Facility) with certain lenders party thereto and JP Morgan Chase

Bank, N.A., as administrative agent (in such capacity, the "Receivables Facility Agent").  The

Receivables Facility provides for revolving credit financing of up to $250 million (the

"Aggregate Commitment") subject to borrowing base availability, which terminates on August 4,

2014; provided that such termination date may be accelerated to a day that is 90 days prior to the

maturity of the First Lien Revolving Facility (as defined below) or First Lien Term Facility (as

defined below) if such facilities are not (i) repaid or (ii) exchanged, extended, refinanced,

renewed, replaced, defeased, or refunded with indebtedness having a stated maturity after

August 4, 2014.  The obligations under the Receivables Facility are non-recourse (except for

standard representations, warranties, covenants, servicing and indemnities made in connection

with such facility) to HMH Holdings and its subsidiaries, other than the Receivables Subsidiary,

and the assets of the Receivables Subsidiary are not available to satisfy the obligations of other

subsidiaries of HMH Holdings.  Proceeds of the financing are used, primarily, to purchase

accounts receivable (the "Receivables") from HMH and certain indirect wholly-owned

subsidiaries of HMH[3] pursuant to a sales and servicing agreement (the "Sales Agreement") by and among the Receivables Subsidiary, as buyer, the Originators, as sellers, and HMH, as servicer. The Receivables Facility borrowing base at any time equals the lesser of (i) the Aggregate Commitment, (ii) the net receivables balance multiplied by an applicable advance rate based on current dilution, minus certain applicable reserves and an availability block and (iii) the net receivable balance multiplied by 85%, minus certain applicable reserves and an availability block. All advances under the Receivables Facility are subject to the satisfaction of customary conditions, including absence of a default and accuracy of representations and warranties. The principal amount outstanding under the Receivables Facility is $0.

Letter of Credit Facility

31.     On October 26, 2010, HMH Publishers Inc. entered into the Letter of Credit Facility pursuant to which Wells Fargo Bank, National Association ("Wells Fargo") has agreed to issue up to $50 million of standby letters of credit. The Letter of Credit Facility is scheduled to expire on June 1, 2013. All letters of credit when issued pursuant to the Letter of Credit Facility are required to be cash collateralized at 100% of their face amount, and Wells Fargo has a first-priority security interest in, and exclusive control over, the account in which cash collateral is posted by HMH Publishers Inc. in connection with each letter of credit. The current aggregate amount of letters of credit outstanding under the Letter of Credit Facility is $26,829,718.53.

---

[3]     Such indirect wholly-owned subsidiaries are: ACHIEVE! Data Solutions, LLC; Edusoft; Greenwood Publishing Group, Inc.; Cognitive Concepts, Inc.; and The Riverside Publishing Company (collectively, the "Originators").

32.     In addition to the foregoing, the Debtors owe approximately $142,990,165 in additional liabilities, such as accounts payable, only a portion of which may become due during these cases.

## III.

## Current Restructuring

### A.     Events Necessitating the Current Restructuring

33.     The global financial crisis over the past several years has negatively affected the Debtors' recent financial performance.  The Debtors' business depends largely on state and local funding and the recession-driven decreases in state spending as well as significant purchase deferrals in key states and territories resulted in material reductions in the overall size of the Debtors' key K-12 market.  Lack of anticipated federal stimulus support also contributed to the Debtors' substantial revenue decline.  As a result of the deteriorating macroeconomic conditions, the Debtors, along with certain of their non-debtor affiliates, implemented a consensual out-of-court restructuring in March 2010 (as discussed above).  Despite the out-of-court restructuring, due to the continuing contraction of funds for state education spending and higher deferrals of awarded business than expected, the Debtors have continued to experience financial difficulties.  On or about December 22, 2011 and December 29, 2011, the Debtors entered into amendments to their first lien credit facility and receivables facility, respectively (collectively, the "Amendments").

34.     Notwithstanding the Amendments, the Debtors have determined that a complete delevering of their capital structure is now necessary.  In or about March 2012 significant holders of claims under the Debtors' First Lien Credit Facility and the Prepetition Senior Secured Notes formed an informal creditor group (the "Informal Creditor Group").  Since its formation, the Informal Creditor Group and its advisors have engaged in constructive

dialogue with the Debtors regarding a comprehensive restructuring of the Debtors' outstanding debt and equity.

35.     After months of good faith, arm's length negotiations among the Debtors and the Informal Creditor Group and their respective advisors, on May 10, 2012, the parties reached an agreement on the terms of a restructuring to completely delever the Debtors' balance sheet. The Debtors have commenced these chapter 11 cases to implement the terms of the agreement which has been embodied in a prepackaged plan of reorganization (the "Prepackaged Plan") and the accompanying Restructuring Support Agreement (as defined in the Prepackaged Plan), filed substantially contemporaneously herewith.

**B.    The Proposed Restructuring Plan and Prepetition Solicitation**

36.     The Prepackaged Plan provides for the restructuring of the Debtors' liabilities in a manner designed to maximize recoveries to holders of claims against and equity interests in the Debtors. I believe that (i) through the Prepackaged Plan, holders of Allowed Claims and Equity Interests would obtain a substantially greater recovery from the Debtors' estates than the recovery they would receive if (a) the Debtors filed chapter 11 petitions without the prior acceptance of the Prepackaged Plan by the requisite amount and number of their creditors for the Prepackaged Plan to be approved by the Bankruptcy Court or (b) the Debtors were liquidated under chapter 7 of the Bankruptcy Code, and (ii) the Prepackaged Plan will afford the Debtors the opportunity and ability to continue their business with sufficient liquidity to operate as a going concern.

37.     The Prepackaged Plan contemplates that (i) Senior Creditors[4] shall receive their pro rata share of (a) 100% of New Common Stock, subject to dilution for (x) New Common Stock to be issued pursuant to the Management Incentive Plan and (y) to the extent applicable, New Common Stock to be issued upon exercise of the New Warrants, and (b) $30.3 million in Cash; (ii) except to the extent that a holder of an Allowed Letter of Credit Facility Claim and the Debtors with the consent of the Requisite Participating Lenders agree to a different treatment, the outstanding letters of credit issued under the Letter of Credit Facility shall either continue unaffected upon consummation of the Plan or be replaced by the Exit Facility and the Letter of Credit Facility shall be deemed terminated; (iii) holders of Allowed General Unsecured Claims shall receive Cash in amount equal to such holder's Allowed General Unsecured Claim plus accrued and unpaid Post-Petition Interest or shall otherwise continue unaffected upon consummation of the Plan, to be paid in the ordinary course of business; and (iv) if the Class of Existing Common Stockholders votes to accept the Plan, the Existing Common Stockholders shall be entitled to receive their pro rata share of the New Warrants; if such Class votes to reject the Plan, the Existing Common Stockholders shall not be entitled to a distribution under the Plan. The Receivables Facility shall be paid in full from the proceeds of the debtor in possession financing that will be provided to the Debtors in the Chapter 11 Cases.

38.     All other classes of claims and equity interests will be satisfied in full and will be unimpaired, with the exception of Class 9 Other Holdings Equity Interests which will receive no distribution under the Prepackaged Plan, is not entitled to vote to accept or reject the Plan and is deemed to reject the Plan.

---

[4]   Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Prepackaged Plan and Disclosure Statement.

39.     In connection with the Prepackaged Plan, the Debtors prepared the

Disclosure Statement describing, among other things, the proposed reorganization and its effects

on holders of claims against and equity interests in the Debtors.  Following the launch of the

solicitation of votes on the Prepackaged Plan, the Debtors and/or their voting agent, caused

copies of the Disclosure Statement, the Prepackaged Plan (attached to the Disclosure Statement)

and the appropriate Ballot to be transmitted to the holders of Class 3 and Class 8 claims.  The

Debtors established 5:00 p.m. (prevailing Eastern Time) on May 18, 2012 as the Voting

Deadline for holders of Class 3 First Lien Credit Facility claims and the Participating Lenders

under the Restructuring Support Agreement and 5:00 p.m. (prevailing Eastern Time) on June 11,

2012 as the Voting Deadline for holders of Class 3 claims related to the Prepetition Senior

Secured Notes and the holders of Class 8 equity interests.  May 10, 2012 was set as the Voting

Record Date.  Solicitation commenced on May 11, 2012.

40.     Although the solicitation period remains open, as of the Petition Date,

90.3% of the total amount of creditors entitled to vote on the Prepackaged Plan voted in favor of

the Prepackaged Plan and 76% in amount of equity holders entitled to vote on the Prepackaged

Plan voted in favor of the Prepackaged Plan.  The Debtors did not receive any ballots rejecting

the Prepackaged Plan.  As a result of the overwhelming support for the Prepackaged Plan, the

Debtors intend to move forward with confirmation of the Prepackaged Plan at the Court's

earliest available date.

## IV.

## First-Day Motions

41.     As discussed above, concurrently with the filing of their chapter 11

petitions, the Debtors filed various First-Day Motions, which are necessary to (a) continue the

Debtors' operations in chapter 11 with as little disruption and loss of productivity as possible, (b)

maintain the confidence and support of customers, employees, suppliers and certain other key

constituencies and (c) establish procedures for the smooth and efficient administration of these

Chapter 11 Cases.  I have reviewed each of the First-Day Motions, including the exhibits thereto,

and I believe that the relief sought in each of the First-Day Motions is tailored to meet the goals

described above and, ultimately, will be critical to the Debtors' ability to achieve a successful

reorganization. It is also my understanding that the First-Day Motions reflect the comments of

the United States Trustee for the Southern District of New York.

### A.        The Debtors Require Relief to Avoid Immediate and Irreparable Harm

42.        To enable the Debtors to minimize the adverse effects of the

commencement of these Chapter 11 Cases on their ongoing business operations and promote a

smooth transition to chapter 11, the Debtors have requested various forms of relief in their First

Day Motions.  The First Day Motions seek authority to, among other things, obtain debtor-in-

possession financing on an interim basis, preserve customer relationships, maintain employee

morale, and ensure the continuation of the Company's cash management systems and other

business operations without interruption.  A complete list of First Day Motions is attached hereto

as Exhibit N.

43.        In connection with the preparation and filing of these Chapter 11 Cases, I

have reviewed the First Day Motions, including the exhibits thereto, and the facts therein are true

and correct to the best of my knowledge, information, and belief, and based upon the information

supplied or verified by various employees of the Debtors.  I believe that Court approval of the

relief sought in the First Day Motions is essential to giving the Debtors an opportunity to work

toward a successful restructuring that will benefit all of the Debtors' constituents and preserve

the value of the Debtors' estates.

**B.      Procedural Motions**

**(a)      Joint Administration Motion**

44.      The Debtors seek joint administration of these Chapter 11 Cases for

procedural purposes only. As described above, each of the twenty-five (25) Debtors in these

Chapter 11 Cases is an affiliate of HMH, and the Debtors share key financial and operational

systems.

45.      The joint administration of these Chapter 11 Cases, to the best of my

knowledge, will not give rise to any conflict of interest among the Debtors' estates.  Nor will

joint administration adversely affect the Debtors' respective creditors because this motion

requests only administrative consolidation of the estates.  Intercompany claims among the

Debtors also will be preserved and each of the Debtors will maintain separate records of assets

and liabilities.  Thus, I believe that individual creditors' rights should not be harmed by the relief

requested.  Instead, non-Debtor parties in interest should benefit from the cost reductions

associated with the joint administration of these Chapter 11 Cases.

**(b)      KCC Retention**

46.      The Debtors propose to engage Kurtzman Carson Consultants LLC

("KCC") to act as claims and noticing agent, in order to assume full responsibility for the

distribution of notices and maintenance, processing and docketing of proofs of claims filed in

these Chapter 11 Cases.  KCC is a bankruptcy administrator that specializes in providing

comprehensive chapter 11 administrative services, including noticing, claims processing and

other related services critical to the effective administration of large chapter 11 cases. KCC's

retention should maximize efficiency in administering these Chapter 11 Cases and ease

administrative burdens that otherwise would fall upon the Debtors and the Clerk of the United

States Bankruptcy Court for the Southern District of New York.

47.     The Debtors obtained and reviewed engagement proposals from at least

two (2) other court-approved claims and noticing agents to ensure selection through a

competitive process. Based on all engagement proposals obtained and reviewed, I believe that

KCC will provide the most cost-effective and efficient service as the claims and noticing agent

for these Chapter 11 Cases. Accordingly, the Debtors chose KCC based on its experience,

reputation and the competitiveness of its fees. I believe that KCC is well-qualified to serve in the

capacity of claims and noticing agent and that KCC's retention is in the best interests of the

Debtors' estates and all parties in interest.

(c)     **Schedules and Statement Extension Motion**

48.     By the schedules and statement extension motion (the "Schedules and

Statement Extension Motion"), the Debtors request a forty-five (45) day extension of time to file

their: (i) schedules of assets and liabilities; (ii) schedules of current income and expenditures;

(iii) schedules of executory contracts and unexpired leases; (iv) statements of financial affairs;

and (v) additional documents, the filing of which is required by Rule 1007(b) of the Bankruptcy

Rules (collectively, the "Schedules and Statements") through and including July 19, 2012.  In

addition, the Debtors are seeking a permanent waiver of the requirement that the Debtors file

Schedules and Statements upon confirmation of the Prepackaged Plan.

49.     The Debtors have begun compiling the information required to complete

the Schedules and Statements.  Nevertheless, due to the complexity of the Debtors' business

operations and the limited time and resources available, the Debtors have not yet finished

gathering such information.

50.     Given the various operational matters that the Debtors' management and

staff must attend to in the early days of these chapter 11 cases, particularly in light of the fact that

it is the Debtors' peak selling season, as well as the volume of information that must be reviewed

and prepared for filing, I do not anticipate that the Debtors will be able to complete their

Schedules and Statements within the fourteen (14) days required by the Bankruptcy Rules.

Furthermore, compiling and consolidating the data required for the Schedules and Statements is a

complex and time intensive task.  I believe the attention of key personnel should be focused

instead on the Debtors' critical operational and restructuring matters during the course of the

bankruptcy because it will facilitate the Debtors smooth transition into chapter 11, and quick

emergence from, these chapter 11 cases, especially in light of the fact that the Debtors are not

intending to set a bar date for creditors.  Accordingly, obtaining an extension of time to file, and

potentially a waiver of the requirement to file, the Schedules and Statements will maximize the

value of the Debtors' estates for the benefit of creditors and all parties in interest and the Debtors

request approval of the Schedules and Statement Extension Motion.

### (d)    Notice Motion

51.     Because the Debtors have thousands of creditors, converting the Debtors'

computerized information to a format compatible with the creditor matrix requirements would be an

exceptionally burdensome task and would greatly increase the risk of error with respect to information

already intact on computer systems maintained by the Debtors or their agents.

52.     After consulting with KCC, the Debtors believe, and I agree, that preparing the

consolidated list of creditors in the format or formats currently maintained by the Debtors in the ordinary

course of business will be sufficient to permit KCC to promptly provide notices to all applicable parties.

Accordingly, the Debtors believe, and I agree, that maintaining their lists of creditors in electronic format

rather than preparing and filing separate matrices is warranted under the circumstances and will maximize

efficiency, increase accuracy, and reduce costs to the benefit of the estates.

53.     Because the top twenty (20) creditor lists of several of the Debtors would

overlap, and certain other Debtors may have fewer than twenty (20) identifiable unsecured creditors, the

Debtors submit that filing separate top twenty (20) lists would be of limited utility.  In addition, the

exercise of compiling separate top twenty (20) creditor lists for each individual Debtor would consume an

excessive amount of the Debtors' time and resources.  Further, the Debtors believe, and I agree, that a

single, consolidated list of the Debtors' twenty (20) largest unsecured, non-insider creditors will aid the

U.S. Trustee in its efforts to communicate with these creditors and is appropriate under the facts and

circumstances.

54.      The Debtors believe, and I agree, that publication of the Commencement Notice

is the most practical method by which to notify those creditors who do not receive the Commencement

Notice by mail and other creditors and parties-in-interest of the commencement of these chapter 11 cases

and will ensure an efficient use of estate resources.

55.      For the foregoing reasons, and the reasons discussed in the motion, the Debtors

have determined, and I agree, that it is in the best interest of the Debtors, their estates and their creditors,

and that it is beneficial to the Court and the Clerk's office, that the motion be granted.

## C.      Operational Motions

### (a)      Cash Management

56.      By the cash management motion (the "Cash Management Motion"), the

Debtors seek entry of an order authorizing the Debtors to:  (i) maintain and use their existing

bank accounts (the "Bank Accounts"), books, records and business forms; (ii) maintain and use

their existing cash management system, (iii) provide superpriority status for intercompany

receivables; and (iv) waive the deposit and investment guidelines of section 345 of the

Bankruptcy Code.

57.      As described in detail in the motion, the Debtors have maintained an

integrated and efficient centralized cash management system to: (i) manage borrowing activity

under various credit facilities, including an accounts receivable securitization facility, as well as

interest payments on the Prepetition Secured Debt; (ii) manage the Debtors' cash flow and cash

needs by collecting and distributing funds generated from operations; (iii) manage the Debtors'

investment activity; and (iv) transfer funds between and among the Debtors' and non-Debtor

affiliates, both foreign and domestic (collectively, the "Cash Management System"). The

Debtors' treasury department ("Treasury") exercises primary oversight over the Cash

Management System.

58. The Debtors manage cash and investments in the Cash Management

System through a rolling cash forecast model ("Cash Forecast") that shows all expected

collections and cash disbursements on a daily basis. Treasury employees create the Cash

Forecast for the year based on historical information and forecasts from various departments

which tie into the Debtors' budget. Forecasted information includes: (i) a collections forecast

based on forecasted sales and returns, with values updated with actual amounts as monthly

activity becomes available; (ii) payroll forecasts based on employment changes and previous

actual payroll disbursements; (iii) sales and use tax disbursement forecasts based on forecasted

sales in various states and countries; and (iv) accounts payable forecasts calculated on a weekly

basis. Treasury uses the Cash Forecast to reconcile the central Bank of America operating and

concentration account (the "Operating Account"). Treasury employees also review the Cash

Forecast daily to evaluate the Debtors' cash position and to make decisions regarding borrowing

and investing.

59. The Cash Management System consists of forty (40) active bank accounts

used for collection, disbursement and investments at thirteen (13) banking and investment

institutions.

60. I am advised that the Operating Guidelines and financial Reporting

Requirements for Debtors in Possession and Trustees (the "U.S. Trustee Guidelines") require,

22

among other things, that, unless the Court orders otherwise, a debtor (i) close all existing bank

accounts and open new debtor in possession accounts at authorized depositories; and (ii) obtain

checks that bear the designation "debtor in possession," among other things.  Strict enforcement

of the U.S. Trustee Guidelines in these chapter 11 cases, however, would needlessly distract

management and staff from more critical operational and restructuring matters.  Furthermore, the

delays that would result from opening these accounts, revising cash management procedures and

instructing customers to redirect payments to the would disrupt the ordinary financial operations

of the Debtors and potentially destroy value.  In addition, I believe requiring the Debtors to

comply with the U.S. Trustee Guidelines would be inappropriate and inefficient in these cases

given their prepackaged nature, and the fact that the Debtors anticipate emerging from chapter 11

in approximately one month.  Accordingly, continued operation of the Cash Management System

will greatly facilitate the Debtors' transition into, and quick emergence from, these chapter 11

cases, will avoid administrative inefficiencies, minimize delays in payment of the Debtors'

obligations and preserve the value of the Debtors' estates.

   61. I am also advised that section 345(a) of the Bankruptcy Code authorizes

deposits of money, such as the Debtors' cash, in a manner that "will yield the maximum

reasonable net return on such money, taking into account the safety of such deposit or

investment."  11 U.S.C. § 345(a).  However, for deposits that are not "insured or guaranteed by

the United States or by a department, agency, or instrumentality of the United States or backed

by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides

that a debtor in possession must require a bond from the entity with which the money is

deposited or invested in favor of the United States secured by the undertaking of an adequate

corporate surety.  Alternatively, the debtor in possession may require the entity to deposit

securities of the kind specified in section 9303 of title 31 of the United States Code.

Nevertheless, the Court may excuse strict performance of the deposit and investment

requirements of section 345(b) of the Bankruptcy Code for "cause."

62.     I believe that cause exists in these cases for waiving the investment and

deposit guidelines of section 345 of the Bankruptcy Code for forty-five (45) days.  First, sixteen

(16) of the Debtors' accounts are fully insured by the FDIC and twenty-six (26) of the Debtors'

accounts are maintained at banks that have been approved by the U.S. Trustee for the Southern

District of New York.  Furthermore, the remaining accounts are subject to an Investment Policy,

as further described in the Cash Management Motion, that helps to ensure the safety and

preservation of invested funds.  Given the anticipated short duration of these chapter 11 cases, it

would be inefficient and unnecessary for the Court to require the Debtors to open new

investment accounts for the Debtors' funds.   Accordingly, the Debtors request approval of the

Cash Management Motion.

> **(b)     Motion Authorizing Payment of Prepetition General
> Unsecured Claims**

63.     In light of (i) the anticipated  short duration  of these prepackaged

chapter 11 cases and (ii) the proposed payment in full of general unsecured claims pursuant to

the terms of the Prepackaged Plan, the Debtors seek the entry of an order authorizing the Debtors

to pay certain prepetition liabilities in the ordinary course (such motion, the "Prepetition Claims

Motion").  Such payments would be on account of prepetition liabilities to holders of undisputed

claims that are not impaired under the Plan in accordance with section 1124 of the Bankruptcy

Code (collectively, the "Unimpaired Claims"), including, without limitation, claims of (i) the

Debtors' prepetition suppliers of goods and services; (ii) potential lienholders; (iii) advertisers;

(iv) authors and licensors; (v) rent and utility service providers; (vi) external data and technology

support service providers; and (vii) consultants, legal advisors (except for those professionals

subject to filing fee applications) and auditors that are not addressed in the First Day Motions

(collectively, the "General Unsecured Creditors").   In exchange, the Debtors may, as appropriate

and necessary, seek agreements from General Unsecured Creditors receiving payment on their

Unimpaired Claims to continue to extend prepetition trade credit terms to the Debtors for the

duration  of these chapter 11 cases.

        64.      The overall purpose of these chapter 11 cases and the Prepackaged Plan is

to implement a consensual balance sheet restructuring for the Debtors with payment in full to all

of the Debtors' unsecured creditors.  The Prepackaged Plan will provide the financial stability to

allow the Debtors to continue their efforts to maintain and enhance their position as a leading

publishing company in the United States.  However, the Debtors maintain relationships with a

wide variety of General Unsecured Creditors, and any loss of confidence regarding the

Company's ability to honor its obligations to them would undermine the goals of the

Prepackaged Plan by disrupting the Debtors' business and reducing the value of the Debtors'

estates.  Accordingly, granting the requested relief would maximize the value of the Debtors'

estates in furtherance of the goals of this reorganization process.

        65.      Granting the requested relief would also facilitate a smooth transition into

and out of bankruptcy by preserving the Company's relationships with its General Unsecured

Creditors and enhancing the Debtors' credibility with its various constituencies.  Furthermore,

payment of certain of the Unimpaired Claims relate to deliveries of goods to the Debtors within

the twenty (20) days prior to the Petition Date, should be afforded administrative expense

priority status under section 503(b)(9) of the Bankruptcy Code and paid in full upon the effective

date of any proposed plan of reorganization.  As a result, granting the relief requested with

respect to these claims is merely an extension and acceleration of the required treatment under

any proposed plan.  In addition, the requested relief is contemplated by the Amended Procedural

Guidelines for Prepackaged Chapter 11 Cases in the United States Bankruptcy Court for the

Southern District of New York dated November 24, 2009 and no parties in interest will be

prejudiced because all Unimpaired Claims will be paid in full under the Prepackaged Plan.

Accordingly, the Debtors request approval of the Prepetition Claims Motion.

<div align="center">(c)      <b>Taxes Motion</b></div>

66.      By the taxes motion (the "<u>Taxes Motion</u>") the Debtors request entry of an

order authorizing (but not directing) the Debtors to pay the relevant Taxing Authorities: (i) any

Taxes that have accrued, but were not yet due and owing or were not paid in full, as of the

Petition Date; and (ii) any prepetition Taxes that arose prior to the Petition Date that become due

and owing during the pendency of the chapter 11 cases in the ordinary course of business.  The

Debtors also seek authority, in their discretion, to satisfy any Audit Amounts in the ordinary

course of business and request that the Court authorize financial institutions to honor and process

transfers, deposits, or checks issued by any of the Debtors on account of any prepetition Taxes

that have not cleared as of the Petition Date.

67.      The Debtors estimate that approximately $18 million in payroll taxes and

$300,000 in remaining Taxes will come due during the course of these chapter 11 cases,

exclusive of any Taxes that may have been paid prior to the Petition Date but had not yet cleared

as of the Petition Date.  Some, if not all, of the Taxing Authorities may initiate an audit of the

Debtors if the Taxes are not paid on time.  Such audits would unnecessarily divert the Debtors'

attention away from the reorganization process and result in unnecessary expenses.  Moreover, if

the Debtors do not pay such amounts in a timely manner, the Taxing Authorities may attempt to

suspend the Debtors' operations, file liens, seek to lift the automatic stay or pursue other

<div align="center">26</div>

remedies could materially and immediately harm the Debtors' estates.  In addition, a portion of

the Taxes may be entitled to priority status and are entitled to payment in full on the effective

date of any plan of reorganization.  Paying such Taxes in the ordinary course will save the

Debtors the potential interest expense (and penalties) that might otherwise accrue if the Taxes

were not paid.  The Taxing Authorities could also assert that certain of the Taxes are "trust fund"

taxes that the Debtors are required to collect from third parties and hold in trust for the Taxing

Authorities' benefit and that such Taxes are not property of the estate.  As a result, payment of

such Taxes would not prejudice the rights of any of the Debtors' other creditors.

68.    I believe the Debtors' failure to pay the Taxes and Audit Amounts could

have a material adverse impact on their ability to operate in the ordinary course of business, and

thus harm the reorganization efforts to the detriment of all parties in interest.  Accordingly, the

Debtors request approval of the Taxes Motion.

### (d)    Insurance Motion

69.    By this motion (the "Insurance Motion"), the Debtors seek authority to (i)

continue their workers' compensation insurance program and policies for claims arising from or

related to the workers' employment with the Debtors (the "Workers Compensation Program");

(ii) continue performing under general liability, automobile, global property damage liability,

employer liability, umbrella and excess liability, media professional liability, fiduciary liability,

crime, kidnap and ransom, real property damage, and directors' and officers' liability

(collectively, the "Insurance Programs" and with the Workers Compensation Program, the

"Programs"); (iii) to the extent necessary, renew the Programs, all in accordance with the same

practices and procedures that were in effect before the Petition Date; and (iv) pay all premiums,

deductibles and all other obligations arising under or in connection with the Programs

(collectively, the "Insurance Obligations") that were due and payable or related to the period

before or after the Petition Date.  The Debtors also seek an order directing the Debtors' banks to

honor, process, and pay, to the extent funds are available in their accounts, any checks or wire

transfer requests issued by the Debtors to satisfy the Insurance Obligations.

70.    The Debtors are current on their prepetition premium and deductible

payments for the Insurance Programs as of the Petition Date; however to the extent a premium or

deductible payment relating to a period prior to the Petition Date is outstanding with respect to

the Programs, the Debtors seek authority to make such payment.

71.    As of the Petition Date, the Debtors believe they owe approximately

$55,000 in Workers Compensation Program premium payments.  The Debtors seek relief to

make these payments in the ordinary course.  The Debtors seek this authority in recognition of

the critical necessity of keeping the Workers Compensation Program in place, and out of concern

that delay in making such payments may have irreversible adverse consequences for the Debtors'

coverage under the Workers Compensation Program.

72.    The Insurance Programs are essential to the preservation of the Debtors'

businesses, properties and assets, and in many cases the coverage is required by various

regulations, laws and contracts that govern the Debtors' business conduct.  If the Debtors are

unable to continue making payments under the Insurance Programs, the Insurance Programs may

be terminated.  The Debtors would then be required to obtain replacement insurance on an

expedited basis and at significant cost to the estates.  If the Debtors were required to obtain

replacement insurance and to pay a lump sum premium for such insurance in advance, this

payment may be the same or greater than what the Debtors currently pay.  Even if the Insurance

Programs were not ultimately terminated, any interruption of payments would severely and

adversely affect the Debtors' ability to enter into future policies and finance premiums for future

policies.

73.     In view of the importance of maintaining the insurance coverage with

respect to their business activities and the preservation of the Debtors' cash flow by paying their

Insurance Obligations on a timely basis, the Debtors believe it is in their best interest and the best

interests of their estates for the Court to authorize the Debtors to honor their obligations under

the Insurance Programs.  Any other alternative would likely require considerable cash

expenditures and would be detrimental to the Debtors' chapter 11 efforts.

### (e)     Wages Motion

74.     By this motion, the Debtors are seeking authority to (i) honor and pay all

pre-petition wages, salaries, commissions and other accrued compensation (collectively, the

"Wages") to their employees, project employees and independent contractors; (ii) honor and pay

certain expenses that employees incurred on behalf of the Debtors in the scope of the employees'

employment (the "Employee Business Expenses"); (iii) continue to honor certain other policies,

programs and benefits the Debtors provide to their employees in the ordinary course of business

(collectively, the "Benefits"); and (iv) honor and process the prepetition obligations with respect

to payroll taxes and deductions in accordance with the Debtors' policies and prepetition

practices.  The Debtors also request that all applicable banks and financial institutions be

authorized and directed to (i) honor prepetition payroll checks, drafts and transfers on or after the

Petition Date and (ii) process and honor all other checks and transfers issued for payments

related to Wages, Employee Business Expenses, Benefits, payroll taxes, and deductions.

75.     The Debtors have a current workforce of approximately 3,300 employees

nationwide - 3,245 of which are full time employees.  The Debtors also currently employ

approximately 581 independent contractors.  The vast majority of these employees and

independent contractors rely exclusively on their full compensation, benefits and reimbursement of their expenses to continue to pay their daily living expenses.  These employees and independent contractors will be exposed to significant financial difficulties if the Debtors are not permitted to pay the unpaid Wages and Benefits.  The Debtors believe that if they are unable to honor all such obligations immediately, employee morale and loyalty will be jeopardized at a time when such support is critical.

76.      The uninterrupted continuation of the Debtors' businesses is critically dependent upon a stable work force.  The Debtors believe any significant number of employee departures or deterioration in morale at this time will quickly and substantially adversely impact the Debtors' businesses and result in immediate and irreparable harm to the estates and their creditors.  If the Debtors are not authorized to continue to honor their pre-petition obligations to the employees and independent contractors in the ordinary course, there is a real risk that the employees and independent contractors would no longer support and maintain the operations of the Debtors, thereby crippling the Debtors' business operations and jeopardizing the prospects of a successful reorganization.  Consequently, the Debtors strongly believe it is critical that they be permitted to pay the pre-petition Wages and continue with their ordinary course Benefit programs, that were in effect prior to the Petition Date.

### (f)      Solicitation Motion

77.      By this motion, the Debtors are seeking authority to (I) schedule a combined hearing to consider (a) the approval of (1) the Disclosure Statement for the Prepackaged Joint Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code (the "Disclosure Statement") and (2) the Debtors' procedures with respect to the prepetition solicitation of votes to accept or reject the Prepackaged Joint Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code (the "Prepackaged Plan"); and (b)

confirmation of the Prepackaged Plan (the "Confirmation Hearing"); and (II) approving the form

of notice of the combined Disclosure Statement hearing and the Confirmation Hearing (the

"Combined Hearing").

78.      I am advised that section 105(d)(2)(B)(vi) of the Bankruptcy Code

authorizes a bankruptcy court to combine a hearing on the disclosure statement with a hearing on

confirmation of a plan of reorganization.  The Debtors submit that such a Combined Hearing in

these chapter 11 cases will further the interests of judicial economy and maximize value to the

Debtors' estates.  The Debtors seek a speedy and orderly confirmation in order to retain their

customer base, maintain the trust of their employees, preserve lenders' confidence in their ability

to reorganize, facilitate a prompt distribution to their stakeholders and minimize disruption to the

Debtors' businesses.

79.      Prior to the Petition Date, the Debtors solicited votes on the Prepackaged

Plan from holders of claims in Class 3 and equity interests in Class 8 – the only impaired classes

entitled to vote to accept or reject the Prepackaged Plan.  According to KCC, voting results

indicate that Classes 3 and 8 have thus far voted overwhelmingly to accept the Prepackaged Plan.

The Debtors believe that because the Prepackaged Plan will soon be accepted by the only two

classes entitled to vote thereon, there is no reason to delay consideration of the adequacy of the

Disclosure Statement, the solicitation procedures and the Prepackaged Plan.

80.      The Debtors also believe that allowing them to serve the Combined

Hearing notice (the "Notice") only on Impaired Classes, rather than all parties-in-interest, will

save the Debtors time and expense, both to the benefit of their creditors.  In addition, the Debtors

believe that publishing the Notice in the national edition of The Wall Street Journal at least two

weeks prior to the Combined Hearing will provide sufficient notice to presently unknown

creditors of the Debtors. The Debtors believe that in light of the prepetition negotiations with the

Senior Creditors and for the reasons set forth above, the proposed procedures for serving the

Notice will provide sufficient notice of the commencement of the chapter 11 cases, the date, time

and place of the Combined Hearing, and the procedures for objecting to the adequacy of the

Disclosure Statement and solicitation procedures or confirmation of the Prepackaged Plan.

81.    Furthermore, the Debtors submit that providing a copy of the Disclosure

Statement and the Prepackaged Plan to all holders of claims against, or equity interests in, the

Debtors, is unnecessary and unduly burdensome on the Debtors' estates. The Debtors

respectfully request that the Court waive the requirements with respect to unimpaired classes and

the impaired class deemed to reject under the Prepackaged Plan. The Notice shall state that any

creditor or other party-in-interest who desires to receive a copy of the Disclosure Statement

and/or the Prepackaged Plan may obtain a copy thereof from the website to be maintained by

KCC, the Debtors' voting agent (www.kccllc.net/hmhco). In addition, the Debtors will provide a

copy of the Disclosure Statement and the Prepackaged Plan to (i) the Office of the United States

Trustee; (ii) the Securities and Exchange Commission; (iii) counsel to any committee appointed

by the United States Trustee (if any); and (iv) the District Director of the Internal Revenue

Service.

82.    The Debtors undertook or caused to be undertaken the solicitation

procedures described in the Solicitation Motion. The Debtors believe that the solicitation

procedures are in accordance with the Bankruptcy Code and the Bankruptcy Rules and should be

approved.

83.    I have reviewed the Solicitation Motion and believe that the facts stated

therein are accurate to the best of my knowledge, information, and belief. I further believe that

entry of the order approving the Solicitation Motion and the Confirmation Order are in the best interests of the Debtors, their estates, and all parties-in-interest.

### (g)    DIP Motion

84.    Contemporaneously with negotiating a restructuring support agreement with the Informal Creditor Group, the Debtors, through Blackstone, have solicited new financing proposals from various financial institutions, private equity firms, and hedge funds which have historically been providers of debtor-in-possession and exit financing, including the Debtors' existing capital structure constituents.

85.    The Debtors' efforts to obtain debtor-in-possession and exit financing were complicated by the Debtors' high level of secured debt, the fact that substantially all of the Debtors' assets are encumbered and the challenging market for any type of financing.

86.    Facing an increasing liquidity shortfall, the Debtors and Blackstone began good faith negotiations with parties who were viewed as qualified to provide the Debtors with fully committed debtor-in-possession and exit financing in the short timeframe required.  The Debtors and Blackstone solicited interest from no less than seven potential lenders, including several prepetition secured lenders, regarding their willingness to provide postpetition and exit financing to the Debtors.  After active due diligence and management presentations, only a limited number of the potential lenders expressed interest in committing to any term financing, and none was willing to commit postpetition financing on an unsecured or junior secured basis.

87.    Out of all the financing proposals, Citibank Global Markets Inc. was the only party to submit a binding commitment letter with associated term sheet, which evolved into the proposed debtor-in-possession and exit financing facilities (the "DIP/Exit Facilities").

88.    The Debtors' business is affected by seasonal swings in liquidity, with cash needs highest in the second and third quarters of each calendar year.  As negotiated, the

33

DIP/Exit Facilities, which permit the Debtors to obtain up to $500 million of available

postpetition and exit financing, will allow the Debtors to stabilize their operations, establish

prudent cash balances and meet their liquidity needs, both postpetition and after emergence from

these chapter 11 cases.  The proceeds of the DIP/Exit Facilities will be used to refinance the

Prepetition Receivables Facility, pay vendors and suppliers while minimizing disruption to day-

to-day operations, fund restructuring costs and necessary capital expenditures, satisfy working

capital and operational needs, and make the adequate protection payments.  In determining the

amount of the adequate protection payments, the Debtors took into consideration, among other

things, the following factors:  (i) the lenders' agreement under the First Lien Credit Facility to

forbear on interest payments in the amount of approximately $15.1 million due on May 10, 2012,

to alleviate the liquidity pressures facing the Debtors; (ii) the amount of accrued and unpaid

interest through June 30, 2012 with respect to the Prepetition Secured Debt, which is

approximately $59 million (including the $15.1 million interest payment noted above); (iii) the

Informal Creditor Group's consent to being primed by the DIP/Exit Facilities and agreement to

forego receipt of periodic payments during these chapter 11 cases; and (iv) the prepetition

secured creditors' overall consent under the Prepackaged Plan to the complete equitization of the

Prepetition Secured Debt.

        89.     The Debtors' negotiated the terms of the DIP/Exit Facilities at arm's

length and in good faith, with all parties represented by counsel.  The Debtors believe that the

negotiated terms, including various commitment and agency fees thereunder, are fair, reasonable

and adequate and the best available given the Debtors' circumstances.  Indeed, the terms and

conditions of the funding to be provided under the proposed DIP/Exit Facilities are more

favorable – or as favorable – to the Debtors (on the  basis of price and economics and other

factors) than those available from other lenders.  In addition, the Informal Creditor Group does not object to the terms of the DIP/Exit Facilities.

90.     The proposed DIP/Exit Facilities will provide immediate access to capital needed to, among other things, continue the operation of the businesses, maintain business relationships with vendors and customers,  and pay employees and vendors while minimizing disruptions to day-to-day operations, thereby stabilizing the Debtors' operations.  The proposed DIP/Exit Facilities also permit the Debtors to establish prudent cash balances and meet their liquidity needs while in chapter 11 and post-emergence.

91.     After careful consideration, the Debtors view the DIP/Exit Facilities  as necessary under the circumstances to preserve value for creditors and stakeholders.  The DIP/Exit Facilities provide Debtors the liquidity they need to operate their businesses during these chapter 11 cases, thus permitting the Debtors to effectively restructure, while establishing an appropriate cash balance for the company of this size.  Without postpetition financing, the Debtors would be unable to operate their businesses as a going concern, which would significantly impair the value of the Debtors' assets to the detriment of all constituents. Furthermore, by obtaining postpetition financing, the Debtors will be in a position to preserve the value of their assets for the benefit of all of the Debtors' stakeholders.

92.     Without access to the DIP/Exit Facilities, the Debtors will be irreparably harmed.

## V.

## Information Required by Local Bankruptcy Rule 1007-2

93.     Local Rule 1007-2 requires certain information related to the Debtors, which I have provided in the exhibits attached hereto as Exhibits B, C, D, E, F, G, H, I, J, K, L

and <u>M</u>.  Specifically, these exhibits contain the following information with respect to the

Debtors:[5]

- Exhibit <u>A</u> – Corporate Organizational Chart

- Pursuant to Local Rule 1007-2(a)(3), Exhibit <u>B</u> hereto provides the following information: the names and addresses of the members of, and attorneys for, any committee organized prior to the Petition Date and a brief description of the circumstances surrounding the formation of the committee and the date of its formation.

- Pursuant to Local Rule 1007-2(a)(4), Exhibit <u>C</u> hereto provides the following information with respect to each of the holders of the Debtors' 20 largest unsecured claims on an consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); telephone number; the name(s) of person(s) familiar with the Debtors' account; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

- Pursuant to Local Rule 1007-2(a)(5), Exhibit <u>D</u> hereto provides the following information with respect to each of the holders of the five largest secured claims against the Debtors: the creditor's name, address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim and whether the claim or lien is disputed.

- Pursuant to Local Rule 1007-2(a)(6), Exhibit <u>E</u> hereto provides a summary of the Debtors' assets and liabilities.

- Pursuant to Local Rule 1007-2(a)(7), Exhibit <u>F</u> attached hereto provides information on the Debtors' outstanding publicly held securities.

- Pursuant to Local Rule 1007-2(a)(8), Exhibit <u>G</u> hereto provides the following information with respect to any property in possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for

---

[5] The information contained in the Exhibits attached to this declaration shall not constitute an admission of liability by, nor is it binding on, the Debtors.  Except as provided herein or in the orders approving the DIP Facility, the Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt.  The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

such entity:  the name, address, and telephone number of such entity and the court in which any proceeding relating thereto is pending.

- Pursuant to Local Rule 1007-2(a)(9), Exhibit H hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their business.

- Pursuant to Local Rule 1007-2(a)(10), Exhibit I hereto sets forth the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

- Pursuant to Local Rule 1007-2(a)(11), Exhibit J hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment or seizure of their property may be imminent.

- Pursuant to Local Rule 1007-2(a)(12), Exhibit K hereto sets forth a list of the names of the individuals who comprise the Debtors' existing senior management, their 36

- tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

- Pursuant to Local Rule 1007-2(b)(1)-(2)(C), Exhibit L hereto provides the estimated amount of payroll to the Debtors' employees (not including officers, directors, and stockholders) and the estimated amounts to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors, for the 30 day period following the filing of the Debtors' chapter 11 petitions.

- Pursuant to Local Rule 1007-2(b)(3), Exhibit M hereto provides a schedule for the 30-day period following the filing of these chapter 11 cases, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  May 21, 2012

_____/s/ William F. Bayers_____
Name:  William F. Bayers
Title:   Executive Vice President and General Counsel

## Exhibit A
## COMPANY STRUCTURE CHART



## Exhibit B

### Unofficial Committees

Pursuant to Local Rule 1007-2(a)(3), the following is a list of the names and addresses of the members and attorneys for any *ad hoc* committee organized prior to the Petition Date.

The Informal Creditor Group was formed in or around March 2012 to collaborate with HMH on the terms of a consensual restructuring.

| Committee | Committee Member | Counsel for Committee |
|---|---|---|
| Informal Creditor Group | Anchorage Capital Group, L.L.C.<br><br>610 Broadway, 6th Floor<br>New York, NY 10012 | **Ira Dizengoff, Esq. and Philip Dublin, Esq.**<br>Akin Gump Strauss Hauer & Feld, LLP<br>One Bryant Park<br>New York, New York 10036 |
|  | Apollo Management Holdings, L.P.<br><br>9 West 57th Street, 43rd Floor<br>New York, NY 10019 |  |
|  | Avenue Capital Group<br><br>399 Park Avenue<br>New York, NY 10022 |  |
|  | Blackrock Financial Management, Inc.<br><br>55 E. 52nd Street<br>New York, NY 10055 |  |
|  | Knighthead Capital Management LLC.<br><br>623 Fifth Avenue, 29th Floor<br>New York, NY  10022 |  |
|  | Oakhill Advisors, L.P.<br><br>1114 Avenue of the Americas, 27th Floor |  |

| | | |
|---|---|---|
| | New York, NY 10036 | |
| | Paulson & Co., Inc.<br><br>1251 Avenue of the Americas, 50th Fl.<br>New York, NY 10020 | |
| | Q Investments, L.P.<br><br>301 Commerce Street Suite 3200<br>Fort Worth, TX 76102-4140 | |
| | WCAS Fraser Sullivan Investment Management, LLC<br><br>400 Madison Ave, 9th Floor<br>New York, NY 10017 | |

## Exhibit C

**Consolidated List of the Holders of the 20 Largest Unsecured Claims of the Debtors**

Pursuant to Local Rule 1007-2(a)(4), the following provides information with respect to the holders of the 20 largest unsecured claims against the Debtors on a consolidated basis.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.  The schedule estimates outstanding claim amounts (including principal and interest) as of May 18, 2012.

| Creditor | Contact Mailing Address | Telephone Number | Person Familiar with Account | Nature of Claim | Amount of Claim (as of May 18, 2012) | Status of Claim |
|---|---|---|---|---|---|---|
| RRD- Receivables Inc. | P.O. Box 13654 Newark, NJ 07188-3654 | 630-322-6586 | Kristen Polewski | Trade Debt | $20,298,620 | Unliquidated |
| WL-Williams Lea Inc. | 1 Dag Hammarskjold Plaza, 8th Floor New York, NY 10017 | 212-351-9119 | Matt Alcorn | Trade Debt | $20,960,119 | Unliquidated |
| Marshall Cavendish International (s) PTE | Times Centre 1 New Industrial Road Singapore 536196 | 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-9521 | Joy Tan | Trade Debt | $6,739,080 | Unliquidated |
| RRD-Asia Printing Solutions | 3 On Yiu Street, Shek Mun, NT Hong Kong | 781-505-6006 | Eileen R. Ly | Trade Debt | $5,615,703 | Unliquidated |
| Kue Digital Inc., DBA Global Scholar | 1100 112th Avenue NE Suite 100 South Building Bellevue, WA 98004 | 425-646-5776 | Kal Raman | Production Vendor | $4,500,00 | Unliquidated |
| Bulkley Dunton Publishing Group | P.O. Box 403565 Atlanta, GA 30384-3656 | 212-863-1835 | Tony V Occhiuto | Trade Debt | $4,068,807 | Unliquidated |
| Cengage Learning | 5191 Natorp Blvd. Mason, OH 45040 | 613-968-4195 | Christine Vitanopoulos | Trade Debt | $3,326,774 | Unliquidated |
| Central National Gottesman Inc. (Lindenmeyr) | 990 Washington Street Dedham, MA 02026 | 781-326-2121 | Steven Wright | Manufacturing /Paper Supplier | $2,562,186 | Unliquidated |

| Creditor | Contact Mailing Address | Telephone Number | Person Familiar with Account | Nature of Claim | Amount of Claim (as of May 18, 2012) | Status of Claim |
|---|---|---|---|---|---|---|
| Cognizant Technology Solutions | 500 Frank W. Burr Blvd Teaneck, NJ 07666 | 201-923-2445 | Badri Ramanujachari | Third Party IT Supplier | $2,090,609 | Unliquidated |
| American Express | P.O. Box 410406 Salt Lake City, UT 84141 | 512-207-6860 | Donna Janeczko | Trade Debt | $1,700,639 | Unliquidated |
| ADP National Account Service | 99 Jefferson Rd Parsippany, NJ 07054 | 801-956-7656 | Gayle Kuhr | Services Vendor | $1,632,632 | Unliquidated |
| Trendset Inc. | 4 Interchange Blvd. Greenville, SC 29607-5700 | 864-527-4383 | Deanna Moore | Transportation | $1,557,715 | Unliquidated |
| Phoenix Color Corp | 11631 Caroline Road Philadelphia, PA 19154 | 800-632-411 x 2507 | Jennifer Dick | Trade Debt | $1,548,153 | Unliquidated |
| Texas Education Agency | 1701 N. Congress Ave. Austin, TX 78701 | 512-463-9734 | Robert Scott | Trade Debt | $1,216,311 | Unliquidated |
| APC Workforce Solutions LLC | 420 S. Orange Avenue Suite 600 Orlando, FL 32801-4902 | 407-770-6176 | Jinnene Marin | Temporary Staffing | $906,200 | Unliquidated |
| McKinsey & Company Inc. | P.O. Box 7247-7255 Philadelphia, PA 19170-7255 | 202-662-0939 | William Wolf | Consulting | $897,000 | Unliquidated |
| Penguin Group USA | 1 Lake St. Upper Saddle River, NJ 07458 | 212-366-2000 | Laura Ceminaro | Trade Debt | $774,992 | Unliquidated |
| Laserwood Private Limited | P.O. Box 2865 Buffalo, NY 14209 | 508-520-0262 | Mark O'Brien | Production Vendor | $665,081 | Unliqidated |
| Six Red Marbles | P.O. Box 37038 Baltimore, MD 21208 | 857-362-0018 | Katie Turcot | Production Vendor | $446,696 | Unliquidated |
| Edu 2000 America | 5743 Corsa Ave Suite 222 Ventura, CA 91362 | 818-516-2178 | Rob Fiance | Trade Debt | $327,495 | Unliquidated |

## Exhibit D

### Consolidated List of the Holders of the Largest Secured Claims

Pursuant to Local Rule 1007-2(a)(5), the following lists the Debtors' largest secured claims on a consolidated basis.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. Except as otherwise provided in the DIP Orders, the Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. The schedule estimates outstanding claim amounts (including principal and interest) as of May 14, 2012 unless otherwise provided.

| Creditor | Contact Mailing Address | Amount of Claim | Type of Collateral | Book Value of Collateral |
|---|---|---|---|---|
| Citibank, N.A., as successor collateral agent for certain secured parties[1] | Citibank, N.A. 1615 Brett Road, Ops III New Castle, DE 19720 Attn: Todd McBride Fax: 212-994-0961 | First Lien Term Loan $2,589.8 mm First Lien Termed Revolver $237.5 mm | Blanket Lien on materially all the assets (subject to customary permitted liens and other exclusions) (the "Credit Agreement Collateral"). | $ 2,696.9 mm (including intangible assets such as good will, trade names, and publishing rights) |
| The Bank of New York Mellon Trust Company, N.A., as collateral agent for certain secured parties[2] | The Bank of New York Mellon Trust Company, N.A. 525 William Penn Place, 38th Floor Pittsburgh, PA 1525 Attn: Corporate Trust Administration | 10.5% Notes due 2019 $314.9 mm | Blanket Lien over the Credit Agreement Collateral ranking equally and ratably with the above-entry. | $2,696.9 mm (including intangible assets such as goodwill, trade names, and publishing rights) |

---

[1]   The Creditor holds this secured claim as successor collateral agent for the secured parties under that certain First Lien Credit Agreement dated as of December 12, 2007 (as amended and restated supplemented or otherwise modified from time to time) among Houghton Mifflin Harcourt Publishers Inc. ("HMH Publishers Inc."), HMH Publishers LLC, Houghton Mifflin Harcourt Publishing Company (collectively, the "Borrower") HMH Holdings (Delaware), Inc, HMH Publishing Company, the lenders party there, Citibank, N.A., as administrative Successor, as collateral agent, and related documents.

[2]   The Creditor holds this secured claim as collateral agent for the holders of certain notes (the "10.5% Notes") issued by HMH Publishers Inc. and Houghton Mifflin Harcourt Publishing Company under that certain Indenture dated May 26, 2011. The 10.5% Notes are secured on an equal and ratable basis with the obligations issued under the First Lien Credit Agreement referred to in the immediately preceding footnote.

| Creditor | Contact Mailing Address | Amount of Claim | Type of Collateral | Book Value of Collateral |
|---|---|---|---|---|
| | Fax:  412-234-7535 | | | |
| Wells Fargo Bank, National Association, a national association, as issuer of certain letters of credit | Wells Fargo Bank, National Association Wholesale Loan Servicing East 7711 Plantation Road Roanoke, VA  24019 Fax:  704-715-0099  *With a copy to*  Wells Fargo Bank National Association Regional Commercial Banking Office 101 Federal St. Suite 2020 Boston, MA  02110 Attn:  Jeffrey Kinney Fax:  617-723-0647 | L/C Facility $26.8 mm outstanding as of May 14, 2012 | First-priority security interest in HMH Publishers, Inc.'s bank account number 2000052726974. | $26.8 mm |

<u>**Exhibit E**</u>

**Summary of the Debtors' Assets and Liabilities**

       The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated with its affiliated debtors as of March 31, 2012. The following financial data shall not constitute an admission of liability by the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt or challenge the priority, nature, amount or status of any claim or debt.

<u>**Summary of Debtors' Assets and Liabilities**[1]</u>:

| | |
|---|---|
| Total Assets (Book Value): | $ 2,680 mm |
| Total Liabilities: | $ 3,535 mm |

<u>**As comprised of**[2]</u>:

Houghton Mifflin Harcourt Publishers Inc.

| | | |
|---|---|---|
| Total Assets (Book Value): | $ | 12 mm |
| Total Liabilities: | $ | - mm |

Houghton Mifflin Harcourt Publishing Company

| | | |
|---|---|---|
| Total Assets (Book Value): | $ | 2,407 mm |
| Total Liabilities: | $ | 492 mm |

Greenwood Publishing Group, Inc.

| | | |
|---|---|---|
| Total Assets (Book Value) | $ | 186 mm |
| Total Liabilities | $ | 4 mm |

The Riverside Publishing Company

| | | |
|---|---|---|
| Total Assets (Book Value): | $ | 73 mm |
| Total Liabilities: | $ | 31 mm |

Advanced Learning Centers, Inc.

| | | |
|---|---|---|
| Total Assets (Book Value): | $ | 7 mm |
| Total Liabilities: | $ | 1 mm |

---

[1]    Total Liabilities includes principal and interest owed on account of the First Lien Facility and the 10.5% Notes as of March 31, 2012.

[2]    These figures do not reflect liabilities on account of the First Lien Facility or the 10.5% Notes.

## Exhibit F

**Publicly Held Securities**


   Pursuant to Local Rule 1007-2(a)(7), listed below are the number and classes of shares of stock, debentures, or other securities of the Debtors that are publicly held and the number of holders thereof, listing separately those held by each of the Debtors' officers and directors and the amounts so held.

   Pursuant to Local Rule 1007-2(a)(7), to the best of my knowledge, information and belief, there are no publicly held securities.

## Exhibit G

### Debtors' Property Not in Debtors' Possession

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property, as of the Petition Date[1], that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.[2]

| Type of Property | Person or Entity in Possession of Property | Approximate Value | Address & Telephone Number of Person or Entity in Possession of Property |
| --- | --- | --- | --- |
| Inventory | Florida School Book | $12,076,837 | Robin Fields<br>1125 Ellis Rd. N<br>Jacksonville, FL 32254<br>Ph: (904) 781-7191 x221 |
| Inventory | Northwest Textbook | $2,538,184 | Linda Leighty<br>17970 Southwest McEwan Rd<br>Portland, OR 97224<br>Ph: (503) 639-3193 |
| Inventory | Archway - Oklahoma | $2,466,104 | Kenia Ruiz<br>5600 SW 36th St<br>Oklahoma City, OK 73179<br>Ph: (405) 681-9588 x105 |
| Inventory | Mountain State School Book | $2,418,113 | Linda Leighty<br>17970 Southwest McEwan Rd.<br>Portland, OR 97224<br>Ph: (503) 639-3193 |
| Inventory | Tennessee Book Company | $2,184,508 | Mandy Bolin<br>1550 Heil Quaker Blvd |

---

[1]    This information was gathered on April 30, 2012. The Debtors do not believe that there has been appreciable changes in inventory amounts between April 30, 2012 and the Petition Date.

[2]    In addition to the properties listed above, in the ordinary course of business, property of the Debtors is likely to be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, secured creditors or agents. Through these arrangements, the Debtors' ownership interest is not affected. In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceedings affecting such property would be impractical if not impossible.

| | | | |
|---|---|---|---|
| | | | La Vergne, TN  37086<br>Ph: (615) 213-7959 |
| Inventory | Publishers Warehouse | $1,985,759 | Patsy Cato<br>2700 Crestwood Blvd<br>Birmingham, AL  35210<br>Ph: (205) 956-2078 |
| Inventory | School Book Supply LA | 1,506,292 | Chris Davis<br>9380 Ashland Rd., Ste. 190<br>Gonzales, LA 70737<br>Ph: (225) 647-0717 |
| Inventory | School Book Supply Co. | $1,491,254 | David Jeffreys<br>4365 Michael Avalon St<br>Jackson, MS  39209<br>Ph: (601) 352-7272 |
| Inventory | Educators Book Depository | $1,393,420 | Claira Burns<br>6700 Sloane Dr<br>Little Rock, AR  72206<br>Ph: (501) 490-0007 |
| Inventory | R L Bryan Company | $950,727 | Steve Harper<br>301 Greystone Blvd.<br>Columbia, SC  29210<br>Ph: (803).343.6708 |
| Inventory | Archway – New Mexico | $926,756 | Kenia Ruiz<br>1600 1st Street NW<br>Albuquerque, NM 87102<br>Ph: (405) 681-9588 x105 |
| Inventory | The James & Law Co. | $558,229 | Gib Brown<br>217 W. Main St<br>Clarksburg, WV  26301<br>Ph: (304) 624-7401 |
| Inventory | Caxton Printers | $112,403 | Gayla Tyson<br>312 Main Street<br>Caldwell, ID 83605<br>Ph: (208) 459-7421 |
| Inventory | Peribo Pty Limited | $24,487 | Michael Coffey<br>58 Beaumont Rd.<br>Mt Kuring-Gai, NSW 2080<br>Australia<br>Tel. +61 (0) 2 9457 0011<br>Fax +61 (0) 2 9457 0022 |
| Inventory | Resolve Corporation – TX | $0 – Cengage | Not HMH Inventory |

| Inventory | PBD – GA | $0 – Cengage | Not HMH Inventory |

## Vendor Locations

| Type of Property | Person or Entity in Possession of Property | Approximate Value | Address & Telephone Number of Person or Entity in Possession of Property |
|---|---|---|---|
| Inventory | RRD - Willard | $1,494,940 | RRD - Willard<br>1145 Conwell Ave<br>Willard, OH 44890<br>Fax: (419) 933-5520<br>Ph: (419) 933-5450 |
| Inventory | RRD – Jefferson City | $1,092,378 | RRD – Jefferson City<br>321 Wilson Drive<br>Jefferson City, MO 65109<br>Fax: (573) 635-5745<br>Ph: (617) 247-7007 |
| Inventory | RRD-GM-Intl Only | $1,061,803 | RRD-GM-Intl Only<br>Tengfei Industrial Bldg<br>Shenzhen, Guangdong<br>PRC 518038, 190 CN |
| Inventory | RRD – Crawfordsville | $774,038 | RRD – Crawfordsville<br>600 State Road 32 West<br>Crawfordsville, IN 47933 |
| Inventory | RRD – Owensville | $493,253 | RRD – Owensville<br>1005 Commercial Drive<br>Owensville, MO 65066<br>Fax: (573) 437-3134<br>Ph: (537) 437-1434 |
| Inventory | WL-Webcrafters-Madison-Fordem Facil | $402,312 | WL-Webcrafters-Madison-Fordem Facil<br>2211 Fordem Ave<br>Madison, WI 53704 |
| Inventory | RRD – Midway | $377,304 | RRD – Midway<br>800 Midway Rd<br>Menasha, WI 54952 |
| Inventory | WL-Courier-Kendallville | $366,518 | WL-Courier-Kendallville<br>2500 Marion Drive |

G-3

| | | | Kendallville, IN 46755<br>Ph: (312) 681-6454 |
|---|---|---|---|
| Inventory | RRD – Asia Printing Solutions | $341,634 | RRD – Asia Printing Solutions<br>Unit 2307-10 23/F<br>NT HK |
| Inventory | RRD – Harrisonburg South | $272,911 | RRD – Harrisonburg South<br>1025 Willow Springs Road<br>Harrisonburg, VA 22801<br>Fax: (540) 564-3982<br>Ph: (540) 564-3942 |
| Inventory | WL–Mercury Print Productions–Roches | $213,223 | WL-Mercury Print Productions-Roches<br>515 Lee Road<br>Rochester, NY 14606<br>Ph: (312) 681-6454 |
| Inventory | WL-Nordica-Guangzhou-Guangzhou Plan | $182,174 | WL-Nordica-Guangzhou-Guangzhou Plan<br>No. 349 Caixin Rd., Man Sang Industrial<br>Guangzhou, CN<br>Ph: (312) 681-6454 |
| Inventory | WL-Press of Ohio-Brimfield-Ohio Div | $111,864 | WL-Press of Ohio-Brimfield-Ohio Div<br>3765 Sunnybrook Road<br>Kent, OH 44240<br>Ph: (312) 681-6454 |
| Inventory | WL-Edwards Brothers-Ann Arbor | $87,973 | WL-Edwards Brothers-Ann Arbor<br>2500 South State Street<br>Ann Arbor, MI 48104<br>Ph: (312) 681-6454 |
| Inventory | RRD-GM-Domestic Only | $87,835 | RRD-GM-Domestic Only<br>675 Brighton Beach Road<br>Menasha, WI 54952<br>Fax: (312) 527-6240 |
| Inventory | WL-R W Patterson Printing-Benton | $86,423 | WL-R W Patterson Printing – Benton<br>1550 Territorial Rd<br>Benton Harbor, MI 49022<br>Ph: (312) 681-6454 |
| Inventory | WL-Bradford & Bigelow-Newburyport | $46,587 | WL-Bradford & Bigelow-Newburyport<br>3 Perkins Way |

| | | | Newburyport, MA 01950<br>Ph: (312) 681-6454 |
|---|---|---|---|
| Inventory | WL-Press of Ohio-Woodstock-DB Hess | $45,107 | WL-Press of Ohio-Woodstock-DB Hess<br>1530 McConnell Road<br>Woodstock, IL 60098<br>Ph: (312) 681-6454 |
| Inventory | WL-Dunn & Co Inc-Clinton (HQ) | $42,815 | WL-Dunn & Co Inc-Clinton (HQ)<br>75 Green Street<br>Clinton, MA 01510<br>Ph: (312) 681-6454 |
| Inventory | RRD-Reynosa/McAllen | $37,612 | RRD-Reynosa/McAllen<br>6800 S 33rd St<br>McAllen, TX 78503<br>Fax: (956) 618-6219<br>Ph: (956) 618-6233 |
| Inventory | WL-Turnkey Solutions-La Vista (HQ) | $34,238 | WL-Turnkey Solutions-La Vista (HQ)<br>12001 Cary Circle<br>La Vista, NE 68128<br>Ph: (312) 681-6454 |
| Inventory | WL-Transcontinental-Beauceville | $27,672 | WL-Transcontinental-Beauceville<br>150 181st Street<br>Beauceville, QC G5X 3P3<br>CA<br>Ph: (312) 681-6454 |
| Inventory | WL-TWP America-New York (HQ) | $25,630 | WL-TWP America-New York (HQ)<br>84 Wooster St<br>New York, NY 10012 SG<br>Ph: (312) 681-6454 |
| Inventory | WL-Quebecor World-Versailles | $20,439 | WL-Quebecor World-Versailles<br>100 US Bypass 60<br>Versailles, KY 40384<br>Ph: (312) 681-6454 |
| Inventory | RRD-Roanoke/Salem | $18,045 | RRD-Roanoke/Salem<br>6450 Technology Drive<br>Salem, VA 24153 |
| Inventory | WL-Courier-Westford | $16,387 | WL-Courier-Westford<br>22 Town Farm Road<br>Westford, MA 01886<br>Ph: (312) 681-6454 |

| Inventory | WL-Commercial Communications-Hartland | $16,239 | WL-Commercial Communications-Hartland 1225 Walnut Ridge Dr. Hartland, WI 53029 Ph: (312) 681-6454 |
|---|---|---|---|
| Inventory | RRD-Harrisonburg North | $13,267 | RRD-Harrisonburg North 1400 Kratzer Road Harrisonburg, VA 22801 |
| Inventory | WL-Edwards Brothers-Lillington- | $12,227 | WL-Edwards Brothers-Lillington-800 Edwards Drive Lillington, NC 27546 Ph: (312) 681-6454 |
| Inventory | Holum & Sons Co Inc | $11,982 | Holum & Sons Co Inc 740 N Burr Oak Dr Westmont, IL 60559 Fax: (630) 654-8222 Ph: (630) 654- 8222 |
| Inventory | Courier Companies Inc | $11,361 | Courier Companies Inc 3094 Lester Drive Kendallville, IN 46755 Fax: (260) 347- 9094 Ph: (260) 349- 6808 |
| Inventory | WL-Worzalla Publishing-Stevens Point | $9,884 | WL-Worzalla Publishing-Stevens Point 3535 Jefferson St. Stevens Point, WI 54481 Ph: (312) 681-6454 |
| Inventory | WL-Strategic Content Imaging Corp | $5,936 | WL-Strategic Content Imaging Corp 374 Starke Road Carlstadt, NJ 07072 Ph: (312) 681-6454 |
| Inventory | WL-Bind Rite Robbinsville LLC | $5,634 | WL-Bind Rite Robbinsville LLC 1 Applegate Drive South Robbinsville, NJ 08691 Ph: (312) 681-6454 |
| Inventory | WL-Leo Paper Products-Guangzhou (HQ) | $5,119 | WL-Leo Paper Products-Guangzhou (HQ) Industrial Develop Area Xijang River Gulao Town  Heshan Guangzhou,  CN Ph: (312) 681-6454 |
| Inventory | WL-Edwards Brothers-Geneva-Digital | $5,085 | WL-Edwards Brothers-Geneva-Digital 1900 S Batavia Ave Geneva, IL 60134 Ph: (312) 681-6454 |
| Inventory | WL-Toppan Excel (Hongkong) Co Ltd | $4,967 | WL-Toppan Excel (Hongkong) Co Ltd 20th Fl 169 Electric Rd |

| | | | |
|---|---|---|---|
| | | | North Point,   HK<br>Ph: (312) 681-6454 |
| Inventory | WL-ETA/Cuisenaire-Vernon Hills | $4,106 | WL-ETA/Cuisenaire-Vernon Hills-<br>500 Greenview Ct<br>Vernon Hills, IL 60061<br>Ph: (312) 681-6454 |
| Inventory | Stromberg Allen & Co | $4,010 | Stromberg Allen & Co<br>18504 W Creek Drive<br>Tinley Park, IL 60477<br>Fax: (773) 847-6673<br>Ph: (773) 847-7131 |
| Inventory | WL-Quebecor World-Fairfield | $3,384 | WL-Quebecor World-Fairfield<br>100 N Miller Street<br>Fairfield, PA 17320<br>Ph: (312) 681-6454 |
| Inventory | Cornell University | $2,409 | Cornell University<br>159 Sapsucker Woods Road<br>Ithaca, NY 14850<br>Ph: (607) 6254-2473 |
| Inventory | WL-Quebecor World-Taunton | $2,202 | WL-Quebecor World-Taunton<br>1133 County Street<br>Taunton, MA0 2780<br>Ph: (312) 681-6454 |
| Inventory | WL-Winter & Company-Quincy (HQ) | $1,697 | WL-Winter & Company-Quincy (HQ)<br>40 Oval Rd Ste 1<br>Quincy, MA 02170<br>Phone: (312) 681-6454 |
| Inventory | Brick & Ballerstein Inc | $1,199 | Brick & Ballerstein Inc<br>1085 Irving Avenue<br>Ridgewood, NY 11385-5745<br>Fax: (718) 366-0149<br>Ph: (718) 497-1400 |
| Inventory | WL-Alliance Print Group Inc - Boston | $1,117 | WL-Alliance Print Group Inc - Boston<br>933 East 2nd Street<br>Boston, MA 02127<br>Ph: (312) 681-6454 |
| Inventory | WL-LMS Acquisitions-Austin (HQ) | $833 | WL-LMS Acquisitions-Austin (HQ)<br>2032 Centimeter Circle<br>Austin, TX 78758<br>Ph: (312) 681-6454 |
| Inventory | Burt Rigid Box Inc | $162 | Burt Rigid Box Inc<br>58 Brown Street<br>Oneonta, NY 13820<br>Fax: (607) 433-2512<br>Ph: (607) 433-2510 |
| Inventory | WL-Quebecor World-Martinsburg | $145 | WL-Quebecor World-Martinsburg |

| | | | 871 Baker Road<br>Martinsburg, WV 25405<br>Ph: (312) 681-6454 |
| --- | --- | --- | --- |

## Leased Warehouse Locations

| Type of Property | Person or Entity in Possession of Property | Approximate Value | Address & Telephone Number of Person or Entity in Possession of Property |
| --- | --- | --- | --- |
| Inventory | RR Donnelley Fulfillment Services | $5,752,770 | RR Donnelley Fulfillment Services<br>1077 Prospect Lane<br>Kaukauna, WI 54130 |

## Special Storage Locations

| Type of Property | Person or Entity in Possession of Property | Approximate Value | Address & Telephone Number of Person or Entity in Possession of Property |
| --- | --- | --- | --- |
| Inventory | RRD-ISS-Dubai | $799,787 | RRD-ISS-Dubai<br>PO Box 5613<br>Dubai, AE |

G-8

**ALC Locations**

| Type of Property | Person or Entity in Possession of Property | Approximate Value | Address & Telephone Number of Person or Entity in Possession of Property |
|---|---|---|---|
| Inventory – ALC | Colorado Express Copies | $79,508 | Jim Jensen or Scott White<br>4865 Oakland Street<br>Denver, CO 80239<br>Ph: 303) 620-9900 |
| Inventory – ALC | National Book Network | $62,146 | Ruth Proctor<br>15200 NBN Way<br>Bldg D<br>Blue Ridge Summit PA 17214<br>Ph: (717) 794-3800 x 3517 |
| Inventory – ALC | Solution Tree | $1,834 | Nick Fleming<br>555 North Morton<br>Bloomington, IN 47404<br>Ph: (800) 733-6786 x 202<br>Fax: (812) 336-7790 |

**Exhibit H**

**Debtors' Property**

Pursuant to Local Rule 1007-2(a)(9), the following lists the property or premises owned, leased or held under other arrangement from which the Debtors operate their business as of the Petition Date.

Owned Real Property

| Lease Address | City | State | Zip Code | Country |
|---|---|---|---|---|
| 2700 N. Richard Avenue | Indianapolis | Indiana | 46219 | USA |
| 200 Academic Way | Troy | Missouri | 63379 | USA |
| 151 Benigno Boulevard | Bellmawr | New Jersey | 08031 | USA |
| 6366 Westwood Boulevard | Orlando | Florida | 32887 | USA |

Leased Real Property

| Lease Address | City | State | Zip Code | Country |
|---|---|---|---|---|
| 11276 5th Street, Suite 100 | Rancho Cucamonga | California | 91730 | USA |
| 365 Main Street | San Francisco | California | 94105 | USA |
| 5901 Priestly Drive, Suite 170, | Carlsbad | California | 92008 | USA |
| 317 Inverness Way South, Suite 150 | Englewood | Colorado | 80112 | USA |
| 1747 Pennsylvania Avenue, Suite 1100 | Washington | District of Columbia | 20006 | USA |
| 9205 South Park Center Loop, 1300 Building, Floors 1, 2 and 3 | Orlando | Florida | 32819 | USA |
| 9400 South Park Center Loop, 1500 Building | Orlando | Florida | 32819 | USA |
| 7584 Presidents Drive | Orlando | Florida | 32809 | USA |
| 82 South Barrett Square, Suite 2i | Rosemary Beach | Florida | 32461 | USA |
| 2940 South US 1, Bays C-11 and C-12 | Fort Pierce | Florida | 34982 | USA |
| 3625 Kennesaw 75 Parkway, Suite 160 | Kennesaw | Georgia | 30144 | USA |
| 5513 N. Cumberland Avenue, Suites 701-716 | Chicago | Illinois | 60656 | USA |
| 909 Davis Street, Suite 600 | Evanston | Illinois | 60201 | USA |
| 761 District Drive | Itasca | Illinois | 60143 | USA |
| 3800 Golf Road | Rolling Meadows | Illinois | 60008 | USA |
| 950 N. Raddant Road | Batavia | Illinois | 60510 | USA |
| 1900 South Batavia | Geneva | Illinois | 60134 | USA |
| 4925 West 86th Street | Indianapolis | Indiana | 46268 | USA |

| Lease Address | City | State | Zip Code | Country |
|---|---|---|---|---|
| 181 Ballardvale Street | Wilmington | Massachusetts | 01887 | USA |
| 187 Ballardvale Street | Wilmington | Massachusetts | 01887 | USA |
| 222 Berkeley Street, FL 3-6, 10 | Boston | Massachusetts | 02116 | USA |
| 500 Boylston Street, FL 3,4,5 | Boston | Massachusetts | 02116 | USA |
| 319 Marlborough Street | Boston | Massachusetts | 02115 | USA |
| 6085 Marshalee Drive, Suite 100 | Elkridge, | Maryland | 21075 | USA |
| Water Tower on Third Street | Troy | Missouri | 63379 | USA |
| 361 Hanover Street | Portsmouth | New Hampshire | 03801 | USA |
| 215 Park Avenue South, 11th and 12th Floors | New York | New York | 10003 | USA |
| 1350 Avenue of the Americas, Suite 815 | New York | New York | 10019 | USA |
| 1175 N. Stemmons Freeway | Lewisville | Texas | 76102 | USA |
| 10801 N. Mopac Expressway | Austin | Texas | 78759 | USA |
| 1655 Waters Ridge Drive | Lewisville | Texas | 75057 | USA |
| 1601 Sangam-Dong (INTL SALES), KGIT Sangam Center, 11th FL, | Mapo-gu | N/A | 110-720 | Seoul |
| B7 Tabonuco Street, Suite 1410, Santander Tower at San Patrico | Guaynabo | Puerto Rico | 00968 | USA |
| 7/F Metropolis Tower, Suite 735, No. 2 Dongsan Street Zhongguancun Xi-Zone | Beijing | N/A | 100080 | China |
| Av. Santa Fe 495, Piso 4, Col. Cruz Manca | Mexico City | N/A | 05349 | Mexico |
| 350 Orchard Road, #11-08 Shaw House, Suite 12 | Singapore | N/A | 238868 | Singapore |
| Festival Tower, 19th Floor, Offices 1967, 1968, 1969 | Dubai | N/A | N/A | United Arab Emirates |
| Trinity Central, FL 2,3,4 , 152-160 Pearse Street | Dublin | N/A | N/A | Ireland |
| 12 Abba Hillel Street, Ayalon House, 16th Floor | Tel Aviv | N/A | 52136 | Israel |

H-2

## Exhibit I

### Location of Debtors' Assets, Books and Records

Pursuant to Local Rule 1007-2(a)(l0), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

As stated in above, the Debtors' substantial assets consist of the real and leased property listed on **Exhibit H** attached hereto and incorporated herein by reference, accounts, equipment, furniture, fixtures, inventory, instruments, and various other assets, in every location from which they operate their business.  In addition, inventory is located at the state textbook depositories and other locations listed in **Exhibit G**, attached hereto and incorporated herein by reference.

### Books and Records

The Debtors' books and records are located at their corporate headquarters at 222 Berkeley Street, Boston, MA 02116.  Additional books and records of the Debtors are located in every location in which they operate their business, including the locations listed on **Exhibit H** attached hereto and incorporated herein by reference.

### Debtors' Assets Outside the United States

Please see the Location of Debtors' Substantial Assets above.  Due to the nature of the Debtors' business, the value of the assets outside the United States is unknown and subject to change.

**Exhibit J**

**Litigation**

Pursuant to Local Rule 1007-2(a)(11), the following is a list of the nature and present status of each action or proceeding, pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent. This list reflects actions or proceedings considered material by the Debtors and, if necessary, will be supplemented in the corresponding Schedules to be filed by the Debtors in these chapter 11 cases.

| Caption of Suit | Case Number | Nature of Proceeding | Court | Location of Court | Status or Disposition |
|---|---|---|---|---|---|
| Paul Perito, M.D. (Dangerous Doses) v. Harcourt, Inc., Katherine Eban, Harcourt Trade Publishers, Reed Elsevier Group, PLC, Reed Elsevier PLC and Reed Elsevier, NV | 07-13222-CA-22 | Action claiming defamation | 11th Judicial Circuit Court – Miami-Dade County, Florida | Lawson E. Thomas Courthouse Center 175 NW 1st Ave Suite #3016 Miami, FL 33128 | Pending but inactive; pre-discovery phase |
| The Learning Company and HMH Consumer Company Ltd. v. Zynga, Inc. | 1:11-cv-10894-MLW | Action claiming trademark infringement and unfair competition | USDC – District of Massachusetts | John Joseph Moakley United States Courthouse 1 Courthouse Way Boston, MA 02210 | Pending but inactive; pre-discovery phase |
| The Riverside Publishing Company v. Mercer Publishing LLC, Michael Hubbard and Rachel Hubbard | 2:11-cv-1249-RAJ | Cross claims sounding in copyright infringement and contract | USDC – Western District of Washington (Seattle) | Seattle United States Courthouse 700 Stewart St. Suite #2310 Seattle, WA 98101 | District court action pending; discovery ongoing regarding counterclaim only |
| | 11-35960 | | United States Court of Appeals for the Ninth Circuit | Richard H. Chambers, United States Court of Appeals 125 South Grand Avenue, Pasadena, CA 91105 | Appeal pending and active regarding denial of right to arbitrate contract claim |
| SingaporeMath.com v. Houghton Mifflin Harcourt Publishing Company | 3:11-cv-01522-MO | Trademark infringement claim and state | USDC – District of Oregon (Portland) | Mark O. Hatfield United States | Action pending and active; early in discovery phase with |

| | | | | | |
|---|---|---|---|---|---|
| | | unfair competition claims; counterclaims regarding same | | Courthouse 1000 S.W. 3rd Ave, Suite #740 Portland, OR 97204 | fast docket |
| Anderson News, LLC v. Houghton Mifflin Harcourt Publishing Company | 0910695CSS | Bankruptcy claim for preference | United States Bankruptcy Court – District of Delaware | 824 North Market Street, Wilmington, DE 19801 | Settlement in principle pending paperwork - $5,000 |
| Larson Texts, Inc. and Ronald E. Larson v. Houghton Mifflin Harcourt Publishing Company and Cengage Learning, Inc. | 50-143-T-00040-12 02 CACR-R | Claim for breach of covenant of good faith and fair dealing in royalty agreements | American Arbitration Association – Boston, MA | 1 Center Plaza Suite #300 Boston, MA 02108 | Arbitration pending; discovery about to begin |
| Jairo Garcia v. Houghton Mifflin Harcourt Publishing Company | 846-2011-90302 | Claim of disability discrimination | Florida Commission on Human Relations | 2009 Apalachee Parkway Suite #100 Tallahassee, FL 32301 | Motion to dismiss pending/prior release of claims |
| Muench Photography, Inc. v. Houghton Mifflin Harcourt Publishing Company and R.R. Donnelley & Sons Co. | 1:09-cv-2669-LAP | Copyright infringement claim regarding excess use of licensed photo images | USDC – Southern District of New York | Daniel Patrick Moynihan United States Courthouse 500 Pearl Street, New York, NY 10007-1312 | Pending; motion by HMH for partial summary judgment on statute of limitations issue due May 7 |
| Alaska Stock v. Houghton Mifflin Harcourt Publishing Company and R.R. Donnelley & Sons Co. | 3:09-cv-00061-TMB | Copyright infringement claim regarding excess use of licensed photo images | USDC – District of Alaska | Anchorage Federal Building United States Courthouse 222 W. 7th Avenue Suite #4, Anchorage, AK 99513 | Final judgment entered in District Court; Appeal pending – argued and awaiting court opinion |
| | 10-36010 | | United States Court of Appeals for the Ninth Circuit | Richard H. Chambers United States Court of Appeals 125 South Grand Avenue, Pasadena, CA 91105 | |
| Tom Bean II v. Houghton Mifflin Harcourt Publishing Company | 3:10-cv-08034-DGC | Copyright infringement claim regarding excess use of licensed photo | USDC – District of Arizona | Sandra Day O'Connor United States Courthouse 401 W. Washington | Final judgment entered in District Court; appeal pending – fully briefed and awaiting court |

| | | images | | Street, Suite 130, SPC 1 Phoenix, AZ 85003-2118 | opinion |
|---|---|---|---|---|---|
| | 10-cv-16771 | | United States Court of Appeals for the Ninth Circuit | Richard H. Chambers, United States Court of Appeals 125 South Grand Avenue, Pasadena, CA 91105 | |
| Harrison Shull v. Houghton Mifflin Harcourt Publishing Company and John Doe Printers 1-10 | 1:11-cv-03012-RPM | Copyright infringement claim regarding excess use of licensed photo images | USDC – Southern District of Colorado | Alfred A. Arraj United States Courthouse, Room A105 901 19th Street Denver, CO 80294-3589 | Action pending; discovery ongoing |
| Robert Lewine v. Houghton Mifflin Harcourt Publishing Company and John Doe Printers 1-10 | 5:12-cv-12-0535-HRL | Copyright infringement claim regarding excess use of licensed photo images | USDC – Northern District of California | Robert F. Peckham Federal Building, San Jose Courthouse 280 South 1st Suite #4050, San Jose, CA 95113 | Action pending; discovery ongoing |
| Lester Lefkowitz v. Houghton Mifflin Harcourt Publishing Company and John Doe Printers 1-10 | 1:12-cv-10614-MLW | Copyright infringement claim regarding excess use of licensed photo images | USDC – Northern District of Massachusetts (Boston) | John Joseph Moakley United States Courthouse 1 Courthouse Way Boston, MA 02210 | Action pending; discovery ongoing |

## <u>Exhibit K</u>

### Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management and a brief summary of their relevant responsibilities and experience.

| Name | Title | Tenure | Prior Experience |
|------|-------|--------|------------------|
| Linda K. Zecher | President, CEO, Director | 2011 to present | <ul><li><u>Microsoft</u> –Corporate Vice President from 2003 to 2011</li><li><u>Texas Instruments</u> – Geophysicist</li><li><u>Bank of America</u> – Vice President</li><li><u>PeopleSoft</u> – Vice President</li><li><u>Oracle</u> – Senior Vice President</li><li><u>Evolve Corp.</u> – Chief Executive Officer</li></ul> |
| Eric Shuman | CFO | 2011 to present | <ul><li><u>Houghton Mifflin Harcourt Education Group</u> – Executive Vice President and Chief Operating Officer from 2009 to 2011.</li><li><u>Thomson Lifelong Learning Group</u> – Chief Executive Officer</li><li><u>Thomson Learning</u> – Senior Vice President and Chief Financial Officer</li><li><u>Thomson Newspapers</u> - Vice President and Corporate Controller</li><li><u>Coopers and Lybrand</u> – General Practice Partner</li></ul> |
| William Bayers | Executive Vice President, General Counsel | 2007 to present | <ul><li><u>Harcourt Education Group</u> – Vice President and General Counsel</li></ul> |
| Gary Gentel | President of HMH Trade and Reference Publishers | 2007 to present | <ul><li><u>Houghton Mifflin Trade and Reference Publishers</u> – Corporate Vice President, Director of Trade Sales</li><li><u>Candlewick Press</u> – President</li><li><u>Scholastic Books</u> – SVP of Trade Sales</li><li><u>The Grosset and Dunlap Group</u> – SVP and Publisher</li><li><u>Random House</u> – VP of Children's Sales</li></ul> |
| Tim Cannon | Executive Vice President, Strategy and Alliances | 2011 to present | <ul><li><u>Microsoft</u> – Senior Director of Business Strategy</li><li><u>Digital Equipment Corporation</u> – Director, Worldwide Microsoft Alliance</li><li><u>Oracle</u> – VP, CRM Sales</li></ul> |

| Name | Title | Tenure | Prior Experience |
|---|---|---|---|
| Bethlam Forsa | Executive Vice President, Global Product And Content Development | 2008 to present | • <u>Accenture</u> – Partner |
| John K. Dragoon | Executive Vice President, Chief Marketing Officer | 2012 to present | • <u>Novell</u> – Chief Marketing Officer and Channel Chief<br>• <u>Art Technology Group</u> - Senior Vice President, Marketing and Product Management<br>• <u>Internet Capital Group</u> – Vice President, Operations<br>• <u>IBM</u> – Marketing and sales positions |
| Mary Cullinane | Executive Vice President of Global Corporate Social Responsibility | 2012 to present | • <u>Microsoft</u> – Worldwide Senior Director Innovation and Strategic Initiatives |
| Joanne Karimi | Senior Vice President Human Resources | 2011 to present | • <u>PacifiCord</u> – Leader of Human Capital |

**<ins>Exhibit L</ins>**

**Payroll**

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by Debtors, for the 30-day period following the Petition Date.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors and Stockholders)** | Approximately $19 mm for 30 days |
| **Payments to Officers, Directors and Stockholders** | **Officers**:  Approximately $694,000<br>**Directors**:  Approximately $266,500<br>**Stockholders**:  $ 0 |
| **Payments to Financial and Business Consultants Retained by the Debtors** | Approximately $ 13.275 mm for 30 days to be paid in accordance with applicable first day motions. |

## Exhibit M

**Cash Receipts and Disbursements,
Net Cash Gain or Loss, Unpaid Obligations and Receivables**

   Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the commencement of these chapter 11 cases, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $57  million |
| **Cash Disbursements** | -$147  million |
| **Net Cash Gain/Loss** | -$90  million |
| **Unpaid Obligations** | $419  million |
| **Unpaid Receivables** | $315  million |

## Exhibit N

## First Day Motions

1.      Debtors' Motion for an Order Directing Joint Administration of the Debtors' Chapter 11 Cases

2.      Debtors' Motion for an Order Authorizing the Debtors to Honor Certain Prepetition Customer Obligations and to Continue Prepetition Customer Programs and Practices in the Ordinary Course of Business

3.      Debtors' Motion for an Order Authorizing the Payment of Certain Prepetition Sales, Use, Franchise and Property Taxes, Licensing Fees, and Similar Obligations

4.      Debtors' Motion for an Order (I) Authorizing the Debtors to Pay Certain Prepetition (A) Wages, Salaries, Commissions and Other Compensation; (B) Compensation Owed to Project Employees and Independent Contractors; (C) Employee Business Expenses; (D) Contributions to Employee Benefit Programs and the Continuation of Such Programs in the Ordinary Course; and (E) Payroll Withholdings and Related Deductions and Payments; and (II) Authorizing and Directing Financial Institutions to Honor and Pay All Checks and Transfers Drawn on the Debtors' Accounts Related to the Foregoing

5.      Motion for Interim and Final Orders Authorizing Debtors to (I) Maintain and Use Existing Bank Accounts, Books, Records and Business Forms; (II) Maintain and Use Existing Cash Management System; (III) Provide Superpriority Status for Intercompany Receivables; and (IV) Waive the Deposit and Investment Guidelines of Section 345 of the Bankruptcy Code

6.      Debtors' Motion for Entry of an Order Extending the Debtors' Deadline to (I) File Schedules of Assets and Liabilities and Statements of Financial Affairs and (II) Permanently Waiving the Requirement to File the Same upon Confirmation of the Prepackaged Plan

7.      Debtors' Motion for an Order Authorizing (A) the Continuation of the Debtors' Workers' Compensation Program and Other Insurance Policies; and (B) the Payment of Certain Obligations Related Thereto

8.      Debtors' Application for an Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. §156(c) 11 U.S.C. §105(a), S.D.N.Y. LBR 5075-1 and General Order M-409

9.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors (A) to Obtain Postpetition Secured Superpriority Financing Pursuant to 11 U.S.C. §§ 105(a), 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d); (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Creditors Pursuant to 11 U.S.C. §§ 361, 363,

364 and 507, (III) Granting Certain Protective Relief With Regard to the Fee Letters Relating to the DIP/Exit Facilities; and (IV) Scheduling a Final Hearing on Debtor-In-Possession and Exit Financing Pursuant to Bankruptcy Rules 4001(b) and (c)

10.   Debtors' Motion for an Order (I) Scheduling a Combined Hearing to Consider (A) the Approval of (1) The Debtors' Disclosure Statement and (2) The Debtors' Prepetition Solicitation Procedures; and (B) Confirmation of The Debtors' Prepackaged Plan; and (II) Approving the Form of Notice of the Combined Confirmation Hearing and Disclosure Statement Hearing

11.   Debtors' Motion for an Interim and Final Orders Authorizing the Payment of Prepetition General Unsecured Claims and Other Unimpaired Claims in the Ordinary Course of Business

12.   Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Prepare a List of Creditors in Lieu of a Formatted Mailing Matrix, (B) File a Consolidated List of the Debtors' 20 Largest Unsecured Creditors and (C) Mail Initial Notices and (II) Approving the Form and Manner of Notifying Creditors of Commencement of Debtors' Chapter 11 Cases