Alan W. Kornberg
Jeffrey D. Saferstein
Philip Weintraub
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Proposed Counsel to the Debtors and the Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| HOUGHTON MIFFLIN | : Case No. 12-____ (___) |
| HARCOURT PUBLISHING COMPANY, *et al.,*[1] | : |
| | : Joint Administration Pending |
| Debtors. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTORS TO (I) MAINTAIN AND USE EXISTING BANK ACCOUNTS, BOOKS, RECORDS AND BUSINESS FORMS; (II) MAINTAIN AND USE EXISTING CASH MANAGEMENT SYSTEM; (III) PROVIDE SUPERPRIORITY STATUS FOR INTERCOMPANY RECEIVABLES; AND (IV) WAIVE THE DEPOSIT AND INVESTMENT GUIDELINES OF SECTION 345 OF THE BANKRUPTCY CODE

Houghton Mifflin Harcourt Publishing Company ("<u>Houghton Mifflin</u>")

and its affiliated debtors and debtors-in-possession in the above-captioned cases (each a

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Houghton Mifflin Harcourt Publishing Company (6030), Houghton Mifflin Harcourt Publishers Inc. (7305), HMH Publishers, LLC (7173), Houghton Mifflin Holding Company, Inc. (2898), Houghton Mifflin, LLC (2961), Houghton Mifflin Finance, Inc. (2812), Houghton Mifflin Holdings, Inc. (0674), HM Publishing Corp. (5843), Riverdeep Inc., a Limited Liability Company (9612), Broderbund LLC (6113), RVDP, Inc. (2557), HRW Distributors, Inc. (4902), Greenwood Publishing Group, Inc. (4537), Classroom Connect, Inc. (3282), ACHIEVE! Data Solutions, LLC (7499), Steck-Vaughn Publishing LLC (6929), HMH Supplemental Publishers Inc. (7571), HMH Holdings (Delaware), Inc. (6372), Sentry Realty Corporation (6742), Houghton Mifflin Company International, Inc. (9100), The Riverside Publishing Company (0173), Classwell Learning Group Inc. (9252), Cognitive Concepts, Inc. (5986), Edusoft (9992), and Advanced Learning Centers, Inc. (2861).

"Debtor," and collectively, the "Debtors"), by and through their undersigned counsel, hereby move this Court for entry of interim and final orders substantially in the form attached hereto as Exhibits D and E, pursuant to sections 105(a), 345(b), 363 and 364, 503, 1107 and 1108 of title 11 of the United States Code, (the "Bankruptcy Code"), authorizing the Debtors to (i) maintain and use their existing bank accounts (the "Bank Accounts"), books, records and business forms; (ii) maintain and use their existing cash management system; (iii) provide superpriority status for intercompany receivables; and (iv) waive the deposit and investment guidelines of section 345 of the Bankruptcy Code.  In support of this motion (the "Motion"), the Debtors rely upon the Affidavit of William F. Bayers (the "Bayers Affidavit"), general counsel to the Debtors, pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") filed contemporaneously herewith and incorporated herein by reference, and respectfully state as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Sections 105(a), 345(b), 363(c)(1) and 364(c), 503, 1107 and 1108 of the Bankruptcy Code provide the statutory predicate for the requested relief herein.

## BACKGROUND

2.      On the date hereof (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2

3.      As described more fully below, contemporaneously with the filing of their petitions, the Debtors also filed their Prepackaged Joint Plan of Reorganization (the "Prepackaged Plan") to implement a restructuring of certain of the Debtors' outstanding indebtedness and existing equity interests.  Although the solicitation period remains open, as of the Petition Date, 90.3% of the total amount of creditors entitled to vote on the Prepackaged Plan voted in favor of the Prepackaged Plan and 76% in amount of equity holders entitled to vote on the Prepackaged Plan voted in favor of the Prepackaged Plan.  The Debtors did not receive any ballots rejecting the Prepackaged Plan.  As a result of the overwhelming support for the Prepackaged Plan, the Debtors intend to move forward with confirmation of the Prepackaged Plan at the Court's earliest available date.

4.      As of the date hereof, no creditors' committee, trustee or examiner has been appointed in these cases.

5.      The Debtors comprise one of the leading educational publishers in the U.S. public school market (known as kindergarten to grade 12 or "K-12").  The Debtors offer a diverse portfolio of products and services, including textbooks, workbooks, supplemental materials, technology-based products, teaching guides, various types of standardized and customized tests, professional assessment products, and a wide range of trade and reference titles.  The Debtors are organized into the following two divisions:  education and trade and reference.  The education division is the largest division and represents approximately 90% of the Debtors' total revenue.  The Debtors' revenue and EBITDA for the year ended December 31, 2011 were approximately $1.295 billion and $238 million, respectively.

6.      The global financial crisis over the past several years has negatively affected the Debtors' recent financial performance.  The Debtors' business depends largely on state and local funding and the recession-driven decreases in state spending as well as significant purchase deferrals in key states and territories resulted in material reductions in the overall size of the Debtors' key K-12 market.  Lack of anticipated federal stimulus support also contributed to the Debtors' substantial revenue decline.  As a result of the deteriorating macroeconomic conditions, the Debtors, along with certain of their non-debtor affiliates, implemented a consensual out-of-court restructuring in March, 2010.  Despite the out-of-court restructuring, due to the continuing contraction of funds for state education spending and higher deferrals of awarded business than expected, the Debtors have continued to experience financial difficulties.  On or about December 22, 2011 and December 29, 2011, the Debtors entered into amendments to their first lien credit facility and receivables facility, respectively (collectively, the "Amendments").

7.      Notwithstanding the Amendments, the Debtors have determined that a complete delevering of their capital structure is now necessary.  In or about March 2012, significant holders of claims under the Debtors' first lien credit facility (the "First Lien Credit Facility") and the 10.5% Notes formed an informal creditor group (the "Informal Creditor Group").  Since its formation, the Informal Creditor Group and its advisors have engaged in constructive dialogue with the Debtors regarding a comprehensive restructuring of the Debtors' outstanding debt and equity.

8.      After months of good faith, arm's length negotiations among the Debtors and the Informal Creditor Group and their respective advisors, the parties

4

reached an agreement on the terms of a restructuring to completely delever the Debtors'

balance sheet.  The Debtors have commenced these Chapter 11 Cases to implement the

terms of the agreement which has been embodied in the Prepackaged Plan and the

accompanying Restructuring Support Agreement (as defined in the Prepackaged Plan).

## THE DEBTORS' CASH MANAGEMENT SYSTEM

### A.    Overview

9.      The Debtors have maintained an integrated and efficient

centralized cash management system to: (i) manage borrowing activity under various

credit facilities, including an accounts receivable securitization facility, as well as interest

payments on the First Lien Credit Facility and the 10.5% Notes[2]; (ii) manage the

Debtors' cash flow and cash needs by collecting and distributing funds generated from

operations; (iii) manage the Debtors' investment activity; and (iv) transfer funds between

and among the Debtors' and  non-Debtor affiliates, both foreign and domestic (the "Cash

Management System").  The Debtors' treasury department ("Treasury") exercises

primary oversight over the Cash Management System.

10.     The Debtors' Cash Management System consists of forty (40)

active bank accounts at thirteen (13) banking and investment institutions (collectively, the

"Bank Accounts").  Each Bank Account maintained by the Debtors is set forth on the

attached Exhibit C.

11.     The Cash Management System is similar to those commonly

employed by corporate enterprises comparable to the Debtors in economic scope and

---

[2]      For purposes of this Motion, claims under the First Lien Credit Facility and the 10.5% Notes are
referred to collectively as "Prepetition Senior Creditor Claims" and the holders thereof as "Prepetition
Senior Creditors."

geographic reach.  The Debtors' continued use of the Cash Management System is

integral to its ability to efficiently and effectively (i) control, monitor, report and forecast

the Debtors' cash positions; (ii) ensure cash availability; (iii) reduce administrative

expenses by facilitating the movement of funds; and (iv) optimize the use of those funds

among entities, thereby minimizing external borrowings and maximizing investment

returns.  These benefits of the Cash Management System necessarily enhance the value

of the Debtors' businesses.  The movement of funds through the Debtors' Cash

Management System is described further below and is illustrated by the charts attached as

Exhibit A and Exhibit B hereto.

> **B.     Cash Position Forecasting**

12.     The Debtors manage cash and investments through a rolling cash

forecast model ("Cash Forecast") that shows all expected collections and cash

disbursements on a daily basis.  Treasury employees create the Cash Forecast for the year

based on historical information and forecasts from various departments which tie into the

Debtors' budget.  Forecasted information includes: (i) a collections forecast based on

forecasted sales and returns, with values updated with actual amounts as monthly activity

becomes available; (ii) payroll forecasts based on employment changes and previous

actual payroll disbursements; (iii) sales and use tax disbursement forecasts based on

forecasted sales in various states and countries; and (iv) accounts payable forecasts

calculated on a weekly basis.

13.     The Cash Forecast is updated with actual amounts when available

which include: (i) lockbox reports showing actual collections; (ii) operating account

activity (defined below); (iii) Automated Clearing House ("ACH") and check

disbursement reports; and (iv) payroll reports.

14.     Treasury uses the Cash Forecast to reconcile the central Bank of America operating and concentration account (the "Operating Account") on a daily basis. Treasury researches any activity in the Operating Account that was not forecasted and will update the Cash Forecast model accordingly.  The Cash Forecast is saved onto a share drive for corporate accounting ("Accounting") and Treasury management to review.  Accounting uses the Cash Forecast to post entries in the Debtors' general ledger detailing borrowing and investing activity on a monthly basis.  Treasury employees compare the Cash Forecast with actual expenditures and reconcile any variances on a monthly basis.

15.     Treasury employees also review the Cash Forecast daily to evaluate the Debtors' cash position and to make decisions regarding borrowing and investing.  The Debtors receive the bulk of their collections during the months of August through October.  Consequently, the Debtors borrow more heavily during the six month period from February through August.  When the Debtors are in a negative cash position they will make decisions regarding the types and amounts of borrowing the Debtors will need to undertake.  When the Debtors are in a positive cash position, they will make decisions regarding the types and amounts of investments the Debtors will make.

**C.     Cash Collection**

16.     Houghton Mifflin maintains two lockboxes located at Bank of America for receipt of checks and two credit card accounts at Bank of America for receipt of credit card receipts for trade and internet sales (collectively, the "Houghton Mifflin Accounts").  Customers may also remit payments via wire transfer or ACH to the Collection Accounts.

7

17.     Greenwood Publishing Group, Inc. ("Greenwood") also maintains three accounts with Bank of America for local deposits and petty cash in New Hampshire as well as for credit card receipts (collectively, the "Greenwood Accounts" and together with the Houghton Mifflin Accounts, the "Collection Accounts").

18.     Furthermore, Houghton Mifflin maintains two accounts with Bank of America into which it deposits receivables the Debtors receive in pounds sterling ("GBP") and in Euro (respectively, the "GBP Account" and the "Euro Account").  The Debtors also utilize the GBP Account and Euro Account to pay disbursements in GBP or Euro rather than purchase foreign currency from their domestic central operating account. Houghton Mifflin Company International, Inc. also maintains a Bank of America value-added tax ("VAT") refund account used to receive any tax refunds issued from certain taxing authorities to Houghton Mifflin Company International, Inc.

**D.      Cash Concentration**

19.     The cash in the Collection Accounts is manually swept into the Operating Account.  The funds in the Houghton Mifflin lockbox and credit card accounts are swept on a daily basis.  The funds in the Greenwood Accounts for local deposits and petty cash are swept on a weekly basis.

**E.      Cash Disbursement**

20.     Once funds are collected into the Central Account, they may then be transferred into (i) a Bank of America payroll account, for payments to the Debtors' employees; (ii) a Wachovia disbursements account, for payments to the Debtors' vendors (the "Wachovia Account"); (iii) a Bank of America Flexible Spending Health Care

Account; (iv) a Bank of America disbursement account for payments to Williams Lea[3] in exchange for the provision of global supply chain outsourcing services for manufacturing purposes; or (v) one of several additional accounts, many of which are used for investment purposes.

21.     Accounts payable disbursements occur weekly primarily through ACH.

22.     All disbursements are subject to institutional controls under a reservation of authority policy ("Reservation of Authority").  The Reservation of Authority helps to ensure that all expenditures of the Debtors' funds are appropriately authorized by creating authorization limits for certain of the Debtors' personnel to be followed in the day-to-day operation of the Debtors' businesses.

23.     Under the Reservation of Authority, the following three types of expenditures require a purchase order:  (i) all inventory-related purchases; (ii) all fixed asset purchases; and (iii) expenditures exceeding $5,000 unless specifically excluded by the Reservation of Authority.  Purchase orders and invoices not subject to the aforementioned purchase order requirement or issued pursuant to a contract must receive transaction authority in accordance with strict dollar value approval limits based on the employees' management level.  The right to approve expenditures is not automatic and must be formalized by a signed reservation of authority form granting those rights within the Reservation of Authority framework, which is described below:

---

[3]    Part of the service provided by Williams Lea involves the reconciliation of manufacturing invoices with purchase orders and warehouse records of what has been received, and then issuing payment against those manufacturing invoices.  These payments are transacted through the Bank of America Williams Lea disbursements account, to which Williams Lea representatives have access.

- Approval by the Debtors' Board of Directors is required for projects involving print or electronic works for which the aggregate investment in plant, grant, advances, and outside editorial/development exceeds $50 million.

- Division and/or subsidiary presidents (the "Division Presidents") have the authority to approve projects in varying amounts up to $1.5 million.

- Corporate Executive Vice Presidents in Legal and Human Resources, as well as the Corporate Controller and Corporate Treasurer, have the authority to approve projects in varying amounts up to $2.5 million.

- The Debtors' Chief Operating Officer and the Chief Financial Officer have the authority to approve projects in varying amounts up to $5 million and Chief Executive Officer ("CEO") approval is required for projects in excess of $5 million.

- The CEO may delegate to the Division Presidents the authority to explore editorial or marketing opportunities at a cost not to exceed $100,000 to $250,000, depending on the division.

- All general and payroll disbursements must comply with certain check-signing requirements in accordance with the Reservation of Authority policy. ACH and wire transfers are subject to the approval limits based on the Employees' management level as described above. Two different individuals in Treasury or the corporate controller must initiate and release wire transfers for them to be processed.

- The Reservation of Authority also provides that Treasury has the authority to move funds between domestic Debtor accounts as necessary. The Treasurer, Assistant Treasurer, or Corporate Controller must approve any movement of funds greater than $500,000.

**F.**     **Intercompany Claims**

24.     In the normal course of business, the Debtors engage in various intercompany transactions (the "Intercompany Transactions") with other Debtors and their non-Debtor affiliates. As a result, at any given time, numerous Intercompany Transactions exist that reflect intercompany payments and receivables made in the ordinary course between and among the Debtors and other Debtors as well as between

and among the Debtors and certain of their non-debtor affiliates (the "Intercompany Claims").

25.     Intercompany Claims represent, but are not limited to, the following:  (1) costs for Dublin office rent; (2) payroll; (3) reimburseable business expenses; and (4) operating expenses.

26.     The Debtors transfer funds to international affiliates electronically via relationships with Western Union, Goldman Sachs, and Wells Fargo.  The Debtors will initiate a wire transfer from their Operating Account to one of these three institutions, with instructions to either convert to foreign currency or to send to the Debtor or non-Debtor affiliate in U.S. dollars.

27.     The Debtors have entered into forward contracts to purchase foreign currency with U.S. dollars at a pre-determined rate.  These forward contracts are transacted through either Western Union or Wells Fargo.  Although the Debtors will not enter into any new forward contracts during the chapter 11 cases, the Debtors expect to pay $2.5 million in forward contract settlements during the course of the cases.  From time to time, the Debtors will purchase foreign currency at the current exchange rate ("Spot Purchases") in order to pay bills or transfer funds to the Debtors' subsidiaries or affiliates in foreign currency. These Spot Purchases are transacted through Western Union, Goldman Sachs, or Wells Fargo.

28.     The Debtors maintain records of Intercompany Claims between and among themselves, as well as between the Debtors and non-Debtor affiliates.

29.     As noted in the Bayers Declaration, the Prepackaged Plan has been accepted by the requisite amount and number of stakeholders voting on the plan and all

11

other stakeholders are unimpaired or deemed to reject the Prepackaged Plan.  Therefore,

the Debtors submit that no party will be prejudiced by the continuation of the Cash

Management System, and, in particular, the Intercompany Transactions.  To the contrary,

as explained below, the continuation of the Cash Management System, including the

existing Bank Accounts, is necessary to ensure the Debtors' smooth transition into

chapter 11, as any disruption could cause immense and irreparable harm to the Debtors'

estates.

## **RELIEF REQUESTED**

30.     Pursuant to this Motion, the Debtors request entry of first, an

interim order (the "Interim Order") in the form attached hereto as Exhibit D, and then a

final order (the "Final Order") in the form attached hereto as Exhibit E, pursuant to

sections 105(a), 363 and 364(c)(l), 503, 1107 and 1108 of the Bankruptcy Code (i)

authorizing the continued use of existing Bank Accounts, books, records and business

forms; (ii) authorizing the continued use of the Cash Management System described

herein as modified to the extent described below; (iii) granting superpriority status for

intercompany receivables; and (iv) waiving the deposit and investment guidelines of

section 345 of the Bankruptcy Code.  The Debtors also request that the Court schedule a

final hearing on the requested relief.

**The Court Should Authorize the Debtors to Continue
Their Cash Management System**

31.     In the ordinary course of business and prior to the Petition

Date, the Debtors used the centralized Cash Management System described above.  As

discussed herein, the Cash Management System is designed for the efficient collection,

transfer and disbursement of funds generated through the Debtors' operations and to accurately record such collections, transfers and disbursements as they are made.

32.     The Cash Management System is an ordinary course, essential business practice of the Debtors.  The system is beneficial to the Debtors, their estates and their creditors because it enables the Debtors to (i) reduce the administrative expenses involved in moving funds; (ii) maintain accurate information regarding receipts, account balances and disbursements; (iii) reduce external borrowings; and (iv) ensure compliance with the Debtors' accounting and disbursement control procedures.  Maintenance of the existing Cash Management System also will avoid potential disruption to the Debtors' businesses that could delay the Debtors' emergence from chapter 11.

33.     This Court has the authority to grant the relief requested herein pursuant to its equitable powers under section 105(a) of the Bankruptcy Code.  Section 105(a) provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  The Debtors submit that the relief requested herein is both necessary and appropriate to allow the Debtors to preserve the benefits of the Cash Management System, and avoid any disruption that would undermine or jeopardize the value of their estates.

34.     Furthermore, bankruptcy courts have noted that requests for authority to continue utilizing existing cash management systems can be relatively "simple matters."  *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987).  Courts have recognized that cash management systems permit efficient utilization

of cash resources and that to deny debtors authority to continue to utilize their cash

management systems would impose a "huge administrative burden" on debtors' estates.

*In re Columbia Gas Sys., Inc.*, 997 F.2d. 1039, 1061 (3d Cir. 1993).

35.     Furthermore, in *In re Charter Co.*, 778 F.2d 617 (11th Cir. 1985),

the Eleventh Circuit Court of Appeals held that an order authorizing the debtor to

continue utilizing a routine cash management system "as had been usual and customary

in the past" was "entirely consistent" with applicable provisions of the Bankruptcy Code,

which permit a debtor in possession to "use property of the estate in the ordinary course

of business without notice or a hearing." *Id.* at 621 (*citing* 11 U.S.C. §363(c)(1)).   The

purpose of section 363(c)(1) is to provide a debtor in possession with the flexibility to

engage in ordinary course transactions required to operate its business without excessive

oversight by its creditors or the court.  *See, e.g. In re Enron Corp.*, 2003 Bankr. LEXIS

2111, *53 (Bankr. S.D.N.Y. 2003).  The Cash Management System is crucial to the

Debtors' daily business operations, and the Debtors will continue to operate the Cash

Management System in the ordinary course.  Accordingly, the Debtors submit that the

Court also has authority under section 363(c)(1) of the Bankruptcy Code to grant the

requested relief.

36.     Authorizing debtors to continue to operate prepetition cash

management systems has been approved by courts in this district in other large chapter 11

cases.  *See e.g.*, *In re Dynegy Holdings, LLC*, Case No. 11-38111 (CGM) (Bankr.

S.D.N.Y. Jan. 26, 2012) [Docket No. 370];  *In re General Maritime Corp.*, 11-15285

(MG) (Bankr. S.D.N.Y. Dec. 28, 2011) [Docket No. 155]; *The Great Atlantic & Pacific

Tea Co., Inc.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Feb. 7, 2011) [Docket No.

733]; *In re Reader's Digest Assoc., Inc.*, 09-23529 (RDD) (Bankr. S.D.N.Y. Nov. 23, 2009) [Docket No. 306]; *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Nov. 6, 2008) [Docket No. 1416].

**The Court Should Approve the Debtors' Continued Use of Existing Bank Accounts**

37.     The Operating Guidelines and Reporting Requirements (the "Operating Guidelines") promulgated by the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") require that a chapter 11 debtor close its prepetition bank accounts and open new accounts. This requirement is designed to (i) provide a clear line of demarcation between prepetition and postpetition transactions and operations; and (ii) block the inadvertent payment of prepetition claims through the payment of checks drawn prior to the commencement of a debtor's case.

38.     The Debtors can achieve the goals of the Operating Guidelines without closing their existing Bank Accounts and opening new ones. The Debtors have requested authority to pay all prepetition general unsecured claims in the ordinary course of business. Accordingly, there should be no prejudice to creditors or confusion to the banks regarding which checks may be properly paid. In the event this Court does not authorize payment of prepetition claims, the Debtors will identify all prepetition checks and other forms of payment outstanding on the Petition Date and notify the appropriate bank not to pay such checks or obligations. The systems currently employed by the Debtors and their banks are sufficient to ensure that prepetition obligations are not paid improperly.

39.     Moreover, requiring the Debtors to close all existing accounts and open new debtor-in-possession accounts would not be in the best interests of their estates. The exercise would (i) be costly; (ii) disrupt the Debtors' ability to satisfy

15

postpetition payables in a timely manner, potentially causing a loss of trade credit and

customer confidence; (iii) interfere with the efficient management of the Debtors' cash

resources; and (iv) distract the Debtors' managers at a time when the Debtors' business

requires their full attention.  Indeed, approximately half of the Debtors' Bank Accounts are

maintained at banks on the United States Trustee's List of Authorized Bank Depositories,

which significantly reduces any risk to these estates posed by leaving the Bank Accounts

in place.

> 40.     In other large chapter 11 cases, courts have recognized that the

strict enforcement of the requirement that a debtor close its prepetition bank accounts

does not serve the rehabilitative purposes of chapter 11.  Accordingly, courts in this

District have regularly entered orders authorizing debtors in chapter 11 cases to maintain

their prepetition bank accounts.  *See e.g.*, *In re Eastman Kodak Co.*, Case No. 12-10202

(ALG) (Bankr. S.D.N.Y. Feb. 16, 2012) [Docket No. 376]; *In re MK Network, LLC*,

Case No. 11-10859 (SHL) (Bankr. S.D.N.Y. Mar. 3, 2011) [Docket No. 15]*; The Great

Atlantic & Pacific Tea Co., Inc.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Feb. 7,

2011) [Docket No. 733]; *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555 (JMP)

(Bankr. S.D.N.Y. Nov. 6, 2008) [Docket No. 1416]; *In re Paper Int'l Inc.*, Case No. 08-

13917 (RDD) (Bankr. S.D.N.Y. Oct. 10, 2008) [Docket No. 20]; *In re Frontier

Airlines Holdings Inc.*, Case No. 08-11298 (RDD) (Bankr. S.D.N.Y. May 2, 2008)

[Docket No. 184].

> 41.     Accordingly, the Debtors respectfully request that the existing

Bank Accounts be deemed debtor-in-possession accounts and that the Court authorize

their maintenance and continued use in the same manner and with the same account

numbers, styles and document forms (including checks) as during the prepetition period, subject only to (i) designation of such accounts in the books and records of the Debtors and by the affected financial institution as debtor-in-possession accounts; and (ii) a prohibition against honoring prepetition checks without specific direction from the Debtors as authorized by the Court.  To the extent the Debtors do not receive authority to pay all prepetition general unsecured claims in the ordinary course of business, the Debtors will advise all banks with which they have disbursement accounts not to honor checks issued prior to the Petition Date, except with specific direction from the Debtors, as authorized by this Court.  By so advising the banks, the Debtors will achieve the goals of the bank account closing requirement: (i) establishing a clear demarcation between prepetition and postpetition checks; and (ii) blocking the inadvertent payment of prepetition checks — without disrupting their ongoing operations or jeopardizing their creditor relationships.

**The Court Should Grant the Debtors the Authority to Use Existing Business Forms**

42.    The Operating Guidelines also require, unless the Court orders otherwise, that a debtor obtain checks that bear the designation "debtor in possession."

43.    In the ordinary course of their business, the Debtors use a variety of checks, purchase orders, letterhead and other business forms (collectively, the "Business Forms").  By virtue of the nature and scope of the businesses in which the Debtors are engaged, and the numerous suppliers of goods and services and other parties with whom the Debtors deal, it is imperative that the Debtors be permitted to continue to use the Business Forms without alteration or change as such Business Forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession.

17

44.     Parties doing business with the Debtors will undoubtedly be aware of each of the Debtors' status as a chapter 11 debtor-in-possession.  Changing correspondence and Business Forms would thus be unnecessary, as well as expensive and disruptive to the Debtors' business operations.  Furthermore, given the prepackaged nature of these cases, the Debtors expect to emerge from bankruptcy by June 21, 2012.  Accordingly, to minimize expenses, the Debtors request that the requirement of the U.S. Trustee be waived until confirmation of the Prepackaged Plan, and that the Debtors be permitted to use their Business Forms in substantially the form they existed prior to the Petition Date and without the legend.

**The Court Should Order Superpriority Status for Intercompany Receivables**

45.     The Cash Management System directs funds to each affiliate in accordance with its operational needs.  From time to time, this may have the effect of rendering some affiliates net lenders and some net borrowers.  To resolve any concerns related to the repayment of funds moved by and between debtors in a chapter 11 case, courts typically grant superpriority status to postpetition intercompany claims.  *See e.g.*, *In re General Maritime Corp.*, 11-15285 (MG) (Bankr. S.D.N.Y. Dec. 28, 2011) [Docket No. 155]; *In re Sbarro, Inc.*, Case No. 11-11527 (SCC) (Bankr. S.D.N.Y. May 4, 2011) [Docket No. 161]; *In re Great Atlantic & Pacific Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Feb. 7, 2011); *In re Reader's Digest Assoc., Inc.*, 09-23529 (RDD) (Bankr. S.D.N.Y. Nov. 23, 2009) [Docket No. 306]; *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Nov. 6, 2008) [Docket No. 1416]; *In re Bally Total Fitness of Greater New York, Inc.*, Case No. 08-14818 (BRL) (Bankr. S.D.N.Y. Dec. 5, 2008) [Docket No. 37].

46.     The Prepackaged Plan contemplates the substantive consolidation of the Debtors.  Nevertheless, in an abundance of caution and to ensure that each individual Debtor will not, at the expense of its respective creditors, fund the operations of another Debtor entity, the Debtors request that, pursuant to section 364(c)(1) of the Bankruptcy Code, all intercompany claims between the Debtors arising after the Petition Date be accorded superpriority status with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, other than (i) any superpriority claims granted to the postpetition lenders, (ii) any claims under section 507(b) of the Bankruptcy Code granted to the Prepetition Secured Creditors, (iii) the Prepetition Secured Creditor Claims and (iv) any priorities, liens, claims and security interests that may be granted by the Court, from time to time.

**The Court Should Waive the Investment and Deposit Guidelines**
**of Section 345 of the Bankruptcy Code, As Applicable**

47.     The Debtors also request that the Court waive, to the extent necessary, the requirements of section 345(b) of the Bankruptcy Code to permit them to maintain their investments in accordance with their existing deposit practices.

48.     Section 345(a) of the Bankruptcy Code authorizes deposits of money, such as the Debtors' cash, in a manner that "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a).  For deposits that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides that a debtor in possession must require a bond from the entity with which the money is

19

deposited or invested in favor of the United States secured by the undertaking of an

adequate corporate surety.  Alternatively, the debtor in possession may require the entity

to deposit securities of the kind specified in section 9303 of title 31 of the United States

Code.

49.     The Court's ability to excuse strict performance of the deposit and

investment requirements of section 345(b) of the Bankruptcy Code for "cause" arises

from the 1994 amendments to the Bankruptcy Code.  The legislative history of that

amendment provides:

> Section 345 of the Code governs investments of funds of
> bankruptcy estates.  The purposes [sic] is to make sure that
> funds of a bankrupt that are obliged to creditors are
> invested prudently and safely with the eventual goal of
> being able to satisfy all claims against the bankruptcy
> estate.  Under current law, all investments are required to
> be FDIC insured, collateralized or bonded.  While this
> requirement is wise in the case of smaller debtors with
> limited funds that cannot afford a risky investment to be
> lost, it can work to needlessly handcuff larger, more
> sophisticated debtors.  This section would amend the Code
> to allow the courts to approve investments other than those
> permitted by section 345(b) for just cause, thereby
> overruling *In re Columbia Gas Systems, Inc.*, 33 F.3d 294
> (3d Cir. 1994).

*In re Service Merchandise Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999)

(quoting H.R. Rep. 103-834, 103rd Cong., 2nd Sess. 224 (Oct. 4, 1994); 140 Cong. Rec.

H10767 (Oct. 4, 1994)).

50.     In determining whether the "for cause" standard has been met, the

Court should consider the "totality of the circumstances", utilizing the following factors:

(a)     the sophistication of the debtor's business;

(b)     the size of the debtor's business operations;

(c)     the amount of investments involved;

(d)    the bank ratings (Moody's and Standard and Poor) of the financial institutions where the debtor-in-possession funds are held;

(e)    the complexity of the case;

(f)    the safeguards in place within the debtor's own business of insuring the safety of the funds;

(g)    the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

(h)    the benefit to the debtor;

(i)    the harm, if any, to the estate; and

(j)    the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

*Service Merchandise*, 240 B.R. at 896.

51.    Examining these factors, the court in *Service Merchandise* concluded that "cause" existed because the debtors were "large, sophisticated [companies] with a complex cash management system" that had the capacity to shift funds as need to ensure their safety.  *Id.*  The court concluded that the benefits of waiving the requirements of section 345(b) far outweighed any potential harm to the estates, and failure to waive the requirements "would needlessly handcuff these debtors' reorganization efforts."  *Id.*at 896-97.

52.    In the present case, the funds held in sixteen (16) Bank Accounts (the "<u>FDIC Insured Bank Accounts</u>"), are fully insured by the FDIC.  Accordingly, they are secure and strictly comply with the requirements of section 345(b).  An additional two Bank Accounts are insured by the FDIC to up to $250,000.  In addition, twenty-six (26) of the Debtors' Bank Accounts are maintained at banks that have been approved by the U.S. Trustee for the Southern District of New York (the "<u>U.S. Trustee</u>") as authorized

depositories (the "Authorized Depositories").  Accordingly, the Debtors believe that any

funds that are deposited in these accounts are secure and that they therefore comply with

the requirements of section 345(b).[4]

53.    Approximately nine (9) Bank Accounts, however, are not FDIC

insured and located at non-Authorized Depositories (the "Non-Authorized Bank

Accounts").  One of these accounts is the Debtors' pension plan account which is

monitored by a trustee.  With respect to the funds held in the Non-Authorized Bank

Accounts, the Debtors submit that "cause" exists to waive the requirements of section

345(b) of the Bankruptcy Code.

54.    First, like the debtors in *Service Merchandise*, the Debtors here are

large, sophisticated companies whose estates will receive a significant benefit from the

continued availability of funds via the existing Bank Accounts.

55.    Second, the funds held in the Non-Authorized Bank Accounts for

investment purposes are governed by the Debtors' investment policy (the "Investment

Policy") which establishes the parameters to be followed to invest the Debtors' excess or

idle cash balances.  The primary objective of the Debtors' Investment Policy is the safety

and preservation of invested funds.  The Investment Policy specifically prohibits any

borrowing of funds for the sole purpose of leveraging the Debtors' investment portfolio

and any investment activity that would be considered speculative according to the

principles of conservative investment management.  Furthermore, the Investment Policy

sets credit quality parameters including that money market funds shall be judged to be of

---

[4]    To the extent any funds held in the FDIC Insured Bank Accounts or with Authorized Depositories
are/become non-compliant or exceed the amounts insured by the FDIC, the Debtors expressly reserve
their right to seek a waiver of the section 345(b) requirements as described above.

best quality as denoted by a Moody's rating of AAAm or an S&P's rating of AAA. The Debtors' Investment Policy also establishes a concentration limit for non-governmental investments of a range between $50 million and $100 million depending on the company's total portfolio size.

56.     Accordingly, the Debtors submit that a waiver of the deposit and investment guidelines set forth in section 345 of the Bankruptcy Code should pose no risk to their estates or their creditors. By contrast, requiring the Debtors to change their deposit and investment procedures abruptly could result in harm to the Debtors, their estates and their creditors due to the disruption of their Cash Management System.

57.     Given the complexity and relative security of the Debtors' Cash Management System, the size of the Debtors' business, and the conservative Investment Policy detailed above, the Debtors submit that ample cause exists to waive the requirements of section 345(b) of the Bankruptcy Code until confirmation of the Prepackaged Plan. Courts have granted similar relief in other large chapter 11 cases in this District. *See, e.g.*, *In re Tronox, Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Feb. 6, 2009); *In re DJK Residential LLC*, Case No. 08-10375 (Bankr. S.D.N.Y. 2008).

58.     To the extent that funds in the Non-Authorized Bank Accounts exceed the amounts insured by the FDIC, are foreign bank accounts or are not otherwise guaranteed or protected, the Debtors propose to engage in discussions with the U.S. Trustee to determine what modifications to such accounts, if any, would be appropriate.

**Immediate Relief is Necessary to Avoid Immediate and Irreparable Harm**

59.     Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the

petition, issue an order granting . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . ."  Fed. R. Bankr. P. 6003(b). Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As discussed herein, the Debtors will suffer immediate and irreparable harm absent this Court's entry of the Interim Order granting the relief requested herein.  Consequently, the relief requested herein is consistent with Bankruptcy Rule 6003.  By this motion, the Debtors respectfully request that the relief requested herein become effective and enforceable immediately notwithstanding Bankruptcy Rule 6004(h).

## NOTICE

60.     As of the date hereof, no creditors' committee, trustee, or examiner has been appointed in these chapter 11 cases.  Notice of this Motion has been provided to:  (i) the United States Trustee, Attention:  Andrea B. Schwartz; (ii) counsel for the DIP/Exit Agent; (iii) the parties identified on the Debtors' consolidated list of twenty (20) largest unsecured creditors; (iv) counsel for the Informal Creditor Group; (v) counsel for the Prepetition Senior Secured Notes Trustee; (vi) counsel for the Prepetition Agent; (vii) counsel for the Prepetition L/C Bank; (viii) the Securities and Exchange Commission; (ix) the United States Attorney for the Southern District of New York; (x) the Internal Revenue Service; (xi) the Environmental Protection Agency; (xii) the Pension Benefit Guaranty Corporation; (xiii) the New York State Department of Taxation; (xiv) the New York City Tax Department; and (xv) such other parties entitled

24

to notice pursuant to Local Rule 9013-1(m).  The Debtors submit that, in light of the

nature of the relief requested, no other or further notice need be provided.

## NO PRIOR REQUEST

No previous request for the relief sought herein has been made to this or to

any other court.

**WHEREFORE**, the Debtors respectfully request that this Court enter the

Interim Order and a Final Order, after a scheduled hearing to determine the relief

requested herein on a final basis, authorizing the Debtors to (a) maintain and use their

existing Bank Accounts, books, records and business forms, (b) maintain and use their

existing Cash Management System, (c) provide superpriority status for intercompany

receivables, and (d) waive the deposit and investment guidelines of section 345 of the

Bankruptcy Code.


Dated: May 21, 2012                         PAUL, WEISS, RIFKIND WHARTON &
     New York, New York                   GARRISON LLP

                                                         By:  _/s/ Jeffrey D. Saferstein_____
                                                          Alan Kornberg
                                                           (akornberg@paulweiss.com)
                                                           Jeffrey D. Saferstein
                                                           (jsaferstein@paulweiss.com)
                                                           Philip Weintraub
                                                           (pweintraub@paulweiss.com)
                                                           1285 Avenue of the Americas
                                                           New York, New York  10019-6064
                                                           Telephone:  (212) 373-3000
                                                           Facsimile:   (212) 757-3990

                                                           Proposed attorneys for the Debtors and
                                                           Debtors-in-Possession

**EXHIBIT A**

**Diagrams of Cash Management System for U.S. Accounts**



## EXHIBIT B

## Diagrams of Cash Management System for International Accounts



# EXHIBIT C

## Debtors' Bank Accounts

Bank and Financial Institution Accounts

| Financial Institution | Account Name | Address of Account | Purpose of the Account | Account Number |
|---|---|---|---|---|
| **Houghton Mifflin Harcourt Publishing Company** | | | | |
| Bank of America | Houghton Mifflin Harcourt Publishing Company; Operating Account | 135 S. LaSalle St. IL4-135-14-02 Chicago, IL 60603 | Main operating & concentration account | X-2008 |
| Bank of America | Houghton Mifflin Harcourt Publishing Company; Trade Credit Card Sales | Same as above | Credit card receipts | X-1320 |
| Bank of America | Houghton Mifflin Harcourt Publishing Company; Internet Sales | Same as above | Credit card receipts | X-3896 |
| Bank of America | Houghton Mifflin Harcourt Publishing Company; Payroll | Same as above | Payroll | X-0257 |
| Bank of America | Houghton Mifflin Harcourt Publishing Company; FSA Health Care | Same as above | Flexible spending | X-2319 |
| Bank of America | Houghton Mifflin Harcourt Publishing Company; Escrow Pursuant to LMS Agreement | Same as above | Escrow established for LMS Agreement deal | X-2306 |
| Bank of America | Houghton Mifflin Harcourt Publishing Company | Same as above | Money Market Investments | X-0806 |
| Bank of America | Houghton Mifflin Harcourt Publishing Company; Williams Lea Disbursements | Same as above | Williams Lea disbursements account | X-6622 |
| Bank of America | Houghton Mifflin Company | 2 King Edward Street London EC1A 1HQ | Pounds sterling receipts and disbursements | X-6014 |
| Bank of America | Houghton Mifflin Company International, Inc. | Same as above | Pounds Sterling VAT refunds | X-9019 |
| Bank of America | Houghton Mifflin Company | Same as above | Euro account | X-6022 |
| Wells Fargo Bank | Houghton Mifflin Harcourt Publishing Company | 101 Federal Street, Suite 2020 Boston, MA  02110 | Disbursements | X-5528 |

| Financial Institution | Account Name | Address of Account | Purpose of the Account | Account Number |
|---|---|---|---|---|
| Wells Fargo Bank | Houghton Mifflin Harcourt Publishers, Inc. | Same as above | Letter of Credit Facility | X-6974 |
| Goldman Sachs | Houghton Mifflin Harcourt Publishing Company | 71 South Wacker Drive Investment Management Division Global Liquidity Management Chicago, IL  60606 | Money Market Investments | X-6000 |
| Wells Capital Management | Houghton Mifflin Harcourt Publishing Company | 525 Market Street, 10th Floor San Francisco, CA 94105 | Money Market Investments | X-2010 |
| Fidelity Capital Markets | Houghton Mifflin Harcourt Publishing Co. | 82 Devonshire Street V6B Boston, MA 02109 | Money Market Investments | X-0051 |
| Capital Advisors Group | Houghton Mifflin Harcourt Publishing Company | 29 Crafts Street Chatham Center, Suite 270 Newton, MA  02458 | Money Market Investments | X-3835 |
| Capital Advisors Group | Houghton Mifflin Harcourt Publishing Company | Same as above | Other Securities | X-3836 |
| Morgan Stanley Private Wealth Management | Houghton Mifflin Harcourt Publishing Company | 522 Fifth Ave. New York, NY  10036 | Money Market Investments | X-0EB0 |
| Morgan Stanley Private Wealth Management | Houghton Mifflin Harcourt Publishing Company | Same as above | Other Securities | X-0ECC |
| State Street Global Advisors | Houghton Mifflin Company; Retirement Trust | 801 Pennsylvania Kansas City, MO 64105 | Human Resources retirement trust account | X-7276 |
| Citibank | Houghton Mifflin Company | 1 Penns Way New Castle, DE  19720 | Cigna Health Care HSA and HRA account | X-8777 |

**Other HMH Holdings (Delaware), Inc. Subsidiaries**

| Financial Institution | Account Name | Address of Account | Purpose of the Account | Account Number |
|---|---|---|---|---|
| JPMorgan Chase Bank, N.A. | Houghton Mifflin Harcourt Publishing Company | JPMorgan Chase Bank, N.A., Seoul Branch J.P. Morgan Plaza 34-35 Jeong-dong, Jung-gu Seoul 100-120, Korea | Payroll – S Korean Branch office (KRW) | X-4168 |
| JPMorgan Chase Bank, N.A. | Houghton Mifflin Harcourt Publishing Company | Same as above | S Korean Branch office USD account | X-2231 |

| Financial Institution | Account Name | Address of Account | Purpose of the Account | Account Number |
|---|---|---|---|---|
| JPMorgan Chase Bank, N.A. | HMH Holdings (Delaware) Inc. | One Chase Manhattan Plaza NY1-A155 New York, NY 10005-1401 | Bank fees related to JPM access | X-9444 |
| Citibank NA | Houghton Mifflin Company International Beijing Rep Office | Citibank (China) Co., Ltd., 17F, Excel Center No. 6 Wudinghou Street, Xicheng District, Beijing 100033 China | USD Account | X-1004 |
| Citibank NA | Houghton Mifflin Company  International Beijing Rep Office | Same as above | CNY Account | X-1209 |
| Citibank NA | Houghton Mifflin Company International Inc. Rep Office | 4th Floor, Citibank Tower, Oud Metha Road, PO Box 749, Dubai, UAE | USD Account | X-4027 |
| Citibank NA | Houghton Mifflin Company International Inc. Rep Office | Same as above | AED Account | X-4019 |
| Citibank NA | Houghton Mifflin Company International, Inc. | Citi Tel Aviv, 21 Ha'arba'a Street, Tel Aviv, Israel, 64739 | ILS | X-1001 |
| Citibank NA | Houghton Mifflin Company International, Inc. | Same as above | USD | X-1028 |

**OSV-HMH Indemnity Escrow**

| Financial Institution | Account Name | Address of Account | Purpose of the Account | Account Number |
|---|---|---|---|---|
| 1st Source Bank | Our Sunday Visitor Inc - Houghton Mifflin Harcourt Publishing Company Indemnity Escrow | 1st Source Bank-PAMB, 306 East Main Street, Suite 100, Niles, MI 49120 | Escrow established for OSV deal | X-4-01-3 |

**Greenwood Publishing Group Inc. Accounts**

| Financial Institution | Account Name | Address of Account | Purpose of the Account | Account Number |
|---|---|---|---|---|
| Bank of America | Greenwood Publishing Group, Inc. | 135 S. LaSalle Street IL4-135-14-02 Chicago, IL 60603 | Local Deposits  (New Hampshire) | X-3534 |
| Bank of America | Greenwood Publishing Group, Inc. | Same as above. | GH Global Credit Card receipts | X-6556 |
| Bank of America | Greenwood Publishing Group, Inc. | Same as above. | Heinemann PD Credit Cards | X-6569 |

**Advanced Learning Centers, Inc.**

| Financial Institution | Account Name | Address of Account | Purpose of the Account | Account Number |
|---|---|---|---|---|
| Community Banks of Colorado | Advanced Learning Centers | 7900 East 1st Avenue NMLS #866293 Lowry Branch Denver, CO 80230 | Operating Account | X-1500 |
| Community Banks of Colorado | Advanced Learning Centers | Same as above. | Merchant Account | X-1527 |
| Community Banks of Colorado | Advanced Learning Centers | Same as above. | Goldman Sachs Sweep Account | X-5924 |
| Chase Bank | Advanced Learning Centers | JPMorgan Chase Bank, N.A P O Box 659754, San Antonio, TX 78265 - 9754 | Collateral for Chase Business Credit Card (checking) | X-0435 |
| Chase Bank | Advanced Learning Centers | Same as above. | Collateral for Chase Business Credit Card (savings) | X-6450 |

**<u>EXHIBIT D</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| HOUGHTON MIFFLIN | : | Case No. 10-____ (___) |
| HARCOURT PUBLISHING COMPANY, *et al.,* | : |  |
|  | : | (Joint Administration Pending) |
| Debtors. | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**INTERIM ORDER AUTHORIZING DEBTORS TO (I) MAINTAIN
AND USE EXISTING BANK ACCOUNTS, BOOKS, RECORDS
AND BUSINESS FORMS;(II) MAINTAIN AND USE EXISTING
CASH MANAGEMENT SYSTEM; (III) PROVIDE SUPERPRIORITY STATUS
FOR INTERCOMPANY RECEIVABLES;
AND (IV) WAIVE THE DEPOSIT AND INVESTMENT
GUIDELINES OF SECTION 345 OF THE BANKRUPTCY CODE**

Upon consideration of the motion (the "Motion")[1] of Houghton Mifflin

Harcourt Publishing Company and its subsidiaries and affiliates, as debtors and debtors-

in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), for

entry of an order pursuant to sections 105(a), 345(b), 363(c)(1) and 364(c), 503, 1107

and 1108 of title 11 of the United States Code (the "Bankruptcy Code") (i) authorizing

the continued use of existing bank accounts (the "Bank Accounts"), books, records and

business forms; (ii) authorizing the continued use of the Debtors' existing cash

management system (the "Cash Management System"); (iii) granting superpriority status

for intercompany accounts; and (iv) waiving the deposit and investment guidelines of

section 345 of the Bankruptcy Code; and upon consideration of the Bayers Affidavit

pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of

New York, sworn to May 21, 2012; and this Court having jurisdiction to consider the

---

[1]   Capitalized terms used and not defined herein shall have the meaning ascribed to them in the Motion.

Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and it

appearing that venue of these cases and the Motion in this district is proper pursuant to 28

U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core proceeding pursuant

to 28 U.S.C. § 157(b); and it appearing that notice of the Motion has been given as set

forth in the Motion and that such notice is adequate and no other or further notice need be

given; and a hearing having been held to consider the relief requested in the Motion and

upon the record of the hearing and all of the proceedings had before the Court; and the

Court having found and determined that the relief sought in the Motion is in the best

interests of the Debtors, their estates, their creditors and all other parties in interest; and

that the legal and factual bases set forth in the Motion establish just cause for the relief

granted herein; and after due deliberation and sufficient cause appearing therefor, it is

hereby ORDERED that:

1.      The Motion is GRANTED as modified herein.

2.      The Debtors are authorized to (i) maintain, and continue to use their

existing prepetition Bank Accounts, in the names and with the account numbers existing

immediately prior to the commencement date of the Debtors' chapter 11 cases (the

"Petition Date"), and treat such Bank Accounts as debtor-in-possession accounts; and

(ii) deposit funds into and withdraw funds from existing prepetition Bank Accounts or

accounts opened postpetition by all usual means, including, without limitation, checks,

wires, automated clearinghouse transfers (the "ACH Transfers"), and other debits.

3.      The Debtors are authorized to open any new bank accounts or

close any existing Bank Accounts as they may deem necessary and appropriate in their

sole discretion; *provided, however,* that the Debtors may open a new bank account with

2

a banking institution not designated as an Authorized Depository under the U.S. Trustee

Guidelines, only after obtaining (i) the consent of the U.S. Trustee and the Informal

Creditor Group or (ii) a court order.

4.      Any and all accounts opened by the Debtors on or after the

Petition Date at any bank shall, for the purposes of this Order, be deemed a Bank Account

(as if it had been opened prior to the Petition Date and listed in Exhibit C to the Motion),

and any and all banks at which such accounts are opened shall similarly be subject to the

rights and obligations of this Order.

5.      Nothing contained herein shall prevent the banks (the "Banks") at

which the Bank Accounts are held from modifying or terminating any Bank Accounts or

related services in accordance with the agreements governing such accounts or services.

6.      The Banks are authorized to continue to treat, service, and

administer such Bank Accounts as accounts of the Debtors as debtors in possession

without interruption and in the usual and ordinary course and to receive, process and

honor and pay any and all postpetition checks, drafts, wires, or ACH Transfers drawn on

the Bank Accounts by the holders or makers thereof to the extent the Debtors have good

funds standing to their credit with such Bank, as the case may be.

7.      Notwithstanding anything to the contrary in any other "First Day

Order" or other order of this Court, the Banks (i) are authorized to accept and honor all

representations from the Debtors as to which checks, drafts, wires, or ACH Transfers

should be honored or dishonored, consistent with any order(s) of this Court and

governing law, whether such checks, drafts, wires, or ACH Transfers are dated prior to, on,

or subsequent to the Petition Date, and whether the Banks believe the payment is or is

not authorized by an order of this Court; (ii) have no duty to inquire as to whether such payments are authorized by an order of this Court; and (iii) have no duty to make payments in respect thereto unless the Debtors have good funds standing to their credit with such Bank.

8.      The Banks shall not be liable to any party on account of (i) following the Debtors' instructions or representations as to any order of this Court; (ii) the honoring of any prepetition check or item in a good faith belief that the Court has authorized such prepetition check or item to be honored; or (iii) an innocent mistake made despite implementation of reasonable item handling procedures.

9.      In accordance with current practice and the agreement governing the Bank Accounts, the Banks are authorized to "charge back" to the Debtors' accounts any amounts incurred by the Banks resulting from returned checks or other returned items, and the Debtors are authorized to pay any fees and expenses owed to the Banks, in each case regardless of whether such items were deposited prepetition or postpetition or relate to prepetition or postpetition items.

10.      The Debtors are authorized to maintain and continue to use their checks and any and all other Business Forms substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors in possession, until confirmation of the Prepackaged Plan.

11.      The Debtors and their duly appointed agents and custodians are authorized and empowered to (i) continue to manage the Debtors' cash pursuant to the Cash Management System maintained by the Debtors and their non-debtor affiliates prior to the Petition Date; (ii) continue to perform their obligations under the agreements

4

governing such system, including paying all prepetition and postpetition fees and expenses incurred in connection therewith; *provided, however*, that prior to the Effective Date (as defined in the Prepackaged Plan), the Debtors must obtain the prior written consent of the Informal Creditor Group for any Intercompany Transaction giving rise to an Intercompany Claim against a Debtor of $3.5 million or more; and (iii) transfer funds by and among the Debtors, and by and among their respective Bank Accounts and other accounts maintained with or by their duly appointed agents and custodians, as and when needed and in the amounts necessary or appropriate to maintain their operations and facilitate the orderly operation of their estates or businesses.

12.     All Intercompany Claims incurred in the ordinary course of business between the Debtors and other Debtors, as well as between Debtors and non-Debtors arising from Intercompany Transactions shall be accorded  superpriority status with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code; *provided, however*, that all superpriority claims for intercompany receivables shall be subordinate in all respects to (i) any superpriority claims granted to the postpetition lenders, (ii) any claims under section 507(b) of the Bankruptcy Code granted to the Prepetition Secured Creditors, (iii) the Prepetition Secured Creditor Claims and (iv) any priorities, liens, claims and security interests that may be granted by the Court, from time to time.

13.     To the extent the Debtors are not already in compliance the requirements of section 345(b) of the Bankruptcy Court, compliance with those requirements is hereby waived  until confirmation of the Prepackaged Plan.

14.     Within three (3) business days after entry hereof, the Debtors shall serve a copy of the Motion and this Order upon (i) the United States Trustee, <u>Attention</u>:  Andrea B. Schwartz; (ii) counsel for the DIP/Exit Agent; (iii) the parties identified on the Debtors' consolidated list of twenty (20) largest unsecured creditors; (iv) counsel for the Informal Creditor Group; (v) counsel for the Prepetition Senior Secured Notes Trustee; (vi) counsel for the Prepetition Agent; (vii) counsel for the Prepetition L/C Bank; (viii) the Securities and Exchange Commission; (ix) the United States Attorney for the Southern District of New York; (x) the Internal Revenue Service; (xi) the Environmental Protection Agency; (xii) the Pension Benefit Guaranty Corporation; (xiii) the New York State Department of Taxation; (xiv) the New York City Tax Department; (xv) such other parties entitled to notice pursuant to Local Rule 9013-1(m) and (xvi) the Banks listed on Exhibit C to this Motion.

15.     A hearing shall be held to consider the relief granted herein on a final basis on _____, 2012, at _.m., before the Honorable _____, United States Bankruptcy Judge, in Courtroom _____ Alexander Hamilton Court House, One Bowling Green, New York, New York; and any objections to entry of such order shall be in writing, filed with the Court in accordance with General Order M-242, and served upon (i) the United States Trustee, <u>Attention</u>:  Andrea B. Schwartz; (ii) counsel for the DIP/Exit Agent; (iii) the parties identified on the Debtors' consolidated list of twenty (20) largest unsecured creditors; (iv) counsel for the Informal Creditor Group; (v) counsel for the Prepetition Senior Secured Notes Trustee; (vi) counsel for the Prepetition Agent; (vii) counsel for the Prepetition L/C Bank; (viii) the Securities and Exchange Commission; (ix) the United States Attorney for the Southern District of New York;

(x) the Internal Revenue Service; (xi) the Environmental Protection Agency; (xii) the

Pension Benefit Guaranty Corporation; (xiii) the New York State Department of

Taxation; (xiv) the New York City Tax Department; (xv) such other parties entitled to

notice pursuant to Local Rule 9013-1(m) and (xvi) the Banks listed on Exhibit C to this

Motion.

16.     Any objections or responses to the Motion shall be filed on or

before May [ ], 2012 at 4:00 p.m. prevailing Eastern Time and served on parties in

interest as required by the Local Rules.

17.     . This Order, and all acts taken in furtherance of or reliance upon

this Order, shall be effective notwithstanding the filing of an objection.

18.     Notwithstanding Bankruptcy Rules 6003 and 6004(h), the terms

and conditions of this Interim Order shall be immediately effective and enforceable upon

its entry.  The requirements of Local Rule 9013-1(b) are hereby waived.

19.     Service of this Order with a copy of the Motion as provided above

shall be deemed good and sufficient notice of the Motion and the final hearing thereon.

Dated: _____, 2012
        New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT E</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| HOUGHTON MIFFLIN | : | Case No. 10-____ (___) |
| HARCOURT PUBLISHING COMPANY, *et al.*, | : | |
| | : | (Joint Administration Pending) |
| Debtors. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## FINAL ORDER AUTHORIZING DEBTORS TO (I) MAINTAIN AND USE EXISTING BANK ACCOUNTS, BOOKS, RECORDS AND BUSINESS FORMS; (II) MAINTAIN AND USE EXISTING CASH MANAGEMENT SYSTEM, AS MODIFIED; AND (III) PROVIDE SUPERPRIORITY STATUS FOR INTERCOMPANY RECEIVABLES

Upon consideration of the motion (the "Motion")[1] of Houghton Mifflin

Harcourt Publishing Company and certain of its subsidiaries and affiliates, as debtors and

debtors-in-possession in the above-captioned chapter 11 cases (collectively, the

"Debtors"), for entry of an order pursuant to sections 105(a), 345(b), 363(c)(1) and

364(c), 503, 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy

Code") (i) authorizing the continued use of existing bank accounts (the "Bank

Accounts"), books, records and business forms; (ii) authorizing the continued use of the

Debtors' existing cash management system (the "Cash Management System"); (iii)

granting superpriority status for intercompany accounts; and (iv) waiving the deposit and

investment guidelines of section 345 of the Bankruptcy Code; and upon consideration of

the Bayers Affidavit pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the

Southern District of New York, sworn to on May 21, 2012; and the Court having

jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C.

---

[1]   Capitalized terms used and not defined herein shall have the meaning ascribed to them in the Motion.

§§ 157 and 1334; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409; and due and proper notice of the Motion having been provided; and it

appearing that no other or further notice need be provided; and the relief requested being

in the best interests of the Debtors and their estates and creditors; and the Court having

reviewed the Motion and having heard the statements in support of the relief requested

therein at the interim hearing before the Court; and the Court having determined that the

legal and factual bases set forth in the Motion and at the interim hearing established just

cause for entry of an interim order (the "Interim Order") granting the requested relief; and

the Court having held a final hearing (the "Hearing") on the relief requested in the Motion;

and the Court having determined that the legal and factual bases set forth in the Motion

and at the Hearing established just cause for the relief granted herein; and upon all of the

proceedings had before the Court and after due deliberation and sufficient cause appearing

therefor; it is hereby ORDERED that:

1.       The Motion is GRANTED as modified herein.

2.       All objections not previously withdrawn are overruled.

3.       The provisions of this order (the "Final Order") supersede the

provisions of the Interim Order previously entered on the Motion by this Court on

May [  ], 2012 ECF. No. [  ]], and in the event of any irreconcilable inconsistency

between this Final Order and the Interim Order, the terms of this Final Order shall govern

and control.

4.       Except as otherwise set forth below, the provisions of this Final

Order shall be effective, *nunc pro tunc*, to the commencement date of the Debtors'

chapter 11 cases (the "Petition Date").

2

5.     The Debtors are authorized to (i) maintain, and continue to use their existing prepetition Bank Accounts, in the names and with the account numbers existing immediately prior to the Petition Date, and treat such Bank Accounts as debtor-in-possession accounts; and (iii) deposit funds into and withdraw funds from existing prepetition Bank Accounts or accounts opened postpetition by all usual means, including, without limitation, checks, wires, automated clearinghouse transfers (the "ACH Transfers"), and other debits.

6.     The Debtors are authorized to open any new bank accounts or close any existing Bank Accounts as they may deem necessary and appropriate in their sole discretion; *provided, however*, that the Debtors may open a new bank account with a banking institution not designated as an Authorized Depository under the U.S. Trustee Guidelines only after obtaining the consent of (i) the U.S. Trustee and the Informal Creditor Group; or (ii) a court order.

7.     Any and all accounts opened by the Debtors on or after the Petition Date at any bank shall, for the purposes of this Order, be deemed a Bank Account (as if it had been opened prior to the Petition Date and listed in Exhibit C to the Motion), any and all banks at which such accounts are opened shall similarly be subject to the rights and obligations of this Order.

8.     Nothing contained herein shall prevent the banks (the "Banks") at which the Bank Accounts are held from modifying or terminating any Bank Accounts or related services in accordance with the agreements governing such accounts or services.

9.     The Banks are authorized to continue to treat, service, and administer such Bank Accounts as accounts of the Debtors as debtors-in-possession

3

without interruption and in the usual and ordinary course and to receive, process and honor and pay any and all postpetition checks, drafts, wires, or ACH Transfers drawn on the Bank Accounts by the holders or makers thereof to the extent the Debtors have good funds standing to their credit with such Bank, as the case may be.

10.     Notwithstanding anything to the contrary in any other "First Day Order" or other order of this Court, the Banks (i) are authorized to accept and honor all representations from the Debtors as to which checks, drafts, wires, or ACH Transfers should be honored or dishonored, consistent with any order(s) of this Court and governing law, whether such checks, drafts, wires, or ACH Transfers are dated prior to, on, or subsequent to the Petition Date, and whether the Banks believe the payment is or is not authorized by an order of this Court; (ii) have no duty to inquire as to whether such payments are authorized by an order of this Court; and (iii) have no duty to make payments in respect thereto unless the Debtors have good funds standing to their credit with such Bank.

11.     The Banks shall not be liable to any party on account of (i) following the Debtors' instructions or representations as to any order of this Court; (ii) the honoring of any prepetition check or item in a good faith belief that the Court has authorized such prepetition check or item to be honored; or (iii) an innocent mistake made despite implementation of reasonable item handling procedures.

12.     In accordance with current practice and the agreement governing the Bank Accounts, the Banks are authorized to "charge back" to the Debtors' accounts any amounts incurred by the Banks resulting from returned checks or other returned items, and the Debtors are authorized to pay any fees and expenses owed to the

4

Banks, in each case regardless of whether such items were deposited prepetition or postpetition or relate to prepetition or postpetition items.

13.     The Debtors are authorized to maintain and continue to use their checks and any and all other Business Forms substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors-in-possession until confirmation of the Prepackaged Plan.

14.     The Debtors and their duly appointed agents and custodians are authorized and empowered to (i) continue to manage the Debtors' cash pursuant to the Cash Management System maintained by the Debtors and their non-Debtor affiliates prior to the Petition Date; (ii) continue to perform their obligations under the agreements governing such Cash Management System, including paying all prepetition and postpetition fees and expenses incurred in connection therewith; *provided, however*, that prior to the Effective Date (as defined in the Prepackaged Plan), the Debtors must obtain the prior written consent of the Informal Creditor Group for any Intercompany Transaction giving rise to an Intercompany Claim against a Debtor of $3.5 million or more; and (iii) transfer funds by and among the Debtors, and by and among their respective Bank Accounts and other accounts maintained with or by their duly appointed agents and custodians, as and when needed and in the amounts necessary or appropriate to maintain their operations and facilitate the orderly operation of their estates or businesses.

15.     All Intercompany Claims incurred in the ordinary course of business between the Debtors and other Debtors, and between the Debtors and non-Debtors arising from Intercompany Transactions shall be accorded  superpriority status

with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code; *provided, however*, that all superpriority claims for intercompany receivables shall be subordinate in all respects to (i) any superpriority claims granted to the postpetition lenders, (ii) any claims under section 507(b) of the Bankruptcy Code granted to the Prepetition Secured Creditors, (iii) the Prepetition Secured Creditor Claims and (iv) any priorities, liens, claims and security interests that may be granted by the Court, from time to time.

16.     To the extent the Debtors are not already in compliance the requirements of section 345(b) of the Bankruptcy Court, compliance with those requirements is hereby waived until confirmation of the Prepackaged Plan.

17.     Notwithstanding Bankruptcy Rules 6003 and 6004(h), the terms and conditions of this Final Order shall be immediately effective and enforceable upon its entry.  The requirements of Local Rule 9013-1(b) are hereby waived.

Dated: _____, 2012
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE