Alan W. Kornberg
Jeffrey D. Saferstein
Philip Weintraub
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Proposed Counsel to the Debtors
and the Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| HOUGHTON MIFFLIN | : Case No. 12-____ (___) |
| HARCOURT PUBLISHING COMPANY, *et al.*,[1] | : |
| | : Joint Administration Pending |
| Debtors. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DEBTORS' MOTION FOR AN ORDER
### AUTHORIZING THE DEBTORS TO HONOR
### CERTAIN PREPETITION CUSTOMER OBLIGATIONS
### AND TO CONTINUE PREPETITION CUSTOMER PROGRAMS
### AND PRACTICES IN THE ORDINARY COURSE OF BUSINESS

Houghton Mifflin Harcourt Publishing Company and its affiliated debtors and

debtors-in-possession in the above-captioned cases (each a "Debtor," and collectively, the

"Debtors"), by and through their undersigned counsel, hereby move this Court for entry of an

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Houghton Mifflin Harcourt Publishing Company (6030), Houghton Mifflin Harcourt Publishers Inc. (7305), HMH Publishers, LLC (7173), Houghton Mifflin Holding Company, Inc. (2898), Houghton Mifflin, LLC (2961), Houghton Mifflin Finance, Inc. (2812), Houghton Mifflin Holdings, Inc. (0674), HM Publishing Corp. (5843), Riverdeep Inc., a Limited Liability Company (9612), Broderbund LLC (6113), RVDP, Inc. (2557), HRW Distributors, Inc. (4902), Greenwood Publishing Group, Inc. (4537), Classroom Connect, Inc. (3282), ACHIEVE! Data Solutions, LLC (7499), Steck-Vaughn Publishing LLC (6929), HMH Supplemental Publishers Inc. (7571), HMH Holdings (Delaware), Inc. (6372), Sentry Realty Corporation (6742), Houghton Mifflin Company International, Inc. (9100), The Riverside Publishing Company (0173), Classwell Learning Group Inc. (9252), Cognitive Concepts, Inc. (5986), Edusoft (9992), and Advanced Learning Centers, Inc. (2861).

order substantially in the form attached as <u>Exhibit A</u> hereto (the "<u>Order</u>") pursuant to sections 105(a), 363, 1107(a) and 1108 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") authorizing: (A) the Debtors to honor certain prepetition obligations to customers and to continue their prepetition customer programs and practices in the ordinary course of business; and (B) financial institutions to honor and process all checks and electronic transfers related thereto; and granting them such other and further relief as the Court deems just and proper.  In support of this motion (the "<u>Motion</u>"), the Debtors rely upon the Affidavit of William F. Bayers, general counsel to the Debtors, pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "<u>Bayers Affidavit</u>"), filed contemporaneously herewith and incorporated herein by reference, and respectfully state as follows:

## JURISDICTION

1.      This Court has jurisdiction to hear this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Sections 105(a), 363, 1107 and 1108 of the Bankruptcy Code provide the statutory predicate for the requested relief.

## BACKGROUND

2.      On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      As described more fully below, contemporaneously with the filing of their petitions, the Debtors also filed their Prepackaged Joint Plan of Reorganization (the "<u>Prepackaged Plan</u>") to implement a restructuring of certain of the Debtors' outstanding

indebtedness and existing equity interests.  Although the solicitation period remains open, as of

the Petition Date, 90.3% of the total amount of creditors entitled to vote on the Prepackaged Plan

voted in favor of the Prepackaged Plan and 76% in amount of equity holders entitled to vote on

the Prepackaged Plan voted in favor of the Prepackaged Plan.  The Debtors did not receive any

ballots rejecting the Prepackaged Plan.  As a result of the overwhelming support for the

Prepackaged Plan, the Debtors intend to move forward with confirmation of the Prepackaged

Plan at the Court's earliest available date.

4.      As of the date hereof, no creditors' committee, trustee or examiner has

been appointed in these cases.

5.      The Debtors comprise one of the leading educational publishers in the

U.S. public school market (known as kindergarten to grade 12 or "K-12").  The Debtors offer a

diverse portfolio of products and services, including textbooks, workbooks, supplemental

materials, technology-based products, teaching guides, various types of standardized and

customized tests, professional assessment products, and a wide range of trade and reference

titles.  The Debtors are organized into the following two divisions:  education and trade and

reference.  The education division is the largest division and represents approximately 90% of

the Debtors' total revenue.  The Debtors' revenue and EBITDA for the year ended December 31,

2011 were approximately $1.295 billion and $238 million, respectively.

6.      The global financial crisis over the past several years has negatively

affected the Debtors' recent financial performance.  The Debtors' business depends largely on

state and local funding and the recession-driven decreases in state spending as well as significant

purchase deferrals in key states and territories resulted in material reductions in the overall size

of the Debtors' key K-12 market.  Lack of anticipated federal stimulus support also contributed

to the Debtors' substantial revenue decline. As a result of the deteriorating macroeconomic conditions, the Debtors, along with certain of their non-debtor affiliates, implemented a consensual out-of-court restructuring in March, 2010. Despite the out-of-court restructuring, due to the continuing contraction of funds for state education spending and higher deferrals of awarded business than expected, the Debtors have continued to experience financial difficulties. On or about December 22, 2011 and December 29, 2011, the Debtors entered into amendments to their first lien credit facility and receivables facility, respectively (collectively, the "Amendments").

7.      Notwithstanding the Amendments, the Debtors have determined that a complete delevering of their capital structure is now necessary. In or about March 2012 significant holders of claims under the Debtors' first lien credit facility and the 10.5% Notes formed an informal creditor group (the "Informal Creditor Group"). Since its formation, the Informal Creditor Group and its advisors have engaged in constructive dialogue with the Debtors regarding a comprehensive restructuring of the Debtors' outstanding debt and equity.

8.      After months of good faith, arm's length negotiations among the Debtors and the Informal Creditor Group and their respective advisors, the parties reached an agreement on the terms of a restructuring to completely delever the Debtors' balance sheet. The Debtors have commenced these Chapter 11 Cases to implement the terms of the agreement which has been embodied in the Prepackaged Plan and the accompanying Restructuring Support Agreement (as defined in the Prepackaged Plan).

## RELIEF REQUESTED

9.      By this Motion, the Debtors request entry of an order granting them the authority to: (a) perform their prepetition obligations related to certain customer programs; (b)

4

continue, renew, replace, modify and/or terminate any of the customer programs in the ordinary course of business without the need for further court order; and (c) perform and pay certain prepetition obligations related thereto.

10.     In the ordinary course of their business, the Debtors engage in certain practices (each a "Customer Program" and collectively, as described below, the "Customer Programs") to develop and sustain a positive reputation with their customers and in the marketplace for their products.  The Customer Programs are generally customary to the Debtors' industry and seek to meet competitive pressures, ensure customer satisfaction, and generate goodwill for the Debtors.  They enable the Debtors to retain existing customers, attract new ones, and ultimately, to enhance the Debtors' overall profitability.[2]

A.     **Customer Programs**

11.     The Debtors seek to continue the Customer Programs because they have historically produced positive results and generate valuable goodwill, repeat business, increased revenue and, as a result, are an important facet of the Debtors' business.  Continuing the Customer Programs in the ordinary course of business will maximize the value of the Debtors' estates for the benefit of all stakeholders.  The following provides a general description of the Customer Programs and the prepetition obligations related thereto.

(i)     *Return Programs*

12.     In order to accommodate trade customers and school customers that purchase products from the Debtors that they cannot sell or use, the Debtors, in the ordinary

---

[2]     Notwithstanding anything to the contrary in this Motion or order, nothing herein constitutes, or shall be deemed to constitute, a request to assume or adopt any executory contract under any Customer Program.  The Debtors expressly reserve all rights with respect to the continuation or termination of any contract with any customer, and expressly reserve the right to contest, in the ordinary course of business, any amounts claimed to be due, if any, by any customer.

course of business, offer certain of these customers limited rights of return (the "Return Programs").  The Return Programs vary based on customer-type as set forth below.

13.     K-12 school customers and international customers must receive authorization from the Debtors before making a return.  Returned books must be unused and in saleable condition.  Once authorization is obtained, these customers receive a credit for book returns.

14.     Trade customers do not require authorization from the Debtors prior to making a return.  Returned books must be in print and in saleable condition and accompanied by sale documentation.  The amount credited to trade customers for a return will be based on the price as well as the discount for purchases made by the customer during the previous 12 months.  If there is no purchase history for a particular customer, credit will be based on the current list price and maximum discount for the customer's buying schedule.  Trade customers may only return products 90 days after the invoice date if purchased on a returnable basis, but not more than 90 days after the product is declared out of print.

15.     As a percentage of sales, returns often fluctuate based on the type of customer, with trade and reference customers usually returning a higher percentage.  Trade and reference returns are spread throughout the year with the highest return percentages occurring from January through April.  K-12 and international customers make most of their their returns from September through December.  The Debtors recorded approximately $46.9 million in credits due to their Return Programs in fiscal year 2011.  The Debtors estimate that approximately $7.63 million of goods purchased prepetition may be returned during the course

of these chapter 11 cases.[3]  Any failure to honor these obligations will undermine the Debtors'

relationship with their customers and impair the Debtors' ability to successfully attract new

customers.  Without the Return Programs, existing customers may seek alternatives, thereby

adversely impacting the Debtors' bottom line.

16.     By this Motion, the Debtors request the authority, but not the direction, to

honor all of their Return Programs whether the Debtors' obligations under the Return Programs

arose before or after the Petition Date.  The Debtors reorganization efforts depend on such relief,

which maximizes the value of their estates for the benefit of all stakeholders.

**(ii)     *Cooperative Advertising Policies***

17.     The Debtors trade and reference division provides cooperative advertising

funds for Houghton Mifflin Harcourt Adult, Reference, Houghton Mifflin Harcourt Juvenile,

Clarion Books, Larousse, and Chambers books (the "Qualifying Products") at both the retail and

wholesale levels (individually, the "Retail Advertising Policy" and "Wholesale Advertising

Policy" respectively, and collectively, the "Cooperative Advertising Policies").  The Debtors

accumulate approximately $250,000 per month in fees under the Cooperative Advertising

Policies.

18.     The Retail Advertising Policy provides that cooperative advertising funds

are only available to retailers who purchase books on a returnable basis and who are in good

credit standing.  Retail customers receive a maximum allowable cooperative advertising

expenditure by formula based on the previous year's net billing and the previous year's

---

[3]     The Debtors' estimate is based on the assumption that they will emerge from chapter 11 within a two-month
period.  The Debtors estimate that should they remain in chapter 11 for a one-month period, approximately
$5,628,219 of goods purchased prepetition may be returned.  As of March 31, 2012, the Debtors have reserved
approximately $30 million for their Returns Programs for 2012.

documented net wholesale purchases (the "Retail Maximum Expenditure").  The Retail

Maximum Expenditure can be used for any method of promotion that is practical and effective,

including print, radio, television, catalogs and circulars, mailing pieces, newsletters, or

promotional placement within retail locations (the "Qualifying Advertising Purpose").  The

Retail Advertising Policy also provides that retail customers are eligible for additional

allowances above the Retail Maximum Expenditure to promote approved author appearances and

to advertise the Debtors' titles in newsletters.  All expenditures under the Retail Advertising

Policy must be pre-approved by the Debtors.

       19.     The Wholesale Advertising Policy provides that cooperative advertising

funds are only available to retailers who purchase books on a returnable basis and who are in

good credit standing for Qualifying Products.  Wholesale customers receive a maximum

allowable cooperative advertising expenditure by formula based on the previous year's net

billing (the "Wholesale Maximum Expenditure").  The Wholesale Maximum Expenditure can be

used for any Qualifying Advertising Purpose.  The Wholesale Advertising Policy also provides

that the Debtors may offer a specific allowance for selling promotionally displayed titles at a

price at or below a certain percentage of the Debtors' suggested list price.  The allowance takes

the form of a credit that is generated to the customer, offsetting any accounts receivable amounts

due from that customer.

       20.     Any failure to honor these obligations or to pay fees under the Cooperative

Advertising Policies will undermine the Debtors' relationship with retailers and wholesalers, and

impair the Debtors' ability to successfully attract new retail and wholesale customers.  Existing

retail and wholesale outlets may stop carrying or advertising the Debtors' products, reducing

sales of the Debtors' products eligible for cooperative advertising funds, thereby adversely impacting the Debtors' bottom line.

21.     By this Motion, the Debtors request the authority, but not the direction, to honor all of their Cooperative Advertising Policies whether the Debtors' obligations under the Cooperative Advertising Policies arose before or after the Petition Date.  The Debtors reorganization efforts depend on such relief, which maximizes the value of their estates for the benefit of all stakeholders.

### BASIS FOR RELIEF

22.     The Bankruptcy Code and established judicial doctrine authorize the requested relief.  Specifically, sections 1107(a) and 1108 of the Bankruptcy Code allow a debtor-in-possession to continue to operate its business.  Further, section 363(c) of the Bankruptcy Code authorizes a debtor-in-possession to operate its business and to use property of the estate in the ordinary course of doing so without having to provide notice or obtain a court hearing.  See *Chaney v. Official Comm. Of Unsecured Creditors (In re Crystal Apparel, Inc.)*, 207 B.R. 406, 409 (S.D.N.Y. 1997) *citing In re Roth American*, 975 F.2d 949, 952 (3rd Cir. 1992) (stating that "the framework of section 363 is designed to allow a [debtor in possession] the flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy court oversight, while protecting creditors by giving them an opportunity to be heard when transactions are not ordinary."); *In re Dana Corp.*, 358 B.R. 567, 580 (Bankr. S.D.N.Y 2006).

23.     The Bankruptcy Code does not provide guidance as to whether a particular transaction was conducted "in the ordinary course of business" but courts have applied a two-step "horizontal and vertical test" that considers the reasonableness of a particular transaction from both an industry-wide perspective and from the viewpoint of a creditor.  *In re Dana Corp.*,

358 B.R. at 580.  "The inquiry deemed horizontal is whether, from an industry-wide perspective,

the transaction is of the sort commonly undertaken by companies in that industry.  The inquiry

deemed vertical analyzes the transactions 'from the vantage point of a hypothetical creditor and

[the inquiry is] whether the transaction subjects a creditor to economic risk of a nature different

from those he accepted when he decided to extend credit."  *Id*. (additional citations omitted).

24.    The Return Programs and Cooperative Advertising Policies are typical in

the educational and/or trade publishing industry, have been offered by the Debtors for many

years and are programs offered in the ordinary course of the Debtors' business.  Accordingly,

continuing, renewing, replacing, initiating, and/or terminating Customer Programs falls well

within the scope of permitted activities under sections 363(c), 1107(a), and 1108 of the

Bankruptcy Code.

25.    To the extent that payment of prepetition obligations owed pursuant to the

Customer Programs would be deemed to constitute a use of property outside of the ordinary

course of business, this Court may also authorize continuation of the Customer Programs under

section 363(b) of the Bankruptcy Code.  Section 363(b)(1) provides that "[t]he trustee, after

notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate."  11 U.S.C. § 363(b)(1).  Courts in this and other circuits have stated that

use of property outside the ordinary course of business is proper when the Debtor  articulates

"some business justification, other than the mere appeasement of major creditors."  *See, e.g. Law*

*Debenture Trust Co. v. Calpine Corp. (In re Calpine Corp.)*, 356 B.R. 585, 594 (S.D.N.Y. 2007);

*Official Comm. Of Unsecured Creditors v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 27-28

(S.D.N.Y. 2005) *quoting In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re*

*Ionosphere Clubs*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (stating that section 363(b) gives

the court "broad flexibility" in authorizing the use of funds outside the ordinary course of business but noting that the debtor must articulate some business justification, other than mere appeasement of major creditors, for doing so).

26.     As noted above, the Customer Programs are an important part of the Debtors' business and strategy.  The Debtors operate in a competitive and volatile market and their business depends on the quality and strength of their customer relationships, and their ability to attract new customers and advertisers.  The continued loyalty and support of the Debtors' customers is critical to the successful reorganization of the Debtors and continuation of the Customer Programs is critical to maintain such support and loyalty.  Any failure to honor the Debtors' Customer Programs would disrupt the Debtors' customer contacts, and as a result, the Debtors' profitability and accordingly, would seriously undermine the goals of these chapter 11 cases.

27.     Section 105(a) of the Bankruptcy Code provides an additional basis to grant the requested relief.  It authorizes a court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  Section 105(a) of the Bankruptcy Code ensures a bankruptcy court's power to take whatever action "is appropriate or necessary in aid of the exercise of its jurisdiction."  2 Collier on Bankruptcy 105.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  Under section 105(a), courts may permit pre-plan payments of prepetition obligations when essential to the continued operation of the debtor's business.  Id. Courts that have approved such payments have relied on the "necessity of payment" doctrine, which further supports the requested relief.

*Ionosphere Clubs*, 98 B.R. at 176 (necessity of payment rule applies to chapter 11 debtors)[4]

*citing In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (payment of

creditors' claims authorized under "necessity of payment" doctrine) (additional citations

omitted); In re Just For Feet Inc., 242 B.R. 821, 824 (D. Del. 1999) (recognizing "the court's

power to authorize payment of pre-petition claims when such payment is necessary for the

debtor's survival during chapter 11"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-192

(Bankr. D. Del. 1994) (noting that the debtors "may pay pre-petition claims that are essential to

continued operation of business"); 2 Collier on Bankruptcy ¶ 105.02[4] [a] (Alan N. Resnick &

Henry J. Sommer eds. 16th ed).

      28.    Where customer loyalty and patronage proves critical to a debtor's

successful chapter 11 case, courts in this district and other jurisdictions have routinely granted

relief similar to that requested here.  *See, e.g., In re Eastman Kodak Co., et al.*, Case No. 12-

10202 (ALG) (Bankr. S.D.N.Y. Feb. 15, 2012) [Docket No. 359]; *In re AMR Corp., et al.*, Case

No. 11-15463 (SHL) (Bankr. S.D.N.Y. Dec. 22, 2011) [Docket No. 426]; *In re Alexander Gallo*

*Holdings LLC, et al.*, Case No. 11-14220 (ALG) (Bankr. S.D.N.Y. Sept. 27, 2011) [Docket No.

119]; *In re Club Ventures Investments LLC*, Case No.  11-1089 (ALG) (Bankr. S.D.N.Y. Mar. 4,

2011) [Docket No. 16]; *In re Steve & Barry's Manhattan LLC, et al.*, 08-12579 (Bankr. S.D.N.Y.

Jul. 29, 2008) [Docket No. 287]; *In re Wellman, Inc., et al.*, Case No. 08-10595 (SMB) (Bankr.

S.D.N.Y. Feb. 25, 2008); *In re Quebecor World (USA) Inc. et al.*, Case No. 08-10152 (JMP)

---

[4]    Although the Court in *Ionosphere Clubs* was applying the necessity of payment doctrine in a railroad
reorganization case, it noted that the doctrine would still be applicable under the rationale of Judge Learned
Hand who applied this rule to a non-railroad debtor.  *Id.* At 176 *citing Dudley v. Mealey*, 147 F.2d 268 (2d Cir.),
*cert. denied*, 325 U.S. 873 (1945).  In *Dudley*, Judge Hand stated that "[j]ust as it is recognized that, after
insolvency, the expenses of continued operation of a business may be necessary to preserve its value for the
secured creditors themselves, and for that reason that the receiver's creditors have priority, so it may be before
insolvency." *Dudley*, 147 F.2d at 271.

(Bankr. S.D.N.Y. Jan. 23, 2008) [Docket No. 45]; *In re Dana Corp et al.*, Case No. 06-10354

(BRL) (Bankr. S.D.N.Y. Mar. 7, 2006) [Docket No. 116]; *In re Delphi Corp., et al.*, Case No.

05-44481 (RDD) (Bankr. S.D.N.Y. Oct. 14, 2005) [Docket No. 221].

29.    The prepetition Customer Program claims meet the requirements for

postpetition payment because, if they are not satisfied, the Debtors' goodwill and going concern

value will be adversely impacted. *In re CoServ*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)

(stating that implicit in the duties of a chapter 11 trustee or a debtor-in possession is the duty of

such a fiduciary to protect and preserve the estate, including an operating business's going-

concern value and that there are occasions when this duty can only be fulfilled by preplan

satisfaction of a prepetition claim, such as customer refund claims). The importance of the

Debtors' major customers to their businesses cannot be overstated and continuing the Customer

Programs is necessary to preserve the value of the Debtors' estates for the benefit of all of their

stakeholders. Maintaining the Debtors' revenue stream is crucial to the Debtors' ability to

propose and confirm a plan of reorganization that will provide a basis for long term success and

profitability, ultimately benefiting all of the Debtors' constituencies.

30.    The success and viability of the Debtors' business depends upon the

development and maintenance of customer loyalty. The commencement of these chapter 11

cases will no doubt create apprehension on the part of customers or potential customers

regarding their willingness to continue or commence doing business with the Debtors. The

Debtors believe that without the requested relief, the stability of the Debtors' businesses will be

significantly undermined, and otherwise loyal customers may discontinue purchasing the

Debtors' products. As previously discussed, the damage that would result if the Debtors fail to

honor their prepetition Customer Programs significantly outweighs any arguable harm to the

Debtors' estates if such obligations were honored.

31.     Pursuant to Bankruptcy Rule 6003, the Court may grant relief regarding a

motion to pay all or part of a prepetition claim within 21 days after the Petition Date if such

relief is necessary to avoid "immediate and irreparable harm."  As described above, the

Customer Programs are vital to the Debtors' operations and are necessary to maintain the

goodwill of the Debtors' customers.  Failure to satisfy the Customer Programs in the ordinary

course of these chapter 11 cases would cause irreparable damage to the Debtors' relationships

with their customers, and by direct extension, the Debtors' reorganization efforts.

### WAIVER OF BANKRUPTCY RULES 6003(b), 6004(a), 6004(h) AND LOCAL RULE 9013-1(b)

32.     The Debtors submit that because the relief requested in this Motion is

necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth

herein, Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") has

been satisfied.  Furthermore, given the nature of the relief requested herein, the Debtors

respectfully request a waiver of (i) the notice requirements under Bankruptcy Rule 6004(a); (ii)

the 14-day stay under Bankruptcy Rule 6004(h); and (iii) the notice requirements under Rule

9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rule

9013-1(b)").

### NOTICE

33.     As of the date hereof, no creditors' committee, trustee, or examiner has

been appointed in these chapter 11 cases.  Notice of this Motion has been provided to:  (i) the

United States Trustee, Attention:  Andrea B. Schwartz; (ii) counsel for the DIP/Exit Agent;

(iii) the parties identified on the Debtors' consolidated list of twenty (20) largest unsecured

14

creditors; (iv) counsel for the Informal Creditor Group; (v) counsel for the Prepetition Senior

Secured Notes Trustee; (vi) counsel for the Prepetition Agent; (vii) counsel for the Prepetition

L/C Bank; (viii) the Securities and Exchange Commission; (ix) the United States Attorney for

the Southern District of New York; (x) the Internal Revenue Service; (xi) the Environmental

Protection Agency; (xii) the Pension Benefit Guaranty Corporation; (xiii) the New York State

Department of Taxation; (xiv) the New York City Tax Department; and (xv) such other parties

entitled to notice pursuant to Local Rule 9013-1(m).  The Debtors submit that, in light of the

nature of the relief requested, no other or further notice need be provided.

**<u>NO PRIOR REQUEST</u>**

34.    No prior request for the relief sought herein has been made to this or any

other court.

WHEREFORE, the Debtors respectfully request that this Court enter an order substantially in the form attached hereto as <u>Exhibit A</u> granting the requested relief and such other and further relief as it deems just and proper.

Dated:  May 21, 2012
      New York, New York

PAUL, WEISS, RIFKIND WHARTON & GARRISON LLP

By:  <u>  /s/ Jeffrey D. Saferstein          </u>
Alan Kornberg
(akornberg@paulweiss.com)
Jeffrey D. Saferstein
(jsaferstein@paulweiss.com)
Philip Weintraub
(pweintraub@paulweiss.com)
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:   (212) 757-3990

Proposed attorneys for the Debtors and Debtors-in-Possession

## Exhibit A

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| HOUGHTON MIFFLIN | : Case No. 12-____ (___) |
| HARCOURT PUBLISHING COMPANY, *et al.*, | : |
| | : Joint Administration Pending |
| Debtors. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### ORDER AUTHORIZING THE DEBTORS TO HONOR CERTAIN PREPETITION CUSTOMER OBLIGATIONS AND TO CONTINUE PREPETITION CUSTOMER PROGRAMS AND PRACTICES IN THE ORDINARY COURSE OF BUSINESS

Upon the motion (the "Motion")[1] of Houghton Mifflin Harcourt Publishing

Company and its affiliated debtors and debtors-in-possession in the above-captioned cases

(each a "Debtor," and collectively, the "Debtors"), requesting entry of an order pursuant to

sections 105(a), 363, 1107(a) and 1108 of the Bankruptcy Code authorizing: (A) the Debtors

to honor certain prepetition obligations to customers and to continue their prepetition

customer programs and practices in the ordinary course of business; and (B) authorizing

financial institutions to honor and process all checks and electronic transfers related thereto;

and upon consideration of the Affidavit of Bill Bayers, general counsel to the Debtors,

pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of

New York, sworn to on May 21, 2012; and this Court having jurisdiction to consider the

Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and it

appearing that venue of these cases and the Motion in this district is proper pursuant to 28

U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core proceeding pursuant to

---

[1]    All capitalized terms used and  not defined herein shall have the meaning ascribed to them in the Motion.

28 U.S.C. § 157(b); and it appearing that notice of the Motion has been given as set forth in

the Motion and that such notice is adequate and no other or further notice need be given; and

a hearing having been held to consider the relief requested in the Motion; and upon the

record of the hearing and all of the proceedings had before the Court; and the Court having

found and determined that the relief sought in the Motion is in the best interests of the

Debtors, their estates, their creditors and all other parties in interest; and that the legal and

factual bases set forth in the Motion establish just cause for the relief granted herein; and

after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED that:

      1.     The Motion is GRANTED as modified herein.

      2.     The Debtors, in their sole discretion, are authorized, but not directed,

to honor and perform their obligations under the Customer Programs, without regard to

whether the Debtors' obligations under any such Customer Programs arose before or after

the Petition Date.

      3.     To the extent the Debtors discover additional pre-petition customer

obligations, the Debtors will seek further order of the Court in order to satisfy them.

      4.     The Debtors, after consultation with the Informal Creditors Group, are

authorized, but not directed, to continue, renew, modify and/or terminate (each, an "Action")

such of their Customer Programs as they deem appropriate, in the ordinary course of

business, without further application to this Court; provided, however that the Debtors must

obtain the prior written consent of the Informal Creditor Group before taking any Action

that will result in an aggregate cost or expense to the Debtors of $5 million or more.

      5.     All financial institutions (the "Banks") are hereby authorized and

directed to receive, process, honor and pay any and all checks presented for payment of,  and

to honor all funds transfer requests made by the Debtors related to, Customer Programs, whether such check were presented or funds transfer requests were submitted prior to or after the Petition Date.  The Banks are authorized to rely on the representations of the Debtors as to which checks are issued or authorized to be paid pursuant to this Order.

6.      Notwithstanding anything in this Order to the contrary, or any relief granted herein or any actions taken hereunder, nothing contained herein shall constitute, nor shall be deemed to constitute, the assumption or adoption of any contract or agreement related to the Customer Programs under section 365 of the Bankruptcy Code.  Nothing in this Order shall impair or be deemed to impair the Debtors' ability to contest the validity or amount of any claim related to any Customer Program or any other payment authorized herein.

7.      Bankruptcy Rule 6003(b) has been satisfied because the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors.  The requirements of Bankruptcy Rules 6004(a) and 6004(h) and Local Rule 9013-1(b) are waived.

8.      Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon its entry; (b) the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order; and (c) the Debtors are authorized and empowered, and may in their discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

9.      This Court shall retain jurisdiction with respect to any matters, claims,

rights or disputes arising from or related to the Motion or the implementation of this Order.

Dated:   May [  ], 2012
         New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE