Alan W. Kornberg
Jeffrey D. Saferstein
Philip A. Weintraub
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Proposed Counsel to the Debtors and the Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| HOUGHTON MIFFLIN | : Case No. 12-____ (___) |
| HARCOURT PUBLISHING COMPANY, *et al.*,[1] | : |
| | : (Joint Administration Pending) |
| Debtors. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR AN ORDER (I) AUTHORIZING THE
DEBTORS TO PAY CERTAIN PREPETITION (A) WAGES, SALARIES,
COMMISSIONS AND OTHER COMPENSATION; (B) COMPENSATION
OWED TO PROJECT EMPLOYEES AND INDEPENDENT CONTRACTORS;
(C) EMPLOYEE BUSINESS EXPENSES; (D) CONTRIBUTIONS TO
EMPLOYEE BENEFIT PROGRAMS AND THE CONTINUATION OF SUCH
PROGRAMS IN THE ORDINARY COURSE; AND (E) PAYROLL
WITHHOLDINGS AND RELATED DEDUCTIONS AND PAYMENTS; AND
(II) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO
HONOR AND PAY ALL CHECKS AND TRANSFERS DRAWN ON THE
DEBTORS' ACCOUNTS RELATED TO THE FOREGOING**

---

[1]   The Debtors in these cases along with the last four digits of each Debtor's federal tax identification number, are Houghton Mifflin Harcourt Publishing Company (6030), Houghton Mifflin Harcourt Publishers Inc. (7305), HMH Publishers, LLC (7173), Houghton Mifflin Holding Company, Inc. (2898), Houghton Mifflin, LLC (2961), Houghton Mifflin Finance, Inc. (2812), Houghton Mifflin Holdings, Inc. (0674), HM Publishing Corp. (5843), Riverdeep Inc., a Limited Liability Company (9612), Broderbund LLC (6113), RVDP, Inc. (2557), HRW Distributors, Inc. (4902), Greenwood Publishing Group, Inc. (4537), Classroom Connect, Inc. (3282), ACHIEVE! Data Solutions, LLC (7499), Steck-Vaughn Publishing LLC (6929), HMH Supplemental Publishers Inc. (7571), HMH Holdings (Delaware), Inc. (6372), Sentry Realty Corporation (6742), Houghton Mifflin Company International, Inc. (9100), The Riverside Publishing Company (0173), Classwell Learning Group Inc. (9252), Cognitive Concepts, Inc. (5986), Edusoft (9992), Advanced Learning Centers, Inc. (2861).

Houghton Mifflin Harcourt Publishing Company and its affiliated debtors and debtors-in-possession in the above-captioned cases (each a "Debtor," and collectively, the "Debtors"), by and through their undersigned counsel, hereby move this Court for entry of an order substantially in the form attached hereto as Exhibit A (the "Order") pursuant to sections 105(a), 363(b), 507(a)(3) and 507(a)(4) of title 11 of the United States Code (the "Bankruptcy Code"):  (I) authorizing the Debtors to pay certain prepetition (A) wages, salaries, commissions and other compensation; (B) compensation owed to project employees and independent contractors; (C) employee business expenses; (D) contributions to employee benefit programs and the continuation of such programs in the ordinary course; and (E) payroll withholding and related deductions and payments; and (II) authorizing and directing banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtors' accounts related to the foregoing; and granting them such other and further relief as the Court deems just and proper.  In support of this motion (the "Motion"), the Debtors rely upon the affidavit of William F. Bayers pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Bayers Affidavit"), filed contemporaneously herewith and incorporated herein by reference, and respectfully state as follows:

## **JURISDICTION**

1.      This Court has jurisdiction to hear this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  Sections 105(a), 363(b), 507(a)(3) and 507(a)(4) of the Bankruptcy Code provide the statutory predicate for the requested relief.

## BACKGROUND

2.      On the date hereof (the "Petition Date"), each of the Debtors filed
with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.
The Debtors continue to operate their businesses and manage their properties as debtors-
in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As
described more fully below, contemporaneously with the filing of their petitions, the
Debtors also filed their Prepackaged Joint Plan of Reorganization (the "Prepackaged
Plan") to implement a restructuring of certain of the Debtors' outstanding indebtedness
and existing equity interests.  Although the solicitation period remains open, as of the
Petition Date, 90.3% of the total amount of creditors entitled to vote on the Prepackaged
Plan voted in favor of the Prepackaged Plan and 76% in amount of equity holders entitled
to vote on the Prepackaged Plan voted in favor of the Prepackaged Plan.  The Debtors did
not receive any ballots rejecting the Prepackaged Plan.  As a result of the overwhelming
support for the Prepackaged Plan, the Debtors intend to move forward with confirmation
of the Prepackaged Plan at the Court's earliest available date.

3.      The Debtors comprise one of the leading educational publishers in
the U.S. public school market (known as kindergarten to grade 12 or "K-12").  The
Debtors offer a diverse portfolio of products and services, including textbooks,
workbooks, supplemental materials, technology-based products, teaching guides, various
types of standardized and customized tests, professional assessment products, and a wide
range of trade and reference titles.  The Debtors are organized into the following two
divisions:  education and trade and reference.  The education division is the largest
division and represents approximately 90% of the Debtors' total revenue.  The Debtors'

revenue and EBITDA for the year ended December 31, 2011 were approximately $1.295 billion and $238 million, respectively.

4.      The global financial crisis over the past several years has negatively affected the Debtors' recent financial performance.  The Debtors' business depends largely on state and local funding and the recession-driven decreases in state spending as well as significant purchase deferrals in key states and territories resulted in material reductions in the overall size of the Debtors' key K-12 market.  Lack of anticipated federal stimulus support also contributed to the Debtors' substantial revenue decline.  As a result of the deteriorating macroeconomic conditions, the Debtors, along with certain of their non-debtor affiliates, implemented a consensual out-of-court restructuring in March, 2010.  Despite the out-of-court restructuring, due to the continuing contraction of funds for state education spending and higher deferrals of awarded business than expected, the Debtors have continued to experience financial difficulties.  On or about December 22, 2011 and December 29, 2011, the Debtors entered into amendments to their first lien credit facility and receivables facility, respectively (collectively, the "Amendments").

5.      Notwithstanding the Amendments, the Debtors have determined that a complete delevering of their capital structure is now necessary.  In or about March 2012, significant holders of claims under the Debtors' first lien credit facility and the 10.5% Notes formed an informal creditor group (the "Informal Creditor Group").  Since its formation, the Informal Creditor Group and its advisors have engaged in constructive dialogue with the Debtors regarding a comprehensive restructuring of the Debtors' outstanding debt and equity.

4

6.      After months of good faith, arm's-length negotiations among the Debtors and the Informal Creditor Group and their respective advisors, on May 10, 2012, the parties reached an agreement on the terms of a restructuring to completely delever the Debtors' balance sheet.  The Debtors have commenced these chapter 11 cases to implement the terms of the agreement which has been embodied in the Prepackaged Plan and the accompanying Restructuring Support Agreement.[2]

## **RELIEF REQUESTED**

7.      By this Motion, the Debtors seek authority under sections 105(a), 363(b), 507(a)(3) and 507(a)(4) of the Bankruptcy Code to pay prepetition wages, salaries, payroll taxes, deductions, employee benefits and related expenses (the "Wages and Benefits") in accordance with their existing policies in the ordinary course of their business up to the following maximum amounts: $6,180,400 in the aggregate, on account of prepetition wages, salaries and commissions owed to Employees (defined below) and Independent Contractors (defined below); $1.745 million, in the aggregate, on account of business expense reimbursements; $1.5 million, in the aggregate, on account of Payroll Taxes (defined below); $4,000, in the aggregate, on account of Deductions (defined below); and $3,665,000, in the aggregate, in connection with Employee Benefits (defined below).

8.      The Debtors' employees constitute the Debtors' most valuable asset and are essential to the Debtors' businesses and successful reorganization.  Absent an order granting the requested relief, many employees will suffer undue hardship, and in

---

[2]   Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Prepackaged Plan and Disclosure Statement.

many instances, face serious financial difficulties.  Moreover, an inability to pay their

employees in the ordinary course may irreparably undermine the stability of the Debtors'

on-going operations and prevent the Debtors' successful recapitalization and

reorganization.

A.    **Employees**

9.      The Debtors currently employ approximately 3,330 employees,

(the "Employees), 3,245 of which are full time Employees.  The Debtors also currently

employ approximately 250 independent contractors (the "Independent Contractors").

10.      The Employees and Independent Contractors perform a variety of

functions critical to the Debtors' operations, including, but not limited to, product

manufacturing, sales, marketing, accounting, administration and management.

Furthermore, the Employees' knowledge and understanding of the Debtors' products,

operations, customer relations and infrastructure are essential to the Debtors' effective

reorganization.

B.    **Prepetition Employee Obligations**

(i)      ***Wages, Salaries, and Other Compensation***

11.      The average gross monthly compensation that the Debtors pay to

their Employees, including wages, salaries, commissions and other compensation

(collectively, "Wages"), totals approximately $19.4 million.  Approximately 97.2% of

payroll payments to Employees are made by direct deposit through electronic fund

transfers directly to the Employees' bank accounts.  The remainder of the payroll

payments are paid by check, primarily to warehouse Employees.  Most of the Employees

are paid on a biweekly basis.  Warehouse Employees are paid on a weekly basis.  The

Debtors' payroll is administered by Automated Data Processing, Inc. ("ADP").  Average

annual fees relating to the administration of the Debtors' payroll and other human
resources systems and services by ADP total approximately $1.4 million.

12.      Because most of the Employees are paid in arrears, some of the
Employees may not have been paid all of their prepetition Wages as of the Petition Date.
Compensation may also be due and owing as of the Petition Date because some payroll
checks issued to Employees may not have been presented for payment or cleared the
banking system prior to the Petition Date.

13.      The Debtors estimate that the aggregate amount of accrued Wages
(excluding the Payroll Taxes and Deductions, each as defined below) earned prior to the
Petition Date that remains unpaid to the Employees totals approximately $5.5 million (the
"Unpaid Wages").  By this Motion, the Debtors request authority to pay all such Unpaid
Wages to their Employees in the ordinary course of business.

14.      Based upon the Debtors' thorough review of their books and
records, approximately 7 Employees are owed more than $11,725, in the aggregate, on
account of Wages as of the Petition Date.[3]  Although these claims exceed the $11,725
statutory limit by approximately $97,700, the Debtors seek authority pursuant to this
Motion to pay those claims in full.  The Debtors believe that such payments are justified
because the Prepackaged Plan provides that all unsecured claims, including prepetition

---

[3]      Of the seven Employees who are owed more than $11,725, the Debtors' chief executive officer, Linda
K. Zecher,  is owed approximately $4,700 over the priority cap.  The other Employees are non-
management Employees who are owed commissions for work that was performed in 2011.  Those
Employees are:  Amy Zagora – Account Manager; Deborah Smith – Account Manager; Beatrice Jean-
Baptiste – Sales Consultant; Christine Jenkins – Sales Representative; and Kimberly Boller-Drake –
Sales Representative.  The range in amounts that is over the priority cap is from $400 to $8,384.  Also,
one Employee, Nancy Updegraff – Federal Funds Consultant, is owed $75,000 over the priority cap,
which is due for commissions for work that was performed in 2011 and that was in dispute until
recently being settled.

amounts in respect of Unpaid Wages, will be paid in full.  As a result, it is merely a question of timing, as the Debtors would have to pay these claims pursuant to the Prepackaged Plan in any event.

15.       The Debtors also utilize Independent Contractors and have engaged ZeroChaos to manage the Independent Contractors' payroll and expenses.  In 2011, the Debtors spent approximately $15 million for the services of Independent Contractors.

16.       Depending on the type of service rendered, Independent Contractors are paid according to the terms of their agreements.  As of the Petition Date, the Debtors estimate that they owe approximately $680,553 for the unpaid and accrued services of Independent Contractors, 7 of whom individually are owed more than $11,725.[4]  By this Motion, the Debtors request authority to pay any and all prepetition amounts owing to Independent Contractors.

**(ii)      *Reimbursement of Prepetition Employee Business Expenses***

17.       In the ordinary course of their business, the Debtors directly or indirectly reimburse Employees for certain expenses that Employees incur on behalf of the Debtors in the scope of the Employees' employment (the "Reimbursable Business Expenses").  The Reimbursable Business Expenses include things such as air travel, lodging, ground transportation, meals, and other similar expenditures.  Certain Employees incur the Reimbursable Business Expenses on behalf of the Debtors through use of American Express credit cards.  After the submission and approval of expense

---

[4]       The Independent Contractors who are owed more than $11,725 provide professional development to schools on-site.  The range in amounts that is over the priority cap is from $1,774 to $5,825.

reports, the Debtors pay the Reimbursable Business Expenses directly to American

Express.  Other Employees enter expenses into Concur software and are then reimbursed

through automated clearing house ("ACH") payments or Electronic Funds Transfer

("EFT") payments.  The Debtors rarely use petty cash funds to reimburse Employees for

Reimburseable Business Expenses, although *de minimis* amounts are paid to Employees

through this method of reimbursement.

18.     In 2011, the Debtors spent approximately $31,542,129 on

Reimbursable Business Expenses, including payments made to American Express and

payments made through ACH and EFT.  Because Employees do not always submit

expense reports regularly, the Debtors cannot precisely determine the exact amount of

Reimbursable Business Expenses outstanding as of the Petition Date.  However, based on

historical averages, the Debtors estimate that no more than $1.745 million of such

expenses remain unpaid as of the Petition Date.

19.     The Employees incurred all of the Reimbursable Business

Expenses on the Debtors' behalf and with the understanding that they would be

reimbursed.  To avoid harming the individual Employees who have incurred such costs,

the Debtors request authority to pay the Reimbursable Business Expenses, including

paying any and all unpaid Reimbursable Business Expenses that accrued prepetition or

relate to the prepetition period up to an amount of $ 1.745 million in the aggregate.

**(iii)     *Prepetition Withholdings and Deductions***

20.     By law, the Debtors must withhold from an Employee's Wages

amounts related to, among other things, federal, state and local income taxes, social

security and Medicare taxes, (collectively, the "Withheld Amounts") for remittance to the

appropriate federal, state, or local taxing authorities.  The Debtors must then match from

their own funds social security and Medicare taxes and pay, based upon a percentage of
gross payroll, additional amounts for state and federal unemployment insurance (the
"Employer Payroll Taxes" and together with the Withheld Amounts, the "Payroll
Taxes").  ADP manages the withholding and payment of Payroll Taxes for the Debtors.

21.     In 2011, the Debtors' annual Payroll Taxes totaled approximately
$94 million, which includes taxes withheld from employees in the aggregate amount of
$70.7 million and taxes that were paid directly by the Debtors in the aggregate amount of
$23.2 million.  ADP generally processes and forwards the Payroll Taxes to the
appropriate federal, state or local taxing authorities one day prior to administering the
Employee payroll checks.  As of the Petition Date, the Debtors estimate that the amount
of accrued and outstanding prepetition obligations with respect to the Payroll Taxes totals
approximately $1.5 million.  The Debtors seek authority, but not direction, to honor and
process the prepetition obligations with respect to the Payroll Taxes, including
forwarding the Withheld Amounts to the appropriate parties.

22.     During each applicable pay period, the Debtors also routinely
deduct certain amounts from Employees' paychecks, including:  pre-tax and after-tax
deductions payable pursuant to certain of the Employee benefit plans discussed below,
including the 401K policy, as well as garnishments (collectively, the "Deductions").  The
Debtors typically forward the Deductions to various third party recipients.  On average,
the Debtors have historically deducted approximately $12.7 million in Deductions from
the Employees' paychecks per month.  As of the Petition Date, the Debtors estimate that
they previously deducted approximately $4,000 from Employees' earnings that have not
yet been forwarded to the appropriate third party recipients.  The Debtors seek authority,

10

but not direction, to honor and process the prepetition Deductions, including forwarding

the Deductions to the appropriate parties.

**C.**        **Prepetition Employee Benefits**

23.        In the ordinary course of business, the Debtors provide their

Employees, directly or indirectly, with a number of employee benefits including:

(a) medical and health care programs; (b) vacation, sick and leave benefits; (c) savings

plans; and (d) certain other employee benefits, each described further below (collectively,

the "Employee Benefits").  The Debtors' Employee Benefits are administered by various

third party insurance companies including CIGNA Corporation, Metropolitan Life

Insurance Co. and Vision Service Plan.  In addition to payroll services, ADP also

provides the Debtors with management tools, such as tracking and call center systems,

related to the administration of Employee Benefits.  As of the Petition Date, the Debtors

estimate that the total amount owed or accrued prepetition in connection with the

Employee Benefits totals approximately $3,665,500.

**(i)**      ***Medical Benefits***

24.        The Debtors offer their eligible full-time Employees programs for

health, vision and dental care coverage through third party insurers (the "Health Care

Programs").  The Health Care Programs are funded by the Debtors and by deductions

from payroll as noted above.

25.        In 2011, the Debtors paid approximately $22.7 million on Health

Care Programs, including $20.8 million for medical programs, $1.7 million for dental

programs, and $160,000 for vision programs.  As of the Petition Date, the Debtors

estimate that the amount of accrued and outstanding prepetition obligations with respect

to the Health Care Programs totals approximately $3.55 million.

26.     By this Motion, the Debtors seek authority to:  (a) continue to provide the Health Care Programs for their Employees in the ordinary course of business; (b) continue to honor obligations under such benefit programs, including any premiums and administrative fees; and (c) pay any amounts owed under the Health Care Programs to the extent that they remain unpaid as of the Petition Date in an amount not to exceed $ $3.55 million in the aggregate.  The Debtors do not believe that they owe any amounts in excess of the statutory limit under section 507(a)(5) of the Bankruptcy Code.  With respect to the Employees who exceed the $11,725 priority cap, the Debtors seek authority pursuant to this Motion to pay amounts owed under the Health Care Programs in full because the Prepackaged Plan provides for the payment of all unsecured claims, including any prepetition amounts in respect of Health Care Programs, in full.  As a result, it is merely a question of timing, as the Debtors would have to pay these claims pursuant to the Prepackaged Plan in any event.

**(ii)    *Vacation, Occasional Absence, Personal Leave and Parental Leave Benefits***

27.     The Debtors provide vacation time ("Vacation Time") to all regular full time Employees, part-time Employees regularly scheduled to work twenty-one (21) or more hours per week, and project employees who are regularly scheduled to work twenty-one (21) or more hours per week and who are assigned to a project expected to last at least six months ("Eligible Employees").  Vacation time accrues weekly.  Full-time Employees and full-time project employees accrue vacation at rates based on their job level and years of service.  Part-time Employees and part-time project employees accrue vacation on a pro-rata basis according to their regularly scheduled hours, job level and years of service.  Eligible Employees are paid for Vacation Time at their regular

hourly or salaried rates.  Vacation Time must be used in the year it initially accrues and may not be carried over from year to year.  The Debtors do not pay Employees in lieu of taking accrued Vacation Time except on termination of employment.  An Employee's accrued, unused Vacation Time will be paid in full at the time of termination.

28.     The Debtors also provide ten (10) paid absence days to their Employees ("Occasional Absence Days").  Occasional Absence Days can be due to illness or injury (if less than five consecutive days), bereavement, religious observances, or compelling personal reasons.  Employees are paid for Occasional Absence Days at their regular hourly or salaried rates.  Occasional Absence Days do not carry over to the following calendar year and pay cannot be requested in lieu of Occasional Absence Days.

29.     The Debtors also provide unpaid personal leave of absence benefits to their Employees ("Personal Leave").   Individual Employees must use all accrued but unused vacation before they are eligible for a personal leave.  Once Personal Leave is approved, an Employee must use five Occasional Absence Days, if available, before entering unpaid status.

30.     In addition, the Debtors provide paid parental leave benefits to their Employees ("Parental Leave," collectively with Vacation Time, Occasional Absence Days and Personal Leave, "Leave Benefits").  Parental Leave is a one week paid leave of absence for eligible Employees who have or adopt a child.

31.     Prepetition costs of Leave Benefits will be honored through the payroll process by the continuation of pay during the affected Employees' applicable leave.  By this Motion, the Debtors request authority to continue to honor their Leave Benefit policies in the ordinary course of business and to honor all prepetition obligations

related thereto, including full payment of Leave Benefits up to the amounts set forth in

Paragraph 7 above, inclusive of Unpaid Wages and other applicable benefits.

### (iii)   *The Savings Plan*

32.    The Debtors maintain a 401(k) Plan for all employees with more

than one month of service (the "401(k) Plan").  The 401(k) Plan provides for pre-tax

salary deductions of eligible compensation, which amounts are generally deducted

automatically from each participating Employee's paycheck.  The Debtors match 50% of

the first 6% the Employee contributes to the 401(k) Plan.  On average, the Debtors'

contributions to the 401(k) Plan total approximately $410,000 per month against

Employee contributions of approximately $1.5 million per month.

33.    Approximately 76% of Employees currently participate in the

401(k) Plan.  During 2011, these Employees collectively contributed approximately

$17.7 million of their own funds into the 401(k) Plan.

34.    The Debtors do not believe that they owe any amounts to third

parties in connection with the 401(k) Plan, but out of an abundance of caution in the

event that they do, by this Motion, the Debtors seek authority to continue to perform their

obligations in connection with the 401(k) Plan in the ordinary course of their business.

### (iv)   *Severance Benefits*

35.    The Debtors provide severance ("Severance") to employees who

have been terminated in the ordinary course of business.  In order to assist a terminated

Employee's transition to unemployment, the Debtors provide severance according to the

terms and conditions set forth in the Debtors' severance plan (the "Severance Plan").

36.    Pursuant to the terms of the Severance Plan, Employees whose

employment is involuntarily terminated by the Debtors for any reason other than for a

14

reason related to performance, or for cause, are entitled to Severance equal to his or her
gross weekly base wages ("Weekly Base Compensation"), before any withholdings or
deductions, times the greater of (i) the minimum number of weeks, ("Minimum Number
of Weeks") as set forth below, for his or her job level at the time of termination or (ii) the
number of his or her years of service multiplied by two (2) weeks per year of service.
The Minimum Number of Weeks for (i) staff and associates, (ii) senior associates,
(iii) professional, management, and leader employees and (iv) executive employees is
four (4), six (6), eight (8) and twelve (12) weeks, respectively.  In general, severance pay
cannot exceed the amount of an Employees' Weekly Base Compensation multiplied by
fifty-two (52).

37.	There are no health benefits provided under the Severance Plan.
However, eligible Employees may continue to participate in the Debtors' medical, dental
and vision benefits provided he or she pays the entire cost of coverage (plus up to a two
percent (2%) administrative fee) under the federal law known as the Consolidated
Omnibus Budget Reconciliation Act ("COBRA").

38.	Severance payments are paid in installments, less withholdings as
required by law, based on the current pay schedule of the eligible Employee at the time of
separation, beginning generally within twenty-one (21) days following the latest of (a)
the date of termination, (b) the last day of the first pay period immediately following the
pay period in which the eligible Employee returns a fully and properly executed release
or separation agreement; or (c) if the eligible Employee has a right to revoke his or her
execution of the release or separation agreement, the latest date as of which he or she
may do so.

39.     As of the Petition Date, the Debtors do not owe any amounts to terminated Employees under the Severance Plan.

40.     By this Motion, the Debtors seek authority to continue to perform their obligations in connection with the Severance Plan in the ordinary course of their business up to the amounts set forth in Paragraph 7 above, inclusive of Unpaid Wages and other applicable benefits.

### (v)    *Additional Employee Benefits*

### (a)    <u>Defined Benefit Plan</u>

41.     The Debtors make contributions to a retirement plan for employees (the "<u>Retirement Plan</u>").  In 2011, the Debtors contributed approximately $9.1 million to the Retirement Plan.   Based on two alternative measures that can be used to determine a plan's funded status, ERISA funding valuation, and FAS accounting, the Retirement Plan is approximately 34% underfunded.  The Debtors project to contribute approximately $16.4 million in 2012 towards funding of the Retirement Plan.

42.     By this Motion, the Debtors seek authority to continue to perform their obligations in connection with the Retirement Plan in the ordinary course of their business.

### (b)    <u>Life Insurance</u>

43.     The Debtors provide life insurance to their eligible Employees (the "<u>Life Insurance Program</u>").  Pursuant to the Life Insurance Program, the Debtors pay approximately $21,600 per month and in 2011, the Debtors paid approximately $251,000 pursuant to the Life Insurance Program.  As of the Petition Date, the Debtors estimate that the amount of accrued and outstanding prepetition obligations with respect to the Life Insurance Program totals approximately $0.

44.    By this Motion, the Debtors seek authority to continue to perform their obligations in connection with the Life Insurance Program in the ordinary course of their business.

### (c)    Disability

45.    The Debtors provide short and long term disability insurance to their eligible Employees (the "Disability Insurance Program").  Pursuant to the Disability Insurance Program, disabled Employees, receive a percentage of their weekly or biweekly salary for a certain period of time.

46.    On average, the Debtors pay approximately $90,000 per month in short term disability insurance and $56,000 per month in long term disability insurance under the Disability Insurance Program.  In 2011, the Debtors paid approximately $1,310,000 in short term disability insurance and $670,000 in long term disability insurance under the Disability Insurance Program.  As of the Petition Date, the Debtors estimate that the amount of accrued and outstanding prepetition obligations with respect to the Disability Insurance Program totals approximately $0.

47.    By this Motion, the Debtors seek authority to:  (a) continue to provide the Disability Insurance Program for their Employees in the ordinary course of business; (b) continue to honor obligations under such benefit programs, including any premiums and administrative fees; and (c) pay any amounts owed under the Disability Insurance Program to the extent that they remain unpaid as of the Petition Date.

### (d)    Executive Life Insurance and Long Term Disability Insurance

48.    The Debtors provide executive life insurance ("Executive Life Insurance Program") that pays a death benefit (a "Death Benefit") to the eligible

17

Employees' beneficiary upon death.  The Debtors also provide executive long term

disability insurance ("Executive Long Term Disability Insurance Program").

49.     On average, the Debtors pay approximately $2,000 per month, in

health care costs under the Executive Life Insurance Program.  In 2011, the Debtors paid

approximately $64,000 under the Executive Life Insurance Program.  On average, the

Debtors pay approximately $1,200 per month in health care costs under the Executive

Long Term Disability Program.  In 2011, the Debtors paid approximately $18,836 in

premiums under the Executive Long Term Disability Program.  As of the Petition Date,

the Debtors estimate that the amount of accrued and outstanding prepetition obligations

with respect to the Executive Life Insurance Program and Executive Long Term

Disability Program totals approximately $15,500, in the aggregate.

50.     By this Motion, the Debtors seek authority to:  (a) continue to

provide the Executive Life Insurance Program and the Executive Long Term Disability

Insurance Program for their executive Employees in the ordinary course of business; (b)

continue to honor obligations under such benefit programs, including any premiums and

administrative fees; and (c) pay any amounts owed under the Executive Life Insurance

Program and the Executive Long Term Disability Insurance Program to the extent that

they remain unpaid as of the Petition Date.

### (e)     Outplacement Services

51.     The Debtors provide outplacement and career transition services

(the "Outplacement Services") for Employees who have been displaced due to

terminations.  In 2011, the cost of Outplacement Services to the Debtors was

approximately $159,000.

52.     The Debtors do not believe that any amounts are outstanding in connection with the Outplacement Services, but in the event that there are, by this Motion, the Debtors seek authority to continue to perform their obligations in connection with Outplacement Services in the ordinary course of their business.

**(f)     Voluntary Insurance**

53.     Eligible Employees may voluntarily purchase additional insurance for home, automobile, legal, critical illnesses and accident, supplemental life and dependent life through carriers such as MetLife and Unum Group (the "Voluntary Programs"). Employees pay 100% of the cost for all Voluntary Programs.

54.     The Debtors do not believe that any amounts are outstanding in connection with the Voluntary Programs, but in the event that there are, by this Motion, the Debtors seek authority to: (a) continue to provide the Voluntary Programs for their Employees in the ordinary course of business and (b) continue to honor obligations under such benefit programs, including any administrative fees.

**(g)     Relocation Expenses**

55.     The Debtors also provide certain of their Employees with reimbursement for relocation expenses. The Debtors believe that honoring their commitments under these programs is warranted, at a minimum, by public relations and Employee morale considerations. As of the Petition Date, the Debtors believe that they owe under $100,000 in reimbursable relocation expenses. Accordingly, the Debtors request authority to make payments for reimbursable relocation expenses.

D.    **Authorizing and Directing Financial Institutions to Honor and Pay All
Checks and Transfers Drawn on the Debtors' Accounts Related to the
Foregoing**

56.    The Debtors further request that all applicable banks and other

financial institutions be authorized and directed to receive, process, honor and pay all

checks presented for payment and to honor all fund transfer requests made by the Debtors

related to the Employee Wages and Benefits, whether such checks were presented or fund

transfer requests were submitted prior to or after the Petition Date.  The Debtors also seek

authority to issue new postpetition checks, or effect new funds transfers, on account of

prepetition Employee Wages and Benefits to replace any prepetition checks or funds

transfer requests that may be dishonored or rejected.  The Debtors represent that each of

these checks or transfers is or will be drawn on the Debtors' accounts and can be readily

identified as relating directly to payment of the Employee Wages and Benefits.  The

Debtors believe that prepetition checks and transfers, other than those for Employee

Wages and Benefits or those authorized by another order of the Court, will not be

honored inadvertently.

57.    Authorization to pay all amounts on account of prepetition

Employee Wages and Benefits shall not be deemed to constitute postpetition assumption

or adoption of any contract, program, or policy pursuant to section 365 of the Bankruptcy

Code.  The Debtors are in the process of reviewing these matters and reserve all of their

rights under the Bankruptcy Code with respect thereto.  Moreover, authorization to pay

all amounts in respect of prepetition Employee Wages and Benefits shall not affect the

Debtors' right to contest the amount or validity of any of the Employee Wages and

Benefits, including without limitation, the Third Party Funds (as defined below) that may

be due to any taxing authority.

20

## BASIS FOR RELIEF

58.     The Debtors request authority to pay their prepetition Wages, and Benefits and related expenses in the ordinary course of their business.  Any delay in paying any of their Employees (including project employees and Independent Contractors) could severely disrupt the Debtors' relationship with their Employees and dedicated non-Employee personnel and irreparably harm their morale at the very time that Employee dedication, confidence, support and cooperation proves most critical.  If the Debtors do not obtain immediate authority to pay their Wages and non-Employee personnel and Employee Benefits, the Debtors' operations may be severely impaired.  At this critical stage, the Debtors cannot risk the substantial disruption of their business operations that would attend any decline in workforce morale attributable to the Debtors' failure, or worse, inability to pay, the Wages and Employee Benefits.

59.     In addition, absent payment of the Wages and Employee Benefits, Employees, Independent Contractors and project employees would suffer hardship and, in many instances, financial duress.  The Debtors' workforce depends on its employment income to meet personal financial obligations, especially in these trying economic times.

60.     Sections 105(a) and 363(b) of the Bankruptcy Code authorize the requested relief.  Section 105(a) of the Bankruptcy Code allows the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code.]"  11 U.S.C. § 105(a).  It permits a bankruptcy court to take whatever action "is appropriate or necessary in aid of the exercise of its jurisdiction." 2 COLLIER ON BANKRUPTCY, ¶ 105.01, at 105-5 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  Similarly, section 363(b)(1) of the Bankruptcy Code authorizes a debtor to

use property of the estate other than in the ordinary course of business after notice and a

hearing.  11 U.S.C. § 363(b)(1).

61.     The Debtors submit that, to the extent any Employee is owed in

excess of $11,725, payment in full of such claims is justified.  Because the Prepackaged

Plan provides that all unsecured creditors – including Employees – will be paid in full,

declining to grant the requested relief most likely would only delay payment to the

affected Employees.  Any such delay will further undermine Employee morale and

exacerbate Employee retention issues, possibly resulting in the loss of key members of

the workforce who have significant institutional knowledge and relevant experience.

Such workforce attrition could seriously undermine the value of the Debtors' estates.

62.     Further, such payments are necessary and appropriate and may be

authorized under sections 105(a) and 363(b) of the Bankruptcy Code and pursuant to the

"doctrine of necessity."  Courts have routinely authorized debtors to pay prepetition wage

and employee claims pursuant to sections 105(a) and 363 of the Bankruptcy Code where

such payment was necessary to ensure the debtor's continued, uninterrupted operation.

*See Michigan Bureau of Workers' Disability Compensation* v. *Chateaugay Corp.* (*In re*

*Chateaugay Corp.*), 80 B.R. 279, 289 (S.D.N.Y. 1987) (affirming a bankruptcy court

authorizing the debtor to pay prepetition wages, salaries and various employee benefits);

*In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989) (authorizing

debtor to pay employee prepetition wages, salaries and benefits).

63.     The well-settled "necessity of payment" doctrine also supports the

requested relief.  This rule authorizes postpetition payment of prepetition obligations

where necessary to preserve or enhance the value of a debtor's estate for the benefit of all

22

creditors.  *See, e.g., Miltenberger* v. *Logansport, C. & S.W. Ry. Co*., 106 U.S. 286, 311

(1882) (articulating legal theory later termed the "doctrine of necessity' or the "'necessity

of payment' doctrine" and holding that payment of pre-receivership claim prior to

reorganization permitted to prevent stoppage of crucial business relations); *In re Boston*

*and Maine Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a

judicial power to authorize trustees to pay claims for goods and services that are

indispensably necessary to the debtors' continued operation); *Southern Ry. Co.* v.

*Flournoy*, 301 F.2d 847, 852 (4th Cir. 1962) ("The principle of necessity of payment

[espoused in *Miltenberger*] has since been carried into different factual surroundings as

the basis for granting superiority to business-operating accounts."); *In re Just For Feet,*

*Inc.*, 242 B.R. 821, 824 (D. Del. 1999) (granting approval to pay prepetition claims of

certain trade vendors which were critical to the debtors' reorganization); *In re Columbia*

*Gas Sys., Inc*., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (noting that debtors may pay

prepetition claims that are essential to continued operation of business); *Chateaugay*

*Corp.*, 80 B.R. at 289 (approving lower court order authorizing payment of prepetition

wages, salaries, expenses and benefits).

          64.     Debtors frequently invoke the necessity of payment doctrine early

in a reorganization case when preservation of the estate proves most critical and often

extremely difficult.  For that reason, bankruptcy courts routinely invoke their equitable

powers to authorize a debtor to pay certain critical prepetition claims under section

105(a) if "authorizing the payment of the prepetition debt creates 'the greatest likelihood

of . . . payment of creditors in full or at least proportionately.'"  *In re Structurelite*

*Plastics Corp.,* 86 B.R. 922, 932 (Bankr. S.D. Ohio 1988); *see also In re Eagle-Picher*

*Industries, Inc.,* 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (stating that "to justify

payment of a prepetition unsecured creditor, a debtor must show that the payment is

necessary to avert a serious threat to the [c]hapter 11 process"); *In re Ionosphere Clubs,*

*Inc.*, 98 B.R. at 176 ("necessity of payment" rule "recognizes the existence of the judicial

power to authorize a debtor in a reorganization case to pay prepetition claims where such

payment is essential to the continued operation of the debtor" ).

65.     Courts have recognized that the "necessity of payment rule"

squarely applies where a debtor's employees must be paid on time to assure their

continued service and loyalty during a chapter 11 case.  *E.g., Ionosphere Clubs*, 98 B.R.

at 174 (permitting Eastern Air Lines to pay its employees' prepetition wages, salaries,

medical benefits and business expense claims under the "necessity of payment" doctrine).

66.     This Court, in other cases, has routinely approved the payment of

prepetition claims of employees for wages, salaries, independent contractor and

temporary worker obligations, expenses and benefits, on the grounds that the payment of

such claims was necessary to a successful chapter 11 outcome.  *See*, *e.g.*, *In re TBS*

*Shipping Servives Inc.*, Case No. 12-22224 (RDD) (Bankr. S.D.N.Y. Feb. 29, 2012)

[Docket No. 86]; *In re Eastman Kodak Company*, Case No. 12-10202 (ALG) (Bankr.

S.D.N.Y. Feb. 15, 2012) [Docket No. 357]; *In re The Great Atl. & Pac. Tea Co.*, Case

No. 10-24549 (RDD) (Bank. S.D.N.Y. Jan. 13, 2011) [Docket No. 497]; *In re Penton*

*Business Media Holdings, Inc. et al.*, Case No. 10-10689 (AJG) (Bankr. S.D.N.Y. Feb 11,

2010) [Docket No. 38]; *In re Metaldyne Corp.*, Case No. 09-13412 (MG) (Bankr.

S.D.N.Y. May 29 and June 22, 2009) [Docket Nos. 9 and 276] (interim and final orders);

*In re BearingPoint Inc., et al.,* Case No. 09-10691 (REG) (Bankr. S.D.N.Y. Feb. 18 and

Mar. 13, 2009) [Docket Nos. 28 and 220] (interim and supplemental orders); *In re Tronox Inc., et al.,* Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Jan. 13 and Feb. 6, 2009) [Docket Nos. 45 and 143] (interim and final orders); *In re Lyondell Chemical Co., et. al.,* Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 9 and 26, 2009) [Docket Nos. 90 and 408] (interim and final orders); *In re Lenox Sales, Inc.,* Case No. 08-14679 (ALG) (Bankr. S.D.N.Y. Nov. 25, 2008) [Docket No. 25]; *In re Steve & Barry's Manhattan LLC,* Case No. 08-12579 (ALG) [Docket No. 49] (Bankr. S.D.N.Y. July 10, 2008); *In re PLVTZ Inc.*, Case No. 07-13532 (REG) (Bankr. S.D.N.Y. Nov. 9, 2007) [Docket No. 46]; *In re Dana Corp.*, Case No. 06-10354 (BRL) (Bankr. S.D.N.Y. Mar. 3, 2006) [Docket No. 46]; *In re Calpine Corp.*, Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 21, 2005) [Docket No. 33]; *In re Delphi Corp.*, No. 05-44481 (RDD) (Bankr. S.D.N.Y. Oct. 13, 2005) [Docket No. 198]; *In re Delta Air Lines, Inc.*, Case No. 05-17923 (ASH) (Bankr. S.D.N.Y. Sept. 16, 2005) [Docket No. 150]; *In re Aerovias Nacionales de Colombia S.A. Avianca*, Case No. 03-11678 (ALG) (Bankr. S.D.N.Y. Mar. 21, 2003) [Docket No. 24]; *In re WorldCom, Inc.*, Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. July 22, 2002) [Docket No. 63]; *In re Adelphia Bus. Solutions, Inc.*, Case No. 02-11389 (REG) (Bankr. S.D.N.Y. Mar. 27, 2002) [Docket No. 36]; *In re Global Crossing Ltd.*, Case No. 02-40188 (REG) (Bankr. S.D.N.Y. Jan. 28, 2002) [Docket No. 24]; *In re Enron Corp., Inc.*, Case No. 01-16034 (ALG) (Bankr. S.D.N.Y. Dec. 3, 2001) (modified on Jan. 15, 2002) [Docket Nos. 49 and 927].

      67.      Furthermore, with respect to Employee Wage and Benefit claims, the issue of payment is mostly one of timing. All or a portion of the claims described in this Motion may be treated as priority claims under section 507(a)(3) and (a)(4) of the

Bankruptcy Code.  *See In re Olga Coal Co.*, 194 B.R. 741, 747 (Bankr. S.D.N.Y. 1996).

As a result, the Debtors would have to pay these claims pursuant to a confirmed chapter

11 plan in any event.  This is particularly true in these chapter 11 cases because the

Prepackaged Plan provides for the payment of all unsecured claims – including those of

Employees – in full.

   68.  The Debtors submit that further cause exists to authorize the

payment to the appropriate entities of the Payroll Taxes and Deductions (together, the

"Third Party Funds").  The Third Party Funds principally comprise Employee earnings

that governments, Employees and judicial authorities have designated for deduction from

pay.  The Debtors do not believe that such amounts are property of the Debtors' estates

under section 541 of the Bankruptcy Code, and, therefore, such funds are not available

for general distribution to the Debtors' creditors.  *See* 11 U.S.C. § 541(b)(7) (amounts

withheld from employee paychecks by employer for contribution to employee benefit

plan are not property of the estate).

   69.  In addition to causing undue hardship to certain Employees, the

failure to pay the Third Party Funds may result in the Debtors being inundated with

inquiries from taxing authorities and garnishors regarding their failure to submit, among

other things, taxes and child support and alimony payments, which are not the Debtors'

property but have been withheld from Employee paychecks.  Moreover, if the Debtors

cannot remit these amounts, the affected Employees may face legal action and/or

imprisonment due to the Debtors' failure to submit these payments.

   70.  The Debtors' request for authority to pay the amounts described

herein is not to be deemed an assumption or adoption of any agreements or policies

providing for such compensation or benefits.  The Debtors are in the process of reviewing these matters and preserve all of their rights with respect to the assumption or rejection of any executory contracts.

## WAIVER OF BANKRUPTCT RULES 6003(b), 6004(a) AND 6004(h) AND LOCAL RULE 9013-1(b)

71.     The Debtors further submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") has been satisfied.  To successfully implement the foregoing, the Debtors also seek a waiver of (i) the notice requirements under Bankruptcy Rule 6004(a); (ii) the 14-day stay under Bankruptcy Rule 6004(h); and (iii) the notice requirements under Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York (the "<u>Local Rules</u>").

## NOTICE

72.    As of the date hereof, no creditors' committee, trustee, or examiner has been appointed in these chapter 11 cases.  Notice of this Motion has been provided to:  (i) the United States Trustee. <u>Attention</u>:  Andrea B. Schwartz; (ii) counsel for the DIP/Exit Agent; (iii) the parties identified on the Debtors' consolidated list of twenty (20) largest unsecured creditors; (iv) counsel for the Informal Creditor Group; (v) counsel for the Prepetition Senior Secured Notes Trustee; (vi) counsel for the Prepetition Agent; (vii) counsel for the Prepetition L/C Bank; (viii) the Securities and Exchange Commission; (ix) the United States Attorney for the Southern District of New York; (x) the Internal Revenue Service; (xi) the Environmental Protection Agency; (xii) the Pension Benefit Guaranty Corporation; (xiii) the New York State Department of Taxation; (xiv) the New York City Tax Department; and (xv) such other parties entitled to notice pursuant to Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be provided.

## NO PRIOR REQUEST

73.    No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court enter an order substantially in the form attached hereto as Exhibit A granting the relief requested and such other and further relief as it deems just and proper.

Dated:  May 21, 2012
        New York, New York

PAUL, WEISS, RIFKIND WHARTON &
GARRISON LLP

By:  /s/  Jeffrey D. Saferstein
Alan W. Kornberg
(akornberg@paulweiss.com)
Jeffrey D. Saferstein
(jsaferstein@paulweiss.com)
Philip A. Weintraub
(pweintraub@paulweiss.com)
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Proposed attorneys for the Debtors and
Debtors-in-Possession

## EXHIBIT A

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                          :   Chapter 11
                                                :
HOUGHTON MIFFLIN                                :   Case No. 12-____ (___)
HARCOURT PUBLISHING COMPANY, *et al.,*          :
                                                :   (Joint Administration Pending)
                              Debtors.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION (A) WAGES, SALARIES, COMMISSIONS AND OTHER COMPENSATION; (B) COMPENSATION OWED TO PROJECT EMPLOYEES AND INDEPENDENT CONTRACTORS; (C) EMPLOYEE BUSINESS EXPENSES; (D) CONTRIBUTIONS TO EMPLOYEE BENEFIT PROGRAMS AND THE CONTINUATION OF SUCH PROGRAMS IN THE ORDINARY COURSE; AND (E) PAYROLL WITHHOLDINGS AND RELATED DEDUCTIONS AND PAYMENTS; AND (II) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR AND PAY ALL CHECKS AND TRANSFERS DRAWN ON THE DEBTORS' ACCOUNTS RELATED TO THE FOREGOING**

Upon the motion (the "Motion")[1] of Houghton Mifflin Harcourt Publishing Company and its affiliated debtors and debtors-in-possession in the above-captioned cases (each a "Debtor," and collectively, the "Debtors"), requesting entry of an order pursuant to sections 105(a), 363(b), 507(a)(3) and 507(a)(4) of the Bankruptcy Code: (I) authorizing the Debtors to pay certain prepetition (A) wages, salaries, commissions and other compensation; (B) compensation owed to project employees and independent contractors; (C) employee business expenses; (D) contributions to employee benefit programs and the continuation of such programs in the ordinary course; and (E) payroll withholding and related deductions and payments; and (II) authorizing and directing banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtors' accounts related to the foregoing; and upon consideration of the

---

[1] Capitalized terms used and not defined herein shall have the meaning ascribed to them in the Motion.

Affidavit of William F. Bayers pursuant to Local Rule 1007-2, sworn to on May 21, 2012; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of these cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that notice of the Motion has been given as set forth in the Motion and that such notice is adequate and no other or further notice need be given; and a hearing having been held to consider the relief requested in the Motion and upon the record of the hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors and all other parties in interest; and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED that:

1.      The Motion is GRANTED as modified herein.

2.      The Debtors are authorized, but not directed, to continue to honor and pay, in the ordinary course of their business, all prepetition amounts relating to: (a) Unpaid Wages in an amount not to exceed $5.5 million in the aggregate; (b) unpaid compensation to Independent Contractors in an amount not to exceed $680,553 in the aggregate; (c) Reimbursable Business Expenses in an amount not to exceed $1.745 million in the aggregate; (d) Payroll Taxes in an amount not to exceed $1.5 million; (e) Deductions in an amount not to exceed $4,000; and (f) Employee Benefits in an amount not to exceed $3,665,500 in the aggregate.

3.      The Debtors are authorized, but not directed, to continue to pay Wages in the ordinary course and in accordance with their prepetition practices and policies.

2

4.      The Debtors are authorized to continue to pay their Independent Contractors in accordance with their prepetition practices and policies.

5.      The Debtors are authorized, but not directed, to continue to pay all Reimbursable Business Expenses in accordance with their prepetition practices and policies.

6.      The Debtors are authorized, but not directed, to continue to allocate and distribute all Third Party Funds in accordance with the Debtors' policies and prepetition practices.

7.      The Debtors are authorized, but not directed, to continue to provide and pay for the Employee Benefits in accordance with their prepetition policies and practices.

8.      The Debtors' financial institutions (the "<u>Banks</u>") are authorized and directed to honor prepetition payroll checks, drafts and transfers on or after the Petition Date and, to the extent any Bank may have honored any prepetition payroll checks, drafts and transfers prior to the Petition Date, such honoring is ratified.  The Banks are authorized and directed to process and honor all other checks and transfers issued for payments approved by this Order and/or reissue checks for any payments approved by this Order where checks may be or have been dishonored postpetition.

9.      The Debtors are authorized to reissue any check which was drawn in payment of a prepetition amount approved herein that is not cleared by a Bank.

10.      Nothing herein shall be deemed an assumption or adoption by the Debtors of any agreements or policies providing for prepetition compensation or benefits to the Employees or Independent Contractors.  Nothing in this Order shall impair the Debtors' ability to contest the validity or amount of any Employee or Independent Contractor (or any other) claim authorized to be paid hereby.

3

11.     Bankruptcy Rule 6003(b) has been satisfied because the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors.  The requirements of Bankruptcy Rules 6004(a) and 6004 (h) and Local Rule 9013-1 (b) are waived.

12.     Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon its entry; (b) the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order; and (c) the Debtors are authorized and empowered, and may in their discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

13.     This Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the Motion or the implementation of this Order.

Dated: _____, 2012
        New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE