# HOUGHTON MIFFLIN HARCOURT PUBLISHING COMPANY, HOUGHTON MIFFLIN HARCOURT PUBLISHERS INC., HMH HOLDINGS (DELAWARE), INC., HMH PUBLISHERS LLC AND CERTAIN OF THEIR AFFILIATES

Disclosure Statement for Solicitation of Acceptances of a Prepackaged Plan of Reorganization

---

**SOLICITATION OF ACCEPTANCES OF THE PREPACKAGED PLAN FOR THE FIRST LIEN BANK LENDERS (AS DEFINED HEREIN) WILL EXPIRE AT 5:00 P.M., NEW YORK CITY TIME, ON MAY 18, 2012, AND AT 5:00 P.M., NEW YORK CITY TIME, ON JUNE 11, 2012 FOR THE BONDHOLDERS AND THE EXISTING COMMON STOCKHOLDERS (EACH AS DEFINED HEREIN) UNLESS EXTENDED BY US (SUCH DATE AND TIME, AS THE SAME MAY BE EXTENDED, THE "EXPIRATION DATE"). SENIOR CREDITORS (AS DEFINED HEREIN) AND EXISTING COMMON STOCKHOLDERS SHOULD REFER TO THE BALLOTS ATTACHED HERETO FOR INSTRUCTIONS ON HOW TO TENDER AND VOTE ON THE PLAN OF REORGANIZATION.**

---

Upon the terms and subject to the conditions set forth in this disclosure statement (as it may be supplemented and amended from time to time, collectively, the "Disclosure Statement") with respect to the solicitation of acceptances of a prepackaged plan of reorganization, attached hereto as Appendix A (the "Plan"), Houghton Mifflin Harcourt Publishing Company ("HMH"), Houghton Mifflin Harcourt Publishers Inc. ("HMH Publishers Inc."), HMH Publishers LLC ("HMH Publishers LLC" and together with HMH Publishers Inc. and HMH, "Houghton Mifflin Harcourt") and certain of their affiliates, including Houghton Mifflin Holding Company, Inc., Houghton Mifflin, LLC, Houghton Mifflin Finance, Inc., Houghton Mifflin Holdings, Inc., HM Publishing Corp., Riverdeep Inc., a Limited Liability Company ("Riverdeep"), Broderbund LLC, RVDP, Inc., HRW Distributors, Inc., Greenwood Publishing Group, Inc., Classroom Connect, Inc., ACHIEVE! Data Solutions, LLC, Steck-Vaughn Publishing LLC, HMH Supplemental Publishers Inc., HMH Holdings (Delaware), Inc. ("HMH Holdings"), Sentry Realty Corporation, Houghton Mifflin Company International, Inc., The Riverside Publishing Company, Classwell Learning Group Inc., Cognitive Concepts, Inc., Edusoft, Advanced Learning Centers, Inc. and HM Receivables Co. II, LLC, intend to restructure the following indebtedness:  (i) $300 million in principal amount of 10.5% Senior Secured Notes due 2019 (as amended and supplemented, the "10.5% Notes" and the holders thereof, the "Bondholders"); (ii) indebtedness outstanding under the Receivables Funding and Administration Agreement dated as of August 4, 2010 (as amended from time to time) among HM Receivables Co. II, LLC, the financial institutions party thereto and JPMorgan Chase Bank, N.A., as administrative agent (the "Receivables Facility"); (iii) indebtedness outstanding under the First Lien Credit Agreement dated as of December 12, 2007 (as amended from time to time) including a term loan and a fully funded revolving credit facility (the "First Lien Credit Facility" and the lenders thereunder, the "First Lien Bank Lenders"); and (iv) a $50 million standby letter of credit facility dated as of October 26, 2010, with Wells Fargo Bank, National Association, as issuer (as amended from time to time, the "Letter of Credit Facility").   All capitalized terms not otherwise defined herein shall have the meanings set forth in the Plan, which is attached hereto as Appendix A.

If the requisite votes with respect to the Plan are received, HMH, HMH Publishers Inc., HMH Publishers LLC, Houghton Mifflin Holding Company, Inc., Houghton Mifflin, LLC, Houghton Mifflin Finance, Inc., Houghton Mifflin Holdings, Inc., HM Publishing Corp., Riverdeep Inc., a Limited Liability Company, Broderbund LLC, RVDP, Inc., HRW Distributors, Inc., Greenwood Publishing Group, Inc., Classroom Connect, Inc., ACHIEVE! Data Solutions, LLC, Steck-Vaughn Publishing LLC, HMH Supplemental Publishers Inc., HMH Holdings, Sentry Realty Corporation, Houghton Mifflin Company International, Inc., The Riverside Publishing Company, Classwell Learning Group Inc., Cognitive Concepts, Inc., Edusoft, and Advanced Learning Centers, Inc. (each, a "Debtor" and collectively, the "Debtors" or the "Company") expect to file  cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") to consummate the restructuring described in this Disclosure Statement, although no decision has been made to pursue a chapter 11 filing at this time.  Only those parties who actually vote are counted for purposes of this solicitation and therefore it is important that you vote.  Consummation of the Plan is subject to the conditions described herein.  The Debtors will be tabulating the voting results during the solicitation period and may decide to file for relief under chapter 11 of the Bankruptcy Code at any time, including prior to the expiration of the solicitation period.  In such event, your vote will be counted and utilized to confirm the Plan.  In the event that the Debtors pursue a chapter 11 filing and consummate the Plan, the Bondholders and the First Lien Bank Lenders (collectively, the "Senior Creditors") will collectively receive 100% of the common stock to be issued by HMH Holdings (the "New Common Stock"), subject to dilution for New Common Stock to be issued pursuant to the Management Incentive Plan and New Common Stock to be issued upon exercise of

the New Warrants, and $30.3 million in Cash.  If the Class of holders of shares of common stock issued by HMH Holdings (the "Existing Common Stock" and the holders thereof, the "Existing Common Stockholders") votes to accept the Plan, the Existing Common Stockholders will receive their pro rata share of the New Warrants (as defined herein); if such Class votes to reject the Plan, the Existing Common Stockholders will receive no distributions.  The Existing Common Stock and Other Holdings Equity Interests (as defined herein) will be canceled on the Effective Date as part of the Restructuring.

**THIS SOLICITATION OF ACCEPTANCES OF THE PLAN IS BEING CONDUCTED TO, AMONG OTHER THINGS, OBTAIN SUFFICIENT ACCEPTANCES OF THE PLAN PRIOR TO THE FILING OF VOLUNTARY CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE.  BECAUSE NO CHAPTER 11 CASES HAVE YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY ANY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.  THE DEBTORS HAVE NOT AT THIS TIME TAKEN ANY ACTION APPROVING ANY CHAPTER 11 FILING.**

**YOU SHOULD CONSIDER THE RISK FACTORS BEGINNING ON PAGE 71 OF THIS DISCLOSURE STATEMENT BEFORE YOU DECIDE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.**

**If the Plan is approved, the New Common Stock will not be registered under the Securities Act of 1933, as amended (the "Securities Act").  The Debtors are relying on Section 4(2) of the Securities Act and similar "blue sky" law provisions in connection with the solicitation of votes on the Plan and as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a) of the Bankruptcy Code, to exempt from registration under the Securities Act and "blue sky" law the issuance of the New Common Stock and the New Warrants (if any) in connection with the Plan.  The New Common Stock will not be listed or quoted on any stock exchange upon consummation of the Plan.**  This solicitation is being made only to those Senior Creditors and Existing Common Stockholders who are accredited investors as defined in Regulation D under the Securities Act.

The New Common Stock and the New Warrants (if any) to be issued on the Effective Date have not been approved or disapproved by the Securities and Exchange Commission or by any state securities commission or similar public, governmental, or regulatory authority, and neither the Securities and Exchange Commission nor any such authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or upon the merits of the Plan.  Any representation to the contrary is a criminal offense.

**Subject to applicable securities laws and the terms set forth in this Disclosure Statement, the Debtors, with the consent of the Requisite Participating Lenders, reserve the right to extend or terminate the voting deadlines with respect to the Plan, which may be for any or no reason, and otherwise to amend the Plan in any respect.**

May 11, 2012

ii

**Prior to voting on the Plan, Senior Creditors and Existing Common Stockholders are encouraged to read and consider carefully this entire Disclosure Statement, including the Plan annexed hereto as Appendix A and the matters described in this Disclosure Statement and the Ballots (as defined below).**

**In making a decision in connection with the Plan, Senior Creditors and Existing Common Stockholders must rely on their own examination of the Debtors, the restructuring transactions, and the Plan, including the merits and risks involved.  Senior Creditors and Existing Common Stockholders should not construe the contents of this Disclosure Statement as providing any legal, business, financial or tax advice.  Senior Creditors and Existing Common Stockholders should consult with their own legal, business, financial and tax advisors with respect to any such matters concerning this Disclosure Statement, the Plan and the restructuring transactions contemplated hereby and thereby.**

# TABLE OF CONTENTS

Page

NOTICE TO SENIOR CREDITORS AND EXISTING COMMON STOCKHOLDERS ..........................................1
NOTICE TO NEW HAMPSHIRE RESIDENTS.................................................................................................2
CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS...................................2
INDUSTRY AND MARKET DATA.................................................................................................................3
ADDITIONAL INFORMATION.......................................................................................................................3
COMPANY BACKGROUND AND OVERVIEW .............................................................................................5
SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA.................................................................9
DESCRIPTION OF CURRENT MATERIAL INDEBTEDNESS OF THE COMPANY .......................................11
BACKGROUND TO RESTRUCTURING.......................................................................................................13
PRO FORMA CAPITALIZATION .................................................................................................................16
THE PLAN ...................................................................................................................................................17
CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS....................................................................55
APPLICABLE SECURITIES LAWS .............................................................................................................65
PROCEDURES FOR VOTING .....................................................................................................................67

## APPENDICES

THE PLAN...................................................................................................................................................A-1
PROJECTIONS OF CERTAIN FINANCIAL DATA FOLLOWING CONSUMMATION OF PLAN .................B-1
LIQUIDATION ANALYSIS ...........................................................................................................................C-1
AUDITED FINANCIAL STATEMENTS FOR THE YEAR ENDED DECEMBER 31, 2011 .............................D-1
RESTRUCTURING SUPPORT AGREEMENT ..............................................................................................E-1

## NOTICE TO SENIOR CREDITORS AND EXISTING COMMON STOCKHOLDERS

The information contained in this Disclosure Statement is as of the date of this Disclosure Statement and is subject to change, completion or amendment without notice. Neither the delivery of this Disclosure Statement at any time nor the exchange or delivery of any security hereunder shall, under any circumstances, create any implication that there has been no change in the information set forth in this Disclosure Statement or in the Debtors' affairs since the date of this Disclosure Statement.

No person is authorized to give any information or to make any representation not contained in this Disclosure Statement, and, if given or made, such other information or representation must not be relied upon as having been authorized by the Debtors.

Neither the Securities and Exchange Commission (the "SEC") nor any other securities commission or other regulatory authority, has approved or disapproved the Plan, the New Common Stock, or the New Warrants (if any), nor have any of the foregoing authorities passed upon or endorsed the accuracy or adequacy of this Disclosure Statement. Any representation to the contrary is a criminal offense.

The solicitation of votes in respect of the Plan is being made on the basis of this Disclosure Statement and is subject to the terms described in this Disclosure Statement. Any decision to vote to accept or reject the Plan must be based on the information contained in this document. In making a decision, Senior Creditors and Existing Common Stockholders must rely on their own examination of the Debtors and the terms of the Plan and the New Common Stock and the New Warrants (if any), including the merits and risks involved. Senior Creditors and Existing Common Stockholders should not construe anything in this Disclosure Statement as legal, business, financial or tax advice. Each Senior Creditor or Existing Common Stockholder should consult its own advisors as needed to make its investment decision.

Each Senior Creditor and Existing Common Stockholder must comply with all applicable laws and regulations in force in any jurisdiction in which it votes to accept or reject the Plan and must comply with all applicable laws and regulations in force in any jurisdiction in which it possesses or distributes this Disclosure Statement and must obtain any consent, approval or permission required by it for voting to accept or reject the Plan under the laws and regulations in force in any jurisdiction to which it is subject, and none of the Debtors nor any of their representatives shall have any responsibility therefor.

The Debtors, with the written consent of the Requisite Participating Lenders, reserve the right to amend, modify or supplement the Plan at any time, and the prior written consent of each member of the Informal Creditor Group is required for modifications to the treatment of Senior Creditors. The Debtors reserve the right to reject, in whole or in part, with the consent of the Requisite Participating Lenders, any vote that does not adhere to the voting requirements set forth herein.

This Disclosure Statement contains summaries believed to be accurate with respect to certain documents, but reference is made to the actual documents for complete information. All of those summaries are qualified in their entirety by this reference. Copies of documents referred to herein will be made available to Senior Creditors and Existing Common Stockholders upon request to the Debtors or the Voting Agent (as defined below).

**This Disclosure Statement, including the documents incorporated by reference herein and the attachments hereto, the Ballot and the Plan contain important information that should be read before any decision is made with respect to the acceptance or rejection of the Plan.**

**The delivery of this Disclosure Statement shall not under any circumstances create any implication that the information contained or incorporated by reference herein or attached hereto is correct as of any time subsequent to the date hereof or date thereof or that there has been no change in the information set forth herein or in any attachments hereto or in the affairs of the Debtors or any of their subsidiaries or affiliates since the date hereof or thereof.**

US1:7781563v22

## NOTICE TO NEW HAMPSHIRE RESIDENTS

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE UNIFORM SECURITIES ACT, 1955, AS AMENDED, WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE OF NEW HAMPSHIRE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING.  NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION.  IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

———————————

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

Certain statements contained in this Disclosure Statement are "forward-looking statements" within the meaning of applicable federal securities laws.  All statements contained herein that are not clearly historical in nature are forward-looking and the words "anticipate," "believe," "could," "expect," "estimate," "forecast," "intend," "plan," "potential," "project," "target" and similar expressions are generally intended to identify forward-looking statements.  All statements contained in this Disclosure Statement, other than statements of historical fact, including without limitation, statements about the Debtors' plans, strategies, prospects and expectations regarding future events and the Debtors' financial performance, are forward-looking statements that involve certain risks and uncertainties.  While these statements represent the Debtors' current judgment on what the future may hold, and the Debtors believe these judgments are reasonable in the circumstances, these statements are not guarantees of any events or financial results, and the Debtors' actual results may differ materially.  You are urged to consider these factors carefully in evaluating the forward-looking statements and are cautioned not to place undue reliance on these forward-looking statements.  The forward-looking statements included in this Disclosure Statement, including the Projections of Certain Financial Data Following Consummation of Plan and the Liquidation Analysis attached as Appendix B hereto, are made only as of the date of this Disclosure Statement.  All subsequent written and oral forward-looking statements attributable to the Debtors or any person acting on their behalf are expressly qualified in their entirety by the cautionary statements contained or referred to in this section.  The Debtors undertake no obligation to update publicly these forward-looking statements to reflect new information, future events or otherwise, except as required by law.  All forward-looking statements involve risks and uncertainties, many of which are beyond the Debtors' control, which may cause actual results, performance or achievements to differ materially from anticipated results, performance or achievements.  The Debtors cannot assure you that projected results or events will be achieved.  Factors that could cause our actual results to be materially different from the Debtors' expectations include those factors described herein under the caption "Risk — Risks Related to the Chapter 11 Cases and the Plan" and in documents incorporated herein by reference, including, among others, the following:

- risks of a further economic recession;

- industry cycles and trends;

- adequacy of reserves for credit losses;

- risks that the Debtors will be unsuccessful in their efforts to effectuate a comprehensive restructuring of their debt structure;

- risks if non-U.S. related companies were required to seek bankruptcy protection;

- conditions and/or changes in the publishing industry;

- application of goodwill accounting in a recessionary economy;

- changes in laws or regulations governing the Debtors' businesses and operations;

- risks that a chapter 11 filing will harm customer relationships and cause the loss of revenues;

- changes in competitive factors;

- inability to retain management or hire employees during the restructuring;

- changes in consumer demand for, and acceptance of, products produced by the Debtors; and

- demographic trends.

## INDUSTRY AND MARKET DATA

In this Disclosure Statement, the Debtors rely on and refer to information and statistics regarding their industry. The Debtors obtained this market data from independent industry publications or other publicly available information. Although the Debtors believe that these sources are reliable, the Debtors have not independently verified and do not guarantee the accuracy and completeness of this information.

## ADDITIONAL INFORMATION

The Audited Financial Statements for the year ended December 31, 2011 are attached hereto as Appendix D.

# SUMMARY

*You should carefully read this Disclosure Statement to understand fully the terms of the Plan, as well as the information incorporated by reference herein. You should pay special attention to the information in the sections entitled "Risk Factors" and "Cautionary Statement Regarding Forward-Looking Statements."*

*Unless otherwise indicated or the context otherwise requires, "the Company," "we," "us" and "our" refer to the Debtors and their direct and indirect subsidiaries on a consolidated basis.*

Through the consummation of the Plan, the Debtors intend to reduce indebtedness, improve their liquidity position, enhance capital levels, and accelerate a return to profitability, while providing adequate time to execute their business restructuring strategy. Upon the terms and subject to the conditions set forth in this Disclosure Statement and the Ballots, the Plan provides that among other things, (i) Senior Creditors shall receive their pro rata share of (a) 100% of New Common Stock, subject to dilution for (x) New Common Stock to be issued pursuant to the Management Incentive Plan and (y) to the extent applicable, New Common Stock to be issued upon exercise of the New Warrants, and (b) $30.3 million in Cash; (ii) except to the extent that a holder of an Allowed Letter of Credit Facility Claim and the Debtors with the consent of the Requisite Participating Lenders agree to a different treatment, the outstanding letters of credit issued under the Letter of Credit Facility shall either continue unaffected upon consummation of the Plan or be replaced by the Exit Facility and the Letter of Credit Facility shall be deemed terminated; (iii) holders of Allowed General Unsecured Claims shall receive Cash in amount equal to such holder's Allowed General Unsecured Claim plus accrued and unpaid Post-Petition Interest or shall otherwise continue unaffected upon consummation of the Plan, to be paid in the ordinary course of business; and (iv) if the Class of Existing Common Stockholders votes to accept the Plan, the Existing Common Stockholders shall be entitled to receive their pro rata share of the New Warrants; if such Class votes to reject the Plan, the Existing Common Stockholders shall not be entitled to a distribution under the Plan. The Receivables Facility shall be paid in full from the proceeds of the debtor in possession financing that will be provided to the Debtors in the Chapter 11 Cases.

Consummation of the Plan is subject to the following conditions, among others:

- The Plan shall be in form and substance acceptable to the Debtors and the Requisite Participating Lenders and, with respect to the treatment of Senior Creditors, each of the members of the Informal Creditor Group;

- the Confirmation Order shall have been entered in form and substance acceptable to the Debtors and the Requisite Participating Lenders, and no stay or injunction shall be in effect precluding the consummation of the transactions contemplated by the Plan; and

- the Exit Facility, which shall be in form and substance acceptable to the Debtors and the Requisite Participating Lenders, shall have been entered into by the Debtors and the other parties thereto and all conditions to the initial borrowings under the Exit Facility shall have been satisfied in accordance with the terms thereof (but for the occurrence of the Effective Date).

**In connection with the transactions contemplated by the Plan, you may elect to (i) vote to accept the Plan, or (ii) vote to reject the Plan.**

If the Plan is not accepted, the Debtors expect that it will likely be necessary for them to file for chapter 11 protection at some time in the near future without the benefit of a pre-negotiated Plan, which would likely have adverse effects on the Debtors' businesses.

## COMPANY BACKGROUND AND OVERVIEW

**Houghton Mifflin Harcourt Business Overview**

The formation of the current group of operating entities originated when HM Rivergroup PLC, which operated several entities using the Riverdeep trade name, acquired Houghton Mifflin Holding Company, Inc. from a consortium of private equity owners in December 2006. Houghton Mifflin Holding Company, Inc. was a premier publisher in the U.S. public school market (known as Kindergarten to Grade 12 or "K-12"), offering a diverse portfolio of products and services, including textbooks, workbooks, supplemental materials, teaching guides, various types of standardized and customized tests, professional assessment products, a range of trade and reference titles, as well as educational software programs.

In 2007, the combined entity operating primarily under the Houghton Mifflin name ("Houghton Mifflin") acquired certain assets of Harcourt Education Inc. and shares of certain sister companies ("Harcourt Education") from Reed Elsevier plc to form the current group of legacy Riverdeep, Houghton Mifflin and Harcourt Education businesses now operating under the Houghton Mifflin Harcourt brand. At the time, Harcourt Education was also a leading publisher of K-12 educational content, providing a full range of basal and supplemental programs to U.S. classrooms. Harcourt Education had a long-standing reputation for expertise in pedagogic design and the creation of new instructional materials across all grade levels. The combination of Houghton Mifflin and Harcourt Education united two of the most successful and established educational book publishers in the United States, forming the second largest player in the K-12 publishing segment based on revenue. Both Houghton Mifflin and Harcourt Education demonstrated strong track records in capturing market share, growing their product bases and streamlining operations. Over the years each has invested significant capital to update and expand the range of their textbooks and printed and digital supplemental product offerings. During this same period, the businesses invested in significant research and development to upgrade and expand their book bags as well as increase their ability to cost-effectively customize their products.

Today, the HMH group of companies is the leading provider, with an estimated addressable market share of over 41%, of educational content, technology and professional services to the elementary and secondary school market in the United States, including a full range of comprehensive curriculum, supplemental and service offerings. We have a long-standing expertise in teaching and instructional strategy and the design and creation of print and electronic learning materials across all grade levels. We distribute our solutions in multiple formats, including print and digital curriculum, technology platforms, assessment tools and services. We believe our solutions are a mission critical tool for school systems as they increasingly focus on outcomes-based learning and teaching solutions that reach students both in the classroom and at home. We believe we are a leader in the transformation of the traditional educational materials market and have the opportunity to increase revenue and profitability by selling our innovative solutions through a comprehensive and integrated approach to educating children. For the year ended December 31, 2011, HMH revenue and adjusted EBITDA were approximately $1.295 billion and $238 million, respectively.

We offer a diverse portfolio of digital and print products and services, including textbooks, digital learning content, assessment tools, technology platforms, related social media and mobile applications, standardized and customized tests, professional development and school reform services, and a wide range of trade and reference titles. Our portfolio includes well-known brands such as *Curious George*, *The Lord of the Rings*, *Polar Express* and *Peterson Field Guides*, and we publish our content under widely-recognized trade names including Holt McDougal, Rigby, Harcourt, Great Source, Earobics, SkillsTutor, Steck-Vaughn, Riverside Publishing, Edusoft, Heinemann, Riverdeep, Broderbund, McDougal Littell and Saxon. To maximize our reach and ability to connect with parents and students who are increasingly focused on the digital world, we also distribute our content through consumer websites such as Amazon and through mobile applications.

We are organized along two business divisions: Education and Trade and Reference. As of December 31, 2011, we employed approximately 3,600 full time employees. The Education business is the largest division, and represented approximately 90% of our total revenue for the year ended December 31, 2011. The Education offices are located in Boston, MA, Orlando, FL, Evanston, IL, Austin, TX, Wilmington, MA, Rolling Meadows, IL, Portsmouth, NH and Dublin, Ireland. Trade and Reference sells and licenses book rights to paperback publishers, book clubs, web sites, and other publishers and electronic businesses in the U.S. and abroad. The Trade and Reference main offices are located in New York and Boston.

**2010 Restructuring and Reorganization**

On March 9, 2010, we completed a restructuring of certain indebtedness and an upper-tier reorganization.  As part of the reorganization, Riverdeep Interactive Learning, an Irish company and our previous parent company ("RIL"), entered into a series of transactions, including a $650 million rights offering, that ultimately resulted in HMH Holdings and its subsidiaries no longer being subsidiaries of RIL.  In the out-of-court restructuring, the then-existing first lien lenders received approximately 90% of the equity of HMH Holdings (pre-dilution from the rights offering) in exchange for converting $2 billion of debt and the then-existing mezzanine lenders received approximately 10% of the equity and warrants to purchase up to an additional 12.5% of the incremental value above a specified equity value (in each case, pre-dilution from the rights offering) in exchange for converting $2 billion of debt.  In addition, HMH used the proceeds from the rights offering in which certain then-existing first lien lenders and mezzanine lenders participated to pay transaction fees, accrued cash interest and fund cash on the balance sheet.

The following is a current corporate structure chart:



**Senior Management Overview**

| Name | Position | Experience |
|------|----------|------------|
| Linda K. Zecher | President, CEO, and Director | 33 years |
| Eric Shuman | Executive Vice President and CFO | 35 years |
| William Bayers | Executive Vice President, General Counsel | 19 years |
| Gary Gentel | President of HMH Trade and Reference Publishers | 29 years |
| Tim Cannon | Executive Vice President, Strategy and Alliances | 34 years |
| Bethlam Forsa | Executive Vice President, Global Product and Content  Development | 20 years |
| John Dragoon | Executive Vice President and Chief Marketing Officer | 28 years |
| Mary Cullinane | Executive Vice President, Corporate Affairs and Social Responsibility | 12 years |
| Joanne Karimi | Executive Vice President, Human Resources | 25 years |

***Linda K. Zecher*** joined HMH in September 2011 as President, Chief Executive Officer and Director.  Previously, she served as Corporate Vice President of Microsoft's $8 billion Worldwide Public Sector organization, where she led a team of nearly 2,000 sales and marketing professionals serving government, education and healthcare customers in more than 100 countries.  Prior to joining Microsoft in 2003, Linda held leadership positions with Texas Instruments, Bank of America, PeopleSoft, Oracle and Evolve Corp.  She currently serves on the U.S. State Department's Board for Overseas Schools, the Focused Ultrasound Surgery Foundation Advisory Council, and the Emily Couric Leadership Forum.  Linda is also a former member of the Intelligence National Security Association, the Virginia Piedmont Technology Council, and James Madison University's Board of Visitors.

***Eric Shuman*** is Executive Vice President and Chief Financial Officer of HMH.  Prior to being named CFO, Eric had assumed the role of interim CFO from November 2011 through January 2012.  Until that time, Eric had served as Executive Vice President and Chief Operating Officer of HMH.  Eric joined HMH in 2009 from Thomson Lifelong Learning Group, a division of Thomson Corporation, where he most recently served as Chief Executive Officer.  Previously, Eric was Senior Vice President and Chief Financial Officer for Thomson Learning and Chief Financial Officer for Thomson Newspapers.  Eric also served as a general practice partner at Coopers and Lybrand.  In these capacities, he led several business integrations, restructurings, and significant mergers and acquisitions activity.  He is a graduate of Boston College and is based in the Boston office.

***William Bayers*** is Executive Vice President and General Counsel of HMH.  Bill joined the HMH in May of 2007 as Senior Vice President and General Counsel.  Previously, he served as Vice President and General Counsel of Harcourt Education Group.  He oversees all legal matters and government relations for the Debtors.  He is a graduate of Harvard College and Harvard Law School.

***Gary Gentel*** is President of the Houghton Mifflin Harcourt Trade and Reference Publishers division.  He leads the division's strategic direction with the support of his Trade and Reference management team.  Gary joined Houghton Mifflin in October of 2003 as Corporate Vice President and Director of Trade Sales and was promoted to Interim President of the combined Trade Group in July 2007.  He was given the permanent position in December of that year.  Previously, he served as President of Candlewick Press—a children's publisher based in Cambridge, SVP of Trade Sales at Scholastic Books, and SVP and Publisher of The Grosset and Dunlap Group at GP Putnam's Sons-now a division of Penguin Books.  Gary started his publishing career as a Sales Representative at Random House in 1980, rising to VP of Children's Sales by 1990.

***Tim Cannon*** is Executive Vice President, Strategy and Alliances.  Tim's career in business, organizational and IT strategy spans nearly three decades.  Before joining HMH, Tim was Senior Director of Business Strategy for Microsoft's Worldwide Public Sector organization, where he oversaw the development and execution of business strategies to better serve Government, Education and Health customers and partners worldwide.  He has also held leadership roles at companies like Digital Equipment Corporation and Oracle, and helped many large organizations cope with the dynamics of change by implementing responses to maximize shareholder value.  Tim serves on the

board of the Center for Entrepreneurship and Innovation at the University of Florida and on the advisory board for the School of Engineering at George Mason University.

***Bethlam Forsa*** is Executive Vice President Global Product and Content Development.  Bethlam previously served as Senior Vice President of Publishing and Operations for School Publishers.  In that role she helped to standardize and optimize our print publishing operations.  Previously, Bethlam was a partner at Accenture, a leading management consulting firm, where she led programs to improve sales, financial performance, and market capitalization for publishing companies around the world.

***John Dragoon*** is Executive Vice President and Chief Marketing Officer.  Prior to joining HMH, he served as Chief Marketing Officer and Channel Chief of Novell where he led all aspects of the company's marketing and partner programs. Before joining Novell, John was the Senior Vice President of Marketing and Product Management at Art Technology Group and previously served as Vice President, Operations at Internet Capital Group, where he was on the board of nine partner companies providing guidance on strategy, marketing, business development, financing, and product development.  John spent more than 16 years at IBM, where he held a number of marketing and sales positions.  He holds an MBA from Cornell University and a BS from Union College.

***Mary Cullinane*** is Executive Vice President, Corporate Affairs and Social Responsibility. Prior to joining HMH , Mary spent 11 years spearheading Microsoft's education-related innovation programs as Worldwide Senior Director of Innovation and Strategic Initiatives.  Before working with Microsoft, Mary was an educator, director of technology and administrator in the public sector.  Mary holds a Master of Public Policy and Administration from Columbia University and a BA from the College of New Jersey.

***Joanne Karimi*** is Senior Vice President, Human Resources.  Prior to joining HMH Joanne served as Leader of Human Capital for PacifiCord, the US subsidiary of the biotechnology company Health Banks and held other key global human resources roles in the banking and technology sectors, as well as with The Walt Disney Company.  Joanne holds an MBA and BS from the University of West Florida and a Masters certificate in Organizational Development from Chapman University.

## UNAUDITED SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA

The following table sets forth the Debtors' summary historical financials for the fiscal years ended December 31, 2011 and 2010 and for the three month period ended March 31, 2012. This information should be read in conjunction with the financial statements attached hereto as Appendix D.

### Summary historical financials ($ in thousands)

| | Fiscal year ended December 31 | | Three months ended |
|---|---|---|---|
| | **2011** | **2010**[3] | **March 31, 2012** |
| **Statement of Operations Data:** | | | |
| Net sales | $1,295,295 | $1,507,047 | $165,229 |
| Cost of sales, excluding pre-publication and publishing rights amortization | 512,612 | 604,863 | 81,317 |
| Publishing rights amortization | 230,624 | 284,313 | 50,604 |
| Pre-publication amortization | 176,829 | 219,444 | 32,577 |
| Cost of sales | 920,065 | 1,108,620 | 164,498 |
| Selling and administrative | 640,023 | 717,846 | 139,942 |
| Other intangible asset amortization | 67,372 | 59,607 | 13,138 |
| Impairment charge for goodwill, intangible assets, pre-publication costs and fixed assets | 1,674,164 | 107,961 | - |
| Severance and other charges | 32,801 | (11,243) | - |
| Gain on sale of assets | (2,000) | (1,179) | - |
| Operating income (loss) | (2,037,130) | (474,565) | (152,349) |
| Other income (expense) | | | |
| Net interest expense | (244,582) | (416,121) | (66,800) |
| Other income (loss), net | - | 3 | - |
| Change in fair value of derivative instruments | (811) | 82,889 | 1,006 |
| Income (loss) from operations before taxes | (2,282,523) | (807,794) | (218,143) |
| Income tax expense (benefit) | (100,153) | 11,709 | 7,204 |
| Net income (loss) | $(2,182,370) | $(819,503) | $(225,347) |
| | | | |
| **Cash Flow Data:** | | | |
| Cash flows from (used in) operating activities | $132,796 | $141,670 | $(175,042) |
| Cash flows used in investing activities | (195,300) | (257,738) | (37,305) |
| Cash flows from (used in) financing activities | 96,041 | 402,139 | (10,875) |
| Net increase (decrease) in cash and cash equivalents | $33,537 | $286,071 | $(223,222) |
| | | | |
| **Selected Other Financial Metrics:** | | | |
| Adjusted EBITDA[1] | $238,198 | $440,738 | $(38,187) |
| Cash and cash equivalents | 413,610 | 380,073 | 190,388 |
| Long term debt[2] | 3,117,441 | 3,010,941 | 3,106,566 |
| Plate capital expenditure | 122,592 | 118,670 | 27,437 |
| Non-plate capital expenditures | 107,409 | 80,522 | 9,883 |
| Total debt to pre-plate EBITDA | 13.1 | 6.8 | n/a |
| Total debt to post-plate EBITDA | 27.0 | 9.3 | n/a |

---

[1]  Defined by adjusting net income (loss) to exclude interest, income taxes, depreciation and amortization, non-cash impairment charges, non-cash interest related charges from debt extinguishment and hedging arrangements, gains and losses on disposition of assets not in the ordinary course of business, stock compensation costs, costs related to restructuring our capital structure, costs incurred with merging Houghton Mifflin and Harcourt (i.e., severance, program, facility and system integration), purchasing accounting adjustments, costs associated with acquisitions, and certain former parent company costs.

9

[2] Includes current portion of long-term debt; excludes original issuance discount.

[3] The 2010 financial information included within the statement of operations data and cash flow data include the combined amounts for the periods January 1, 2010 to March 9, 2010 and March 10, 2010 to December 31, 2010.

## DESCRIPTION OF CURRENT MATERIAL INDEBTEDNESS OF THE COMPANY

**Receivables Facility**

On August 4, 2010, HM Receivables Co. II, LLC, a non-Debtor Delaware limited liability company and direct wholly-owned special purpose subsidiary of HM Publishing Corp. (the "Receivables Subsidiary"), entered into the Receivables Funding and Administration Agreement (the "Receivables Facility") with certain lenders party thereto and JP Morgan Chase Bank, N.A., as administrative agent (in such capacity, the "Receivables Facility Agent"). The Receivables Facility provides for revolving credit financing of up to $250 million (the "Aggregate Commitment") subject to borrowing base availability, which terminates on August 4, 2014; provided that such termination date may be accelerated to a day that is 90 days prior to the maturity of the First Lien Revolving Facility (as defined below) or First Lien Term Facility (as defined below) if such facilities are not (i) repaid or (ii) exchanged, extended, refinanced, renewed, replaced, defeased, or refunded with indebtedness having a stated maturity after August 4, 2014. The obligations under the Receivables Facility are non-recourse (except for standard representations, warranties, covenants, servicing and indemnities made in connection with such facility) to HMH Holdings and its subsidiaries, other than the Receivables Subsidiary, and the assets of the Receivables Subsidiary are not available to satisfy the obligations of other subsidiaries of HMH Holdings. Proceeds of the financing are used, primarily, to purchase accounts receivable (the "Receivables") from HMH and certain indirect wholly-owned subsidiaries of HMH[1] pursuant to a sales and servicing agreement (the "Sales Agreement") by and among the Receivables Subsidiary, as buyer, the Originators, as sellers, and HMH, as servicer. The Receivables Facility borrowing base at any time equals the lesser of (i) the Aggregate Commitment, (ii) the net receivables balance multiplied by an applicable advance rate based on current dilution, minus certain applicable reserves and an availability block and (iii) the net receivable balance multiplied by 85%, minus certain applicable reserves and an availability block. All advances under the Receivables Facility are subject to the satisfaction of customary conditions, including absence of a default and accuracy of representations and warranties. The principal amount outstanding under the Receivables Facility is $0.

**First Lien Credit Facility**

Our existing senior secured credit facilities with a syndicate of lenders and Citibank, N.A., as administrative agent, and as collateral agent, provide a (i) fully funded revolving credit facility in the outstanding principal amount of $235.8 million that matures on December 12, 2013, under which the commitments have been terminated and the outstanding loans have been effectively converted into term loans (the "First Lien Revolving Facility"), and (ii) a term loan facility in the outstanding principal amount of $2.571 billion that currently matures on June 12, 2014 (the "First Lien Term Facility" and, together with the First Lien Revolving Facility, the "First Lien Credit Facility"). The First Lien Credit Facility is fully drawn with no further borrowings available thereunder. Borrowings under our First Lien Credit Facility bear interest at a rate per annum equal to, at our option, either (a) a base rate determined by reference to the higher of (1) the prime rate and (2) the federal funds effective rate plus 0.5%, or (b) the eurodollar rate determined by reference to the costs of funds for U.S. dollar deposits for the interest period relevant to such borrowing adjusted for certain additional costs, in each case plus an applicable margin. The current applicable margin for loans under the First Lien Credit Facility is 6.25% per annum for base rate borrowings and LIBOR borrowings and increases by 0.25% per annum each August and February to a maximum applicable margin of 6.50%.

The First Lien Credit Facility is guaranteed by HMH Holdings, and certain of its subsidiaries, and secured by substantially all of the assets of certain members of the group of operating companies.

**10.5% Notes**

On May 26, 2011, HMH Publishers, Inc. and HMH issued $300 million of 8-year 10.5% Notes. The 10.5% Notes mature on June 1, 2019. The notes are senior secured obligations that rank equally in right of payment with

---

[1]   Such indirect wholly-owned subsidiaries are:  ACHIEVE! Data Solutions, LLC; Edusoft; Greenwood Publishing Group, Inc; Cognitive Concepts, Inc.; and The Riverside Publishing Company (collectively, the "Originators").

the First Lien Credit Facility and all of our other existing and future senior indebtedness and are senior in right of payment to any of our existing and future subordinated indebtedness.  The notes are guaranteed on a senior secured basis by HMH Holdings, its subsidiary, HMH Publishing Company, and all of the direct and indirect subsidiaries of HMH Publishing Company that guarantee, or act as co-borrowers under, the First Lien Credit Facility.  The notes are structurally subordinated to all of the liabilities and preferred stock of each of our subsidiaries that do not guarantee or co-issue the notes.  The outstanding principal amount of the 10.5% Notes is $300 million.

**Letter of Credit Facility**

On October 26, 2010, HMH Publishers Inc. entered into the Letter of Credit Facility pursuant to which Wells Fargo Bank, National Association ("Wells Fargo") has agreed to issue up to $50 million of standby letters of credit. The Letter of Credit Facility is scheduled to expire on June 1, 2013.  All letters of credit when issued pursuant to the Letter of Credit Facility are required to be cash collateralized at 100% of their face amount, and Wells Fargo has a first-priority security interest in, and exclusive control over, the account in which cash collateral is posted by HMH Publishers Inc. in connection with each letter of credit.  The current aggregate amount of letters of credit outstanding under the Letter of Credit Facility is $26,829,718.53.

## BACKGROUND TO RESTRUCTURING

The global financial crisis and the following economic downturn have negatively affected the Debtors' operational performance.  Notwithstanding a leading market share and strong product feedback, the Debtors experienced weaker financial performance in 2011 relative to their original business plan as a result of this difficult operating environment.  As the institutional school market depends largely on state and local funding, the current lack of certainty regarding state budgets and local tax receipts have impacted customers' willingness to make new purchases, and the outlook for the remainder of 2012 remains uncertain.

### First Lien and Receivables Facility Amendments

Houghton Mifflin Harcourt successfully negotiated an amendment to the First Lien Credit Facility on December 22, 2011, and to the Receivables Facility on December 29, 2011, which provided for greater operating flexibility by widening certain financial covenants through March  2013.  The successful negotiation of these amendments was key to enabling Houghton Mifflin Harcourt to avoid an event of default under, among other debt instruments, the First Lien Credit Facility, the 10.5% Notes, and the Receivables Facility.

### Events Necessitating the Current Restructuring Plan

The Debtors have continued to experience financial difficulties due mainly to exogenous macroeconomic factors.  The Debtors experienced substantial revenue decline in 2011, largely due to recession-driven decreases in adoption, open territory and supplemental spending.  Significant purchase deferrals in key adoption states coupled with purchase cancellations led to material reductions in the overall size of the Debtors' key K-12 market.  Sustained weakness in the Debtors' market and a lack of federal stimulus support has caused the Debtors' financial outlook to become increasingly negative over the course of 2012.  In or about March 2012, significant holders of claims under the First Lien Credit Agreement and the 10.5% Notes formed an informal creditor group (the "Informal Creditor Group") and engaged Houlihan Lokey as their financial advisor and Akin Gump Strauss Hauer & Feld LLP as legal counsel.  The members of the Informal Creditor Group are set forth in the Restructuring Support Agreement annexed hereto as Appendix E.  Since its formation, the Informal Creditor Group and its advisors have engaged in constructive dialogue with the Debtors regarding potential structures for a comprehensive restructuring.  After weeks of intensive good faith and arm's length negotiations, the Debtors and the Informal Creditor Group recently agreed to a restructuring to be effectuated through the Plan that will completely eliminate the Debtors' outstanding indebtedness and result in a complete deleveraging of the Debtors' balance sheet while providing sufficient liquidity to meet the Debtors projected long term cash needs (the "Restructuring Plan").  On May 10, 2012, the Debtors and their affiliates entered into the Restructuring Support Agreement with holders of 71.01% of the aggregate indebtedness under the First Lien Credit Facility and the 10.5% Notes (collectively, the "First Lien Facilities") pursuant to which such holders have agreed, subject to certain terms and conditions, to vote in favor of the Plan when solicited to do so.

### Forbearance in Favor of Foreign Affiliate Guarantors

In connection with the solicitation of acceptances of the Plan prior to a chapter 11 filing, the Senior Creditors have been asked to agree to the forbearance of any action against all of the guarantors of the First Lien Facilities, including the Debtors' foreign affiliates, HMH Publishing Company, a company organized under the laws of the Republic of Ireland, HMH Consumer Company, a company organized under the laws of the Republic of Ireland, HMH Education Company, a company organized under the laws of the Republic of Ireland, HMH IP Company, a company organized under the laws of the Republic of Ireland, Riverdeep UK Limited, a company organized under the laws of England and Wales, Houghton Mifflin Harcourt (Asia) Pte. Ltd., a private limited company organized under the laws of Singapore, and Houghton Mifflin PLC, a public limited company organized under the laws of England and Wales, to avoid the need for additional insolvency proceedings.  Upon the consummation of the Plan, pursuant to the terms of the Plan, the First Lien Administrative Agent, the First Lien Collateral Agent and the 10.5% Indenture Trustee shall release any and all collateral and guarantees with respect to the First Lien Credit Facility and the 10.5% Notes, respectively.

## SUMMARY OF TREATMENT OF CLAIMS AND EQUITY INTERESTS

| Class | Treatment Under the Plan |
|---|---|
| Senior Creditors | On the Initial Distribution Date, each holder of an Allowed Senior Creditor Claim shall receive, in full and final satisfaction of such Claim, its pro rata share of (i) 100% of the New Common Stock, subject to dilution for the New Common Stock to be issued pursuant to the Management Incentive Plan and the exercise of the New Warrants and (ii) $30.3 million in Cash. |
| General Unsecured Claims | Each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such claim, Cash in amount equal to such holder's Allowed General Unsecured Claim plus accrued and unpaid Post-Petition Interest or such Claim shall otherwise continue unaffected upon consummation of the Plan, to be paid in the ordinary course of business. |
| Letter of Credit Facility | Except to the extent that a holder of an Allowed Letter of Credit Facility Claim and the Debtors with the consent of the Requisite Participating Lenders agree to a different treatment, the outstanding letters of credit issued under the Letter of Credit Facility shall either continue unaffected upon consummation of the Plan or be replaced by the proceeds of the Exit Facility and the Letter of Credit Facility shall be deemed terminated. |
| Existing Common Stock | If the Class of Existing Common Stockholders votes to accept the Plan, the Existing Common Stockholders shall be entitled to receive their pro rata share of the New Warrants; if such Class votes to reject the Plan, the Existing Common Stockholders shall neither receive distributions nor retain any property under the Plan on account of such Existing Common Stock. |
| Other Holdings Equity Interests | Other Holdings Equity Interest Holders will not receive or retain any property under the Plan. |

## ESTIMATED RECOVERIES UNDER THE PLAN

| Class | Recoveries Under the Plan |
|---|---|
| **Senior Creditors (Class 3 under the Plan) Estimated Amount: approximately $3.142 billion** | Class 3 is Impaired under the Plan. Each holder of an Allowed Senior Creditor Claim in Class 3 is entitled to vote to accept or reject the Plan.<br><br>Estimated Recovery: 54.4% |
| **Letter of Credit Facility Lenders (Class 4 under the Plan) Estimated Amount: approximately $26.83 million** | Class 4 is unimpaired under the Plan. Each holder of an Allowed Letter of Credit Facility Claim in Class 4 is not entitled to vote and will be deemed to accept the Plan.<br><br>Estimated Recovery: 100% |
| **General Unsecured Creditors (Class 5 under the Plan)** | Class 5 is unimpaired under the Plan. Each holder of an Allowed General Unsecured Claim in Class 5 is not entitled to vote and will be deemed to accept the Plan.<br><br>Estimated Recovery: 100% |

| | |
|---|---|
| **Existing Common Stock (Class 8 under the Plan)** | Class 8 is Impaired under the Plan.  Each holder of an Existing Common Stock in Class 8 is entitled to vote to accept or reject the Plan. |
| **Other Holdings Equity Interests (Class 9 under the Plan)** | Class 9 is Impaired under the Plan.  Each holder of an Other Holdings Equity Interest is not entitled to vote to accept or reject the Plan and is deemed to reject the Plan. |

The existing equity interests in HMH, HMH Publishers LLC, HMH Publishers, Inc., Houghton Mifflin Holding Company, Inc., Houghton Mifflin, LLC, Houghton Mifflin Finance, Inc., Houghton Mifflin Holdings, Inc., HM Publishing Corp., Riverdeep Inc., a Limited Liability Company, Broderbund LLC, RVDP, Inc., HRW Distributors, Inc., Greenwood Publishing Group, Inc., Classroom Connect, Inc., ACHIEVE! Data Solutions, LLC, Steck-Vaughn Publishing LLC, HMH Supplemental Publishers Inc., Sentry Realty Corporation, Houghton Mifflin Company International, Inc., The Riverside Publishing Company, Classwell Learning Group Inc., Cognitive Concepts, Inc., Edusoft, and Advanced Learning Centers, Inc. shall remain unimpaired and unaffected upon consummation of the Plan.

**The Restructuring Plan**

The Debtors' principal objective in restructuring their debt structure through the Restructuring Plan is to deleverage the Debtors' balance sheets while providing sufficient liquidity to meet their projected, long-term cash needs.  The Debtors believe that consummation of the Restructuring Plan through the Plan provides several benefits, including:

- significantly reducing leverage by eliminating the Debtors' current debt balances and thereby becoming more competitive among their peers in the industry;

- minimizing business disruptions and potential customer defections by limiting uncertainty as to the viability of the Debtors as a going concern and the period of time during which the Debtors are subject to such uncertainty;

- providing the Debtors with sufficient operational and financial flexibility to execute the balance of the Debtors' ongoing business restructuring strategy;

- preserving significantly higher value for the Debtors than a liquidation of the Debtors or a chapter 11 filings without a "pre-packaged" Plan; and

- employing the Exit Facility to provide significant liquidity and support a stable foundation for business.

**The Restructuring Plan**

It is the Debtors' intention to pursue the Restructuring Plan through the Plan.  If, however, the Plan is not accepted by the creditors entitled to vote on the Plan, the Debtors expect they will likely need to file for chapter 11 protection without the benefit of a "pre-packaged" Plan.  In the event of a chapter 11 filing without a "pre-packaged" Plan, the Debtors would likely be subject to a lengthy and costly chapter 11 process, and such a filing may cause substantial damage to the Debtors' business and reputation.  Such a chapter 11 filing would present obstacles to conducting the Debtors' business, including the inability to insulate the Debtors' operating units from the proceedings and additional uncertainty and constraints with respect to the Debtors' liquidity.  In addition, such a filing could have the effect of significantly eroding our customers' confidence in our business.  Employees could be distracted or more easily attracted to other career opportunities, and it may be more difficult to attract or replace key employees.  Furthermore, creditors and other partners could seek to terminate their relationships with us, require financial assurances or enhanced returns, or refuse to provide credit or other services on the same terms as prior to filing.  See, pages 71-81,  "Risk Factors — Risks Related to Failure to Consummate the Restructuring Plan."

## PRO FORMA CAPITALIZATION

The following table sets forth the pro forma capitalization of the Debtors after giving effect to the Plan:

**Illustrative Pro Forma Capital Structure** (*$ in millions*)

| | Status Quo | Conversion to Equity | New Facilities | Pro Forma |
|---|---|---|---|---|
| First Lien Revolver | $ 236 | $ (236) | $ - | $ - |
| First Lien Term Loan | 2,571 | (2,571) | - | - |
| Receivables Facility | - | - | - | - |
| 10.5% Secured Notes | 300 | (300) | - | - |
| New Revolving Credit Facility[1] | - | - | - | - |
| New Term Loan | - | - | 250 | 250 |
| **Total Debt** | **$ 3,107** | **$ (3,107)** | **$ 250** | **$ 250** |

[1]  New Revolving Credit Facility will have capacity of $250 million to support seasonal working capital.

## THE PLAN

**THE DEBTORS HAVE NOT COMMENCED CHAPTER 11 CASES UNDER THE BANKRUPTCY CODE, NOR HAVE THEY TAKEN ANY CORPORATE ACTION AUTHORIZING THE COMMENCEMENT OF SUCH CASES. THIS DISCLOSURE STATEMENT SOLICITS YOUR ADVANCE ACCEPTANCE OF THE PLAN, A COPY OF WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS APPENDIX A, AND WHICH CONTAINS IMPORTANT INFORMATION RELEVANT TO YOUR DECISION WHEN VOTING ON THE PLAN. PLEASE READ THE PLAN COMPLETELY AND CAREFULLY**.

To enhance the likelihood that we will succeed in our restructuring efforts, we have formulated the Plan for our reorganization under chapter 11 of the Bankruptcy Code. The Plan covers the Debtors and provides the treatment set forth below to holders of claims against and interests in the Debtors. If the Plan is confirmed and consummated, all holders of claims against and interests in the Debtors would receive the treatment described in this Disclosure Statement.

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions.

In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan or any other operative document thereunder, on the other hand, the terms of the Plan and such other operative document(s) are controlling. To the extent not defined in this section or otherwise defined in this Disclosure Statement, capitalized terms used in the description of the Plan have the meanings ascribed to them in Article I of the Plan attached hereto as Appendix A.

WE HAVE NOT MADE ANY DECISION AT THIS TIME TO COMMENCE ANY CHAPTER 11 CASES, AND RESERVE ALL OF OUR RIGHTS TO PURSUE ANY AND ALL OF OUR STRATEGIC ALTERNATIVES.

**Reasons for the Solicitation**

The solicitation is being conducted at this time to obtain (prior to the filing of voluntary petitions for reorganization of the Debtors under chapter 11 of the Bankruptcy Code) the requisite acceptances of the Plan. We anticipate that by conducting the solicitation in advance of commencing any Chapter 11 Cases, if Chapter 11 Cases were commenced, the duration of the Chapter 11 Cases will be significantly shortened, and the administration of the cases, which otherwise could be lengthy, complex, and extremely expensive, will be greatly simplified and much less costly. The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. Acceptance of a plan by a class of interests requires acceptance by at least two-thirds of the amount of interests of such class that cast ballots for acceptance or rejection of the plan.

**Anticipated Events During the Chapter 11 Cases**

If the requisite votes for acceptance of the Plan are received from the Senior Creditors, the Debtors may file voluntary petitions for relief under chapter 11 of the Bankruptcy Code. At that time, all actions and proceedings against the Debtors and all acts to obtain property from the Debtors will be stayed under section 362 of the Bankruptcy Code. The Debtors will continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors do not expect the Chapter 11 Cases to be protracted. To expedite their emergence from chapter 11, the Debtors on the Petition Date, in addition to filing this Disclosure Statement and the Plan, would file motions seeking the relief described below, among other relief, from the Court. Such relief, if granted, will facilitate the

17

administration of the Chapter 11 Cases; there can be no assurance, however, that the Court will grant the relief sought.

### Applications For Retention Of The Debtors' Professionals

The Debtors intend to seek retention of certain professionals to represent them and assist them in connection with the Chapter 11 Cases. These professionals were intimately involved with the negotiation and development of the restructuring transactions and the Plan. These professionals include, among others, Paul, Weiss, Rifkind, Wharton & Garrison LLP, as bankruptcy counsel, and Blackstone Advisory Partners LP ("Blackstone"), as financial advisor.

### Motion To Approve Combined Disclosure Statement And Confirmation Hearing

The Debtors intend to seek an order scheduling a combined hearing on this Disclosure Statement and confirmation of the Plan (the "Confirmation Hearing") for a date not more than forty-five (45) days following the Petition Date. At the Confirmation Hearing, the Debtors will seek approval of this Disclosure Statement and confirmation of the Plan pursuant to sections 1125, 1128 and 1129 of the Bankruptcy Code. At that time, the Debtors will also request that the Court approve the prepetition solicitation of votes on the Plan. There can be no assurance that the Court will grant the requested relief, including the Debtors' request to schedule the Confirmation Hearing within forty-five (45) days of the Petition Date.

### Motion To Continue Using Existing Cash Management Systems

Because the Debtors expect the Chapter 11 Cases to be pending for less than two (2) months, and because of the administrative hardship that any operating changes would impose, the Debtors intend to seek authority to continue using their existing cash management system, bank accounts and business forms and to follow their internal investment and deposit guidelines. Absent the Court's authorization of the continued use of the cash management system, the Debtors' cash flow could be impaired to the detriment of the Debtors' Estates and creditors.

Continued use of their existing cash management system will facilitate the Debtors' smooth and orderly transition into the Chapter 11 Cases, minimize the disruption of their businesses while in chapter 11, and expedite their emergence from chapter 11. As a result of set-up time and expenses, requiring the Debtors to adopt and implement a new cash management system would likely increase the costs of the Chapter 11 Cases. For the same reasons, requiring the Debtors to close their existing bank accounts and establish new accounts or requiring them to create new business forms would frustrate their efforts to reorganize expeditiously.

### Motion For Authority To Pay Prepetition Employee Wages And Associated Benefits

The Debtors believe that they have a valuable asset in their work force and that any delay in paying prepetition compensation or benefits to their employees would damage significantly their relationships with employees and irreparably harm employee morale at a time when the continued dedication, confidence and cooperation of their employees is most critical. The Debtors are grateful to their employees for their help, without which a restructuring would not be possible. Accordingly, the Debtors will seek authority to pay compensation and benefits which were accrued but unpaid as of the Petition Date.

### Motion To Approve DIP/Exit Financing

On the first day of their Chapter 11 Cases, the Debtors intend to seek approval of DIP Facility from Citibank, N.A. in the amount of $500 million (the "DIP Facility"). Approval of the DIP Facility will enable the Debtors to address their funding and other commitments while in chapter 11 and to otherwise maintain normal operations and strong relationships with their vendors, customers, and suppliers during the Chapter 11 Cases. The structure of the DIP Facility will allow the Debtors to convert the DIP Facility into permanent financing upon their exit from their Chapter 11 Cases. The Debtors intend that a portion of the DIP proceeds will be used to repay the Receivables Facility in full to the extent there is an outstanding funded balance on the Petition Date and to replace or backstop the letters of credit under the Letter of Credit Facility. In addition, the Debtors intend to provide to the Senior

18

Creditors as adequate protection for, among other things, the priming of their liens, any diminution in value of the collateral securing their Claims and the imposition of the automatic stay, pursuant to sections 105, 361 and 364 of the Bankruptcy Code, $69.7 million in Cash (the "Adequate Protection Payments"), which will be (i) allocated-6.2% to holders of the First Lien Revolver Claims, 67.6% to holders of the First Lien Term Loan Claims and 26.2% to holders of the 10.5% Notes Claims and (ii) indefeasibly payable upon entry of the Interim DIP Order. The Interim DIP Order and any final order will be in form and substance acceptable to the Requisite Participating Lenders and the Debtors.

### *Motion For Authorization to Pay Prepetition Unsecured Claims As They Become Due*

All prepetition general unsecured claims against the Debtors arising from or with respect to the operation of the Debtors in the ordinary course of business are the Class of Claims denominated "Class 5 General Unsecured Claims." Notwithstanding provisions of the Bankruptcy Code that would otherwise require the Debtors to defer payment of such prepetition general unsecured claims until the Effective Date, the Debtors intend to seek authority from the Court to pay such claims in the ordinary course of business. The Debtors also intend to seek permission to condition payments to be made on account of prepetition obligations on the agreement of the recipient of such payment to continue supplying goods and/or services to the Debtors on terms that are at least as favorable to the Debtors as the most favorable trade terms in effect between such party and the Debtors in the twelve (12) months before the Petition Date or such other trade terms as are agreed to by the Debtors and such party. Because certain goods and services are essential to the businesses of the Debtors, the relief sought in this motion is critical to uninterrupted operations during the Chapter 11 Cases and is otherwise appropriate because such payments will not affect relative distributions to creditors under the Plan.

### *Motion To Waive Filing Of Schedules And Statement Of Financial Affairs*

Bankruptcy Code section 521 and Bankruptcy Rule 1007 direct that, unless otherwise ordered by the court, a debtor must prepare and file certain schedules of claims, executory contracts and unexpired leases and related information (the "Schedules") and a statement of financial affairs (the "Statement") within fifteen (15) days of the commencement of a chapter 11 case. The purpose of these requirements is to provide a debtor's creditors, equity security holders and other interested parties with sufficient information to make informed decisions with respect to the debtor's reorganization. In appropriate circumstances, however, a bankruptcy court may modify or dispense with the filing of the Schedules and the Statement pursuant to section 521 of the Bankruptcy Code. The Debtors believe that such circumstances would exist in the Chapter 11 Cases, and that they should not be required to file the Schedules and the Statement. The Debtors thus intend to request that the Court waive the necessity of filing the Schedules and the Statement but can give no assurances that the Court will grant such a waiver.

## Timetable for Chapter 11 Cases

Assuming that the Court approves the Disclosure Statement and confirms the Plan on the schedule requested by the Debtors, the Debtors would seek to emerge from chapter 11 within approximately one (1) month of the Petition Date. There can be no assurance, however, that the Court's calendar or orders will permit the Chapter 11 Cases to proceed as expeditiously as anticipated.

## Summary of the Plan

## Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and interest holders. Another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan by the Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN, AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS UNDER THE PLAN AND WILL, UPON OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, THE ESTATES, THE REORGANIZED DEBTORS, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

**Overall Structure of the Plan**

The Plan described herein provides for the restructuring of the Debtors' liabilities in a manner designed to maximize recoveries to holders of claims against and interests in the Debtors.  In particular, the Plan contemplates that (i) each Senior Creditor will receive its pro rata share of 100% of New Common Stock, subject to dilution for New Common Stock to be issued pursuant to the Management Incentive Plan and, if applicable, New Common Stock to be issued upon exercise of the New Warrants, and $30.3 million in Cash and (ii) if Class 8 (Existing Common Stock) votes to accept the Plan, the Existing Common Stockholders will receive their pro rata share of the New Warrants; if such Class votes to reject the Plan, the Existing Common Stockholders will not receive a distribution on account of the Existing Common Stock.

The Debtors believe that (i) through the Plan, holders of Allowed Claims and Existing Common Stockholders (if Class 8 votes to accept the Plan) will obtain a substantially greater recovery from the Estates than the recovery they would receive if (a) the Debtors filed chapter 11 petitions without the pre-packaged Plan or (b) the Debtors filed for liquidation relief under chapter 7 of the Bankruptcy Code, and (ii) the Plan will, among other things, afford the Debtors the opportunity and ability to continue their business as viable going concerns and preserve ongoing employment for the Debtors' employees.

The Classes of Claims against and Equity Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan and distributions, if any, to be made under the Plan are described below.

**Adequate Information; Creditors Entitled to Vote on the Plan**

As more fully described below, the Plan designates separate classes of Claims against and Equity Interests in the Debtors (other than Administrative Claims, Fee Claims, Priority Tax Claims and DIP Financing Claims, which are unclassified).  In addition to holders of unclassified Claims, holders of Class 1 Claims (Other Priority Claims), Class 2 Claims (Other Secured Claims), Class 4 (Letter of Credit Facility Claims), Class 5 Claims (General Unsecured Claims), Class 6 Claims (Intercompany Claims) and Class 7 (Equity Interests in Debtors other than HMH Holdings) are unimpaired by the Plan, will not be entitled to vote to accept or reject the Plan, and will be deemed to have accepted the Plan.  Holders of Class 9 Equity Interests (Other Holdings Equity Interests) are Impaired under the Plan, will not receive or retain any property under the Plan, are not entitled to vote to accept or reject the Plan and are deemed to reject the Plan.  Holders of Class 3 Claims (Senior Creditor Claims) and Class 8 Equity Interests (Existing Common Stock) are Impaired under the Plan and only the votes of such Classes will be solicited.

Bankruptcy Rule 3018(b) prescribes the conditions that must be satisfied to count the ballots solicited with respect to a Plan prior to the commencement of a chapter 11 case.  Bankruptcy Rule 3018(b) requires that (i) the chapter 11 Plan must have been disseminated to substantially all impaired creditors and equity security holders in the class(es) entitled to vote, (ii) the time prescribed for voting on the Plan must be sufficient and (iii) the solicitation must have been conducted in accordance with section 1126(b) of the Bankruptcy Code, which requires compliance with all applicable non-bankruptcy laws, rules, or regulations or, if there are no such applicable laws, rules or regulations, that the disclosure with respect to the Plan contains "adequate information" as defined in section 1125(a) of the Bankruptcy Code.  Section 1125(a)(1) defines "adequate information" as information of a kind and in sufficient detail as far as is reasonably practicable in light of the nature and history of a company and the condition of such company's books and records, as would enable a hypothetical reasonable investor typical of holders of claims or equity interests of the relevant class to make an informed judgment about the Plan.

The Debtors believe that all of the requirements of Bankruptcy Rule 3018(b) will be satisfied in the event that the Debtors seek confirmation of the Plan.  This Disclosure Statement and the Plan, together with all of the accompanying materials, are being transmitted to holders of Class 3 Senior Creditor Claims and Class 8 Existing Common Stock.  The Debtors believe that this Disclosure Statement contains adequate information (within the meaning of section 1125(a)(1) of the Bankruptcy Code) to enable holders of such Claims and Equity Interests to vote to accept or reject the Plan.

**Certain Matters Regarding Classification and Treatment of Claims and Equity Interests**

Section 1123 of the Bankruptcy Code provides that a Plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1123, the Plan divides Claims and Equity Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims, Priority Tax Claims and DIP Financing Claims which, pursuant to section 1123(a)(1), need not be and have not been classified).

The Debtors are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Equity Interests in the Debtors into Classes, each of which contain Claims and Equity Interests that are substantially similar to the other Claims and Equity Interests in such Class.  The Debtors believe that the Plan has classified all Claims and Equity Interests in compliance with the provisions of section 1122, but if Chapter 11 Cases were to be commenced, it is possible that a holder of a Claim or Equity Interest may challenge the classification of Claims and Equity Interests and that the Court may find that a different classification is required for the Plan to be confirmed. In that event, to the extent permitted by the Bankruptcy Code, the Plan and the Court, the Debtors would intend to make such reasonable modifications to the classification scheme under the Plan as to permit confirmation and to use the acceptances of the Plan that are marked on the Ballots received in the Solicitation Package for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately would be deemed to be a member.  Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such class and the vote required of that Class for acceptance of the Plan.  Furthermore, a reclassification of a Claim or Equity Interest after acceptance of the Plan could necessitate a resolicitation of acceptances of the Plan.

The classification of Claims and Equity Interests and the nature of distributions to members of each Class are summarized below.  The Debtors believe that the consideration, if any, that would be provided under the Plan to

holders of Claims and Equity Interests would reflect an appropriate resolution of their Claims and Equity Interests, and would take into account the differing nature and priority of such Claims and Equity Interests. The Court would be required to find, however, that a number of statutory tests are met before it could confirm the Plan. Many of these tests are designed to protect the interests of holders of Claims or Equity Interests who are not entitled to vote on the Plan, or would not vote to accept the Plan, but who would be bound by the provisions of the Plan if it were confirmed by the Court. The "cramdown" provisions of section 1129(b) of the Bankruptcy Code, for example, permit confirmation of the Plan in certain circumstances even if the Plan has not been accepted by all Impaired Classes of Claims and Equity Interests. Although the Debtors believe that, as long as Class 3 votes to accept the Plan, the Plan could be confirmed under section 1129(b), there can be no assurance that the requirements of such section would be satisfied.

## Material Terms of the Plan

### Treatment of Administrative Claims, Fee Claims, Priority Tax Claims and DIP Financing Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Fee Claims), Priority Tax Claims and DIP Financing Claims are not classified and holders of such Claims are not entitled to vote on the Plan. The treatment of such Claims is set forth immediately below.

### Administrative Claims

Subject to the provisions of sections 330(a) and 331 of the Bankruptcy Code, as applicable, each holder of an Allowed Administrative Claim shall receive in full and final satisfaction of such Claim, (a) Cash in the full amount of such Allowed Claim, without interest, or (b) such amount at such other date and upon such other terms as may be agreed upon in writing by such holder and the Debtors with the consent of the Requisite Participating Lenders or otherwise approved by Final Order of the Court on or as soon as practicable after the later of (i) the Effective Date, (ii) the date on which such Administrative Claim becomes Allowed, (iii) the date on which such Allowed Administrative Claim is due to be paid in the ordinary course of business with the Debtors, and (iv) the date on which the holder of such Administrative Claim and the Debtors, with the consent of the Requisite Participating Lenders otherwise agree in writing. Notwithstanding anything herein to the contrary, except with respect to Fee Claims and except with respect to subsection (iv) hereof, the Debtors or Reorganized Debtors, as applicable, shall object to any Allowed Administrative Claim before the later of (x) sixty (60) days after the Effective Date and (y) sixty (60) days after the filing of the request for payment of an Administrative Claim.

### Fee Claims

All requests for compensation or reimbursement of Fee Claims pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date shall be filed and served on the Reorganized Debtors and their counsel, the United States Trustee, counsel to the Creditors' Committee (if any), counsel to the Informal Creditor Group and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or any other order(s) of the Court, no later than forty-five (45) days after the Effective Date. Holders of Fee Claims that are required to file and serve applications for final allowance of their Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Fee Claims against the Debtors, the Reorganized Debtors or their respective properties, and such Fee Claims shall be deemed discharged as of the Effective Date. Objections to any Fee Claims must be filed and served on the Reorganized Debtors and their counsel and the requesting party no later than seventy-five (75) days (or such longer period as may be allowed by order of the Court) after the Effective Date.

### Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim and the Debtors, with the consent of the Requisite Participating Lenders, agree to a different treatment, each holder of an Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim plus Post-Petition Interest on the later of the Initial Distribution Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business without Post-Petition Interest.

**DIP Financing Claims**

On the Effective Date, except to the extent that the holders of the DIP Financing Claims and the Debtors, with the consent of the Requisite Participating Lenders, agree to a different treatment, in full and final satisfaction of such Claims, the DIP Financing Claims shall be satisfied as provided under the Exit Facility.

<b>Treatment of Claims and Equity Interests</b>

## Class 1 — Other Priority Claims

*Distributions*

Except to the extent that a holder of an Allowed Other Priority Claim and the Debtors with the consent of the Requisite Participating Lenders agree to a different treatment, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash in an amount equal to such Allowed Other Priority Claim plus Post-Petition Interest on or as soon as practicable after the later of the Initial Distribution Date and the date when such Other Priority Claim becomes an Allowed Other Priority Claim. All Allowed Other Priority Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business without Post-Petition Interest.

*Impairment and Voting*

Class 1 is unimpaired under the Plan. Holders of Allowed Other Priority Claims in Class 1 are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

## Class 2 — Other Secured Claims

*Distributions*

Except to the extent that a holder of an Allowed Other Secured Claim and the Debtors with the consent of the Requisite Participating Lenders agree to a different treatment, in full and final satisfaction of such Claim, (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or to receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim plus Post-Petition Interest in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Initial Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable, or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim plus Post-Petition Interest in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Initial Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable, in each case as determined by the Debtors, with the consent of the Requisite Participating Lenders.

*Impairment and Voting*

Class 2 is unimpaired under the Plan. The holders of Allowed Other Secured Claims in Class 2 are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

**Class 3 — Senior Creditor Claims**

*Distributions*

Senior Creditor Claims shall be deemed Allowed in the following amounts: (a) the First Lien Term Loan Claims shall be deemed Allowed in the amount of $2.571 billion plus accrued interest as of the Petition Date; (b) the First Lien Revolver Claims shall be deemed Allowed in the amount of $235.8 million plus accrued interest as of the Petition Date; and (c) the 10.5% Notes Claims shall be Allowed in the amount of $300 million plus accrued interest as of the Petition Date.  On the Initial Distribution Date, subject to the occurrence of the Restructuring, each holder of an Allowed Senior Creditor Claim shall receive, in full and final satisfaction of such Claim, its pro rata share of (i) 100% of the New Common Stock, subject to dilution for the New Common Stock to be issued pursuant to the Management Incentive Plan and exercise of the New Warrants and (ii) $30.3 million in Cash.

*Impairment and Voting*

Class 3 is Impaired under the Plan.  Each holder of an Allowed Senior Creditor Claim in Class 3 is entitled to vote to accept or reject the Plan.

**Class 4 – Letter of Credit Facility Claims**

*Distributions*

Except to the extent that a holder of an Allowed Letter of Credit Facility Claim and the Debtors with the consent of the Requisite Participating Lenders agree to a different treatment, the outstanding letters of credit issued under the Letter of Credit Facility shall either continue unaffected upon consummation of the Plan or be replaced by the Exit Facility and the Letter of Credit Facility shall be deemed terminated.

*Impairment and Voting*

Class 4 is unimpaired under the Plan.  Each holder of an Allowed Letter of Credit Facility Claim in Class 4 is presumed to accept the Plan and is not entitled to vote to accept or reject the Plan.

**Class 5 — General Unsecured Claims**

*Distributions*

Each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claims, Cash in amount equal to such holder's Allowed General Unsecured Claim plus accrued and unpaid Post-Petition Interest; provided, however, that the Debtors may, with the consent of the Requisite Participating Lenders, seek authority from the Court to pay certain General Unsecured Claims in advance of the Effective Date pursuant to certain "first day motions" the Debtors intend to file in the Chapter 11 Cases, as described in the Disclosure Statement; provided, further, that any General Unsecured Claim that becomes due and owing after the Effective Date shall be paid in the ordinary course of business when such claim is due and owing, without Post-Petition Interest

*Impairment and Voting*

Class 5 is unimpaired under the Plan.  Each holder of an Allowed General Unsecured Claim in Class 5 is presumed to accept the Plan and is not entitled to vote to accept or reject the Plan.

**Class 6 — Intercompany Claims**

*Distributions*

On or as soon as practicable after the Effective Date, all Allowed Intercompany Claims shall be adjusted, continued, or discharged to the extent determined appropriate by the Debtors, with the consent of the Requisite Participating Lenders.

*Impairment and Voting*

Class 6 is unimpaired under the Plan.  Holders of Intercompany Claims in Class 6 are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

**Class 7 — Equity Interests in Debtors other than HMH Holdings**

*Distributions*

The holders of Equity Interests in Debtors other than HMH Holdings shall retain such Equity Interests.

*Impairment and Voting*

Class 7 is unimpaired under the Plan.  The holders of Equity Interests in Debtors other than HMH Holdings in Class 7 are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

**Class 8 — Existing Common Stock**

*Distributions*

If the Class 8 Existing Common Stock votes to accept the Plan, each holder of Existing Common Stock shall receive its pro rata share of the New Warrants.  If the Class 8 Existing Common Stock votes to reject the Plan, the holders of the Existing Common Stock shall neither receive distributions nor retain any property under the Plan on account of such Existing Common Stock.

*Impairment and Voting*

Class 8 is Impaired under the Plan.  Each Existing Common Stockholder is entitled to vote to accept or reject the Plan.

**Class 9 – Other Holdings Equity Interests**

*Distributions*

Each Other Holdings Equity Interest Holder shall neither receive distributions nor retain any property under the Plan on account of such Other Holdings Equity Interest.

*Impairment and Voting*

Class 9 is Impaired under the Plan.  Each Other Holdings Equity Interest Holder is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

**Provisions Regarding Voting, Distributions, And Treatment Of Disputed, Contingent And Unliquidated Administrative Expense Claims, Claims And Equity Interests**

**Voting on the Plan**

Each holder of an Allowed Claim in Class 3 and each Existing Common Stockholder in Class 8 is Impaired and is entitled to vote to accept or reject the Plan.  Holders of Claims or Equity Interests in Classes 1, 2, 4, 5, 6, and 7 are unimpaired and are not to entitled to vote to accept or reject the Plan, as they are presumed to accept the Plan.  Class 9 is Impaired, will not receive or retain any property under the Plan, and is not entitled to vote to accept or reject the Plan as it is deemed to reject the Plan.

**Distributions**

*Delivery of Distributions*

Distributions under the Plan shall be made by the Reorganized Debtors or their designee to the holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, and Allowed General Unsecured Claims at the addresses set forth in the Debtors' books and records, unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001 on or prior to the Voting Record Date (or at the last known addresses of such holders if the Debtors or the Reorganized Debtors have been notified in writing of a change of address).  Distributions on account of the Allowed Senior Creditor Claims shall be made initially to the First Lien Administrative Agent and the 10.5% Indenture Trustee, or to such other entity(ies) as may be determined by the First Lien Administrative Agent and/or the 10.5% Indenture Trustee, for distribution to holders of Allowed Senior Creditor Claims.  Distributions on account of the Existing Common Stock, if any, shall be made to the Debtors' transfer agent, for distribution to Existing Common Stockholders.

*Distribution of Cash*

Any payment of Cash by the Reorganized Debtors pursuant to the Plan shall be made at the option and in the sole discretion of the Reorganized Debtors by (i) a check drawn on, or (ii) wire transfer from, a domestic bank selected by the Reorganized Debtors.

*Fractional Cents*

Any other provision of the Plan to the contrary notwithstanding, no payment of fractions of cents will be made. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

*Fractional Securities*

Any other provision of the Plan to the contrary notwithstanding, no distributions of fractional shares of New Common Stock or fractional New Warrants will be made.  Whenever any distribution of a fraction of a share of New Common Stock or a fraction of a New Warrant would otherwise be called for, the actual distribution shall reflect a rounding down of such fraction to the nearest whole share of New Common Stock or New Warrant.

*Unclaimed Distributions*

Any Distribution of Cash under the Plan to the holder of an Allowed Claim which remains unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan shall be transferred to and become property of the Reorganized Debtors notwithstanding state or other escheat or similar laws to the contrary, and any and all entitlement by the holder of such Claim to such Distribution shall be extinguished and forever barred.  The failure by a holder of the Senior Creditor Claims to execute the Registration Rights Agreement within 180 days of the Effective Date shall result in the forfeiture of such holder's allocation of

26

New Common Stock.  After such date, all forfeited New Common Stock shall revert to the Reorganized Debtors and the Senior Creditor Claim of such holder to such New Common Stock shall be discharged and forever barred.

*Saturdays, Sundays, or Legal Holidays*

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and shall be deemed to have been completed as of the required date.

*Distributions to Holders of Allowed Claims as of the Distribution Record Date*

As of the close of business on the Distribution Record Date, the Claims register shall be closed, and there shall be no further changes in the record holders of any Claims.  The Debtors and the Reorganized Debtors shall have no obligation to recognize any Claim filed or transfer of any Claims occurring after the Distribution Record Date.  The Debtors and the Reorganized Debtors shall instead be entitled to recognize and deal for purposes under the Plan with only those record holders stated on the Claims register as of the close of business on the Distribution Record Date.

*Third Party Agreements; Subordination.*

Distributions shall be subject to and modified by any Final Order directing distributions other than as provided in the Plan.  The right of the Debtors to seek subordination of any Claim or Equity Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Equity Interest that becomes a subordinated Claim or subordinated Equity Interest at any time shall be modified to reflect such subordination.  Unless the Confirmation Order provides otherwise, no Distributions shall be made on account of any subordinated Claim or subordinated Equity Interest.

**Objections to and Resolution of Claims**

*Objections to and Resolution of Administrative Claims and Claims*

The Reorganized Debtors shall have the exclusive right to make and to file objections to Administrative Claims (other than Fee Claims) and Claims subsequent to the Effective Date.  Unless otherwise ordered by the Court, objections to Administrative Claims and Claims shall be filed and served upon the holders of the Administrative Claims or Claims as to which the objection is made as soon as practicable.  Objections to Fee Claims shall be filed and served within seventy-five (75) days (or such longer period as may be allowed by order of the Court) after the Effective Date.

Objections to Administrative Claims and Claims may be litigated to judgment, settled or withdrawn, in the Reorganized Debtors' sole discretion.  The Reorganized Debtors may settle any such objections without Court approval.

**Estimation**

The Debtors or the Reorganized Debtors, as the case may be, may at any time request that the Court estimate, subject to 28 U.S.C. § 157, any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim.  The Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim.  In the event that the Court estimates any Disputed Claim, such estimated amount may constitute either (a) the Allowed amount of such Claim, (b) the estimate to be used by the Debtors in calculating potential Distributions under the Plan, or (c) a maximum limitation on such Claim, as determined by the Court.  In the case of Claims arising from personal injury tort or wrongful death actions, the Court may estimate such Claims for the purpose of confirming the Plan.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors may elect to object to ultimate payment of such Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

27

**Indenture Trustee Expenses and First Lien Agent Expenses**

In addition to any other Claim that may be filed by the 10.5% Indenture Trustee or the First Lien Agents pursuant to the provisions set forth herein, the 10.5% Indenture Trustee and the First Lien Agents shall have an Allowed Administrative Claim in an amount equal to the Indenture Trustee Expenses or the First Lien Agent Expenses, respectively.  If the Debtors or the Reorganized Debtors dispute the reasonableness of the Indenture Trustee Expenses or the First Lien Agent Expenses, the Debtors, the Reorganized Debtors, or the 10.5% Indenture Trustee or the First Lien Agents, as applicable, may submit such dispute to the Court for a determination of the reasonableness of such fees or expenses and the disputed portion of the Indenture Trustee Expenses or the First Lien Agent Expenses shall not be paid until the dispute is resolved.  The undisputed portion of the Indenture Trustee Expenses or the First Lien Agent Expenses shall be paid as provided herein.  The 10.5% Indenture Trustee shall not be entitled to payment of or assertion of its Indenture Trustee Charging Lien for any disputed Indenture Trustee Expenses to the extent the Court determines that such Indenture Trustee Expenses are unreasonable under the terms of the 10.5% Notes Indenture.  Nothing contained herein shall otherwise affect the right of the 10.5% Indenture Trustee from asserting its Indenture Trustee Charging Lien, to the extent applicable under the terms of the 10.5% Notes Indenture, provided, however, that upon the full and indefeasible payment of the Indenture Trustee Expenses, the Indenture Trustee Charging Lien shall be deemed released and discharged in full.

**Nonconsensual Confirmation**

Classes 3 and 8 are Impaired and are entitled to vote to accept or reject the Plan.  Class 9 is Impaired, is not entitled to vote to accept or reject the Plan, and is deemed to reject the Plan.  As such, the Debtors will seek to have the Court confirm the Plan under section 1129(b) of the Bankruptcy Code with respect to Class 8 if it votes to reject the Plan and Class 9.

### Substantive Consolidation of the Debtors

Substantive consolidation is an equitable remedy that the Court may be asked to apply in chapter 11 cases involving affiliated debtors.  Substantive consolidation involves the pooling and merging of the assets and liabilities of the affected debtors.  All of the debtors in the substantively consolidated group are treated as if they were a single corporate and economic entity.  Consequently, a creditor of one of the substantively consolidated group of debtors and issues of individual corporate ownership of property and individual corporate liability are ignored.

Substantive consolidation of two or more debtors' estates generally results in the deemed consolidation of the assets and liabilities of the debtors, the deemed elimination of intercompany claims, subsidiary equity or ownership interests, multiple and duplicative creditor claims, joint and several liability claims and guarantees, and the payment of allowed claims from a common fund.

The Plan is predicated upon, and it is a condition precedent to confirmation of the Plan, that the Court provide in the Substantive Consolidation Order for the substantive consolidation of the Chapter 11 Cases of the Debtors into a single Chapter 11 Case for purposes of the Plan and the Distributions thereunder.  Pursuant to such Substantive Consolidation Order (i) all assets and liabilities of the Substantively Consolidated Debtors will be merged, (ii) the obligations of each Debtor will be deemed to be the obligations of the Substantively Consolidated Debtors, (iii) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the Substantively Consolidated Debtors, (iv) each Claim filed in the Chapter 11 Cases of any Debtor will be deemed filed against the Debtors in the consolidated Chapter 11 Cases in accordance with the substantive consolidation of the assets and liabilities of the Debtors, (v) all transfers, disbursements and distributions made by any Debtor under the Plan will be deemed to be made by the Substantively Consolidated Debtors, and (vi) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the Substantively Consolidated Debtors.  Holders of Allowed Claims in each Class shall be entitled to their share of assets available for distribution to such Class without regard to which Debtor was originally liable for such Claim.  Such substantive consolidation shall not (other than for purposes related to the Plan) affect (a) the legal and corporate structure of the Reorganized Debtors (b) Intercompany Claims or (c) other pre- and post-Petition Date guarantees that are required to be maintained (i) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been, or will be, assumed, (ii) pursuant to the

express terms of the Plan, or (iii) in connection with the Exit Facility. The proposed substantive consolidation shall not affect each Debtor's obligation to file the necessary operating reports and pay any required fees pursuant to 28 U.S.C. § 1930(a)(6) and such obligations shall continue until an order is entered closing, dismissing or converting such Debtor's Chapter 11 Case.

Unless the Court has approved the substantive consolidation of the Estates by a prior order, the Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Debtors' estates. If no objection to substantive consolidation is timely filed and served, then the proposed substantive consolidation of the Substantively Consolidated Debtors may be approved by the Court. If any such objection is timely filed and served, a hearing with respect to the substantive consolidation of the Debtors' estates and the objections thereto shall be scheduled by the Court, which hearing may coincide with the Confirmation Hearing.

The Debtors believe that substantive consolidation is warranted here because, among other reasons, the Debtors historically operated on a consolidated basis. All Debtors have essentially the same officers and directors. For purposes of the Debtors' negotiation of secured and certain unsecured financing, the Debtors believe the parties to such financing arrangements treated the Debtors' operations as unitary. Customers and others identified the Debtors by their trade names as opposed to their corporate identities. However, the trade names do not reliably correlate to the corporate entity that owns each name. The Debtors' unsecured creditors viewed the Debtors as a single entity when extending credit terms, as such negotiations and agreements customarily provided for services to be rendered to multiple Debtors, and the Debtors capitalized upon the scale and operations of the entirety of the Debtors' business operations to negotiate such agreements and maximize value. Further, nearly all accounts payable functions were performed from one centralized location, by the same administrative staff working on behalf of all Debtors, and nearly all debts were centralized and paid by one Debtor entity. Additionally, while the Debtors' financial systems did track intercompany transactions and debts in the aggregate, such amounts customarily were simply forgiven and written off at varying intervals by the Debtors' boards of directors as a matter of administrative and accounting convenience. Determining the sources of the Debtors' pre-petition assets and liabilities on a per-entity basis would involve the nearly impossible task of reviewing and categorizing records of millions of individual transactions to trace such transactions back to the appropriate entity.

Indeed, given the nominal amount of assets held by various of the Debtors, and the expense of generating separate plans of reorganization for each of the Debtors, the Debtors believe that the overall effect of substantive consolidation will be more beneficial than harmful to creditors and will allow for greater efficiencies and simplification in administering the Plan. Accordingly, the Debtors believe that substantive consolidation of the Debtors' Estates under the terms of the Plan will not adversely impact the treatment of any of the Debtors' creditors, but rather will reduce administrative expenses by automatically eliminating duplicative claims asserted against more than one of the Debtors, decreasing the administrative difficulties and costs related to the administration of twenty-five (25) separate Debtors' Estates separately, as well as eliminating the need to determine professional fees on a case-by-case basis and streamlining the administration of the Plan.

In the event the Court determines not to approve the substantive consolidation of the Substantively Consolidated Debtors, the Plan shall constitute a separate chapter 11 plan of reorganization for each Debtor, each of which shall include the classifications set forth herein. For the avoidance of doubt, to the extent a Class contains Allowed Claims or Equity Interests with respect to a particular Debtor, such Class is designated with respect to such Debtor. To the extent there are no Allowed Claims or Equity Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor.

### Implementation of the Plan

**Exit Facility**

The Debtors shall have closed on the Exit Facility on or prior to the Effective Date, to be entered into by the Reorganized Debtors, the administrative agent and the lenders party thereto with the consent of the Requisite Participating Lenders, and all ancillary agreements, substantially in the form included in the Plan Supplement which must be acceptable to the Requisite Participating Lenders. On the Effective Date, the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Facility without

further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any person.

The amounts borrowed under the Exit Facility shall be used to make the required Distributions under the Plan, to satisfy certain plan-related expenses and to fund the Reorganized Debtors' working capital needs.

**The Restructuring**

To implement the Plan, on the Effective Date, the Debtors will undergo a restructuring, that will include the following steps (the "Restructuring"):

Step (1):  HMH Holdings will contribute the New Common Stock (through intermediate subsidiaries) to HMH Publishers Inc. (on its own behalf and on behalf of HMH Publishers LLC) and to HMH, so that HMH Publishers Inc. and HMH own the New Common Stock of HMH Holdings.  HMH Publishers Inc. (on its own behalf and on behalf of HMH Publishers LLC) and HMH will receive New Common Stock in proportion to the benefit each derived from the proceeds of the indebtedness under the First Lien Credit Agreement and the 10.5% Notes (the "Co-Borrower Percentages"). The Debtors will contribute or distribute (through intermediate subsidiaries or parent entities), as necessary, an aggregate amount of $30.3 million of Cash to HMH and HMH Publishers Inc. (on its own behalf and on behalf of HMH Publishers LLC) so that each holds Cash (in proportion to the Co-Borrower Percentages) necessary to engage in the exchanges described in Step 2.

Step (2):

(A) The Senior Creditor Claims will be transferred to HMH Publishers Inc. (on its own behalf and on behalf of HMH Publishers LLC) and to HMH in accordance with the Co-Borrower Percentages and the Senior Creditor Claims will be cancelled.

(B) In exchange for their Senior Creditor Claims, Senior Creditors will receive from each of HMH Publishers Inc. and HMH, a pro rata share of the New Common Stock that HMH Publishers Inc. and HMH held after Step (1) of the Restructuring and $30.3 million of Cash.  HMH Publishers Inc. and HMH shall hold no New Common Stock after this Step (2).

Step (3):  The Existing Common Stock will be cancelled, either (x) in exchange for the New Warrants if Class 8 votes to approve the Plan, or (z) for no consideration if Class 8 votes to reject the Plan.  All Other Holdings Equity Interests will be cancelled.

For U.S. federal income tax purposes, and for state, local, and non-U.S. tax purposes, to the extent applicable, (x) the Senior Creditors and the Debtors shall report the transactions described in Step 1 and Step 2 (taken together) as a taxable exchange of the Senior Creditor Claims for New Common Stock and Cash, and (y) the Existing Common Stockholders and the Debtors shall report the transactions described in Step (3), to the extent the Existing Common Stockholders receive New Warrants, as a taxable exchange of their Existing Common Stock for New Warrants.

**Sources of Cash for Plan Distribution and Transfers of Funds Among Debtors**

All consideration necessary for the Reorganized Debtors to make payments or distributions pursuant to the Plan shall be obtained from the Exit Facility or other Cash from the Debtors, including Cash from business operations. Further, the Debtors, the Foreign Affiliates and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth in the Plan, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

**Securities to Be Issued Pursuant to the Plan**

The New Common Stock offered under the Plan shall be the common stock in Reorganized HMH Holdings. Computershare Limited will be the transfer agent, registrar and redemption agent for the New Common Stock.

Reorganized HMH Holdings shall authorize and issue or reserve for issuance such number of shares of New Common Stock as may be necessary to be issued upon exercise of the New Warrants or to effectuate the Management Incentive Plan.

**Corporate Governance and Management of Reorganized HMH Holdings and the Reorganized Debtors**

This is a summary of certain of the corporate governance documents. The Reorganized HMH Holdings Certificate of Incorporation, Reorganized HMH Holdings Bylaws, and the Registration Rights Agreement will be attached as an exhibit to the Plan Supplement. Each holder of Senior Creditor Claims must register its New Common Stock with Reorganized HMH Holdings and execute a signature page to and be bound by the Registration Rights Agreement as a condition precedent to receiving its allocation of New Common Stock.

*The Initial Board of Directors*

Immediately following the Effective Date, the Reorganized HMH Holdings Board of Directors shall be comprised of nine (9) members, one (1) of whom shall be the chief executive officer and eight (8) of whom, including the chairperson, shall be initially chosen by the Informal Creditor Group with the participation and input of the chief executive officer, *provided, that,* Paulson & Co. Inc. ("Paulson") shall have the right to designate two (2) initial directors, one of whom will be "independent" and selected from the pool of candidates identified with the assistance of a consultant. All initial members of the Reorganized HMH Holdings Board of Directors (other than the two (2) nominated by Paulson, one of whom shall be chosen from the pool of independent director candidates), whether designated prior to or after the Effective Date, will be designated for an initial term of one (1) year by the consensus of the Informal Creditor Group from a pool of director candidates that has been generated by the Informal Creditor Group with the participation and input of the chief executive officer and an outside consulting firm selected by the Informal Creditor Group. The pool of director candidates may include existing directors as well as new director candidates. Thereafter, all members of the Reorganized HMH Holdings Board of Directors (until an IPO, other than those directors nominated pursuant to a Nomination Agreement) will be designated by the nominating committee of the Reorganized HMH Holdings Board of Directors or the holders of a majority of outstanding shares of New Common Stock. After the Effective Date, in any uncontested election for directors, a director must receive the approval of a majority of the shares of New Common Stock voted at the meeting.

A majority of the Reorganized HMH Holdings Board of Directors, including the Chairperson, will be "independent" under NYSE standards. The Reorganized HMH Holdings Board of Directors will have an audit committee, a compensation committee, a nominating committee and an ethics and governance committee, whose members will comply with NYSE and SEC requirements.

The identities, affiliations and the nature of compensation of the directors shall be disclosed in the Plan Supplement. The directors of each Debtor on the day immediately preceding the Effective Date that are not otherwise appointed as members of the initial board of directors or the equivalent governing body for the corresponding Reorganized Debtor shall be deemed to have resigned from the board of directors of such Debtor as of the Effective Date. To the extent there are open seats on the Reorganized HMH Holdings Board of Directors on the Effective Date, the nominating committee, which shall consist of the members of the Informal Creditor Group, shall be empowered to appoint new members of the Reorganized HMH Holdings Board of Directors and the board of directors for the other Reorganized Debtors to fill the empty seats on and after the Effective Date.

*Nomination Agreements*

On the Effective Date, Paulson and Reorganized HMH Holdings will enter into a Nomination Agreement. Any Nominating Holder (as defined below) is also entitled to enter into a Nomination Agreement with Reorganized HMH Holdings upon the terms and conditions described below. The two initial Paulson nominees will be

nominated by Paulson as set forth - one of whom will be chosen from the pool of independent director candidates (the "Independent Director") and the other nominated by Paulson (the "Holder Director"). The initial Holder Director will be Sheru Chowdhry. Any vacancy in the Independent Director position shall be nominated by Paulson in consultation with the nominating committee of the Board of Directors and shall be subject to approval by a majority of the Reorganized HMH Holdings Board of Directors; any vacancy in the Holder Director shall be nominated by Paulson and (i) filled with a full-time Paulson employee or (ii) selected in consultation with the nominating committee and approved by a majority of the Reorganized HMH Holdings Board of Directors (excluding the Independent Director). The right to nominate the Independent Director terminates if Paulson holds less than 20% of the issued and outstanding New Common Stock and the right to nominate the Holder Director terminates if Paulson holds less than 15% of the issued and outstanding New Common Stock. All nominating rights terminate upon an IPO. If Paulson transfers at least 20% of the issued and outstanding New Common Stock to a Transferee, the nominating rights with respect to only the Holder Director (and any successor in the event of a vacancy) may be assigned to the Transferee (subject to the same termination events – 15% ownership threshold or an IPO). If any holder acquires 20% or more of the issued and outstanding New Common Stock (a "Nominating Holder"), such Nominating Holder will also be entitled to nominate one director to the Reorganized HMH Holdings Board of Directors immediately pursuant to a nomination agreement (which Reorganized HMH Holdings shall be required to enter into if the Nominating Holder so elects) in form and substance substantially similar to the Paulson nomination agreement. If the Nominating Holder became a Nominating Holder other than by acquiring the stock of an existing 20% Holder, the size of the Reorganized HMH Holdings Board of Directors will be increased in order to elect the director chosen by such Nominating Holder. As with the Paulson nomination agreement, the Nominating Holder nomination agreement will terminate upon an IPO or if the Nominating Holder owns less than 15% of the outstanding common stock. As long as Paulson or a Nominating Holder does not hold less than 20% of the issued and outstanding New Common Stock, respectively, the directors nominated by Paulson or such Holder, respectively, will be eligible for re-election at each annual meeting until an IPO.

*DGCL 203*

The Reorganized HMH Holdings Certificate of Incorporation will contain a provision that opts out of the Delaware General Corporation Law Section 203 on Business Combinations with Interested Stockholders.

*Special Meetings*

Holders of at least 15% of the outstanding shares of New Common Stock may call a special meeting of the stockholders.

*Written Consent*

Stockholders shall be permitted to act by written consent in accordance with Delaware law.

*Certain Actions Requiring Approval of 66 2/3% of All Directors Prior to an IPO*

The Reorganized HMH Holdings Bylaws will contain a provision that prior to an IPO, unless 66 2/3% of directors comprising the entire Reorganized HMH Holdings Board of Directors (other than any directors recused due to a conflict of interest) approves, Reorganized HMH Holdings may not take, or permit any of its subsidiaries to take certain specified actions, including:

- Adoption of an annual budget including the capital expenditure budget for plate and non-plate capital expenditure;

- Approval of any sale of all or substantially all of the assets of Reorganized HMH Holdings and its subsidiaries;

- Approval of any mergers, acquisitions and divestitures having a value in excess of $50 million;

- Issuance of equity securities;

- Approval of any dividends or stock repurchases;

- Incurrence of debt;

- Approval of any affiliate transactions;

- Approval of any amendment to the Management Incentive Plan and approval of or amendment to any senior executive (e.g., CEO and direct reports to the CEO) compensation arrangements;

- Approval of amendments to the Reorganized HMH Holdings Certificate of Incorporation or Bylaws;

- Approval of executive officer changes; and

- Approval of any plan of liquidation or bankruptcy filing.

*Information Rights*

Reorganized HMH Holdings will make publicly available on a website the following information, which need not be Sarbanes-Oxley compliant:

- Within 45 days after the end of each calendar quarter, quarterly management reports and unaudited financial statements, all in reasonable detail, together with a "Management's Discussion and Analysis of Financial Condition and Results of Operations" that describes the financial condition and results of operations of Reorganized HMH Holdings and its consolidated subsidiaries similar to Form 10-Q information.

- Within 90 days after each calendar year end, audited GAAP financial statements all in reasonable detail, together with a "Management's Discussion and Analysis of Financial Condition and Results of Operations" that describes the financial condition and results of operations of Reorganized HMH Holdings and its consolidated subsidiaries similar to Form 10-K information.

- All current reports that would be required to be filed with the SEC on Form 8-K if Reorganized HMH Holdings were required to file such reports, in each case, within the time periods required for filing such forms and reports as specified in the SEC's rules and regulations, subject to customary carveouts from such reporting.

Prior to the occurrence of an IPO, Reorganized HMH Holdings will use its commercially reasonable efforts to become a voluntary filer with the SEC (but not file a Form 10 with the SEC to register the New Common Stock) by March 31, 2013, if an IPO Demand Right (as defined below) has not been exercised prior to such date.  If Reorganized HMH Holdings does not become a voluntary filer by such date, it shall post on its website the same information that it would be required to file if it were a filer with the SEC.

*Transfers*

Holders of shares of New Common Stock will not be subject to limitations on transferability, except to comply with applicable securities laws and except as described below regarding executing a joinder to the Registration Rights Agreement and Reorganized HMH Holdings Board of Directors' ability to impose certain restrictions on trading to preserve certain tax attributes of Reorganized HMH Holdings and its subsidiaries.  The New Common Stock will not be DTC eligible and will be book-entry only, held on the records of Reorganized HMH Holdings' transfer agent.  On or about the Effective Date, Reorganized HMH Holdings will use commercially reasonable efforts to obtain a market maker to have the New Common Stock quoted on the OTCQX so long as the New Common Stock remains in book-entry only form.  Prior to the New Common Stock becoming DTC eligible, any transferee will be required to execute a joinder to the Registration Rights Agreement in order to complete a transfer of New Common Stock.  A transferor will be able to share material non-public information regarding Reorganized HMH Holdings with a prospective transferee if such transferee is not a competitor of Reorganized HMH Holdings

and has entered into a confidentiality agreement with Reorganized HMH Holdings with terms that are reasonably acceptable to Reorganized HMH Holdings.  Reorganized HMH Holdings will cooperate with any holder of shares of New Common Stock to facilitate any permitted transfer, including entering into such confidentiality agreements with prospective transferees.

The Reorganized HMH Holdings Certificate of Incorporation will include provisions that, upon the occurrence of certain events, will permit the Reorganized HMH Holdings Board of Directors to meet on an expedited basis to impose trading restrictions on the New Common Stock and certain other securities of Reorganized HMH Holdings if the Reorganized HMH Holdings Board of Directors determines to impose trading restrictions to protect certain valuable tax assets of Reorganized HMH Holdings.  The details of the trading restrictions (if they were to be imposed) will be described in the Plan Supplement.

*Registration Rights Agreement*

Each holder of the outstanding shares of New Common Stock will be a party to the Registration Rights Agreement and will be required to execute a signature page to such Registration Rights Agreement in order to receive their distribution of New Common Stock.

Anytime after January 1, 2013, any holder or holders who hold at least 25% of the outstanding shares of New Common Stock will be able to cause Reorganized HMH Holdings to consummate an underwritten initial public offering pursuant to an registration statement on a Form S-1 Registration Statement (or, if Reorganized HMH Holdings is eligible, a Form S-3 registration statement) after April 1, 2013 pursuant to the exercise of demand registration rights on a secondary basis so long as the total proposed offering size is at least $150 million (an "IPO Demand Right").

If an IPO Demand Right is exercised, such holders may also, at their option, require all other stockholders to sell in such IPO their pro rata share of the New Common Stock being sold, not to exceed 15% (including any underwriters over-allotment option) of the shares of the New Common Stock held by such holder; but only if the IPO price of the New Common Stock equates to a total equity value of Reorganized HMH Holdings of not less than $1.5 billion (an "IPO Drag Right").  The IPO price of the New Common Stock to be issued pursuant to the IPO Demand Right and, if applicable, the IPO Drag Right will be determined by a pricing committee comprised of members of the Reorganized HMH Holdings Board of Directors.

On October 1, 2013, unless an IPO (whether pursuant to an IPO Demand Right, IPO Drag Right or otherwise) has been consummated prior thereto, Reorganized HMH Holdings will (i) file a Form 10 to register the New Common Stock under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), (ii) timely apply to list the New Common Stock on the New York Stock Exchange or Nasdaq and (iii) timely apply for the New Common Stock to be made DTC eligible (collectively, the "Exchange Act Registration Filings"), such Exchange Act Registration Filings to be effective in each instance, on but not before December 1, 2013; it being understood that at any time prior to such December 1, 2013 date (unless Reorganized HMH Holdings has consummated an IPO prior to such date), holders of a majority of the outstanding shares of New Common Stock (the "Majority Holders") may direct Reorganized HMH Holdings to withdraw or delay the effectiveness of all such applications relating to the Exchange Act Registration Filings and have the New Common Stock remain book-entry only.  If the Majority Holders direct Reorganized HMH Holdings to withdraw or delay the Exchange Act Registration Filings, then such Majority Holders shall also determine a new date for proceeding with the Exchange Act Registration Filings, at which time Reorganized HMH Holdings will proceed with and diligently pursue the effectiveness of the Exchange Act Registration Filings unless prior to such date the Majority Holders determine to further extend the date of filing the Exchange Act Registration Filings.

Any time after Reorganized HMH Holdings becomes an Exchange Act public reporting company, Reorganized HMH Holdings shall use commercially reasonable efforts to cause to become effective a shelf registration statement (on Form S-3 if permitted) for the benefit of all holders party to the Registration Rights Agreement and any individual holder of 15% or more can demand an unlimited number of "takedowns" off the shelf so long as the total offering size exceeds $100 million.

Each holder or holders who hold in the aggregate at least 15% of the outstanding shares of New Common

Stock will have, after an initial public offering (i) one S-1 demand registration right per annum which may be an underwritten offering, and provided that any underwritten offering must have a total offering price of $100 million; and (ii) unlimited S-3 registration rights and S-3 shelf registration rights, which may be underwritten offerings if the total offering price is at least $100 million, each subject to customary cutback provisions.

Any holder's participation in one demand registration will not preclude such holder from participating in another demand registration.

Each party to the Registration Rights Agreement will have unlimited piggyback registration rights with respect to underwritten offerings (including with respect to the IPO Demand).

Each holder that holds greater than 15% of the outstanding shares of New Common Stock will have a second S-1 demand registration right per annum and will be entitled to unlimited S-3 registration rights, which may be an underwritten offering if the total offering size exceeds $100 million, each subject to customary cutback provisions.

Cutbacks on registration rights will reflect (i) Reorganized HMH Holdings having priority on the initial public offering and piggybacks on primary offerings; and (ii) the holders of New Common Stock exercising demand registration rights having priority on any secondary offerings (other than the initial public offering) on a *pro rata* basis based on ownership.

Each party to the Registration Rights Agreement will be subject to lock-ups in connection with public offerings, not to exceed 180 days in the case of the initial public offering and 90 days in the case of other underwritten public offerings (but only for stockholders who exercise their piggyback rights to participate in such post-IPO offerings).

Registration rights will also contain customary suspension/blackout provisions.

Subject to the conditions set forth in the Registration Rights Agreement, the rights under the Registration Rights Agreement may be transferred on a pro rata basis in connection with any transfer, assignment, or other conveyance of the New Common Stock to any transferee or assignee. Prior to the New Common Stock being made DTC eligible, any transferee of New Common Stock will be required to execute a joinder to the Registration Rights Agreement. After the New Common Stock is made DTC eligible, no joinder shall be required.

Reorganized HMH Holdings will pay the underwriting fees and commissions on the first two underwritten demand registrations.

*Pre-emptive Rights.*

The Registration Rights Agreement will provide that, prior to Reorganized HMH Holdings becoming a public reporting company under the Exchange Act, each holder of shares of New Common Stock that holds at least 3% of the outstanding shares of New Common Stock will receive the right to participate in future equity financings; Reorganized HMH Holdings on a pro rata basis (subject to customary exceptions, such as issuance of options to employees) based on the number of shares of New Common Stock owned by such holders relative to the total number of outstanding shares of New Common Stock owned by all holders having pre-emptive rights.

*Management of Reorganized Debtors*

Upon the Effective Date, the officers of the Reorganized Debtors shall be substantially the same as the officers of the Debtors on the Petition Date. The Reorganized Debtors' officers shall serve in accordance with any employment agreement with the Reorganized Debtors and applicable nonbankruptcy law. The Debtors will disclose the identities of senior management and any related employment agreements in the Plan Supplement.

*Reorganized HMH Holdings Certificate of Incorporation, Reorganized HMH Holdings Bylaws and Other Amended and Restated Governing Documents*

The adoption of the Amended and Restated Governing Documents shall be deemed to have occurred and be effective as of the Effective Date without any further action by the directors, stockholders, partners or members (as the case may be) of the Debtors or Reorganized Debtors.  The Amended and Restated Governing Documents will, among other things, contain appropriate provisions prohibiting the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.  On or prior to the Effective Date, the Debtors will, if required by applicable state law, file with the Secretary of State of the appropriate jurisdiction the Amended and Restated Governing Documents.

**Reorganized Debtors' Management Incentive Plan**

On the Effective Date of the Plan, the Management Incentive Plan will be implemented and will be comprised of options to acquire up to ten (10) percent of the total number of fully diluted shares of New Common Stock to be outstanding after the Restructuring (the "Management Options").  The terms of the Management Incentive Plan and the Management Options, each of which shall be acceptable to the Debtors and the Requisite Participating Lenders, will be set forth in the Plan Supplement.

**Informal Creditor Group Professionals Fees**

On the Effective Date, the Reorganized Debtors shall pay the reasonable fees and expenses of the Informal Creditor Group Professionals, whether incurred prior to or after the Petition Date, in full in Cash without the need for application to, or approval of, the Court.

**Cancellation and Surrender of Existing Securities and Agreements**

On the Effective Date, except as otherwise specifically provided for in the Plan, after the Restructuring, the obligations under the 10.5% Notes Indenture and the First Lien Credit Agreement and any other certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim, including Equity Interests , shall be deemed cancelled and the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors shall be released and discharged, provided, however, notwithstanding Confirmation or the occurrence of the Effective Date, any agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of allowing holders to receive distributions under the Plan as provided in the Plan; provided, however, that (a) the 10.5% Notes Indenture and the First Lien Credit Agreement shall continue to survive and be in full force and effect only for the purposes of (i) making distributions under the Plan, (ii) asserting any Indenture Trustee Charging Lien thereunder, (iii) permitting the 10.5% Indenture Trustee to appear in the Chapter 11 Cases, and (iv) any function necessary in connection with the forgoing clauses (a)(i)-(a)(iii) and (b) the First Lien Credit Agreement shall continue to survive and be in full force and effect only for purposes of (i) making distributions under the Plan; (ii) permitting the First Lien Agents to appear in the Chapter 11 Cases and (iii) any function necessary in connection with the foregoing clauses (b)(i) and (b)(ii); provided, however, that for the avoidance of doubt, the 10.5% Notes Indenture shall be deemed to be fully and completely terminated and discharged upon the making of all of the distributions set forth in clause (a)(i) and (b)(i).

**Corporate Action**

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate related actions to be taken by or required of the Reorganized Debtors shall, as of the Effective Date, have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by holders of Claims or Equity Interests, directors of the Debtors, or any other entity.

**Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**Exemption from Certain Taxes and Fees**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**Powers of Officers**

The officers of the Debtors or the Reorganized Debtors, as the case may be, shall have the power to enter into and to execute any Plan Supplement Document to which the Debtors, or the Reorganized Debtors are to be a party and to take such other or further action as they deem reasonable and appropriate to effectuate the terms of the Plan.

**Confirmation and Effectiveness of the Plan**

**Conditions Precedent to Confirmation**

The Plan will not be confirmed by the Court unless and until the following conditions have been satisfied in full or waived pursuant to Article XIII.C of the Plan:

1.  The Plan shall be in form and substance acceptable to the Debtors and the Requisite Participating Lenders and, with respect to the treatment of Senior Creditors, each of the members of the Informal Creditor Group;

2.  The Debtors shall have submitted to the Court a proposed Confirmation Order, in form and substance acceptable to the Debtors and the Requisite Participating Lenders;

3.  The Interim DIP Order shall have been entered in form and substance acceptable to the Debtors and the Requisite Participating Lenders, and the Debtors shall have indefeasibly paid the Adequate Protection Payments to the Senior Creditors; and

4.  All documents to be executed, delivered or filed pursuant to the Plan, including all Plan Supplement Documents, shall be in form and substance acceptable to the Debtors and the Requisite Participating Lenders.

**Conditions Precedent to Effectiveness**

The Plan shall not become effective unless and until it has been confirmed and the following conditions have been satisfied in full or waived pursuant to Article XIII.C of the Plan:

1.  The Plan shall be in form and substance acceptable to the Debtors and the Requisite Participating Lenders and, with respect to the treatment of Senior Creditors, each of the members of the Informal Creditor Group;

2.  The Confirmation Order shall have been entered in form and substance acceptable to the Debtors and the Requisite Participating Lenders, and no stay or injunction shall be in effect precluding the consummation of the transactions contemplated by the Plan;

3.  The Exit Facility, which shall be in form and substance acceptable to the Debtors and the Requisite Participating Lenders, shall have been entered into by the Reorganized Debtors and the other parties thereto and all conditions to the initial borrowings under the Exit Facility shall have been satisfied in accordance with the terms thereof (but for the occurrence of the Effective Date);

4.  All undisputed statutory fees then due and payable to the United States Trustee shall have been paid in full;

5.  All documents to be executed, delivered or filed pursuant to the Plan, including all Plan Supplement Documents, shall be in form and substance acceptable to the Debtors and the Requisite Participating Lenders and such documents shall be executed, delivered or filed, as the case may be; and

6.  All actions, authorizations, filings, consents and regulatory approvals required (if any) shall have been obtained, effected or executed in a manner acceptable to the Debtors and the Requisite Participating Lenders and shall remain in full force and effect.

**Waiver of Conditions**

The Debtors may waive any or all of the conditions set forth in Articles XIII.A. or XIII.B. (other than XIII.B.2.) of the Plan at any time, with the prior written consent of the Requisite Participating Lenders, without leave or order of the Court and without any formal action; provided that the prior written consent of each member of the Informal Creditor group shall be required to waive the conditions in XIII.A.1 and XIII.B.1 of the Plan.

**Effect of Failure of Conditions**

In the event that the Effective Date does not occur on or prior to thirty (30) days after the Confirmation Order is entered by the Court or such later date as may be agreed to by the Debtors and the Requisite Participating Lenders upon notification submitted by the Debtors to the Court: (a) the Confirmation Order shall be vacated, (b) no Distributions under the Plan shall be made, (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

**Denial of Confirmation/Vacatur of Confirmation Order**

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors; (c) prejudice in any manner any right, remedy or claim of the Debtors; or (d) be deemed an admission against interest by the Debtors.

**Revocation, Withdrawal, or Non-Consummation**

*Right to Revoke or Withdraw*

The Debtors reserve the right to revoke or withdraw the Plan in accordance with their fiduciary duties or otherwise with the consent of the Requisite Participating Lenders at any time prior to the Effective Date.

*Effect of Withdrawal, Revocation, or Non-Consummation*

If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), the assumption or rejection of executory contracts, unexpired leases, insurance policies or benefit plans effected by the Plan, any release, exculpation or indemnification provided for in the Plan, and any document or agreement executed pursuant to the Plan shall be null and void.  In such event, nothing contained in the Plan or herein, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims by or against or Equity Interests in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

## Effect Of Confirmation Of the Plan

**Continued Corporate Existence**

The Debtors, as Reorganized Debtors, shall continue to exist after the Effective Date with all of the powers of a corporation, partnership or limited liability company, as the case may be, under the laws of the State of Delaware or their state of incorporation or formation and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.  In addition, the Reorganized Debtors may operate their businesses free of any restrictions imposed by the Bankruptcy Code, the Bankruptcy Rules or by the Court, subject only to the terms and conditions of the Plan, the Confirmation Order, and the documents and instruments executed and delivered in connection with the Plan, including without limitation, the documents and instruments included in the Plan Supplement.  Notwithstanding the foregoing, on or as of the Effective Date or as soon as practicable thereafter and without need for any further action, the Reorganized Debtors (with the consent of the Requisite Participating Lenders) may (a) cause any or all of the Reorganized Debtors or Foreign Affiliates to be merged into one or more of the Reorganized Debtors or Foreign Affiliates, dissolved or otherwise consolidated; (b) cause the transfer of assets between or among the Reorganized Debtors or Foreign Affiliates; or (c) engage in any other transaction in furtherance of the Plan.

**Releases of Guarantees and Collateral**

Upon the Effective Date, the First Lien Agents and the 10.5% Indenture Trustee shall release any and all collateral and guarantees with respect to the First Lien Credit Facility and the 10.5% Notes.

**Dissolution of Creditors' Committee**

The Creditors' Committee (if one is appointed) shall continue in existence until the Effective Date and shall continue to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and shall perform such other duties as it may have been assigned by the Court prior to the Effective Date.  On the Effective Date, the Creditors' Committee shall be dissolved and its members shall be deemed released of all of their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, financial advisors, and other agents, if any, shall terminate except that the Creditors' Committee shall continue to have standing and a right to be heard with respect to (i) all Fee Claims, (ii) any appeals of the Confirmation Order, (iii) any adversary proceedings pending as of the Effective Date to which it may be a party and (iv) post-Effective Date modifications to the Plan.

**Vesting of Property**

Except as otherwise expressly provided in the Plan, on the Effective Date, or as soon as practicable thereafter, the Reorganized Debtors shall be vested with all of the property of the Debtors' estates free and clear of all Claims, Liens, encumbrances, charges and other interests of creditors and equity security holders.

**Discharge of the Debtors**

**Except as otherwise provided in the Plan, the rights afforded in the Plan, and the treatment of all Claims and Equity Interests under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims or Equity Interests of any kind or nature whatsoever, whether known or unknown, including any interest accrued or expenses incurred thereon, against or in the Debtors, the Reorganized Debtors or any of their respective assets or properties, arising prior to the Effective Date. Except as otherwise expressly specified in the Plan, the Confirmation Order shall act as of the Effective Date as a discharge of all debts of, Claims against, Liens on, and Equity Interests in the Debtors, their respective assets and properties, arising at any time before the Effective Date, regardless of whether a proof of Claim or Equity Interest with respect thereto was filed, whether the Claim or Equity Interest is Allowed, or whether the holder thereof votes to accept the Plan or is entitled to receive a Distribution thereunder. Except as otherwise expressly specified in the Plan, after the Effective Date, any holder of such discharged Claim or Equity Interest shall be precluded from asserting any other or further Claim against, or Equity Interest in, the Debtors, the Reorganized Debtors, or any of their respective assets or properties, based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the Effective Date. Notwithstanding any provision in the Plan to the contrary, the distribution on account, and discharge of Allowed 10.5% Notes Claims will not be dependent on the surrender or cancellation of the 10.5% Notes. The 10.5% Indenture Trustee will send such notices and take such other actions as are reasonably requested by the Debtors to effect the cancellation of the 10.5% Notes held by Cede & Co.**

**Injunction**

**Except as otherwise expressly provided in the Plan, the Confirmation Order, the Plan Supplement Documents, or a separate order of the Court, all Persons who have held, hold, or may hold Claims against, or Equity Interests in, the Debtors that arose before or were held as of the Effective Date, shall be permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or the Reorganized Debtors with respect to any such Claim or Equity Interest, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors or the Reorganized Debtors on account of any such Claim or Equity Interest, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or the Reorganized Debtors on account of any such Claim or Equity Interest and (d) asserting any right of setoff or subrogation of any kind against any obligation due from the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or the Reorganized Debtors on account of any such Claim or Equity Interest. Such injunction shall extend to successors of the Debtors (including, without limitation, the Reorganized Debtors) and their respective properties and interests in property.**

**Preservation of Causes of Action**

The Reorganized Debtors shall retain all rights and all Causes of Action accruing to them and their estates, including but not limited to, those arising under sections 505, 544, 547, 548, 549, 550, 551, 553 and 1123(b)(3)(B) of the Bankruptcy Code, including all tax setoff and refund rights arising under section 505, other than as expressly provided below. Except as expressly provided in the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any such rights or Causes of Action. Nothing contained in the Plan or the Confirmation Order shall be deemed a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors have that is not specifically waived or relinquished by the Plan. The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such Claims, Causes of Action, rights of setoff and other legal or equitable defenses that the Debtors have as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights

40

respecting any Claim that are not specifically waived or relinquished by the Plan may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

**Votes Solicited in Good Faith**

The Debtors have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtors (and each of their respective affiliates, agents, directors, officers, members, employees, advisors and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in connection with the Distributions contemplated and therefore have not been, and on account thereof will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the Distributions contemplated thereunder.

**Mutual Releases**

**On the Effective Date, (a) the Debtors and any non-Debtor guarantors under the First Lien Credit Agreement and the 10.5% Notes Indenture, (b) the Senior Creditors in their capacity as a First Lien Bank Lender and/or a Bondholder, as applicable, (c) the members of the Creditors' Committee (if any), (d) the DIP Lenders and DIP Agents, (e) the First Lien Agents, (f) the 10.5% Indenture Trustee, (g) the Existing Equity Holders and (h) each of the respective current and former direct and indirect equity holders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective equity holders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives) and other professionals of the parties listed in clauses (a) through (g), including the Informal Creditor Group Professionals, in each case, in their respective capacities as such, (collectively clauses (a) through (g) being the "Released Parties," and each a "Released Party") shall be deemed to and hereby unconditionally release and irrevocably discharge each other from any and all claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part on any act, omission, transaction or occurrence from the beginning of time through the Effective Date except that (i) no Released Party shall be released from any act or omission that constitutes gross negligence, fraud or willful misconduct, (ii) the foregoing release shall not apply to (a) any obligations under existing contracts and other agreements between any of the Released Parties that are not being terminated, extinguished or cancelled pursuant to, in connection with, or contemplated by, the Plan and (b) any obligations arising under any contract or agreement entered into between any of the Released Parties pursuant to, in connection with, or contemplated by, the Plan.**

**Releases by Non-Debtors**

**On and as of the Effective Date, all Persons who directly or indirectly have held, hold or may hold Claims or Equity Interests and do not, on their Ballots, opt out of providing the releases contemplated by this section, shall be deemed, by virtue of their treatment contemplated under the Plan, to have forever released and covenanted with the Reorganized Debtors and the other Released Parties not to (y) sue or otherwise seek recovery from any of the Reorganized Debtors or any other Released Party on account of any Claims or Equity Interests, including but not limited to any claim based upon tort, breach of contract, violations of federal, state or foreign securities laws or otherwise, based upon any act, occurrence, or failure to act from the beginning of time through the Effective Date in any way relating to the Debtors or their businesses and affairs or (z) assert against any of the Reorganized Debtors or any other Released Party any claim, obligation, right, Cause of Action or liability that any holder of Claims or Equity Interests may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction, or occurrence from the beginning of time through the Effective Date in any way relating to the Debtors, the Restructuring Support Agreement, the Chapter 11 Cases, or the Plan; <u>provided</u>, <u>however</u>, that (i) none of the Released Parties shall be released from any act or omission that constitutes gross negligence, fraud or willful misconduct, (ii) the foregoing release shall not apply to (a) any**

41

**obligations under existing contracts and other agreements between any of the Released Parties that are not being terminated, extinguished or cancelled pursuant to, in connection with, or contemplated by, the Plan and (b) any obligations arising under any contract or agreement entered into between any of the Released Parties pursuant to, in connection with, or contemplated by, the Plan, and (iii) the foregoing release shall not be construed to prohibit a party in interest from seeking to enforce the terms of the Plan or any contract or agreement entered into pursuant to, in connection with, or contemplated by, the Plan.  Notwithstanding anything to the contrary in the Plan, the releases of the Released Parties shall extend only to claims arising against such Released Parties in their capacities as parties in interest in the Chapter 11 Cases. Notwithstanding anything to the contrary in the Plan, to the extent a holder of a Claim or Equity Interest elects on its Ballot not to grant the releases of the Released Parties, such holder of a Claim or Equity Interest will not be deemed to be a Released Party to the extent it would have otherwise qualified as such.**

Exculpation

*Exculpation and Limitation of Liability*

**The Debtors, the Reorganized Debtors and the other Released Parties (i) shall have no liability whatsoever to any holder or purported holder of a Claim, or Equity Interest for any act or omission in connection with, or arising out of, the Plan, the Disclosure Statement, the Restructuring Support Agreement, the negotiation of the Plan and the Restructuring Support Agreement, the negotiation of the Plan Supplement Documents, the Exit Facility, the pursuit of approval of the Disclosure Statement or the solicitation of votes for confirmation of the Plan, the Chapter 11 Cases, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, or any transaction contemplated by the Plan, the Restructuring Support Agreement or Disclosure Statement or in furtherance thereof except for any act or omission that constitutes fraud, willful misconduct or gross negligence as determined by a Final Order, and (ii) in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under or in connection with the Plan.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability.**

*Limitation of Governmental Releases*

**Notwithstanding Articles VIII.J and VIII.K.1 of the Plan, the Plan shall not release, discharge, or exculpate any non-Debtor party from any debt owed to the United States Government ( the "Government") and/or its agencies, including the Pension Benefit Guaranty Corporation (the "PBGC"), or from any liability arising under the Internal Revenue Code, the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or the environmental laws, securities laws or criminal laws of the United States.  In addition, notwithstanding Articles VIII.J and VIII.K.1 of the Plan, the Plan shall not enjoin or prevent the Government from collecting any such liability from any such non-Debtor party under the provisions of applicable law.**

Term of Bankruptcy Injunction or Stays

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

Preservation of Insurance

*Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims*

Distributions under the Plan to each holder of an Allowed Claim that is an Insured Claim shall be in accordance with the treatment provided under the Plan for the Class in which such Allowed Claim is classified, but solely to the extent that such Allowed Claim is not satisfied from proceeds payable to the holder thereof under any pertinent insurance policies and applicable law.  Nothing in Article VIII.M.1 of the Plan shall constitute a waiver of any

42

claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that any Person may hold against any other Person, including the Debtors' insurance carriers.

*Reinstatement and Continuation of Insurance Policies*

Unless otherwise assumed during the pendency of the Chapter 11 Cases, from and after the Effective Date, each of the Debtors' insurance policies in existence on and as of the Effective Date shall be reinstated and continued in accordance with its terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code.

The Debtors' discharge and release from all Claims and Equity Interests, under the Plan, shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors, the Reorganized Debtors (including, without limitation, its officers and directors) or any other person or entity.  Notwithstanding any other provision of the Plan or the Confirmation Order, nothing in the Plan shall (i) impair (w) the right of any insurer to defend against any claim asserted against such insurer, (x) an insurer's status as a secured creditor to the extent applicable under the terms of the Plan, including the right to recover from any Collateral (in accordance with the applicable insurance policy), (y) an insurer's right to draw on third-party letters of credit (in accordance with the terms of the applicable insurance policy and letter of credit) or (z) any insurer's right of setoff pursuant to section 553 of the Bankruptcy Code to the extent applicable and/or (ii) affect an insurer's right to seek arbitration of disputes between the Debtors and such insurer to the extent provided for under the terms of the applicable insurance agreement.

## Officers' and Directors' Indemnification Rights and Insurance

Notwithstanding any other provisions of the Plan, the obligations of the Debtors to indemnify their directors, officers, managers, and employees against any obligations, liabilities, costs or expenses pursuant to the articles of incorporation, bylaws, partnership agreements or limited liability company operating agreements of the Debtors, as the case may be, applicable state law, specific agreement, or any combination of the foregoing, shall survive the Effective Date in all respects.

## Executory Contracts And Unexpired Leases

## Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtors shall be deemed to have assumed each executory contract and unexpired lease to which they are party, unless such contract or lease (i) was previously assumed or rejected by the Debtors, (ii) previously expired or terminated pursuant to its terms, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (iv) is set forth in a schedule, as an executory contract or unexpired lease to be rejected, if any, filed by the Debtors as part of the Plan Supplement.  The Confirmation Order shall constitute an order of the Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions or rejections described above, as of the Effective Date.  For the avoidance of doubt, as described herein, the forgoing does not apply to (x) benefit plans, which are specifically dealt with in Article XII of the Plan, or (y) insurance policies, which are specifically dealt with in Article VIII.M of the Plan.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements have been rejected pursuant to an order of the Court.

**Cure**

Any monetary amounts by which any executory contract or unexpired lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Reorganized Debtors upon assumption thereof or as soon as practicable thereafter.  If there is a dispute regarding (i) the nature or amount of any cure, (ii) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (iii) any other matter pertaining to assumption, any cure shall occur following the entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment, as applicable.

**Rejection Damage Claims**

All Claims for damages arising from the rejection of executory contracts or unexpired leases must be served upon the Debtors and their counsel within thirty (30) days after the date of entry of an order of the Court approving such rejection.  Any Claims not filed within such time shall be forever barred from assertion against the Debtors, their respective estates and the Reorganized Debtors and their respective property.  All Allowed Claims arising from the rejection of executory contracts or unexpired leases shall be treated as Class 5 –General Unsecured Claims.

**Benefit Plans**

As, and subject to the occurrence, of the Effective Date, all employee compensation and benefit plans, policies and programs of the Debtors applicable generally to their employees, including agreements and programs subject to section 1114 of the Bankruptcy Code, as in effect on the Effective Date, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans, and life, accidental death, and dismemberment insurance plans and workers' compensation programs, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under the Plan, and the Debtors' obligations under such agreements and programs shall survive the Effective Date of the Plan, without prejudice to the Reorganized Debtors' rights under applicable non-bankruptcy law to modify, amend, or terminate the foregoing arrangements, except for (i) such executory contracts or plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate section 1114 of the Bankruptcy Code) and (ii) such executory contracts or plans that have previously been terminated or rejected, pursuant to a Final Order, or specifically waived by the beneficiaries of such plans, contracts or programs.

The Debtors and the Reorganized Debtors, as the case may be, will continue to be the contributing sponsors of all pension plans which are defined as benefit pension plans by the PBGC under Title IV of ERISA.  The Confirmation Order shall provide that (i) such pension plans are subject to minimum funding requirements of ERISA and section 412 of the Internal Revenue Code, (ii) no provision of the Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code, shall, or shall be construed to, discharge, release or relieve the Debtors or any other party, in any capacity, from any liability with respect to such pension plans under ERISA or under Internal Revenue Code section 412 and (iii) neither the PBGC nor such pension plans shall be enjoined from enforcing such liability as a result of the Plan's provisions for satisfaction, release and discharge of Claims.

<b>Summary of Other Provisions of Plan</b>

**Modification of the Plan**

*Pre-Confirmation Modifications*

The Debtors may, with the written consent of the Requisite Participating Lenders, amend, modify or supplement the Plan before the Confirmation Date as provided for in section 1127 of the Bankruptcy Code; provided, however, that with respect to the treatment of Senior Creditors, the prior written consent of each member of the Informal Creditor Group shall be required.

*Post-Confirmation Immaterial Modifications*

After the Confirmation Date, the Debtors may, with the written consent of the Requisite Participating Lenders, and with the approval of the Court, and without notice to all holders of Claims or Equity Interests, insofar as it does not materially and adversely affect the holders of Claims or Equity Interests, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of the Plan; provided, however, that with respect to the treatment of Senior Creditors, the prior written consent of each member of the Informal Creditor Group shall be required

*Post-Confirmation Material Modifications*

After the Confirmation Date, the Debtors may, with the written consent of the Requisite Participating Lenders, alter, amend or modify the Plan in a manner which, as determined by the Court, materially and adversely affects holders of Claims or Equity Interests; provided that such alteration, amendment or modification is made after a hearing as provided in section 1127 of the Bankruptcy Code; provided further that with respect to the treatment of Senior Creditors, the prior written consent of each member of the Informal Creditor Group shall be required.

*Waiver of Bankruptcy Rule 3020(e) and Federal Rule of Civil Procedure 62(a)*

The Debtors may, with the consent of the Requisite Participating Lenders, request that the Confirmation Order include (a) a finding that Bankruptcy Rule 3020(e) and Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order and (b) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

<b>The Confirmation Hearing</b>

If the Debtors commence the Chapter 11 Cases, the Court would schedule a hearing on the confirmation of the Plan. At the Confirmation Hearing, the Court would consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether the Plan is feasible and whether the Plan is in the best interests of the holders of Claims against and Equity Interests in the Debtors. At that time, the Debtors would submit a report to the Court concerning the votes for acceptance or rejection of the Plan by the parties entitled to vote thereon.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. Any objection to confirmation of the Plan would have to be made in writing and filed with the Court and served on all required parties by the objection deadlines set by the Court. Unless an objection to confirmation is timely served and filed, it may not be considered by the Court.

<b>Confirmation</b>

At the Confirmation Hearing, the Court could confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a Plan are that the plan is (i) accepted by all impaired classes of claims and equity interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) feasible and (iii) in the "best interests" of creditors and interest holders that are impaired under the Plan.

**Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative**

Because Class 9 (Other Holdings Equity Interests) is deemed to reject the Plan, the Debtors will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.

Specifically, Bankruptcy Code section 1129(b) provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it.  A bankruptcy court may confirm a plan at the request of the debtors if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the Plan.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects a plan if the plan provides either: (a) each impaired creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim; (b) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (c) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (a) or (b) of this subparagraph.

A plan is fair and equitable as to a class of  unsecured claims that rejects a plan if the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that the holder of any interest that is junior to the interests of such class will not receive or retain any property at all on account of such junior interest under the plan.

As set forth in "*Reorganization Valuation Analysis*" of the Disclosure Statement, the valuation of the Debtors is such that, on an absolute priority basis, holders of Equity Interests in Classes 8 and 9 would not be entitled to receive or retain any recovery under the Plan.  Accordingly, the Debtors believe that the Plan can be confirmed over the objection of such Equity Interests under section 1129(b).

**Feasibility of the Plan**

The Bankruptcy Code requires that the Court determine that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors.  For purposes of showing that the Plan meets this feasibility standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business.

The Debtors believe that with a deleveraged capital structure and the issuance of the New Common Stock, the Debtors will be able to meet their financial projections set forth in Appendix B attached hereto (the "Projections").  Based on the terms of the Plan, (it is assumed that the Effective Date will occur approximately 60 days following the Petition Date) at emergence the Reorganized Debtors shall have been released from more than $3 billion in debt obligations.

Holders of Claims against and Equity Interests in the Debtors are advised, however, that the Projections were not prepared with a view toward compliance with the published guidelines of the American Institute of Certified Public Accountants or any other regulatory or professional agency or body or generally accepted accounting principles.  FURTHERMORE, THE DEBTORS' INDEPENDENT AUDITORS HAVE NOT COMPILED,

46

EXAMINED OR PERFORMED ANY OTHER PROCEDURES ON THE PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS ANY OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO AND ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS.

In addition to the assumptions footnoted in the Projections themselves, the Projections also assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material adverse change in legislation or regulations, or the administration thereof, including environmental legislation or regulations that will have an unexpected effect on the operations of the Reorganized Debtors, (iii) there will be no change in United States generally accepted accounting principles that will have a material effect on the reported financial results of the Reorganized Debtors, and (iv) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Reorganized Debtors.  To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change.  In addition, although they are presented with numerical specificity and considered reasonable by the Debtors when taken as a whole, the assumptions and estimates underlying the Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors.

Accordingly, the Projections are only estimates that are necessarily speculative in nature.  It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time.  The Projections should therefore not be regarded as a representation by the Debtors or any other person that the results set forth in the Projections will be achieved.  In light of the foregoing, readers are cautioned not to place undue reliance on the Projections.  The Projections should be read together with the information in the sections of this Disclosure Statement entitled "*Risk Factors*" and "*The Plan — Risks Associated with Plan*" which set forth important factors that could cause actual results to differ from those in the Projections.

The Debtors do not intend to update or otherwise revise the Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition.  Furthermore, the Debtors do not intend to update or revise the Projections to reflect changes in general economic or industry conditions.  Whether actual results will conform to the Projections is subject to a number of risks and uncertainties, including:

- the high degree of competition in the Debtors' business;

- the susceptibility of the Debtors' business to general economic conditions;

- discovery of unknown contingent liabilities;

- the interest rate environment;

- the ability to retain client base; and

- the effect of tightened liquidity markets on the Debtors and their customers.

**Reorganization Valuation Analysis**

**Overview**

The Debtors have been advised by Blackstone Advisory Partners L.P. ("Blackstone"), with respect to the reorganization enterprise value of the Reorganized Debtors on a going concern basis.  Blackstone has determined the estimated range of reorganization enterprise value of the Reorganized Debtors, excluding cash on hand, to be approximately $1.6 billion to $1.9 billion (with a mid-point estimate of approximately $1.75 billion) as of an assumed Effective Date of June 30, 2012.  The reorganization valuation analysis includes all the Debtor entities as well as non-Debtor domestic entities including HM Receivables Co. II, LLC, HMH Intermediate Holdings (Delaware), LLC, Houghton Mifflin Harcourt Foundation Inc. and Foundation for Marine Animal Husbandry, Inc.

The non-Debtor domestic entities had no revenue or EBITDA for FY 2011.  In addition, there are real estate assets with de minimus market value at the non-Debtor domestic entities.  The analysis also includes the assets of the non-Debtor Foreign Affiliates including HMH Publishing Company, HMH Consumer Company, HMH Education Company, HMH IP Company, Riverdeep UK Limited, Houghton Mifflin Harcourt (Asia) Pte. Ltd. and Houghton Mifflin PLC, which are all guarantors under the First Lien Credit Agreement and 10.5% Notes Indenture, and HMH Publishing Company (IOM) Unlimited – the assets of these foreign non-Debtor entities are considered immaterial relative to the total value of the estate and, as such, are not being provided separately.

**The estimated range of the reorganization enterprise value of the Reorganized Debtors, as of an assumed Effective Date of the "Valuation Date", reflects work performed by Blackstone on the basis of information in respect of the business and** assets **of the Debtors provided to Blackstone as of March 25, 2012.  Changes in facts and circumstances between the date hereof and the Effective Date, including, without limitation, a delay in the Effective Date, may result in changes to the reorganization enterprise value of the Reorganized Debtors.  Blackstone will consider any such changes in facts and circumstances and may modify its estimate of the reorganization enterprise value prior to the Effective Date but will have no obligation to do so or to file such update with the court.**

The foregoing estimates of the reorganization enterprise value of the Reorganized Debtors is based on a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, the successful implementation of the Reorganized Debtors' business plan (the "Business Plan"), the achievement of the forecasts reflected in the Business Plan projections, access to adequate exit financing, continuity of a qualified management team, market conditions through the period covered by the Projections, and the Plan becoming effective in accordance with the estimates and other assumptions discussed below.

With respect to the Debtor's projected financial information (the "Projections"), which were prepared by the management of the Debtors, and are included as Appendix B to this Disclosure Statement, Blackstone has assumed that the Projections have been reasonably prepared in good faith and on a basis reflecting the best currently available estimates and judgments of the management of the Debtors as to the future operating and financial performance of the Reorganized Debtors.  Blackstone's estimate of a range of reorganization enterprise values assumes that operating results projected by the Debtors will be achieved by the Reorganized Debtors in all material respects, including revenue growth and improvements in operating margins, earnings and cash flow.  Certain of the results forecast by the management of the Debtors may be materially better than the recent historical results of operations of the Debtors.  The estimate of reorganization enterprise values is dependent upon the Reorganized Debtors performing at the levels set forth in the Projections. If the business performs at levels above or below those set forth in the Projections, such performance may have a material impact on the Projections and on the estimated range of values derived therefrom.

**In estimating the range of the reorganization enterprise value of the Reorganized Debtors, Blackstone: (1) reviewed certain historical financial information of the Debtors beginning in 2010; (2) reviewed certain internal financial and operating data of the Debtors, including the Projections, which were prepared and provided to Blackstone by the Debtors' management and which relate to the Debtors' business and its prospects; (3) met with certain members of management of the Debtors to discuss the Debtors' operations and future prospects; (4) reviewed publicly available financial data and considered the market value of public companies that Blackstone deemed generally comparable to the operating businesses of the Debtors; (5) considered relevant precedent transactions in the industry most comparable to the Debtors' operating businesses; (6) considered certain economic and industry information relevant to the operating businesses; and (7) conducted such other studies, analyses, inquiries, and investigations as it deemed appropriate. Blackstone assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors, as well as publicly available information.**

**Blackstone did not independently verify management's Projections in connection with such estimates of the reorganization enterprise value of the Reorganized Debtors, and no independent valuations or appraisals of the Debtors were sought or obtained in connection herewith.**

**Estimates of the reorganization enterprise value of the Reorganized Debtors do not purport to be appraisals** or **necessarily reflect the values that may be realized if assets are sold as a going concern, in liquidation, or otherwise.**

In the case of the Reorganized Debtors, the estimates of the reorganization enterprise value prepared by Blackstone represent the hypothetical reorganization enterprise value of the Reorganized Debtors.  The reorganization enterprise value includes all the Debtor entities as well as non-Debtor domestic entities including HM Receivables Co. II, LLC, HMH Intermediate Holdings (Delaware), LLC, Houghton Mifflin Harcourt Foundation Inc. and Foundation for Marine Animal Husbandry, Inc.  The non-Debtor domestic entities had no revenue or EBITDA for FY 2011.  In addition, there are real estate assets with de minimus market value at the non-Debtor domestic entities.  The analysis also includes the assets of the non-Debtor Foreign Affiliates including HMH Publishing Company, HMH Consumer Company, HMH Education Company, HMH IP Company, Riverdeep UK Limited, Houghton Mifflin Harcourt (Asia) Pte. Ltd. and Houghton Mifflin PLC, which are all guarantors under the Secured Credit Agreement and 10.5% Notes Indenture, and HMH Publishing Company (IOM) Unlimited – the assets of these foreign non-Debtor entities are considered immaterial relative to the total value of the estate and, as such, are not being provided separately.  Such estimates reflect computations of the range of the estimated reorganization enterprise value of the Reorganized Debtors through the application of various valuation techniques and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities issued pursuant to the Plan, which may be significantly different than the amounts set forth herein.

The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business.  As a result, the estimate of the ranges of the reorganization enterprise value of the Reorganized Debtors set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein.  Because such estimates are inherently subject to uncertainties, none of the Debtors, Blackstone, the Debtors' other advisors or any other person assumes responsibility for their accuracy.  In addition, the valuation of newly issued Securities is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, consistent availability of willing buyers and sellers, conditions in the financial markets, the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis, and other factors which generally influence the prices of securities.  The valuation analysis does not consider how the securities will or will not trade, given a lack of public market at emergence.

**Valuation Methodology**

Blackstone performed a variety of analyses and considered a variety of factors in preparing the reorganization enterprise value of the Reorganized Debtors. Blackstone primarily relied on a market multiples-based approach and a discounted cash flow ("DCF") approach. Blackstone made judgments as to the relative significance of each analysis in determining the Debtors' indicative reorganization enterprise value range. The valuation must be considered as a whole, and selecting just one methodology or portions of the analyses, without considering the analyses as a whole, could create a misleading or incomplete conclusion as to the Reorganized Debtors' reorganization enterprise value.

The following summary does not purport to be a complete description of the analyses and factors undertaken to support Blackstone's conclusions.  The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, as well as the application of those analyses and factors under the particular circumstances.  As a result, the process involved in preparing a valuation is more complex than the summary provided below.

**1.  Market Multiples-Based Approach**

The market multiples-based approach incorporates analysis of (i) comparable public company trading multiples and (ii) precedent transactions.

*(i) Comparable Public Company Trading Multiples Analysis*

A comparable public company trading multiples analysis estimates value based on a comparison of the target company's financial statistics with the financial statistics of public companies that are similar to the target company. It establishes a benchmark for asset valuation by deriving the value of "comparable" assets through a standardized approach that uses a common variable such as revenues, earnings or cash flows. The analysis includes a comparison of each company's income statement, balance sheet and cash flow statement. In addition, each company's performance, profitability, margins, leverage and business trends are also examined. Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of businesses, business risks, target market segments, growth prospects, maturity of businesses, market presence, size and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation. However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining reorganization enterprise value.

While calculating the current trading value for the comparable companies, Blackstone utilized two separate methods. Blackstone analyzed the current enterprise values for the comparable companies as a multiple of historical last twelve months and projected fiscal year end 2012 earnings before interest, taxes, depreciation and amortization ("EBITDA").

Blackstone also analyzed the current enterprise values for the comparable companies as a multiple of historical last twelve months and projected fiscal year end 2012 EBITDA less capital expenditures ("EBITDA less CapEx").

These multiples were then applied to the Debtors' fiscal year end 2011 and 2012 forecasted EBITDA and EBITDA less CapEx to determine a range of reorganization enterprise values.

*(ii) Precedent Transactions Analysis*

Precedent transactions analysis estimates value by examining publicly available information about recent merger and acquisition transactions. An analysis of the disclosed purchase price as a multiple of various operating statistics reveals industry acquisition multiples for companies in similar lines of businesses to the Debtors. These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to the Debtors. Blackstone specifically focused on prices paid as a multiple of EBITDA in determining a range of values for the Debtors. These multiples were then applied to the Debtors' EBITDA to determine reorganization enterprise values or value to a potential strategic buyer assuming the purchase of the Debtors in a single transaction.

Unlike the comparable public company analysis, the valuation in the precedent transactions methodology is assumed to include a "control" premium, representing the purchase of a majority or control position in a company's assets. Thus, the precedent transactions methodology generally produces higher valuations than the comparable public company analysis though timing and other factors sometimes offset this effect. Other factors that impact value in the precedent transactions analysis include, but are not limited to, the following:

  1. The operating, financing and market environments and their attendant impact on an acquirers' ability to finance acquisitions;

  2. Circumstances surrounding a specific merger transaction, including the financial position of the acquisition targets and potential buyers, which may significantly impact the valuation of the transaction; and

  3. Perceived synergies and tax benefits that buyers can obtain and their willingness to pay for or share such synergies and benefits with the seller.

As with the comparable company analysis, because no acquisition used in any analysis is identical to any other transaction, valuation conclusions cannot be based solely on quantitative results. The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations and prospects of each. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition. The number of completed transactions during a relevant timeframe for which public data is available also limits this analysis.

Blackstone considered the precedent transaction analysis to be less relevant than other methods in preparing the reorganization enterprise value assessment of the Reorganized Debtors. Further, given limited disclosure with respect to the selected transactions, Blackstone determined that there were too few recent data points available to draw conclusions from the precedent transaction analysis.

## 2. Discounted Cash Flow Approach

The DCF valuation methodology assesses the value of an asset or business based on the present value of expected future cash flows to be generated by that asset or business. The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by a theoretical or observed discount rate determined by calculating the average cost of debt and equity for publicly traded companies that are similar to the Debtors. The expected future cash flows have two components: the present value of the projected unlevered after-tax free cash flows for a determined period and the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the Projections). Blackstone's discounted cash flow valuation is based on a five and one-half year fiscal year end projection of the Debtors' operating results (2H2012E to FY2017E). Blackstone discounted the projected cash flows using the Debtors' estimated weighted average cost of capital, and calculated the terminal value of the Debtors using both the EBITDA less CapEx multiples and the perpetual growth method.

The DCF approach relies on a company's ability to project future cash flows with some degree of accuracy. Because the Projections reflect significant assumptions made by the Debtors' management concerning anticipated results, the assumptions and judgments used in the Projections may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized. Blackstone cannot and does not make any representations or warranties as to the accuracy or completeness of the Projections.

To each of the comparable public company analysis and DCF analysis, Blackstone added in the present value of tax attributes that it deemed to be unique to the Reorganized Debtors. Specifically, the Reorganized Debtors are projected to shield taxes as a result of (i) net operating losses accumulated by the Reorganized Debtors and (ii) earnings stripping associated with previous interest expense that was not previously deducted for tax purposes. The present value of these tax benefits was calculated by applying the weighted average cost of capital for the Debtors to tax payments that would be otherwise required over the projection period.

The estimates of the reorganization enterprise value of the Reorganized Debtors determined by Blackstone represent estimated reorganization enterprise values and do not reflect values that could be attainable in public or private markets. The reorganization enterprise value includes all the Debtor entities as well as non-Debtor domestic entities includes all the Debtor entities as well as non-Debtor domestic entities including HM Receivables Co. II, LLC, HMH Intermediate Holdings (Delaware), LLC, Houghton Mifflin Harcourt Foundation Inc. and Foundation for Marine Animal Husbandry, Inc. The non-Debtor domestic entities had no revenue or EBITDA for FY 2011. In addition, there are real estate assets with de minimus market value at the non-Debtor domestic entities. The analysis also includes the assets of the non-Debtor Foreign Affiliates including HMH Publishing Company, HMH Consumer Company, HMH Education Company, HMH IP Company, Riverdeep UK Limited, Houghton Mifflin Harcourt (Asia) Pte. Ltd. and Houghton Mifflin PLC, which are all guarantors under the First Lien Credit Agreement and 10.5% Notes Indenture, and HMH Publishing Company (IOM) Unlimited – the assets of these foreign non-Debtor entities are considered immaterial relative to the total value of the estate and, as such, are not being provided separately. The estimate of the range of the reorganization enterprise value of the Reorganized Debtors ascribed in the analysis does not purport to be an estimate of the post-reorganized market trading value. Any such trading value may be materially different from the estimate of the reorganization enterprise value range for the Reorganized Debtors associated with the Blackstone's valuation analysis.

**Best Interests Test**

With respect to each Impaired Class of Claims and Equity Interests, confirmation of the Plan requires that each holder of a Claim or Equity Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  To calculate the probable distribution to holders of each Impaired Class of Claims and Equity Interests if the Debtors were liquidated under chapter 7, the Court must first determine the aggregate dollar amount that would be generated from the Debtors' assets if their Chapter 11 Cases were converted to chapter 7 cases under the Bankruptcy Code.  This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtors' assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral, and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 cases and chapter 11 cases.  Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in their Chapter 11 Cases (such as compensation of attorneys, financial advisors and accountants) that are allowed in the chapter 7 cases, litigation costs, and claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.  The liquidation itself would trigger certain Tax and Other Priority Claims (collectively, "Priority Claims") that otherwise would be due in the ordinary course of business.  Those Priority Claims would be paid in full from the liquidation proceeds before the balance would be made available to pay General Unsecured Claims or to make any distribution in respect of equity interests.  The liquidation would also prompt the rejection of most, if not all, of the Debtors' executory contracts and unexpired leases, thereby creating a significant increase in General Unsecured Claims.

**Liquidation Analysis**

In order to determine the amount of liquidation value available to creditors, the Debtors prepared a liquidation analysis that provides an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation for the Debtors.  While the Debtors believe that the assumptions underlying the Liquidation Analysis are reasonable, it is possible that certain of those assumptions would not be realized in an actual liquidation.  The Liquidation Analysis is set forth as Appendix C to the Disclosure Statement.

Notwithstanding the foregoing, the Debtors believe that any liquidation analysis with respect to the Debtors is inherently speculative.  The liquidation analysis for the Debtors necessarily contains estimates of the net proceeds that would be received from a forced sale of assets and/or business units, as well as the amount of Claims that will ultimately become Allowed Claims.  The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

**Application of the 'Best Interests' of Creditors Test to the Liquidation Analyses and the Valuation**

Under the Plan, with respect to Classes 3 and 8, it is impossible to determine with any specificity the value that will be distributed to holders of such Claims and Existing Common Stock.  This difficulty in estimating the value of recoveries is due to the lack of any public market for the New Common Stock and the New Warrants.

Notwithstanding the difficulty in quantifying recoveries to holders of Allowed Senior Creditor Claims and Existing Common Stock in Classes 3 and 8, respectively with precision, the Debtors believe that the financial disclosures and Projections contained herein imply a greater recovery to holders of Claims and Equity Interests in Classes 3 and 8 than the recovery available in a chapter 7 liquidation.  As set forth in the Liquidation Analysis, holders of Allowed Claims in Class 3 are estimated to receive a recovery of 19% (low value) to 25% (high value) in a chapter 7 liquidation, while holders of Existing Common Stock in Class 8 would not receive a recovery.  See Appendix B.  In contrast, under the Plan, holders of Allowed Class 3 Claims will receive a 54.4% recovery and holders of Class 8 Existing Common Stock would receive $12.25 million.  See Appendix C.  Therefore, holders of such Claims and Existing Common Stock will receive substantially more under the Plan than in a liquidation.

The foregoing recoveries assume that New Common Stock is valued based on the mid-point of the equity value range set forth in the section above titled "*Reorganization Valuation Analysis.*"

Accordingly, the Debtors believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied because the Debtors believe that the members of each Impaired Class will receive greater or equal value under the Plan than they would in a chapter 7 liquidation of the Debtors.

Although the Debtors believe that the Plan meets the "best interests test" of section 1129(a)(7) of the Bankruptcy Code, there can be no assurance that the Court will determine that the Plan meets this test. THESE ESTIMATES OF VALUE ARE SUBJECT TO A NUMBER OF ASSUMPTIONS AND SIGNIFICANT QUALIFYING CONDITIONS. ACTUAL VALUES AND RECOVERIES COULD VARY MATERIALLY FROM THE ESTIMATES SET FORTH HEREIN. See "*The Plan — Reorganization Valuation Analysis.*"

### Risk Factors Associated with the Plan

Holders of Claims and Equity Interests against the Debtors should read and consider carefully the information set forth in the section entitled "*Risk Factors*" starting on page 71, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Plan.

### Alternatives to Confirmation and Consummation of the Plan

The Debtors believe that the Plan affords holders of Claims and Existing Common Stock, to the extent that the Class of Existing Common Stockholders votes to accept the Plan, the potential for the greatest recovery and, therefore, is in the best interests of such holders. The Plan as presented is the result of considerable negotiations between the Debtors and the Informal Creditor Group.

If, however, the requisite acceptances are not received, or the Plan is not confirmed and consummated, the theoretical alternatives include: (i) formulation of an alternative Plan or (ii) liquidation of the Debtors under chapter 7 or 11 of the Bankruptcy Code.

### Alternative Plan(s) of Reorganization

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors may file chapter 11 petitions and attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plan(s) might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of assets.

The Debtors' businesses could suffer from increased costs, erosion of customer confidence and liquidity difficulties if the Debtors remained Debtors in possession during a lengthy chapter 11 process while trying to negotiate a Plan.

The Debtors believe that the Plan, which is the result of extensive negotiations between the Debtors and the Informal Creditor Group, enables creditors to realize the greatest possible value under the circumstances and that, compared to any later alternative Plan, the Plan has the greatest chance to be confirmed and consummated.

### Liquidation Under Chapter 7 or Chapter 11

If no plan is confirmed, the Debtors may be forced to liquidate under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution to creditors and equity holders in accordance with the priorities established by the Bankruptcy Code. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Equity Interests in the Debtors.

The Debtors believe that in a liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other

professionals to assist such trustees would cause a substantial diminution in the value of the Debtors' Estates. Outstanding letters of credit (if any) which would otherwise not be drawn would be drawn. The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors could also be liquidated pursuant to the provisions of a chapter 11 plan of liquidation. In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to the holders of Claims under a chapter 11 liquidation plan probably would be delayed substantially.

The Debtors believe that any alternative liquidation under chapter 7 or chapter 11 is a much less attractive alternative to creditors and interest holders than the Plan because of the greater return the Debtors believe is provided to creditors and interest holders under the Plan.

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

*TREASURY DEPARTMENT CIRCULAR 230. TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF TAX ISSUES HEREIN IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY A HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON SUCH HOLDER UNDER APPLICABLE TAX LAW; (B) SUCH DISCUSSION IS INCLUDED HEREIN IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) OF THE TRANSACTIONS DESCRIBED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT ADVISOR.*

A summary description of certain United States ("U.S.") federal income tax consequences of the restructuring of the indebtedness outstanding under the First Lien Credit Agreement and the 10.5% Notes (the 10.5% Notes, together with the indebtedness outstanding under the First Lien Credit Agreement, the "Debt") is provided below. This description applies to a reorganization that occurs in a title 11 reorganization in bankruptcy court pursuant to the Plan (a "Restructuring").

This description is for informational purposes only and, due to a lack of certain facts and of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of a Restructuring, as discussed herein. Only the principal consequences of the Restructuring for HMH Holdings and certain of its U.S. subsidiaries (HMH Holdings and such subsidiaries, collectively, for purposes of this section, the "Company" or "Companies," as appropriate) and holders of the Debt (such holders, the "Holders") are described below.

The following discussion is based upon the U.S. Internal Revenue Code of 1986, as amended (the "Tax Code"), U.S. judicial decisions, administrative pronouncements and existing and proposed Treasury Regulations, all as in effect as of the date hereof. All of the preceding authorities are subject to change, possibly with retroactive effect, which may result in U.S. federal income tax consequences different from those discussed below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Restructuring. No rulings or determinations of the U.S. Internal Revenue Service (the "IRS") or any other tax authorities have been sought or obtained with respect to any tax consequences of the Restructuring, and the discussion below is not binding on the IRS or such other authorities. In addition, events occurring after the date of the Disclosure Statement, including changes in law and changes in administrative positions, could affect the U.S. federal income tax consequences of the Restructuring. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Company or any Holder. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

Except as otherwise specifically stated herein, this summary does not address any estate, gift, state, local, or foreign law tax consequences of the Restructuring. Furthermore, this discussion does not address all tax considerations that might be relevant to particular Holders in light of their personal circumstances or to persons that are subject to special tax rules. In addition, this description of the material U.S. federal income tax consequences does not address the tax treatment of special classes of Holders, such as financial institutions, regulated investment companies, real estate investment trusts, tax-exempt entities, insurance companies, persons holding Debt as part of a hedging, integrated or conversion transaction, constructive sale or "straddle," U.S. expatriates, persons subject to the alternative minimum tax, and dealers or traders in securities or currencies.

For purposes of this discussion, a "U.S. Holder" is a Holder that is: (1) an individual citizen or resident of the U.S. for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the U.S. or any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (4) a trust (A) if a court within the U.S. is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

55

For purposes of this discussion, a "Non-U.S. Holder" is a Holder that is: (1) a nonresident alien individual; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) that is not created or organized under the laws of the United States or any state thereof or the District of Columbia; or (3) a trust or estate other than a trust or estate described in the immediately preceding paragraph.

If a partnership or other pass-through entity is a Holder, the tax treatment of a partner or other owner generally will depend upon the status of the partner (or other owner) and the activities of the entity. Partners (or other owners) of pass-through entities that are Holders should consult their own tax advisors regarding the tax consequences of the Restructuring.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE RESTRUCTURING ARE COMPLEX. THE FOLLOWING DISCUSSION IS FOR GENERAL INFORMATION ONLY, DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION, AND IS NOT INTENDED TO BE, NOR SHOULD IT BE CONSTRUED TO BE, LEGAL OR TAX ADVICE TO ANY HOLDER. NO OPINION OR REPRESENTATION WITH RESPECT TO THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO ANY SUCH HOLDER IS MADE. EACH HOLDER IS URGED TO CONSULT THE HOLDER'S OWN TAX ADVISOR REGARDING THE PARTICULAR TAX CONSEQUENCES TO IT OF THE TRANSACTIONS CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICATION OF U.S. FEDERAL, STATE AND LOCAL TAX LAWS, AS WELL AS ANY APPLICABLE FOREIGN TAX LAWS, TO A HOLDER'S PARTICULAR SITUATION, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## U.S. Federal Income Tax Consequences of the Restructuring to the Company

### Introduction

The U.S. federal income tax consequences of the Restructuring to the Company are complex and somewhat uncertain. Section I.B. of this Disclosure Statement describes certain U.S. federal income tax rules that govern the Company's analysis of the U.S. federal income tax consequences to the Company of the Restructuring, and certain related matters. Section I.C. discusses the Company's analysis and current views on the tax consequences of the Restructuring.

### General U.S. Federal Income Tax Rules Applicable to the Restructuring

*Cancellation of Indebtedness Income and Reduction of Tax Attributes*

In general, absent an exception, a U.S. taxpayer must include in gross income the amount of any discharge of indebtedness (cancellation of debt or "COD") income realized during the taxable year. The amount of COD income generally equals the difference between (a) the "adjusted issue price" of the indebtedness discharged and (b) the sum of (i) the amount of cash and (ii) the fair market value of any other property ("issue price" in the case of debt) transferred in satisfaction of such discharged indebtedness.

A debtor is not required to include any amount of COD income in gross income if such debtor is under the jurisdiction of a court in a title 11 bankruptcy proceeding and the discharge of debt occurs pursuant to that proceeding. Instead, as the price for the exclusion of COD income under the foregoing rule, the Tax Code requires the debtor to reduce its tax attributes by the amount of COD income that is excluded from gross income. The reduction in tax attributes occurs at the beginning of the taxable year following the taxable year in which the discharge of indebtedness occurs. As a general rule, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs"), (b) most tax credits, (c) capital loss carryovers, (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject), and (e) foreign tax credits. For the purpose of attribute reduction, any limitations on the use of NOLs, as discussed below in "*Limitations on NOLs and Other Tax Benefits*", are disregarded. In the context of a consolidated group of corporations, the Tax Code provides for a complex ordering mechanism to determine how the tax attributes of one member can be reduced in respect of the COD income of another member.

*Limitation on NOLs and Other Tax Benefits*

If a corporation undergoes an "ownership change," Section 382 of the Tax Code generally imposes an annual limitation (the "Section 382 Limitation") on a corporation's use of its NOL carryforwards, and may limit a corporation's use of certain built-in losses if such built-in losses are recognized within a five-year period following an ownership change (such NOL carryforwards and built-in losses collectively, "Pre-Change Losses").

The annual Section 382 Limitation on the use of Pre-Change Losses to offset income in any "post change year" is generally equal to the product of (a) the fair market value of the loss corporation's outstanding stock immediately before the ownership change, and (b) the long-term tax-exempt rate in effect for the month in which the ownership change occurs. The long-term tax-exempt rate (3.26% for ownership changes in May 2012) is published monthly by the IRS and is intended to reflect current interest rates on long-term tax-exempt debt obligations. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits.

If, in any year, the amount of Pre-Change Losses used by a corporation to offset income is less than the Section 382 Limitation, any unused limitation may be carried forward, thereby increasing the Section 382 Limitation (the amount of Pre-Change Losses which may offset income) in the subsequent taxable year of the corporation. In addition, a corporation's Section 382 Limitation may be increased to the extent that the corporation recognizes or is deemed to recognize certain built-in gains in its assets during the five-year period following the ownership change. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

In general, an ownership change occurs for Section 382 purposes when the percentage of the corporation's stock owned by certain "5 percent shareholders" increases by more than 50 percentage points in the aggregate over the lowest percentage owned by those shareholders at any time during the applicable "testing period" (generally, the shorter of (a) the 36-month period preceding the testing date and (b) the period of time since the most recent ownership change of the corporation). A "5 percent shareholder" for this purpose includes, generally, an individual or entity that directly or indirectly owns 5% or more of a corporation's stock at any time during the testing period and one or more groups of shareholders that individually own less than 5% of the corporation's stock. Under applicable Treasury Regulations, an ownership change with respect to an affiliated group of corporations filing a consolidated return that has consolidated NOLs is generally measured by changes in stock ownership of the parent corporation of the group.

In bankruptcy, the Section 382 Limitation may be calculated under a special rule (the "Section 382(l)(5) Rule") if the corporation's pre-bankruptcy shareholders and certain holders of debt receive, in respect of their claims, at least 50% of the stock of the reorganized corporation (or of a controlling corporation, if such corporation also is in bankruptcy) pursuant to a confirmed plan of reorganization. If a corporation qualifies for the Section 382(l)(5) Rule, the corporation will not be treated as having undergone an ownership change, and, therefore, the annual Section 382 Limitation will not apply to the corporation's Pre-Change Losses. Instead, the corporation's Pre-Change Losses are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date, and the portion of the current taxable year ending on the date of the ownership change, in respect of all debt converted into stock pursuant to the bankruptcy reorganization. Additionally, if the Section 382(l)(5) Rule applies and the reorganized corporation undergoes another ownership change within two years after consummation of the plan of reorganization, then the reorganized corporation's use of any Pre-Change Losses after the subsequent ownership change would be eliminated. A corporation may elect not to apply the Section 382(l)(5) Rule.

Alternatively, if the Corporation does not qualify for, or elects not to apply, the Section 382(l)(5) Rule described above, the provisions of Section 382(l)(6) applicable to corporations under the jurisdiction of a bankruptcy court would apply in calculating the annual Section 382 limitation (the "Section 382(l)(6) Rule"). Under the Section 382(l)(6) Rule, a corporation in bankruptcy that undergoes an ownership change pursuant to a plan of reorganization values its stock to be used in computing the Section 382 Limitation by taking into account any increase in value resulting from the discharge of creditors' claims in the reorganization (rather than the value without taking into account such increases, as is the case under the general rule for non-bankruptcy ownership changes).

**COD Income of the Company**

As a result of the exchange of New Common Stock for existing Debt, the Company expects to realize COD in an amount equal to the difference between (x) the aggregate adjusted issue price of the Debt and (y) the fair market value of the New Common Stock.  Because the value of the New Common Stock cannot be known with certainty until after the Effective Date of the Restructuring, the Company cannot determine the amount of COD income it will realize until that time.

The Company currently expects to rely on the bankruptcy exception to exclude any COD income realized.  As a result of the availability of the bankruptcy exception, the Company currently expects that it will not be required to pay U.S. federal income taxes in 2012 as a result of the Restructuring.

The Company, however, will be required to reduce its tax attributes by the amount of the excluded COD income. The exact amount of such reductions and which attributes will be affected will not be known until after the Restructuring.  However, the Company does anticipate that, due to the attribute reduction described above, most (if not all) of its NOLs will be eliminated no later than January 1, 2013.  The Company also believes that it will be required to reduce other tax attributes and its basis in certain assets, which will have an impact on the Company's tax liability going forward. Any COD income of the Company excluded under the bankruptcy exception which is in excess of the amount of the Company's tax attributes available for reduction would not be subject to U.S. federal income tax.

**Limitations on NOLs and Other Tax Benefits of the Company Post-Restructuring**

The issuance under the Restructuring of New Common Stock, along with the cancellation of existing stock of the Company, may cause an ownership change with respect to the Company.  If the Company undergoes an ownership change, the Company's Pre-Change Losses will be subject to the Section 382 Limitation (as described above in "*Limitations on NOLs and Other Tax Benefits*").  Because the Company anticipates that most, if not all, of its NOLs will be eliminated no later than January 1, 2013, due to the attribute reduction described above resulting from the COD excluded from gross income, the Section 382 Limitation should not impact the Company significantly with respect to NOLs. The Company has certain significant tax assets (other than NOLs) and expects that these tax assets will not be subject to any limitation under Section 382 or otherwise as a result of the Restructuring.

**U.S. Federal Income Tax Considerations for U.S. Holders**

The following discussion describes certain U.S. federal income tax consequences of the transactions contemplated by the Restructuring to U.S. Holders of the Debt, U.S. Holders of Existing Common Stock, U.S. Holders of New Common Stock after the Restructuring, and U.S. Holders of New Warrants after the Restructuring.

*U.S. Holders should consult their own tax advisors for information that may be relevant to their particular situation and circumstances and the particular tax consequences of the transactions contemplated by the Restructuring.*

**Tax Consequences for Holders of Exchanging Debt for New Common Stock and Cash**

The U.S. federal income tax consequences to a U.S. Holder (including the character, timing and amount of income, gain or loss recognized) will depend on, among other factors: (a) the manner in which the Holder acquired the Debt; (b) the length of time the Holder has held the Debt; (c) whether the Holder acquired the Debt at a discount; (d) whether the Holder has taken a bad debt deduction with respect to the Debt (or any portion thereof) in current or prior years; (e) whether the Holder has previously included in taxable income accrued but unpaid interest with respect to the Debt; and (f) the Holder's method of accounting.

*Consequences for Holders of Exchanging Debt for New Common Stock Generally*

Pursuant to the Plan, each Holder of the Debt will receive its *pro rata* share of the New Common Stock and Cash in full satisfaction of their Senior Creditor Claims. Each Holder will recognize gain or loss for United States federal income tax purposes in an amount equal to the difference between (1) the amount of Cash received and the fair market value of its share of the New Common Stock and (2) the Holder's adjusted tax basis in its Debt. Except to the extent such payment is received in discharge of accrued but unpaid interest, such gain or loss should be capital gain or loss (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Debt was held for more than one year by the Holder. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to limitations. A Holder's basis in the New Common Stock will be the fair market value of the New Common Stock, and a Holder's holding period will begin the day after the Restructuring.

*Accrued Interest*

A portion of the New Common Stock and Cash received by Holders of the Debt may be attributable to accrued but unpaid interest with respect to such Debt. Such amount should be taxable to a Holder as ordinary interest income if the accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes. Conversely, a Holder may recognize a loss (which may be capital) to the extent that any accrued interest was previously included in income and is not paid in full.

If the fair value of the New Common Stock and Cash received by Holders of the Debt is not sufficient to satisfy fully all principal and interest on the Debt, the extent to which such New Common Stock and Cash will be attributable to accrued but untaxed interest is unclear. Pursuant to the Plan, the Company will allocate for U.S. federal income tax purposes all distributions in respect of any Claim first to the principal amount of such Claim, and thereafter to accrued but unpaid interest. Certain legislative history indicates that an allocation of consideration between principal and interest provided for in a bankruptcy plan of reorganization is binding for U.S. federal income tax purposes. However, no assurance can be given that the IRS will not challenge such allocation. If a distribution with respect to a Claim is allocated entirely to the principal amount of such Claim, a Holder may be entitled to claim a loss to the extent of any accrued but unpaid interest on the Claim that was previously included in the Holder's gross income. Holders of Debt should consult their tax advisors regarding the proper allocation of the consideration received by them under the Plan, as well as the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income.

*Market Discount*

The market discount provisions of the Tax Code may apply to certain Holders. In general, a debt obligation other than a debt obligation with a fixed maturity of one year or less that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its revised issue price) exceeds the holder's adjusted tax basis in the debt obligation immediately after such holder's acquisition of the debt obligation by more than a statutory *de minimis* amount. Gain recognized by a holder upon a disposition of a "market discount bond" generally will be treated as ordinary interest income to the extent of the market discount accrued on such bond during the holder's period of ownership, unless the holder elected to include accrued market discount in taxable income currently. Absent such an election, a holder of a market discount bond is required under the market discount rules of the Tax Code to defer deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry the bond. In such circumstances, the holder will be allowed to deduct such interest, in whole or in part, on the disposition of such bond.

## Tax Consequences for Holders of Exchanging Existing Common Stock for New Warrants

If the Existing Common Stockholders Class votes to accept the Plan, the holders of Existing Common Stock will receive their pro rata shares of the New Warrants and the Existing Common Stock will be cancelled. If the Existing Common Stockholders Class does not vote to accept the plan, the holders of Existing Common Stock will not receive New Warrants, and the Existing Common Stock will be cancelled. The treatment of receipt of the New Warrants by holders of Existing Common Stock for U.S. federal income tax purposes is not entirely clear.

The Company currently intends to take the position that the New Warrants should be treated as issued in exchange for Existing Common Stock. The exchange of the Existing Common Stock for the New Warrants would be treated as a taxable transaction for U.S. Holders of Existing Common Stock. In such case, a U.S. Holder of Existing Common Stock would recognize gain or loss for United States federal income tax purposes in an amount equal to the difference between (1) the fair market value of its share of the New Warrants and (2) the Holder's adjusted tax basis in its Existing Common Stock. Such gain or loss should be capital gain or loss (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Existing Common Stock was held for more than one year by the Holder. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to limitations. A Holder's initial tax basis in the New Warrants will be the fair market value of the New Warrants, and a Holder's holding period will begin the day after the Restructuring. If a Holder owns Existing Common Stock that was acquired in a non-recognition transaction received in exchange for property that had market discount (as discussed above), the market discount may have carried over into the Existing Common Stock, in which event any gain recognized on the exchange of Existing Common Stock for New Warrants would be subject to the market discount rules and treated as ordinary income to the extent of such accrued but unrecognized market discount. Holders should consult with their own tax advisors regarding this issue.

Alternatively, because the New Warrants are issued only if the Existing Common Stockholders Class votes to accept the Plan, it is possible that the New Warrants would be treated as a fee paid to such Holders, in which case the Holders would generally be taxed on the value of such New Warrants as ordinary income and would recognize a capital loss on the cancellation of their Existing Common Stock.

Each Holder should consult its own tax advisor with respect to the consequences to it with respect to this issue.

## Ownership and Disposition of New Common Stock

### Distributions of Cash or Property on New Common Stock

Generally, the gross amount of any distribution of cash or property made with respect to New Common Stock will be includible by a Holder in gross income as dividend income to the extent that such distributions are paid out of the current or accumulated "earnings and profits" of HMH Holdings as determined under U.S. federal income tax principles.

A distribution in excess of HMH Holdings's current and accumulated earnings and profits will first be treated as a return of capital to the extent of a Holder's adjusted tax basis in New Common Stock and will be applied against and reduce such basis dollar-for-dollar (thereby increasing the amount of gain and decreasing the amount of loss recognized on a subsequent taxable disposition of the New Common Stock). To the extent that such distribution exceeds a Holder's adjusted tax basis in New Common Stock the distribution generally will be treated as capital gain, subject to the "*Market Discount*" rules discussed above, and will be treated as long-term capital gain if the Holder's holding period in such stock exceeds one year as of the date of the distribution. Dividends received by non-corporate holders in taxable years beginning before January 1, 2013, may qualify for a reduced rate of taxation if certain holding period and other requirements are met.

### Sale, Exchange or Other Taxable Disposition of New Common Stock and New Warrants

Upon the sale, retirement or other taxable disposition of a share of New Common Stock or a New Warrant, a Holder generally will recognize gain or loss in an amount equal to the difference between the sum of cash plus the fair market value of any property received and the Holder's adjusted tax basis in such New Common Stock or New Warrant, subject to the "*Market Discount*" rules discussed above. Such gain or loss generally will constitute capital gain or loss, and will be long-term capital gain or loss if at the time of the sale, exchange, retirement or other taxable disposition, the Holder held the share of New Common Stock or New Warrant for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations.

*Exercise or Expiration of New Warrants*

A U.S. Holder generally will not recognize gain or loss upon the exercise of a New Warrant. New Common Stock that a Holder acquires pursuant to the exercise of the New Warrants will have a tax basis equal to the U.S. Holder's adjusted basis in the New Warrants so exercised, increased by any amount paid to exercise the New Warrants. The holding period for the New Common Stock that a Holder acquires pursuant to the exercise of the New Warrants will commence on the date following the date of exercise (or possibly on the date of exercise). If the terms of the New Warrants provide for any adjustment to the number of shares of New Common Stock for which the New Warrants may be exercised or to the exercise price of the New Warrants, such adjustment may, under limited circumstances, result in a constructive distribution that could be taxable as a dividend to a U.S. Holder. Conversely, the absence of an appropriate adjustment may result in a constructive distribution that could be taxable as a dividend to U.S. Holders of the New Common Stock. If the New Warrants are allowed to lapse unexercised, a U.S. Holder will have a capital loss equal to the U.S. Holder's adjusted basis in the New Warrants, which will be treated as a long-term capital loss if the U.S. Holder's holding period in the New Warrants exceeds one year as of the date of the expiration. The deductibility of capital losses is subject to certain limitations

**Information Reporting and Backup Withholding**

Certain payments ("reportable payments") generally are subject to information reporting by the payor to the IRS. Moreover, reportable payments are subject to backup withholding (currently at a rate of twenty eight percent (28%)) under certain circumstances. Under the backup withholding rules set forth in the Tax Code, a Holder receiving a payment or distribution of cash or other property pursuant to the Restructuring or distributions on New Common Stock, may be subject to backup withholding with respect to such payment or distribution unless it: (i) is an exempt recipient, such as a corporation, and when required, demonstrates this exemption, or (ii) timely provides a correct U.S. taxpayer identification number and makes certain certifications under penalties of perjury.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against the Holder's U.S. federal income tax liability, and it may obtain a refund of excess amounts withheld under the backup withholding tax rules by timely filing an appropriate claim for refund with the IRS.

**Additional Tax on Passive Income**

For tax years beginning after December 31, 2012, certain individuals, estates and trusts whose income exceeds certain thresholds will be required to pay a 3.8% Medicare surtax on "net investment income" including, among other things, dividends and net gain from disposition of property (other than property held in a trade or business), including the New Common Stock. U.S. Holders should consult with their own tax advisors regarding the effect, if any, of this tax on their ownership and disposition of the New Common Stock.

**U.S. Federal Income Tax Considerations for Non-U.S. Holders**

This subsection applies to a Holder who is a Non-U.S. Holder. The rules governing U.S. federal income taxation of Non-U.S. Holders are complex. Each non-U.S. Holder should consult with its own tax advisor to determine the effect of U.S. federal, state, local and foreign income tax laws, as well as treaties, with regard to its participation in the transactions contemplated by the Restructuring and its ownership of New Common Stock or New Warrants, including any reporting requirements.

**Tax Consequences for Existing Non-U.S. Holders of Debt**

As discussed above, it is expected that the exchange of the Debt for New Common Stock and Cash in the Restructuring will result in a taxable exchange for Holders. Each Holder will realize net income, gain or loss for United States federal income tax purposes in an amount equal to the difference between (1) the amount of Cash received and the fair market value of its share of the New Common Stock and (2) the Holder's adjusted tax basis in the Debt.

Subject to the discussion below in "*Information Reporting and Backup Withholding*," however, any gain or loss realized by a Non-U.S. Holder in connection with the Debt for Stock Exchange should not be subject to U.S. federal income tax unless:

- the gain or loss is effectively connected with such Non-U.S. Holder's conduct of a trade or business in the U.S. (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains within the U.S.), in which case the gain or loss will be treated in the manner described below in "*Effectively Connected Income and Loss*;"

- the Non-U.S. Holder is an individual who is present in the U.S. for 183 days or more during the taxable year of the Restructuring, and certain other conditions are met, in which case the gain (reduced by any U.S.-source capital losses) will be subject to thirty percent (30%) tax (subject to possible reduction if provided by treaty); or

- the Non-U.S. Holder is subject to the Tax Code provisions applicable to certain former citizens or residents.

Any amounts that are attributable to accrued and unpaid interest on the Debt generally will not be subject to U.S. federal income tax or withholding tax, if the Non-U.S. Holder:

- does not own, actually or constructively, for U.S. federal income tax purposes, ten percent (10%) or more of the total combined voting power of all classes of the voting stock of the Company that is the applicable borrower;

- is not, for U.S. federal income tax purposes, a "controlled foreign corporation" related, directly or indirectly, to the Company through stock ownership under applicable rules of the Code;

- is not a bank receiving interest described in Section 881(c)(3)(A) of the Tax Code; and

- in each case, the certification requirement, as described below, is fulfilled with respect to the beneficial owner of the Debt.

The certification requirement referred to above generally will be fulfilled if the Non-U.S. Holder provides to the Company or its paying agent an IRS Form W-8BEN (or successor form), signed under penalties of perjury, which includes the Non-U.S. Holder's name and address and a certification as to the Non-U.S. Holder's non-U.S. status. Other methods might be available to satisfy the certification requirements described above, depending on a Non-U.S. Holder's particular circumstances.

In general, the gross amount of payments of interest that do not qualify for the exception from withholding described above will be subject to U.S. withholding tax at a rate of thirty percent (30%) unless (A) the Non-U.S. Holder provides a properly completed IRS Form W-8BEN (or successor form) claiming an exemption from or reduction in withholding under an applicable tax treaty, or (B) such interest is effectively connected with the Non-U.S. Holder's conduct of a U.S. trade or business and the Non-U.S. Holder provides a properly completed IRS Form W-8ECI (or successor form).

**Tax Consequences for Non-U.S. Holders of Exchanging Existing Common Stock for New Warrants**

If the Existing Common Stockholders Class votes to accept the Plan, the holders of Existing Common Stock will receive their pro rata shares of the New Warrants and the Existing Common Stock will be cancelled. If the Existing Common Stockholders Class does not vote to accept the plan, the holders of Existing Common Stock will not receive New Warrants, and the Existing Common Stock will be cancelled. The treatment of receipt of the New Warrants by holders of Existing Common Stock for U.S. federal income tax purposes is not entirely clear.

The Company currently intends to take the position that the New Warrants should be treated as issued in exchange for Existing Common Stock. The exchange of the Existing Common Stock for the New Warrants would be treated as a taxable transaction. In such case, a Non-U.S. Holder of Existing Common Stock would generally not

be subject to U.S. federal income tax with respect to any gain, unless the Non-U.S. Holder is an individual who is present in the U.S. for 183 days or more in the taxable year of disposition, and certain other conditions are met; or any such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the U.S. (*see* "*Effectively Connected Income and Loss*").

Alternatively, because the New Warrants are issued only to Holders of Existing Common Stock if the Existing Common Stockholders Class votes to accept the Plan, it is possible that the New Warrants would be treated as a fee paid to such Holders. It is uncertain whether this type of fee income would be U.S. source income or foreign source income, and thus whether such income would be subject to U.S. withholding tax, and, in the absence of such withholding, to U.S. income tax (with associated filing obligations) for the Non-U.S. Holder.

Non-U.S. Holders are advised to consult their tax advisors with respect to this issue.

**Ownership of New Common Stock; Distributions on New Common Stock**

Distributions of cash and property that HMH Holdings makes in respect of New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of its current or accumulated earnings and profits (as determined under U.S. federal income tax principles). Distributions of cash and property that constitute dividends for U.S. federal income tax purposes generally will be subject to U.S. federal withholding at a thirty percent (30%) rate unless a reduced rate is prescribed by an applicable income tax treaty. If the amount of a distribution exceeds HMH Holdings's current and accumulated earnings and profits, such excess first will be treated as a return of capital to the extent of a Non-U.S. Holder's tax basis in the New Common Stock and thereafter will be treated as gain from the disposition of such share of New Common Stock, subject to tax as described below in "*Sale, Exchange or Disposition of New Common Stock*"

In order to obtain a reduced rate of U.S. withholding tax under an applicable income tax treaty, a Non-U.S. Holder will be required to provide a properly executed IRS Form W-8BEN certifying its entitlement to benefits under the treaty. If a Non-U.S. Holder is eligible for a reduced rate of U.S. withholding tax under a treaty, the Non-U.S. Holder may obtain a refund or credit of any excess amounts withheld by filing an appropriate claim for a refund with the IRS. Each Non-U.S. Holder should consult its own tax advisor regarding its possible entitlement to benefits under a treaty.

The U.S. federal withholding tax described above will not apply to dividends paid to a Non-U.S. Holder if such dividends represent U.S. trade or business income for the Non-U.S. Holder and the Non-U.S. Holder provides a properly executed IRS Form W-8ECI certifying that the dividends are effectively connected with the Non-U.S. Holder's conduct of a trade or business within the U.S., as the dividends will be subject to tax as described below under "*Effectively Connected Income and Loss.*"

**Effectively Connected Income and Loss**

If a Non-U.S. Holder is engaged in a trade or business in the U.S. and if dividends received in respect of New Common Stock, or gain or loss realized on the disposition of a share of New Common Stock or New Warrants are "effectively connected" with the conduct of such U.S. trade or business, any such interest, dividends, gain or loss realized by a Non-U.S. Holder will be subject to full net-basis U.S. federal income tax in the same manner as if the Non-U.S. Holder were a U.S. Holder, unless an applicable income tax treaty provides otherwise. In addition, if the Non-U.S. Holder is a foreign corporation, the Non-U.S. Holder may also be subject to a "branch profits tax" on earnings and profits effectively connected with such U.S. trade or business (subject to certain adjustments) at a rate of thirty percent (30%), unless the branch profits tax is reduced or eliminated by an applicable income tax treaty. Even though any such effectively connected income would be subject to income tax, and might also be subject to branch profits tax, it would not be subject to withholding tax if the Non-U.S. Holder satisfied the applicable certification requirements described above. Non-U.S. Holders should discuss the applicability of the "effectively connected" rules with their tax advisors.

**Sale, Exchange or Disposition of New Common Stock and New Warrants**

Subject to the discussion below concerning backup withholding, if a Non-U.S. Holder owns New Common Stock or New Warrants, the Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain or loss realized on the sale, exchange or other taxable disposition of such New Common Stock or New Warrant, unless:

- the Non-U.S. Holder is an individual who is present in the U.S. for 183 days or more in the taxable year of disposition, and certain other conditions are met; or

- such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the U.S. (see "*Effectively Connected Income and Loss*").

**Information Reporting and Backup Withholding**

Unless certain exceptions apply, the Company must report annually to the IRS and to each Non-U.S. Holder any interest paid during the taxable year, as well as the amount of any dividends paid to the Non-U.S. Holder (whether such dividend income is subject to U.S. withholding tax or is exempt from such tax pursuant to an income tax treaty). Copies of these information returns may also be made available under the provisions of a specific treaty or other agreement to the tax authorities of the country in which a Non-U.S. Holder resides.

Under current U.S. federal income tax law, backup withholding tax will not apply to payments of dividends or interest by the Company or its paying agent if the Non-U.S. Holder provides a properly executed IRS Form W-8BEN (or successor form), or otherwise establishes its eligibility for an exemption, provided that the Company or its paying agent, as the case may be, does not have actual knowledge or reason to know that the payee Non-U.S. Holder is a U.S. person.

Backup withholding is not an additional tax. Any amounts withheld from a payment to a Non-U.S. Holder under the backup withholding rules will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle the holder to a refund, provided that the holder furnishes the required information to the IRS. A Non-U.S. Holder should consult its tax advisor regarding the application of information reporting and backup withholding in such holder's particular situation, the availability of an exemption from backup withholding and the procedure for obtaining such an exemption, if available.

**FATCA**

Under the Foreign Account Tax Compliance Act (or "FATCA"), which was enacted in 2010, foreign financial institutions and certain other foreign entities must comply with information reporting rules with respect to their U.S. account holders and investors or confront a withholding tax on U.S. source payments made to them (whether received as a beneficial owner or as an intermediary for another party). More specifically, a foreign financial institution or other foreign entity that does not comply with the FATCA reporting requirements will generally be subject to a 30% withholding tax with respect to any "withholdable payments." For this purpose, withholdable payments are generally U.S.-source payments otherwise subject to nonresident withholding tax and also include the entire gross proceeds from the sale of any equity or debt instruments of U.S. issuers (which would include the New Common Stock). The FATCA withholding tax will apply even if the payment would otherwise not be subject to U.S. nonresident withholding tax (e.g., because it is capital gain treated as foreign source income under the Code). Recently released Proposed Treasury Regulations implementing FATCA defer this withholding obligation until January 1, 2014 for payments of dividends on U.S. common stock and until January 1, 2015 for gross proceeds from dispositions of U.S. common stock. FATCA withholding will not apply to withholdable payments made directly to foreign governments, international organizations, foreign central banks of issue and individuals, and Treasury is authorized to provide additional exceptions.

Non-U.S. Holders are urged to consult with their own tax advisors regarding the effect, if any, of the FATCA provisions to them based on their ownership of New Common Stock and their particular circumstances.

## APPLICABLE SECURITIES LAWS

We intend to issue New Common Stock and the New Warrants pursuant to the Plan. We believe that, subject to certain exceptions described below, various provisions of the Securities Act, the Bankruptcy Code, and state securities laws exempt from federal and state securities registration requirements (a) the offer and the sale of securities pursuant to the Plan and (b) subsequent transfers of such securities.

### Offer and Sale of New Securities: Bankruptcy Code Exemption

This solicitation is being made only to those Senior Creditors and Existing Common Stockholders who are accredited investors as defined in Regulation D of the Securities Act.  The Debtors are relying on Section 4(2) of the Securities Act and similar "blue sky" law provisions in connection with the solicitation of votes on the Plan.

Pursuant to the Plan, Senior Creditors will receive shares of New Common Stock and Existing Common Stockholders will receive the New Warrants (if issued). Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (1) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (2) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor or such affiliate; and (3) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or such affiliate, or "principally" in such exchange and "partly" for cash or property.  In reliance upon this exemption, the Debtors believe that the offer and sale, under the Plan, of the New Common Stock and the New Warrants (if issued) will be exempt from registration under the Securities Act and state securities laws with respect to any Senior Creditor or Existing Common Stockholder who is not deemed to be an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

In addition, the Debtors will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption. Accordingly, such securities generally may be resold without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by Section 4(1) of the Securities Act, unless the holder is an "underwriter" (see discussion below) with respect to such securities, as that term is defined under the Bankruptcy Code. In addition, such securities generally may be resold without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states. However, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirement or conditions to such availability.

### Subsequent Transfers of New Securities

Section 1145(b) of the Bankruptcy Code defines the term "underwriter" for purposes of the Securities Act as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (1) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest; (2) offers to sell securities offered or sold under a plan for the holders of such securities; (3) offers to buy securities offered or sold under the plan from the holders of such securities, if the offer to buy is: (a) with a view to distribution of such securities and (b) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (4) is an "issuer" with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

The term "issuer" is defined in Section 2(a)(4) of the Securities Act;  however, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to Section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor (or its successor) under a plan of reorganization may be deemed to be a "control person," particularly if such management position is coupled with the ownership of a

65

significant percentage of the debtor's (or successor's) voting securities. Ownership of a significant amount of voting securities of a reorganized debtor could also result in a person being considered to be a "control person."

To the extent that persons deemed to be "underwriters" receive New Common Stock or New Warrants pursuant to the Plan, resales by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such persons would not be permitted to resell such New Common Stock or the New Warrants, unless such securities were registered under the Securities Act or an exemption from such registration requirements were available. Entities deemed to be statutory underwriters for purposes of section 1145 of the Bankruptcy Code may, however, be able, at a future time and under certain conditions, to sell securities without registration pursuant to the resale provisions of Rule 144 under the Securities Act or another available exemption under the Securities Act.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Common Stock or the New Warrants to be issued pursuant to the Plan, or an "affiliate" of HMH Holdings, would depend upon various facts and circumstances applicable to that person.  Accordingly, we express no view as to whether any such person would be such an "underwriter" or "affiliate." PERSONS WHO RECEIVE NEW COMMON STOCK AND/OR THE NEW WARRANTS UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE NEW COMMON STOCK, THE NEW WARRANTS OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, THE DEBTORS ENCOURAGE EACH SENIOR CREDITOR, EXISTING COMMON STOCKHOLDER AND PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISOR WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE NEW COMMON STOCK OR THE NEW WARRANTS.

**PROCEDURES FOR VOTING**

---

**SOLICITATION OF ACCEPTANCES OF THE PREPACKAGED PLAN FOR THE FIRST LIEN BANK LENDERS WILL EXPIRE AT 5:00 P.M., NEW YORK CITY TIME, ON MAY 18, 2012, AND AT 5:00 P.M., NEW YORK CITY TIME, ON JUNE 11, 2012 FOR THE BONDHOLDERS AND THE EXISTING COMMON STOCKHOLDERS UNLESS EXTENDED BY THE DEBTORS, WITH THE CONSENT OF THE REQUISITE PARTICIPATING LENDERS.  SENIOR CREDITORS AND EXISTING COMMON STOCKHOLDERS SHOULD REFER TO THE BALLOTS RECEIVED WITH THIS DISCLOSURE STATEMENT FOR INSTRUCTIONS ON HOW TO TENDER AND VOTE ON THE PLAN.**

---

**Notice to Senior Creditors and Existing Common Stockholders**

This Disclosure Statement is being transmitted to Senior Creditors and Existing Common Stockholders, which are the only holders of Claims or Equity Interests entitled to vote on the Plan.  All other creditors or interest holders of the Debtors will either be paid in full under the Restructuring and their claims or interests unimpaired or their interests will be Impaired and they are deemed to reject the Plan.  Therefore, unless you are a Senior Creditor or Existing Common Stockholder, you do not need to take any action hereunder.  The purpose of this Disclosure Statement is to provide adequate information to enable Senior Creditors and Existing Common Stockholders to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or reject the Plan.  Any capitalized terms used in this section and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

ALL SENIOR CREDITORS AND EXISTING COMMON STOCKHOLDERS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR TO REJECT THE  PLAN.  This Disclosure Statement contains important information about the Plan and considerations pertinent to acceptance or rejection of the Plan.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS.  Except with respect to the Projections and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement.  The Debtors do not intend to update the Projections; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections.  Further, the Debtors do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences.  Accordingly, the delivery of this Disclosure Statement will not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY AN INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

**Solicitation Package**

In soliciting votes for the Plan pursuant to this Disclosure Statement from the Senior Creditors and the Existing Common Stockholders, the Debtors are also sending copies of the Plan and a ballot (a "Ballot") (together with the Disclosure Statement, the "Solicitation Package") to such holders.

**Voting Procedures and Ballots and Voting Deadline**

The "Voting Record Date" for purposes of determining claimants and interest holders that are eligible to vote on the Plan is May 10, 2012 at 5:00 p.m., New York City time.

There are two different voting options for Senior Creditors and Existing Common Stockholders in connection with the Plan, which are outlined in greater detail below. Each Ballot was designed to assist Senior Creditors and Existing Common Stockholders to understand the voting process. Senior Creditors and Existing Common Stockholders should return the Ballot to the Voting Agent or to their Voting Nominee, as appropriate, to cast their vote.

Senior Creditors and Existing Common Stockholders have two voting options in connection with the Plan, as follows:

OPTION (1).        Vote to ACCEPT the Plan.

OPTION (2).        Vote to REJECT the Plan.

Senior Creditors and Existing Common Stockholders that vote to reject the Plan, take no action, or fail to provide or timely cast their Class 3 Ballot or Class 8 Ballot, respectively, may nevertheless be bound by the terms of the Plan and have the relevant treatment applied to their Claim or Equity Interest if the Plan is consummated. You must check the box on your Ballot to opt-out of the releases granted under the Plan. If Class 8 (Existing Common Stock) votes to reject the Plan, Existing Common Stockholders will receive no distributions under the Plan.

Selection of OPTION (1) on the Class 3 Ballot by a First Lien Bank Lender will be deemed a direction (evidenced by the Class 3 Ballot), effective upon the Petition Date, to the First Lien Administrative Agent and the First Lien Collateral Agent to forbear from exercising all rights and remedies with respect to defaults under the First Lien Credit Facility, including, but not limited to, rights and remedies exercisable in respect of guarantees by non-Debtor affiliates and against Collateral. Selection of OPTION (1) on the Class 3 Ballot by a Bondholder shall constitute an agreement (evidenced by the Class 3 Ballot), effective upon the Petition Date, by such Bondholder to forbear from exercising all rights and remedies with respect to defaults under the 10.5% Notes Indenture, including, but not limited to, rights and remedies exercisable in respect of guarantees by non-Debtor affiliates and against Collateral.

In addition to the voting options set forth above, the Senior Creditors and Existing Common Stockholders must identify themselves as an accredited investor as defined in Regulation D under the Securities Act.

**Parties in Interest Entitled to Vote on the Plan**

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a Plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events related to bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a Plan if (i) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (ii) the claim or interest is impaired by the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan. Claims in Classes 1, 2, 4, 5, 6, and 7 are unimpaired under the Plan, and holders of such Claims are therefore not entitled to vote. Claims in Class 3 and Existing Common Stock in Class 8 are Impaired under the Plan, and holders of such Claims and Equity Interests are therefore entitled to vote. Equity Interests in Class 9 are Impaired under the Plan, are deemed to reject the Plan and, therefore, are not entitled to vote to accept or reject the Plan. Accordingly, only holders of Claims in Class 3 and holders of Existing Common Stock in Class 8 are entitled to vote on the Plan.

68

By executing a Ballot, each Senior Creditor or Existing Common Stockholder will be confirming that (i) it is the holder of a Senior Creditor Claim or Existing Common Stock to which the Ballot pertains or is an authorized signatory and has full power and authority to vote to accept or reject the Plan; (ii) it has been provided with a copy of the Plan and the Disclosure Statement, and acknowledges that the votes set forth on the Ballot are subject to all of the terms and conditions set forth in the Plan and the Disclosure Statement; (iii) it has not submitted any other Ballots relating to the Senior Creditor Claim or Existing Common Stock that are inconsistent with the votes set forth in the Ballot or if such other Ballots were previously submitted, they have been revoked or changed to reflect the votes set forth in the new Ballot; and (iv) with respect to each Senior Creditor, such holder is an Accredited Investor, as the term is defined in Regulation D of the Securities Act; provided, however, the failure to return such certification will not affect such holders' right to receive a distribution under the Plan; and (v) either (a) the Ballot is the only Ballot submitted for the Senior Creditor Claim or Existing Common Stock or (b) in addition to the Ballot, one or more Ballots for the Senior Creditor Claim or Existing Common Stock have been submitted as indicated on the Ballot.

By executing a Ballot each Senior Creditor also acknowledges that the interests being offered pursuant to the Plan are not being offered pursuant to a registration statement filed with the Securities and Exchange Commission and represents that any such securities will be acquired for its own account solely for investment, not as agent or nominee, and not with a view to, or for resale in connection with, any distribution of, or with any present intention of distributing or selling in connection with any distribution, all or any portion thereof within the meaning of the Exchange Act.

**Voting Instructions Specific to Bondholders**

If you are a Bondholder, you must deliver your Ballot to your broker, bank, dealer, agent, or other nominee (each of the foregoing, a "Nominee"). Please return your Ballot to your Nominee in order to allow for sufficient time to permit your Nominee to deliver a master ballot (the "Master Ballot") including your vote to the Voting Agent by June 11, 2012 (the "Voting Deadline").

Prior to the Solicitation Mailing Date, the Voting Agent will determine the identity of those registered record owners and intermediary record owners (collectively, "Record Owners") holding 10.5% Notes on behalf of Bondholders as of the applicable Voting Record Date utilizing security positions reports provided by the Depository Trust Company ("DTC") and will distribute an appropriate number of Solicitation Packages to such Record Owners to allow them to forward one to each applicable Bondholder. Intermediate Record Owners will distribute Solicitation Packages to the respective Bondholders within five (5) days of receiving Solicitation Packages.

**Withdrawal of Ballots; Revocation**

A notice of withdrawal, to be valid, must (i) contain the description of the Claim(s) or Equity Interest(s) to which it relates and the aggregate principal amount represented by such Claim(s) or Equity Interest(s), (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) or Equity Interest(s) and possesses the right to withdraw the vote sought to be withdrawn and (iv) be received by the Voting Agent in a timely manner at the address set forth on the Ballot. The Debtors will determine whether any withdrawals of Ballots are valid and expressly reserve the absolute right to contest the validity of any such withdrawals of Ballots. Unless otherwise directed by the Court, a purported notice of withdrawal of a Ballot which is not received in a timely manner by the Debtors will not be effective to withdraw a timely cast Ballot.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot or Master Ballot may revoke such Ballot or Master Ballot and change his or its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot or Master Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot or Master Ballot is received, only the Ballot or Master Ballot which bears the latest date of receipt by the Voting Agent will be counted for purposes of determining whether the requisite acceptances have been received. In the case where more than one timely, properly completed Master Ballot is received, provided that the underlying beneficial accounts on such Master Ballots are determined to not be duplicative, each such Master Ballot will be counted.

**Voting Agent and Financial Advisor**

In connection with the Plan, the Debtors intend to retain KCC to act as Voting Agent and Blackstone, as financial advisor (together the "Agents"), each of which will receive customary fees for their services. The Debtors have agreed to reimburse each of the Agents' respective out-of-pocket expenses and to indemnify each Agent against certain liabilities, including liabilities under federal securities laws and to contribute to payments that such Agent may be required to make in respect thereof. No fees or commissions have been or will be paid by the Debtors to any broker, dealer or other person, other than the Agents, in connection with the solicitation of acceptances of the Plan.

Questions and requests for assistance or additional copies of this Disclosure Statement or the related Ballot may be directed to the Voting Agent at (877) 833-4150.

Ballots and all correspondence in connection with the Plan should be sent or delivered to the Voting Agent in accordance with the instructions contained in the Ballot. Any Senior Creditor or Existing Common Stockholder that has questions concerning the Plan should contact the Voting Agent at (877) 833-4150.

None of the Agents assumes any responsibility for the accuracy or completeness of the information concerning the Debtors contained or incorporated by reference in this Disclosure Statement or for any failure by the Debtors to disclose events that may have occurred and may affect the significance or accuracy of such information.

**Further Information; Additional Copies**

If you have any questions or require further information about the voting procedure for voting your Claim or Equity Interest or about the packet of material you received, please contact the Voting Agent, whose contact information is set forth above and on the Ballot. If you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any exhibits or appendices to such documents, please contact the Voting Agent.

# RISK FACTORS

*The restructuring transactions involve a high degree of risk and uncertainty.  You should carefully consider the risks and uncertainties described below as well as the other information appearing elsewhere in this Disclosure Statement before making a decision whether to vote to accept the Plan.*

## Risks Related to Failure to Consummate the Restructuring Plan

***If the Plan is not accepted by the requisite number of creditors for its approval, the Debtors will likely need to seek relief under the Bankruptcy Code without the benefit of a pre-negotiated Plan.***

If the Debtors do not consummate the Plan, they will likely need to seek relief under the Bankruptcy Code without the benefit of a pre-negotiated Plan.

The Debtors believe that seeking relief under the Bankruptcy Code other than in connection with the pre-packaged Plan could materially adversely affect the relationships between the Debtors and their existing and potential customers, employees, partners and other stakeholders.  For example:

- such a filing may substantially erode our customers' confidence and that as a result there could be a significant and precipitous decline in our global revenues, profitability and cash flow;

- employees could be distracted from performance of their duties, or more easily attracted to other career opportunities;

- it may be more difficult to attract or replace key employees;

- lenders and other partners could seek to terminate their relationships with the Debtors, require financial assurances or enhanced returns, or refuse to provide credit on the same terms as prior to the reorganization case under chapter 11 of the Bankruptcy Code or at all;

- lenders to subsidiaries that are not subject to the bankruptcy proceedings could, in certain cases, terminate financing agreements, accelerate amounts due thereunder or otherwise claim an event of default has occurred thereunder;

- the Debtors could be forced to operate in bankruptcy for an extended period of time while they try to develop a reorganization plan that could be confirmed;

- certain of the Debtors' Foreign Affiliates may be required to seek bankruptcy or similar relief under proceedings outside the United States, which would adversely affect their businesses;

- If the Debtors were unable to obtain debtor in possession financing during the Chapter 11 Cases, the Debtors may need to consider liquidation under chapter 7 of the Bankruptcy Code;

- if the Debtors were not able to confirm and implement a Plan, the Debtors may be forced to liquidate under chapter 7 of the Bankruptcy Code; and

- any distributions that you may receive under a liquidation or under a protracted reorganization case or cases under chapter 11 of the Bankruptcy Code would likely be substantially delayed and the value of any potential recovery likely would be adversely impacted by such delay.

## Risks Related to the Chapter 11 Cases and the Plan

*The commencement of a chapter 11 case for the purpose of implementing the Plan may result in a number of adverse consequences.*

71

***The Chapter 11 environment may adversely affect our business.***

The filing of chapter 11 petitions by the Debtors, and the publicity attendant thereto, may adversely affect the Debtors' business.  The Debtors believe that any such adverse effects may worsen during the pendency of protracted chapter 11 cases if the Plan is not confirmed as expected.

Some state and local procurement laws and guidelines require the school district or department of education to award contracts only to financially "responsible" bidders.  Accordingly, the Debtors' state and local government customers may take into account a chapter 11 petition in determining the Debtors' financial responsibility, which may in turn impact not only the award of new contracts but potentially also renewals or extensions of existing contracts.  Furthermore, many jurisdictions specifically require a vendor to disclose a bankruptcy filing for several years after such filing is made.  Such disclosure may affect customer decisions regarding the future award of contracts.  While certain anti-discrimination provisions of the Bankruptcy Code protect government vendors against discrimination solely on the basis of having sought bankruptcy protection, it is unclear if such provisions can be successfully used to protect future business.

***The Restructuring Plan, which contemplates transactions that will modify our debt and equity structure is based in large part upon assumptions and analyses developed by us regarding our business, the economic environment and other factors.  If these assumptions and analyses prove to be incorrect, our plan may be unsuccessful in its execution.***

The Restructuring Plan, which constitutes transactions that will affect both our debt and equity structure, is based upon assumptions and analyses based on our experience and perception of historical trends, current conditions and expected future developments, as well as other factors that we consider appropriate under the circumstances.  Whether actual future results and developments will be consistent with our expectations and assumptions depends on a number of factors, including but not limited to (i) our ability to obtain adequate liquidity and financing sources and establish an appropriate level of debt, including our ability to implement the Restructuring Plan; (ii) our ability to maintain customers' confidence in our viability as a continuing entity and to attract and retain sufficient customers; (iii) our ability to retain key employees in those businesses that we intend to continue to emphasize, and (iv) the overall strength and stability of general economic conditions of the financial industry, both in the United States and in global markets.  The failure of any of these factors could materially adversely affect the successful execution of the restructuring of our businesses.

In addition, the Restructuring Plan relies upon financial forecasts, including with respect to revenue growth, improved earnings before interest, taxes, depreciation and amortization, improved interest margins, and growth in cash flow.  Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate.  In our case, the forecasts are even more speculative than normal, because they involve fundamental changes in the nature of our business.  Accordingly, we expect that our actual financial condition and results of operations will differ, perhaps materially, from what we have anticipated.  Consequently, there can be no assurance that the results or developments contemplated by the Restructuring Plan will occur or, even if they do occur, that they will have the anticipated effects on us and our subsidiaries or our businesses or operations.  The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of the transactions contemplated by the Restructuring Plan.

***Failure to Satisfy Vote Requirement.***

In the event that sufficient votes are not received in favor of the Plan, the Debtors may or may not file petitions for relief under chapter 11 or chapter 7 of the Bankruptcy Code.  In such event, the Debtors may seek to accomplish an alternative restructuring of their capitalization and their obligations to creditors.

***Non-Confirmation or Delay of Confirmation of the Plan.***

The Court, which sits as a court of equity, may exercise substantial discretion.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of the Plan

not be followed by a need for further financial reorganization and that the value of distributions to dissenting creditors and shareholders not be less than the value of distributions such creditors and shareholders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Court would reach the same conclusion.

### Risk of Non-Occurrence or Delay of the Effective Date.

Although the Debtors believe that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to such timing or as to whether it will occur.

### Classification and Treatment of Claims and Equity Interests.

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Equity Interests in, the Debtors.  The Bankruptcy Code also provides that the Plan may place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests of such Class.  If it is determined that the Plan has not appropriately classified Claims and Equity Interests, any required reclassification could require the Debtors to resolicit acceptances, and, in that event, confirmation of the Plan could be delayed and possibly jeopardized.

### If the Court determines that our solicitation of votes did not comply with the requirements of the Bankruptcy Code, we may need to resolicit acceptances which would delay confirmation of the Plan.

Section 1126(b) of the Bankruptcy Code provides that the holder of a claim against, or interest in, a debtor who accepts or rejects a plan before the commencement of a chapter 11 case is deemed to have accepted or rejected such plan under the Bankruptcy Code so long as the solicitation of such acceptance was made in compliance with applicable nonbankruptcy law governing the adequacy of disclosure in connection with such solicitations, or, if such laws do not exist, such acceptance was solicited after disclosure of "adequate information," as defined in section 1125 of the Bankruptcy Code.

In addition, Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures.

The Debtors believe that the solicitation of votes to accept or reject the Plan from holders of Claims in Class 3 and the holders of Equity Interests in Class 8 is proper under applicable nonbankruptcy law, rules, and regulations, and contains adequate information as defined by section 1125(a) of the Bankruptcy Code.  The Debtors also believe that they are not required to solicit any other Class under the Bankruptcy Code or applicable nonbankruptcy law, rules, or regulations.  The Debtors cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Court.  There is also a risk that confirmation of the Plan could be denied by the Court.

The Debtors believe that the use of the Disclosure Statement and Ballots for the purpose of obtaining acceptances of the Plan and the solicitation complies with the Bankruptcy Code.  The Court may decide, however, that the solicitation failed to meet the requirements of section 1126(b) of the Bankruptcy Code.  If the Court determines that the solicitation did not comply with the requirements of section 1126(b) of the Bankruptcy Code, the Debtors may seek to resolicit acceptances, and, in that event, confirmation of the Plan could be delayed and possibly jeopardized.

### The Restructuring will be a Taxable Transaction for Holders of Senior Creditor Claims, and Holders of Senior Creditor Claims may not receive Cash in the Transactions in an amount sufficient to pay taxes.

As described in more detail in "Certain U.S. Federal Income Tax Considerations" above, the Restructuring transactions will be taxable to holders of Senior Creditor Claims who receive New Common Stock and Cash.  Whether the transaction will result in taxable gain or loss will depend on a holder's tax basis in the Senior Creditor Claims.  Holders that recognize taxable gain will receive Cash in the transaction, but the amount of such Cash may

not be sufficient to pay all taxes attributable to taxable gain on the transaction, and therefore, holders may need cash from other sources to pay any tax attributable to such gain.  Holders are urged to consult their own tax advisors with respect to these and other consequences of the Plan in light of their particular circumstances.

***Existing Common Stockholders that are Non-U.S. Holders that receive New Warrants may be required to file U.S. tax returns as a result of receiving the New Warrants.***

The treatment of the receipt of New Warrants is not entirely clear. If the receipt of the New Warrants is treated as a fee, Non-U.S. Holders may be required to file tax returns with respect to, and be subject to US federal income tax on, the fee.  Non-U.S. Holders of Existing Common Stock are urged to speak with their own tax advisors.  See "*Certain U.S. Federal Income Tax Considerations - U.S. Federal Income Tax Considerations for Non-U.S. Holders - U.S. Federal Income Tax Considerations for Non-U.S. Holders*" for more information.

***The Restructuring is expected to be a Taxable Transaction Existing Common Stockholders, and Existing Common Stockholders will not receive Cash in the Transactions.***

As described in more detail in "Certain U.S. Federal Income Tax Considerations" above, the Restructuring transactions are expected to be taxable to holders of Existing Common Stock who receive New Warrants.  Whether the transaction will result in taxable gain or loss will depend on a holder's tax basis in the Existing Common Stock. Holders that recognize taxable gain will not receive Cash in the transaction and may need Cash from other sources to pay any tax attributable to taxable gain on the transaction.  Holders are urged to consult their own tax advisors with respect to these and other consequences of the Plan in light of their particular circumstances.

### Risks Related to the Capital Stock of Reorganized HMH Holdings

***There can be no assurance as to the liquidity of the trading market for the New Common Stock or the New Warrants or that a trading market for such securities will develop.***

There is currently no public market through which the New Common Stock or the New Warrants offered hereby may be sold and we do not intend to immediately apply for the listing of such securities on any securities exchange.  This may negatively affect the value and the pricing of the New Common Stock and the New Warrants in the secondary market, the transparency and availability of trading prices, and the liquidity of such securities.  As a result, holders of such securities may be unable to resell such securities at an acceptable price or at all.  In addition, pursuant to the Amended and Restated Articles of Incorporation of HMH Holdings, in certain cases, the HMH Holdings Board of Directors may institute trading restrictions with respect to the New Common Stock to protect certain tax assets of the Companies, which could also affect the liquidity, transparency, and trading prices of the New Common Stock.

### Risks Related to Liquidity and Capital

***Even if we successfully consummate the Plan, inadequate liquidity could materially adversely affect our future business operations.***

Even if the Plan is consummated successfully, we may require additional funding during the remainder of 2012 and beyond to manage and operate our businesses.  Given the current business environment, our liquidity needs could be significantly higher than we currently anticipate.  Our ability to maintain adequate liquidity through 2012 and beyond will depend on entering into a new credit facility, successfully consummating the Plan, successfully operating our business, continuing to curtail operating expenses and capital spending, and, potentially, completing various asset sales.  Our forecasted liquidity needs are highly sensitive to changes in each of these and other factors.

Even if we successfully consummate the Plan, implement our business restructuring strategy, obtain sufficient financing from third party sources to continue operations, and successfully operate our business, we may be required to execute asset sales or other capital generating actions over and above our normal finance activities and cut back or eliminate programs that are important to the future success of our business.  In addition, our customers and counterparties might respond to further weakening of our liquidity position by requesting quicker payment, requiring

additional collateral and increasing draws on our outstanding commitments. If this were to happen, our need for cash would be intensified and we may be unable to operate our business successfully.

***Even if we successfully consummate the Plan, the Reorganized Debtors will continue to face risks beyond their control.***

Even if the Plan is consummated, the Reorganized Debtors will continue to face a number of risks, including certain risks that are beyond their control, including changes in economic conditions, changes in the industry, legislative changes, changes in consumer demand for, and acceptance of, products produced by Houghton Mifflin Harcourt, inflation and other costs and purchase obligations. As a result of these risks and others, there is no certainty that the Restructuring will achieve Houghton Mifflin Harcourt's stated goals.

***We may be adversely affected by significant changes in interest rates.***

The Reorganized Debtors' new financing indebtedness, including borrowings under a revolver, bears interest at variable rates. If market interest rates increase, variable-rate debt will create higher debt service requirements, which could adversely affect our cash flow. While we may enter into agreements limiting exposure to higher interest rates, these agreements may not offer complete protection from this risk.

***We are subject to contingent liabilities that may affect liquidity and our ability to meet our obligations.***

In the ordinary course of business, we issue performance-related surety bonds and letters of credit posted as security for our operating activities, some of which obligate us to make payments if we fail to perform under certain contracts in connection with the sale of instructional materials and assessment tests. The surety bonds are partially backstopped by letters of credit. As of December 31, 2011, our contingent liability for all letters of credit was approximately $26.2 million, of which $6.4 million were issued to backstop $11.6 million of surety bonds. The gross amount of letters of credit is 100% cash collateralized. As a result, letters of credit reduce operating cash, which could affect liquidity and, therefore, our ability to meet our obligations. We may increase the number and amount of contracts that require the use of letters of credit, which may further restrict liquidity and, therefore, our ability to meet our obligations in the future. Furthermore, there is a risk that surety providers may require that letters of credit be issued to backstop a higher percentage of any new performance bonds.

**Risks Related to Our Business**

The following factors affect our business and the industry in which we operate. The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties not presently known or that we currently consider immaterial may also have an adverse effect on our business. If any of the matters discussed in the following risk factors were to occur, our business, financial position, results of operations, cash flows, or prospects could be materially adversely affected.

***Our U.S. educational comprehensive curriculum, supplemental and assessment businesses may be adversely affected by changes in state and local educational funding resulting from either general economic conditions, changes in government educational funding, programs and legislation (both at the federal and state level), and/or changes in the state procurement process.***

The results and growth of our U.S. educational comprehensive curriculum, supplemental and assessment businesses are dependent on the level of federal and state educational funding, which in turn is dependent on the robustness of state finances and the level of funding allocated to educational programs. State, local and municipal finances have been adversely affected by the U.S. recession and continuing economic weakness as well as the increasing costs and financial liabilities from under-funded public pension plans. In response to budget shortfalls, states and districts may reduce educational spending as they seek cost savings to mitigate budget deficits. Most public school districts, the primary customers for K-12 products and services, are largely dependent on state and local funding to purchase materials. In school districts in states that primarily rely on local tax proceeds, significant reductions in those proceeds for any reason can severely restrict district purchases of instructional materials. In

districts and states that primarily rely on state funding for instructional materials, a reduction in state funds or loosening of restrictions on the use of those funds may reduce net sales.

Federal and/or state legislative changes can also affect the funding available for educational expenditure, which include the impact of education reform such as the reauthorization of the Elementary and Secondary Education Act ("ESEA"), the implementation of Common Core State Standards, and Race to the Top funding. Existing programs and funding streams could be changed or eliminated in connection with legislation to reauthorize the ESEA and/or the federal appropriations process, in ways that could negatively affect demand and sources of funding for our products and services. Similarly, changes in the state procurement process for textbooks, supplemental material and student tests, particularly in adoption states, can also affect our markets and sales. For example, changes in curricula, delays in the timing of the adoptions of use adoption funds and changes in student testing requirements can all affect these programs and therefore the size of our market in any given year. The transition to Common Core State Standards in many states could delay or otherwise affect purchases of curriculum materials and other products.

There are multiple competing demands for educational funds and there is no guarantee that states will fund the purchase of new textbooks or testing programs, or that we will win this business.

***A significant portion of net sales is derived from sales of K-12 instructional materials pursuant to cyclical adoption schedules, and if we are unable to maintain residual sales and continue to generate new business, net sales could be materially and adversely affected.***

Due to the revolving and staggered nature of state adoption schedules, sales of K-12 instructional materials have traditionally been cyclical, with some years offering more sales opportunities than others. Furthermore, we cannot make assurances that states that have adopted our programs, or that schools and school districts that have purchased our products and services, will do so again in the future. A significant portion of net sales is dependent upon our ability to maintain residual sales and to continue to generate new business. For example, from 2012 through 2016, adoptions are scheduled or will be implemented in the primary subjects of reading, language arts and literature, social studies, science and mathematics in, among others, the states of Texas and Florida, two of the largest adoption states. The inability to succeed in these two states, or reductions in their anticipated funding levels, could materially and adversely affect net sales for subsequent years. Texas recently enacted legislation (SB 6) allowing districts flexibility to use State funds previously dedicated exclusively to the purchase of instructional materials for things such as technology hardware and training, which could adversely affect district expenditures on state-adopted instructional materials in the future.

***Our operating results fluctuate on a seasonal and quarterly basis and in the event we do not generate sufficient net sales in the third quarter, we may not be able to generate sufficient income to support operating needs.***

Our business is seasonal. For the year ended December 31, 2011, we derived approximately 90% of net sales from educational publishing in the Education business. For sales of educational products, purchases typically are made primarily in the second and third quarters of the calendar year, in preparation for the beginning of the school year, though testing net sales are primarily generated in the second and fourth quarters. We typically realize a significant portion of net sales during the third quarter, making third-quarter results material to full-year performance. For example, we realized approximately 44.4% of our net sales for the year ended December 31, 2011 in the third quarter. This sales seasonality affects operating cash flow from quarter to quarter. We normally incur a net cash deficit from all of our activities through the middle of the third quarter of the year. We cannot make assurances that our third quarter net sales will continue to be sufficient to meet our obligations or that they will be higher than net sales for our other quarters. In the event we do not derive sufficient net sales in the third quarter, we may not be able to generate sufficient income to support our capital and operating needs.

***The presence and development of open-sourced content could continue to increase as foundations and other parties fund development of educational content to be offered to schools and the public at no cost, which could adversely affect our revenue.***

In recent years there have been initiatives by non-profit organizations such as the Gates Foundation, the Hewlett Foundation and the General Electric Foundation to develop educational content that can be "open sourced" and made available to educational institutions for free or nominal cost. To the extent that such open sourced content is

developed and made available to educational customers and is competitive with our instructional materials, our sales opportunities and net sales could be adversely affected.

***We operate in a highly competitive environment that is subject to rapid change and we must continue to invest and adapt to remain competitive.***

Our businesses operate in highly competitive markets.  These markets continue to change in response to technological innovations and other factors.  Profitability is affected by developments in our markets beyond our control, including: changing U.S. federal and state standards for educational materials; rising development costs due to customers' requirements for more customized instructional materials, instructional platforms, and assessment programs; changes in prevailing educational and testing methods and philosophies; higher technology costs due to the trend toward delivering more educational content in both traditional print and electronic formats; market acceptance of new technology products, including online or computer-based testing; an increase in the amount of materials given away in the K-12 markets as part of a bundled pack; the impact of the expected increase in turnover of K-12 teachers and instructors on the market acceptance of our products; customer consolidation in the retail and wholesale book market and the increased dependence on fewer but stronger customers; rising advances for popular authors and market pressures to maintain competitive retail pricing; a material increase in product returns or in certain costs such as paper; and overall uncertain economic issues that affect all markets.

We cannot predict with certainty the changes that may occur and the effect of those changes on the competitiveness of our businesses, and the acceleration of any of these developments may materially and adversely affect our profitability.

The means of delivering our products may be subject to rapid technological change.  Although we have undertaken several initiatives and invested significant amounts of capital to adapt to and benefit from these changes, we cannot predict whether technological innovations will, in the future, make some of our products, particularly those printed in traditional formats, wholly or partially obsolete.  If this were to occur, we might be required to invest significant resources to further adapt to the changing competitive environment.  In addition, we cannot predict whether end customers will have sufficient funding to purchase the equipment needed to use our new technology products.

In order to maintain a competitive position, we must continue to invest in new offerings and new ways to deliver our products and services.  These investments may not be profitable or may be less profitable than what we have experienced historically.  If we do not adapt quickly to technology driven changes, we could experience threats to our existing businesses from the rise of competitors who can adapt rapidly and who increasingly are non-traditional competitors such as technology providers.

***Our ability to enforce our intellectual property and proprietary rights may be limited, which may harm our competitive position and materially and adversely affect our business and results of operations.***

Our products are largely comprised of intellectual property content delivered through a variety of media, including books and digital and web-based media.  We rely on copyright, trademark and other intellectual property laws to establish and protect our proprietary rights in these products.  However, we cannot make assurances that our proprietary rights will not be challenged, invalidated or circumvented.  We conduct business in other countries where the extent of effective legal protection for intellectual property rights is uncertain, and this uncertainty could affect future growth.  Moreover, despite the existence of copyright and trademark protection under applicable laws, third parties may nonetheless violate our intellectual property rights, and our ability to remedy such violations, particularly in foreign countries, may be limited.  In addition, the copying and distribution of content over the Internet creates additional challenges for us in protecting our proprietary rights.  If we are unable to adequately protect and enforce our intellectual property and proprietary rights, our competitive position may be harmed and our business and financial results could be materially and adversely affected.

***We operate in markets which are dependent on Information Technology ("IT") systems and technological innovation.***

Our business is dependent on information technology.  We either provide software and/or internet based services to our customers or we use complex IT systems and products to support our business activities, particularly in infrastructure and as we move our products and services to an increasingly digital delivery platform.

We face several technological risks associated with software product development and service delivery in our educational businesses, information technology security (including virus and hacker attacks), e-commerce, enterprise resource planning system implementations and upgrades.  The failure to recruit and retain staff with relevant skills may constrain our ability to grow as we combine traditional publishing products with online service offerings.

***A major data privacy breach or unanticipated IT system failure may cause reputational damage to our brands and financial loss.***

Across our businesses we hold large volumes of personal data, including that of employees, customers and students.  Failure to adequately protect personal data could lead to penalties, significant remediation costs, reputational damage, potential cancellation of existing contracts and inability to compete for future business.  We have policies, processes and internal controls to ensure the stability of our information technology, provide security from unauthorized access to our systems and maintain business continuity, but our operating results may be adversely impacted by unanticipated system failures, data corruption or breaches in security.

***We are reliant on third-party software development as part of our digital platform.***

Some of the technologies and software that compose our instruction and assessment technologies, including a core component of certain of our digital learning solutions, are developed by third parties.  We are reliant on those third parties for the development of future components and modules.  Thus, we face risks associated with software product development and the ability of those third parties to meet our needs and their obligations under our contracts with them.

***We are a party to at-will contracts with significant customers and the termination of these contracts could harm our business.***

We currently provide or have agreements to provide products and services to governmental agencies, school districts and educational facilities under contracts that are generally terminable at-will.  The fact that these customers have at-will contracts with us gives rise to the possibility that we may have no recourse in the event of customer cancellation of a contract (except as may be provided under the Bankruptcy Code).  In addition, contracts awarded by states pursuant to a procurement process are subject to challenge by competitors and other parties during and after that process.  We anticipate that we will continue to rely predominately upon customers under such at-will contractual arrangements.  As a result of this reliance, the election by these customers to terminate any or all of their at-will contracts with us, or the loss of or decrease in business from several of our large customers, could materially and adversely affect our business, prospects, financial condition and results of operations.

***We may not be able to identify successful business models for generating sales of technology based programs. Furthermore, customers' expectations for the number and sophistication of technology-based programs that are given to them at no additional charge may increase, as may development costs.***

The basal elementary school, basal secondary school and educational testing customers have become accustomed to being given technology-based products at no additional charge from publishers, such as us, as incentives to adopt programs and other products.  The sophistication and expense of technology-based products continues to grow.  Our profitability may decrease materially if:  we are unable to realize sales of these products; customers continue to rely on an increasing number of technology-based materials of increasing quality being given to them; or costs of these products continue to rise.

78

***Changes in product distribution channels and/or customer bankruptcy may restrict our ability to grow and affect our profitability.***

New distribution channels such as digital format, the internet, online retailers, growing delivery platforms (e.g. e-readers), combined with the concentration of retailer power, pose threats and provide opportunities to our traditional consumer publishing models in our Trade and Reference business, potentially impacting both sales volumes and pricing.  The economic slowdown combined with the trend to e-books has created contraction in the consumer books retail market that has increased the risk of bankruptcy of major retail customers as evidenced by the bankruptcy filing of the Borders book chain, which resulted in the write-off of a receivable of $4.4 million.  Additional bankruptcies of traditional "bricks and mortar" retailers of Trade and Reference books could negatively affect our financial performance.

***Expansion of our investments and business outside of our traditional core U.S. market may result in lower than expected returns and incremental risks.***

To take advantage of international growth opportunities and to reduce our reliance on our core U.S. market, we are increasing our investments in a number of countries and emerging markets, including Asia and the Middle East, some of which are inherently more risky than our investments in the U.S. market.  Political, economic, currency, reputational and corporate governance risks (including fraud) as well as unmanaged expansion are all factors which could limit our returns on investments made in these markets.  For example, current political instability in the Middle East has caused uncertainty in the region, which could affect our results of operations in the region.  Also, certain international customers require longer payment terms, increasing our credit risk.  As we expand internationally, these risks will become more pertinent to us and could have a bigger impact on our business.

***We may not be able to complete, or achieve the expected benefits from, any future acquisitions, which could materially and adversely affect our growth.***

We have at times used acquisitions as a means of expanding our business and expect that we will continue to do so.  If we do not successfully integrate acquisitions, anticipated operating advantages and cost savings may not be realized.  The acquisition and integration of companies involve a number of risks, including: use of available cash, new borrowings or borrowings under our accounts receivable securitization facility to consummate the acquisition; demands on management related to the increase in our size after an acquisition; diversion of management's attention from existing operations to the integration of acquired companies; integration of companies existing systems into our systems; difficulties in the assimilation and retention of employees; and potential adverse effects on our operating results.

We may not be able to maintain the levels of operating efficiency that acquired companies achieved separately.  Successful integration of acquired operations will depend upon our ability to manage those operations and to eliminate redundant and excess costs.  We may not be able to achieve the cost savings and other benefits that we would hope to achieve from acquisitions, which could materially and adversely affect our financial condition and results.

***We may not be able to retain or attract the key management, creative, editorial and sales personnel that we need to remain competitive and grow.***

Our success depends, in part, on our ability to continue to retain key management and other personnel.  We operate in a number of highly visible industry segments where there is intense competition for experienced and highly effective individuals, including authors.  Our successful operations in these segments may increase the market visibility of members of key management, creative and editorial teams and result in their recruitment by other businesses.  There can be no assurance that we can continue to attract and retain the necessary talented employees, including executive officers and other key members of management and, if we fail to do so, it could adversely affect our business.

In addition, our sales personnel make up approximately 20% of our employees, and our business results depend largely upon the experience, knowledge of local market dynamics and long-standing customer relationships of such

personnel.  Our inability to retain or hire effective sales people at economically reasonable compensation levels could materially and adversely affect our ability to operate profitably and grow our business.

***A significant increase in operating costs and expenses could have a material adverse effect on our profitability.***

Our major expenses include employee compensation and printing, paper and distribution costs for product-related manufacturing.  We offer competitive salary and benefit packages in order to attract and retain the quality employees required to grow and expand our businesses.  Compensation costs are influenced by general economic factors, including those affecting the cost of health insurance and postretirement benefits, and any trends specific to the employee skill sets we require.  We could experience changes in pension costs and funding requirements due to poor investment returns and/or changes in pension laws and regulations.

Paper prices fluctuate based on the worldwide demand and supply for paper in general and for the specific types of paper used by us.  Paper is one of our principal raw materials and, for the year ended December 31, 2011, our paper purchases totaled approximately $65 million while our manufacturing costs totaled approximately $248 million.  Our books and workbooks are printed by third parties and we typically have multi-year contracts for the production of books and workbooks in order to reduce price fluctuations over the contract term.  Increases in any of our operating costs and expenses could materially and adversely affect our profitability and our results of operations.

We make significant investments in information technology data centers and other technology initiatives as well as significant investments in the development of programs for the K-12 marketplace.  Although we believe we are prudent in our investment strategies and execution of our implementation plans, there is no assurance as to the ultimate recoverability of these investments.

***Exposure to litigation could have a material effect on our financial position and results of operations.***

We are involved in legal actions and claims arising from our business practices and face the risk that additional actions and claims will be filed in the future.  Litigation alleging infringement of copyrights and other intellectual property rights has become extensive in the educational publishing industry.  At present, there are various suits pending or threatened which claim that we exceeded the print run limitation or other restrictions in licenses granted to us to reproduce photographs in our textbooks.  A number of similar claims against us have already been settled.  While management does not expect any of these matters to have a material adverse effect on our results of operations, financial position or cash flows, due to the inherent uncertainty of the litigation process, the resolution of any particular legal proceeding or change in applicable legal standards could have a material effect on our financial position and results of operations.

We have insurance in such amounts and with such coverage and deductibles as management believes is reasonable.  However, there can be no assurance that our liability insurance will cover all events or that the limits of coverage will be sufficient to fully cover all liabilities.

***Operational disruption to our business caused by a major disaster and/or external threats could restrict our ability to supply products and services to our customers.***

Across all our businesses, we manage complex operational and logistical arrangements including distribution centers, data centers and large office facilities as well as relationships with third party print vendors.  We have also outsourced some support functions, including application maintenance support, to third party providers.  Failure to recover from a major disaster (such as fire, flood or other natural disaster) at a key facility or the disruption of supply from a key third party vendor or partner (for example, due to bankruptcy) could restrict our ability to service our customers.  External threats, such as terrorist attacks, strikes, weather and political upheaval, could affect our business and employees, disrupting our daily business activities.

***Uncertainties related to our business may result in the loss of or decreased business with customers.***

Our business depends upon our customers believing that we will be able to provide a wide range of quality products on a timely basis to our customers.  Our ability to provide our products on a reliable and timely basis

affects our ability to attract new customers.  If our customers are uncertain as to our ability to continue to provide them with products on a timely basis or to provide the same breadth and quality of products, we may be unable to attract new customers and we may experience lower business with or a loss of customers.

***Uncertainties related to our business may create a distraction for or cause a loss of employees and may otherwise materially adversely affect our ability to attract new employees.***

Our future results of operations will depend in part upon our ability to retain existing highly skilled and qualified employees and to attract new employees.  Failure to continue to attract and retain such individuals could materially adversely affect our ability to compete.  Uncertainties about the future prospects and viability of our business and the possibility of seeking relief under the Bankruptcy Code is impacting and is likely to continue to impact our ability to attract and retain key management, technical and other personnel, and is creating a distraction for existing employees.  If we are significantly limited or unable to attract and retain key personnel, or if we lose a significant number of key employees, or if employees continue to be distracted due to the uncertainties about the future prospects and viability of our business, it could have a material adverse effect on our ability to successfully operate our business or to meet our operations, risk management, compliance, regulatory, and financial reporting requirements.

***We may be adversely affected by further deterioration in economic conditions that is general or specific to industries, products or geographic areas.***

A continued and prolonged recession would likely exacerbate our current difficulties in originating new business, given the resultant availability of credit.  In addition, a continued downturn in state revenues and funding may result in a reduced demand for the products that we produce.

***We may record future goodwill impairment charges related to one or more of our business units, which could materially adversely impact our results of operations.***

We test our goodwill balances for impairment during the fourth quarter of each year, or more frequently if indicators are present or changes in circumstances suggest that impairment may exist.  We assess goodwill for impairment at the reporting unit level and, in evaluating the potential for impairment of goodwill, we make assumptions regarding estimated revenue projections, growth rates, cash flows and discount rates.  Although we use consistent methodologies in developing the assumptions and estimates underlying the fair value calculations used in our impairment tests, these estimates are uncertain by nature and can vary from actual results. Declines in the future performance and cash flows of the reporting unit or small changes in other key assumptions may result future goodwill impairment charges, which could materially adversely impact our results of operations.

## CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation of the Plan in the Chapter 11 Cases is preferable to the alternatives described above because it provides the greatest distributions to holders of Claims against and Equity Interests in the Debtors.  In addition, any alternative to confirmation of the Plan in the Chapter 11 Cases could result in extensive delays and increased expenses and have a material adverse effect on the Debtors.  Accordingly, the Debtors urge all Senior Creditors and Existing Common Stockholders to vote to accept the Plan.

Dated: May 11, 2012

Respectfully submitted,

HOUGHTON MIFFLIN HARCOURT PUBLISHING
COMPANY

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel


HOUGHTON MIFFLIN HARCOURT PUBLISHERS INC.

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel


HMH PUBLISHERS, LLC

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel


HOUGHTON MIFFLIN HOLDING COMPANY, INC.

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel


HOUGHTON MIFFLIN, LLC

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel


HOUGHTON MIFFLIN FINANCE, INC.

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel

HOUGHTON MIFFLIN HOLDINGS, INC.

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel


HM PUBLISHING CORP.

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel


RIVERDEEP INC., A LIMITED LIABILITY COMPANY

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel


BRODERBUND LLC

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel


RVDP, INC.

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel


HRW DISTRIBUTORS, INC.

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel


GREENWOOD PUBLISHING GROUP, INC.

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel

CLASSROOM CONNECT, INC.

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel


ACHIEVE! DATA SOLUTIONS, LLC

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel


STECK-VAUGHN PUBLISHING LLC

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel


HMH SUPPLEMENTAL PUBLISHERS INC.

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel


HMH HOLDINGS (DELAWARE), INC.

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel


SENTRY REALTY CORPORATION

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel


HOUGHTON MIFFLIN COMPANY INTERNATIONAL,
INC.

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel

THE RIVERSIDE PUBLISHING COMPANY

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel


CLASSWELL LEARNING GROUP INC.

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel


COGNITIVE CONCEPTS, INC.

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel


EDUSOFT

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel


ADVANCED LEARNING CENTERS, INC.

By:_____
Name:  William F. Bayers
Title:    EVP and General Counsel

**APPENDIX A**

**THE PLAN**

*See Attached.*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Alan W. Kornberg
Jeffrey D. Saferstein
Philip A. Weintraub
1285 Avenue of the Americas
New York, New York  10019-6064
(212) 373-3000

*Proposed Attorneys for the Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ------------------------------------------x | Chapter 11 |
| In re: | |
| | Case No. 12-_____ (___) |
| HOUGHTON MIFFLIN HARCOURT PUBLISHING COMPANY, *et al.*, | (Jointly Administered) |
| Debtors. | |
| ------------------------------------------x | |

## PREPACKAGED JOINT PLAN OF
## REORGANIZATION OF THE DEBTORS
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Dated:    New York, New York
          May 11, 2012

## TABLE OF CONTENTS

**Page**

I. DEFINITIONS AND CONSTRUCTION OF TERMS ....................................................4
    A.     Definitions ..................................................................................4
    B.     Interpretation, Application of Definitions and Rules of
           Construction.................................................................................21

II. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ..............................21
    A.     Introduction..................................................................................21

III. TREATMENT OF ADMINISTRATIVE CLAIMS,  PRIORITY TAX
    CLAIMS AND DIP FINANCING CLAIMS ......................................................23
    A.     Administrative Claims.................................................................23
    B.     Fee Claims...................................................................................23
    C.     Priority Tax Claims......................................................................24
    D.     DIP Financing Claims..................................................................24

IV. TREATMENT OF CLAIMS AND EQUITY INTERESTS ......................................24
    A.     Class 1 — Other Priority Claims................................................24
    B.     Class 2 — Other Secured Claims................................................25
    C.     Class 3 — Senior Creditor Claims...............................................25
    D.     Class 4 — Letter of Credit Facility Claims.................................26
    E.     Class 5 — General Unsecured Claims.........................................26
    F.     Class 6 — Intercompany Claims..................................................27
    G.     Class 7 — Equity Interests in Debtors other than HMH Holdings...........27
    H.     Class 8 — Existing Common Stock..........................................27
    I.     Class 9 — Other Holdings Equity Interests................................28

V. PROVISIONS REGARDING VOTING, DISTRIBUTIONS, AND
    TREATMENT OF DISPUTED, CONTINGENT AND UNLIQUIDATED
    ADMINISTRATIVE EXPENSE CLAIMS, CLAIMS AND EQUITY
    INTERESTS ...................................................................................28
    A.     Voting on the Plan.......................................................................28
    B.     Distributions. ..............................................................................28
    C.     Objections to and Resolution of Claims......................................30
    D.     Estimation...................................................................................31
    E.     Indenture Trustee Expenses and First Lien Agent Expenses....................31
    F.     Cancellation and Surrender of Existing Securities and Agreements. ........31
    G.     Nonconsensual Confirmation. ....................................................32

VI. SUBSTANTIVE CONSOLIDATION OF THE DEBTORS ....................................32

VII. PROVISIONS REGARDING IMPLEMENTATION OF PLAN ............................33
    A.     Exit Facility. ...............................................................................33
    B.     The Restructuring. ......................................................................34

C.      Sources of Cash for Plan Distribution and Transfers of Funds
        Among Debtors..................................................................................35
D.      The Initial Board of Directors.....................................................35
E.      Securities to Be Issued Pursuant to the Plan...........................36
F.      Management of Reorganized Debtors. ......................................36
G.      Reorganized HMH Holdings Certificate of Incorporation,
        Reorganized HMH Holdings Bylaws and Other Amended and
        Restated Governing Documents. ...............................................36
H.      Registration Rights Agreement..................................................37
I.      Reorganized Debtors' Management Incentive Plan. ................37
J.      Informal Creditor Group Professionals Fees. ..........................37
K.      Corporate Action. ........................................................................37
L.      Effectuating Documents; Further Transactions. ......................37
M.      Exemption from Certain Taxes and Fees..................................38
N.      Powers of Officers. ......................................................................38

VIII. EFFECT OF CONFIRMATION OF THE PLAN ...................................38
A.      Continued Corporate Existence. ................................................38
B.      Releases of Guarantees and Collateral. .....................................39
C.      Dissolution of Creditors' Committee. ........................................39
D.      Vesting of Property........................................................................39
E.      Discharge of the Debtors. ...........................................................39
F.      Injunction......................................................................................40
G.      Preservation of Causes of Action. .............................................40
H.      Votes Solicited in Good Faith.....................................................41
I.      Mutual Releases............................................................................41
J.      Releases by Non-Debtors. ...........................................................42
K.      Exculpation...................................................................................43
L.      Term of Bankruptcy Injunction or Stays. .................................43
M.      Preservation of Insurance. ..........................................................44
N.      Officers' and Directors' Indemnification Rights and Insurance................44

IX. RETENTION OF JURISDICTION ...........................................................45

X. MISCELLANEOUS PROVISIONS............................................................45
A.      Payment of Statutory Fees. ........................................................45
B.      Modification of the Plan. ............................................................46
C.      Governing Law. ............................................................................46
D.      Filing or Execution of Additional Documents............................46
E.      Withholding and Reporting Requirements. ..............................47
F.      Allocation Between Principal and Accrued Interest.................47
G.      Waiver of Bankruptcy Rule 3020(e) and Federal Rule of Civil
        Procedure 62(a)............................................................................47
H.      Exhibits/Schedules.......................................................................47
I.      Notices...........................................................................................47
J.      Plan Supplement. .........................................................................48
K.      Conflicts.........................................................................................48

L.      Setoff by the United States. ...................................................................48

XI. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...................................48
    A.      Assumption and Rejection of Executory Contracts and Unexpired
            Leases. ..................................................................................................48
    B.      Cure.........................................................................................................49
    C.      Rejection Damage Claims. .....................................................................49

XII. BENEFIT PLANS.................................................................................................50

XIII. CONFIRMATION AND EFFECTIVENESS OF THE PLAN ...............................50
    A.      Conditions Precedent to Confirmation. ...................................................50
    B.      Conditions Precedent to Effectiveness. ...................................................51
    C.      Waiver of Conditions..............................................................................52
    D.      Effect of Failure of Conditions. ..............................................................52
    E.      Denial of Confirmation/Vacatur of Confirmation Order..........................52
    F.      Revocation, Withdrawal, or Non-Consummation. ...................................52

Houghton Mifflin Harcourt Publishing Company ("HMH"), Houghton Mifflin Harcourt Publishers Inc. ("HMH Publishers, Inc."), HMH Publishers LLC ("HMH Publishers LLC"), Houghton Mifflin Holding Company, Inc., Houghton Mifflin, LLC, Houghton Mifflin Finance, Inc., Houghton Mifflin Holdings, Inc., HM Publishing Corp., Riverdeep Inc., a Limited Liability Company, Broderbund LLC, RVDP, Inc., HRW Distributors, Inc., Greenwood Publishing Group, Inc., Classroom Connect, Inc., ACHIEVE! Data Solutions, LLC, Steck-Vaughn Publishing LLC, HMH Supplemental Publishers Inc., HMH Holdings (Delaware), Inc., Sentry Realty Corporation, Houghton Mifflin Company International, Inc., The Riverside Publishing Company, Classwell Learning Group Inc., Cognitive Concepts, Inc., Edusoft, and Advanced Learning Centers, Inc., the above-captioned debtors and debtors in possession (collectively, the "Debtors"), hereby propose the following prepackaged joint plan of reorganization under section 1121(a) of the Bankruptcy Code.

Reference is made to the Disclosure Statement accompanying the Plan, including the exhibits thereto, for a discussion of the Debtors' history, business, properties, results of operations, projections for future operations and risk factors, together with a summary and analysis of the Plan. Certain documents to be entered into in connection with consummation of the Plan are summarized herein. To the extent any inconsistency exists between the summaries contained herein and the documents to be entered into in connection with consummation of the Plan, the terms of such documents shall control. All Creditors and Equity Interest holders entitled to vote on the Plan are encouraged to consult the Disclosure Statement, including the documents attached thereto as exhibits, and to read the Plan carefully before voting to accept or reject the Plan.

# I.

## DEFINITIONS AND CONSTRUCTION OF TERMS

### A.    Definitions.

Unless otherwise defined herein, or the context otherwise requires, the following terms shall have the respective meanings set forth below:

| | |
|---|---|
| ***10.5% Indenture Trustee*** | means The Bank of New York Mellon Trust Company, N.A. and any successor thereto in its capacity as indenture trustee under the 10.5% Notes Indenture. |
| ***10.5% Notes*** | means the 10.5% Senior Secured Notes due 2019 issued pursuant to the 10.5% Notes Indenture. |

4

| | |
|---|---|
| ***10.5% Notes Claim*** | means all Claims in respect of the 10.5% Notes (including interest accrued thereon as of the Petition Date) other than the Indenture Trustee Expenses. |
| ***10.5% Notes Indenture*** | means the Indenture (as amended, supplemented, restated or otherwise modified), dated as of May 26, 2011 among The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent, Houghton Mifflin Harcourt Publishers Inc., Houghton Mifflin Harcourt Publishing Company and the Guarantors named on the signature pages thereto |
| ***Adequate Protection Payments*** | means the payments to the Senior Creditors as adequate protection for, among other things, the priming of their liens, any diminution in value of the collateral securing their Claims and the imposition of the automatic stay, pursuant to sections 105, 361 and 364 of the Bankruptcy Code, in the aggregate amount of $69.7 million in Cash, which will be (i) allocated 6.2% to holders of the First Lien Revolver Claims, 67.6% to holders of the First Lien Term Loan Claims and 26.2% to holders of the 10.5% Notes Claims and (ii) indefeasibly payable upon entry of the Interim DIP Order. |
| ***Administrative Claim*** | means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(1), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Estates, any actual and necessary costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or assumed by the Debtors in Possession in connection with the conduct of their businesses, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, all valid and existing reclamation claims, all compensation and reimbursement of expenses to the extent awarded by the Court under sections 330, 331 or 503 of the Bankruptcy Code, any fees or charges assessed |

against the Debtors' Estates under section 1930 of title 28 of the United States Code, and all reasonable fees and expenses incurred by the Informal Creditor Group Professionals, pursuant to the terms of their respective prepetition engagement letters, each of the foregoing only to the extent not paid as adequate protection.

**Allowed**

means, with reference to any Claim or Equity Interest, (a) any Claim against or Equity Interest in any of the Debtors that has been listed by the Debtors in the Schedules, as such Schedules (if filed) may have been amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent, and with respect to which no contrary proof of claim or interest has been filed, (b) any Claim or Equity Interest specifically allowed under the Plan or the Confirmation Order, (c) any Claim or Equity Interest that is not Disputed, (d) any Claim or Equity Interest, the amount or existence of which, if Disputed, has been determined or allowed by a Final Order, or (e) any Claim or Equity Interest as to which no objection to the allowance thereof has been filed; provided, however, that the term Allowed, with reference to any Claim, shall not include interest on such Claim from and after the Petition Date unless otherwise expressly provided for in this Plan.

**Amended and Restated Governing Documents**

means with respect to each of the Reorganized Debtors, such entity's amended and restated certificate of incorporation and bylaws, or operating agreement, as the case may be, which will be in form and substance acceptable to the Requisite Participating Lenders and be in effect on the Effective Date, and shall be in substantially the form contained in the Plan Supplement.

**Ballots**

means the documents for accepting or rejecting the Plan, which were distributed with the Disclosure Statement to parties entitled to vote on the Plan.

**Bankruptcy Code**

means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*., as in effect on the Petition Date or as otherwise applicable to these

6

Chapter 11 Cases.

**Bankruptcy Rules**    means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, and local rules of the Court, as the context may require, as in effect on the Petition Date or as otherwise applicable to these Chapter 11 Cases.

**Bondholder**    means a holder of 10.5% Notes.

**Business Day**    means any day not designated as a legal holiday by Bankruptcy Rule 9006(a) and any day on which commercial banks are open for business, and not authorized, by law or executive order, to close, in the City of New York, New York.

**Cash**    means cash and cash equivalents denominated in legal tender of the United States of America.

**Causes of Action**    means any and all actions, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise, now owned or hereafter acquired by the Debtors, whether arising under the Bankruptcy Code or other federal, state or foreign law, equity or otherwise, including, without limitation, any causes of action arising under sections 510, 544, 547, 548, 549, 550, 551 or any other section of the Bankruptcy Code, and the Cash and non-Cash proceeds of any of the foregoing.

**Chapter 11 Cases**    means the chapter 11 cases commenced by the Debtors.

**Claim**    means any claim, as such term is defined in section 101(5) of the Bankruptcy Code.

**Class**    means each category or group of Claims or Equity Interests as classified or designated in Article II of

7

the Plan.

| | |
|---|---|
| ***Co-Borrower Percentages*** | has the meaning set forth in Article VII.B of the Plan. |
| ***Collateral*** | means any property or interest in property of the Debtors' estates subject to a Lien to secure the payment or performance of a Claim, which Lien has not been avoided or is not subject to avoidance under the Bankruptcy Code or is otherwise invalid under the Bankruptcy Code or applicable state law. |
| ***Confirmation*** | means "confirmation" as used in section 1129 of the Bankruptcy Code. |
| ***Confirmation Date*** | means the date on which the Confirmation Order is entered on the Court's docket. |
| ***Confirmation Hearing*** | means the hearing to consider Confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, as it may be adjourned or continued from time to time. |
| ***Confirmation Order*** | means the order entered by the Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance acceptable to the Requisite Participating Lenders and the Debtors. |
| ***Court*** | means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, or any other court having jurisdiction over the Chapter 11 Cases. |
| ***Creditor*** | means "creditor" as defined in section 101(10) of the Bankruptcy Code. |
| ***Creditors' Committee*** | means the official committee of unsecured creditors (if any) appointed in the Debtors' Chapter 11 Cases by the United States Trustee for Region 2, pursuant to section 1102(a) of the Bankruptcy Code, as constituted from time to time. |
| ***Debtors*** | has the meaning set forth in the introductory paragraph of the Plan. |

| | |
|---|---|
| ***Debtors in Possession*** | means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. |
| ***DIP Credit Facility*** | means that certain Debtor-In-Possession Credit Agreement (as amended, restated, supplemented or otherwise modified), by and among the Debtors, the DIP Credit Facility Agent and the lenders party thereto, which shall be entered into on or about the Petition Date and shall be in form and substance acceptable to the Requisite Participating Lenders and the Debtors. |
| ***DIP Credit Facility Agent*** | means the administrative agent under the DIP Credit Facility. |
| ***DIP Financing Claims*** | means all Claims arising under or relating to the DIP Credit Facility and all agreements and instruments relating thereto. |
| ***DIP Lenders*** | means the lenders that are parties to the DIP Credit Facility. |
| ***DIP Motion*** | means the Debtors' Motion for an Order Pursuant to Sections 361, 363, and 364 of the Bankruptcy Code (1) Authorizing the Debtors to Obtain Postpetition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting Liens and Super-Priority Administrative Expense Status, (4) Providing Adequate Protection and (5) Scheduling and Approving the Form and Method of Notice of Final Hearing, which shall be in form and substance acceptable to the Requisite Participating Lenders and the Debtors. |
| ***DIP Order*** | means the Final Order entered by the Court, granting final approval of the DIP Motion, as amended or otherwise modified and in form and substance acceptable to the Requisite Participating Lenders and the Debtors. |
| ***Disclosure Statement*** | means the written offering memorandum and disclosure statement and all schedules and exhibits attached thereto that relates to the Plan, as such disclosure statement may be amended, modified or supplemented from time to time and |

9

shall be in form and substance acceptable to the Requisite Participating Lenders and the Debtors.

| | |
|---|---|
| ***Disputed*** | means, with respect to Claims or Equity Interests, any such Claim or Equity Interests (a) that is listed on the Schedules (if any) as unliquidated, disputed or contingent; (b) as to which any Debtor or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or which is otherwise disputed in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order; or (c) is not listed in the Debtors' books or records as due and owing or outstanding. |
| ***Distribution Record Date*** | means the Effective Date. |
| ***Distributions*** | means the Cash, New Common Stock, New Warrants, if any, or other distributions to be made pursuant to, and in accordance with, this Plan. |
| ***Effective Date*** | means the first Business Day on which all of the conditions specified in Article XIII.B. of the Plan have been satisfied or waived in accordance with Article XIII.C of the Plan; provided, however, that if a stay of the Confirmation Order is in effect on such date, the Effective Date will be the first Business Day after such stay is no longer in effect. |
| ***Equity Interest*** | means, excluding New Common Stock, any equity security within the meaning of section 101(16) of the Bankruptcy Code or any other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any right to acquire any such equity security or instrument, including any option, warrant or other right, contractual or otherwise, to acquire, sell or subscribe for any such security or instrument. |
| ***ERISA*** | has the meaning set forth in Article VIII.K.2. of the Plan. |
| ***Estates*** | means the estates of the Debtors, individually or collectively, as is appropriate in the context, created in the Chapter 11 Cases pursuant to section |

10

|  |  |
|---|---|
|  | 541 of the Bankruptcy Code. |
| ***Existing Equity*** | means, collectively, the Existing Common Stock and the Other Holdings Equity Interests. |
| ***Existing Equity Holders*** | means the holders of the Existing Equity. |
| ***Existing Common Stock*** | means the common stock of HMH Holdings immediately preceding the Effective Date, par value $0.01 per share (which will be cancelled in Step 3 of the Restructuring). |
| ***Existing Common Stockholders*** | means the holders of Existing Common Stock. |
| ***Exit Facility*** | means that certain Superpriority Senior Secured Debtor-in-Possession and Exit Revolving Credit Agreement and Superpriority Senior Secured Debtor-in-Possession and Exit Term Loan Credit Agreement each dated May [21], 2012, entered into, by and among the Reorganized Debtors, Citibank N.A. as administrative agent and the lenders party thereto, and all ancillary agreements, as may be amended or modified, from time to time in accordance with their terms. |
| ***Federal Judgment Rate*** | means the rate of interest provided for in 28 U.S.C. § 1961, as in effect on the Petition Date. |
| ***Fee Claims*** | means an Administrative Claim under section 330(a), 331 or 503 of the Bankruptcy Code for compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the Effective Date (including, to the extent applicable, the reasonable non-legal expenses of the individual members of the Creditors' Committee incurred in the discharge of their duties as members of the Creditors' Committee, but not the fees and expenses of the Informal Creditor Group Professionals). |

11

| | |
|---|---|
| ***Final Order*** | means an order or judgment of the Court, or other court of competent jurisdiction, as entered on the docket of such court, the operation or effect of which has not been stayed, reversed, vacated or amended, and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal, petition for certiorari, or seek review or rehearing has expired and as to which no appeal, petition for certiorari, or petition for review or rehearing was filed or, if filed, remains pending; <u>provided</u>, <u>however</u>, that the possibility that a motion may be filed pursuant to Rule 9024 of the Bankruptcy Rules or Rule 60(b) of the Federal Rules of Civil Procedure shall not mean that an order is not a Final Order. |
| ***First Lien Administrative Agent*** | means Citibank, N.A., as successor in interest to Wilmington Trust FSB, as administrative agent under the First Lien Credit Agreement. |
| ***First Lien Agent Expenses*** | means any reasonable fees and documented out-of-pocket costs and expenses incurred prior to or after the Petition Date by the First Lien Agents under the First Lien Credit Agreement, the reasonableness of which shall, if disputed by the Debtors, be determined by the Court.  Such costs shall include, without limitation, the reasonable, documented out-of-pocket costs and expenses of, and reasonable documented unpaid legal fees actually incurred by, counsel to the First Lien Agents in connection with the Chapter 11 Cases and Distributions to the holders of First Lien Bank Claims. |
| ***First Lien Agents*** | means the First Lien Administrative Agent and the First Lien Collateral Agent. |
| ***First Lien Bank Claims*** | means, collectively, the First Lien Term Loan Claims and the First Lien Revolver Claims. |
| ***First Lien Bank Lenders*** | means the lenders party to the First Lien Credit Agreement. |
| ***First Lien Collateral Agent*** | means Citibank, N.A., in its capacity as collateral agent under the First Lien Credit Agreement. |

| | |
|---|---|
| ***First Lien Credit Agreement*** | means that certain First Lien Credit Agreement dated as of December 12, 2007 among the First Lien Administrative Agent, the First Lien Collateral Agent, certain of the Debtors, and the lenders from time to time party thereto (as amended, modified, or otherwise supplemented from time to time) consisting of a term loan in the aggregate principal amount of $2.571 billion (the "***First Lien Term Loan***") and a revolving loan in the aggregate principal amount of $235.8 million (the "***First Lien Revolving Loan***"). |
| ***First Lien Revolver Claims*** | means all Claims in respect of the First Lien Revolving Loan (including interest accrued thereon as of the Petition Date) other than the First Lien Agent Expenses. |
| ***First Lien Revolving Loan*** | has the meaning set forth in the definition of the First Lien Credit Agreement. |
| ***First Lien Term Loan*** | has the meaning set forth in the definition of First Lien Credit Agreement. |
| ***First Lien Term Loan Claims*** | means all Claims in respect of the First Lien Term Loan other than the First Lien Agent Expenses. |
| ***Foreign Affiliates*** | means HMH Education Company (Ireland), HMH IP Company (Ireland), HMH Publishing Company (Ireland), Riverdeep UK Limited, HMH Consumer Company (Ireland), Houghton Mifflin Harcourt (Asia) Pte. Ltd (Singapore), Houghton Mifflin PLC (UK) and HMH Publishing Company (IOM) Unlimited. |
| ***General Unsecured Claim*** | means a Claim against any of the Debtors that is not an Administrative Claim, Priority Tax Claim, Fee Claim, DIP Financing Claim, Other Priority Claim, Other Secured Claim, Senior Creditor Claim, Letter of Credit Facility Claim or Intercompany Claim. |
| ***Government*** | has the meaning set forth in Article VIII.K.2 of the Plan. |
| ***HMH Holdings*** | means HMH Holdings (Delaware), Inc., a Delaware corporation and its successors, assigns and/or designees, as applicable. |

13

| | |
|---|---|
| ***Impaired*** | has the meaning as used in section 1124 of the Bankruptcy Code. |
| ***Indenture Trustee Charging Lien*** | means a lien that secures repayment of the Indenture Trustee Expenses, to the extent provided for in the 10.5% Notes Indenture. |
| ***Indenture Trustee Expenses*** | means any reasonable fees and documented out-of-pocket costs and expenses, incurred prior to or after the Petition Date by the 10.5% Indenture Trustee under the 10.5% Notes Indenture, the reasonableness of which shall, if disputed by the Debtors, be determined by the Court.  Such amounts shall include, without limitation, the reasonable, documented, out-of-pocket costs and expenses of, and reasonable, documented unpaid legal fees actually incurred by, counsel to the 10.5% Indenture Trustee in connection with the Chapter 11 Cases and the Distributions to the Bondholders. |
| ***Informal Creditor Group*** | means the informal group of unaffiliated investors that are party to the Restructuring Support Agreement. |
| ***Informal Creditor Group Professionals*** | means the advisors to the Informal Creditor Group, including, without limitation, Akin Gump Strauss Hauer & Feld LLP, Houlihan Lokey Capital, Inc., Heidrick & Struggles and Lyons, Beneson & Company, Inc. |
| ***Initial Distribution Date*** | means the Effective Date or as soon thereafter as is practicable upon which Distributions shall commence. |
| ***Insured Claim*** | means any Claim arising from an incident or occurrence alleged to have occurred prior to the Effective Date that is covered under an insurance policy applicable to the Debtors or their businesses. |
| ***Intercompany Claims*** | means any Claim held by one Debtor (or a non-debtor that is a direct or indirect subsidiary, a direct or indirect parent, or an affiliate of a Debtor) against any other Debtor(s), including, without limitation, (a) any account reflecting intercompany book entries by such Debtor (or non-debtor that is |

14

a direct or indirect subsidiary, a direct or indirect parent, or an affiliate of such Debtor) with respect to any other Debtor(s), (b) any Claim not reflected in book entries that is held by such Debtor (or non-debtor that is a direct or indirect subsidiary, a direct or indirect parent, or an affiliate of such Debtor), and (c) any derivative Claim asserted or assertable by or on behalf of such Debtor (or non-debtor that is a direct or indirect subsidiary, a direct or indirect parent, or an affiliate of such Debtor) against any other Debtor(s).

| | |
|---|---|
| ***Interim DIP Order*** | means the interim order in form and substance acceptable to the Requisite Participating Lenders and the Debtors, entered by the Court, granting interim approval of the DIP Motion and authorizing and directing the payment of the Adequate Protection Payments. |
| ***IPO*** | means an initial public offering of New Common Stock. |
| ***Letter of Credit Facility*** | means that certain $50 million standby letter of credit facility dated as of October 26, 2010, with Wells Fargo Bank, National Association, as issuer (as amended from time to time). |
| ***Letter of Credit Facility Claims*** | means all Claims arising under the Letter of Credit Facility. |
| ***Lien*** | has the meaning set forth in section 101(37) of the Bankruptcy Code. |
| ***Management Incentive Plan*** | means the incentive plan substantially in the form contained in the Plan Supplement, to be applicable to, among others, senior management of Reorganized HMH Holdings and the Reorganized Debtors that provides for the issuance of, among other things, the Management Options. |
| ***Management Options*** | means the options, the terms of which are set forth in the Management Incentive Plan, issued pursuant to the Management Incentive Plan. |

| | |
|---|---|
| ***New Common Stock*** | means, following the Effective Date, the common stock of Reorganized HMH Holdings, par value $0.01 per share, to be originally issued by HMH Holdings (which will initially be issued to HMH and HMH Publishers Inc. as described in more detail in Step 1 of the Restructuring and will be exchanged for Senior Creditor Claims, as described in Step 2 of the Restructuring). |
| ***New Warrant Agreement*** | means the warrant agreement pursuant to which the New Warrants will be issued, which shall be included the Plan Supplement and be in form and substance acceptable to the Requisite Participating Lenders and the Debtors. |
| ***New Warrants*** | means seven (7) year warrants to purchase, in the aggregate, 5% of the New Common Stock subject to dilution by equity distributed in connection with the Management Incentive Plan, with a strike price based on a $3.1 billion enterprise value for the Reorganized Debtors, which, if Class 8 votes to accept the Plan, shall be issued to the Existing Common Stockholders pursuant to the New Warrant Agreement. |
| ***Other Holdings Equity Interest Holders*** | means the holders of Other Holdings Equity Interests. |
| ***Other Holdings Equity Interests*** | means all Equity Interests in HMH Holdings other than Existing Common Stock and New Common Stock. |
| ***Other Priority Claim*** | means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code (other than Administrative Claims and Priority Tax Claims). |
| ***Other Secured Claim*** | means any Secured Claim, other than the DIP Financing Claims, the Senior Creditor Claims and the Letter of Credit Facility Claims or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, the amount of such Claim that is subject to such setoff. |
| ***Paulson*** | has the meaning set forth in Article VII.D. of the Plan. |
| ***PBGC*** | has the meaning set forth in Article VIII.K.2 of the |

Plan.

**Person**                          means any individual, corporation, partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, governmental unit or any political subdivision thereof, or any other entity.

**Petition Date**                   means the date on which the Debtors filed their voluntary petitions for relief commencing the Chapter 11 Cases.

**Plan**                            means this Plan, as it may be amended or modified from time to time, together with all addenda, exhibits, schedules, supplements or other attachments, if any, which shall, in each case, be in form and substance acceptable to the Requisite Participating Lenders and the Debtors.

**Plan Supplement**                 means the supplement to the Plan containing the Plan Supplement Documents, which shall be filed with the Court no later than ten days before the Confirmation Hearing.

**Plan Supplement Documents**       means the documents to be included in the Plan Supplement, including those identified in Article X.J. of the Plan, each of which shall be in form and substance acceptable to the Requisite Participating Lenders and the Debtors.

**Post-Petition Interest**          means with respect to:

(a)     Priority Tax Claims, interest accruing from the Petition Date through the Effective Date (i) with respect to federal taxes, at a fixed annual rate equal to the federal statutory rate as provided in 26 U.S.C. § 6621, and (ii) with respect to state and local taxes, at the Prime Rate of interest as in effect for the period to which the Priority Tax Claim pertains or (iii) in either case, as otherwise agreed to by the holder of such Priority Tax Claim and the Debtors with the consent of the Requisite Participating Lenders;

(b)     Other Secured Claims and Other Priority Claims, interest accruing on such claims

17

from the Petition Date through the Effective Date at the rate set forth in the contract or other applicable document giving rise to such claims (to the extent lawful) or, if the applicable instrument does not specify a rate of interest, at the Federal Judgment Rate; and

(c)     General Unsecured Claims, interest, accruing from the Petition Date through the Effective Date at the Federal Judgment Rate or such other rate ordered by the Court.

For the avoidance of doubt, except as required under applicable non-bankruptcy law, Post-Petition Interest will not be paid on the following Claims:  Senior Creditor Claims, Intercompany Claims and General Unsecured Claims paid in the ordinary course of business.

**Prime Rate**            means the rate of interest published from time to time in *The Wall Street Journal*, Eastern Edition, and designated as the prime rate.

**Priority Tax Claim**            means any Claim that is entitled to a priority in right of payment under section 502(i) or 507(a)(8) of the Bankruptcy Code.

**pro rata**            means, with respect to any Claim, at any time, the proportion that the amount of a Claim in a particular Class bears to the aggregate amount of all Claims (including Disputed Claims) in such Class, unless the Plan provides otherwise with respect to such Claim or Claims.

**Professional**            means (i) any professional employed in the Chapter 11 Cases pursuant to section 327, 328, 363 or 1103 of the Bankruptcy Code or otherwise and (ii) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code provided that the Informal Creditor Group Professionals shall not be Professionals as used in the Plan.

18

| | |
|---|---|
| ***Qualified Institutional Buyer*** | has the meaning ascribed to it in Rule 144A promulgated under the Securities Act. |
| ***Registration Rights Agreement*** | means a registration rights agreement by Reorganized HMH Holdings in favor of holders of New Common Stock, which shall be in form and substance acceptable to the Requisite Participating Lenders and contained in the Plan Supplement. |
| ***Released Parties*** | has the meaning set forth in Article VIII.I. of the Plan. |
| ***Reorganized Debtors*** | means the Debtors, or any successors thereto by merger, consolidation, or otherwise, on and after the Effective Date. |
| ***Reorganized HMH Holdings*** | means HMH Holdings, as reorganized, on and after the Effective Date. |
| ***Reorganized HMH Holdings Board of Directors*** | has the meaning set forth in Article VII.D. of the Plan. |
| ***Reorganized HMH Holdings Certificate of Incorporation*** | means Reorganized HMH Holdings' certificate of incorporation, which will be in effect on the Effective Date, and shall be in form and substance acceptable to the Requisite Participating Lenders and contained in the Plan Supplement. |
| ***Reorganized HMH Holdings Bylaws*** | means Reorganized HMH Holdings' bylaws, which will be in effect on the Effective Date, and shall be in form and substance acceptable to the Requisite Participating Lenders and contained in the Plan Supplement. |
| ***Restructuring*** | has the meaning set forth in Article VII.B of the Plan. |
| ***Restructuring Support Agreement*** | means that certain restructuring support agreement among the Debtors and the members of the Informal Creditor Group dated as of May 10, 2012 as attached to the Disclosure Statement. |
| ***Requisite Participating Lenders*** | means holders of at least 75% of the Senior Creditor Claims held by the members of the Informal Creditor Group. |

| | |
|---|---|
| ***Scheduled*** | means, with respect to any Claim or Equity Interest, the status and amount, if any, of such Claim or Equity Interest as set forth in the Schedules (if any). |
| ***Schedules*** | means the schedules, if any, of assets and liabilities, statements of financial affairs, and lists of holders of Claims and Equity Interests filed with the Court by the Debtors, including any amendments, modifications or supplements thereto. |
| ***SEC*** | means the United States Securities and Exchange Commission. |
| ***Secured Claim*** | means a Claim that is secured by a Lien on Collateral, to the extent of the value (as of the Effective Date or such other date as may be established by the Court) of such Collateral determined by a Final Order of the Court pursuant to section 506 of the Bankruptcy Code or as otherwise Allowed herein. |
| ***Securities Act*** | means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder. |
| ***Senior Creditors*** | means all First Lien Bank Lenders and all Bondholders, collectively. |
| ***Senior Creditor Claims*** | means all First Lien Bank Claims and 10.5% Note Claims, collectively. |
| ***Substantive Consolidation Order*** | means the Confirmation Order or such other order of the Court providing for the substantive consolidation of the Debtors. |
| ***Substantively Consolidated Debtors*** | means the Debtors, as substantively consolidated pursuant to the Substantive Consolidation Order. |
| ***Voting Agent*** | means Kurtzman Carson Consultants, LLC. |
| ***Voting Deadline*** | means May 18, 2012 at 5:00 P.M. prevailing Eastern Time for First Lien Bank Lenders and June 11, 2012 at 5:00 P.M. prevailing Eastern Time for Bondholders and Existing Common Stockholders. |

20

*Voting Record Date*                    means May 10, 2012.

### B.    Interpretation, Application of Definitions and Rules of Construction.

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter, such meanings to be applicable to both the singular and plural forms of the terms defined. Capitalized terms in the Plan that are not defined herein shall have the same meanings assigned to such terms by the Bankruptcy Code or Bankruptcy Rules, as the case may be. The words "herein," "hereof," and "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section or subsection in the Plan unless expressly provided otherwise.  The words "includes" and "including" are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity or specificity and do not in any respect qualify, characterize or limit the generality of the class within which such things are included.  Captions and headings to articles, sections and exhibits are inserted for convenience of reference only, are not a part of this Plan, and shall not be used to interpret this Plan.  The rules of construction set forth in section 102 of the Bankruptcy Code shall apply to this Plan.  In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## II.

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

### A.    Introduction.

All Claims and Equity Interests, except Administrative Claims, Priority Tax Claims, and DIP Financing Claims, are placed in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims and DIP Financing Claims, as described below, have not been classified.

A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.  A Claim or Equity Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and such Claim or Equity Interest has not been paid, released, or otherwise satisfied prior to the Effective Date.

### 1.    Unclassified Claims (not entitled to vote on the Plan).

(a)    Administrative Claims.

21

      (b)      <u>Priority Tax Claims</u>.

      (c)      <u>DIP Financing Claims</u>.

**2.**      <u>**Unimpaired Classes of Claims and Equity Interests (deemed to have accepted the Plan and, therefore, not entitled to vote on the Plan)**</u>**.**

      (a)      <u>Class 1:  Other Priority Claims</u>.

Class 1 consists of all Other Priority Claims.

      (b)      <u>Class 2:  Other Secured Claims</u>.

Class 2 consists of all Other Secured Claims.

      (c)      <u>Class 4: Letter of Credit Facility Claims</u>.

Class 4 consists of all Letter of Credit Facility Claims.

      (d)      <u>Class 5:  General Unsecured Claims</u>.

Class 5 consists of all General Unsecured Claims.

      (e)      <u>Class 6:  Intercompany Claims</u>.

Class 6 consists of all Intercompany Claims.

      (f)      <u>Class 7:  Equity Interests in Debtors other than HMH Holdings</u>.

Class 7 consists of all Equity Interests in Debtors other than HMH Holdings.

**3.**      <u>**Impaired Classes (entitled to vote on the Plan)**</u>**.**

      (a)      <u>Class 3:  Senior Creditor Claims</u>.

Class 3 consists of all Senior Creditor Claims.

    (b)    <u>Class 8: Existing Common Stock</u>.

Class 8 consists of all Existing Common Stock.

    **4.**    **<u>Impaired Classes (deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan)</u>.**

    (a)    <u>Class 9:  Other Holdings Equity Interests</u>.

Class 9 consists of all Other Holdings Equity Interests.

**III.**

**TREATMENT OF ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS AND DIP FINANCING CLAIMS**

    **A.**    <u>**Administrative Claims**</u>.

Subject to the provisions of sections 330(a) and 331 of the Bankruptcy Code, as applicable, each holder of an Allowed Administrative Claim shall receive in full and final satisfaction of such Claim, (a) Cash in the full amount of such Allowed Claim, without interest, or (b) such amount at such other date and upon such other terms as may be agreed upon in writing by such holder and the Debtors, with the consent of the Requisite Participating Lenders or otherwise approved by Final Order of the Court on or as soon as practicable after the later of (i) the Effective Date, (ii) the date on which such Administrative Claim becomes Allowed, (iii) the date on which such Allowed Administrative Claim is due to be paid in the ordinary course of business with the Debtors, and (iv) the date on which the holder of such Allowed Administrative Claim and the Debtors, with the consent of the Requisite Participating Lenders, otherwise agree in writing.  Notwithstanding anything herein to the contrary, except with respect to Fee Claims and except with respect to subsection (iv) hereof, the Debtors or Reorganized Debtors, as applicable, shall object to any Administrative Claims before the later of (x) sixty (60) days after the Effective Date and (y) sixty (60) days after the filing of the request for payment of an Administrative Claim.

    **B.**    <u>**Fee Claims**</u>.

All requests for compensation or reimbursement of Fee Claims pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date shall be filed and served on the Reorganized Debtors and their counsel, the United States Trustee, counsel to the Creditors' Committee (if any), counsel to the Informal Creditor Group and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or any other order(s) of the Court, no later than forty-five (45) days after the Effective Date.  Holders of Fee Claims that are required to file and serve applications for final allowance of their Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Fee Claims against the Debtors, the Reorganized Debtors or their respective properties, and

23

such Fee Claims shall be deemed discharged as of the Effective Date. Objections to any Fee Claims must be filed and served on the Reorganized Debtors and their counsel and the requesting party no later than seventy-five (75) days (or such longer period as may be allowed by order of the Court) after the Effective Date.

### C.      Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim and the Debtors, with the consent of the Requisite Participating Lenders, agree to a different treatment, each holder of an Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim plus Post-Petition Interest on the later of the Initial Distribution Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business without Post-Petition Interest.

### D.      DIP Financing Claims.

On the Effective Date, except to the extent that the holders of the DIP Financing Claims and the Debtors, with the consent of the Requisite Participating Lenders, agree to a different treatment, in full and final satisfaction of such Claims, the DIP Financing Claims shall be satisfied as provided under the Exit Facility.

### IV.

### TREATMENT OF CLAIMS AND
### EQUITY INTERESTS

### A.      Class 1 — Other Priority Claims.

### 1.      Distributions.

Except to the extent that a holder of an Allowed Other Priority Claim and the Debtors, with the consent of the Requisite Participating Lenders, agree to a different treatment, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash in an amount equal to such Allowed Other Priority Claim plus Post-Petition Interest on or as soon as practicable after the later of the Initial Distribution Date and the date when such Other Priority Claim becomes an Allowed Other Priority Claim. All Allowed Other Priority Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business without Post-Petition Interest.

### 2.      Impairment and Voting.

Class 1 is unimpaired under the Plan. Holders of Allowed Other Priority Claims in Class 1 are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

24

### B.   Class 2 — Other Secured Claims.

#### 1.   Distributions.

Except to the extent that a holder of an Allowed Other Secured Claim and the Debtors, with the consent of the Requisite Participating Lenders, agree to a different treatment, in full and final satisfaction of such Claim, (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or to receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim plus Post-Petition Interest in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Initial Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable, or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim plus Post-Petition Interest in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Initial Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable, in each case as determined by the Debtors, with the consent of the Requisite Participating Lenders.

#### 2.   Impairment and Voting.

Class 2 is unimpaired under the Plan.  The holders of Allowed Other Secured Claims in Class 2 are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

### C.   Class 3 — Senior Creditor Claims.

#### 1.   Allowance of Senior Creditor Claims and Distribution.

Senior Creditor Claims shall be deemed Allowed in the following amounts:  (a) the First Lien Term Loan Claims shall be deemed Allowed in the amount of $2.571 billion plus accrued interest as of the Petition Date; (b) the First Lien Revolver Claims shall be deemed Allowed in the amount of $235.8 million plus accrued and unpaid interest as of the Petition Date; and (c) the 10.5% Notes Claims shall be allowed in the amount of $300 million plus accrued interest as of the Petition Date.  On the Initial Distribution Date, subject to the occurrence of the Restructuring (as provided in Article VII.B), each holder of an Allowed Senior Creditor Claim shall receive, in full and final satisfaction of such Claim, its pro rata share of (i) 100% of the New Common Stock, subject to dilution for the New Common Stock to be issued pursuant to the Management Incentive Plan and, if applicable, New Common Stock to be issued upon exercise of the New Warrants and (ii) $30.3 million in Cash.

### 2.    **Impairment and Voting**.

Class 3 is Impaired under the Plan.  Each holder of an Allowed Senior Creditor Claim in Class 3 is entitled to vote to accept or reject the Plan.

### D.    **Class 4 — Letter of Credit Facility Claims**.

### 1.    **Distributions**.

Except to the extent that a holder of an Allowed Letter of Credit Facility Claim and the Debtors, with the consent of the Requisite Participating Lenders, agree to a different treatment, the outstanding letters of credit issued under the Letter of Credit Facility shall either continue unaffected upon consummation of the Plan or be replaced from the proceeds of the Exit Facility and the Letter of Credit Facility shall be deemed terminated.

### 2.    **Impairment and Voting**.

Class 4 is unimpaired under the Plan.  Each holder of an Allowed Letter of Credit Facility Claim in Class 4 is presumed to accept the Plan and is not entitled to vote to accept or reject the Plan.

### E.    **Class 5 — General Unsecured Claims**.

### 1.    **Distributions**.

Each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claims, Cash in amount equal to such holder's Allowed General Unsecured Claim plus accrued and unpaid Post-Petition Interest; provided, however, that the Debtors may, with the consent of the Requisite Participating Lenders, seek authority from the Court to pay certain General Unsecured Claims in advance of the Effective Date pursuant to certain "first day motions" the Debtors intend to file in the Chapter 11 Cases, as described in the Disclosure Statement; provided, further, that any General Unsecured Claim that becomes due and owing after the Effective Date shall be paid in the ordinary course of business when such claim is due and owing, without Post-Petition Interest.

### 2.    **Impairment and Voting**.

Class 5 is unimpaired under the Plan.  Each holder of an Allowed General Unsecured Claim in Class 5 is presumed to accept the Plan and is not entitled to vote to accept or reject the Plan.

F.    <u>**Class 6 — Intercompany Claims**</u>.

1.    <u>**Distributions**</u>.

On or as soon as practicable after the Effective Date, all Allowed Intercompany Claims shall be adjusted, continued, or discharged to the extent determined appropriate by the Debtors, with the consent of the, Requisite Participating Lenders.

2.    <u>**Impairment and Voting**</u>.

Class 6 is unimpaired under the Plan.  Holders of Intercompany Claims in Class 6 are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

G.    <u>**Class 7 — Equity Interests in Debtors other than HMH Holdings**</u>.

1.    <u>**Distributions**</u>.

The holders of Equity Interests in Debtors other than HMH Holdings shall retain such Equity Interests.

2.    <u>**Impairment and Voting**</u>.

Class 7 is unimpaired under the Plan.  The holders of Equity Interests in Debtors other than HMH Holdings in Class 7 are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

H.    <u>**Class 8 — Existing Common Stock**</u>.

1.    <u>**Distribution**</u>.

If the Class 8 Existing Common Stock votes to accept the Plan, each holder of Existing Common Stock shall receive its pro rata share of the New Warrants.  If the Class 8 Existing Common Stock votes to reject the Plan, the holders of the Existing Common Stock shall neither receive distributions nor retain any property under the Plan on account of such Existing Common Stock.

2.    <u>**Impairment and Voting**</u>.

Class 8 is Impaired under the Plan.  Each Existing Common Stockholder is entitled to vote to accept or reject the Plan.

I.  **Class 9 — Other Holdings Equity Interests.**

1.  **Distribution.**

Each Other Holdings Equity Interest Holder shall neither receive distributions nor retain any property under the Plan on account of such Other Holdings Equity Interest.  The Other Holdings Equity Interests will be cancelled on the Effective Date.

2.  **Impairment and Voting.**

Class 9 is Impaired under the Plan.  Each Other Holdings Equity Interest Holder is presumed to reject the Plan and is not entitled to vote to accept or reject the Plan.

## V.

## PROVISIONS REGARDING VOTING, DISTRIBUTIONS, AND TREATMENT OF DISPUTED, CONTINGENT AND UNLIQUIDATED ADMINISTRATIVE EXPENSE CLAIMS, CLAIMS AND EQUITY INTERESTS

A.  **Voting on the Plan.**

Each holder of an Allowed Claim in Class 3 and each Existing Common Stockholder in Class 8 is Impaired and is entitled to vote to accept or reject the Plan.  Classes 1, 2, 4, 5, 6 and 7 are unimpaired and are not entitled to vote to accept or reject the Plan as they are presumed to accept the Plan.  Class 9 is Impaired, will not receive or retain any property under the Plan, and is not entitled to vote to accept or reject the Plan as it is deemed to reject the Plan.

B.  **Distributions.**

1.  **Allowed Claims.**

(a)  *Delivery of Distributions*.

Distributions under the Plan shall be made by the Reorganized Debtors or their designee to the holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, and Allowed General Unsecured Claims at the addresses set forth in the Debtors' books and records, unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001 on or prior to the Voting Record Date (or at the last known addresses of such holders if the Debtors or the Reorganized Debtors have been notified in writing of a change of address).  Distributions on account of the Allowed Senior Creditor Claims shall be made initially to the First Lien Administrative Agent and the 10.5% Indenture Trustee, or to such other entity(ies) as may be determined by the First Lien Administrative Agent and/or the 10.5% Indenture Trustee, for distribution to holders of Allowed Senior Creditor Claims.  Distributions on account of the Existing Common Stock, if any, shall

be made to the Debtors' transfer agent, for distribution to Existing Common Stockholders.

(b)      *Distribution of Cash*.

Any payment of Cash by the Reorganized Debtors pursuant to the Plan shall be made at the option and in the sole discretion of the Reorganized Debtors by (i) a check drawn on, or (ii) wire transfer from, a domestic bank selected by the Reorganized Debtors.

(c)      *Fractional Cents*.

Any other provision of the Plan to the contrary notwithstanding, no payment of fractions of cents will be made.  Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

(d)      *Fractional Securities*.

Any other provision of the Plan to the contrary notwithstanding, no distributions of fractional shares of New Common Stock or fractional New Warrants will be made. Whenever any distribution of a fraction of a share of New Common Stock or a fraction of a New Warrant would otherwise be called for, the actual distribution shall reflect a rounding down of such fraction to the nearest whole share of New Common Stock or New Warrant.

(e)      *Unclaimed Distributions*.

Any Distribution of Cash under the Plan to the holder of an Allowed Claim which remains unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan shall be transferred to and become property of the Reorganized Debtors notwithstanding state or other escheat or similar laws to the contrary, and any and all entitlement by the holder of such Claim to such Distribution shall be extinguished and forever barred.  The failure by a holder of the Senior Creditor Claims to execute the Registration Rights Agreement within 180 days of the Effective Date shall result in the forfeiture of such holders allocation of New Common Stock.  After such date, all forfeited New Common Stock shall revert to the Reorganized Debtors and the Senior Creditor Claim of such holder to such New Common Stock shall be discharged and forever barred.

(f)    *Saturdays, Sundays, or Legal Holidays*.

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and shall be deemed to have been completed as of the required date.

(g)    *Distributions to Holders of Allowed Claims as of the Distribution Record Date*.

As of the close of business on the Distribution Record Date, the Claims register shall be closed, and there shall be no further changes in the record holders of any Claims. The Debtors and the Reorganized Debtors shall have no obligation to recognize any Claim filed or transfer of any Claims occurring after the Distribution Record Date. The Debtors and the Reorganized Debtors shall instead be entitled to recognize and deal for purposes under the Plan with only those record holders stated on the Claims register as of the close of business on the Distribution Record Date.

(h)    *Third Party Agreements; Subordination*.

Distributions shall be subject to and modified by any Final Order directing distributions other than as provided in the Plan. The right of the Debtors to seek subordination of any Claim or Equity Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Equity Interest that becomes a subordinated Claim or subordinated Equity Interest at any time shall be modified to reflect such subordination. Unless the Confirmation Order provides otherwise, no Distributions shall be made on account of any subordinated Claim or subordinated Equity Interest.

## C.    Objections to and Resolution of Claims.

### 1.    Objections to and Resolution of Administrative Claims and Claims.

The Reorganized Debtors shall have the exclusive right to make and to file objections to Administrative Claims (other than Fee Claims) and Claims subsequent to the Effective Date. Unless otherwise ordered by the Court, objections to Administrative Claims and Claims shall be filed and served upon the holders of the Administrative Claims or Claims as to which the objection is made as soon as practicable. Objections to Fee Claims shall be filed and served within seventy-five (75) days (or such longer period as may be allowed by order of the Court) after the Effective Date.

Objections to Administrative Claims and Claims may be litigated to judgment, settled or withdrawn, in the Reorganized Debtors' sole discretion. The Reorganized Debtors may settle any such objections without Court approval.

**D.**     **Estimation.**

The Debtors or the Reorganized Debtors, as the case may be, may at any time request that the Court estimate, subject to 28 U.S.C. § 157, any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim.  The Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim.  In the event that the Court estimates any Disputed Claim, such estimated amount may constitute either (a) the Allowed amount of such Claim, (b) the estimate to be used by the Debtors in calculating potential Distributions under the Plan, or (c) a maximum limitation on such Claim, as determined by the Court.  In the case of Claims arising from personal injury tort or wrongful death actions, the Court may estimate such Claims for the purpose of confirming the Plan.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors may elect to object to ultimate payment of such Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

**E.**     **Indenture Trustee Expenses and First Lien Agent Expenses.**

In addition to any other Claim that may be filed by the 10.5% Indenture Trustee or the First Lien Agents pursuant to the provisions set forth herein, the 10.5% Indenture Trustee and the First Lien Agents shall have an Allowed Administrative Claim in an amount equal to the Indenture Trustee Expenses or the First Lien Agent Expenses.  If the Debtors or the Reorganized Debtors dispute the reasonableness of the Indenture Trustee Expenses or the First Lien Agent Expenses, the Debtors, the Reorganized Debtors, or the 10.5% Indenture Trustee or the First Lien Agents, as applicable, may submit such dispute to the Court for a determination of the reasonableness of such fees or expenses and the disputed portion of the Indenture Trustee Expenses or the First Lien Agent Expenses shall not be paid until the dispute is resolved.  The undisputed portion of the Indenture Trustee Expenses or the First Lien Agent Expenses shall be paid as provided herein.  The 10.5% Indenture Trustee shall not be entitled to payment of or assertion of its Indenture Trustee Charging Lien for any disputed Indenture Trustee Expenses to the extent the Court determines that such Indenture Trustee Expenses are unreasonable under the terms of the 10.5% Notes Indenture.  Nothing contained herein shall otherwise affect the right of the 10.5% Indenture Trustee from asserting its Indenture Trustee Charging Lien, to the extent applicable under the terms of the 10.5% Notes Indenture, provided, however, that upon the full and indefeasible payment of the Indenture Trustee Expenses, the Indenture Trustee Charging Lien shall be deemed released and discharged in full.

**F.**     **Cancellation and Surrender of Existing Securities and Agreements.**

On the Effective Date, except as otherwise specifically provided for in the Plan, after the Restructuring, the obligations under the 10.5% Notes Indenture and the First Lien Credit Agreement and any other certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any

indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim, including Equity Interests , shall be deemed cancelled and the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors shall be released and discharged, provided, however, notwithstanding Confirmation or the occurrence of the Effective Date, any agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of allowing holders to receive distributions under the Plan as provided in the Plan; provided, however, that (a) the 10.5% Notes Indenture and the First Lien Credit Agreement shall continue to survive and be in full force and effect only for the purposes of (i) making distributions under the Plan, (ii) asserting any Indenture Trustee Charging Lien thereunder, (iii) permitting the 10.5% Indenture Trustee to appear in the Chapter 11 Cases, and (iv) any function necessary in connection with the forgoing clauses (a)(i)-(a)(iii) and (b) the First Lien Credit Agreement shall continue to survive and be in full force and effect only for purposes of (i) making distributions under the Plan; (ii) permitting the First Lien Agents to appear in the Chapter 11 Cases and (iii) any function necessary in connection with the foregoing clauses (b)(i) and (b)(ii); provided, however, that for the avoidance of doubt, the 10.5% Notes Indenture shall be deemed to be fully and completely terminated and discharged upon the making of all of the distributions set forth in clause (a)(i) and (b)(i) of this Article V.F, respectively.

### G.    Nonconsensual Confirmation.

Classes 3 and 8 are Impaired and are entitled to vote to accept or reject the Plan.  Class 9 is Impaired, is not entitled to vote to accept or reject the Plan, and is deemed to reject the Plan.  As such, the Debtors will seek to have the Court confirm the Plan under section 1129(b) of the Bankruptcy Code with respect to Class 8 if it votes to reject the Plan and Class 9.

### VI.

### SUBSTANTIVE CONSOLIDATION OF THE DEBTORS

The Plan is predicated upon, and it is a condition precedent to confirmation of the Plan, that the Court provide in the Substantive Consolidation Order for the substantive consolidation of the Chapter 11 Cases of the Debtors into a single Chapter 11 Case for purposes of the Plan and the Distributions hereunder.  Pursuant to such Substantive Consolidation Order (i) all assets and liabilities of the Substantively Consolidated Debtors will be merged, (ii) the obligations of each Debtor will be deemed to be the obligations of the Substantively Consolidated Debtors, (iii) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the Substantively Consolidated Debtors, (iv) each Claim filed in the Chapter 11 Cases of any Debtor will be deemed filed against the Debtors in the consolidated Chapter 11 Cases in accordance with the substantive consolidation of the assets and liabilities of the Debtors, (v) all

transfers, disbursements and distributions made by any Debtor under the Plan will be deemed to be made by the Substantively Consolidated Debtors, and (vi) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the Substantively Consolidated Debtors. Holders of Allowed Claims in each Class shall be entitled to their share of assets available for distribution to such Class without regard to which Debtor was originally liable for such Claim. Such substantive consolidation shall not (other than for purposes related to the Plan) affect (a) the legal and corporate structure of the Reorganized Debtors (b) Intercompany Claims or (c) other pre- and post-Petition Date guarantees that are required to be maintained (i) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been, or will hereunder be, assumed, (ii) pursuant to the express terms of the Plan, or (iii) in connection with the Exit Facility. The proposed substantive consolidation shall not affect each Debtor's obligation to file the necessary operating reports and pay any required fees pursuant to 28 U.S.C. § 1930(a)(6) and such obligations shall continue until an order is entered closing, dismissing or converting such Debtor's Chapter 11 Case.

Unless the Court has approved the substantive consolidation of the Estates by a prior order, the Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Debtors' estates. If no objection to substantive consolidation is timely filed and served, then the proposed substantive consolidation of the Substantively Consolidated Debtors may be approved by the Court. If any such objection is timely filed and served, a hearing with respect to the substantive consolidation of the Estates and the objections thereto shall be scheduled by the Court, which hearing may coincide with the Confirmation Hearing.

In the event the Court determines not to approve the substantive consolidation of the Substantively Consolidated Debtors, the Plan shall constitute a separate chapter 11 plan of reorganization for each Debtor, each of which shall include the classifications set forth herein. For the avoidance of doubt, to the extent a Class contains Allowed Claims and Equity Interests with respect to a particular Debtor, such Class is designated with respect to such Debtor. To the extent there are no Allowed Claims or Equity Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor.

## VII.

## PROVISIONS REGARDING IMPLEMENTATION OF PLAN

### A.    Exit Facility.

The Debtors shall have closed on the Exit Facility on or prior to the Effective Date, to be entered into by the Reorganized Debtors, the administrative agent and the lenders party thereto with the consent of the Requisite Participating Lenders, and all ancillary agreements, substantially in the form included in the Plan Supplement, which must be

acceptable to the Requisite Participating Lenders.  On the Effective Date, the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Facility without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any person.

The amounts borrowed under the Exit Facility shall be used to make the required Distributions under the Plan, to satisfy certain plan-related expenses and to fund the Reorganized Debtors' working capital needs.

## B.     The Restructuring.

To implement the Plan, on the Effective Date, the Debtors will undergo a restructuring (the "Restructuring"), that will include the following steps:

Step (1):  HMH Holdings will contribute the New Common Stock (through intermediate subsidiaries) to HMH Publishers Inc. (on its own behalf and on behalf of HMH Publishers LLC) and to HMH, so that HMH Publishers Inc. and HMH own the New Common Stock of HMH Holdings.  HMH Publishers Inc. (on its own behalf and on behalf of Reorganized HMH Publishers LLC) and HMH will receive New Common Stock in proportion to the benefit each derived from the proceeds of the indebtedness under the First Lien Credit Agreement and the 10.5% Notes) (the "Co-Borrower Percentages").  The Debtors will contribute or distribute (through intermediate subsidiaries or parent entities), as necessary, an aggregate amount of $30.3 million of Cash to HMH and HMH Publishers Inc. (on its own behalf and on behalf of Reorganized HMH Publishers LLC) so that each holds Cash (in proportion to the Co-Borrower Percentages) necessary to engage in the exchanges described in Step 2.

Step (2):

(A) The Senior Creditor Claims will be transferred to HMH Publishers Inc. (on its own behalf and on behalf of Reorganized HMH Publishers LLC) and to HMH in accordance with the Co-Borrower Percentages and the Senior Creditor Claims will be cancelled.

(B) In exchange for their Senior Creditor Claims, Senior Creditors will receive from each of HMH Publishers Inc. and HMH, a pro rata share of the New Common Stock that HMH Publishers Inc. and HMH held after Step (1) of the Restructuring and a pro rata share of $30.3 million in Cash.  HMH Publishers Inc. and HMH shall hold no New Common Stock after this Step (2).

Step (3):  The Existing Common Stock will be cancelled, either (x) in exchange for the New Warrants if Class 8 votes to approve the Plan, or (z) for no consideration if Class 8 votes to reject the Plan.  All Other Holdings Equity Interests will be cancelled.

For U.S. federal income tax purposes, and for state, local, and non-U.S. tax purposes, to the extent applicable, (x) the Senior Creditors and the Debtors shall report the

transactions described in Step 1 and Step 2 (taken together) as a taxable exchange of the Senior Creditor Claims for New Common Stock and Cash and (y) the Existing Common Stockholders and the Debtors shall report the transactions described in Step (3), to the extent the Existing Common Stockholders receive New Warrants, as a taxable exchange of their Existing Common Stock for New Warrants.

## C.    Sources of Cash for Plan Distribution and Transfers of Funds Among Debtors

All consideration necessary for the Reorganized Debtors to make payments or distributions pursuant to the Plan shall be obtained from the Exit Facility or other Cash from the Debtors, including Cash from business operations.  Further, the Debtors, the Foreign Affiliates and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth in the Plan, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

## D.    The Initial Board of Directors.

Immediately following the Effective Date, the board of directors of Reorganized HMH Holdings ("Reorganized HMH Holdings Board of Directors") shall be comprised of nine (9) members, one (1) of whom shall be the chief executive officer and eight (8) of whom, including the chairperson, shall be initially chosen by the Informal Creditor Group with the participation and input of the chief executive officer, *provided, that,* Paulson & Co. Inc. ("Paulson") shall have the right to designate two (2) initial directors, one of whom will be "independent" and selected from the pool of candidates identified with the assistance of a consultant.  All initial members of the Reorganized HMH Holdings Board of Directors (other than the two (2) nominated by Paulson, one of whom shall be chosen from the pool of independent director candidates), whether designated prior to or after the Effective Date, will be designated for an initial term of one (1) year by the consensus of the Informal Creditor Group from a pool of director candidates that has been generated by the Informal Creditor Group with the participation and input of the chief executive officer and an outside consulting firm selected by the Informal Creditor Group.  The pool of director candidates may include existing directors as well as new director candidates. Thereafter, all members of the Reorganized HMH Holdings Board of Directors (until an IPO, other than those directors nominated pursuant to a Nomination Agreement) will be designated by the nominating committee of the Reorganized HMH Holdings Board of Directors or the holders of a majority of outstanding shares of New Common Stock. After the Effective Date, in any uncontested election for directors, a director must receive the approval of a majority of the shares of New Common Stock voted at the meeting.

A majority of the Reorganized HMH Holdings Board of Directors, including the Chairperson, will be "independent" under NYSE standards.  The Reorganized HMH Holdings Board of Directors will have an audit committee, a compensation committee, a nominating committee and an ethics and governance committee.

The identities, affiliations and the nature of compensation of the directors shall be disclosed in the Plan Supplement. The directors of each Debtor on the day immediately preceding the Effective Date that are not otherwise appointed as members of the initial board of directors or the equivalent governing body for the corresponding Reorganized Debtor shall be deemed to have resigned from the board of directors of such Debtor as of the Effective Date. To the extent there are open seats on the Reorganized HMH Holdings Board of Directors on the Effective Date, the nominating committee, which shall consist of the members of the Informal Creditor Group, shall be empowered to appoint new members of the Reorganized HMH Holdings Board of Directors and the board of directors for the other Reorganized Debtors to fill the empty seats on and after the Effective Date.

### E.        Securities to Be Issued Pursuant to the Plan.

The New Common Stock offered in the Plan shall be the common stock in Reorganized HMH Holdings. The issuance of the New Common Stock, the New Warrants, the Management Options or other equity awards reserved for the Management Incentive Plan, and the New Common Stock issuable upon exercise of the New Warrants is authorized without the need for any further corporate action or without any further action by a holder of a Claim. Computershare Limited will be the transfer agent, registrar and redemption agent for the New Common Stock. Reorganized HMH Holdings shall authorize and issue or reserve for issuance such number of shares of New Common Stock as may be necessary to be issued upon exercise of the New Warrants or to effectuate the Management Incentive Plan. All of the shares of New Common Stock and New Warrants issued pursuant to the Plan shall be duly authorized, validly issued and fully paid and non-assessable.

### F.        Management of Reorganized Debtors.

Upon the Effective Date, the officers of the Reorganized Debtors shall be substantially the same as the officers of the Debtors on the Petition Date. The Reorganized Debtors' officers shall serve in accordance with any employment agreement with the Reorganized Debtors and applicable nonbankruptcy law. The Debtors will disclose the identities of senior management and any related employment agreements in the Plan Supplement.

### G.        Reorganized HMH Holdings Certificate of Incorporation, Reorganized HMH Holdings Bylaws and Other Amended and Restated Governing Documents.

The adoption of the Amended and Restated Governing Documents shall be deemed to have occurred and be effective as of the Effective Date without any further action by the directors, stockholders, partners or members (as the case may be) of the Debtors or Reorganized Debtors. The Amended and Restated Governing Documents will, among other things, contain appropriate provisions prohibiting the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. On or prior to the Effective Date, the Debtors will, if required by applicable state law, file with

the Secretary of State of the appropriate jurisdiction the Amended and Restated Governing Documents.

### H.    Registration Rights Agreeement

Upon the Effective Date, the Registration Rights Agreement shall be deemed to become valid, binding and enforceable in accordance with its terms, and each holder of New Common Stock shall be bound thereby, in each case, without need for execution by any party thereto other than Reorganized HMH Holdings, provided, however, that each holder of a Senior Creditor Claim must register its New Common Stock with Reorganized HMH Holdings and execute a signature page to and be bound by the Registration Rights Agreement as a condition precedent to receiving its allocation of New Common Stock.  The Registration Rights Agreement shall contain provisions relating to the listing of the New Common Stock on a national securities exchange, the registration of securities held by certain stockholders with the SEC, access to information regarding the Reorganized Debtors and preemptive rights to purchase securities.

### I.    Reorganized Debtors' Management Incentive Plan.

On the Effective Date of the Plan, the Management Incentive Plan will be implemented and will be comprised of the Management Options which are to be options to acquire up to ten (10) percent of the total number of fully diluted shares of New Common Stock to be outstanding after the Restructuring.  The terms of the Management Incentive Plan and the Management Options, each of which shall be acceptable to the Debtors and the Requisite Participating Lenders, will be set forth in the Plan Supplement.

### J.    Informal Creditor Group Professionals Fees.

On the Effective Date, the Reorganized Debtors shall pay the reasonable fees and expenses of the Informal Creditor Group Professionals, whether incurred prior to or after the Petition Date, in full in Cash without the need for application to, or approval of, the Court.

### K.    Corporate Action.

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate related actions to be taken by or required of the Reorganized Debtors shall, as of the Effective Date, have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by holders of Claims or Equity Interests, directors of the Debtors, or any other entity.

### L.    Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized Debtors and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file,

or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### M.      Exemption from Certain Taxes and Fees.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### N.      Powers of Officers.

The officers of the Debtors or the Reorganized Debtors, as the case may be, shall have the power to enter into and to execute any Plan Supplement Document to which the Debtors, or the Reorganized Debtors are to be a party and to take such other or further action as they deem reasonable and appropriate to effectuate the terms of the Plan.

## VIII.

## EFFECT OF CONFIRMATION OF THE PLAN

### A.      Continued Corporate Existence.

The Debtors, as Reorganized Debtors, shall continue to exist after the Effective Date with all of the powers of a corporation, partnership or limited liability company, as the case may be, under the laws of the State of Delaware or their state of incorporation or formation and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and

delivered in connection therewith.  In addition, the Reorganized Debtors may operate their businesses free of any restrictions imposed by the Bankruptcy Code, the Bankruptcy Rules or by the Court, subject only to the terms and conditions of the Plan, the Confirmation Order, and the documents and instruments executed and delivered in connection with the Plan, including without limitation, the documents and instruments included in the Plan Supplement.  Notwithstanding the foregoing, on or as of the Effective Date or as soon as practicable thereafter and without need for any further action, the Reorganized Debtors (with the consent of the Requisite Participating Lenders) may (a) cause any or all of the Reorganized Debtors or Foreign Affiliates to be merged into one or more of the Reorganized Debtors or Foreign Affiliates, dissolved or otherwise consolidated; (b) cause the transfer of assets between or among the Reorganized Debtors or Foreign Affiliates; or (c) engage in any other transaction in furtherance of the Plan.

## B.      Releases of Guarantees and Collateral.

Upon the Effective Date, the First Lien Agents and the 10.5% Indenture Trustee shall release any and all collateral and guarantees with respect to the First Lien Credit Agreement and the 10.5% Notes.

## C.      Dissolution of Creditors' Committee.

The Creditors' Committee (if one is appointed) shall continue in existence until the Effective Date and shall continue to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and shall perform such other duties as it may have been assigned by the Court prior to the Effective Date.  On the Effective Date, the Creditors' Committee shall be dissolved and its members shall be deemed released of all of their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, financial advisors, and other agents, if any, shall terminate except that the Creditors' Committee shall continue to have standing and a right to be heard with respect to (i) all Fee Claims, (ii) any appeals of the Confirmation Order, (iii) any adversary proceedings pending as of the Effective Date to which it may be a party and (iv) post-Effective Date modifications to the Plan.

## D.      Vesting of Property.

Except as otherwise expressly provided in the Plan, on the Effective Date, or as soon as practicable thereafter, the Reorganized Debtors shall be vested with all of the property of the Debtors' estates free and clear of all Claims, Liens, encumbrances, charges and other interests of creditors and equity security holders.

## E.      Discharge of the Debtors.

**Except as otherwise provided in the Plan, the rights afforded in the Plan, and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims or Equity Interests of any kind or nature whatsoever, whether known or unknown, including any interest**

accrued or expenses incurred thereon, against or in the Debtors, the Reorganized
Debtors or any of their respective assets or properties, arising prior to the Effective
Date.  Except as otherwise expressly specified in the Plan, the Confirmation Order
shall act as of the Effective Date as a discharge of all debts of, Claims against, Liens
on, and Equity Interests in the Debtors, their respective assets and properties,
arising at any time before the Effective Date, regardless of whether a proof of Claim
or Equity Interest with respect thereto was filed, whether the Claim or Equity
Interest is Allowed, or whether the holder thereof votes to accept the Plan or is
entitled to receive a Distribution hereunder.  Except as otherwise expressly specified
in the Plan, after the Effective Date, any holder of such discharged Claim or Equity
Interest shall be precluded from asserting any other or further Claim against, or
Equity Interest in, the Debtors, the Reorganized Debtors, or any of their respective
assets or properties, based on any document, instrument, act, omission, transaction,
or other activity of any kind or nature that occurred before the Effective Date.
Notwithstanding any provision in the Plan to the contrary, the distribution on
account, and discharge of Allowed 10.5% Notes Claims will not be dependent on the
surrender or cancellation of the 10.5% Notes. The 10.5% Indenture Trustee will
send such notices and take such other actions as are reasonably requested by the
Debtors to effect the cancellation of the 10.5% Notes held by Cede & Co.

> ### F.    Injunction.

**Except as otherwise expressly provided in the Plan, the Confirmation Order, the
Plan Supplement Documents, or a separate order of the Bankruptcy Court, all
Persons who have held, hold, or may hold Claims against, or Equity Interests in, the
Debtors that arose before or were held as of the Effective Date, shall be permanently
enjoined, on and after the Effective Date, from (a) commencing or continuing in any
manner any action or other proceeding of any kind against the Debtors or the
Reorganized Debtors with respect to any such Claim or Equity Interest, (b) the
enforcement, attachment, collection, or recovery by any manner or means of any
judgment, award, decree, or order against the Debtors or the Reorganized Debtors
on account of any such Claim or Equity Interest, (c) creating, perfecting, or
enforcing any encumbrance of any kind against the Debtors or the Reorganized
Debtors or against the property or interests in property of the Debtors or the
Reorganized Debtors on account of any such Claim or Equity Interest and
(d) asserting any right of setoff or subrogation of any kind against any obligation
due from the Debtors or the Reorganized Debtors or against the property or
interests in property of the Debtors or the Reorganized Debtors on account of any
such Claim or Equity Interest.  Such injunction shall extend to successors of the
Debtors (including, without limitation, the Reorganized Debtors) and their
respective properties and interests in property.**

> ### G.    Preservation of Causes of Action.

The Reorganized Debtors shall retain all rights and all Causes of Action accruing to them
and their estates, including but not limited to, those arising under sections 505, 544, 547,

548, 549, 550, 551, 553 and 1123(b)(3)(B) of the Bankruptcy Code, including all tax setoff and refund rights arising under section 505, other than as expressly provided below.  Except as expressly provided in the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any such rights or Causes of Action.  Nothing contained in the Plan or the Confirmation Order shall be deemed a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors have that is not specifically waived or relinquished by the Plan.  The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such Claims, Causes of Action, rights of setoff and other legal or equitable defenses that the Debtors have as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim that are not specifically waived or relinquished by the Plan may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### H.    Votes Solicited in Good Faith.

The Debtors have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.  The Debtors (and each of their respective affiliates, agents, directors, officers, members, employees, advisors and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in connection with the Distributions contemplated hereunder and therefore have not been, and on account thereof will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the Distributions contemplated hereunder.

### I.    Mutual Releases.

**On the Effective Date, (a) the Debtors and any non-Debtor guarantors under the First Lien Credit Agreement and the 10.5% Notes Indenture, (b) the Senior Creditors in their capacity as a First Lien Bank Lender and/or a Bondholder, as applicable, (c) the members of  the Creditors' Committee (if any), (d) the DIP Lenders and DIP Agents, (e) the First Lien Agents, (f) the 10.5% Indenture Trustee, (g) the Existing Equity Holders and (h) each of the respective current and former direct and indirect equity holders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective equity holders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives) and other professionals of the parties listed in clauses (a) through (g), including the Informal Creditor Group Professionals, in each case, in their respective capacities as such, (collectively clauses (a) through (g) being the "Released Parties," and each a "Released Party") shall be deemed to and hereby unconditionally release and irrevocably discharge each other from any and all claims, obligations, suits, judgments, damages, rights, Causes of**

Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part on any act, omission, transaction or occurrence from the beginning of time through the Effective Date except that (i) no Released Party shall be released from any act or omission that constitutes gross negligence, fraud or willful misconduct, (ii) the foregoing release shall not apply to (a) any obligations under existing contracts and other agreements between any of the Released Parties that are not being terminated, extinguished or cancelled pursuant to, in connection with, or contemplated by, the Plan and (b) any obligations arising under any contract or agreement entered into between any of the Released Parties pursuant to, in connection with, or contemplated by, the Plan.

J.      Releases by Non-Debtors.

On and as of the Effective Date, all Persons who directly or indirectly have held, hold or may hold Claims or Equity Interests and do not, on their Ballots, opt out of providing the releases contemplated by this section, shall be deemed, by virtue of their treatment contemplated under the Plan, to have forever released and covenanted with the Reorganized Debtors and the other Released Parties not to (y) sue or otherwise seek recovery from any of the Reorganized Debtors or any other Released Party on account of any Claims or Equity Interests, including but not limited to any claim based upon tort, breach of contract, violations of federal, state or foreign securities laws or otherwise, based upon any act, occurrence, or failure to act from the beginning of time through the Effective Date in any way relating to the Debtors or their businesses and affairs or (z) assert against any of the Reorganized Debtors or any other Released Party any claim, obligation, right, Cause of Action or liability that any holder of Claims or Equity Interests may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction, or occurrence from the beginning of time through the Effective Date in any way relating to the Debtors, the Restructuring Support Agreement, the Chapter 11 Cases, or the Plan; provided, however, that (i) none of the Released Parties shall be released from any act or omission that constitutes gross negligence, fraud or willful misconduct, (ii) the foregoing release shall not apply to (a) any obligations under existing contracts and other agreements between any of the Released Parties that are not being terminated, extinguished or cancelled pursuant to, in connection with, or contemplated by, the Plan and (b) any obligations arising under any contract or agreement entered into between any of the Released Parties pursuant to, in connection with, or contemplated by, the Plan, and (iii) the foregoing release shall not be construed to prohibit a party in interest from seeking to enforce the terms of the Plan or any contract or agreement entered into pursuant to, in connection with, or contemplated by, the Plan.  Notwithstanding anything to the contrary in the Plan, the releases of the Released Parties shall extend only to claims arising against such Released Parties in their capacities as parties in interest in the Chapter 11 Cases. Notwithstanding anything to the contrary in the Plan, to the extent a holder of a Claim or Equity Interest elects on its Ballot not to grant the releases of the Released

Parties, such holder of a Claim or Equity Interest will not be deemed to be a Released Party to the extent it would have otherwise qualified as such.

### K.    Exculpation.

#### 1.    Exculpation and Limitation of Liability.

The Debtors, the Reorganized Debtors and the other Released Parties (i) shall have no liability whatsoever to any holder or purported holder of a Claim or Equity Interest for any act or omission in connection with, or arising out of, the Plan, the Disclosure Statement, the Restructuring Support Agreement, the negotiation of the Plan and the Restructuring Support Agreement, the negotiation of the Plan Supplement Documents, the Exit Facility, the pursuit of approval of the Disclosure Statement or the solicitation of votes for confirmation of the Plan, the Chapter 11 Cases, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, or any transaction contemplated by the Plan, the Restructuring Support Agreement or Disclosure Statement or in furtherance thereof except for any act or omission that constitutes fraud, willful misconduct or gross negligence as determined by a Final Order, and (ii) in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under or in connection with the Plan.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability.

#### 2.    Limitation of Governmental Releases.

Notwithstanding Articles VIII.J and VIII.K.1 of the Plan, the Plan shall not release, discharge, or exculpate any non-Debtor party from any debt owed to the United States Government ( the "Government") and/or its agencies, including the Pension Benefit Guaranty Corporation (the "PBGC"), or from any liability arising under the Internal Revenue Code, the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or the environmental laws, securities laws or criminal laws of the United States.  In addition, notwithstanding Articles VIII.J and VIII.K.1 of the Plan, the Plan shall not enjoin or prevent the Government from collecting any such liability from any such non-Debtor party under the provisions of applicable law.

### L.    Term of Bankruptcy Injunction or Stays.

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

**M.**      **Preservation of Insurance.**

**1.**      **Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims**

Distributions under the Plan to each holder of an Allowed Claim that is an Insured Claim shall be in accordance with the treatment provided under the Plan for the Class in which such Allowed Claim is classified, but solely to the extent that such Allowed Claim is not satisfied from proceeds payable to the holder thereof under any pertinent insurance policies and applicable law.  Nothing in Article VIII.M.1 of the Plan shall constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that any Person may hold against any other Person, including the Debtors' insurance carriers.

**2.**      **Reinstatement and Continuation of Insurance Policies**

Unless otherwise assumed during the pendency of the Chapter 11 Cases, from and after the Effective Date, each of the Debtors' insurance policies in existence on and as of the Effective Date shall be reinstated and continued in accordance with its terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code.

The Debtors' discharge and release from all Claims and Equity Interests, under the Plan, shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors, the Reorganized Debtors (including, without limitation, its officers and directors) or any other person or entity.  Notwithstanding any other provision of the Plan or the Confirmation Order, nothing in the Plan shall (i) impair (w) the right of any insurer to defend against any claim asserted against such insurer, (x) an insurer's status as a secured creditor to the extent applicable under the terms of the Plan, including the right to recover from any Collateral (in accordance with the applicable insurance policy), (y) an insurer's right to draw on third-party letters of credit (in accordance with the terms of the applicable insurance policy and letter of credit) or (z) any insurer's right of setoff pursuant to section 553 of the Bankruptcy Code to the extent applicable and/or (ii) affect an insurer's right to seek arbitration of disputes between the Debtors and such insurer to the extent provided for under the terms of the applicable insurance agreement.

**N.**      **Officers' and Directors' Indemnification Rights and Insurance.**

Notwithstanding any other provisions of the Plan, the obligations of the Debtors to indemnify their directors, officers, managers and employees against any obligations, liabilities, costs or expenses pursuant to the articles of incorporation, bylaws, partnership agreements or limited liability company operating agreements of the Debtors, as the case may be, applicable state law, specific agreement, or any combination of the foregoing, shall survive the Effective Date in all respects.

## IX.

## RETENTION OF JURISDICTION

The Court shall have exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, section 105(a) and section 1142 of the Bankruptcy Code and for, among other things, the following purposes: (1) to hear and determine applications for the assumption or rejection of executory contracts or unexpired leases pending on the Confirmation Date, and the allowance of Claims resulting therefrom; (2) to determine any other applications, adversary proceedings, and contested matters pending on the Effective Date; (3) to ensure that Distributions to holders of Allowed Claims and Equity Interests are accomplished as provided herein; (4) to resolve disputes as to the ownership of any Claim or Equity Interest; (5) to hear and determine timely objections to Claims and Equity Interests; (6) to hear and determine any disputes arising as to the reasonableness of the Indenture Trustee Expenses or First Lien Agent Expenses; (7) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated; (8) to issue orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code; (9) to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including, without limitation, the Confirmation Order; (10) to hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code; (11) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan; (12) to hear and determine any issue for which the Plan requires a Final Order of the Court; (13) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; (14) to hear and determine any Causes of Action preserved under the Plan under sections 544, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code; (15) to hear and determine any matter regarding the existence, nature and scope of the Debtors' discharge; (16) to hear and determine any matter regarding the existence, nature, and scope of the releases and exculpation provided in Article VIII of the Plan; and (17) to enter a final decree closing the Chapter 11 Cases.

## X.

## MISCELLANEOUS PROVISIONS

### A.    Payment of Statutory Fees.

All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date and all such fees payable after the Effective Date shall be paid by the applicable Reorganized Debtor as and when such fees become due.

## B.   Modification of the Plan.

### 1.   Pre-Confirmation Modifications.

The Debtors, with the written consent of the Requisite Participating Lenders, may amend, modify or supplement the Plan before the Confirmation Date as provided for in section 1127 of the Bankruptcy Code; provided, however, that with respect to modifications to the treatment of Senior Creditors, the prior written consent of each member of the Informal Creditor Group shall be required.

### 2.   Post-Confirmation Immaterial Modifications.

After the Confirmation Date, the Debtors may, with the written consent of the Requisite Participating Lenders, and with the approval of the Court and without notice to all holders of Claims or Equity Interests, insofar as it does not materially and adversely affect the holders of Claims or Equity Interests, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of the Plan; provided, however, that with respect to modifications to the treatment of Senior Creditors, the prior written consent of each member of the Informal Creditor Group shall be required.

### 3.   Post-Confirmation Material Modifications.

After the Confirmation Date, the Debtors may, with the written consent of the Requisite Participating Lenders, alter, amend or modify the Plan in a manner which, as determined by the Court, materially and adversely affects holders of Claims or Equity Interests; provided that such alteration, amendment or modification is made after a hearing as provided in section 1127 of the Bankruptcy Code; provided, further that, with respect to modifications to the treatment of Senior Creditors, the prior written consent of each member of the Informal Creditor Group shall be required.

## C.   Governing Law.

Unless a rule of law or procedure is supplied by Federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of New York (without reference to the conflicts of law provisions thereof) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specified.

## D.   Filing or Execution of Additional Documents.

On or before the Effective Date, the Debtors shall file with the Court or execute, as appropriate, such agreements and other documents, in each case, in form and substance acceptable to the Requisite Participating Lenders, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

E.    **Withholding and Reporting Requirements.**

In connection with the Plan and all instruments issued in connection herewith and Distributions hereunder, the Debtors and the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements.

F.    **Allocation Between Principal and Accrued Interest.**

For tax purposes, the aggregate consideration paid to holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claim (to the extent thereof) and, thereafter, to interest, if any, accrued through the Effective Date.

G.    **Waiver of Bankruptcy Rule 3020(e) and Federal Rule of Civil Procedure 62(a).**

The Debtors may, with the consent of the Requisite Participating Lenders, request that the Confirmation Order include (a) a finding that Bankruptcy Rule 3020(e) and Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order and (b) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

H.    **Exhibits/Schedules.**

All exhibits and schedules to the Plan and the Plan Supplement are incorporated into and constitute a part of the Plan as if fully set forth herein.

I.    **Notices.**

All notices, requests, and demands hereunder to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

To the Debtors:  Houghton Mifflin Harcourt Publishing Company, 222 Berkeley Street, Boston, Massachusetts 02116, attention:  Mr. Bill Bayers, with a copy to (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064, attention:  Alan W. Kornberg and Jeffrey D. Saferstein, Tel.: (212) 373-3000, Fax:  (212) 757-3990.

To the Informal Creditor Group:  In care of (i) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: Ira Dizengoff and Philip Dublin, Tel: (212) 872-8012, Fax: (212) 872-1002.

To the Creditors' Committee (if any):  In care of counsel to the Committee.

### J.   Plan Supplement.

Forms of the documents relating to the Registration Rights Agreement, the New Warrant Agreement, the Reorganized HMH Holdings Certificate of Incorporation, the Reorganized HMH Holdings Bylaws, the identities, terms and nature of the compensation of the Reorganized Debtors' senior officers and directors, the other Amended and Restated Governing Documents, documents relating to the Management Incentive Plan and such other documents and information as the Debtors, with the consent of the Requisite Participating Lenders, determine to be necessary or appropriate to the implementation and/or confirmation of the Plan shall be contained in the Plan Supplement, which will be filed with the Clerk of the Court no later than ten (10) days prior to the Confirmation Hearing; provided, however, that the Debtors, with the consent of the Requisite Participating Lenders, may alter, amend or modify any of the Plan Supplement Documents through and including the Effective Date in a manner consistent with the Plan.

The Plan Supplement may be inspected in the office of the Clerk of the Court during normal Court hours and shall be available online at the Voting Agent's website at HMH's dedicated web page: kccllc.net/hmhco. Holders of Claims or Equity Interests may also obtain a copy of the Plan Supplement upon written request to the Debtors in accordance with Article X.I. of the Plan.

### K.   Conflicts.

The terms of the Plan shall govern in the event of any inconsistency between the Plan and the summary of the Plan set forth in the Disclosure Statement. The terms of the Confirmation Order shall govern in the event of any inconsistency between the Confirmation Order and the Plan or the summary of the Plan set forth in the Disclosure Statement.

### L.   Setoff by the United States.

The valid setoff rights, if any, of the United States of America will be unaffected by the Plan or confirmation hereof.

### XI.

### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.   Assumption and Rejection of Executory Contracts and Unexpired Leases.

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtors shall be deemed to have assumed each executory contract and unexpired lease to which they are party, unless such contract or lease (i) was previously assumed or rejected by the Debtors, (ii) previously expired or terminated

48

pursuant to its terms, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (iv) is set forth in a schedule, as an executory contract or unexpired lease to be rejected, if any, filed by the Debtors as part of the Plan Supplement.  The Confirmation Order shall constitute an order of the Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions or rejections described above, as of the Effective Date.  For the avoidance of doubt, as described herein, the forgoing does not apply to (x) benefit plans, which are specifically dealt with in Article XII of the Plan, or (y) insurance policies, which are specifically dealt with in Article VIII.M of the Plan.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements have been rejected pursuant to an order of the Court.

### B.    Cure.

Any monetary amounts by which any executory contract or unexpired lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Reorganized Debtors upon assumption thereof or as soon as practicable thereafter.  If there is a dispute regarding (i) the nature or amount of any cure, (ii) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (iii) any other matter pertaining to assumption, any cure shall occur following the entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment, as applicable.

### C.    Rejection Damage Claims.

All Claims for damages arising from the rejection of executory contracts or unexpired leases must be served upon the Debtors and their counsel within thirty (30) days after the date of entry of an order of the Court approving such rejection.  Any Claims not filed within such time shall be forever barred from assertion against the Debtors, their respective estates and the Reorganized Debtors and their respective property.  All Allowed Claims arising from the rejection of executory contracts or unexpired leases shall be treated as Class 5 –General Unsecured Claims.

**XII.**

**BENEFIT PLANS**

As, and subject to the occurrence, of the Effective Date, all employee compensation and benefit plans, policies and programs of the Debtors applicable generally to their employees, including agreements and programs subject to section 1114 of the Bankruptcy Code, as in effect on the Effective Date, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans, and life, accidental death, and dismemberment insurance plans and workers' compensation programs, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under the Plan, and the Debtors' obligations under such agreements and programs shall survive the Effective Date of the Plan, without prejudice to the Reorganized Debtors' rights under applicable non-bankruptcy law to modify, amend, or terminate the foregoing arrangements, except for (i) such executory contracts or plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate section 1114 of the Bankruptcy Code) and (ii) such executory contracts or plans that have previously been terminated or rejected, pursuant to a Final Order, or specifically waived by the beneficiaries of such plans, contracts or programs.

The Debtors and the Reorganized Debtors, as the case may be, will continue to be the contributing sponsors of all pension plans which are defined as benefit pension plans by the PBGC under Title IV of ERISA. The Confirmation Order shall provide that (i) such pension plans are subject to minimum funding requirements of ERISA and section 412 of the Internal Revenue Code, (ii) no provision of the Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code, shall, or shall be construed to, discharge, release or relieve the Debtors or any other party, in any capacity, from any liability with respect to such pension plans under ERISA or under Internal Revenue Code section 412 and (iii) neither the PBGC nor such pension plans shall be enjoined from enforcing such liability as a result of the Plan's provisions for satisfaction, release and discharge of Claims.

**XIII.**

**CONFIRMATION AND EFFECTIVENESS OF THE PLAN**

**A.      Conditions Precedent to Confirmation.**

The Plan shall not be confirmed by the Court unless and until the following conditions have been satisfied in full or waived pursuant to Article XIII.C. of the Plan:

1.    The Plan shall be in form and substance acceptable to the Debtors and the Requisite Participating Lenders and, with respect to the treatment of Senior Creditors, each of the members of the Informal Creditor Group;

50

2.      The Debtors shall have submitted to the Court a proposed Confirmation Order, in form and substance acceptable to the Debtors and the Requisite Participating Lenders;

3.      The Interim DIP Order shall have been entered in form and substance acceptable to the Debtors and the Requisite Participating Lenders, and the Debtors shall have indefeasibly paid the Adequate Protection Payments to the Senior Creditors; and

4.      All documents to be executed, delivered or filed pursuant to the Plan, including all Plan Supplement Documents, shall be in form and substance acceptable to the Debtors and the Requisite Participating Lenders.

**B.      <u>Conditions Precedent to Effectiveness</u>.**

The Plan shall not become effective unless and until it has been confirmed and the following conditions have been satisfied in full or waived pursuant to Article XIII.C. of the Plan:

1.      The Plan shall be in form and substance acceptable to the Debtors and the Requisite Participating Lenders and, with respect to the treatment of Senior Creditors, each of the members of the Informal Creditor Group;

2.      The Confirmation Order shall have been entered in form and substance acceptable to the Debtors and the Requisite Participating Lenders, and no stay or injunction shall be in effect precluding the consummation of the transactions contemplated by the Plan;

3.      The Exit Facility, which shall be in form and substance acceptable to the Debtors and the Requisite Participating Lenders,  shall have been entered into by the Reorganized Debtors and the other parties thereto and all conditions to the initial borrowings under the Exit Facility shall have been satisfied in accordance with the terms thereof (but for the occurrence of the Effective Date);

4.      All undisputed statutory fees then due and payable to the United States Trustee shall have been paid in full;

5.      All documents to be executed, delivered or filed pursuant to the Plan, including all Plan Supplement Documents, shall be in form and substance acceptable to the Debtors and the Requisite Participating Lenders and such documents shall be executed, delivered or filed, as the case may be; and

6.      All actions, authorizations, filings, consents and regulatory approvals required (if any) shall have been obtained, effected or

51

executed in a manner acceptable to the Debtors and the Requisite Participating Lenders and shall remain in full force and effect.

## C.    Waiver of Conditions.

The Debtors may waive any or all of the conditions set forth in Article XIII.A. or XIII.B. (other than XIII.B.2.) of the Plan at any time, with the prior written consent of the Requisite Participating Lenders without leave or order of the Court and without any formal action; provided, however, that the prior written consent of each member of the Informal Creditor Group shall be required to waive the Plan treatment conditions in Articles XIII.A.1 and XIII.B.1.

## D.    Effect of Failure of Conditions.

In the event that the Effective Date does not occur on or prior to thirty (30) days after the Confirmation Order is entered by the Court or such later date as may be agreed to by the Debtors and the Requisite Participating Lenders upon notification submitted by the Debtors to the Court: (a) the Confirmation Order shall be vacated, (b) no Distributions under the Plan shall be made, (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

## E.    Denial of Confirmation/Vacatur of Confirmation Order.

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors; (c) prejudice in any manner any right, remedy or claim of the Debtors; or (d) be deemed an admission against interest by the Debtors.

## F.    Revocation, Withdrawal, or Non-Consummation.

### 1.    Right to Revoke or Withdraw.

The Debtors reserve the right to revoke or withdraw the Plan in accordance with their fiduciary duties or otherwise with the consent of the Requisite Participating Lenders at any time prior to the Effective Date.

2. **Effect of Withdrawal, Revocation, or Non-Consummation.**

If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), the assumption or rejection of executory contracts, unexpired leases, insurance policies or benefit plans effected by the Plan, any release, exculpation or indemnification provided for in the Plan, and any document or agreement executed pursuant to the Plan shall be null and void.  In such event, nothing contained herein, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims by or against or Equity Interests in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

Dated: May 11, 2012

**HOUGHTON MIFFLIN HARCOURT
PUBLISHING COMPANY**


By:_____
Name:
Title:


**HOUGHTON MIFFLIN HARCOURT
PUBLISHERS INC.**


By:_____
Name:
Title:


**HMH PUBLISHERS, LLC**


By:_____
Name:
Title:


**HOUGHTON MIFFLIN HOLDING
COMPANY, INC.**


By:_____
Name:
Title:


**HOUGHTON MIFFLIN, LLC**


By:_____
Name:
Title:

**HOUGHTON MIFFLIN FINANCE, INC.**

By:_____
Name:
Title:

**HOUGHTON MIFFLIN HOLDINGS, INC.**

By:_____
Name:
Title:

**HM PUBLISHING CORP.**

By:_____
Name:
Title:

**RIVERDEEP INC., A LIMITED LIABILITY COMPANY**

By:_____
Name:
Title:

**BRODERBUND LLC**

By:_____
Name:
Title:

**RVDP, INC.**

By:_____
Name:
Title:

**HRW DISTRIBUTORS, INC.**

By:_____
Name:
Title:

**GREENWOOD PUBLISHING GROUP, INC.**

By:_____
Name:
Title:

**CLASSROOM CONNECT, INC.**

By:_____
Name:
Title:

**ACHIEVE! DATA SOLUTIONS, LLC**

By:_____
Name:
Title:

**STECK-VAUGHN PUBLISHING LLC**

By:_____
Name:
Title:

**HMH SUPPLEMENTAL PUBLISHERS INC.**

By:_____
Name:
Title:

**HMH HOLDINGS (DELAWARE), INC.**


By:_____
Name:
Title:


**SENTRY REALTY CORPORATION**


By:_____
Name:
Title:


**HOUGHTON MIFFLIN COMPANY
INTERNATIONAL, INC.**


By:_____
Name:
Title:


**THE RIVERSIDE PUBLISHING COMPANY**


By:_____
Name:
Title:


**CLASSWELL LEARNING GROUP INC.**


By:_____
Name:
Title:


**COGNITIVE CONCEPTS, INC.**


By:_____
Name:
Title:

**EDUSOFT**

By:_____
Name:
Title:

**ADVANCED LEARNING CENTERS, INC.**

By:_____
Name:
Title

# APPENDIX B

## PROJECTIONS OF CERTAIN FINANCIAL DATA FOLLOWING CONSUMMATION OF PLAN

In connection with the restructuring pursuant to the Plan, management of the Debtors analyzed the Debtors' ability to meet its obligations upon consummation of such restructuring with sufficient liquidity and capital resources to conduct its businesses. The Debtors' management has also developed a business plan for the Debtors and prepared certain projections of the Debtors' operations for the fiscal years 2012 through 2017 (the "Projection Period"). Such projections, summarized below, are based upon assumptions and have been adjusted to reflect the terms of the restructuring pursuant to the Plan, certain subsequent events and additional assumptions, including those set forth below (as adjusted, the "Projections").

**THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH THEIR BUSINESS PLANS, BUDGETS OR STRATEGIES OR MAKE EXTERNAL PROJECTIONS OR FORECASTS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. ACCORDINGLY, THE DEBTORS DO NOT ANTICIPATE THAT THEY WILL, AND DISCLAIM ANY OBLIGATION TO, FURNISH UPDATED BUSINESS PLANS, BUDGETS OR PROJECTIONS TO CREDITORS AND EQUITY HOLDERS PRIOR TO OR AFTER THE EFFECTIVE DATE OF ANY PLAN OR TO INCLUDE SUCH INFORMATION IN DOCUMENTS REQUIRED TO BE FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ("SEC") OR OTHERWISE MAKE SUCH INFORMATION PUBLICLY AVAILABLE.**

The following Projections were not prepared with a view toward compliance with published rules of the SEC or the American Institute of Certified Public Accountants regarding projections. The prospective financial information included in this offering document has been prepared by and is the responsibility of the Debtors' management. The Debtors and their management believe that the following Projections have been prepared on a reasonable basis, reflecting management's best estimates and judgments, and represent, to the best of management's knowledge and opinion, the Debtors' expected course of action. However, because this information is highly subjective, it should not be relied on as necessarily indicative of future results.

The Debtors' independent auditor has not examined, compiled or performed any procedures with respect to the prospective financial information contained in this appendix and, accordingly, it does not express an opinion or any other form of assurance on such information or its achievability. The Debtors' independent auditor assumes no responsibility for and denies any association with the prospective financial information. The PricewaterhouseCoopers LLP report included in this solicitation document refers exclusively to the Debtors' historical financial information. PricewaterhouseCoopers LLP's report does not cover any other information in this solicitation document and should not be read to do so.

The Projections should be read in conjunction with the entire Disclosure Statement including the assumptions, qualifications and explanations set forth herein and the "*Summary*," "*Risk Factors*," and "*Selected Historical Consolidated Financial Data*," included in this Disclosure Statement.

## Principal Assumptions for the Projections

The Projections are based on, and assume the successful implementation of, the Debtors' business plan. Both the business plan and the Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors. In addition, the assumptions do not take into account the uncertainty and disruption of business that may accompany a restructuring in Court. Therefore, although the Projections are necessarily presented with numerical specificity, the actual results achieved during the Projection Period will likely vary from the projected results. These variations may be material. Accordingly, no representation can be or is being made with respect to the accuracy of the Projections or the ability of the Debtors or the Reorganized Debtors to achieve the projected results of operations. THE INDEPENDENT AUDITOR FOR THE DEBTORS HAS NOT EXAMINED, COMPILED, OR OTHERWISE PERFORMED ANY PROCEDURES ON THE PROSPECTIVE FINANCIAL INFORMATION AND, CONSEQUENTLY, DOES NOT EXPRESS AN

OPINION OR ANY OTHER FORM OR ASSURANCE WITH RESPECT TO THE PROSPECTIVE FINANCIAL INFORMATION.  See "*Risk Factors*".

Although the Debtors' management believes that the assumptions underlying the Projections, when considered on an overall basis, are reasonable in light of current circumstances, no assurance can be or is given that the Projections will be realized.  In deciding whether to vote to accept or reject the proposed Plan, creditors must make their own determinations as to the reasonableness of such assumptions and the reliability of the Projections.  See "*Risk Factors*".  Moreover, the Projections were prepared solely in connection with the restructuring pursuant to the Plan.

Under Accounting Standards Codification "ASC" 852, "Reorganizations" ("ASC 852"), the Debtors do not anticipate being required to apply fresh-start accounting.  Accordingly, the reorganization value of the Debtors will not be allocated among the assets of the Debtors, and the discharge of the debt may be recorded as an extinguishment of the debt in accordance with accounting guidance ASC 470, "Debt".  For purposes of the Projections, the enterprise value of the Reorganized Debtors is assumed to be approximately $1.75 billion, which is the mid-point of the $1.6 billion to $1.9 billion range of estimated enterprise values of the Reorganized Debtors provided by Blackstone as of an assumed Effective Date of June 30, 2012 in connection with its valuation analysis.  The actual reorganization value that will be used by the Debtors may differ materially from this estimate.

**Select Risk Factors Related to the Projections**

A potential impact of chapter 11 not incorporated into the Projections are risks associated with a decline in revenue associated with the stigma of having filed for reorganization under chapter 11 of the bankruptcy laws.

Another potential impact of a chapter 11 filing, which is not incorporated into the Projections, is employee turnover at the management and sales force levels.  Loss of employees from these and other parts of the Debtors could have an adverse impact on the Debtors' financial performance.

The Projections are based on the currently expected state-by-state educational adoption calendar and anticipated open territory purchases. To the extent that state spending deviates from management's expectations, financial performance could be materially different than shown in the Projections.

The foregoing assumptions and resulting computations were made solely for purposes of preparing the Projections.  Upon emergence from any chapter 11 case, the Debtors will be required to determine the amount by which its reorganization value as of the Effective Date exceeds, or is less than, the fair value of its assets as of the Effective Date.  Such determination will be based upon the fair values at that time, which may be based on, among other things, a different methodology than the above-mentioned valuation.  In any event, such valuations, as well as the determination of the fair value of the Debtors' assets and liabilities, will be made as of the Effective Date.  The changes between the amounts of any or all of the foregoing items as assumed in the Projections and the actual amounts thereof as of the Effective Date may be material.

## Projections

The Projections set forth below have been prepared based on the assumption that the Effective Date is June 30, 2012.  Although the Debtors will seek the Effective Date to occur as soon as practicable, there can be no assurance as to when the Effective Date will actually occur.  The Debtors' Projected Consolidated Balance Sheets as of June 30, 2012 set forth below present: (a) the projected pre-restructuring financial position as of June 30, 2012; (b) Reorganization Adjustments and Financing Adjustments; and (c) the projected post-restructuring consolidated financial position of the Debtors after giving effect to the Reorganization, as of June 30, 2012. The Balance Sheet Adjustments set forth in the columns captioned "Conversion of Debt," and "Issuance of New Debt" reflect the assumed effects of confirmation and significant financings contemplated by the Plan, including the settlement of various liabilities and related securities issuances, cash payments, and borrowings. The Balance Sheet Adjustments are illustrative and take into account reorganization adjustments.

The Debtors' Consolidated Financial Statements, including Balance Sheet, Income Statement and Statement of Cash Flows for the Projection Period set forth on the following pages present the projected consolidated position of the Debtors after giving effect to confirmation and the consummation of the transactions contemplated by the Plan, as of the end of each fiscal year in the Projection Period. THE INDEPENDENT AUDITOR FOR THE DEBTORS HAS NOT EXAMINED, COMPILED, OR OTHERWISE PERFORMED ANY PROCEDURES ON THE PROSPECTIVE FINANCIAL INFORMATION AND, CONSEQUENTLY, DOES NOT EXPRESS AN OPINION OR ANY OTHER FORM OR ASSURANCE WITH RESPECT TO THE PROSPECTIVE FINANCIAL INFORMATION.

## ILLUSTRATIVE ACCOUNTING ADJUSTMENTS

| ($ in millions) | | Projected Book Value (6/30/2012) | Transaction Adj. | | Pro Forma (6/30/2012) |
|---|---|---|---|---|---|
| | | | Conversion of Debt | Issuance of New Debt | |
| Cash & Cash Equivalents | Note A | $ 36 | $ (100) | $ 206 | $ 141 |
| Accounts Receivable | | 351 | | | 351 |
| Inventory | | 331 | | | 331 |
| Other Current Assets | | 26 | | | 26 |
| **Total Current Assets** | | **$ 743** | **$ (100)** | **$ 206** | **$ 849** |
| | | | | | |
| Net Property, Plant & Equipment | | 156 | | | 156 |
| Net Pre-Publication Costs | | 280 | | | 280 |
| Net Royalty Advances | | 45 | | | 45 |
| Net Intangible Assets & Goodwill | | 1,670 | | | 1,670 |
| Other Assets | Note B | 104 | (99) | 5 | 11 |
| **Total Assets** | | **$ 2,998** | **$ (199)** | **$ 211** | **$ 3,010** |
| | | | | | |
| Accounts Payable | | 137 | | | 137 |
| Other Current Liabilities | | 100 | (36) | | 64 |
| **Total Current Liabilities** | | **$ 237** | **$ (36)** | **$ -** | **$ 202** |
| | | | | | |
| First Lien Revolver | Note C | $ 236 | $ (236) | | $ - |
| First Lien Term Loan | Note C | 2,571 | (2,571) | | - |
| A/R Securitization Facility | Note D | - | - | | - |
| 10.5% Notes | | 300 | (300) | | - |
| DIP / New Revolving Credit Facility | Note E | - | | - | - |
| New Term Loan | Note E | - | | 250 | 250 |
| Accrued Benefits | | 95 | | | 95 |
| Deferred Revenue | | 330 | | | 330 |
| Other Liabilities | | 194 | | | 194 |
| **Total Liabilities** | | **$ 3,963** | **$ (3,142)** | **$ 250** | **$ 1,071** |
| | | | | | |
| **Total Owners' Equity** | Note F | **$ (966)** | **$ 2,944** | **$ (39)** | **$ 1,939** |
| | | | | | |
| **Total Liabilities + Owners' Equity** | | **$ 2,998** | **$ (199)** | **$ 211** | **$ 3,010** |

## UNAUDITED PROJECTED BALANCE SHEET

*($ in millions)*

| | | Pro Forma | Projected as of December 31, | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | (6/30/2012) | 2012E | 2013E | 2014E | 2015E | 2016E | 2017E |
| Cash & Cash Equivalents | Note G | $ 141 | $ 485 | $ 490 | $ 524 | $ 594 | $ 678 | $ 829 |
| Accounts Receivable | Note H | 351 | 296 | 314 | 317 | 322 | 326 | 332 |
| Inventory | Note H | 331 | 230 | 243 | 294 | 294 | 314 | 320 |
| Other Current Assets | | 26 | 26 | 26 | 26 | 26 | 26 | 26 |
| **Total Current Assets** | | **$ 849** | **$ 1,037** | **$ 1,073** | **$ 1,160** | **$ 1,236** | **$ 1,343** | **$ 1,507** |
| | | | | | | | | |
| Net Property, Plant & Equipment | | 156 | 179 | 255 | 273 | 292 | 283 | 261 |
| Net Pre-Publication Costs | | 280 | 271 | 342 | 366 | 341 | 319 | 308 |
| Net Royalty Advances | | 45 | 45 | 47 | 49 | 50 | 51 | 51 |
| Net Intangible Assets & Goodwill | | 1,670 | 1,549 | 1,391 | 1,279 | 1,193 | 1,127 | 1,077 |
| Other Assets | | 11 | 10 | 9 | 9 | 8 | 7 | 6 |
| **Total Assets** | | **$ 3,010** | **$ 3,091** | **$ 3,117** | **$ 3,136** | **$ 3,118** | **$ 3,130** | **$ 3,211** |
| | | | | | | | | |
| Accounts Payable | Note H | $ 137 | $ 105 | $ 112 | $ 102 | $ 87 | $ 91 | $ 95 |
| Other Liabilities | | 64 | 110 | 120 | 131 | 130 | 130 | 133 |
| **Total Current Liabilities** | | **$ 202** | **$ 215** | **$ 232** | **$ 233** | **$ 217** | **$ 221** | **$ 229** |
| | | | | | | | | |
| First Lien Revolver | | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| First Lien Term Loan | | - | - | - | - | - | - | - |
| A/R Securitization Facility | | - | - | - | - | - | - | - |
| 10.5% Notes | | - | - | - | - | - | - | - |
| New Revolving Credit Facility | | - | - | - | - | - | - | - |
| New Term Loan | | 250 | 249 | 241 | 205 | 133 | 46 | - |
| Accrued Benefits | | 95 | 88 | 74 | 61 | 48 | 34 | 21 |
| Deferred Revenue | | 330 | 351 | 382 | 427 | 441 | 428 | 437 |
| Other Liabilities | | 194 | 173 | 160 | 150 | 140 | 132 | 126 |
| **Total Liabilities** | | **$ 1,071** | **$ 1,075** | **$ 1,090** | **$ 1,077** | **$ 979** | **$ 862** | **$ 813** |
| | | | | | | | | |
| **Total Owners' Equity** | | **$ 1,939** | **$ 2,016** | **$ 2,027** | **$ 2,060** | **$ 2,139** | **$ 2,268** | **$ 2,398** |
| | | | | | | | | |
| **Total Liabilities + Owners' Equity** | | **$ 3,010** | **$ 3,091** | **$ 3,117** | **$ 3,136** | **$ 3,118** | **$ 3,130** | **$ 3,211** |

## UNAUDITED PROJECTED INCOME STATEMENT (Note I)

*($ in millions)*

| | | | | Projected as of December 31, | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Q1-Q2 2012 | Q3-Q4 2012 | 2012E | 2013E | 2014E | 2015E | 2016E | 2017E |
| Revenue | Note J | $ 509 | $ 922 | $ 1,431 | $ 1,499 | $ 1,554 | $ 1,617 | $ 1,681 | $ 1,680 |
| *% growth* | | | | | *4.8%* | *3.6%* | *4.1%* | *4.0%* | *(0.0%)* |
| Less: COGS | Note K | (171) | (295) | (466) | (490) | (512) | (518) | (525) | (528) |
| **Gross Profit** | | **$ 338** | **$ 626** | **$ 964** | **$ 1,009** | **$ 1,042** | **$ 1,098** | **$ 1,156** | **$ 1,152** |
| *% margin* | | *66.4%* | *68.0%* | *67.4%* | *67.3%* | *67.1%* | *67.9%* | *68.8%* | *68.6%* |
| Less: Operating Expenses | Note K | (301) | (332) | (634) | (653) | (675) | (688) | (699) | (711) |
| **EBITDA** | | **$ 36** | **$ 294** | **$ 330** | **$ 356** | **$ 367** | **$ 411** | **$ 457** | **$ 441** |
| *% margin* | | *7.2%* | *31.9%* | *23.1%* | *23.8%* | *23.6%* | *25.4%* | *27.2%* | *26.2%* |
| Less: Depreciation | | $ (23) | $ (17) | $ (41) | $ (35) | $ (53) | $ (65) | $ (89) | $ (103) |
| Less: Amortization | | (124) | (122) | (245) | (158) | (112) | (86) | (66) | (50) |
| Less: Plate Amortization | | (65) | (65) | (130) | (116) | (136) | (150) | (148) | (140) |
| **EBIT** | | **$ (176)** | **$ 90** | **$ (86)** | **$ 47** | **$ 66** | **$ 110** | **$ 153** | **$ 149** |
| Less: Net Interest Expense | Note L | (205) | (10) | (215) | (23) | (21) | (17) | (10) | (5) |
| Less: Other Expenses / Gains | | 1,251 | (5) | 1,246 | (16) | (16) | (11) | (9) | (9) |
| **EBT** | | **$ 870** | **$ 74** | **$ 945** | **$ 8** | **$ 29** | **$ 82** | **$ 134** | **$ 134** |
| Less: Taxes | Note M | (9) | (1) | (10) | (3) | (4) | (4) | (5) | (5) |
| **Net Income** | | **$ 861** | **$ 74** | **$ 935** | **$ 5** | **$ 26** | **$ 78** | **$ 129** | **$ 129** |

## UNAUDITED PROJECTED INDIRECT CASH FLOWS

| ($ in millions) | | Q1-Q2 2012 | Q3-Q4 2012 | 2012E | 2013E | 2014E | 2015E | 2016E | 2017E |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Projected as of December 31, | | | | |
| EBITDA (Pre-plate) | | $ 36 | $ 294 | $ 330 | $ 356 | $ 367 | $ 411 | $ 457 | $ 441 |
| Less: Plate Capital Expenditures | Note N | (56) | (57) | (113) | (186) | (161) | (124) | (127) | (129) |
| **EBITDA (Post-plate)** | | **$ (19)** | **$ 237** | **$ 218** | **$ 170** | **$ 206** | **$ 287** | **$ 330** | **$ 312** |
| Less: Other Capital Expenditures | Note N | ($27) | (41) | (67) | (112) | (71) | (83) | (81) | (80) |
| Change in Working Capital | Note O | (205) | 169 | (36) | (17) | (54) | (22) | (21) | (5) |
| Deferred Revenue | Note P | (20) | 21 | 1 | 31 | 44 | 14 | (13) | 9 |
| Less: Other | Note Q | (28) | (31) | (59) | (35) | (33) | (33) | (31) | (29) |
| Less: Cash Taxes | | (9) | (1) | (10) | (3) | (4) | (4) | (5) | (5) |
| **Unlevered Free Cash Flow** | | **$ (308)** | **$ 355** | **$ 47** | **$ 34** | **$ 90** | **$ 159** | **$ 180** | **$ 202** |
| Less: Cash Interest | | (86) | (10) | (95) | (22) | (20) | (16) | (9) | (4) |
| **Free Cash Flow for Debt Amortization** | | **$ (394)** | **$ 345** | **$ (49)** | **$ 12** | **$ 70** | **$ 143** | **$ 170** | **$ 198** |
| Plus: Revolver Draw / (Payment) | | $0 | | | | | | | |
| Less: Scheduled Amortization | Note R | (11) | (1) | (12) | (3) | (3) | (3) | (3) | (3) |
| Less: Debt Paydown | | (100) | - | (100) | (5) | (34) | (70) | (84) | (44) |
| Plus: New Financing (Net Transaction Fees) | | 206 | - | 206 | - | - | - | - | - |
| **Change in Cash** | | **$ (299)** | **$ 344** | **$ 45** | **$ 5** | **$ 34** | **$ 70** | **$ 84** | **$ 152** |
| Beginning Cash Balance | | $440 | 141 | 440 | 485 | 490 | 524 | 594 | 678 |
| Change in Cash | | (299) | 344 | 45 | 5 | 34 | 70 | 84 | 152 |
| **Ending Cash Balance** | | **$ 141** | **$ 485** | **$ 485** | **$ 490** | **$ 524** | **$ 594** | **$ 678** | **$ 829** |

## NOTES TO FINANCIAL PROJECTIONS

### Note A – Cash & Cash Equivalents

The proceeds from the new financings will be used to refinance any drawn amounts under the existing Receivables Facility and provide liquidity for working capital and for other general corporate purposes of the Debtors (including payment of fees and expenses in connection with the transactions contemplated under the Plan and adequate protection payments in the form of $69.7 million of Cash (such adequate protection payments, the "Adequate Protection Payments") and additionally may include the payment of the fees and expenses of (a) the First Lien Agents and (b) the 10.5% Indenture Trustee and its counsel. In addition, the DIP Facility will be used to fund assumed chapter 11 administrative costs, general corporate expenses during the chapter 11 case, commitment fees on the DIP Facility and interest expense and fees on the drawn and undrawn portions of the DIP Facility.

### Note B – Other Assets

Adjustment to Other Assets represents capitalizing of original issuance discount on the New Term Loan and expensing all original issue discount and deferred financing fees related to existing debt.

### Note C – First Lien Debt

Approximately $2.6 billion of the Debtors' First Lien Term Loan, approximately $236 million of the Debtors' First Lien Revolving Loan and approximately $300 million of the Debtors' 10.5% Notes are assumed to convert into equity pursuant to the Plan. The conversion is assumed to be based on the projected debt balances as of the Petition Date, excluding original issue discount.

### Note D – Receivables Facility / DIP Facility

Any balance on the existing Receivables Facility will be repaid using proceeds from the DIP Facility upon filing. At emergence, the DIP Facility will be converted into the New ABL Credit Facility.

### Note E – New Credit Facility

As part of the transaction, the Debtors will enter into a $500 million credit facility comprised of a $250 million New Term Loan and a $250 million New ABL Credit Facility.

### Note F – Owners' Equity

Adjustments to Owners' Equity reflects gain on extinguishment of debt, expensed transaction fees and expensing all original issue discount and deferred financing fees related to existing debt.

### Note G – Cash & Cash Equivalents

Cash is forecasted to accumulate on the Debtors' balance sheet throughout the projection period. Fifty percent of excess cash generated by the business is assumed to repay New Term Loan commitments.

### Note H – Working Capital Accounts

Accounts receivable, inventory and accounts payable balances are projected based on days outstanding calculations and forecasted to be generally in-line with historical ratios. These accounts fluctuate significantly within years depending on seasonality.

### Note I – Basis For Projections

The Projections take into account the current difficult economic environment and challenged state and municipal budgets, which are negatively impacting the Debtors. The Projections assume that the general weakness in economic activity will continue to affect the Debtors' near-term financial performance. The Projections are based on an assumed Effective Date of June 30, 2012 and assume no material disruptions to the business during the pendency of a chapter 11 filing. The exhibits reflect the projected financial performance of all the Debtor entities as well as the assets of the foreign non-Debtor entities including HMH Publishing Company, HMH Education Company, HMH IP Company, HMH Consumer Company and Riverdeep UK Limited, which are all guarantors under the First Lien Credit Agreement and 10.5% Notes, and Houghton Mifflin Harcourt (Asia) Pte. Ltd – the assets of these foreign non-Debtor entities are considered immaterial relative to the total value of the estate and, as such, are not being provided separately.

### Note J – Revenue

The 2012 revenue forecast is based on management's view of the Debtors' market position, product strategies, specific adoption schedules and overall economic outlook. The core basal revenue build-up is based on detailed adoption schedules and open territory is forecasted by state and subject. While average program cycles within specific subject areas in both adoption and open territories typically span 5 to 7 years, backlist sales (i.e., sales in contract) serve as a recurring revenue stream that offsets the decline in new sales (frontlist sales) that follows the initial launch of each new program. Due to the nature of the business, the Debtors are largely a price taker and typically compete on a combination of product differentiation and provision of "gratis" materials (supplemental teachers' editions, workbooks and other materials) designed to heighten specific programs' attractiveness to decision makers.

Forecasts of the Debtors' businesses outside of the basal market are based on historical performance and expected growth, taking into consideration a variety of factors including economic conditions, product launches, and expected orders.

### Note K – Variable & Fixed Costs

Approximately 65% of the Debtors' expense base consists of variable costs. Approximately 35% of the Debtors' expense base is fixed and largely consists of labor-related costs. Approximately 33% of revenues relate to manufacturing, royalty, inventory obsolescence and gratis, and 9% of revenues is related to commissions, samples, transportation and depository fees. Variable expenses are projected to remain roughly 39%- 41% of revenues from 2012 to 2017.

### Note L – Interest Expense

Interest expense for the Debtors' New Term Loan is assumed to be LIBOR plus 625 basis points cash interest with a LIBOR floor of 150 basis points. Interest expense for the Debtors' Revolver under the DIP Facility

and New Revolving Credit Facility issued at exit is assumed to be LIBOR plus 325 basis points and LIBOR plus 225 to 275 basis points cash interest based on availability, respectively with no LIBOR floor. Both facilities are projected based on a forward LIBOR curve.

### Note M – Income Taxes

Under the auspices of the bankruptcy court, the debt restructuring is not anticipated to result in any U.S. income tax consequences to cash flow during the Projections period. However, as a result of the restructuring, it is anticipated that the carried forward net operating losses and credits of the U.S. group will be eliminated and certain tax basis in the Debtors' IP may be reduced. Because of deferred interest deductions that survive the restructuring and the Debtors' remaining IP amortization deductions, there are no material federal taxes anticipated to be incurred prior to 2018. The Debtors project minimal state income taxes. There may also be some non-income state taxes and alternative minimum taxes generated. For simplicity, the Projections only include anticipated cash taxes.

### Note N –Capital Expenditures

The Debtors' projected plate capital expenditures take into consideration the adoption calendar and open territory market share forecast. Plate capital expenditures are required to be spent beginning 18 to 24 months prior to the scheduled adoption. Plate capital expenditures are forecasted to increase in 2013 due to the large upcoming adoptions schedule for Texas and Florida.

Projected non-plate capital expenditures are driven by platform investment to support the enterprise solutions businesses and limited maintenance spending.

### Note O – Net Working Capital

Changes in Net Working Capital are primarily driven by changes in Accounts Receivable, Inventory, Accounts Payable, Accrued Salaries and Royalties.

### Note P – Deferred Revenue

Changes in deferred revenue are primarily driven by increases in adoption and enterprise sales along with subscription sales, all of which have certain future deliverables by the Debtors for which a portion of the revenue needs to be deferred until such future deliverables are fully satisfied.

### Note Q – Other

Other cash flows include restructuring costs, pension and other post-employment benefit payments, severance payments, payments made related to vacant space net of sublet income and other accrued liabilities.

### Note R – Scheduled Debt Amortization

Reflects mandatory debt amortization of 1% annually, consistent with the terms of the anticipated New Term Loan.

APPENDIX C

LIQUIDATION ANALYSIS

The Bankruptcy Code requires that each holder of an Impaired Claim or Equity Interest either (a) accept the Plan or (b) receive or retain property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  The first step in determining whether this test has been met is to determine the estimated amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  The gross amount of cash available to the holders of Impaired Claims or Equity Interests would be the sum of the proceeds from the disposition of the Debtors' assets through the liquidation proceedings and the cash held by the Debtors at the time of the commencement of the chapter 7 case.  This gross amount of cash available is reduced by the amount of any Claims secured by the estate's assets, the costs and expenses of the liquidation, and additional administrative expenses that may result from the termination of the Debtors' businesses and the use of chapter 7 for the purposes of liquidation.  Any remaining net cash would be allocated to creditors and equity holders in strict priority in accordance with section 726 of the Bankruptcy Code.  For purposes of this liquidation analysis, it is assumed that the assets of the Debtors are liquidated for the benefit of the Debtors' creditors.  A general summary of the assumptions used by the Debtors' management in preparing this liquidation analysis follows.  The more specific assumptions are discussed below.

***Estimate of Net Proceeds***

Estimates were made of the cash proceeds which might be realized from the liquidation of the assets of the Debtor and non-Debtor entities (see Note A).  The chapter 7 liquidation period is assumed to commence on June 30, 2012 and to last twelve months following the appointment of a chapter 7 trustee.  For purposes of the analysis, unaudited asset balances as of March 31, 2012 were used to estimate recoveries.  There can be no assurance that the liquidation would be completed in a limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.  Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally at distressed prices) as is compatible with the best interests of parties-in-interest.  The liquidation analysis assumes that there would be pressure to complete the sales process within 12 months.

***Estimate of Costs***

The Debtors' cost of liquidation under chapter 7 would include fees payable to a chapter 7 trustee, as well as those which might be payable to attorneys and other professionals that such a trustee may engage.  Further, costs of liquidation would include any obligations and unpaid expenses incurred by the Debtors' until conclusion of the chapter 7 case.

Additional Claims would arise by reason of the breach or rejection of obligations incurred under executory contracts and leases entered into by the Debtors.  It is possible that in a chapter 7 case, the wind-down expenses may be greater or less than the estimated amount.  Such expenses are in part dependent on the length of time of the liquidation.

***Distribution of Net Proceeds Under Absolute Priority***

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee and professional advisors to such trustee, (ii) an erosion in the value of assets in the chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the forced sale atmosphere that would likely prevail, and (iii) the substantial increase in Claims that would need to be satisfied on a priority basis, THE DEBTORS HAVE DETERMINED, AS SUMMARIZED ON THE FOLLOWING CHART, THAT CONFIRMATION OF THE PLAN WILL PROVIDE EACH CREDITOR AND EQUITY HOLDER WITH A RECOVERY EQUAL OR GREATER THAN IT WOULD RECEIVE PURSUANT TO A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

THE DEBTORS' LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE ASSETS OF THE DEBTORS.  Underlying the liquidation analysis are a number of estimates and assumptions that are inherently subject to significant economic, competitive, and operational uncertainties, and contingencies beyond the control of the Debtors or a chapter 7 trustee.  In addition, various liquidation decisions upon which certain assumptions are based are subject to change.  Therefore, there can be no assurance that the assumptions and estimates employed in determining the liquidation values of the assets will result in an accurate estimate of the proceeds that would be realized were the Debtors to undergo an actual liquidation.  The actual amounts of Claims against the estate could vary significantly from the estimates set forth herein, depending on the Claims asserted during the pendency of the chapter 7 case.  Moreover, this liquidation analysis does not include liabilities that may arise as a result of litigation, certain additional tax assessments, or other potential Claims.  This analysis also does not include potential recoveries from avoidance actions.  Therefore, the actual liquidation value of the Debtors could vary materially from the estimates provided herein.

THE LIQUIDATION ANALYSIS SET FORTH HEREIN WAS BASED ON THE VALUES OF DEBTORS' ASSETS ON MARCH 31, 2012 AND ASSUMES THE CHAPTER 7 PROCESS BEGINS JUNE 30, 2012.  THE INDEPENDENT AUDITOR FOR THE DEBTORS' HAS NOT EXAMINED, COMPILED OR OTHERWISE PERFORMED ANY PROCEDURES ON THESE VALUES AND, CONSEQUENTLY, DOES NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE VALUES IN THE LIQUIDATION ANALYSIS.

Estimated net proceeds may be realized from the liquidation of the Debtors' non-Debtor subsidiaries.  The method of liquidation may vary greatly from subsidiary to subsidiary depending on the jurisdiction or country in which it is principally located or was formed.  The obligations are assumed to be satisfied at the individual entity level, and the excess would then flow upward to the next ownership level and ultimately to the Debtors, to the extent available.

## HYPOTHETICAL LIQUIDATION ANALYSIS

*($ in millions)*

| | | Book Value (A) | Estimated Recovery Rate | | Estimated Recovery Amount | |
|---|---|---|---|---|---|---|
| | | (3/31/2012) | Low | High | Low | High |
| Unrestricted Cash and Cash Equivalents | Note B | $217 | 100% | 100% | $ 217 | $ 217 |
| Accounts Receivable | Note C | 184 | 68% | 79% | 126 | 146 |
| Inventory | Note D | | | | | |
| Education | | 235 | 15% | 25% | 35 | 59 |
| Trade | | 16 | 85% | 85% | 14 | 14 |
| Materials and Other | | 6 | 85% | 85% | 5 | 5 |
| Other Current Assets | Note E | 26 | 9% | 12% | 2 | 3 |
| **Total Current Assets** | | **$684** | | | **$399** | **$443** |
| Property, Plant, and Equipment | Note F | 148 | | | | |
| Land, net | | 7 | 80% | 80% | 5 | 5 |
| Buildings, Machine, Lease & Equipment, net | | 11 | 80% | 100% | 9 | 11 |
| Computer Equipment, net | | 9 | 30% | 30% | 3 | 3 |
| Software - Internally Developed, net | | 60 | - | 25% | - | 15 |
| Software - Externally Purchased, net | | 6 | - | - | - | - |
| Furniture and Fixtures, net | | 2 | - | 10% | - | 0 |
| Leasehold Improvements | | 19 | - | - | - | - |
| AUC | | 32 | - | - | - | - |
| PP&E Accrual | | 2 | - | - | - | - |
| Net Pre-Publication Costs | Note G | 284 | - | - | - | - |
| Net Royalty Advances | Note H | 44 | - | - | - | - |
| Net Intangibles | Note I | 1,210 | | | | |
| Trade Name - HMH School | | 161 | 50% | 75% | 81 | 121 |
| Trade Name - Holt McDougal | | 111 | 50% | 75% | 56 | 83 |
| Trade Name - Supplemental | | 49 | 50% | 75% | 25 | 37 |
| Trade Name - HMHLT | | 5 | 50% | 75% | 3 | 4 |
| Trade Name - Assessment | | 39 | 50% | 75% | 20 | 29 |
| Trade Name - Heineman | | 44 | 50% | 75% | 22 | 33 |
| Trade Name - Trade | | 30 | 50% | 75% | 15 | 23 |
| Trade Name - Leadership and Learning Centers | | 3 | - | - | - | - |
| Other Intangibles | | 768 | 15% | 20% | 115 | 154 |
| Goodwill | Note J | 520 | - | - | - | - |
| Other Assets | Note K | 18 | 11% | 13% | 2 | 2 |
| **Total Assets** | | **$2,908** | | | **$752** | **$963** |
| Less: A/R Securitization Facility | Note L | - | | | - | - |
| **Net Assets** | | **$2,908** | | | **$ 752** | **$ 963** |

## CALCULATION OF FEES AND EXPENSES

| *($ in millions)* | | Estimated Costs | |
|---|---|---|---|
| | | **Low** | **High** |
| Chapter 7 Trustee Fees and Expenses | Note M | $16 | $22 |
| Chapter 7 Professional Fees and Expenses | Note N | 12 | 12 |
| Employee Expenses and Wind-down Costs | Note O | 135 | 135 |
| **Total Chapter 7 Fees & Expenses** | | **$163** | **$169** |

## NOTES TO LIQUIDATION ANALYSIS

### Note A – Book Value as of March 31, 2012

The book values used in the Liquidation Analysis for cash and cash equivalents, accounts receivable, inventories, property, plant and equipment, intangible assets and other assets, which are used as a reference point for the analysis, represent unaudited figures as of March 31, 2012 and are assumed to be representative of the Debtors' assets.

The book values used in the Liquidation Analysis include all the domestic Debtor entities as well as the assets of the foreign non-Debtor entities including HMH Publishing Company, HMH Consumer Company, HMH Education Company, HMH IP Company, Riverdeep UK Limited, Houghton Mifflin Harcourt (Asia) Pte. Ltd. and Houghton Mifflin PLC, which are all guarantors under the First Lien Credit Agreement, – the assets of these foreign non-Debtor entities are considered immaterial relative to the total value of the estate and, as such, are not being provided separately.

### Note B – Cash and Cash Equivalents

Cash consists of all unrestricted cash, in banks or operating accounts and held at divisions as of March 31, 2012, including float and cash under certain control account agreements.  Cash is assumed to be fully recoverable.  The cash recovered may be materially different if financial institutions have rights of off-set against cash, or if cash is unrecoverable from the non-U.S. subsidiaries.

Balance excludes restricted cash, which is cash collateralized against the Debtors' outstanding letters of credit and assumed to be drawn in a liquidation.

### Note C – Accounts Receivable

Estimated proceeds realizable from short-term and long-term accounts receivable are based on the Debtors' management's ability to collect on its accounts, taking into consideration the credit quality and aging of the accounts.  The Liquidation Analysis for accounts receivable is based on estimated recoveries of aging receivables using a declining scale of recoveries.  Despite historical low write-downs on accounts receivable, given the current deficits of state budgets and certain dated components of the booked accounts receivable, the inevitable difficulty in collecting receivables and any concessions that might be required to facilitate the collection of certain accounts receivable needs to be considered. Additionally, ceasing all operations would terminate various contracts and business relationships, which would also impact collection of receivables.

### Note D – Inventory

Estimated inventory recoveries are based on the type of product (i.e., paper and books by segment) and the market in which the inventory is sold.  This estimate assumes obsolescence as well as diminished market demand for product volumes and a general discount for liquidation and the limited market in which the product is sold.  Both raw material (paper) and finished goods of the Trade and Reference divisions, which are sold through the retail channel, have a higher liquidation valuation range because they may be sold to a broader market.  Finished products

relating to the Education Segment (e.g., K-12 textbooks) will likely only be sold to districts needing fill-in product and have therefore been ascribed lower liquidation values.

### Note E – Other Current Assets

Other Current Assets consist primarily of current deferred taxes, prepaid rent and other items.  The estimated recovery is based on the benefit and likelihood of such prepayments being refunded.

### Note F – Net Property, Plant and Equipment

Property, plant and equipment includes (x) the sum of (i) land (ii) buildings, machine, lease & equipment (iii) computer equipment (iv) software, internally developed (v) software, externally developed (vi) furniture and fixtures (vii) leasehold improvements and (viii) assets under construction less (y) accumulated depreciation.  The hypothetical recovery rates are applied to net book values.

### Note G – Net Pre-publication Costs

Net Pre-publication Costs represent the capitalized art, pre-press, manuscript and other costs incurred in the creation of the master copy of a book or other media.  Since this asset represents expenses that are deferred and recognized over a period representative of the remaining life of the product, no recovery value has been ascribed to Net Pre-publication Costs.

### Note H – Net Royalty Advances

Net Royalty Advances represent author advances that will be earned against future royalties associated with the sale of such product.  The estimate recovery is based upon the sale of only the existing inventory taking into consideration the discounted sale price to sell the inventory.  Accordingly, it is anticipated that none of the book royalty advances will be earned and collected.

### Note I – Net Intangibles

Net Intangibles consist primarily of trade names, publishing rights and other intangibles.  The trade names have a carrying value based on recent appraisals which applied the Royalty Relief Methodology on trade name valuation assuming the Debtors generate royalties as a going concern.  The estimated valuation range of the trade names is based on the recent appraisals with a discount to reflect the diminished value resulting from an orderly liquidation for post intangible categories.

Other intangibles consists primarily of publishing rights, which allow the Debtors to publish and republish existing and future works as well as create new works based on previously published materials.  The liquidation value of the publishing rights is based on the estimated value of the content.

### Note J – Goodwill

Since Goodwill represents residual value paid in excess of net tangible assets in prior acquisitions, no recovery value has been ascribed to Goodwill.

### Note K – Other Assets and Long-Term Receivables

Other Assets and Long-term Receivables include deferred financing fees and receivables due from affiliated entities.  The deferred financing fees have no value and the affiliated entities which owe the Debtors funds have no underlying liquid assets.

Other assets also includes sub-rights, which represent receivables related to contracts where the Debtors sell the rights to certain titles when books convert from hardcover to paperback, and are assumed to have some recovery value.

*Note L – Receivables Facility*

The Debtors' accounts receivable are sold to a bankruptcy-remote, special purpose vehicle under a receivables sale agreement as part of the pre-petition Receivables Facility. HM Receivables LLC is the legal entity which purchases all of the receivables on the Debtors' balance sheet. While the asset summary exhibit includes the value of the accounts receivable held by HMH Receivables LLC, it is not among the Debtor entities and the accounts receivable serve as collateral to the pre-petition Receivables Facility. As such, the expected outstanding amount of the Receivables Facility as of June 30, 2012 would be deducted from the total estimated liquidation value to estimate distributable proceeds to the estate. There was no amount outstanding as of March 31, 2012.

*Note M – Chapter 7 Trustee Fees and Expenses*

Compensation for the chapter 7 trustee will be limited to fee guidelines in section 326(a) of the Bankruptcy Code. The Debtors' management has assumed trustee fees of 3% of the gross proceeds (excluding cash) from the liquidation.

*Note N – Chapter 7 Professional Fees and Expenses*

Compensation for the chapter 7 trustee's counsel and other legal, financial and professional services during the chapter 7 case is estimated to be approximately $1 million per month beginning at the commencement of the liquidation proceedings and continuing throughout the wind-down Period.

*Note O – Employee Expenses and Wind-down Costs*

The Debtors' assume the chapter 7 liquidation process will take 12 months to complete. Corporate payroll and operating costs during liquidation are based on the assumption that certain functions would be required during the liquidation process in order for an orderly wind-down of the business and the plants. Costs would include costs associated with shutting down the production lines as well as salaries of certain operating and maintenance employees, severance and bonus pay that would be incurred during a chapter 7 liquidation. These expenses are estimated to be $135 million in total over 12 months.

THE DEBTORS' LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE DEBTORS' ASSETS. Underlying the liquidation analysis are a number of estimates and assumptions that are inherently subject to significant economic, competitive, and operational uncertainties and contingencies beyond the control of the Debtors or a chapter 7 trustee. In addition, various liquidation decisions upon which certain assumptions are based are subject to change. Therefore, there can be no assurance that the assumptions and estimates employed in determining the liquidation values of the Debtors will result in an accurate estimate of the proceeds that would be realized were the Debtors to undergo an actual liquidation. This liquidation analysis does not include liabilities that may arise as a result of litigation, certain new tax assessments, or other potential Claims. This analysis also does not include potential recoveries from avoidance actions. Therefore, the actual liquidation value of the Debtors could vary materially from the estimates provided herein.

**APPENDIX D**

**AUDITED FINANCIAL STATEMENTS FOR THE YEAR ENDED DECEMBER 31, 2011**

# HMH Holdings (Delaware), Inc.

## Consolidated Financial Statements
## December 31, 2011, 2010 and 2009

# HMH Holdings (Delaware), Inc.
**Index**
**December 31, 2011, 2010 and 2009**

**Page(s)**

**Reports of Independent Auditors**……………………………………………….……………..…....3-4

**Consolidated Financial Statements**

Consolidated Balance Sheets ................................................................................................5

Consolidated Statements of Operations ................................................................................6

Consolidated Statements of Cash Flows ...............................................................................7

Consolidated Statements of Stockholders' Equity (Deficit) and Comprehensive Income (Loss) ...............8

Notes to Consolidated Financial Statements .......................................................................9-57



**Report of Independent Auditors**

To the Board of Directors and Stockholders of
HMH Holdings (Delaware), Inc.

In our opinion, the accompanying consolidated balance sheets as of December 31, 2011 and 2010 and
the related consolidated statements of operations, of stockholders' equity (deficit) and comprehensive
income (loss), and of cash flows for the year ended December 31, 2011 and for the period from March 10,
2010 to December 31, 2010 present fairly, in all material respects, the financial position of HMH Holdings
(Delaware), Inc. and its subsidiaries (Successor) at December 31, 2011 and 2010, and the results of their
operations and their cash flows for the year ended December 31, 2011 and for the period from March 10,
2010 to December 31, 2010 in conformity with accounting principles generally accepted in the United
States of America.  These financial statements are the responsibility of the Company's management.  Our
responsibility is to express an opinion on these financial statements based on our audits.  We conducted
our audits of these statements in accordance with auditing standards generally accepted in the United
States of America.  Those standards require that we plan and perform the audit to obtain reasonable
assurance about whether the financial statements are free of material misstatement.  An audit includes
examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements,
assessing the accounting principles used and significant estimates made by management, and evaluating
the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our
opinion.

We have not audited any financial statements of the Company for any period subsequent to December 31,
2011.  However, as described in Note 15 to the consolidated financial statements, on May 10, 2012 the
Company entered into a restructuring support agreement with participating borrowers to restructure the
Company's debt pursuant to a joint prepackaged plan of reorganization under Chapter 11 of the U.S
Bankruptcy Code.  This raises substantial doubt about the Company's ability to continue as a going
concern.  Management's plans in regard to these matters are also described in Note 15. The
accompanying consolidated financial statements do not include any adjustments that might result from the
outcome of this uncertainty and have been prepared assuming that the Company will continue as a going
concern.

*PricewaterhouseCoopers LLP*

March 30, 2012, except with respect to our opinion on the consolidated financial statements insofar as it
relates to Note 15, as to which the date is May 10, 2012

*PricewaterhouseCoopers LLP, 125 High Street, Boston, MA 02110*
*T: (617) 530 5000, F: (617) 530 5001, www.pwc.com/us*



**Report of Independent Auditors**

To the Board of Directors and Stockholders of
HMH Holdings (Delaware), Inc.

In our opinion, the accompanying consolidated statements of operations, of stockholders' equity (deficit) and comprehensive income (loss), and of cash flows for the period from January 1, 2010 to March 9, 2010 and for the year ended December 31, 2009 present fairly, in all material respects, the results of operations and cash flows of HMH Publishing Company and its subsidiaries (Predecessor) for the period from January 1, 2010 to March 9, 2010 and for the year ended December 31, 2009 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

*PricewaterhouseCoopers LLP*

March 30, 2011

# HMH Holdings (Delaware), Inc.
## Consolidated Balance Sheets

| (in thousands of dollars, except share information) | December 31, 2011 | December 31, 2010 |
|---|---|---|
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 413,610 | $ 380,073 |
| Restricted cash | 26,495 | 43,246 |
| Short-term investments | - | 17,667 |
| Accounts receivable, net of allowance for bad debts and book returns of $43.8 million and $30.4 million, respectively | 256,271 | 252,065 |
| Inventories | 242,162 | 281,987 |
| Deferred income taxes | 14,152 | - |
| Prepaid expenses and other assets | 13,811 | 17,347 |
| Total current assets | 966,501 | 992,385 |
| Property, plant, and equipment, net | 152,212 | 144,139 |
| Pre-publication costs, net | 289,125 | 373,442 |
| Royalty advances to authors, net of allowance of $12.3 million and $3.7 million, respectively | 42,700 | 44,414 |
| Goodwill | 520,088 | 1,956,071 |
| Other intangible assets, net | 1,274,213 | 1,734,810 |
| Other assets and long-term receivables | 19,064 | 11,894 |
| Total assets | $ 3,263,903 | $ 5,257,155 |
| **Liabilities and Stockholders' Equity (Deficit)** | | |
| Current liabilities | | |
| Current portion of long-term debt | $ 43,500 | $ 193,064 |
| Accounts payable | 130,128 | 98,615 |
| Royalties payable | 52,294 | 47,468 |
| Salaries, wages, and commissions payable | 43,515 | 52,990 |
| Deferred revenue | 141,763 | 112,045 |
| Interest payable | 30,843 | 12,830 |
| Severance and other charges | 35,750 | 31,180 |
| Accrued postretirement benefits | 2,252 | 2,450 |
| Other liabilities | 45,612 | 61,065 |
| Total current liabilities | 525,657 | 611,707 |
| Long-term debt | 2,968,088 | 2,668,530 |
| Royalties payable | 1,313 | 2,075 |
| Long-term deferred revenue | 208,173 | 126,896 |
| Accrued pension benefits | 64,490 | 59,973 |
| Accrued postretirement benefits | 33,718 | 34,096 |
| Deferred income taxes | 32,072 | 135,536 |
| Other liabilities | 104,944 | 100,514 |
| Total liabilities | 3,938,455 | 3,739,327 |
| Commitments and contingencies (Note 13) | | |
| Stockholders' equity (deficit) | | |
| Common stock, $0.001 par value: authorized 600,000,000 shares; issued and outstanding 283,636,235 shares | 284 | 284 |
| Capital in excess of par value | 2,038,714 | 2,030,155 |
| Accumulated deficit | (2,690,097) | (507,727) |
| Accumulated other comprehensive income (loss) | (23,453) | (4,884) |
| Total stockholders' equity (deficit) | (674,552) | 1,517,828 |
| Total liabilities and stockholders' equity (deficit) | $ 3,263,903 | $ 5,257,155 |

The accompanying notes are an integral part of these consolidated financial statements.

# HMH Holdings (Delaware), Inc.
## Consolidated Statements of Operations

| | Successor | | Predecessor | |
|---|---|---|---|---|
| *(in thousands of dollars)* | **For the Year Ended December 31, 2011** | **For the Period March 10, 2010 to December 31, 2010** | **For the Period January 1, 2010 to March 9, 2010** | **For the Year Ended December 31, 2009** |
| **Net sales** | $ 1,295,295 | $ 1,397,142 | $ 109,905 | $ 1,562,415 |
| **Costs and expenses** | | | | |
| Cost of sales, excluding pre-publication and publishing rights amortization | 512,612 | 559,593 | 45,270 | 586,159 |
| Publishing rights amortization | 230,624 | 235,977 | 48,336 | 334,022 |
| Pre-publication amortization | 176,829 | 181,521 | 37,923 | 242,045 |
| Cost of sales | 920,065 | 977,091 | 131,529 | 1,162,226 |
| Selling and administrative | 640,023 | 598,807 | 119,039 | 740,068 |
| Other intangible asset amortization | 67,372 | 57,601 | 2,006 | 28,857 |
| Impairment charge for goodwill, intangible assets, pre-publication costs and fixed assets | 1,674,164 | 103,933 | 4,028 | 953,587 |
| Severance and other charges | 32,801 | (11,243) | - | 75,882 |
| Gain on sale of assets | (2,000) | (1,179) | - | (5,937) |
| | 3,332,425 | 1,725,010 | 256,602 | 2,954,683 |
| Operating income (loss) | (2,037,130) | (327,868) | (146,697) | (1,392,268) |
| **Other income (expense)** | | | | |
| Interest expense | (244,582) | (258,174) | (157,947) | (860,042) |
| Other (loss) income, net | - | (6) | 9 | (631) |
| Change in fair value of derivative instruments | (811) | 90,250 | (7,361) | 46,401 |
| | (245,393) | (167,930) | (165,299) | (814,272) |
| Loss before taxes | (2,282,523) | (495,798) | (311,996) | (2,206,540) |
| Income tax expense (benefit) | (100,153) | 11,929 | (220) | (61,393) |
| Net income (loss) | $ (2,182,370) | $ (507,727) | $ (311,776) | $ (2,145,147) |

The accompanying notes are an integral part of these consolidated financial statements.

# HMH Holdings (Delaware), Inc.
## Consolidated Statements of Cash Flows

| | Successor | | Predecessor | |
|---|---|---|---|---|
| (in thousands of dollars) | For the Year Ended December 31, 2011 | For the Period March 10, 2010 to December 31, 2010 | For the Period January 1, 2010 to March 9, 2010 | For the Year Ended December 31, 2009 |
| **Cash flows from operating activities** | | | | |
| Net loss | $ (2,182,370) | $ (507,727) | $ (311,776) | $ (2,145,147) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities | | | | |
| Noncash interest expense | - | - | 20,737 | 344,524 |
| Gain on sale of assets | (2,000) | (1,179) | - | (5,937) |
| Depreciation and amortization expense | 532,996 | 523,651 | 99,260 | 680,622 |
| Amortization of debt discount and deferred financing costs | 46,249 | 37,040 | 13,680 | 71,295 |
| Deferred income taxes (benefit) | (117,616) | 11,708 | (220) | (63,728) |
| Noncash stock-based compensation expense | 8,559 | 4,274 | 925 | 7,970 |
| Impairment charge for goodwill, intangible assets, pre-publication costs and fixed assets | 1,674,164 | 103,933 | 4,028 | 953,587 |
| Allowance for loan receivable from officer | - | 18,875 | - | - |
| Change in fair value of derivative instruments | 811 | (90,250) | 7,361 | (15,163) |
| Changes in operating assets and liabilities, net of acquisitions | | | | |
| Accounts receivable | (2,356) | (27,996) | 86,787 | 17,433 |
| Inventories | 39,825 | 98,329 | (22,741) | 90,867 |
| Accounts payable and accrued expenses | 18,488 | (13,145) | (30,990) | (34,799) |
| Royalties, net | 5,778 | 11,653 | (9,867) | (3,571) |
| Deferred revenue | 110,993 | 130,683 | (9,539) | 34,697 |
| Interest payable | 18,013 | (49,328) | 118,423 | (38,770) |
| Severance and other charges | 4,570 | (30,977) | (4,257) | 42,142 |
| Accrued pension and postretirement benefits | (10,568) | (19,003) | 1,297 | (11,053) |
| Other, net | (12,740) | (17,575) | (4,404) | (132,354) |
| Net cash provided by (used in) operating activities | 132,796 | 182,966 | (41,296) | (207,385) |
| **Cash flows from investing activities** | | | | |
| Proceeds from (deposits into) restricted cash accounts | 16,751 | (42,745) | - | - |
| Proceeds from sale of short-term investments | 17,800 | - | - | - |
| Purchases of short-term investments | - | (17,978) | - | - |
| Additions to pre-publication costs | (122,592) | (96,613) | (22,057) | (138,440) |
| Additions to property, plant, and equipment | (71,817) | (64,139) | (3,559) | (30,659) |
| Proceeds from sale of assets | 150 | 2,177 | - | 14,000 |
| Acquisition of intangible asset | (30,000) | - | - | - |
| Acquisition of business, net of cash acquired | (5,592) | (12,824) | - | - |
| Net cash (used in) provided by investing activities | (195,300) | (232,122) | (25,616) | (155,099) |
| **Cash flows from financing activities** | | | | |
| (Payments) borrowings under receivables funding agreement | - | (140,000) | 2,350 | 87,650 |
| Proceeds from revolving credit facility | - | - | - | 258,539 |
| Payments of long-term debt | (43,500) | (43,640) | - | (32,625) |
| Payments of short-term debt | (150,000) | - | - | - |
| Proceeds from secured notes offering | 300,000 | - | - | - |
| Payments of deferred financing fees | (10,459) | - | - | - |
| Dividend to affiliate | - | - | (2,500) | - |
| Proceeds from issuance of common stock, net | - | 649,600 | - | - |
| Loan advances to officer | - | (20,000) | - | - |
| Payment of restructuring costs | - | (43,671) | - | - |
| Payment to parent, net | - | - | - | (10,486) |
| Net cash provided by (used in) financing activities | 96,041 | 402,289 | (150) | 303,078 |
| Net increase (decrease) in cash and cash equivalents | 33,537 | 353,133 | (67,062) | (59,406) |
| **Cash and cash equivalents** | | | | |
| Beginning of period | 380,073 | 26,940 | 94,002 | 153,408 |
| Net increase (decrease) in cash and cash equivalents | 33,537 | 353,133 | (67,062) | (59,406) |
| End of period | $ 413,610 | $ 380,073 | $ 26,940 | $ 94,002 |
| **Supplementary disclosure of cash flow information** | | | | |
| Income taxes (refunded) paid | $ 2,825 | $ (2,210) | $ 855 | $ 3,702 |
| Interest paid | 180,647 | 268,925 | 4,847 | 421,735 |
| Deferred/contingent consideration for acquisitions, net | 4,695 | (15,626) | - | - |
| Restructuring (See Note 1) | | | | |

The accompanying notes are an integral part of these consolidated financial statements.

# HMH Holdings (Delaware), Inc.
## Consolidated Statements of Stockholders' Equity (Deficit) and Comprehensive Income (Loss)

### Predecessor Company

| (in thousands of dollars, except share information) | Common Stock Shares | $0.001 Par Value Amount | Capital in excess of Par Value | Accumulated Deficit | Accumulated Other Comprehensive Income (Loss) | Total |
|---|---|---|---|---|---|---|
| Balance at January 1, 2009 | 3,100 | $ - | $ 1,748,460 | $ (2,586,960) | $ (17,560) | $ (856,060) |
| Comprehensive income (loss) | | | | | | |
| Net loss | - | - | - | (2,145,147) | - | (2,145,147) |
| Net change in pension liability | - | - | - | - | 1,275 | 1,275 |
| Cumulative translation adjustment | - | - | - | - | 193 | 193 |
| Total comprehensive income (loss) | | | | | | (2,143,679) |
| Recapitalization of amounts due to Parent | - | - | 379,368 | - | - | 379,368 |
| Stock compensation | - | - | 7,970 | - | - | 7,970 |
| Effects of adoption of accounting standard on uncertainties in income taxes | - | - | - | (2,335) | - | (2,335) |
| Balance at December 31, 2009 | 3,100 | - | 2,135,798 | (4,734,442) | (16,092) | (2,614,736) |
| Comprehensive income (loss) | | | | | | |
| Net loss | - | - | - | (311,776) | - | (311,776) |
| Net change in pension liability | - | - | - | - | (1,313) | (1,313) |
| Cumulative translation adjustment | - | - | - | - | 392 | 392 |
| Total comprehensive income (loss) | | | | | | (312,697) |
| Stock compensation | - | - | 925 | - | - | 925 |
| Dividend to affiliate | - | - | (2,500) | - | - | (2,500) |
| Recapitalization of amounts due from Parent | - | - | (1,154) | - | - | (1,154) |
| Balance at March 9, 2010 | 3,100 | $ - | $ 2,133,069 | $ (5,046,218) | $ (17,013) | $ (2,930,162) |

### Successor Company

| (in thousands of dollars, except share information) | Common Stock Shares | $0.001 Par Value Amount | Capital in excess of Par Value | Accumulated Deficit | Accumulated Other Comprehensive Income (Loss) | Total |
|---|---|---|---|---|---|---|
| Balance at March 10, 2010 | 129,999,970 | $ 130 | $ 1,376,435 | $ - | $ - | $ 1,376,565 |
| Comprehensive income (loss) | | | | | | |
| Net loss | - | - | - | (507,727) | - | (507,727) |
| Net change in pension liability | - | - | - | - | (6,533) | (6,533) |
| Cumulative translation adjustment | - | - | - | - | 1,829 | 1,829 |
| Unrealized loss on short-term investments | - | - | - | - | (180) | (180) |
| Total comprehensive income (loss) | | | | | | (512,611) |
| Issuance of common stock, net | 153,636,265 | 154 | 649,446 | - | - | 649,600 |
| Stock compensation | - | - | 4,274 | - | - | 4,274 |
| Balance at December 31, 2010 | 283,636,235 | 284 | 2,030,155 | (507,727) | (4,884) | 1,517,828 |
| Comprehensive income (loss) | | | | | | |
| Net loss | - | - | - | (2,182,370) | - | (2,182,370) |
| Net change in pension liability | - | - | - | - | (14,509) | (14,509) |
| Cumulative translation adjustment | - | - | - | - | (4,241) | (4,241) |
| Unrealized gain on short-term investments | - | - | - | - | 181 | 181 |
| Total comprehensive income (loss) | | | | | | (2,200,939) |
| Stock compensation | - | - | 8,559 | - | - | 8,559 |
| Balance at December 31, 2011 | 283,636,235 | $ 284 | $ 2,038,714 | $ (2,690,097) | $ (23,453) | $ (674,552) |

The accompanying notes are an integral part of these consolidated financial statements.

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

## 1.    Basis of Presentation

HMH Holdings (Delaware), Inc., ("HMH", "Houghton Mifflin Harcourt", "we", "us", "our", or the "Company"), is a leading global education and learning company providing innovative solutions and approaches to the challenges facing education today.  We are the world's largest provider of educational products and solutions for pre-K–12 learning and we also develop and deliver interactive, results-driven learning solutions that advance teacher effectiveness and student achievement in the Education market.  Furthermore, since 1832, we have published trade and reference materials including award-winning adult and children's books, fiction, and nonfiction.

The consolidated December 31, 2011 and 2010 financial statements of HMH include the accounts of all of our wholly-owned subsidiaries as of and for the periods ended December 31, 2011, December 31, 2010, March 9, 2010 and December 31, 2009.  Prior to the Restructuring noted below, our operations were held by HMH Publishing Company ("HMH Publishing" or "Predecessor"), a wholly-owned subsidiary of Education Media and Publishing Group Limited ("EMPG" or "Former Parent") formed through the combination of Houghton Mifflin and Harcourt Education (both education learning companies) and Riverdeep Group Limited, a digital publishing business.  Throughout the notes to the consolidated financial statements, both HMH and HMH Publishing are referred to collectively as the "Company".

The accompanying consolidated financial statements have been prepared in accordance with principles generally accepted in the United States of America ("GAAP"). All intercompany accounts and transactions have been eliminated.

**March 2010 Restructuring**

As a result of lower than expected operating results beginning in the latter half of 2008 and continuing through 2009, primarily due to a downturn in the economy and state budget deficits adversely affecting many of our customers, we failed several of our debt covenants and faced liquidity constraints.  Waivers were obtained from our first lien lenders and mezzanine lenders for the covenant violations through March 9, 2010.

On March 9, 2010, the Company and its first lien and mezzanine lenders and its shareholders consummated a restructuring of the Company (the "Restructuring").  As part of the Restructuring, a new legal entity was formed, HMH Holdings (Delaware), Inc., to hold all of the assets of the operating companies.  On March 9, 2010, the then-existing senior secured lenders in the first lien credit facility received 90% (pre-dilution from the rights offering noted below) of the equity in HMH, in exchange for converting $1,983.7 million of their senior secured position in the first lien credit agreement to equity in HMH.  The then-existing mezzanine lenders received 10% of the equity of HMH (pre-dilution from the rights offering) and 40,519,431 warrants at a strike price of $12.26, in exchange for converting all of their $2,124.8 million subordinated secured position in the mezzanine credit agreement to equity.  The former shareholder, EMPG, cancelled its equity ownership in the Company in exchange for 18,956,473 warrants with a strike price of $22.32. Upon conclusion of the Restructuring, EMPG no longer had an ownership interest in us.

Additionally, on March 9, 2010, HMH raised $650.0 million of new equity capital through a rights offering from the then-existing senior secured and mezzanine lenders who agreed to convert a portion of their first lien and mezzanine positions to equity.  The proceeds were used to pay transaction fees, accrued interest and fund working capital needs.

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

As a result of this change in control, we applied the acquisition method of accounting, as required by authoritative literature.  Accordingly, the consolidated financial statements prior to the closing of the Restructuring reflect the historical accounting basis in the assets and liabilities and are labeled Predecessor Company, while such records subsequent to the Restructuring are labeled Successor Company and reflect the fair values determined as part of applying the acquisition method.  This is presented in the consolidated financial statements by a vertical black line division which appears between the columns labeled Predecessor and Successor in the financial statements and the relevant notes.  The black line signifies that the periods prior to the Restructuring are not comparable.

A valuation was performed to determine the acquisition price using the Income Approach employing a Discounted Cash Flow ("DCF") methodology.  The DCF method explicitly recognizes that the value of a business enterprise is equal to the present value of the cash flows that are expected to be available for distribution to the equity and/or debt holders of a company.  In the valuation of a business enterprise, indications of value are developed by discounting future net cash flows available for distribution to their present worth at a rate that reflects both the current return requirements of the market and the risk inherent in the specific investment.

We used a multi-year DCF model to derive a Total Invested Capital value which was adjusted for cash, non-operating assets, debt and any negative net working capital to calculate a Business Enterprise Value of approximately $5.0 billion which was then used to value our equity.  In connection with the Income Approach portion of this exercise, we made the following assumptions: (1) the discount rate was based on an average of a range of scenarios with rates between 8.6% and 11.4%; (2) management's estimates of future performance of our operations; and (3) a terminal growth rate of 3.5%.  The discount rate and market growth rate reflect the risks associated with the general economic pressure impacting both the economy in general and more specifically the publishing industry.  Costs and professional fees incurred as part of the refinancing totaled $43.7 million and were recorded in other assets and long-term receivables in the Predecessor Company and were treated as a reduction to the equity value in the Successor Company.

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

We finalized the valuation and completed the allocation of the business enterprise value.  The allocation of the business enterprise value at March 10, 2010 was as follows:

| | |
|---|---:|
| Cash and cash equivalents | $      22,995 |
| Accounts receivable | 222,213 |
| Inventories | 380,243 |
| Note receivable - related party | 73 |
| Prepaid expenses and other assets | 12,191 |
| Property, plant, and equipment | 128,282 |
| Pre-publication costs | 463,459 |
| Royalty advances to authors | 44,415 |
| Goodwill | 1,935,965 |
| Other intangible assets | 2,108,538 |
| Other assets and long-term receivables | 9,123 |
| Accounts payable | (105,688) |
| Royalties payable | (34,621) |
| Salaries, wages, and commissions payable | (46,872) |
| Deferred revenue | (107,609) |
| Interest payable | (30,517) |
| Interest rate swap liability | (121,891) |
| Severance and other charges | (62,157) |
| Accrued postretirement benefits | (2,443) |
| Other liabilities | (124,761) |
| Debt | (3,009,212) |
| Royalties payable | (3,243) |
| Accrued pension benefits | (80,026) |
| Accrued postretirement benefits | (31,526) |
| Deferred income taxes | (153,003) |
| Other liabilities | (37,363) |
| Total net assets acquired | $   1,376,565 |

**Liquidity**

Our liquidity and our ability to service our debt, as well as fund future acquisitions, other purchase commitments, operating leases, working capital and capital expenditure requirements, is dependent on our future financial performance, which is subject to general economic, financial and other factors certain of which are beyond our control.  We expect our cash flows from operations, combined with our cash on hand and availability under our accounts receivable securitization facility, to provide sufficient liquidity to fund our current obligations, debt service requirements, projected working capital requirements, debt principal repayments, and capital spending over the next twelve months; however, there can be no assurance that our business will generate sufficient cash flow from operations, that anticipated net sales will be realized or that future borrowings will be available under our accounts receivable securitization facility, or any other facility, in an amount sufficient to enable us to service our indebtedness or to fund our other liquidity needs beyond such period. We anticipate that to the extent additional liquidity is necessary to fund our operations, it would be funded through an expansion of our accounts receivable securitization facility, the incurrence of other indebtedness, additional equity financings or a combination of these potential sources of liquidity, however, there can be no assurance that we will be able to raise additional debt or equity or whether such debt or equity could be obtained on commercially reasonable terms.

## HMH Holdings (Delaware), Inc.
### Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

All previous debt covenants were amended under the Restructuring described above and were further amended in December 2011 to provide for additional covenant expansion.  We are in compliance with our amended debt covenant as of December 31, 2011.  The economic downturn has resulted in a contraction of spending in the education market for 2011 materially beyond what we had forecasted and it appears that this will continue through 2012.  As a direct result of the lower sales generated in 2011 and expected for 2012, we have enacted cost saving initiatives to help align our cost structure with anticipated revenues.  With the financial covenant expansion and cost reductions, we expect to be in compliance with our financial covenant over the next twelve months.  If we were to not comply with any of our financial covenants, we would expect to pursue an amendment of or waiver under our credit facilities, however, there can be no assurance that we would be able to obtain such amendment or waiver and thus have sufficient liquidity. The failure to comply with our financial covenants and to obtain a waiver or amendment of such covenants would cause an event of default under the senior secured credit facilities and the accounts receivable securitization facility which would allow the lenders to terminate their commitments under the credit facilities, and also, subject to certain cure periods, allow the lenders to accelerate the repayment of amounts outstanding under the credit facilities.  Also, if the lenders were to accelerate indebtedness under the credit facilities, and such indebtedness were not discharged within a specific period of time, it would be the basis for an event of default under our Senior Notes, which would allow the holders of the Senior Notes to accelerate the maturity of the Senior Notes.

As of December 31, 2011, we had approximately $2.8 billion (face value) outstanding under our senior secured credit facility and $300.0 million outstanding under our Senior Notes.  $235.8 million of the amount outstanding under the senior secured credit facility is due in December 2013 and $2.6 billion is due in June 2014.  The $300.0 million outstanding under the Senior Notes is due in June 2019.  We do not currently have sufficient funds to repay the debt upon maturity or an acceleration of maturity and we would need to raise additional funds to do so.  We cannot assure you that any necessary additional financing would be available to us on commercially reasonable terms, or at all.  If adequate funds were not available and we were unable to repay the amounts due and payable under our senior secured credit facilities, the lenders could proceed against the collateral granted to them to secure that indebtedness.  Further, in the event we cannot repay such indebtedness, we may not be able to sustain our future operations and may be required to delay, reduce and/or cease our operations.  Also, if lenders were to terminate their commitment under our accounts receivable securitization facility, our inability to draw on the facility would affect our working capital, impact our ability to make capital improvements and may also impact our ability to acquire inventory and products because vendors may be unwilling to extend credit to us.  Borrowings under the accounts receivable securitization facility are subject to meeting certain requirements and borrowing base availability.  As of December 31, 2011, we have borrowing capacity of $250.0 million, of which $110.6 million is available to us.  We also had approximately $26.2 million of outstanding letters of credit under our $50.0 million standby letter of credit facility, all of which were cash collateralized.  We are currently assessing strategic alternatives to restructure our debt obligations.  In the event we are unable to complete a consensual restructuring with our lenders, we may consider other actions, including the restructuring of the debt through an in-court process.

### Subsequent Events
The Company has performed an evaluation of subsequent events through March 30, 2012, which is the date the financial statements were issued.

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

## 2.   Significant Accounting Policies

### Principles of Consolidation

Our accompanying consolidated financial statements include the results of operations of the Company and our wholly-owned subsidiaries.  All material intercompany accounts and transactions are eliminated in consolidation.

### Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires the use of estimates, assumptions and judgments by management that affect the reported amounts of assets, liabilities, revenues, expenses, and related disclosure of contingent assets and liabilities in the amounts reported in the financial statements and accompanying notes.  On an ongoing basis, we evaluate our estimates andassumptions including, but not limited to, book returns, allowance for bad debts, recoverability of advances to authors, valuation of inventory, depreciation and amortization periods, recoverability of long-term assets such as property, plant, and equipment, capitalized pre-publication costs, other identified intangibles, goodwill, deferred revenue, income taxes, pensions and other postretirement benefits, contingencies, and litigation.  We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources.  Actual results may differ from those estimates.

### Revenue Recognition

We derive revenue primarily from the sale of print and digital textbooks and instructional materials, trade books, reference materials, multimedia instructional programs, license fees for book rights, content, software and services that include test development, test scoring, consulting and training.  Revenue from print and digital textbooks and instructional materials, trade books, reference materials, assessment materials and multimedia instructional programs is recognized in the period when persuasive evidence of an arrangement with the customer exists, the products are shipped, title and risk of loss have transferred to the customer, all significant obligations have been performed and collection is reasonably assured.

We enter into certain contractual arrangements that have multiple elements, one or more of which may be delivered subsequent to the initial sale.  These multiple deliverable arrangements may include print and digital media, professional development, training services, software, software as a service (SaaS), and various services related to the software including but not limited to hosting, maintenance and support, and implementation.  At the inception of these arrangements, consideration is allocated using the Relative Sales Value (RSV) method.  For each element, we determine whether the element falls under the accounting guidance within multiple element arrangements or software revenue recognition.  For elements which fall under the accounting guidance for multiple element arrangements, we apply the highest applicable relative selling price guidance available, Vendor Specific Objective Evidence (VSOE), Third Party Evidence (TPE), or Best Estimate of Selling Price (BESP).  For elements which fall under the accounting guidance for software revenue recognition, we apply VSOE and the residual method.  If we are not able to establish VSOE, we estimate relative selling price based on TPE or BESP for purposes of allocation of total project discount, and defer until all such elements are fulfilled assuming all other revenue recognition criteria have been met.  For multiple deliverable arrangements, fair value is determined for all elements and the relative sales value of revenue for items to be delivered after the initial sale is deferred until such time as the items are delivered.   A significant component of revenue that is deferred relates to gratis items delivered in connection with sales to customers within adoption states.  As our business model shifts to more digital and on-line learning components, additional revenue could be deferred.  As products are shipped with right of return, a

13

## HMH Holdings (Delaware), Inc.
### Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

provision for estimated returns on these sales is made at the time of sale based on historical experience.

License fees for software products without future obligations are recognized upon delivery.  Certain contracts include software and on-going fees for maintenance and other support.  If vendor-specific objective evidence of the fair value of each element of the arrangement exists, the elements of the contract are unbundled and the revenue is recognized for each element when or as delivered. Revenue for test delivery, test scoring and training are recognized when the services have been completed, the fee is fixed or determinable and collection is reasonably assured.  Revenue for test development is recognized as the services are provided.  Differences between what has been billed and what has been recognized as revenue is recorded as deferred revenue.  We enter into agreements to license certain book publishing rights and content.  We recognize revenue on such arrangements when all materials have been delivered to the customer and collection is reasonably assured.

### Advertising Costs and Sample Expenses
Advertising costs are charged to selling and administrative expenses as incurred.  For the year ended December 31, 2011, advertising costs were $7.4 million.  For the period January 1, 2010 to March 9, 2010, advertising costs were $1.1 million and for the period March 10, 2010 to December 31, 2010 advertising costs were $5.1 million.  For the year ended December 31, 2009, advertising costs were $7.2 million.  Sample expenses are charged to selling and administrative expenses when the samples are shipped.

### Cash and Cash Equivalents
Cash and cash equivalents consist primarily of cash in banks and highly liquid investment securities that have maturities of three months or less when purchased.  The carrying amount of cash equivalents approximates fair value because of the short term maturity of these investments.

### Restricted Cash
Restricted cash consists primarily of cash collateral for irrevocable standby letters of credit in connection with property that we currently lease and performance and surety bonds.

### Accounts Receivable
Accounts receivable are recorded net of allowances for doubtful accounts and reserves for book returns.  In the normal course of business, we extend credit to customers that satisfy predefined criteria.  We estimate the collectability of our receivables.  Allowances for doubtful accounts are established through the evaluation of accounts receivable aging and prior collection experience to estimate the ultimate collectability of these receivables.  Reserves for book returns are based on historical return rates and sales patterns.

### Inventories
Inventories are stated at the lower of weighted average cost or net realizable value.  The level of obsolete and excess inventory is estimated on a program or title level-basis by comparing the number of units in stock with the expected future demand.  The expected future demand of a program or title is determined by the copyright year, the previous years' sales history, the subsequent year's sales forecast, known forward-looking trends including our development cycle to replace the title or program and competing titles or programs.

### Property, Plant, and Equipment
Property, plant, and equipment are stated at cost, or in the case of assets acquired in business combinations, at fair value as of the acquisition date, less accumulated depreciation.  Equipment

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

under capital lease is stated at fair value at inception of the lease, less accumulated depreciation. Maintenance and repair costs are charged to expense as incurred, and renewals and improvements that extend the useful life of the assets are capitalized.

Depreciation on property, plant, and equipment is calculated using the straight-line method over the estimated useful lives of the assets or, in the case of assets acquired in business combinations, over their remaining lives.  Equipment held under capital leases and leasehold improvements are amortized using the straight-line method over the shorter of the lease term or estimated useful life of the asset.  Estimated useful lives of property, plant, and equipment are as follows:

**Capitalized Internal-Use and External-Use Software**
Capitalized internal-use and external-use software is included in property, plant and equipment on the consolidated balance sheets.

We capitalize certain costs related to obtaining or developing computer software for internal use. Costs incurred during the application development stage, including external direct costs of materials and services, and payroll and payroll related costs for employees who are directly associated with the internal-use software project, are capitalized and amortized on a straight-line basis over the expected useful life of the related software.  The application development stage includes design, software configuration and integration, coding, hardware installation and testing. Costs incurred during the preliminary stage, as well as maintenance, training and upgrades that do not result in additional functionality are expensed as incurred.

Certain computer software development costs for software that is to be sold or marketed are capitalized in the consolidated balance sheets.  Capitalization of computer software development costs begins upon the establishment of technological feasibility.  We define the establishment of technological feasibility as a working model.  Amortization of capitalized computer software development costs is provided on a product-by-product basis using the straight-line method, beginning upon commercial release of the product, and continuing over the remaining estimated economic life of the product.  The carrying amounts of computer software development costs are periodically compared to net realizable value and impairment charges are recorded, as appropriate, when amounts expected to be realized are lower.

We review internal and external software development costs for impairment.  For the year ended December 31, 2011 and for the period January 1, 2010 to March 9, 2010, software development costs of $5.6 million and $4.0 million, respectively, were deemed impaired and included as a charge to the statement of operations in the impairment charge for pre-publication costs and fixed assets caption.  There were no software development cost impairments for the period March 10, 2010 to September 30, 2010 and for the year ended December 31, 2009.

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

### Pre-publication costs

We capitalize the art, prepress, manuscript and other costs incurred in the creation of the master copy of a book or other media (the "pre-publication costs").  Pre-publication costs are primarily amortized from the year of copyright, or sale if earlier, over five years using the sum-of-the years-digits method.  This policy is used throughout the Company, except for the Trade and Reference division's consumer trade books, which expenses such costs as incurred, and the assessment products, which uses the straight-line amortization method.  The amortization methods and periods chosen best reflect the pattern of expected sales generated from individual titles or programs.  We periodically evaluate the remaining lives and recoverability of capitalized pre-publication costs, which are often dependent upon program acceptance by state adoption authorities.

Amortization expense related to pre-publication costs was $176.8 million for the year ended December 31, 2011.  For the period January 1, 2010 to March 9, 2010 amortization expense related to pre-publication costs was $37.9 million and for the period March 10, 2010 to December 31, 2010 amortization expense related to pre-publication costs was $181.5 million.  For the year ended December 31, 2009, amortization expense related to pre-publication costs was $242.0 million.

Pre-publication costs recorded on the balance sheet are periodically reviewed for impairment by comparing the unamortized capitalized costs of the assets to the net realizable value of those assets.  The net realizable value approximates the fair value of the assets.  For the year ended December 31, 2011, the period January 1, 2010 to March 9, 2010, and the period March 10, 2010 to December 31, 2010, pre-publication costs of $33.5 million, zero and $16.9 million, respectively, were deemed to be impaired.  For the year ended December 31, 2009, pre-publication costs of $20.3 million were deemed to be impaired. The impairment was included as a charge to the statement of operations in the impairment charge for goodwill, intangible assets, pre-publication costs and fixed assets caption by comparing the unamortized capital costs of the assets to the net realizable value of those assets.

### Goodwill and indefinite-lived intangible assets

Goodwill is the excess of the purchase price paid over the fair value of the net assets of the business acquired.  Other intangible assets principally consist of branded trademarks and trade names, acquired publishing rights and customer relationships.  Goodwill and indefinite-lived intangible assets (certain trade names) are not amortized but are reviewed at least annually for impairment or earlier, if an indication of impairment exists.  Recoverability of goodwill and indefinite lived intangibles is evaluated using a two-step process.  In the first step, the fair value of a reporting unit is compared to its carrying value.  If the fair value of a reporting unit exceeds the carrying value of the net assets assigned to a reporting unit, goodwill is considered not impaired and no further testing is required.  If the carrying value of the net assets assigned to a reporting unit exceeds the fair value of a reporting unit, the second step of the impairment test is performed in order to determine the implied fair value of a reporting unit's goodwill.  Determining the implied fair value of goodwill requires valuation of a reporting unit's tangible and intangible assets and liabilities in a manner similar to the allocation of purchase price in a business combination.  If the carrying value of a reporting unit's goodwill exceeds its implied fair value, goodwill is deemed impaired and is written down to the extent of the difference.  We estimate total fair value of each reporting unit using discounted cash flow analysis, and make assumptions regarding future revenue, gross margins, working capital levels, investments in new products, capital spending, tax, cash flows and the terminal value of the reporting unit.  With regard to other intangibles with indefinite lives, we determine the fair value by asset, which is then compared to its carrying value to determine if the assets are impaired.

**HMH Holdings (Delaware), Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2011, 2010 and 2009**

*(in thousands of dollars, except share information)*

Goodwill is allocated entirely to our Education reporting unit.  Determining the fair value of a reporting unit is judgmental in nature, and involves the use of significant estimates and assumptions.  These estimates and assumptions may include revenue growth rates sand operating margins used to calculate projected future cash flows, risk-adjusted discount rates, future economic and market conditions, the determination of appropriate market comparables as well as the fair value of individual assets and liabilities.  Consistent with prior years, we used an income approach to establish the fair value of the reporting unit as of October 1, 2011.  As in prior years, we used the most recent five year strategic plan as the initial basis of our analysis.  We also assessed the fair values of the assets and liabilities attributed to our education business.  Under this approach, the fair value of each asset and liability were determined based on the methodology we believe is most appropriate for each.  Significant estimates and judgments were involved in this assessment. Those estimates and judgments include the use of valuation methods for determining the fair value of the intangible assets and the applicable assumptions utilized to arrive at the market values of the fixed assets and the realizability of other assets within the Education business.

We completed our annual goodwill and indefinite-lived intangible asset impairment tests as of October 1, 2011, 2010 and 2009 and recorded a noncash impairment charge of $1,635.1 million for the year ended December 31, 2011 and $87.0 million for the period March 10, 2010 to December 31, 2010. There was no impairment for the period January 1, 2010 to March 9, 2010. For the year ended December 31, 2009, impairment charges were $933.3 million. The impairments principally related to goodwill and tradenames within the Education business in 2011, and related to tradenames within the Education business and Trade Division in 2010, and principally related to tradenames and goodwill within the Education business in 2009. The impairment charges resulted primarily from a decline in revenue from previously projected amounts as a result of the economic downturn and reduced educational spending by states and school districts.  All impairment charges are included in operating income.

**Publishing Rights**
A publishing right allows us to publish and republish existing and future works as well as create new works based on previously published materials.  We determine the fair market value of the publishing rights arising from business combinations by discounting the after-tax cash flows projected to be derived from the publishing rights and titles to their net present value using a rate of return that accounts for the time value of money and the appropriate degree of risk.  The useful life of the publishing rights is based on the lives of the various copyrights involved.  We calculate amortization using the percentage of the projected operating income before taxes derived from the titles in the current year as a percentage of the total estimated operating income before taxes over the remaining useful life.  Acquired publication rights, as well as customer-related intangibles with definitive lives, are primarily amortized on an accelerated basis over periods ranging from three to 20 years.

## HMH Holdings (Delaware), Inc.
**Notes to Consolidated Financial Statements**
**December 31, 2011, 2010 and 2009**

*(in thousands of dollars, except share information)*

### Impairment of other long-lived assets

We review our other long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be fully recoverable.  If the future undiscounted cash flows are less than their book value, impairment exists.  The impairment is measured as the difference between the book value and the fair value of the underlying asset.  Fair value is normally determined using a discounted cash flow model.

### Severance

We accrue postemployment benefits if the obligation is attributable to services already rendered, rights to those benefits accumulate, payment of benefits is probable, and amount of benefit is reasonably estimated.  Postemployment benefits include severance benefits.

Subsequent to recording such accrued severance liabilities, changes in market or other conditions may result in changes to assumptions upon which the original liabilities were recorded that could result in an adjustment to the liabilities.

### Royalty advances

Royalty advances to authors are capitalized and represent amounts paid in advance of the sale of an author's product and are recovered as earned.  As advances are recorded, a partial reserve may be recorded immediately based primarily upon historical sales experience.  Advances are evaluated periodically to determine if they are expected to be recovered.  Any portion of a royalty advance that is not expected to be recovered is fully reserved.

### Income taxes

We record income taxes using the asset and liability method.  Deferred income tax assets and liabilities are recognized for future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective income tax basis, and operating loss and tax credit carryforwards.  Our consolidated financial statements contain certain deferred tax assets which have arisen primarily as a result of operating losses, as well as other temporary differences between financial and tax accounting.  We establish a valuation allowance if the likelihood of realization of the deferred tax assets is reduced based on an evaluation of objective verifiable evidence.  Significant management judgment is required in determining our provision for income taxes, our deferred tax assets and liabilities and any valuation allowance recorded against those net deferred tax assets.  We evaluate the weight of all available evidence to determine whether it is more likely than not that some portion or all of the net deferred income tax assets will not be realized.

We also evaluate any uncertain tax positions and only recognize the tax benefit from an uncertain tax position if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position.  The tax benefits recognized in the financial statements from such positions are then measured based on the largest benefit that has a greater than 50 percent likelihood of being realized upon ultimate settlement.  We record a liability for unrecognized tax benefits resulting from uncertain tax positions taken or expected to be taken in a tax return.  Any change in judgment related to the expected ultimate resolution of uncertain tax positions is recognized in earnings in the period in which such change occurs.  Interest and penalties, if any, related to unrecognized tax benefits are recorded in income tax expense.

### Share-Based Compensation

Certain employees and or directors have been granted stock options and restricted stock awards in both the predecessor and successor companys' common stock.  Stock based compensation

## HMH Holdings (Delaware), Inc.
### Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

expense reflects the fair value of stock-based awards measured at the grant date and recognized over the relevant service period.  We estimate the fair value of each stock-based award on the measurement date using either the current market price or the Black-Scholes option valuation model.  The Black-Scholes option valuation model incorporates assumptions as to stock volatility, the expected life of the options, risk-free interest rate and dividend yield for time-vested stock options and restricted stock.  We recognize compensation cost on a straight-line basis over the awards' vesting periods.

**Comprehensive Income (Loss)**
Comprehensive income (loss) is defined as changes in the equity of an enterprise except those resulting from stockholder transactions.  The amounts shown on the consolidated statements of stockholders' equity (deficit) and comprehensive income (loss) relate to the cumulative effect of minimum pension liabilities and translation gain and loss adjustments.

**Foreign Currency Translation**
The functional currency for each of our subsidiaries is the currency of the primary economic environment in which the subsidiary operates, generally defined as the currency in which the entity generates and expends cash.  Foreign currency denominated assets and liabilities are translated into United States dollars at current rates as of the balance sheet date and the revenue, costs and expenses are translated at the average rates established during each reporting period.  Cumulative translation gains or losses are recorded in equity as an element of accumulated other comprehensive income.

**Financial instruments**
Derivative financial instruments are employed to manage risks associated with interest rate exposures and are not used for trading or speculative purposes.  We recognize all derivative instruments, such as interest rate swap agreements, in our consolidated balance sheets at fair value.  Changes in the fair value of derivatives are recognized periodically either in earnings or in stockholders' equity (deficit) as a component of other comprehensive income (loss), depending on whether the derivative financial instrument qualifies for hedge accounting and, if so, whether it qualifies as a fair value hedge or a cash flow hedge.  Gains and losses on derivatives designated as hedges, to the extent they are effective, are recorded in other comprehensive income, and subsequently reclassified to earnings to offset the impact of the hedged items when they occur.  Changes in the fair value of derivatives not qualifying as hedges are reported in earnings.  Our interest rate swap agreements that existed during 2010 and terminated upon expiration did not qualify for hedge accounting because we did not contemporaneously document our hedging strategy upon entering into the hedging arrangements.  The net interest paid or received on interest rate swaps is recognized within net interest expense in the consolidated statement of operations.  There were no derivative instruments that qualified for hedge accounting during 2011.

**Reclassifications**
Certain 2011 amounts have been reclassified to conform to the 2010 presentation.

**Recent Accounting Pronouncements**
Recent accounting pronouncements, not included below, are not expected to have a material impact on our consolidated financial position and results of operations.

On January 1, 2011, we adopted guidance issued by the Financial Accounting Standards Board ("FASB") on revenue recognition.  Under the new guidance, when vendor specific objective evidence or third party evidence of the selling price for a deliverable in a multiple element

19

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

arrangement cannot be determined, a best estimate of the selling price is required to allocate arrangement consideration using the relative selling price method.  The new guidance includes new disclosure requirements on how the application of the relative selling price method affects the timing of when revenue is recognized. Adoption of the new guidance did not have a material impact to our financial position, results of operations or cash flows

In May 2011, the FASB issued new guidance for fair value measurements intended to achieve common fair value measurement and disclosure requirements in U.S. GAAP and International Financial Reporting Standards.  The amended guidance provides a consistent definition of fair value to ensure that the fair value measurement and disclosure requirements are similar between U.S. GAAP and International Financial Reporting Standards. The amended guidance changes certain fair value measurement principles and enhances the disclosure requirements, particularly for Level 3 fair value measurements.  The amended guidance will be effective for us beginning January 1, 2012.  We do not anticipate that these changes will have a significant impact on our financial position, results of operations or cash flows.  We have elected not to early adopt this new guidance and we do not anticipate that these changes will have a material impact on our financial statements.

In June 2011, the FASB issued guidance that modified how comprehensive income is presented in an entity's financial statements. The guidance issued requires an entity to present the total of comprehensive income, the components of net income, and the components of other comprehensive income either in a single continuous statement of comprehensive income or in two separate but consecutive statements and eliminates the option to present the components of other comprehensive income as part of the statement of equity.  The revised financial statement presentation for comprehensive income will be effective for us beginning January 1, 2012, with early adoption permitted.

In September 2011, the FASB issued new guidance to simplify how entities test goodwill for impairment.  The amended guidance permits an entity to first assess qualitative factors to determine whether it is more likely than not (that is, a likelihood of more than 50 percent) that the fair value of a reporting unit is less than its carrying amount.  If this is the case, companies will need to perform a more detailed two-step goodwill impairment test which is used to identify potential goodwill impairments and to measure the amount of goodwill impairment losses to be recognized, if any.  The amended guidance will be effective for us beginning January 1, 2012.  We believe the adoption of this update will not have a material impact on our financial statements.

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

**3.    Acquisitions**

During the period March 10, 2010 to December 31, 2010, we completed the acquisitions of two companies (the "Acquired Companies") for a total purchase price of approximately $28.3 million, which is net of cash acquired.  The purchase price consisted of approximately $12.9 million of cash at closing, installment payments due over 5 years with a net present value of approximately $4.1 million, and approximately $11.6 million of accrued contingent consideration.  The Acquired Companies provided us with a suite of educational technology software for students along with consulting services to school districts throughout the United States.

During 2011, we reduced the accrued contingent consideration in total for the Acquired Companies by $5.6 million, as we have not been able to achieve certain growth targets and the projections for future growth are lower than originally anticipated.  In accordance with the accounting guidance relating to the subsequent remeasurement of contingent consideration, the amount was recorded as a decrease to the selling and administrative expenses caption in our statement of operations for the year ended December 31, 2011.

During the year ended December 31, 2011, we completed two acquisitions for a total purchase price of approximately $6.5 million, which is net of cash acquired.  The purchase price consisted of approximately $5.6 million of cash at closing and $0.9 million of accrued contingent consideration.  The acquisitions provide us with English as a second language course material for the international markets.

The aforementioned transactions were accounted for under the acquisition method of accounting.  We allocated the purchase price to each company's assets and liabilities assumed at estimated fair values as of the acquisition dates.  The excess of the purchase price over the net amounts assigned to the fair value of the assets acquired and liabilities assumed was recorded as goodwill.  Goodwill and intangible assets recorded as part of the acquisitions totaled approximately $6.5 million and $0 in 2011 and $20.1 million and $6.9 million in 2010, respectively.  The financial results of each company acquired were included within our financial statements from their respective dates of acquisition.  These acquisitions were not considered to be material for purposes of additional disclosure.

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

## 4.    Balance Sheet Information

### Inventories

Inventories at December 31, 2011 and 2010 consisted of the following:

|  | 2011 | 2010 |
|---|---|---|
| Finished goods | $    236,350 | $    277,192 |
| Raw materials | 5,812 | 4,795 |
| Inventory | $    242,162 | $    281,987 |

### Property, Plant, and Equipment

Balances of major classes of assets and accumulated depreciation and amortization at December 31, 2011 and 2010 were as follows:

|  | 2011 | 2010 |
|---|---|---|
| Land and land improvements | $    6,629 | $    6,629 |
| Building and building equipment | 16,322 | 15,708 |
| Machinery and equipment | 37,452 | 30,501 |
| Capitalized software | 176,276 | 126,363 |
| Leasehold improvements | 22,131 | 13,495 |
|  | 258,810 | 192,696 |
| Less:  Accumulated depreciation and amortization | (106,598) | (48,557) |
| Property, plant, and equipment, net | $    152,212 | $    144,139 |

For the year ended December 31, 2011, depreciation and amortization expense were $58.0 million. Depreciation and amortization expense for the period January 1, 2010 to March 9, 2010 was $10.9 million and for the period March 10, 2010 to December 31, 2010 was $48.6 million.  For the year ended December 31, 2009, depreciation and amortization expense were $75.7 million.

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

**5.     Goodwill and Other Intangible Assets**

Goodwill and other intangible assets consisted of the following:

| | December 31, 2011 | | December 31, 2010 | |
| --- | --- | --- | --- | --- |
| | Cost | Accumulated Amortization | Cost | Accumulated Amortization |
| Goodwill | $      520,088 | $              - | $   1,956,071 | $              - |
| Trademarks and tradenames | 440,805 | - | 601,805 | - |
| Publishing rights | 1,180,000 | (466,601) | 1,180,000 | (235,977) |
| Customer related and other | 245,470 | (125,461) | 247,071 | (58,089) |
| | $   2,386,363 | $   (592,062) | $   3,984,947 | $   (294,066) |

The changes in the carrying amount of goodwill for the years ended December 31, 2011 and 2010 are as follows:

| | Predecessor Company |
| --- | --- |
| **Balance at December 31, 2009** | |
| Goodwill | $   3,253,384 |
| Accumulated impairment losses | (895,800) |
| | 2,357,584 |
| Acquisitions | - |
| Impairment losses | - |
| **Balance at March 9, 2010** | 2,357,584 |
| Goodwill | 3,253,384 |
| Accumulated impairment losses | (895,800) |
| **Balance at March 9, 2010** | $   2,357,584 |

| | Successor Company |
| --- | --- |
| **Balance at March 10, 2010** | |
| Goodwill | $   1,935,965 |
| Accumulated impairment losses | - |
| | 1,935,965 |
| Acquisitions | 20,106 |
| Impairment losses | - |
| **Balance at December 31, 2010** | 1,956,071 |
| Goodwill | 1,956,071 |
| Accumulated impairment losses | - |
| **Balance at December 31, 2010** | 1,956,071 |
| Acquisitions | 6,517 |
| Impairment losses | (1,442,500) |
| **Balance at December 31, 2011** | 520,088 |
| Goodwill | 1,962,588 |
| Accumulated impairment losses | (1,442,500) |
| **Balance at December 31, 2011** | $      520,088 |

**HMH Holdings (Delaware), Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2011, 2010 and 2009**

*(in thousands of dollars, except share information)*

We had goodwill of $520.1 million and $1,956.1 million at December 31, 2011 and 2010, respectively.  The adjustments to goodwill relate to our acquisitions described in Note 3 of approximately $6.5 million and $20.1 million for the years ended December 31, 2011 and 2010, respectively.  The decrease in goodwill of $1,442.5 million for the year ended December 31, 2011 was due to goodwill impairment charges.  There was no goodwill impairment charge for the period January 1, 2010 to March 9, 2010, or for the period March 10, 2010 to December 31, 2010.

In accordance with the provisions of the accounting standard for goodwill and other intangible assets, goodwill and certain indefinite-lived tradenames are not amortized.  We recorded an impairment charge of approximately $192.6 million, $87.0 million and $291.0 million for certain of our intangible assets at October 1, 2011, 2010 and 2009, respectively.  Amortization expense for publishing rights and customer related and other intangibles were $298.0 million for the year ended December 31, 2011, $50.3 million for the period January 1, 2010 to March 9, 2010, $293.6 million for the period March 10, 2010 to December 31, 2010, and $362.9 million for the year ended December 31, 2009.

On October 5, 2011, we entered into an agreement with EMPG International Limited ("EMPGI"), a former related party, to terminate the 2008 license agreement between us and EMPGI.  The license agreement had provided EMPGI the rights to translate and prepare localized versions of substantially all of our products, as well as change or create derivative versions and redistribute such products in territories outside of our current presence.  As a result of entering into the agreement, certain international intellectual property rights were obtained for consideration of a one-time payment of $30.0 million.  This amount has been capitalized within other intangible assets and is being amortized over a 20 year life.

Estimated aggregate amortization expense expected for each of the next five years related to intangibles subject to amortization is as follows:

|  | Publishing Rights | Other Intangible Assets |
|---|---|---|
| 2012 | $    177,747 | $    52,243 |
| 2013 | 139,588 | 16,978 |
| 2014 | 105,624 | 8,255 |
| 2015 | 81,007 | 7,434 |
| 2016 | 61,350 | 5,873 |
| Thereafter | 148,083 | 29,226 |

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

**6.    Long-Term Debt and Receivables Funding Agreement**

As described in Note 1, we completed our Restructuring on March 9, 2010 converting $1,983.7 million of our Term Loan and the entire balance of our Mezzanine Loan to equity.

Long-term debt at December 31, 2011 and 2010 consisted of the following:

|  | 2011 | 2010 |
|---|---|---|
| $150,000 7.2% Secured Notes due March 15, 2011, interest payable semiannually | $            - | $      149,564 |
| $2,668,690 Term Loan due June 12, 2014 | 2,475,837 | 2,476,279 |
| $235,751 Revolving Loan due December 12, 2013 | 235,751 | 235,751 |
| $300,000 10.5% Secured Notes due June 1, 2019, interest payable semiannually | 300,000 | - |
|  | 3,011,588 | 2,861,594 |
| Less:  Current portion of long-term debt | 43,500 | 193,064 |
| Total long-term debt, net of discount | $   2,968,088 | $   2,668,530 |

Long-term debt repayments due (at face value) in each of the next five years and thereafter is as follows:

| Year | |
|---|---|
| 2012 | $        43,500 |
| 2013 | 279,251 |
| 2014 | 2,494,690 |
| 2015 | - |
| 2016 | - |
| Thereafter | 300,000 |
|  | $    3,117,441 |

On March 19, 2001, we issued $150.0 million of 10-year 7.2% notes through a public offering ("7.2% Notes") that were priced at 99.847% to yield an effective annual interest rate of 7.22%. The notes are secured obligations, ranking equally with our First Lien indebtedness and matured on March 15, 2011, at which time they were paid in full.

On March 9, 2010, in connection with the Restructuring, we entered into Amendment No. 3 to our first lien credit agreement (the "First Lien Credit Agreement") in connection with the conversion of $1,983.7 million of the senior secured position in the First Lien Credit Agreement to equity in HMH and converting all amounts owed under the Mezzanine Credit Agreement (the "Mezzanine Credit Agreement"), $2,124.8 million, to equity in HMH. Subsequent to the Restructuring, the face value of the First Lien indebtedness was $2,904.6 million.

The amendment modified certain financial covenants, definitions and provisions of the agreement, modified the interest rate to LIBOR plus an applicable percentage of 5.0% (while retaining the 25 basis point increase every six month up to a maximum applicable percentage of 7.5%), eliminated interest paid in kind, eliminated restrictions on transfer of funds with foreign loan parties, reinstated

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

the excess cash prepayments beginning at the end of 2011, eliminated the ability to transfer funds to EMPG, and modified certain asset sales and disposition covenants.

Prior to the Restructuring, our debt consisted of a First Lien Credit Agreement in the amount of $4,350.0 million (the "Term Loan"), and a $500.0 million revolving loan (the "Revolving Loan").  A related entity of Lehman Brothers, Inc. ("Lehman") was a party to our Revolving Loan.  We had the option of paying the following floating interest rates: (i) a rate equal to the higher of (A) the rate announced from time to time as the prime rate of Credit Suisse's New York City branch, or (B) the Federal Funds Effective Rate in effect on such day plus .50% plus an applicable percentage plus an applicable percentage of 7.5% or (ii) a rate based on the London Interbank Offered Rate (LIBOR) plus an applicable percentage of 4.0% for the Term Loan and a range of 2.0% to 3.5%, depending on our consolidated leverage ratio, for the Revolving Loan.  The Term Loan matures on June 12, 2014 and the Revolving Loan on December 12, 2013, the terms of which were not modified with the Restructuring.

Along with the First Lien Credit Agreement, we were a party to a mezzanine credit agreement in an aggregate amount of $1,700.0 million, comprised of a seven-year loan (the "Mezzanine Loan"). We had the option of paying the following floating interest rates: (i) a rate equal to the higher of (A) the rate announced from time to time as the prime rate of Credit Suisse's New York City branch, or (B) the Federal Funds Effective Rate in effect on such day plus .50% plus an applicable percentage plus an applicable percentage of 7.5% or (ii) a rate based on the London Interbank Offered Rate (LIBOR) plus an applicable percentage of 9.5%.  A portion of the interest on the Mezzanine Loan (550 basis points) was to be paid in kind and added to principal unless an election was made in advance to pay this interest in cash.  The remaining portion of the interest is to be paid in cash.

On March 12, 2009, we entered into Amendment No. 1 to our First Lien Credit Agreement, which provided us greater near-term financial flexibility, primarily through changes to certain restrictive financial covenants, definitions and provisions of the agreements.  The amendment also had the effect of increasing the interest rate margin on the Term Loan by 300 basis points to be paid in kind.  The amendment provided for the incremental interest rate margin to be decreased 100 basis points for each $600.0 million of debt repaid prior to the maturity date.  The cost of the amendment was approximately $7.8 million and was being amortized over the remaining term of the debt using the effective interest method.

On August 13, 2009, we entered into Amendment No. 2 to our First Lien Credit Agreement, providing us a widening of leverage and interest coverage covenants, increase in permitted indebtedness to allow for an increase in the accounts receivable facility, eliminated excess cash flow prepayments, amending the inter-creditor agreement to reflect the terms of the Mezzanine Loan.  In exchange for the amendment, we agreed to the following: (i) to pay an amendment fee of approximately $11.6 million which was being amortized over the remaining term of the debt using the effective interest method, (ii) an additional 100 basis points of payable in kind interest per annum beginning on the amendment effective date, increasing by an additional 25 basis points per annum on the date six months after the amendment effective date and each six month anniversary thereafter up to 250 basis points, (iii) a shortening of the maturity on the Revolving Loan and the Term Loan to June 12, 2013 if by March 12, 2011 indebtedness under the First Lien Credit Agreement had not been reduced by $700.0 million (which was achieved), and (iv) a limit on capital expenditures, permitted acquisitions and certain other transactions.  We incurred approximately $7.9 million of professional fees in connection with the amendment which were expensed in accordance with the applicable accounting guidance for debt modifications.

On March 16, 2009 through August 11, 2009, we entered into Amendment No. 2 through Amendment No. 12 to the Mezzanine Credit Agreement.  These amendments principally deferred

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

the interest payments due along with certain other modifications. The cost of the amendment was approximately $8.5 million, all of which was payable in kind, and was being amortized over the remaining term of the debt.

On August 13, 2009, we entered into Amendment No. 13 to the Mezzanine Credit Agreement. This agreement amended the Mezzanine Loan at 100% of its accreted value into an all payable in kind facility, deferred interest payments that were due on May 27, 2009 and June 30, 2009 which were converted to payable in kind rather than cash payments, amended the definition of Receivables Facility to allow for increases in the accounts receivable facility from $275.0 million to $400.0 million, and amended leverage and interest coverage covenants. In exchange for the amendment, we agreed to the following: (i) an increase to the interest rate of the Mezzanine Loan to 17.5% payable in kind, (ii) a shortening of the maturity to December 12, 2013 if by March 12, 2011 indebtedness under the First Lien Credit Agreement has not been reduced by $700.0 million, (iii) a limit on capital expenditures, permitted acquisitions and certain other transactions, and (iv) to provide for additional sale rights as set forth in the Sale Rights Agreement. We incurred approximately $12.6 million of professional fees in connection with the amendment which were expensed in accordance with the applicable accounting guidance for debt modifications.

On May 26, 2011, we issued $300.0 million aggregate principal amount of our 10.5% Senior Secured Notes due 2019 ("Senior Notes"), which mature on June 1, 2019. The Senior Notes accrue interest at 10.5% and interest is paid semi-annually on June 1 and December 1. The Senior Notes are pari passu to our existing Term Loan. The proceeds from the Senior Notes were used to provide for working capital needs and to repay borrowings under the accounts receivable securitization facility. We incurred approximately $8.2 million of professional fees to issue the Senior Notes which were capitalized in accordance with the applicable accounting guidance for debt issuance costs, and are being amortized over the term of the debt.

On May 26, 2011, we entered into Amendment No. 5 to our First Lien Credit Agreement, which modified certain financial covenants, definitions and provisions of the agreement. The amendment was required for the issuance of the 10.5% Senior Secured Notes as well as Amendment No.1 to our Receivables Funding and Administration Agreement (see below). We did not incur material professional fees in connection with the amendment. The professional fees incurred were expensed in accordance with the applicable accounting guidance for debt modifications.

On October 27, 2011, we entered into Amendment No. 6 to our First Lien Credit Agreement, in order to align our quarterly and annual financial reporting requirements under our First Lien Credit Agreement and the 10.5% Senior Secured Notes. We did not incur material professional fees in connection with the amendment. The professional fees incurred were expensed in accordance with the applicable accounting guidance for debt modifications.

On December 22, 2011, we entered into Amendment No. 7 to our First Lien Credit Agreement. Amendment No. 7 modified certain financial covenants, definitions and provisions of the agreement. The interest coverage ratio and maximum leverage ratio were suspended until June 30, 2013 and replaced with a minimum consolidated EBITDA requirement. We did not incur material professional fees in connection with the amendment. The professional fees incurred were expensed in accordance with the applicable accounting guidance for debt modifications.

The Term Loan and Revolving Loan were all issued with a discount equal to 4% of the borrowing commitment of each instrument. As of December 31, 2011, the effective interest rates were 8.1% and 6.4% for the Term Loan and Revolving Loan, respectively. As of December 31, 2010, the effective interest rates were 7.40% and 5.75% for the Term Loan and Revolving Loan, respectively.

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

As of December 31, 2009, the effective interest rates were 6.36%, 6.77% and 17.91% for the Term Loan, Revolving Loan and Mezzanine Loan, respectively. We have written off the remaining balance of deferred financing fees as of March 10, 2010 relating to the issuance of the Term Loan, Mezzanine Loan and Revolving Loan. The discounts were being amortized over the life of each debt arrangement as additional interest expense.

Substantially all of our assets and the assets of the guarantors are also pledged as collateral pursuant to the terms of our senior secured credit facilities on a pari passu basis with the Senior Notes.

**Loan Covenants**

The Company is currently required to meet certain restrictive financial covenants as defined under the First Lien Credit Agreement.

The First Lien Credit Agreement covenants require us to maintain certain minimum consolidated EBITDA levels or quarterly ratios related to interest coverage and total leverage. The minimum consolidated EBITDA covenant is as follows.

Four consecutive fiscal quarters ending:

| | |
|---|---|
| December 31, 2011 | $276.0 million |
| March 31, 2012 | 267.0 million |
| June 30, 2012 | 262.0 million |
| September 30, 2012 | 228.0 million |
| December 31, 2012 | 276.0 million |
| March 31, 2013 | 276.0 million |

The covenants were established based on trailing twelve month EBITDA, as defined in the Credit Agreement. The leverage ratio covenant is set at 7.25x at Q2 2013, and 6.75x thereafter. The interest coverage ratio is set at 1.5x from Q2 2013 to the maturity of the debt.

We are also subject to restrictions on certain transactions that can be entered into by us. The First Lien Credit Agreement is guaranteed by HMH and secured by the assets of the operating companies. In the event of default, the collateral would be split on a pro rata basis with the holders of the 10.5% Notes. The Term Loan contains mandatory prepayments of principal in the event that cash proceeds from certain asset sales, debt and equity transactions are not reinvested in the business within 365 days.

A breach of any of these covenants, ratios, tests or restrictions, as applicable, for which a waiver is not obtained could result in an event of default, in which case our lenders could elect to declare all amounts outstanding to be immediately due and payable and result in a cross-default under other arrangements containing such provisions. A default would permit lenders to accelerate the maturity for the debt under these agreements and to foreclose upon any collateral securing the debt owed to these lenders and to terminate any commitments of these lenders to lend to us. If the lenders accelerate the payment of the indebtedness, our assets may not be sufficient to repay in full the indebtedness and any other indebtedness that would become due as a result of any acceleration. Further, in such an event, the lenders would not be required to make further loans to us, and assuming similar facilities were not established and we are unable to obtain replacement financing, it would materially affect our liquidity and results of operations.

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

**Receivables Funding Agreement**

HM Receivables Co., LLC ("HMRC"), a subsidiary of HMH, entered into the Receivables Funding Agreement and Administration Agreement (the "Funding Agreement"), which established a $250.0 million revolving credit facility, with a maturity date of May 31, 2011.  The LIBOR rate advance was LIBOR plus 1.4% per annum for the first $100.0 million of borrowing and LIBOR plus 1.7% for borrowings in excess of $100.0 million.  The index rate advance was a base rate, as defined, plus 1.0% per annum for the first $100.0 million of borrowing and base rate plus 0.7% for borrowings in excess of $100.0 million.

On May 22, 2009, the Funding Agreement was amended primarily to allow HMRC to enter into a Second Lien Receivables Funding and Administration Agreement in order to increase the revolving loan commitments.  This amendment allowed for up to $50.0 million in second lien obligations.  Simultaneously with the execution of the amendment, on May 22, 2009, HMRC entered into a Second Lien Receivables Funding and Administration Agreement with Lehman Commercial Paper, Inc., whereby allowing the facility to increase to $50.0 million.

On February 23, 2010, HMRC entered into an Amended and Restated Receivables Funding and Administration Agreement, in the amount of a $140.0 million term loan (collectively "Tranche A1-3 Term Loans").  The proceeds of the term loan were used to repay the Funding Agreement which was terminated.  The Tranche A1-3 Term Loans were secured by our accounts receivables. We have the option of paying the following interest rates: (i) a rate equal to the lower of (A) the rate announced from time to time as the prime rate plus an applicable percentage of 7.5%, or B) 10.0% or (ii) a rate based on the London Interbank Offered Rate (subject to a floor between 2.0%-2.25%) plus an applicable percentage ranging between 7.75% and 8.0%.  Our effective interest rate for the Tranche A1-3 Term Loans was 10%.  The maturity date was December 31, 2010 although the Tranche A1-3 Term Loans had a call feature at 104% from February 23, 2010 to April 24, 2010, 102% from April 25, 2010 to June 23, 2010, and 101% from June 24, 2010 to July 23, 2010.  The Tranche A1-3 Term Loans were paid in full on August 4, 2010 in conjunction with obtaining the new receivables funding agreement.

On August 4, 2010, HM Receivables Co. II, LLC ("HMRC II"), a subsidiary of us, entered into a Receivables Funding and Administration Agreement (the "New Funding Agreement"), which established a $250.0 million revolving credit facility, with a maturity date of August 4, 2013.  The interest rate is LIBOR based.

On May 26, 2011, HMRC II entered into Amendment No. 1 to its Receivables Funding and Administration Agreement ("RFAA").  The RFAA was amended primarily to extend the maturity of the existing facility by one additional year to August 4, 2014 and to allow a second lien debt of up to an additional $100.0 million.  The amendment modified certain financial covenants, definitions and provisions of the agreement to conform to those defined in the amended First Lien Credit Agreement.  Further, the amendment relaxed the borrowing base calculations to provide greater liquidity.  We did not incur material professional fees in connection with the amendment.  The professional fees incurred were capitalized in accordance with the applicable accounting guidance for revolving loan modifications.

On December 29, 2011, HMRC II entered into Amendment No. 2 to its RFAA.  The RFAA was amended in connection with Amendment No. 7 to the First Lien Credit Agreement.  The amendment aligned certain definitions, financial covenants, reporting requirements and provisions with those of the First Lien Credit Agreement Amendment No. 6 and No. 7.
The amendment no longer allows for a second lien facility.  Further, there were changes to the borrowing base calculation to tighten the requirement.  We incurred approximately $1.6 million of

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

professional fees in connection with the amendment which were capitalized in accordance with the applicable accounting guidance for revolving loan modifications.

All accounts receivables are held in a subsidiary of HMH, HMRC II, which has entered into the aforementioned New Funding Agreement and amendments thereto.  Total HMRCII receivables on December 31, 2011 and 2010 were $302.1 million and $248.3 million, respectively.  As of December 31, 2011 and 2010, $156.3 million and $124.4 million, respectively, of eligible receivables were pledged as collateral on the revolving credit facility, and the receivables have been sold by originating subsidiaries to HMRC II.  The assets of HMRC II are not available to satisfy the obligations of our other subsidiaries.  No LIBOR based rate was elected as of December 31, 2011 and 2010 insofar as the HMRCII facility had no borrowings.

7.  **Interest Swap Arrangements**

We entered into interest rate swap agreements to manage our exposure to interest rate changes as required under our First Lien Credit Agreement which had required, prior to the March 9, 2010 amendment, that at least 50% of the aggregate principal amount of our debt being effectively subject to a fixed or maximum interest.  The swaps effectively converted a portion of our variable rate debt to a fixed rate, without exchanging the notional principal amounts.

We had entered into the following interest rate swap agreements with various financial institutions.

| Effective date of swap | Expiration Date | Notional Amount | Interest Rates |
|---|---|---|---|
| 3/30/2007 | 3/31/2010 | $   814,370 | 4.999%–5.12% |
| 12/31/2007 | 12/31/2010 | 1,875,000 | 3.00%–4.715% |

Our interest rate swaps were not designated as hedges and therefore did not qualify for hedge accounting under the accounting standards for derivative instruments and hedging activities.  Our interest rate swaps expired in 2010.  We had no other interest rate swaps outstanding as of December 31, 2011.  We recorded an unrealized loss of $7.4 million for the period January 1, 2010 to March 9, 2010, and a gain of $90.3 million for the period March 10, 2010 to December 31, 2010 in our statement of operations to account for the changes in fair value of the derivatives.  Interest rate swap arrangements expensed and recorded in interest expense for the period January 1, 2010 to March 9, 2010 were $23.3 million and for the period March 10, 2010 to December 31, 2010 were $69.8 million.  Further, we recorded an unrealized gain of $46.4 million for the year ended December 31, 2009.  Interest rate swap arrangements expensed and recorded in interest expense were $117.8 million for the year ended December 31, 2009.

8.  **Severance and Other Charges**

**2011**

On November 8, 2011, our Board of Directors approved a restructuring plan that was substantially implemented in the fourth quarter of 2011 and with the remainder to be executed in the first two quarters of 2012.  The plan includes workforce reductions of up to approximately 10% of the current workforce as part of an organizational realignment and a reduction of operating costs.  Accordingly, a severance charge of $28.8 million was recorded in 2011 to reflect the workforce reductions due to our organizational realignment.  For the year ended December 31, 2011, $18.3

**HMH Holdings (Delaware), Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2011, 2010 and 2009**

*(in thousands of dollars, except share information)*

million of severance payments were made to employees whose employment ended in 2011 and prior years.  We expect substantially all of the $16.1 million severance reserve at December 31, 2011 to be paid during 2012.

In the year ended December 31, 2011, the vacant space accrual was increased $4.0 million primarily as a result of our exiting certain space.   Additionally, during 2011, we paid $9.9 million of payments for excess space where our committed payment obligations exceeded the sublease income received. The lease obligations anticipated to be paid in future years, on a discounted basis, are $6.7 million, $3.7 million, $3.2 million, $3.1 million, $2.3 million, $0.5 million, and $0.3 million in 2012, 2013, 2014, 2015, 2016, 2017 and thereafter, respectively.

**2010**
We recorded a reduction in severance expense for the period March 10, 2010 to December 31, 2010 of approximately $0.3 million in connection with revised cost estimates in relation to workforce reductions of employees.  These reductions were part of our continuing strategic integration of the former Houghton and Harcourt businesses.  During 2010, approximately $11.1 million of severance payments were made to employees whose employment ended in 2010 and prior years.

As part of purchase accounting, we established a $48.0 million accrual for ongoing obligations to pay rent for vacant space that could not be sublet or space that is expected to be sublet at rates lower than the committed lease arrangements.  The length of these obligations varies by lease with the longest extending through 2019.  Subsequently, we sublet vacant space more quickly and at higher rates than previously estimated.  Accordingly, the reserve initially established was reduced by $11.5 million in the period ended December 31, 2010 to reflect the more recent positive sublet experience.

**2009**
During 2009, we recorded a severance charge of approximately $25.9 million in connection with workforce reductions of 499 employees.  These reductions were part of our continuing strategic integration of the former Houghton and Harcourt businesses.  During 2009, $33.7 million of severance payments were made to employees whose employment ended in 2009 and prior years.

In connection with the workforce reductions that occurred in 2007, 2008, and 2009, we were able to vacate various office spaces throughout the country.  Accordingly, we established a $50.0 million accrual for ongoing obligations to pay rent for vacant space that could not be sublet or space that is expected to be sublet at rates lower than the committed lease arrangements.  The length of these obligations varies by lease with the longest extending through 2019.

A summary of the significant components of the severance/restructuring and other charges is as follows:

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
## December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

| | Severance/ restructuring accrual at December 31, 2010 | Severance/ restructuring expense | Cash payments | Severance/ restructuring accrual at December 31, 2011 |
|---|---|---|---|---|
| **Successor Company** | | **2011** | | |
| Severance costs | $ 5,587 | $ 28,801 | $ (18,317) | $ 16,071 |
| Other accruals | 25,593 | 4,000 | (9,914) | 19,679 |
| | $ 31,180 | $ 32,801 | $ (28,231) | $ 35,750 |

| | Severance/ restructuring accrual at March 10, 2010 | Severance/ restructuring expense | Cash payments | Severance/ restructuring accrual at December 31, 2010 |
|---|---|---|---|---|
| **Successor Company** | | **2010** | | |
| Severance costs | $ 14,392 | $ 282 | $ (9,087) | $ 5,587 |
| Other accruals | 47,765 | (11,525) | (10,647) | 25,593 |
| | $ 62,157 | $ (11,243) | $ (19,734) | $ 31,180 |

| | Severance/ restructuring accrual at December 31, 2009 | Severance/ restructuring expense | Cash payments | Severance/ restructuring accrual at March 9, 2010 |
|---|---|---|---|---|
| **Predecessor Company** | | **2010** | | |
| Severance costs | $ 16,414 | $ - | $ (2,022) | $ 14,392 |
| Other accruals | 50,000 | - | (2,235) | 47,765 |
| | $ 66,414 | $ - | $ (4,257) | $ 62,157 |

| | Severance/ restructuring accrual at December 31, 2008 | Severance/ restructuring expense | Cash payments | Severance/ restructuring accrual at December 31, 2009 |
|---|---|---|---|---|
| **Predecessor Company** | | **2009** | | |
| Severance costs | $ 24,272 | $ 25,882 | $ (33,740) | $ 16,414 |
| Other accruals | - | 50,000 | - | 50,000 |
| | $ 24,272 | $ 75,882 | $ (33,740) | $ 66,414 |

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

## 9.    Income Taxes

Total income taxes are as follows:

| | Successor Company | | Predecessor Company | |
|---|---|---|---|---|
| | **For the Year Ended December 31, 2011** | **For the Period March 10, 2010 December 31, 2010** | **For the Period January 1, 2010 to March 9, 2010** | **For the Year Ended December 31, 2009** |
| Income tax expense (benefit) | $ (100,153) | $ 11,929 | $ (220) | $ (61,393) |
| | $ (100,153) | $ 11,929 | $ (220) | $ (61,393) |

Significant components of the expense (benefit) for income taxes attributable to loss from continuing operations consist of the following:

| | Successor Company | | Predecessor Company | |
|---|---|---|---|---|
| | **For the Year Ended December 31, 2011** | **For the Period March 10, 2010 to December 31, 2010** | **For the Period January 1, 2010 to March 9, 2010** | **For the Year Ended December 31, 2009** |
| **Current** | | | | |
| Foreign | $ 3,958 | $ - | $ - | $ - |
| U.S. - Federal | - | (2,775) | - | - |
| U.S. - State and other | 13,506 | 4,207 | 499 | 25,340 |
| Total current | 17,464 | 1,432 | 499 | 25,340 |
| **Deferred** | | | | |
| Foreign | (2,413) | (6,548) | (719) | 719 |
| U.S. - Federal | (98,655) | 15,465 | - | (74,688) |
| U.S. - State and other | (16,549) | 1,580 | - | (12,764) |
| Total deferred | (117,617) | 10,497 | (719) | (86,733) |
| Income tax expense (benefit) | $ (100,153) | $ 11,929 | $ (220) | $ (61,393) |

The reconciliation of the income tax rate computed at the statutory tax rate to the reported income tax expense (benefit) attributable to continuing operations is as follows:

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

| | Successor Company | | Predecessor Company | |
|---|---|---|---|---|
| | **For the Year Ended December 31, 2011** | **For the Period March 10, 2010 to December 31, 2010** | **For the Period January 1, 2010 to March 9, 2010** | **For the Year Ended December 31, 2009** |
| Statutory rate | (35.0)% | (35.0)% | (12.5)% | (12.5)% |
| Permanent items | 0.1 | 0.1 | 0.1 | 3.3 |
| Goodwill impairment | 12.0 | - | - | - |
| Foreign rate differential | 1.0 | 2.4 | (21.8) | (21.0) |
| State and local taxes | (0.4) | (2.5) | - | - |
| Alternative Minimum Tax Credit | - | (0.6) | - | - |
| Increase in valuation allowance | 17.9 | 38.0 | 34.1 | 27.4 |
| Effective tax rate | (4.4)% | 2.4 % | (0.1)% | (2.8)% |

The significant components of the net deferred tax assets and liabilities are shown in the following table:

| | 2011 | 2010 |
|---|---|---|
| **Tax asset related to** | | |
| Net operating loss and other carryforwards | $ 111,185 | $ 200,190 |
| Returns reserve/inventory expense | 86,235 | 80,374 |
| Pension and postretirement benefits | 26,291 | 23,077 |
| Interest | 507,741 | 416,780 |
| Deferred revenue | 130,803 | 47,072 |
| Deferred compensation | 30,392 | 14,142 |
| Other, net | 17,943 | 9,736 |
| Valuation allowance | (822,485) | (434,471) |
| | 88,105 | 356,900 |
| **Tax liability related to** | | |
| Intangible assets | (34,330) | (216,032) |
| Depreciation and amortization expense | (70,667) | (276,404) |
| Other, net | (1,028) | - |
| | (106,025) | (492,436) |
| Net deferred tax liabilities | $ (17,920) | $ (135,536) |

The net deferred tax liability balance is stated at prevailing statutory income tax rates.  Deferred tax assets and liabilities are reflected on our consolidated balance sheets as follows:

## HMH Holdings (Delaware), Inc.
### Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

|  | 2011 | 2010 |
|---|---|---|
| Current deferred tax assets | $ 14,152 | $ - |
| Noncurrent deferred tax liability | (32,072) | (135,536) |
|  | $ (17,920) | $ (135,536) |

A reconciliation of the gross amount of unrecognized tax benefits, excluding accrued interest and penalties, is as follows:

| **Predecessor Company** | |
|---|---|
| **Balance at January 1, 2009** | $ 16,836 |
| Additions based on tax positions related to the prior year | - |
| Additions based on tax positions related to the current year | 48,338 |
| Reductions based on tax positions related to the prior year | (519) |
| **Balance at January 1, 2010** | 64,655 |
| Additions based on tax positions related to the prior year | - |
| Additions based on tax positions related to the current year | - |
| **Balance at March 9, 2010** | $ 64,655 |

| **Successor Company** | |
|---|---|
| **Balance at March 10, 2010** | $ 64,655 |
| Additions based on tax positions related to the prior year | - |
| Additions based on tax positions related to the current year | - |
| Reductions based on tax positions related to the prior year | (243) |
| **Balance at December 31, 2010** | $ 64,412 |
| Additions based on tax positions related to the prior year | - |
| Additions based on tax positions related to the current year | - |
| **Balance at December 31, 2011** | $ 64,412 |

At December 31, 2011, we had $64.4 million of gross unrecognized tax benefits (excluding interest and penalties), of which $52.1 million, if recognized, would reduce our effective tax rate. We expect the amount of unrecognized tax benefit disclosed above not to change significantly over the next 12 months.

With a few exceptions, we are currently open for audit under the statute of limitation for federal, state, and foreign jurisdictions for years 2008 through 2011. However, carryforward attributes from prior years may still be adjusted upon examination by tax authorities if they are used in a future period.

We report penalties and tax-related interest expense as a component of the provision for income taxes in the accompanying consolidated statement of operations. At December 31, 2011 and 2010, we had $3.7 million and $1.7 million, respectively, of accrued interest and penalties in the accompanying consolidated balance sheet.

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

As part of the Restructuring discussed in Note 1, we realized approximately $2.3 billion of cancellation of debt income.  We recognized approximately $200.0 million of income from cancellation of debt and were able to exclude approximately $2.1 billion from taxable income since we were insolvent (liabilities exceeded the fair market value of assets) by this amount at the time of the exchange.  Although we will not have to pay current cash taxes from this transaction, it will reduce our tax attributes, such as net operating loss carryovers and tax credit carryovers, and also reduce the tax basis of our assets to offset the $2.1 billion of taxable income that did not have to be recognized due to the insolvency.  As a result, the net operating losses and credit carryforwards have been reduced on January 1, 2011 and a portion of the tax basis in our assets were also reduced at that time.

As of December 31, 2011, we have approximately $206.0 million of federal tax loss carryforwards, which expire through 2031.  In addition, we have foreign tax credit carryforwards of $4.6 million, which will expire through 2021.

Based on our assessment of historical pretax losses and the fact that we did not anticipate sufficient future taxable income in the near term to assure utilization of certain deferred tax assets, we recorded a valuation allowance at December 31, 2011 and 2010 of $822.5 million and $434.5 million, respectively.  We increased our valuation allowance by $388.0 million for the year ended December 31, 2011, $188.3 million in the period from March 10, 2010 to December 31, 2010, $129.6 million in the period from January 1, 2010 to March 9, 2010 and by $629.2 million for the year ended December 31, 2009.

**Tax Indemnification**
Vivendi Universal, S.A. (former parent of Houghton Mifflin) agreed to indemnify Houghton Mifflin Company for all income taxes of Houghton Mifflin Company and its subsidiaries due with respect to tax periods, or any portion of a tax period, ending on or before September 30, 2002.  Reed Elsevier Plc has agreed to indemnify the Company for all taxes for any of the Harcourt businesses with respect to periods prior to the date of acquisition.

10.    **Retirement and Postretirement Benefit Plans**

**Retirement Plan**
We have a noncontributory, qualified defined benefit pension plan (the "Retirement Plan"), which covers certain employees.  The Retirement Plan is a cash balance plan, which accrues benefits based on pay, length of service, and interest.  The funding policy is to contribute amounts subject to minimum funding standards set forth by the Employee Retirement Income Security Act of 1974 and the Internal Revenue Code.  The Retirement Plan's assets consist principally of common stocks, fixed income securities, investments in registered investment companies, and cash and cash equivalents.  We also have a nonqualified defined benefit plan, or nonqualified plan, that covers employees who earn over the qualified pay limit as determined by the Internal Revenue Service.  The nonqualified plan accrues benefits for the executive officers based on service and pay.  Benefits for all other employees accrue based on the cash balance plan calculation.  The nonqualified plan is not funded.  We use a December 31 date to measure the pension and postretirement liabilities.  In 2007, both the qualified and nonqualified pension plans eliminated participation in the plans for new employees hired after October 31, 2007.

Houghton Mifflin Plc, our subsidiary, has a defined benefit pension plan (the "Kingfisher Pension Plan") which has been approved by Inland Revenue.  Prior to the elimination of participation in the plan in 2007, all permanent employees between ages 21 and 64 were eligible to join the plan.  On

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

July 20, 2011, we entered into a bulk annuity policy with a third party which effectively terminated the Kingfisher Pension Plan.  This policy covers all known plan beneficiaries and liabilities and represents a full transfer of the plan's financial and longevity risk to the third party.  The policy is held in the name of the plan trustees.  This termination did not constitute a settlement of liability under applicable accounting guidance for pension plans.  Following a full plan data cleansing, the bulk annuity policy is expected to be converted into individual annuity policies at which point the plan will be discharged of all future liability with respect to the plan beneficiaries.  The Kingfisher Pension Plan had benefit obligations of $14.3 million and $12.7 million as of December 31, 2011 and 2010, respectively.  The plan had assets of $14.6 million and $13.3 million December 31, 2011 and 2010, respectively.  Further, the plan had a pension benefit asset of $0.2 million and $0.6 million, at December 31, 2011 and 2010, respectively.  Kingfisher's Pension Plan is included in the accompanying table for all years presented.

We are required to recognize the funded status of defined benefit pension and other postretirement plans as an asset or liability in the balance sheet and are required to recognize actuarial gains and losses and prior service costs and credits in other comprehensive income and subsequently amortize those items in the statement of operations.  Further, we are required to use a measurement date equal to the fiscal year end.

The following table summarizes the Accumulated Benefit Obligations ("ABO"), the change in Projected Benefit Obligation ("PBO"), and the funded status of our plans as of and for the financial statement period ended December 31, 2011 and 2010:

|  | 2011 | 2010 |
|---|---|---|
| **ABO at end of period** | $ 196,898 | $ 186,169 |
| **Change in PBO** | | |
| PBO at beginning of period | $ 186,169 | $ 175,421 |
| Service cost | - | - |
| Interest cost on PBO | 9,120 | 7,816 |
| Actuarial (gain) loss | 10,497 | 9,995 |
| Benefits paid | (9,045) | (7,165) |
| Exchange rates | 157 | 102 |
| PBO at end of period | $ 196,898 | $ 186,169 |
| **Change in plan assets** | | |
| Fair market value at beginning of period | $ 126,196 | $ 95,395 |
| Actual return (loss) | 3,628 | 11,493 |
| Company contribution | 11,460 | 26,366 |
| Benefits paid | (9,045) | (7,165) |
| Exchange rates | 169 | 107 |
| Fair market value at end of period | $ 132,408 | $ 126,196 |
| **Funded status** | $ (64,490) | $ (59,973) |

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

Amounts recognized in the consolidated balance sheets at December 31, 2011 and 2010 consist of:

|  | 2011 | 2010 |
|---|---|---|
| Noncurrent liabilities | $ (64,490) | $ (59,973) |

Additional year-end information for pension plans with ABO in excess of plan assets at December 31, 2011 and 2010 consist of:

|  | 2011 | 2010 |
|---|---|---|
| PBO | $ 182,549 | $ 173,483 |
| ABO | 182,549 | 173,483 |
| Fair value of plan assets | 117,843 | 112,865 |

Amounts not yet reflected in net periodic benefit cost and recognized in accumulated other comprehensive income at December 31, 2011 and 2010 consist of:

|  | 2011 | 2010 |
|---|---|---|
| Net gain (loss) | $ (14,954) | $ (3,945) |
| Accumulated other comprehensive income (loss) | $ (14,954) | $ (3,945) |

Weighted average assumptions used to determine the benefit obligations (both PBO and ABO) at December 31, 2011 and 2010 are:

|  | 2011 | 2010 |
|---|---|---|
| Discount rate | 4.4% | 5.1% |
| Increase in future compensation | N/A | N/A |

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

Net periodic pension cost includes the following components:

| | Sucessor Company | | Predecessor Company | |
|---|---|---|---|---|
| | For the Year Ended December 31, 2011 | For the Period March 10, 2010 to December 31, 2010 | For the Period January 1, 2010 to March 9, 2010 | For the Year Ended December 31, 2009 |
| Service cost | $            - | $            - | $            - | $            - |
| Interest cost on projected benefit obligation | 9,120 | 7,816 | 1,580 | 10,881 |
| Expected return on plan assets | (8,175) | (5,443) | (1,318) | (9,866) |
| Amortization of net (gain) loss | - | - | 2 | 30 |
| Net pension expense | 945 | 2,373 | 264 | 1,045 |
| Loss (gain) due to settlement | 20 | - | - | 5,343 |
| Net cost (gain) recognized for the period | $        965 | $      2,373 | $        264 | $      6,388 |

Significant actuarial assumptions used to determine net periodic pension cost at December 31, 2011 and 2010 are:

| | 2011 | 2010 |
|---|---|---|
| Discount rate | 5.1 % | 5.6 % |
| Increase in future compensation | N/A | N/A |
| Expected long-term rate of return on assets | 6.7 % | 7.0 % |

### Assumptions on Expected Long-Term Rate of Return as Investment Strategies

We employ a building block approach in determining the long-term rate of return for plan assets. Historical markets are studied and long-term relationships between equities and fixed income are preserved congruent with the widely accepted capital market principle that assets with higher volatility generate a greater return over the long run. Current market factors such as inflation and interest rates are evaluated before long-term capital market assumptions are determined. The long-term portfolio return is established via a building block approach and proper consideration of diversification and rebalancing. Peer data and historical returns are reviewed for reasonability and appropriateness. We regularly review the actual asset allocation and periodically rebalances investments to a targeted allocation when appropriate. The current targeted asset allocation is 50% with equity managers and 50% with fixed income managers. For 2012, we will use a 7.0% long-term rate of return for the Retirement Plan. We will continue to evaluate the expected rate of return assumption, at least annually, and will adjust as necessary.

### Plan Assets

Plan assets for the U.S. tax qualified plans consist of a diversified portfolio of fixed income securities, equity securities, real estate, and cash equivalents. Plan assets do not include any of our securities. The U.S. pension plan assets are invested in a variety of funds within a Collective Trust ("Trust"). The Trust is a group trust designed to permit qualified trusts to comingle their assts for investment purposes on tax-exempt basis. The U.K pension plan assets are invested in a single bulk annuity policy with a third party.

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

### Investment Policy and Investment Targets

The tax qualified plans consist of the U.S. pension plan and the U.K. pension scheme.  It is our practice to fund amounts for our qualified pension plans at least sufficient to meet minimum requirements of local benefit and tax laws.  The investment objectives of our pension plan asset investments is to provide long-term total growth and return, which includes capital appreciation and current income.  The nonqualified noncontributory defined benefit pension plan is generally not funded.  Assets were invested among several asset classes.

The percentage of assets invested in each asset class at December 31, 2011 and 2010 is shown below.

| 2011 Asset Class | Percentage in Each Asset Class |
|---|---|
| Equity | 44.0 % |
| Fixed income | 43.0 |
| Annuity policies | 10.8 |
| Other | 2.2 |
| | 100.0 % |

| 2010 Asset Class | Percentage in Each Asset Class |
|---|---|
| Equity | 51.1 % |
| Fixed income | 46.2 |
| Real estate investment trust | 0.1 |
| Other | 2.6 |
| | 100.0 % |

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

### Fair Value Measurements

The fair value of our pension plan assets by asset category and by level (as described in Note 12) at December 31 were as follows:

| | For the Year ended December 31, 2011 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) |
|---|---|---|---|
| Cash and cash equivalents | $ 1,005 | $ 1,005 | $ - |
| Equity securities | | | |
| U.S. large cap growth | 8,944 | - | 8,944 |
| U.S. large cap value | 9,333 | - | 9,333 |
| U.S. large cap passive | 13,034 | - | 13,034 |
| U.S. small / mid cap growth | 3,877 | - | 3,877 |
| U.S. small / mid cap value | 3,983 | - | 3,983 |
| Non-U.S. equities | 19,102 | - | 19,102 |
| Government bonds | 17,535 | - | 17,535 |
| Corporate bonds | 29,249 | - | 29,249 |
| Mortgage-backed securities | 9,239 | - | 9,239 |
| Asset-backed securities | 472 | - | 472 |
| Commercial Mortgage-Backed Securities | 424 | - | 424 |
| Annuity policies | 14,349 | | 14,349 |
| Other | 1,862 | - | 1,862 |
| | $ 132,408 | $ 1,005 | $ 131,403 |

| | For the Year Ended December 31, 2010 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) |
|---|---|---|---|
| Cash and cash equivalents | $ 1,012 | $ 1,012 | $ - |
| Equity securities | | | |
| U.S. large cap growth | 9,424 | - | 9,424 |
| U.S. large cap value | 9,458 | - | 9,458 |
| U.S. large cap passive | 11,027 | - | 11,027 |
| U.S. small / mid cap growth | 4,908 | - | 4,908 |
| U.S. small / mid cap value | 3,905 | - | 3,905 |
| Non-U.S. equities | 25,704 | - | 25,704 |
| Government bonds | 17,731 | - | 17,731 |
| Corporate bonds | 30,819 | - | 30,819 |
| Mortgage-backed securities | 8,724 | - | 8,724 |
| Asset-backed securities | 406 | - | 406 |
| Commercial Mortgage-Backed Securities | 665 | - | 665 |
| Other | 2,413 | - | 2,413 |
| | $ 126,196 | $ 1,012 | $ 125,184 |

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

We recognize that risk and volatility are present to some degree with all types of investments. However, high levels of risk are minimized through diversification by asset class, by style of each fund.

**Estimated Future Benefit Payments**

The following benefit payments are expected to be paid.

| Fiscal Year Ended | Total Pension |
|---|---|
| 2012 | $    13,719 |
| 2013 | 18,415 |
| 2014 | 19,471 |
| 2015 | 18,920 |
| 2016 | 10,645 |
| 2017–2021 | 58,073 |

**Expected Contributions**

We expect to contribute approximately $17.2 million in 2012; however, the actual funding decision will be made after the 2012 valuation is completed.

**Postretirement Benefit Plan**

We also provide postretirement medical benefits to retired full-time, nonunion employees hired before April 1, 1992, who have provided a minimum of five years of service and attained age 55.

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

The following table summarizes the Accumulated Postretirement Benefit Obligation ("APBO"), the changes in plan assets, and the funded status of our plan as of and for the financial statement periods ended December 31, 2011 and 2010.

|  | | 2011 | | 2010 |
|---|---|---|---|---|
| **Change in APBO** | | | | |
| APBO at beginning of period | $ | 36,546 | $ | 33,967 |
| Service cost (benefits earned during the period) | | 372 | | 300 |
| Interest cost on APBO | | 1,840 | | 1,583 |
| Plan curtailment | | - | | - |
| Employee contributions | | 716 | | 1,198 |
| Actuarial (gain) loss | | (540) | | 2,796 |
| Net transfer in (out) (including any business combination) | | - | | - |
| Benefits paid | | (2,964) | | (3,298) |
| APBO at end of period | $ | 35,970 | $ | 36,546 |
| **Change in plan assets** | | | | |
| Fair market value at beginning of period | $ | - | $ | - |
| Company contributions | | 2,248 | | 2,100 |
| Employee contributions | | 716 | | 1,198 |
| Benefits paid | | (2,964) | | (3,298) |
| Fair market value at end of period | $ | - | $ | - |
| | | | | |
| **Funded status** | $ | 35,970 | $ | 36,546 |

Amounts for postretirement benefits accrued in the consolidated balance sheets at December 31, 2011 and 2010 consist of:

|  | | 2011 | | 2010 |
|---|---|---|---|---|
| Current liabilities | $ | (2,252) | $ | (2,450) |
| Noncurrent liabilities | | (33,718) | | (34,096) |
| Net amount recognized | $ | (35,970) | $ | (36,546) |

Amounts not yet reflected in net periodic benefit cost and recognized in accumulated other comprehensive income at December 31, 2011and 2010 consist of:

|  | | 2011 | | 2010 |
|---|---|---|---|---|
| Net gain (loss) | $ | (2,256) | $ | (2,796) |
| Prior service cost | | - | | - |
| Accumulated other comprehensive income (loss) | $ | (2,256) | $ | (2,796) |

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

Weighted average actuarial assumptions used to determine APBO at year-end December 31, 2011 and 2010 are:

|  | 2011 | 2010 |
|---|---|---|
| Discount rate | 4.5 % | 5.2 % |
| Health care cost trend rate assumed for next year | 7.6 % | 7.8 % |
| Rate to which the cost trend rate is assumed to decline (ultimate trend rate) | 4.5 % | 4.5 % |
| Year that the rate reaches the ultimate trend rate | 2027 | 2027 |

Net periodic postretirement benefit cost included the following components:

|  | Successor Company | | Predecessor Company | |
|---|---|---|---|---|
|  | For the Year Ended December 31, 2011 | For the Period March 10, 2010 to December 31, 2010 | For the Period January 1, 2010 to March 9, 2010 | For the Year Ended December 31, 2009 |
| Service cost | $ 372 | $ 300 | $ 57 | $ 408 |
| Interest cost on APBO | 1,840 | 1,583 | 319 | 2,281 |
| Amortization of unrecognized prior service cost | - | - | (15) | (92) |
| Amortization of net (gain) loss | - | - | (226) | (1,101) |
| Net periodic postretirement benefit expense | $ 2,212 | $ 1,883 | $ 135 | $ 1,496 |

Significant actuarial assumptions used to determine postretirement benefit cost at December 31, 2011 and 2010 are:

|  | 2011 | 2010 |
|---|---|---|
| Discount rate | 5.2 % | 5.8 % |
| Health care cost trend rate assumed for next year | 7.8% | 8.1 % |
| Rate to which the cost trend rate is assumed to decline (ultimate trend rate) | 4.5% | 4.5 % |
| Year that the rate reaches the ultimate trend rate | 2027 | 2027 |

## HMH Holdings (Delaware), Inc.
### Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

Assumed health care trend rates have a significant effect on the amounts reported for the health care plans.  A one-percentage-point change in assumed health care cost trend rates would have the following effects on the expense recorded in 2011 and 2010 for the postretirement medical plan:

|  | 2011 | 2010 |
|---|---|---|
| One-percentage-point increase |  |  |
| Effect on total of service and interest cost components | $       47 | $       48 |
| Effect on postretirement benefit obligation | 1,076 | 880 |
| One-percentage-point decrease |  |  |
| Effect on total of service and interest cost components | (55) | (53) |
| Effect on postretirement benefit obligation | (1,278) | (996) |

The following table presents the change in other comprehensive income for the year ended December 31, 2011 related to our pension and postretirement obligations.

|  | Pension Plans | Postretirement Benefit Plan | Total |
|---|---|---|---|
| **Sources of change in accumulated other comprehensive income (loss)** |  |  |  |
| Net loss (gain) arising during the period | $     15,049 | $     (540) | $     14,509 |
| Total accumulated other comprehensive income (loss) recognized during the period | $     15,049 | $     (540) | $     14,509 |

Estimated amounts that will be amortized from accumulated other comprehensive income (loss) over the next fiscal year.

|  | Total Pension Plans | Total Postretirement Plan |
|---|---|---|
| Prior service credit (cost) | $             - | $             - |
| Net gain (loss) | (12,839) | - |
|  | $     (12,839) | $             - |

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

Estimated Future Benefit Payments

The following benefit payments, which reflect expected future service, are expected to be paid:

| Fiscal Year Ended | Total Postretirement Plan |
|---|---|
| 2012 | $        2,252 |
| 2013 | 2,257 |
| 2014 | 2,305 |
| 2015 | 2,311 |
| 2016 | 2,308 |
| 2017-2021 | 15,812 |

**Expected Contribution**
We expect to contribute approximately $2.3 million in 2012.

**Defined Contribution Retirement Plan**
We maintain a defined contribution retirement plan, the Houghton Mifflin 401(k) Savings Plan, which conforms to Section 401(k) of the Internal Revenue Code, and covers substantially all of our eligible employees.  Participants may elect to contribute up to 50.0% of their compensation subject to an annual limit.  We provided a matching contribution in amounts up to 4.5% of employee compensation until March 1, 2009 when the employer contribution was suspended.  The contribution was reinstated on July 1, 2010, where we provide a matching contribution in amounts up to 1.5% of employee compensation and further increased to 3.0% of employee contribution effective May 2011.  The 401(k) contribution expense amounted to $4.0 million for the year ended December 31, 2011 and $1.0 million for the period March 10, 2010 through December 31, 2010. For the year ended December 31, 2009 the 401(k) contribution expense was $1.8 million.  We did not make any discretionary contribution in 2011 and 2010.

## 11.   Share-Based Compensation

Certain employees participate in various equity plans of the Predecessor and Successor Company which provide for the grant of stock options, some with performance conditions, and restricted stock to certain executive and management level employees.  The stocks underlying such plans for the Predecessor Company were held in trust for the equity recipients.  The stock related to award forfeitures remains outstanding and may be reallocated to new recipients.  After the date of the Restructuring, the equity awards pertaining to the Predecessor Company were no longer charged to our financial results as the employees were no longer related to the Predecessor Company.  The vesting terms for equity awards generally range from 1 to 5 years over equal annual installments and generally expire seven years after the date of grant.  Restricted stock is common stock that is subject to a risk of forfeiture only upon voluntary termination or termination for cause, as defined. Total compensation expense related to stock option grants and restricted stock issuances recorded in the year ended December 31, 2011 was approximately $8.6 million and was recorded in selling and administrative expense.  Total compensation expense related to stock option grants and

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

restricted stock issuances for the period January 1, 2010 to March 9, 2010 was approximately $0.9 million and for the period March 10, 2010 to December 31, 2010 was approximately $4.3 million. Total compensation expense related to stock option grants and restricted stock issuances recorded in the year ended December 31, 2009 was approximately $12.4 million.

### Stock Options

The following tables summarize option activity for HMH employees in stock options for the periods ended December 31, 2011, December 31, 2010, March 9, 2010, and December 31, 2009:

| | Successor Company | |
|---|---|---|
| | Number of Shares | Weighted Average Exercise Price |
| Balance at March 10, 2010 | - | $ - |
| Granted | 26,976,957 | 9.54 |
| Forfeited | - | - |
| Balance at December 31, 2010 | 26,976,957 | $ 9.54 |
| Granted | 468,224 | 5.37 |
| Forfeited | (14,522,175) | 8.58 |
| Cancelled | (9,213,225) | 8.67 |
| Balance at December 31, 2011 | 3,709,781 | $ 5.90 |
| Options Exercisable at end of year | 648,311 | $ 5.97 |

| | Predecessor Company | |
|---|---|---|
| | Number of Shares | Weighted Average Exercise Price |
| Balance at December 31, 2008 | 7,310,125 | $ 9.25 |
| Granted | - | - |
| Forfeited | (2,133,332) | 10.00 |
| Balance at December 31, 2009 | 5,176,793 | $ 8.94 |
| Granted | - | - |
| Forfeited | - | - |
| Balance at March 9, 2010 | 5,176,793 | $ 8.94 |
| Options Exercisable at end of period | 2,269,760 | $ 7.59 |

The intrinsic value of a stock option is the amount by which the current market value of the underlying stock exceeds the exercise price of the option as of the balance sheet date.  There was no intrinsic value of options outstanding and exercisable at December 31, 2011, 2010 and 2009.

We estimate the fair value of stock options using the Black-Scholes valuation model.  Key input assumptions used to estimate the fair value of stock options include the exercise price of the

## HMH Holdings (Delaware), Inc.
### Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

award, the expected volatility of our stock over the option's expected term, the risk-free interest rate over the option's expected term, and our expected annual dividend yield.

The fair value of each option granted was estimated on the grant date using the Black-Scholes valuation model with the following assumptions:

| | Successor Company | | Predecessor Company | |
| --- | --- | --- | --- | --- |
| | For the Year Ended December 31, 2011 | For the Period March 10 2010 to December 31, 2010 | For the period January 1 2010 to March 9, 2010 | For the Year Ended December 31, 2009 |
| Expected term (years) [a] | 7.0 | 7.0 | 3.92-4.17 | 3.92-4.17 |
| Expected dividend yield | 0.00% | 0.00% | 0.00% | 0.00% |
| Expected volatility [b] | 25.88% | 22.68%-24.12% | 27.25%-28.01% | 27.25%-28.01% |
| Risk-free interest rate [c] | 2.40% | 1.77%-3.11% | 2.7%-2.95% | 2.7%-2.95% |

[a]   The expected term is the number of years that we estimate that options will be outstanding prior to exercise.

[b]   We have estimated volatility for options granted based on the historical volatility for a group of companies believed to be a representative peer group, selected based on industry and market capitalization.

[c]   The risk-free interest rate is based on the U.S. Treasury yield for a period commensurate with the expected life of the option.

The accounting standard for stock-based compensation requires companies to estimate forfeitures at the time of grant and periodically revise those estimates in subsequent periods if actual forfeitures differ from those estimates.  Stock-based compensation expense is recorded only for those awards expected to vest using an estimated forfeiture rate based on historical forfeiture data coupled with estimated derived forfeiture rate of peers.

As of December 31, 2011, there remained approximately $2.4 million of unearned compensation expense related to unvested stock options to be recognized over a weighted average term of 3.3 years.

The weighted average grant date fair value was $4.54 and $7.01 for options granted in 2011 and 2010, respectively.

## HMH Holdings (Delaware), Inc.
### Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

The following tables summarize information about stock options outstanding and exercisable under the plan at December 31, 2011:

| | | Successor Company | | | | |
|---|---|---|---|---|---|---|
| | Options Outstanding | | | | Options Exercisable | |
| Range of Exercise Price | Options Outstanding at December 31, 2011 | Weighted Average Remaining Contractual life | Weighted Average Exercise Price | Options Exercisable at December 31, 2011 | Weighted Average Exercise Price |
| $    4.725 | 2,269,090 | 3.3 | $    4.725 | 388,267 | $    4.725 |
| $    6.88 | 1,112,934 | 3.3 | 6.88 | 194,493 | 6.88 |
| $    8.57 | 140,467 | 3.3 | 8.57 | 28,093 | 8.57 |
| $    12.26 | 187,290 | 3.3 | 12.26 | 37,458 | 12.26 |
| | 3,709,781 | 3.3 | $    5.90 | 648,311 | $    5.97 |

### Restricted Stock (Successor Company)
The following table summarizes restricted stock activity for grants to HMH employees in our restricted stock units from March 10, 2010 to December 31, 2011:

| | Numbers of Shares | Weighted Average Grant Date Fair Value |
|---|---|---|
| **Balance at March 10, 2010** | - | - |
| Granted | - | - |
| Vested | - | - |
| Forfeited | - | - |
| **Balance at December 31, 2010** | - | $    - |
| Granted | 138,354 | 4.54 |
| Vested | - | - |
| Forfeited | - | - |
| **Balance at December 31, 2011** | 138,354 | $    4.54 |

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

### Restricted Stock (Predecessor Company)

The following table summarizes restricted stock activity for grants to HMH employees in EMPG restricted stock through March 9, 2010:

| | Numbers of Shares | Weighted Average Grant Date Fair Value | |
|---|---|---|---|
| **Balance at December 31, 2008** | 1,850,000 | $ | 10.00 |
| Granted | - | | - |
| Vested | (750,000) | | 10.00 |
| Forfeited | - | | - |
| **Balance at December 31, 2009** | 1,100,000 | $ | 10.00 |
| Granted | - | | - |
| Vested | (666,667) | | 10.00 |
| Forfeited | - | | - |
| **Balance at March 9, 2010** | 433,333 | $ | 10.00 |

The total intrinsic value of EMPG restricted stock that vested in 2009 was zero.  The EMPG restricted stock awards had various vesting terms generally over 2 to 3 years, including pro rata vesting over one and three years.

As of March 9, 2010 and December 31, 2009, 0.4 million and 1.1 million shares, respectively, of EMPG restricted stock were outstanding and unvested, with an aggregate intrinsic value of zero and a weighted average remaining contractual life of less than one year.

## 12.    Fair Value Measurements

The accounting standard for fair value measurements among other things, defines fair value, establishes a consistent framework for measuring fair value and expands disclosure for each major asset and liability category measured at fair value on either a recurring or nonrecurring basis.  The accounting standard establishes a three-tier fair value hierarchy which prioritizes the inputs used in measuring fair value as follows:

Level 1      Observable input such as quoted prices in active markets for identical assets or liabilities;

Level 2      Observable inputs, other than the quoted prices in active markets, that are observable either directly or indirectly; and

Level 3      Unobservable inputs in which there is little or no market data, which require the reporting entity to develop its own assumptions.

Assets and liabilities measured at fair value are based on one or more of three valuation techniques identified in the tables below.  Where more than one technique is noted, individual

## HMH Holdings (Delaware), Inc.
### Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

assets or liabilities were valued using one or more of the noted techniques.  The valuation techniques are as follows:

[a]    Market approach: Prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities;

[b]    Cost approach: Amount that would be currently required to replace the service capacity of an asset (current replacement cost); and

[c]    Income approach: Valuation techniques to convert future amounts to a single present amount based on market expectations (including present value techniques).

On a recurring basis, we measure certain financial assets and liabilities at fair value, including our money market funds, foreign exchange forward contracts and interest rate swaps.  The accounting standard for fair value measurements defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.  As such, fair value is a market-based measurement that should be determined based on assumptions that market participants would use in pricing an asset or liability.  In determining fair value, we utilize valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs to the extent possible as well as considers counterparty and its credit risk in its assessment of fair value.

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

The following tables present our financial assets and liabilities measured at fair value on a recurring basis at December 31, 2011 and December 31, 2010:

| | Successor Company 2011 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Valuation Technique |
|---|---|---|---|---|
| **Financial assets** | | | | |
| Money market funds | $  368,701 | $  368,701 | $  - | (a) |
| | $  368,701 | $  368,701 | $  - | |
| | | | | |
| **Financial liabilities** | | | | |
| Foreign exchange forward contracts | $  1,113 | $  - | $  1,113 | (a) |
| | $  1,113 | $  - | $  1,113 | |

| | Successor Company 2010 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Valuation Technique |
|---|---|---|---|---|
| **Financial assets** | | | | |
| Money market funds | $  307,612 | $  307,612 | $  - | (a) |
| US treasury bills and notes | 45,337 | - | 45,337 | (a) |
| Short-term investments | 17,667 | 17,667 | - | (a) |
| | $  370,616 | $  325,279 | $  45,337 | |
| **Financial liabilities** | | | | |
| Foreign exchange forward contracts | $  413 | - | $  413 | (a) |
| | $  413 | $  - | $  413 | |

Our investments in U.S. treasury bills and notes are classified within Level 2 of the fair value hierarchy because they are valued using quoted market prices but are not traded actively on an exchange.  In addition to $368.7 million and $352.9 million invested in money market funds and U.S. treasury bills and notes as of December 31, 2011 and December 31, 2010, respectively, we had $44.9 million and $27.0 million of cash invested in bank accounts as of December 31, 2011 and December 31, 2010, respectively.

Our short-term investments were investments in debt instruments which matured on March 15, 2011.  These short-term investments are classified within Level 1 of the fair value hierarchy because they are valued based on quoted prices.

Our foreign exchange forward contracts consist of Euro forward contracts and are classified within Level 2 of the fair value hierarchy because they are valued based on observable inputs and are available for substantially the full term of our derivative instruments.

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

We classified our derivative liabilities within Level 2 of the fair value hierarchy because these observable inputs are available for substantially the full term of our derivative instruments.

We determined there were no nonfinancial liabilities requiring disclosure under the accounting standard for fair value measurements.  The following table presents our nonfinancial assets measured at fair value on a nonrecurring basis at December 31, 2011 and 2010:

| | Successor Company 2011 | Significant Unobservable Inputs (Level 3) | Total Impairment | Valuation Technique |
|---|---|---|---|---|
| Nonfinancial assets | | | | |
| Goodwill | $ 520,088 | $ 520,088 | $ 1,442,500 | (a) (c) |
| Other intangible assets | 1,274,213 | 1,274,213 | 192,600 | (a) (c) |
| | $ 1,794,301 | $ 1,794,301 | $ 1,635,100 | |

| | Successor Company 2010 | Significant Unobservable Inputs (Level 3) | Total Impairment | Valuation Technique |
|---|---|---|---|---|
| Nonfinancial assets | | | | |
| Other intangible assets | $ 1,734,810 | $ 1,734,810 | $ 87,000 | (a) (c) |
| | $ 1,734,810 | $ 1,734,810 | $ 87,000 | |

In evaluating goodwill for impairment, we first compare our reporting unit's fair value to its carrying value.  We estimate the fair values of our reporting units by considering market multiple and recent transaction values of peer companies, where available, and projected discounted cash flows, if reasonably estimable.  Impairment recorded for goodwill for the year ended December 31, 2011 was $1,442.5 million.  There was no impairment recorded for the periods January 1, 2010 to March 9, 2010, and March 10, 2010 to December 31, 2010.

We perform an impairment test for our other intangible assets by comparing the assets fair value to its carrying value.  Fair value is estimated based on recent market transactions, where available, and projected discounted cash flows, if reasonably estimable.  Other intangible assets were written down to their fair value of $1,274.2 million resulting in an impairment charge of $192.6 million which was included in earnings for the year ended December 31, 2011.  There was no impairment recorded for the period January 1, 2010 to March 9, 2010.  Impairment charges were $87.0 million for the period March 10, 2010 to December 31, 2010.  The fair value of goodwill and other intangible assets are estimates, which are inherently subject to significant uncertainties, and actual results could vary significantly from these estimates.

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

### Fair Value of Debt

The following table presents the carrying amounts and estimated fair market values of our debt at December 31, 2011 and December 31, 2010.  The fair value of debt is deemed to be the amount at which the instrument could be exchanged in an orderly transaction between market participants at the measurement date.

| | Successor Company December 31, 2011 | | Successor Company December 31, 2010 | |
| | Carrying Amount | Estimated Fair Value | Carrying Amount | Estimated Fair Value |
|---|---|---|---|---|
| **Debt** | | | | |
| 7.2% notes | $ - | $ - | $ 149,564 | $ 150,750 |
| Term loan | 2,581,690 | 1,484,472 | 2,476,279 | 2,434,864 |
| Revolving loan | 235,751 | 135,557 | 235,751 | 218,659 |
| 10.5% notes | 300,000 | 189,000 | - | - |

The fair market values of the debt were estimated based on quoted restricted market prices for those instruments that are traded or estimated based on publicly traded debt using current discount rates for similar instruments with equivalent credit quality at December 31, 2011 and December 31, 2010.  The fair market values require varying degrees of management judgment.  The factors used to estimate these values may not be valid on any subsequent date.  Accordingly, the fair market values of the debt presented may not be indicative of their future values.

## 13.    Commitments and Contingencies

### Lease Obligations

We have operating leases for various real property, office facilities, and warehouse equipment that expire at various dates through 2019.  Certain leases contain renewal and escalation clauses for a proportionate share of operating expenses.

The future minimum rental commitments under all noncancelable leases (with initial or remaining lease terms in excess of one year) for real estate and equipment are payable as follows:

| | Operating Leases |
|---|---|
| 2012 | $ 46,040 |
| 2013 | 44,229 |
| 2014 | 42,773 |
| 2015 | 42,395 |
| 2016 | 34,606 |
| Thereafter | 50,869 |
| Total minimum lease payments | $ 260,912 |
| Total future minimal rentals under subleases | $ 35,334 |

For the year ended December 31, 2011 rent expense, net of sublease income, was $39.3 million.  The rent expense, net of sublease income, for the period January 1, 2010 to March 9, 2010 was $6.3 million and for the period March 10, 2010 to December 31, 2010 was $18.4 million.  In the

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

year ended December 31, 2009 rent expense, net of sublease income, was $100.5 million.  The 2009 rent expense included a $50.0 million charge for ongoing obligations to pay rent for vacant space that could not be sublet or space that is expected to be sublet at rates lower than the committed lease arrangements.  On March 10, 2010, in connection with purchase accounting, the accrual estimate was revised and the estimate was adjusted to fair value.  In the period March 10, 2010 to December 31, 2010, the accrual for the vacant space was reduced by $11.5 million; thus, lowering rent expense, to reflect the subleasing of space sooner and at higher rates than originally assumed.  For the year ended December 31, 2011, the rent expenses included a $3.5 million charge as additional real estate was vacated.

### Purchase Commitments

During 2008, we entered into a print services agreement with a third party for a term of five years commencing January 1, 2009 whereby the third party will provide platemaking, printing, binding and disposition services for the Company.  The agreement expands the previous relationship between the two companies.  We are obligated to purchase $175.0 million per contract year for a total of $875.0 million over the five-year term.  Effective January 1, 2012, the print service agreement was amended to extend the agreement for two years and modify some of the aggregate spend and savings covenants.

### Contingencies

We are involved in ordinary and routine litigation and matters incidental to our business. Litigation alleging infringement of copyrights and other intellectual property rights has become extensive in the educational publishing industry.  Specifically, there have been various settled, pending and threatened litigation that allege we exceeded the print run limitation or other restrictions in licenses granted to us to reproduce photographs in our textbooks.  While management believes that there is a reasonable possibility we may incur a loss associated with the pending and threatened litigation, we are not able to estimate such amount, and we do not expect any of these matters to have a material adverse effect on our results of operations, financial position or cash flows.  We have insurance over such amounts and with coverage and deductibles as management believes is reasonable. There can be no assurance that our liability insurance will cover all events or that the limits of coverage will be sufficient to fully cover all liabilities. We were contingently liable for $11.6 million and $12.7 million of performance related surety bonds for our operating activities as of December 31, 2011 and 2010, respectively.  An aggregate of $26.2 million and $31.8 million of letters of credit existed at December 31, 2011 and December 31, 2010, respectively, of which $6.4 million and $8.7 million backed the aforementioned performance related surety bonds in 2011 and 2010, respectively.

We routinely enter into standard indemnification provisions as part of license agreements involving use of our intellectual property.  These provisions typically require us to indemnify and hold harmless licensees in connection with any infringement claim by a third party relating to the intellectual property covered by the license agreement.  The assessment business routinely enters into contracts with customers that contain provisions requiring us to indemnify the customer against a broad array of potential liabilities resulting from any breach of the contract or the invalidity of the test.  Although the term of these provisions and the maximum potential amounts of future payments we could be required to make is not limited, we have never incurred any costs to defend or settle claims related to these types of indemnification provisions.  We therefore believe the estimated fair value of these provisions is minimal, and have no liabilities recorded for them as of December 31, 2011 and December 31, 2010.

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

## 14.    Related Party Transactions

### Officer Loan

On March 9, 2010, we entered into a credit agreement with an entity controlled by an executive of the Company at that time, whereby the entity was granted a loan in the aggregate principal amount of $20.0 million for the sole purpose of satisfying certain obligations of that officer with regards to the acquisition of equity of the Predecessor Company.  The loan bore interest at a rate per annum equal to 2.69% and had a maturity date of March 9, 2015.

On November 16, 2010, we entered into an amended and restated credit agreement whereby the loan of $20.0 million was divided into a tranche A loan with an aggregate principal amount of $12.2 million and a tranche B loan with an aggregate principal amount of $7.8 million.  Both tranches of the loan continued to bear interest at a rate per annum equal to 2.69%.  The tranche A loan had a maturity date of March 9, 2015 and the tranche B loan has a maturity date of September 30, 2030.  There are no required principal or interest payments during the term of the loan with the interest accruing to the outstanding balance.  While the officer was employed by the Company, the loan entity earned a fee equal to approximately $0.1 million per month ("Earned Fee") that was used to repay the amount outstanding under the loan.  The Earned Fee was approximately $1.1 million which was recorded as professional fees which is a component of administrative expenses in our statement of operations for the period March 10, 2010 to December 31, 2010.

We fully reserved the remaining balance of the loan due to the long term nature of the maturity date and uncertainty of collectability.  The total amount of $18.9 million was recorded in selling and administrative expenses in our statement of operations for the period March 10, 2010 to December 31, 2010.

### Officer Separation Agreement

On May 7, 2011, the Company entered into a separation agreement with an executive of the Company.  Under the terms on the agreement, the former executive agreed to act as a senior advisor to the Company for a year.  For these services, the former executive received a consulting fee of $2.0 million and the potential to receive an additional $3.0 million in success fees predicated upon certain criteria.  The success fee was fully earned and paid in October 2011.

### Other Transactions

We paid $10.0 million to an entity controlled by a former executive of the Company at that time for consulting services rendered in connection with the March 9, 2010 financial restructuring.  The $10.0 million payment has been recorded as professional fees, which is a component of administrative expenses, in our statement of operations for the period March 10, 2010 to December 31, 2010.

## 15.    Subsequent Events

Further to our discussions in Note 1, after considering various strategic alternatives to restructure our debt obligations, on May 10, 2012 we entered into a Restructuring Support Agreement with our participating borrowers to restructure our debt pursuant to a joint prepackaged plan of reorganization under Chapter 11 of the U.S. Bankruptcy Code. In conjunction with this agreement, we will seek approval for debtor-in-possession financing which we anticipate will become permanent financing upon completion of the restructuring.  In connection with the reorganization, our existing long term debt will be converted to equity and our current equity will be eliminated. Although it is management's expectation that the Company will emerge from bankruptcy as a

# HMH Holdings (Delaware), Inc.
## Notes to Consolidated Financial Statements
### December 31, 2011, 2010 and 2009

*(in thousands of dollars, except share information)*

viable entity, there can be no assurance that the prepackaged bankruptcy will proceed according to the prepackaged plan. These actions raise substantial doubt about the Company's ability to continue as a going concern. The accompanying consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty and have been prepared assuming that the Company will continue as a going concern.

**APPENDIX E**

**RESTRUCTURING SUPPORT AGREEMENT**

*See Attached.*

*EXECUTION VERSION*

May 10, 2012

To the Holders of Lender Claims
Referred to Below

Ladies and Gentlemen:

   This letter agreement (this "Agreement") sets forth certain terms and conditions pursuant to which (i) Houghton Mifflin Harcourt Publishing Company, HMH Publishers LLC, and Houghton Mifflin Harcourt Publishers Inc., each in its capacity either as a borrower or issuer[1] under the First Lien Credit Agreement or the Senior Secured Notes Indenture (each as defined below) (collectively, the "Participating Borrowers"); (ii) HMH Holdings (Delaware), Inc. ("Holdings"), Houghton Mifflin Holding Company, Inc., Houghton Mifflin, LLC, Houghton Mifflin Finance, Inc., Houghton Mifflin Holdings, Inc., HM Publishing Corp., Riverdeep Inc., Broderbund LLC, RVDP, Inc., HRW Distributors, Inc., Greenwood Publishing Group, Inc., Classroom Connect, Inc., ACHIEVE! Data Solutions, LLC; Steck-Vaughn Publishing LLC, HMH Supplemental Publishers Inc., Sentry Realty Corporation, Houghton Mifflin Company International, Inc., The Riverside Publishing Company, Classwell Learning Group Inc., Cognitive Concepts, Inc., Edusoft and Advanced Learning Centers, Inc. each in its capacity as a guarantor under the First Lien Credit Agreement and Senior Secured Notes Indenture (each as defined below) (collectively, the "Participating Guarantors" and, together with the Participating Borrowers, the "Participating Obligors") and (iii) HMH Publishing Company, HMH Education Company, HMH IP Company, HMH Consumer Company, Houghton Mifflin PLC, Riverdeep UK Ltd., HMH Intermediate Holdings (Delaware), LLC, HMH Publishing Company (IOM) Unlimited, Houghton Mifflin Harcourt Foundation, Inc., Houghton Mifflin Harcourt (Asia) Pte. Ltd., and Foundation for Marine Animal Husbandry, Inc. (collectively, with the Participating Borrowers and Participating Guarantors, the "Participating Company Entities") will propose a restructuring (the "Restructuring") of the Participating Obligors' outstanding obligations under the First Lien Credit Agreement (as defined below), the Senior Secured Notes Indenture (as defined below), the A/R Securitization Facility (as defined in the Restructuring Term Sheet (as defined below)) and the LOC Facility (as defined in the Restructuring Term Sheet) to be effectuated pursuant to a joint prepackaged chapter 11 plan of reorganization (a "Plan"), with the support of the undersigned creditors signatory hereto (collectively the "Participating Lender" and each Lender under the First Lien Credit Agreement or Holder of Senior Secured Notes under the Senior Secured Notes Indenture generally referred to as a "Lender") party to and/or a holder of indebtedness under (i) that certain First Lien Credit Agreement dated as of December 12, 2007 among Citibank, N.A. as the Administrative Agent and the Collateral Agent (the "First Lien Agent"), HMH Publishing Company Limited (formerly known as Riverdeep Education Limited), Houghton Mifflin Harcourt Publishers Inc., HMH Publishers LLC, and Houghton Mifflin Harcourt Publishing Company, and their direct and indirect subsidiaries and the lenders from

---

[1] The borrowers under the First Lien Credit Agreement are: Houghton Mifflin Harcourt Publishers Inc., HMH Publishers LLC, and Houghton Mifflin Harcourt Publishing Company. The issuers under the Senior Secured Notes Indenture are Houghton Mifflin Harcourt Publishers Inc. and Houghton Mifflin Harcourt Publishing Company.

time to time party thereto (as amended, modified or otherwise supplemented from time to time, the "First Lien Credit Agreement") and (ii) that certain Indenture for the 10½% Senior Secured Notes due 2019 dated as of May 26, 2011 among The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent (the "Senior Secured Notes Trustee"), Houghton Mifflin Harcourt Publishers Inc., Houghton Mifflin Harcourt Publishing Company and the Guarantors named on the signature pages thereto (as amended, modified or otherwise supplemented from time to time, the "Senior Secured Notes Indenture," collectively with the First Lien Credit Agreement, the "Debt Documents"). Each Participating Company Entity, each Participating Lender and each person that becomes a party hereto in accordance with the terms hereof are collectively referred to as the "Parties" and individually as a "Party."

For purposes of this Agreement, the term the "Requisite Participating Lenders" shall be defined as Participating Lenders holding at least 75% of the aggregate principal amount of outstanding claims under the Debt Documents (the "First Lien Claims") bound by this Agreement. Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Restructuring Term Sheet (as defined below).

The parties hereto hereby agree as follows:

1.    Proposed Restructuring. The principal terms of the Restructuring are set forth on the term sheet and its annexes attached hereto as Exhibit A (which term sheet is expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein (as such term sheet may be modified in accordance with Section 10 hereof, the "Restructuring Term Sheet").

(a)    The Participating Company Entities intend to implement the Restructuring through a pre-packaged chapter 11 case, which will, consistent with the Restructuring Term Sheet, provide for, among other things, satisfaction of all outstanding claims, including outstanding principal and accrued interest at the non-default rate as of the Petition Date, under the First Lien Credit Agreement (the "First Lien Credit Facility Claims") and all outstanding claims under the Senior Secured Notes Indenture, including outstanding principal and accrued interest at the non-default rate as of the Petition Date (the "Senior Secured Notes Claims" and together with the First Lien Credit Facility Claims, the "Lender Claims"). The Participating Company Entities will effectuate the Restructuring by commencing voluntary "pre-packaged" cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on or before the Commencement Date (as defined below). Such Restructuring will be implemented pursuant to various agreements and related documentation, including the Plan, which Plan shall contain the terms and conditions set forth in the Restructuring Term Sheet, shall be consistent in all respects with this Agreement and the Restructuring Term Sheet, and shall, with respect to the treatment of the Participating Lenders, be in form and substance acceptable to each of the Participating Lenders and shall otherwise be in form and substance reasonably acceptable to the Requisite Participating Lenders (the "Approved Plan") and the related documents (the "Plan Related Documents") which shall include, but not be limited to, (i) a disclosure statement (the "Disclosure Statement"), (ii) the materials related to the solicitation of votes for the Restructuring pursuant to the Bankruptcy Code (the "Solicitation"), (iii) a Registration Rights

2

Agreement, (iv) the DIP credit facility/exit credit facility containing the terms and conditions set forth in Exhibit C to the Restructuring Term Sheet, (v) any other documents or agreements required in connection with the Approved Plan and Disclosure Statement, including, but not limited to, (A) a proposed confirmation order, (B) any appendices, amendments, modifications, supplements, exhibits and schedules relating to the Approved Plan or the Disclosure Statement, and (C) any motion and proposed order relating to debtor-in-possession financing and/or use of cash collateral (the "Financing Motion"), and (vi) an amended and restated certificate of incorporation and bylaws containing the terms and conditions set forth in Exhibit B to the Restructuring Term Sheet.

Each of the Plan Related Documents shall, (i) to the extent applicable, be consistent with the applicable form or term sheet attached hereto or to the Restructuring Term Sheet, as the case might be, or (ii) if no applicable form or term sheet exists, be in form and substance acceptable to the Requisite Participating Lenders, except that the Approved Plan shall be consistent in all respects with this Agreement and the Restructuring Term Sheet, and shall, with respect to the treatment of the Participating Lenders, be in form and substance acceptable to each of the Participating Lenders and shall otherwise be in form and substance reasonably acceptable to the Requisite Participating Lenders (each of the Plan Related Documents in the foregoing forms or with the foregoing required approvals are collectively referred to herein as the "Approved Plan Documents").

2.      Representations of the Parties. Each Party hereby represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(a)      It has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(b)      The execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (A) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (B) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) with respect to the Participating Company Entities, conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party (except as a result of any chapter 11 filing made by the Participating Obligors).

(c)      This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(d)     If such Party is a Participating Company Entity, such Participating Company Entity represents that the execution, delivery and performance by it of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, except such filing as may be necessary and/or required for approval by the Bankruptcy Court of such Participating Company Entity's authority to implement this Agreement.

(e)     If such Party is a Participating Lender, such Participating Lender shall set forth below its name on the signature page hereof such Lender Claims (as so set forth, the "Specified Lender Claims") that it (i) is either (A) the sole legal and beneficial owner of, free and clear of all claims, liens and encumbrances, or (B) has investment or voting discretion in respect to matters relating to the Restructuring contemplated by this Agreement and has the power and authority to bind the beneficial owner(s) of such Lender Claims to the terms of this Agreement and (ii) has full power and authority to act on behalf of, vote and consent to matters relating to the Restructuring contemplated by this Agreement and dispose of, exchange, assign and transfer such Lender Claims. For the purposes of this Agreement, "Participating Lenders" shall not include (A) a holder of Lender Claims signatory hereto in its capacity or to the extent of its holdings as a broker, dealer or market maker of Lender Claims or any other claim against or security in the Participating Obligors or (B) any subsidiary or affiliate of a holder of Lender Claims signatory hereto (x) over which the holder of Lender Claims does not have corporate authority or control or (y) whose credit decisions, including credit decisions to be bound by agreements such as this Agreement, under the internal policies or rules of such subsidiary or holder, are not subject to control by such holder. Furthermore, such Participating Lender has made no prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any Lender Claims that are subject to this Agreement, the terms of which agreement are, as of the date hereof, inconsistent with the representations and warranties of such Participating Lender herein or would render such Participating Lender otherwise unable to comply with this Agreement and perform its obligations hereunder. If applicable, each Participating Lender shall include a breakdown of its Specified Lender Claims by specific fund within its control or over which it has investment or voting discretion.

(f)     If such party is a Participating Lender, such Participating Lender (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Participating Obligors that it considers sufficient and reasonable for purposes of entering into this Agreement and (ii) is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended).

3.     Agreements of the Participating Lenders.

(a)     Subject to the terms and conditions hereof and for so long as no Support Termination Event, as defined in Section 5 below, shall have occurred, and except as the

Participating Company Entities may expressly release the Participating Lenders in writing from any of the following obligations, each Participating Lender shall:

(i)    (A) agree to vote its Lender Claims in favor of the Approved Plan (when solicited to do so and no later than seven (7) days after the commencement of the solicitation) proposed by the Participating Obligors, (B) deliver its duly executed and completed ballot(s) voting in favor of such Approved Plan on a timely basis following commencement of the Solicitation for such Approved Plan, and (C) not change or withdraw such agreement or vote (or cause or direct such agreement or vote to be changed or withdrawn), provided that such agreement or vote may be revoked or withdrawn immediately upon occurrence of a Support Termination Event;

(ii)    not object to, or vote any of its Lender Claims to reject or impede, the Approved Plan, support directly or indirectly any such objection or impediment or otherwise take any action or commence any proceeding to oppose or to seek any modification of the Approved Plan or, to the extent applicable, any of the Approved Plan Documents filed by any of the Participating Obligors in connection with the Chapter 11 Cases and confirmation of the Approved Plan;

(iii)    not directly or indirectly seek, solicit, support, encourage, vote its Lender Claims for, or consent to (i) any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring for any of the Participating Company Entities (each, an "Alternative Proposal") other than the Approved Plan or (ii) any other action that is inconsistent with, or that would delay or obstruct the Approved Plan;

(iv)    to the extent such Participating Lender is a holder of any equity interests in Holdings ("Holdings Equity Interests"), such Participating Lender agrees to support the Restructuring and take any action in its capacity as holder of such Holdings Equity Interests as necessary to implement the Restructuring, including, but not limited to, participating in any shareholder vote in connection with the Restructuring and voting in favor of the Restructuring; and

(v)    to the extent a Participating Lender is a holder of First Lien Credit Facility Claims, it shall execute a forbearance agreement with respect to defaults under the First Lien Credit Agreement listed on Schedule 2 hereto.

(b)    Each Participating Lender agrees that, as long as this Agreement has not terminated in accordance with its terms, it shall not sell, transfer, assign or otherwise dispose of any Lender Claims or Holdings Equity Interests, or any option thereon or any right or interest (voting or otherwise) in any or all of its Lender Claims (including, without limitation, any participation therein) or Holdings Equity Interests, unless (i) the transferee, participant or other party (A) is a Participating Lender or (B) agrees in writing to assume and be bound by all of the terms of this Agreement and the Restructuring Term Sheet attached hereto as Exhibit A (including, but not limited to, any transfer restrictions and/or conditions to transfer set forth in the Restructuring Term Sheet, to the extent applicable) with respect to all Lender Claims and all

5

Holdings Equity Interests such transferee, participant or other party currently holds or shall acquire in the future by executing the Joinder attached hereto as Exhibit B (such transferee, participant or other party, if any, to also be a "Participating Lender" hereunder); and (ii) the transferor complies with any applicable transfer restrictions and/or conditions to transfer set forth in the Restructuring Term Sheet. If a transferee of any of the Lender Claims or Holdings Equity Interests is not a Participating Lender or does not execute a Joinder in substantially the form attached hereto as Exhibit B within three (3) business days of the completion of such transfer, participation or other grant or otherwise agree to be bound by all of the terms of this Agreement, then such sale, transfer, assignment or other disposition of the Lender Claims and/or Holdings Equity Interests or related option, right or interest shall be deemed void *ab initio*. This Agreement shall in no way be construed to preclude any Participating Lender from acquiring additional Lender Claims or Holdings Equity Interests; provided, however, that any such additional holdings shall automatically be deemed to be subject to all of the terms of this Agreement and each such Participating Lender agrees that such additional Lender Claims and/or Holdings Equity Interests shall be subject to this Agreement and that it shall vote (or cause to be voted) any such additional Lender Claims and/or Holdings Equity Interests entitled to vote on the Approved Plan (in each case, to the extent still held by it or on its behalf at the time of such vote) in a manner consistent with this Section 3. Subject to the terms and conditions of any order of the Bankruptcy Court, each Participating Lender agrees to provide to the Agent, Senior Secured Notes Trustee, counsel to the Ad Hoc Group (such group, the "Ad Hoc Group") and to counsel for the Participating Obligors (i) a copy of any Joinder and (ii) a notice of the acquisition of any additional Lender Claims or Holdings Equity Interests, in each case within three (3) business days of the consummation of the transaction disposing of, or acquiring, Lender Claims or Holdings Equity Interests. Notwithstanding the foregoing, this Section 3(b) shall not apply to any transferee that specifies in the documentation executed in connection with the transfer of Lender Claims that it is acting as a "Riskless Principal," as such term is defined by the Loan Syndications and Trading Association in its Standard Terms and Conditions for Distressed Trade Confirmations; provided, however, that any subsequent transferee of such Riskless Principal shall be required to execute the Joinder annexed hereto as Exhibit B.

4.    Agreements of the Participating Obligors and the Participating Company Entities.

(a)    As long as a Support Termination Event has not occurred, and except as the Requisite Participating Lenders may expressly release the Participating Company Entities and/or the Participating Obligors, as applicable, in writing from any of the following obligations,

(i)    The Participating Obligors hereby agree (A) to prepare or cause the preparation of the Plan and the Plan Related Documents, (B) provide draft copies of the Plan and the Plan Related Documents to counsel for the Ad Hoc Group within a reasonable amount of time prior to the launch of the Solicitation, commencement of the Chapter 11 Cases, or execution of any such documents, as might be applicable, and (C) that they shall, except in an emergency where it is not reasonably practicable, provide draft copies of all motions, including "first day" motions, and applications and other documents the Participating Obligors intend to file with the Bankruptcy Court to counsel for the Ad Hoc Group as soon as reasonably practicable, but in no event less than three

6

(3) business days before such documents are filed with the Bankruptcy Court, and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing.

(ii)    The Participating Company Entities agree to use commercially reasonable efforts to (A) support and complete the Restructuring and all other actions contemplated in connection therewith and under the Approved Plan Documents, as applicable, (B) take any and all necessary and appropriate actions in furtherance of the Restructuring and the other actions contemplated under the Approved Plan or the Approved Plan Documents, as applicable, (C) obtain any and all required regulatory approvals and third-party approvals for the Restructuring, and (D) not take any actions inconsistent with this Agreement, the Restructuring Term Sheet, the Approved Plan or the Approved Plan Documents and the confirmation and consummation of the Approved Plan.

(iii)    The Participating Company Entities shall cause each of their subsidiaries and affiliates to (A) support and complete the Restructuring and all other actions contemplated in connection therewith and under the Approved Plan Documents, (B) take any and all necessary and appropriate actions in furtherance of the Restructuring and the other actions contemplated under the Approved Plan or the Approved Plan Documents, as applicable, and (C) not take any actions inconsistent with this Agreement, the Restructuring Term Sheet, the Approved Plan or the Approved Plan Documents and the confirmation and consummation of the Approved Plan.

(iv)    The Participating Company Entities shall not, directly or indirectly, seek, solicit, negotiate, support or engage in any discussions relating to, or enter into any agreements relating to, any Alternative Proposal other than the Approved Plan (as it may be amended, supplemented or otherwise modified as provided herein) or as otherwise set forth in the Restructuring Term Sheet (as it may be amended, supplemented or otherwise modified as provided herein), nor shall the Participating Company Entities solicit or direct any person or entity, including, without limitation, any member of the Participating Company Entities' boards of directors or any holder of equity in the Participating Company Entities, to undertake any of the foregoing; provided, however, that the Participating Company Entities may agree to modifications to the Restructuring Term Sheet, the Approved Plan and the Approved Plan Related Documents, as provided herein;

(b)    The Participating Company Entities shall pay (i) all reasonable fees and expenses of the advisors to the Ad Hoc Group, including, without limitation, (A) Akin Gump Strauss Hauer & Feld LLP, counsel to the Ad Hoc Group, in accordance with the terms of the existing engagement letter, (B) Houlihan Lokey Capital, Inc., financial advisor to the Ad Hoc Group, in accordance with the terms of the existing engagement letter, (C) Heidrick & Struggles, in accordance with the agreement between the Ad Hoc Group and such firm, and (D) Lyons, Benenson & Company Inc., in accordance with the agreement among the Company, the Ad Hoc Group and such firm, and (ii) the reasonable and documented, out of pocket, travel-related expenses of the members of the Ad Hoc Group, that are due and owing as of the Closing or the Support Termination Date (as and to the extent applicable).

5.    <u>Termination of Obligations</u>.  This Agreement shall terminate and, except as otherwise provided herein, all obligations of the Parties shall immediately terminate and be of no further force and effect as follows (each, a "<u>Support Termination Event</u>"),

(a)    upon termination of this Agreement by the mutual written consent of the Participating Company Entities and the Requisite Participating Lenders, <u>provided</u>, <u>however</u>, that notice of such termination is provided within one (1) business day to the persons and entities listed on <u>Schedule 1</u> annexed hereto, in accordance with <u>Section 14</u> hereof;

(b)    upon the occurrence of any of the following, unless such Support Termination Event is waived or extended by the Participating Company Entities and the Requisite Participating Lenders in writing:

(i)    at 5:00 P.M. prevailing Eastern Time on May 18, 2012 unless the Participating Obligors have commenced the Solicitation (the "<u>Solicitation Commencement Date</u>");

(ii)    at 5:00 P.M. prevailing Eastern Time on the date that is 21 business days after the Solicitation Commencement Date unless the Participating Obligors have previously concluded the Solicitation (the "<u>Solicitation Termination Date</u>");

(iii)    at 5:00 p.m. prevailing Eastern Time on the date that is five (5) business days after the Solicitation Termination Date unless the Chapter 11 Cases have been commenced (the date that the Chapter 11 Cases are commenced is referred to herein as the "<u>Commencement Date</u>") and the Participating Obligors have filed, and are pursuing confirmation of, the Approved Plan, and have filed the Financing Motion;

(iv)    at 5:00 p.m. prevailing Eastern Time on the date that is four (4) business days after the Commencement Date unless the Financing Motion has been approved, the Interim DIP Order has been entered, and the holders of the First Lien Claims indefeasibly have received the Adequate Protection Payments;

(v)    at 5:00 p.m. prevailing Eastern Time on the date that is 60 calendar days after the Commencement Date unless the Disclosure Statement has been approved, and the Approved Plan has been confirmed, by the Bankruptcy Court;

(vi)    at 5:00 p.m. prevailing Eastern Time on the date that is 30 calendar days following entry by the Bankruptcy Court of an order confirming the Approved Plan if there has not occurred substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Approved Plan on or before such date;

(vii)    upon the filing by any Participating Company Entity of any motion or other request for relief seeking to (1) dismiss any of the Chapter 11 Cases, (2) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (3) appoint a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

8

(viii)   upon the entry of an order by the Bankruptcy Court (1) dismissing any of the Chapter 11 Cases, (2) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (3) appointing a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases, or (4) terminating or shortening exclusivity under Bankruptcy Code section 1121 or (5) making a finding of fraud, dishonesty or misconduct by any officer or director of the Participating Company Entities, regarding or relating to the Participating Company Entities;

(ix)   upon the withdrawal, amendment or modification by the Participating Obligors of the Approved Plan or any of the Approved Plan Documents or the filing by a Participating Company Entity of a pleading seeking to amend or modify the Interim DIP Order, the Approved Plan or any of the Approved Plan Documents, which withdrawal, amendment, modification or filing is materially inconsistent with the Approved Plan (with such amendments and modifications as have been effected in accordance with the terms hereof) or is materially adverse to the Participating Lenders, or if any of the Participating Company Entities files any motion or pleading with the Bankruptcy Court that is not consistent in any material respect with this Agreement, the Restructuring Term Sheet or the Approved Plan or any of the Approved Plan Documents (in each case with such amendments and modifications as have been effected in accordance with the terms hereof) and such motion or pleading has not been withdrawn prior to the earlier of (i) three (3) business days after the Participating Company Entities receive written notice from the Requisite Participating Lenders that such motion or pleading is inconsistent with this Agreement, the Restructuring Term Sheet or the Approved Plan or the Approved Plan Documents, as applicable, and (ii) the entry of an order of the Bankruptcy Court approving such motion; provided, that this Section 5(b)(ix) shall not apply with respect to any motion or pleading that is inconsistent with this Agreement if such motion or pleading is consistent with the Approved Plan;

(x)   the Bankruptcy Court grants relief that is inconsistent with this Agreement, the Restructuring Term Sheet or the Approved Plan in any material respect (in each case with such amendments and modifications as have been as have been effected in accordance with the terms hereof); provided that this Section 5(b)(x) shall not apply with respect to any relief that is inconsistent with this Agreement if such relief is consistent with the Approved Plan;

(xi)   any of the Participating Company Entities files, proposes or otherwise supports any plan of reorganization other than the Approved Plan,

(xii)   upon the discovery of any fraud committed by, or dishonesty or misconduct of, any officer or director of the Participating Company Entities that has a material adverse effect on any Participating Lender;

(xiii)   unless otherwise waived by the Requisite Participating Lenders, five (5) business days after any of the Participating Company Entities furnish the Participating Lenders, the Agent and the Senior Secured Notes Trustee with notice (in accordance with Section 14 hereof) of its intent, in the exercise of its fiduciary duties (set

9

forth in Section 26 below), to take any action that is prohibited hereunder or to refrain from taking any action that is required hereunder, which notice shall set forth (A) the acts that such Participating Company Entity intends to take or refrain from taking and (B) the specific dut(y)/(ies) that such Participating Company Entity believes it would breach as a result of such action or inaction;

(xiv)    upon the material breach by any of the Participating Company Entities of any of the undertakings, representations, warranties or covenants of the Participating Company Entities set forth in this Agreement, including the Participating Company Entities' obligations under Section 4, which breach remains uncured for a period of ten (10) business days after the receipt of written notice of such breach from the Requisite Participating Holders;

(xv)    upon the material breach by any of the Participating Lenders of any of the undertakings, representations, warranties or covenants of such Participating Lender(s) set forth in this Agreement that would have a material adverse effect on the Participating Company Entities or the consummation of the Restructuring, which breach remains uncured for a period of ten (10) business days after the receipt by the Participating Lender(s) of notice of such breach from the Participating Company Entities;

(xvi)    the issuance by any governmental authority, including the Bankruptcy Court or any other regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring;

(xvii)    the entry of an order by the any court of competent jurisdiction invalidating, disallowing, subordinating, or limiting, in any respect, as applicable, the enforceability, priority, or validity of the Lender Claims or liens securing them;

(xviii)    any material breach of or default under (A) the First Lien Credit Agreement or Senior Secured Notes Indenture that is not waived or forborne under any of the waivers or forbearance agreements executed by the Lenders, or (B) any waivers or forbearance agreements executed in connection with the First Lien Credit Agreement or Senior Secured Notes Indenture; or

(xix)    a bankruptcy filing by any of the Participating Obligors in any jurisdiction other than as provided for in this Agreement and the Restructuring Term Sheet.

For the avoidance of doubt, the Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder for purposes of providing notice under this Agreement (and agree not to object to any non-breaching Party seeking, if necessary, to lift such automatic stay in connection with the giving any such notice).

Upon occurrence of a Support Termination Event, this Agreement shall forthwith become void and of no further force or effect, each Party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement and any of the Approved Plan

Documents, as applicable, and there shall be no liability or obligation on the part of any Party hereto; provided, however, that in no event shall any such termination relieve a Party hereto from (i) liability for its breach or non-performance of its obligations hereunder prior to the date of such termination and (ii) obligations under this Agreement which by their terms expressly survive any such termination; and provided, further that, notwithstanding anything to the contrary herein, any Support Termination Event may be waived in accordance with the procedures established by Section 10 hereof, in which case the Support Termination Event so waived shall be deemed not to have occurred, this Agreement shall be deemed to continue in full force and effect, and the rights and obligations of the Parties hereto shall be restored, subject to any modification set forth in such waiver. Upon termination of this Agreement, any and all votes delivered by a Participating Lender prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Participating Company Entities.

6.     Good Faith Cooperation; Further Assurances; Transaction Documents. The Parties shall, and the Participating Company Entities shall cause each of their subsidiaries and affiliates to, cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring. Furthermore, each of the Parties shall, and the Participating Company Entities shall cause each of their subsidiaries and affiliates to, take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary to carry out the purposes and intent of this Agreement. Each Party hereby covenants and agrees (a) to negotiate in good faith the Approved Plan, and the Approved Plan Related Documents, each of which shall (i) contain the same economic terms as, and other terms consistent in all material respects with, the terms set forth in the Restructuring Term Sheet (as amended, supplemented or otherwise modified as provided herein), (ii) except as otherwise provided for herein, be in form and substance reasonably acceptable in all respects to the Parties signatory thereto or beneficiaries thereof and counsel for the Ad Hoc Group, and (iii) be consistent with this Agreement and the Restructuring Term Sheet in all material respects, and (b) to execute the Approved Plan Documents (in each case to the extent such Party is a party thereto).

7.     Business Continuance. Except as contemplated by this Agreement or with the prior written consent of the Requisite Participating Lenders, the Company covenants and agrees that, between the date hereof and the consummation of the Approved Plan, the Company shall operate its businesses in the ordinary course in a manner consistent with past practice in all material respects (other than any changes in operations resulting from or relating to the filing of the Chapter 11 Cases or imposed by the Bankruptcy Court). At the reasonable request and upon reasonable notice of one or more Participating Lenders or advisors, the Company also agrees to respond to reasonable requests from such Representatives and provide reasonable access to the Company's senior management personnel regarding the Company's business, the Chapter 11 Cases, the general status of ongoing operations and operating results of the Company during normal business hours and at other reasonable times in a manner that does not unreasonably interfere with the business operations of the Company. Further, except as expressly contemplated by this Agreement and except for changes resulting from or relating to the filing of the Chapter 11 Cases or ordered by the Bankruptcy Court, the Company will continue (a) using commercially reasonable efforts to preserve its relationships with current customers, distributors,

11

suppliers, vendors and others having business dealings with the Company, including but not limited to the performance of all material obligations under any executory contracts which have not been rejected and compliance with historical billing practices, (b) maintaining and insuring its physical assets, properties and facilities in their current working order, condition and repair as of the date hereof (ordinary wear and tear excepted) and maintaining all existing insurance on the forgoing, (c) maintaining the Company's books and records on a basis consistent with prior practice, including prior billing and collection practices and (d) conduct the business only in the ordinary course of business and in accordance with the limitations set forth in any cash collateral budget, DIP Facility budget and any subsequent orders of the Bankruptcy Court. Further, except as expressly contemplated by this Agreement and except for changes resulting from or relating to the filing of the Chapter 11 Cases or ordered by the Bankruptcy Court, the Company will not: (i) take any action, or omit to take any action, the intent of which is to cause the termination of its current executive officers (other than for good reason or for cause), (ii) permit consolidated EBITDA for any twelve-month period, as of the end of each calendar month, to be less than the amount set forth in the DIP Facility (as calculated for purposes of the DIP Facility), (iii) permit liquidity to be less than $50 million for three consecutive business days (as calculated for purposes of the DIP Facility) or (iv) enter into, modify or terminate any contract for payments over the life of the contract of more than $5 million, without the prior written consent of the Requisite Participating Lenders; provided, however, that any revenue generating contracts that are entered into in the ordinary course of business consistent with past practices shall be excluded from this provision.

8.    Remedies. All remedies that are available at law or in equity, including specific performance and injunctive or other equitable relief, to any Party for a breach of this Agreement by another Party shall be available to the non-breaching Party; provided, however, that if there is a breach of the Agreement by a Participating Lender, money damages shall be an insufficient remedy to the other Participating Lenders and any Participating Lender can seek specific performance as against another Participating Lender; provided further that in connection with any remedy asserted in connection with this Agreement, each Party agrees to waive any requirement for the securing or posting of a bond in connection with any remedy. All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such Party or any other Party.

9.    Prior Negotiations. This Agreement supersedes all prior negotiations, and documents reflecting such prior negotiations, between and among the Participating Company Entities and the Participating Lenders (and their respective advisors) with respect to the subject matter hereof.

10.    Amendments

(a)    The Restructuring Term Sheet and this Agreement may be amended only upon written approval of (i) the Participating Company Entities and (ii) the Requisite Participating Lenders; provided, however, that no amendment, waiver, modification or other supplement to the Restructuring Term Sheet may impose less favorable treatment of any Participating Lender's Lender Claims, or any group of Participating Lenders' Lender Claims, or its rights and

obligations hereunder and under the Restructuring Term Sheet compared to those of the Participating Lenders generally, without such Participating Lender's, or such group of Participating Lenders', express written consent of all of the Participating Lenders.

(b)    Any amendment, modification or other supplement to any of the Approved Plan Documents shall require the consent of the Requisite Participating Lenders.

11.    Independent Analysis. Each Participating Lender hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

12.    Governing Law. This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State and County of New York. By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State and County of New York, upon the commencement of the Chapter 11 Cases, each of the Parties hereto hereby agrees that, if the petitions have been filed and the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement. EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

13.    Effective Date. This Agreement shall become effective upon the Participating Obligors giving each Participating Lender notice that it has received duly executed counterpart signature pages from the Participating Company Entities and holders of not less than 66 2/3% of the First Lien Claims (the "Effective Date").

Upon the Effective Date, the Restructuring Term Sheet shall be deemed effective for the purposes of this Agreement and thereafter the terms and conditions therein may only be amended, modified, waived or otherwise supplemented as set forth in Section 10 above.

14.    Notices. All demands, notices, requests, consents and other communications under this Agreement shall be in writing, sent contemporaneously to all of the Parties, and deemed given when delivered, if delivered by hand, or upon confirmation of transmission, if delivered by email or facsimile, during standard business hours (from 8:00 A.M. to 6:00 P.M. at the place of receipt) at the addresses and facsimile numbers set forth on Schedule 1 hereto.

15.    Reservation of Rights. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each Party to protect and preserve its rights, remedies and interests, including the Lender Claims and any other claims against the Participating Company Entities or other parties, or its full participation in the Chapter 11 Cases. Without limiting the foregoing sentence in any way, after a Support Termination Event, the Parties hereto each fully reserve any and all of their respective rights, remedies and interests, subject to Section 5, in the case of any claim for breach of this Agreement. Furthermore, nothing in this Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement, the Restructuring Term Sheet and the Approved Plan and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Restructuring. Notwithstanding any contained in this Agreement, this Agreement, the Restructuring Term Sheet and all other exhibits, schedules and appendices thereto are subject to Rule 408 of the Federal Rules of Evidence and shall not be admissible into evidence other than in a proceeding seeking to enforce their terms.

16.    Rule of Interpretation. Notwithstanding anything contained herein to the contrary, it is the intent of the Parties that all references to votes or voting in this Agreement be interpreted to include (a) votes or voting on a plan of reorganization under the Bankruptcy Code and (b) all means of expressing agreement with, or rejection of, as the case may be, a restructuring or reorganization transaction that is not implemented under the Bankruptcy Code.

17.    Survival. Notwithstanding (i) any sale of the Lender Claims in accordance with Section 3(b) or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Sections 4(b) (expenses), 15 (reservation of rights), 25 (publicity) and 26 (fiduciary duties) shall survive such sale and/or termination and shall continue in full force and effect for the benefit of the Participating Lenders in accordance with the terms hereof.

18.    Successors and Assigns; Severability; Several Obligations. This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives. The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction. The agreements, representations and obligations of the Participating Lenders under this Agreement are, in all respects, several and not joint.

14

19.     Third-Party Beneficiary. This Agreement is intended for the benefit of the Parties hereto and no other person or entity shall be a third party beneficiary hereof or have any rights hereunder.

20.     Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile, electronic mail or otherwise, each of which shall be deemed to be an original for the purposes of this paragraph.

21.     Entire Agreement. This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations but shall not supersede the Restructuring Term Sheet, Approved Plan and, to the extent applicable, the Approved Plan Documents; provided, however, that the Parties acknowledge and agree that any confidentiality agreements heretofore executed between the Participating Obligors and any Participating Lender shall continue in full force and effect.

22.     Headings. The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement and shall not affect the interpretation of this Agreement.

23.     Acknowledgment. This Agreement is not and shall not be deemed to be a solicitation of consents to the Approved Plan. The acceptance of the Lenders will not be solicited until the Lenders have received the Disclosure Statement and related ballot.

24.     Settlement Discussions. This Agreement and the Restructuring Term Sheet are part of a proposed settlement of matters that could otherwise be the subject of litigation among the parties hereto. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

25.     Publicity. The Participating Company Entities will submit to counsel for the Ad Hoc Group, and the Ad Hoc Group will submit to counsel for the Participating Obligors, all press releases, public filings, public announcements or other communications with any news media relating to this Agreement or the transactions contemplated hereby and any amendments thereof. The Participating Company Entities shall not (a) use the name of any Participating Lender in any press release without such Participating Lender's prior written consent or (b) disclose to any person, other than legal, accounting, financial and other advisors to the Participating Company Entities, the principal amount or percentage of Lender Claims held by any Participating Lender or any of its respective subsidiaries; provided, however, that the Participating Obligors shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class Lender Claims held by the Participating Lenders as a group. Notwithstanding the foregoing, the Participating Lenders hereby consent to the disclosure by the Participating Company Entities in the Approved Plan and the Approved Plan Documents,

15

as applicable, as well as any required filings by the Participating Obligors with the Bankruptcy Court or as otherwise required by law or regulation, of the execution, terms and contents of this Agreement and the aggregate principal amount of, and aggregate percentage of, any class of Lender Claims held by the Participating Lenders as a group.

26.     Fiduciary Duties.  Notwithstanding anything to the contrary herein, nothing in this Agreement shall require the Participating Company Entities or their affiliated entities or any directors or officers of the Participating Company Entities or their affiliated entities, in such person's capacity as a director or officer of a Participating Company Entity or their affiliated entities, to take any action, or to refrain from taking any action, to the extent required to comply with its or their fiduciary obligations under applicable law.  None of the Participating Lenders shall have any fiduciary duty or other duties or responsibilities to each other, any Lender, the Participating Company Entities or any of the Participating Company Entities' creditors or other stakeholders, except as expressly provided herein or in the Approved Plan or the Approved Plan Documents.

27.     Conflicts Between the Restructuring Term Sheet and this Agreement.  In the event of any conflict among the terms and provisions in the Restructuring Term Sheet and this Agreement, the terms and provisions of the Restructuring Term Sheet shall control.  Nothing contained in this Section 27 shall affect, in any way, the requirements set forth herein for the amendment of this Agreement and the Restructuring Term Sheet set forth in Section 10 hereof.

*[Remainder of page intentionally left blank]*

16

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

HMH HOLDINGS (DELAWARE), INC.

By: _____
Name:  William F. Bayers
Title:    EVP and General Counsel


HOUGHTON MIFFLIN HARCOURT PUBLISHING COMPANY

By: _____
Name:  William F. Bayers
Title:    EVP and General Counsel


HOUGHTON MIFFLIN HARCOURT PUBLISHERS INC.

By: _____
Name:  William F. Bayers
Title:    EVP and General Counsel


HMH PUBLISHERS, LLC

By: _____
Name:  William F. Bayers
Title:    EVP and General Counsel


HMH PUBLISHING COMPANY

By: _____
Name:  William F. Bayers
Title:    Secretary

HOUGHTON MIFFLIN HOLDING COMPANY,
INC.

By: _____
     Name: William F. Bayers
     Title:  EVP and General Counsel


HOUGHTON MIFFLIN, LLC

By: _____
     Name: William F. Bayers
     Title:  EVP and General Counsel


HOUGHTON MIFFLIN FINANCE, INC.

By: _____
     Name: William F. Bayers
     Title:  EVP and General Counsel


HOUGHTON MIFFLIN HOLDINGS, INC.

By: _____
     Name: William F. Bayers
     Title:  EVP and General Counsel


HM PUBLISHING CORP.

By: _____
     Name: William F. Bayers
     Title:  EVP and General Counsel


RIVERDEEP INC., A LIMITED LIABILITY
     COMPANY

By: _____
     Name: William F. Bayers
     Title:  EVP and General Counsel

BRODERBUND LLC

By: _____
    Name: William F. Bayers
    Title:  EVP and General Counsel


RVDP, INC.

By: _____
    Name: William F. Bayers
    Title:  EVP and General Counsel


HRW DISTRIBUTORS, INC.

By: _____
    Name: William F. Bayers
    Title:  EVP and General Counsel


GREENWOOD PUBLISHING GROUP, INC.

By: _____
    Name: William F. Bayers
    Title:  EVP and General Counsel


CLASSROOM CONNECT, INC.

By: _____
    Name: William F. Bayers
    Title:  EVP and General Counsel


ACHIEVE! DATA SOLUTIONS, LLC

By: _____
    Name: William F. Bayers
    Title:  EVP and General Counsel

STECK-VAUGHN PUBLISHING LLC

By: _____
    Name: William F. Bayers
    Title:  EVP and General Counsel


HMH CONSUMER COMPANY


By: _____
    Name: William F. Bayers
    Title:  Secretary


HMH EDUCATION COMPANY

By: _____
    Name:  William F. Bayers
    Title:  Secretary


HMH IP COMPANY

By: _____
    Name:  William F. Bayers
    Title:  Secretary


RIVERDEEP UK LIMITED

By: _____
    Name:  William F. Bayers
    Title:  Secretary


HMH SUPPLEMENTAL PUBLISHERS INC.

By: _____
    Name: William F. Bayers
    Title:  EVP and General Counsel

SENTRY REALTY CORPORATION

By: _____
     Name: William F. Bayers
     Title:  EVP and General Counsel

HOUGHTON MIFFLIN COMPANY
    INTERNATIONAL, INC.

By: _____
     Name: William F. Bayers
     Title:  EVP and General Counsel

THE RIVERSIDE PUBLISHING COMPANY

By: _____
     Name: William F. Bayers
     Title:  EVP and General Counsel

CLASSWELL LEARNING GROUP INC.

By: _____
     Name: William F. Bayers
     Title:  EVP and General Counsel

COGNITIVE CONCEPTS, INC.

By: _____
     Name: William F. Bayers
     Title:  EVP and General Counsel

EDUSOFT

By: _____
     Name: William F. Bayers
     Title:  EVP and General Counsel

HOUGHTON MIFFLIN PLC

By: _____
Name: William F. Bayers
Title:  EVP and General Counsel


ADVANCED LEARNING CENTERS, INC.

By: _____
Name: William F. Bayers
Title:  EVP and General Counsel


HMH INTERMEDIATE HOLDINGS
(DELAWARE), LLC

By: _____
Name: William F. Bayers
Title:  EVP and General Counsel


HMH PUBLISHING COMPANY (IOM)
     UNLIMITED

By: _____
Name: William Bayers
Title:  Director


HOUGHTON MIFFLIN HARCOURT
FOUNDATION, INC.

By: _____
Name: William F. Bayers
Title:  Secretary


HOUGHTON MIFFLIN HARCOURT (ASIA)
PTE. LTD.

By: _____
Name: William F. Bayers
Title:  Director

FOUNDATION FOR MARINE ANIMAL
HUSBANDRY, INC.

By: _____

Name: William F. Bayers

Title:   EVP and General Counsel

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**ANCHORAGE CAPITAL MASTER OFFSHORE, LTD.**
**By: Anchorage Capital Group, L.L.C.**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By:
Name:         MICHAEL AGLIALORO
Title:        · Executive Vice President

| Address:          | 610 Broadway, 6th Floor New York, NY 10012 |
|-------------------|--------------------------------|
| Facsimile Number: | 212-358-4840                   |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By:
Name:
Title:

| Address:          |  |
|-------------------|--|
| Facsimile Number: |  |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By:
Name:         MICHAEL AGLIALORO
Title:        Executive Vice President

| Address:          | 610 Broadway, 6th Floor New York, NY 10012 |
|-------------------|--------------------------------|
| Facsimile Number: | 212-358-4840                   |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**ANCHORAGE ILLIQUID OPPORTUNITIES OFFSHORE MASTER, L.P.**
By: Anchorage Capital Group, L.L.C., Its Investment Manager

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By:
Name:
Title:      Executive Vice President

| Address:           | 610 Broadway, 6th Floor<br>New York, NY 10012 |
|--------------------|-----------------------------------------------|
| Facsimile Number:  | 212-358-4840                                  |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By:
Name:
Title:

| Address:           |  |
|--------------------|--|
| Facsimile Number:  |  |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By:
Name:
Title:

| Address:           | 610 Broadway, 6th Floor<br>New York, NY 10012 |
|--------------------|-----------------------------------------------|
| Facsimile Number:  | 212-358-4840                                  |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**ANCHORAGE ILLIQUID OPPORTUNITIES OFFSHORE MASTER II, L.P.**
By: Anchorage Capital Group, L.L.C., Its Investment Manager

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____
Name: 
Title: 

MICHAEL AGLIALORO
Executive Vice President

| Address: | 610 Broadway, 6th Floor New York, NY 10012 |
|---|---|
| Facsimile Number: | 212-358-4840 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____
Name: 
Title: 

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name: 
Title: 

MICHAEL AGLIALORO
Executive Vice President

| Address: | 610 Broadway, 6th Floor New York, NY 10012 |
|---|---|
| Facsimile Number: | 212-358-4840 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**ANCHORAGE ILLIQUID OPPORTUNITIES OFFSHORE MASTER III, L.P.**
By: Anchorage Capital Group, L.L.C., Its Investment Manager

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____
Name:
Title:       MICHAEL AGLIALORO
             Executive Vice President

| Address: | 610 Broadway, 6th Floor New York, NY 10012 |
|---|---|
| Facsimile Number: | 212-358-4840 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | 610 Broadway, 6th Floor New York, NY 10012 |
|---|---|
| Facsimile Number: | 212-358-4840 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**GRF MASTER FUND II, L.P.**
By: Anchorage Capital Group, L.L.C., Its Investment Manager

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____
Name:
Title:   MICHAEL AGUALORO
         Executive Vice President

| Address: | 610 Broadway, 6th Floor New York, NY 10012 |
|---|---|
| Facsimile Number: | 212-358-4840 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name:   MICHAEL AGUALORO
Title:   Executive Vice President

| Address: | 610 Broadway, 6th Floor New York, NY 10012 |
|---|---|
| Facsimile Number: | 212-358-4840 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**PCI Fund, L.L.C.**
By: Anchorage Capital Group, L.L.C., Its Investment Manager

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By:
Name:        MICHAEL AGLIALORO
Title:        Executive Vice President

| Address: | 610 Broadway, 6th Floor New York, NY 10012 |
|---|---|
| Facsimile Number: | 212-358-4840 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**GRF MASTER FUND, L.P.**
By: Anchorage Capital Group, L.L.C., Its Investment Manager

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By:
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By:
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By:
Name:       MICHAEL ALMALORO
Title:      Executive Vice President

| Address: | 610 Broadway, 6th Floor New York, NY 10012 |
|---|---|
| Facsimile Number: | 212-358-4840 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**LEVERAGESOURCE IV, LLC**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____

Name: Laurie Medley

Title:  Vice President

| Address: | One Manhattanville Road<br>Suite 201<br>Purchase, NY 10577 |
|---|---|
| Facsimile Number: | 914-206-4316 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____

Name:

Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____

Name:  Laurie Medley

Title:   Vice President

| Address: | One Manhattanville Road<br>Suite 201<br>Purchase, NY 10577 |
|---|---|
| Facsimile Number: | 914-206-4316 |

AGREED BY AVENUE CAPITAL MANAGEMENT II, L.P., SOLELY ON BEHALF OF
EACH OF THE FOLLOWING:

By:  Avenue Capital Management II GenPar, LLC, its General Partner

By: _____

Name: Marc Lasry

Title: Managing Member

| Address: | 399 Park Avenue |
| | 6th Floor |
| | New York, NY 10022 |
| Facsimile Number: | 212-850-7506 |

**Avenue International Master, L.P.**

Claims under the First Lien Credit Agreement, if any:

Claims under the Senior Secured Notes Indenture, if any:

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

**Avenue Investments, L.P.**

Claims under the First Lien Credit Agreement, if any:

Claims under the Senior Secured Notes Indenture, if any:

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

**Avenue-CDP Global Opportunities Fund, L.P.**

Claims under the First Lien Credit Agreement, if any:

Claims under the Senior Secured Notes Indenture, if any:

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

**Managed Accounts Master Fund Services - MAP 10, a sub-trust of Managed Accounts Master Fund Services**

Claims under the First Lien Credit Agreement, if any:

Claims under the Senior Secured Notes Indenture, if any:

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:


**Avenue Special Situations Fund V, L.P.**

Claims under the First Lien Credit Agreement, if any:

Claims under the Senior Secured Notes Indenture, if any:

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:


**Avenue Special Situations Fund VI (Master), L.P.**

Claims under the First Lien Credit Agreement, if any:

Claims under the Senior Secured Notes Indenture, if any:

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BCI 1 Loan Funding LLC**
**By: Citibank, N.A.**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By:   _Lynette Thompson_
Name:  Lynette Thompson
Title:  Director

| | |
|---|---|
| Address: | 5400 Westheimer Court, Suite 760 Houston, Texas 77056 |
| Facsimile Number: | 888-387-1318 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By:   _____
Name:
Title:

| | |
|---|---|
| Address: | |
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any: ____

Authorized Signatory:

By:   _____
Name:
Title:

| | |
|---|---|
| Address: | |
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**MET Investors Series Trust – Blackrock High Yield Portfolio**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _C A Marshall_

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | 55 East 52nd Street<br>New York, NY<br>10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____

Name:

Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _C A Marshall_

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | 55 East 52nd Street<br>New York, NY<br>10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**The Obsidian Master Fund**

Claims under the First Lien Credit Agreement, if any·

Authorized Signatory:

By: _____

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $ _____

Authorized Signatory:

By: _____

Name: _____

Title: _____

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**Missouri State Employees' Retirement System**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____

Name: _____

Title: _____

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any: _____

Authorized Signatory:

By: _____

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | |
|---|---|
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BlackRock Corporate High Yield Fund, Inc.**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____
Name:   C. Adrian Marshall
Title:   Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any: $_____

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name:   C. Adrian Marshall
Title:   Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BlackRock Corporate High Yield Fund III, Inc.**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By:    _____

Name:    C. Adrian Marshall

Title:    Authorized Signatory

| Address: | 55 East 52nd Street<br>New York, NY<br>10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By:    _____

Name:

Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By:    _____

Name:

Title:    C. Adrian Marshall
Authorized Signatory

| Address: | 55 East 52nd Street<br>New York, NY<br>10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BlackRock Corporate High Yield Fund V, Inc.**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory: _C. A. Marshall_

By: _____
Name:    C. Adrian Marshall
Title:    Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory: _C. A. Marshall_

By: _____
Name:    C. Adrian Marshall
Title:    Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BlackRock Corporate High Yield Fund VI, Inc.**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____

Name: C. Adrian Marshall

Title: Authorized Signatory

| | |
|---|---|
| Address: | 55 East 52nd Street New York, NY 10055 |
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____
Name:
Title:

| | |
|---|---|
| Address: | |
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name: C. Adrian Marshall
Title: Authorized Signatory

| | |
|---|---|
| Address: | 55 East 52nd Street New York, NY 10055 |
| Facsimile Number: | (212) 810-8756 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BlackRock Credit Investors Master Fund, L.P.**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____

Name: C. Adrian marshall
Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $ _____

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name: C. Adrian marshall
Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BlackRock Debt Strategies Fund, Inc.**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____

Name:

Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BlackRock Defined Opportunity Credit Trust**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any: $_____

Authorized Signatory:

By: _____

Name:

Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BlackRock Diversified Income Strategies Fund, Inc.**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _C. A. Marshall_____

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____

Name:

Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _C. A. Marshall_____

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BlackRock Fixed Income Portable Alpha Master Series Trust**

Claims under the First Lien Credit Agreement, if any·

Authorized Signatory:

By: _____
Name: C. Adrian Marshall
Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name: C. Adrian Marshall
Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BlackRock Fixed Income Value Opportunities Trust**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _C. A. Marshall_____

Name: _C. Adrian Marshall_

Title: _Authorized Signatory_

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _C. A. Marshall_____

Name: _C. Adrian Marshall_

Title: _Authorized Signatory_

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BlackRock Funds II Blackrock Floating Rate Income Portfolio**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _C. A. Marshall_____

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____

Name:

Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any: _____

Authorized Signatory:

By: _C. A. Marshall_____

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | |
|---|---|
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BlackRock Floating Rate Income Strategies Fund, Inc.**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____

Name:

Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BlackRock Floating Rate Income Strategies Fund II, Inc.**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _C A Marshall_
Name: C. Adrian Marshall
Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:
By: _C A Marshall_
Name: C. Adrian Marshall
Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BlackRock Floating Rate Income Trust**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any: $ _____

Authorized Signatory:

By: _____

Name:

Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**Ironshore Inc.**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____

Name:

Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any: _____

Authorized Signatory:

By: _____

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | |
|---|---|
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BlackRock Funds II – High Yield Bond Portfolio**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By:     _C. A. Marshall_

Name:   C. Adrian Marshal

Title:  Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By:     _____

Name:

Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By:     _C. A. Marshall_

Name:   C. Adrian Marshall

Title:  Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BlackRock Global Investment Series – Income Strategies Portfolio**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _C. A. Marshall_____

Name: _C. Adrian Marshall_

Title: _Authorized Signatory_

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____

Name:

Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _C. A. Marshall_____

Name: _C. Adrian Marshall_

Title: _Authorized Signatory_

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BlackRock High Income Shares**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____
Name:  C. Adrian Marshall
Title:  Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name:  C. Adrian Marshall
Title:  Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BlackRock High Yield Trust**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____

Name:

Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____

Name: C. Adrian Marshall

Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BlackRock Limited Duration Income Trust**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____
Name: C. Adrian Marshall
Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name: C. Adrian Marshall
Title: Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BlackRock Senior Floating Rate Portfolio**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____
Name:   C. Adnan Marshall
Title:   Authorized Signatory

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any: _____

Authorized Signatory:

By: _____
Name:   C. Adnan Marshall
Title:   Authorized Signatory

| Address: | |
|---|---|
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BlackRock Senior High Income Fund, Inc.**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory: _C. A. Marshall_

By: _____

Name: _C. Adrian Marshall_

Title: _Authorized Signatory_

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____

Name:

Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any: '

Authorized Signatory: _C. A. Marshall_

By: _____

Name: _C. Adrian Marshall_

Title: _Authorized Signatory_

| Address: | 55 East 52nd Street New York, NY 10055 |
|---|---|
| Facsimile Number: | (212) 810-8756 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**Knighthead Master Fund, LP**

By: Knighthead Capital Management, L.L.C.,
Its Investment Manager

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____
Name: Laura Torrado
Title: Authorized Signatory

| Address: | 623 Fifth Avenue, 29th Floor New York, NY 10022 |
|---|---|
| Facsimile Number: | (212) 356-3933 |

Claims under the Senior Secured Notes Indenture, if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name: Laura Torrado
Title: Authorized Signatory

| Address: | 623 Fifth Avenue, 29th Floor New York, NY 10022 |
|---|---|
| Facsimile Number: | (212) 356-3933 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**LMA SPC for and on behalf of the MAP 84 Segregated Portfolio**

By: Knighthead Capital Management, L.L.C.,
Its Investment Manager

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By:

Name:
    Laura Torrado
Title: **Authorized Signatory**

| Address: | 623 Fifth Avenue, 29th Floor New York, NY 10022 |
|---|---|
| Facsimile Number: | (212) 356-3933 |

Claims under the Senior Secured Notes Indenture, if any:

Authorized Signatory:

By:

Name:

Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By:

Name:

Title: Laura Torrado
    **Authorized Signatory**

| Address: | 623 Fifth Avenue, 29th Floor New York, NY 10022 |
|---|---|
| Facsimile Number: | (212) 356-3933 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**Lerner Enterprises LLC**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By:    _____

Name: Robert B. Okun

Title:   Authorized Signatory

| Address: | 1114 Avenue of the Americas, 27th Floor New York, NY 10036 |
| --- | --- |
| Facsimile Number: | 212-850-7506 |

Claims under the Senior Secured Notes Indenture, if any:

Authorized Signatory:

By:    _____

Name:

Title:

| Address: | |
| --- | --- |
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By:    _____

Name:

Title:

| Address: | |
| --- | --- |
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**Future Fund Board of Guardians**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____
Name: Robert B. Okun
Title:   Authorized Signatory

| Address: | 1114 Avenue of the Americas, 27th Floor New York, NY 10036 |
|---|---|
| Facsimile Number: | 212-850-7506 |

Claims under the Senior Secured Notes Indenture, if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**Oak Hill Credit Opportunities Financing, Ltd.**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____

Name: Robert B. Okun

Title:   Authorized Signatory

| Address: | 1114 Avenue of the Americas, 27th Floor New York, NY 10036 |
|---|---|
| Facsimile Number: | 212-850-7506 |

Claims under the Senior Secured Notes Indenture, if any:

Authorized Signatory:

By: _____

Name:

Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____

Name:

Title:

| Address: | |
|---|---|
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**Oak Hill Credit Partners IV, Limited**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____

Name: Robert B. Okun
Title:   Authorized Signatory

| Address: | 1114 Avenue of the Americas, 27th Floor New York, NY 10036 |
|---|---|
| Facsimile Number: | 212-850-7506 |

Claims under the Senior Secured Notes Indenture, if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**OHA Finlandia Credit Fund**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____
Name: Robert B. Okun
Title:   Authorized Signatory

| Address: | 1114 Avenue of the Americas, 27th Floor New York, NY 10036 |
|---|---|
| Facsimile Number: | 212-850-7506 |

Claims under the Senior Secured Notes Indenture, if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**OHA Hedged Credit Master, L.P.**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____

Name: Robert B. Okun

Title:   Authorized Signatory

| Address: | 1114 Avenue of the Americas, 27th Floor New York, NY 10036 |
|---|---|
| Facsimile Number: | 212-850-7506 |

Claims under the Senior Secured Notes Indenture, if any:

Authorized Signatory:

By: _____

Name:

Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____

Name:

Title:

| Address: | |
|---|---|
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**OHA Strategic Credit Master Fund LP**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____
Name: Robert B. Okun
Title:   Authorized Signatory

| Address: | 1114 Avenue of the Americas, 27th Floor New York, NY 10036 |
|---|---|
| Facsimile Number: | 212-850-7506 |

Claims under the Senior Secured Notes Indenture, if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**OHA Strategic Credit Master Fund II LP**

Claims under the First Lien Credit Agreement, if any

Authorized Signatory:

By: _____
Name: Robert B. Okun
Title:   Authorized Signatory

| Address: | 1114 Avenue of the Americas, 27th Floor New York, NY 10036 |
|---|---|
| Facsimile Number: | 212-850-7506 |

Claims under the Senior Secured Notes Indenture, if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**OHSF Financing, Ltd.**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____

Name: Robert B. Okun

Title:   Authorized Signatory

| Address: | 1114 Avenue of the Americas, 27th Floor New York, NY 10036 |
|---|---|
| Facsimile Number: | 212-850-7506 |

Claims under the Senior Secured Notes Indenture, if any:

Authorized Signatory:

By: _____

Name:

Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____

Name:

Title:

| Address: | |
|---|---|
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**Oregon Public Employees Retirement Fund**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____
Name: Robert B. Okun
Title:   Authorized Signatory

| Address: | 1114 Avenue of the Americas, 27th Floor New York, NY 10036 |
|---|---|
| Facsimile Number: | 212-850-7506 |

Claims under the Senior Secured Notes Indenture, if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**Sirius Investment Fund SICAV-FIS**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____

Name: Robert B. Okun

Title:   Authorized Signatory

| Address: | 1114 Avenue of the Americas, 27th Floor New York, NY 10036 |
|---|---|
| Facsimile Number: | 212-850-7506 |

Claims under the Senior Secured Notes Indenture, if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**Stichting Pensioenfonds Metaal en Techniek**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____
Name: Robert B. Okun
Title:  Authorized Signatory

| Address: | 1114 Avenue of the Americas, 27th Floor New York, NY 10036 |
|---|---|
| Facsimile Number: | 212-850-7506 |

Claims under the Senior Secured Notes Indenture, if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**Stichting Pensioenfonds van de Metalektro (PME)**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____
Name: Robert B. Okun
Title:  Authorized Signatory

| Address: | 1114 Avenue of the Americas, 27th Floor New York, NY 10036 |
|---|---|
| Facsimile Number: | 212-850-7506 |

Claims under the Senior Secured Notes Indenture, if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**Paulson Advantage Master Ltd.**

Claims under the First Lien Credit Agreement and, if any:

Authorized Signatory:

By: _____

Name:

Title:   MICHAEL WALDORF
         Authorized Signatory

| Address: | 1251 Avenue of the Americas, 50th Fl New York, NY 10020 |
|---|---|
| Facsimile Number: | 212.977.9505 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____

Name:

Title:   MICHAEL WALDORF
         Authorized Signatory

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____

Name:

Title:   MICHAEL WALDORF
         Authorized Signatory

| Address: | 1251 Avenue of the Americas, 50th Fl New York, NY 10020 |
|---|---|
| Facsimile Number: | 212.977.9505 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**Paulson Advantage Plus Master Ltd.**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:
By:        _____
Name:    MICHAEL WALDORF
Title:     Authorized Signatory

| Address: | 1251 Avenue of the Americas, 50th Floor New York, NY 10020 |
|---|---|
| Facsimile Number: | 212.977.9505 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:
By:        _____
Name:
Title:     MICHAEL WALDORF
              Authorized Signatory

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:
By:        _____
Name:
Title:     MICHAEL WALDORF
              Authorized Signatory

| Address: | 1251 Avenue of the Americas, 50th Floor New York, NY 10020 |
|---|---|
| Facsimile Number: | 212.977.9505 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**Paulson Advantage Select Master Fund Ltd.**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By:   _Michael Waldorf_
Name:   MICHAEL WALDORF
Title:   Authorized Signatory

| Address: | 1251 Avenue of the Americas, 50th Floor New York, NY 10020 |
|---|---|
| Facsimile Number: | 212.977.9505 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By:   _Michael Waldorf_
Name:   MICHAEL WALDORF
Title:   Authorized Signatory

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By:   _Michael Waldorf_
Name:   MICHAEL WALDORF
Title:   Authorized Signatory

| Address: | 1251 Avenue of the Americas, 50th Floor New York, NY 10020 |
|---|---|
| Facsimile Number: | 212.977.9505 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**Paulson Credit Opportunities Master Ltd.**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____

Name:    **MICHAEL WALDORF**
Title:    **Authorized Signatory**

| Address: | 1251 Avenue of the Americas, 50th Floor New York, NY 10020 |
|---|---|
| Facsimile Number: | 212.977.9505 |

Claims under the Senior Secured Notes Indenture, if any:

Authorized Signatory:

By: _____

Name:    **MICHAEL WALDORF**
Title:    **Authorized Signatory**

| Address: | 1251 Avenue of the Americas, 50th Floor New York, NY 10020 |
|---|---|
| Facsimile Number: | 212.977.9505 |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____

Name:    **MICHAEL WALDORF**
Title:    **Authorized Signatory**

| Address: | 1251 Avenue of the Americas, 50th Floor New York, NY 10020 |
|---|---|
| Facsimile Number: | 212.977.9505 |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**PP Opportunities Ltd.**

Claims under the First Lien Credit Agreement, if any:  $_____

Authorized Signatory:

By: _____
Name:
Title:          MICHAEL WALDORF
             Authorized Signatory

| Address: | |
|---|---|
| Facsimile Number: | |

Claims under the Senior Secured Notes Indenture, if any:

Authorized Signatory:

By: _____
Name:
Title:          MICHAEL WALDORF
             Authorized Signatory

| Address: | 1251 Avenue of the Americas, 50th Floor New York, NY 10020 |
|---|---|
| Facsimile Number: | 212.977.9505 |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any: ___

Authorized Signatory:

By: _____
Name:
Title:          MICHAEL WALDORF
             Authorized Signatory

| Address: | |
|---|---|
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**BLT 8 LLC**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____

Name: Robert Healey

Title: Authorised Signatory

| | |
|---|---|
| Address: | 11 Madison Avenue New York, NY 10010 |
| Facsimile Number: | 214-442-5186 |

Claims under the Senior Secured Notes Indenture, if any:  $_____

Authorized Signatory:

By: _____

Name:

Title:

| | |
|---|---|
| Address: | |
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any: __

Authorized Signatory:

By: _____

Name:

Title:

| | |
|---|---|
| Address: | |
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**Q5-R5 TRADING, LTD.**

Claims under the First Lien Credit Agreement, if any:

By: Q Global Capital Management, L.P., as Investment Manager
By: Q Global Advisors, LLC, its General Partner

By: _____
Name:  Scott McCarty
Title:    Assistant Secretary

| Address: | c/o Q Global Capital Management, L.P. 301 Commerce Street, Suite 3200 Fort Worth, TX 76102-4140 |
|---|---|
| Facsimile Number: | |

Claims under the Senior Secured Notes Indenture, if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**R2 TOP HAT, LTD.**

Claims under the First Lien Credit Agreement, if any:

By: Amalgamated Gadget, L.P., as its Investment Manager
By: Scepter Holdings, Inc., its General Partner

By: _____
Name:  Scott McCarty
Title:   Assistant Secretary

| Address: | c/o Amalgamated Gadget, L.P. |
|---|---|
| | 301 Commerce Street, Suite 3200 |
| | Fort Worth, TX 76102-4140 |
| Facsimile Number: | (817) 332-7463 |

Claims under the Senior Secured Notes Indenture, if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

AGREED BY EACH OF THE FOLLOWING LENDERS:

**R2 INVESTMENTS, LDC**

Claims under the First Lien Credit Agreement, if any:

By: Amalgamated Gadget, L.P., as its Investment Manager
By: Scepter Holdings, Inc., its General Partner

By: _____
Name:  Scott McCarty
Title:    Assistant Secretary

| Address: | c/o Amalgamated Gadget, L.P.<br>301 Commerce Street, Suite 3200<br>Fort Worth, TX 76102-4140 |
|---|---|
| Facsimile Number: | (817) 332-7463 |

Claims under the Senior Secured Notes Indenture, if any:
Authorized Signatory:

By: _____
Name:
Title:

| Address: | |
|---|---|
| Facsimile Number: | |

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

By: Amalgamated Gadget, L.P., as its Investment Manager
By: Scepter Holdings, Inc., its General Partner

By: _____
Name:  Scott McCarty
Title:    Assistant Secretary

| Address: | |
|---|---|
| Facsimile Number: | |

* Pending settlement

AGREED BY EACH OF THE FOLLOWING
LENDERS:

**Lehman Commercial Paper Inc.**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____

Name: Douglas Lambert

Title:  Vice President

**Lehman Brothers Special Finance Inc.**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____

Name: Douglas Lambert

Title:  Vice President

**Woodlands Commercial Corporation**

Claims under the First Lien Credit Agreement, if any:

Authorized Signatory:

By: _____

Name: Douglas Lambert

Title:  CEO

| Address: | 1271 Avenue of the Americas, 40th Floor New York, NY 10020 |
|---|---|
| Facsimile Number: | 646-514-5064 |

**Lehman Commercial Paper Inc.**

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name: Douglas Lambert
Title:  Vice President

**Lehman Brothers Special Finance Inc.**

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name: Douglas Lambert
Title:  Vice President

**Woodlands Commercial Corporation**

Number of Common Stock Interests in HMH HOLDINGS (DELAWARE), INC., if any:

Authorized Signatory:

By: _____
Name: Douglas Lambert
Title:  CEO

| Address: | 1271 Avenue of the Americas, 40th Floor New York, NY 10020 |
|---|---|
| Facsimile Number: | 646-514-5064 |

## SCHEDULE 1

### NOTICE ADDRESSES

If to the Participating Company Entities:

Eric Shuman
Chief Financial Officer
Houghton Mifflin Harcourt Publishing Company
222 Berkeley Street
Boston, Massachusetts 02116
Facsimile:
Eric.Shuman@hmhpub.com


with a copy to:

Paul Weiss Rifkind Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attn:   Alan W. Kornberg, Esq.
        Jeffrey D. Saferstein, Esq.
Facsimile: 212-757-3990
akornberg@paulweiss.com
jsaferstein@paulweiss.com

If to the First Lien Agent:

Citibank, N.A.

_____

_____

Fax No.: (__) ___-____
Attention: Corporate Trust Administration


with a copy to:

_____

_____

Facsimile: _____

If to the Indenture Trustee:

The Bank of New York Mellon Trust Company, N.A.

_____

_____
Fax No.: (__) ___-____
Attention: Corporate Trust Administration

with a copy to:

_____

_____

_____
Facsimile: _____

If to the Participating Lenders:

See signature pages

with a copy to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attn.:  Ira Dizengoff, Esq.
        Russell W. Parks, Esq.
Facsimile:  212-872-1002
idizengoff@akingump.com
rparks@akingump.com

If to any Participating Lender, at the address shown for such Participating Lender on the applicable signature page hereto, to the attention of the person who has executed this Agreement on behalf of such Participating Lender.

## SCHEDULE 2

FIRST LIEN CREDIT AGREEMENT FORBEARANCE[2]

Any breach, violation, or Event of Default under Section 7.01(c) of the First Lien Credit Agreement arising as a result of a failure to make the interest payment under Section 2.06 of the First Lien Credit Agreement due and payable on May 10, 2012 and any other date thereafter as long as a "Support Termination Event" (or similar term) has not occurred under the Restructuring Support Agreement.

To the extent the foregoing breach, violation or Event of Default gives rise to a default or event of default under any Material Indebtedness (including the First Lien Notes Documents, the outstanding Replacement LC Facility, the outstanding Receivables Facility or any Hedging Agreement to which Holdings or any of its Subsidiaries is a party), any breach, violation, Default or Event of Default of the First Lien Credit Agreement under Section 7.01(f) of the First Lien Credit Agreement arising solely as a result of any such defaults or events of default under any Material Indebtedness (including the First Lien Notes Documents, the outstanding Replacement LC Facility, the outstanding Receivables Facility or any Hedging Agreement to which Holdings or any of its Subsidiaries is a party) so long as, with respect to such Material Indebtedness (other than the outstanding Replacement LC Facility and any Hedging Agreement), the holders of such Material Indebtedness, or any agent or trustee on their behalf, have not instituted enforcement remedies against any assets of any Loan Party.

---

[2] All capitalized terms used in this Schedule 2 other than "First Lien Credit Agreement" are as defined in the First Lien Credit Agreement.

# **EXHIBIT A**

RESTRUCTURING TERM SHEET

**HMH HOLDINGS (DELAWARE), INC., HOUGHTON MIFFLIN HARCOURT PUBLISHERS INC., HOUGHTON MIFFLIN HARCOURT PUBLISHING COMPANY, HMH PUBLISHERS LLC AND HMH PUBLISHING COMPANY LIMITED**
*and/or certain of their direct or indirect subsidiaries*

---

**Restructuring Term Sheet**
**Summary of Terms and Conditions**

---

This term sheet (the *"Term Sheet"*) summarizing the principal terms of certain potential transactions concerning the Company (as defined below), is not legally binding or a complete list of all the terms and conditions of the potential transactions described herein. This Term Sheet shall not constitute an offer to sell or buy, nor the solicitation of an offer to sell or buy any of the securities referred to herein or the solicitation of acceptances of a chapter 11 plan. Any such offer or solicitation shall only be made in compliance with all applicable laws. Without limiting the generality of the foregoing, this Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution and delivery of definitive documentation. This Term Sheet shall be attached to, and incorporated into a restructuring support agreement (the *"Restructuring Support Agreement"*) entered into by and among the Company and certain existing creditors that are signatories thereto (the *"Participating Lenders"*). For purposes of this Term Sheet, the term *"Requisite Participating Lenders"* shall be defined as Participating Lenders holding at least 75% of the aggregate amount of outstanding Company first lien claims bound by the Restructuring Support Agreement. This Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions and is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and any other rule of similar import. This Term Sheet, the Restructuring Support Agreement, and the terms hereof and thereof, remain subject to further review and diligence by the Participating Lenders.

*THIS TERM SHEET IS BEING PROVIDED AS PART OF A PROPOSED COMPREHENSIVE RESTRUCTURING TRANSACTION, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED RESTRUCTURING OF THE DEBT OF THE COMPANY. NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, WITH A FULL RESERVATION OF ALL RIGHTS, REMEDIES, CLAIMS, OR DEFENSES OF THE COMPANY.*

| Company | HMH Holdings (Delaware), Inc. (*"Holdings"*), Houghton Mifflin Harcourt Publishers Inc., Houghton Mifflin Harcourt Publishing Company, HMH Publishers LLC and HMH Publishing Company Limited and certain of their direct and indirect subsidiaries (collectively, the *"Company"*). |
|---|---|
| **Current Capital Structure** | The following outstanding indebtedness of, and equity interests in, the Company shall be restructured through a pre-packaged chapter 11 plan, as set forth in <u>Annex A</u> (the *"Pre-Packaged Chapter 11 Plan"*), consistent with the material terms and conditions described in this Term Sheet and the Restructuring Support Agreement: |
|  | (a) Indebtedness under the First Lien Credit Agreement dated as of December 12, 2007 among Citibank, NA as the Administrative Agent (the *"Agent"*), the Company and the lenders from time to |

time party thereto (as amended, modified or otherwise supplemented from time to time, the "*First Lien Credit Facility*") consisting of a "First Lien Term Loan" and "First Lien Revolving Loan" and, collectively, the claims in respect thereof, including but not limited to the outstanding principal and accrued interest at the non-default rate as of the Petition Date, the "*First Lien Credit Facility Claims*". As of May 10, 2012, the aggregate outstanding principal amount of (i) the First Lien Term Loan was $2.571 billion and (ii) the First Lien Revolving Loan was $235.8 million;

(b) Indebtedness under the Indenture for the 10.5% Senior Secured Notes due 2019 (the "*Notes*") dated as of May 26, 2011 among The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent (the "*Trustee*"), Houghton Mifflin Harcourt Publishers Inc., Houghton Mifflin Harcourt Publishing Company and the Guarantors named on the signature pages thereto (as amended, modified or otherwise supplemented from time to time, the "*Senior Secured Notes Indenture*"). As of May 10, 2012, the aggregate outstanding principal amount of the Notes was $300 million (such amount plus all accrued interest at the non-default rate as of the Petition Date shall be defined as the "*Senior Secured Notes Claims*" and together with the First Lien Credit Facility Claims, the "*First Lien Claims*");

(c) Indebtedness under the Receivables Funding & Administration Agreement dated as of August 4, 2010 among HM Receivables Co. II, LLC, the lenders party thereto and J.P. Morgan Chase Bank, N.A., as Administrative Agent (as amended, modified or otherwise supplemented from time to time, "*A/R Securitization Facility*"). As of May 10, 2012, there were no amounts outstanding under the A/R Securitization Facility.

(d) Indebtedness the Credit Agreement dated as of October 26, 2010 by Houghton Mifflin Harcourt Publishers, Inc. and Wells Fargo Bank, National Association (as amended, modified or otherwise supplemented from time to time, the "*LOC Facility*"). As of May 10, 2012, the aggregate outstanding principal amount of the LOC Facility was $26.83 million.

(e) All existing common stock (the "*Existing Common Stock*" and the holders thereof, the "*Existing Common Stockholders*") and other equity interests in Holdings, including warrants, rights and options to acquire such Existing Common Stock (the "*Other Holdings Equity Interests*" and together with the Existing Common Stock, the "*Existing Equity*") owned by the holders thereof (the "*Other Holdings Equity Interest Holders*" and together with the Existing Common Stockholders, "*Existing Equity Holders*").

| | |
|---|---|
| **Restructuring/Treatment of Indebtedness and Equity Interests** | The proposed Restructuring (the "*Restructuring*") would be accomplished through the Pre-Packaged Chapter 11 Plan in which:[1] |

    (i)    Holders of the outstanding indebtedness under the First Lien Credit Facility and the Senior Secured Notes Indenture (the "*Lenders*") would receive in full and final satisfaction of their First Lien Claims their pro rata[2] share of (i) new common stock in the reorganized Holdings representing 100% of the common stock (the "*New Common Stock*"), subject to dilution pursuant to the Management Incentive Plan (as defined below) and the exercise of the New Warrants (as defined below) and (ii) $30.4 million in cash.

    (ii)    Holders of outstanding indebtedness under the A/R Securitization Facility would be paid in full with proceeds of the DIP Facility (as defined below), in full and final satisfaction of such claims.

    (iii)    The outstanding letters of credit issued under the Letter of Credit Facility shall either continue unaffected upon consummation of the Plan or be replaced by the Exit Facility and the Letter of Credit Facility shall be deemed terminated.

    (iv)    General unsecured creditors will receive payment in full in cash in the ordinary course of business or upon the effective date of the Pre-Packaged Chapter 11 Plan, as appropriate.

    (v)    If the class of Existing Common Stockholders votes to accept the Pre-Packaged Chapter 11 Plan, each Existing Common Stockholder will receive its pro rata share of warrants to purchase 5% of the common stock of Holdings, subject to dilution by equity issued in connection with the Management Incentive Plan  (the "*New Warrants*").  The exercise price for the warrant shall be based upon a $3.1 billion enterprise valuation of the Company and will have a term of seven years.  If the class of Existing Common Stockholders votes to reject the Plan, the Existing Common Stockholders will not receive a distribution under the Pre-Packaged Chapter 11 Plan.  All Existing Common Stock will be extinguished on the Effective Date.

    (vi)    Other Holdings Equity Interest Holders will not receive or retain any property under the Pre-Packaged Chapter 11 Plan. All Other Holdings Equity Interests will be extinguished on

---

[1] Liabilities with respect to any trade payables to remain outstanding and satisfied in the ordinary course of business.

[2] Pro rata allocation will be based on principal and interest accrued on the First Lien Claims as of the Petition Date.

|  | the Effective Date. |
|---|---|
|  | The "**Effective Date**" shall be the effective date of the Pre-Packaged Chapter 11 Plan. |
| **Chapter 11 Cases** | Holdings and certain of its subsidiaries (upon such filing, the "**Debtors**") shall file voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code commencing chapter 11 cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). The Pre-Packaged Chapter 11 Plan and the disclosure statement describing the Pre-Packaged Chapter 11 Plan (the "**Disclosure Statement**") shall be filed contemporaneously with the filing of the Chapter 11 Cases (the "**Petition Date**"). The Pre-Packaged Chapter 11 Plan shall be in all material respects consistent with Annex A hereto and the Restructuring Support Agreement. |
| **DIP Facility/New Credit Facility** | The Company shall enter into a new $500 million senior secured credit facility (the "**DIP Facility**"), which will be rolled into an exit facility on the Effective Date, consisting of a $250 million ABL and a $250 million term credit facility (the "**New Credit Facility**") on terms and conditions as set forth in Annex C. The proceeds of the New Credit Facility will be used to, among other things, fund the costs of the Restructuring and provide post-Closing working capital to the Company.<br><br>The Lenders will receive as adequate protection for, among other things, the priming of their liens, any diminution value of their collateral and the imposition of the automatic stay, pursuant to sections 105, 361 and 364 of the Bankruptcy Code, $69.7 million in cash (the "**Adequate Protection Payments**"), which will be allocated as set forth on Annex F and indefeasibly payable upon entry of an interim order approving the DIP Facility (the "**Interim DIP Order**"). The Interim DIP Order will be in form and substance acceptable to the Requisite Participating Lenders and the Debtors. |
| **Motions and Other Bankruptcy Court Filings** | All motions and other filings with the Bankruptcy Court, including any proposed orders (including, without limitation, the order confirming the Pre-Packaged Chapter 11 Plan (the "**Confirmation Order**")) shall be in form and substance acceptable to the Requisite Participating Lenders and the Debtors. |
| **Tax/Business Considerations** | The parties to the Restructuring Support Agreement shall use good faith efforts to structure the Restructuring and the transactions contemplated thereby and in the Restructuring Support Agreement to the maximum extent possible in a tax-efficient and cost-effective manner for the Company, Existing Equity Holders, and the Lenders, *provided that*, the exchange by the Lenders of the First Lien Claims for New Common Stock is intended to be a taxable transaction for the Lenders, and the Lenders and the Company will report it as such. |

| | |
|---|---|
| **Board Members/Corporate Governance** | The Board of Directors of the Reorganized Company (the "*New Board*") to be selected prior to the Effective Date shall be comprised of nine (9) members, one (1) of whom shall be the CEO and eight (8) of whom, including the Chairperson, shall be initially jointly chosen by the Participating Lenders with the participation and input of the CEO, *provided, that,* Paulson shall have the right to designate two (2) initial directors, one of whom will be "independent" and selected from the pool of candidates selected with a consultant.  All other Corporate Governance and Shareholder Rights shall be consistent with the terms and conditions set forth in Annex B. |
| **Management Incentive Plan** | A management incentive plan (taking into account tax implications) for the Company (the "*Management Incentive Plan*"), shall become effective upon consummation of the Pre-Packaged Chapter 11 Plan.  The Management Incentive Plan shall provide for grants of options and restricted stock struck at the equity value of the reorganized Company at the time of consummation of the Pre-Packaged Chapter 11 Plan reserved for management, directors, and employees for up to 10% of the New Common Stock of Holdings.  The amount, form, exercise price, allocation and vesting of such awards, and any limitations thereon, shall be set forth in Annex D. |
| **Releases** | To the fullest extent permitted by applicable law, the Pre-Packaged Chapter 11 Plan shall include a full release from liability in favor of the Company, the Existing Equity Holders, the Lenders, and all current and former direct and indirect equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives) by the Company, the Existing Equity Holders and the Lenders from any claims and causes of action related to or arising on or prior to the Effective Date, except for any claims and causes of action for fraud, gross negligence or willful misconduct. |
| **Conditions Precedent to Closing** | The occurrence of the Effective Date shall be subject to the satisfaction of conditions precedent customary for transactions of this type and the satisfaction of such other conditions precedent agreed upon by the Requisite Participating Lenders and the Company, including but not limited to, the following:<br><br>• The negotiation, execution and delivery of definitive documentation with respect to the Restructuring contemplated by this Term Sheet and the Restructuring Support Agreement, acceptable to the Requisite Participating Lenders and otherwise consistent with the terms and conditions set forth in this Term Sheet and the Restructuring Support Agreement. |

|  | |
|---|---|
|  | • Each of the conditions precedent set forth in <u>Annex E</u> having been satisfied or waived. |
|  | • Entry of the Interim DIP Order by the Bankruptcy Court and indefeasible payment to the Lenders of the Adequate Protection Payments. |
|  | • Confirmation of the Pre-Packaged Chapter 11 Plan by the Bankruptcy Court, on terms consistent with <u>Annex A</u> and the Restructuring Support Agreement (including the agreed upon milestones). |
| **Other Terms** | • Payment by the Company of (i) the reasonable and documented fees and expenses of the advisors to the ad hoc group of lenders including, without limitation, (a) Akin Gump Strauss Hauer & Feld LLP ("*Akin Gump*"), legal advisor to the ad hoc group of lenders, in accordance with the agreement between the Company and such firm, (b) Houlihan Lokey Capital, Inc. ("*Houlihan Lokey*"), financial advisor to the ad hoc group of Lenders in accordance with the agreement between the Company and such firm; (c) Heidrick & Struggles ("*H&S*"), in accordance with the agreement between the ad hoc group of lenders and such firm and (d) Lyons, Benenson & Company Inc. ("*Benenson*") in accordance with the agreement among the Company, the ad hoc group of lenders and such firm, and (ii) the reasonable and documented, out of pocket, travel-related expenses of the members of the ad hoc group of lenders, in each case in accordance with the terms of the Restructuring Support Agreement. |
|  | • Execution by the required percentage(s) of Lenders of any necessary waivers/forbearance agreements with respect to any breach of non-Debtor guarantees or enforcement of security documents under the applicable credit documents arising from the commencement of the Chapter 11 Cases. |
|  | • All non-Debtor guarantors of the First Lien Claims shall be deemed as of the Effective Date to have been granted a release with respect to such guarantees and liens on collateral will be released as well such that the non-Debtor guarantors will be unconditionally relieved from any liability to the Lenders on account of the First Lien Claims against the non-Debtor guarantors. |
|  | • The Debtors reserve the right to revoke or withdraw the Pre-Packaged Chapter 11 Plan in accordance with their fiduciary duties or otherwise with the consent of the Requisite Participating Lenders at any time prior to the Effective Date, subject to the terms of the Restructuring Support Agreement. |
| **Governing Law and Forum** | New York governing law and consent to exclusive New York |

| | jurisdiction. |
|---|---|

## ANNEX A

### Summary of Recoveries under the Plan of Reorganization

#### A. Unclassified Claims

| | |
|---|---|
| **Administrative Expense Claims** | On or as soon as practicable after the Effective Date, each holder of an Allowed[2] Administrative Expense Claim shall (i) receive cash equal to the full Allowed amount of its claim, or (ii) be paid in the ordinary course of business, unless otherwise agreed to by such holder and the Debtors, with the consent of the Requisite Participating Lenders.<br><br>The claims for the reasonable and documented fees and expenses of (a) Akin Gump, (b) Houlihan Lokey, (c) H&S and (d) Benenson, shall be Allowed and paid pursuant to the terms of their pre-petition engagement and/or fee letters, as applicable, without any requirement for the filing of fee or retention applications in the Chapter 11 Cases. |
| **Priority Tax Claims** | On or as soon as practicable after the Effective Date, each holder of an Allowed Priority Tax Claim shall be treated in accordance with Bankruptcy Code section 1129(a)(9)(C). |
| **DIP Financing Claims** | On the Effective Date, except to the extent that the holders of the DIP Financing Claims and the Debtors, with the consent of the Requisite Participating Lenders, agree to a different treatment, in full and final satisfaction of such Claims, the DIP Financing Claims shall be satisfied as provided under the Exit Facility. |

#### B. Classified Claims and Interests

| | |
|---|---|
| **Other Priority Claims** | On or as soon as practicable after the Effective Date, each holder of an Allowed Other Priority Claim shall receive cash equal to the full Allowed amount of its claim plus post-petition interest or otherwise be left unimpaired, unless otherwise agreed to by such holder and the Debtors, with the consent of the Requisite Participating Lenders. |
| **Other Secured Claims** | To the extent that any Other Secured Claims exist, on or as soon as practicable after the Effective Date, all such Allowed Other Secured Claims, if not paid previously, shall be satisfied, at the option of the Debtors with the consent of the Requisite Participating Lenders, by (i) payment in full in cash, (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. Other Secured Claims shall include Allowed A/R Securitization Facility Claims. |
| **First Lien Claims** | On or as soon as practicable after the Effective Date, each holder of an Allowed First Lien Claim shall receive in full and final satisfaction of such claims its pro rata share of (i) New Common Stock in the reorganized Holdings representing |

---

[2] *"Allowed"* shall mean any claim that is determined to be an allowed claim in the Chapter 11 Cases in accordance with sections 502 and/or 506 of the Bankruptcy Code.

100% of the New Common Stock, subject to dilution pursuant to the Management Incentive Plan and the New Warrants and (ii) $30.4 million in Cash.

The First Lien Lender Claims shall be Allowed in an aggregate amount of approximately $3,106.8 million plus accrued interest as of the Petition Date.

| | |
|---|---|
| **Letter of Credit Facility Claims** | Except to the extent that a holder of an Allowed Letter of Credit Facility Claim and the Debtors, with the consent of the Requisite Participating Lenders, agree to a different treatment, the outstanding letters of credit issued under the Letter of Credit Facility shall either continue unaffected upon consummation of the Plan or be replaced by the Exit Facility and the Letter of Credit Facility shall be deemed terminated. |
| **General Unsecured Claims** | Each holder of an Allowed General Unsecured Claim shall receive payment in full in cash of the unpaid portion of such Allowed General Unsecured Claim on the latest of (a) the Effective Date (or as soon thereafter as reasonably practicable), (b) in the ordinary course of the Company and its subsidiaries' businesses, and (c) as otherwise agreed by such holder and the Debtors, with the consent of the Requisite Participating Lenders. |
| **Intercompany Claims** | On or as soon as practicable after the Effective Date, all Allowed Intercompany Claims shall be adjusted, continued, or discharged to the extent determined appropriate by the Debtors, with the consent of the, Requisite Participating Lenders. |
| **Equity Interests in Debtors other than Holdings** | The holders of Equity Interests in Debtors other than Holdings shall retain such Equity Interests. |
| **Existing Common Stock** | If the class of Existing Common Stockholders votes to accept the Pre-Packaged Chapter 11 Plan, each Existing Common Stockholder will receive its pro rata share of the New Warrants. If the class of Existing Common Stockholders votes to reject the Plan, the Existing Common Stockholders will not receive a distribution under the Pre-Packaged Chapter 11 Plan. All Existing Common Stock will be extinguished on the Effective Date. |
| **Other Holdings Equity Interests** | Other Holdings Equity Interest Holders will not receive or retain any property under the Pre-Packaged Chapter 11 Plan. All Other Holdings Equity Interests will be extinguished on the Effective Date. |

## Other Relevant Considerations

| | |
|---|---|
| **Plan of Reorganization Filing and Sponsorship** | The Pre-Packaged Chapter 11 Plan shall be filed by the Debtors. Without in any way limiting the Debtors' ability to satisfy their fiduciary or similar duties, the Debtors shall use all commercially reasonable efforts to seek confirmation of the Pre-Packaged Chapter 11 Plan as promptly as is practicable. |
| **Releases and Exculpation** | The Pre-Packaged Chapter 11 Plan shall include, to the full extent permitted by applicable law, a full release from liability in favor of the Debtors, the Existing Equity Holders, the Lenders, and all current and former members, managers, |

A-2

officers, directors, employees, advisors, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective officers, directors, employees, members, managers, advisors, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives) of the Debtors, the Existing Equity Holders and the Lenders from any claims, causes of action, act or omission related to, or arising out of, the Restructuring, the Chapter 11 Cases, the pursuit of confirmation of the Pre-Packaged Chapter 11 Plan, the consummation of the Pre-Packaged Chapter 11 Plan or the administration of the Chapter 11 Cases or the property to be distributed under the Pre-Packaged Chapter 11 Plan except for any claims and causes of action for fraud, gross negligence or willful misconduct.

| | |
|---|---|
| **Other Provisions** | • The Pre-Packaged Chapter 11 Plan shall contain customary conditions to effectiveness in form and substance to be agreed upon, including, without limitation: (i) the Restructuring Support Agreement has not been terminated; (ii) the Confirmation Order has become a final order in form an substance acceptable to the Requisite Participating Lenders and is not stayed (iii) payment in full, in cash, of all invoices for (a) reasonable fees and expenses that remain unpaid as of the Effective Date, incurred by Akin Gump, Houlihan Lokey, H&S and Benenson and (b) the reasonable and documented, out of pocket, travel-related expenses of the members of the ad hoc group of lenders, in each case in accordance with the terms of the Restructuring Support Agreement. |
| | • Executory contracts and unexpired leases shall be assumed or rejected pursuant to a schedule to be attached to the Disclosure Statement or Plan Supplement, which shall be subject to approval by the Requisite Participating Lenders. Trade vendor contracts shall be assumed and paid in the ordinary course of business. |
| | • Other provisions shall be more fully set forth in the Pre-Packaged Chapter 11 Plan and Disclosure Statement, both of which shall be in form and substance acceptable to the Requisite Participating Lenders; provided that no provision in the Pre-Packaged Chapter 11 Plan or Disclosure Statement may be materially inconsistent with the terms in this Term Sheet. |
| | • Each of the order(s) approving the Disclosure Statement and confirming the Pre-Packaged Chapter 11 Plan and the Plan Supplement Documents, will be in form and substance acceptable to the Requisite Participating Lenders and the Debtors. |

A-3

## ANNEX B

**Corporate Governance and Liquidity Terms of New Common Stock
Issued in Connection with the Restructuring of the Company**

*Certificate of Incorporation*

➤ The certificate of incorporation of Holdings (the "*Certificate of Incorporation*") will provide that the size of the board of directors of Holdings (the "*Board*") will be set in the manner set forth in the by-laws of Holdings (the "*By-Laws*").

➤ Amendments to the Certificate of Incorporation will require the approval of the Board and a majority of the outstanding shares of New Common Stock.

➤ Holdings will opt out of DGCL 203.

*By-Laws*

➤ The Board shall consist of nine members, the number thereof to be adjusted from time to time by resolution adopted by a majority of the entire Board.

➤ Holders of at least 15% of the outstanding shares of New Common Stock may call a special meeting of the stockholders.

➤ Stockholders shall be permitted to act by written consent in accordance with Delaware law.

➤ The By-Laws will contain a provision that prior to an IPO (primary or secondary), unless 66 2/3% of directors comprising the entire board (other than any directors recused due to a conflict of interest) approves, Holdings may not take, or permit any of its subsidiaries to take certain specified actions, including:

  o Adopt an annual budget including the capital expenditure budget for plate and non-plate cap ex;

  o Approval of any sale of all or substantially all of the assets of Holdings and its subsidiaries;

  o Approval of any mergers, acquisitions and divestitures having a value in excess of $50 million;

  o Issuance of equity securities;

  o Approval of any dividends or stock repurchases;

  o Incurrence of debt;

  o Approval of any affiliate transactions;

  o Approval of any amendment to the Management Incentive Plan and approval of or amendment to any senior executive[3] compensation arrangements;

  o Approval of amendments to the Certificate of Incorporation or By-laws;

  o Approval of executive officer changes; and

---

[3] Defined as the CEO and her direct reports.

        o  Approval of any plan of liquidation or bankruptcy filing.

**Board Members:**

➢ All initial members of the Board (other than the two (2) nominated by Paulson, one of whom shall be chosen from the pool of independent director candidates), whether designated prior to or after the Effective Date, will be designated for an initial term of one (1) year by the consensus of the ad hoc group of Lenders from a pool of director candidates that has been generated by the ad hoc group of Lenders with the participation and input of the CEO and an outside consulting firm selected by the ad hoc group of Lenders. The pool of director candidates may include existing directors as well as new director candidates. Thereafter, all members of the Board (until an IPO, other than any directors nominated pursuant to a Nomination Agreement), will be designated by the Nominating Committee of the Board or the holders of a majority of outstanding shares of New Common Stock. In any uncontested election for directors, a director must receive approval of a majority of the shares of New Common Stock voted at the meeting.

➢ A majority of the Board, including the Chairperson, will be "independent" under NYSE standards.

➢ The CEO will be a member of the Board but will not have contractual rights to be a member of the Board except as may be set forth in an agreement between Holdings and such CEO.

**Nomination Agreement**

➢ On the effective date, Paulson and Holdings would enter into a Nomination Agreement substantially similar to the current Nomination Agreement, except as set forth below. Any Holder (as defined below) is also entitled to enter into a Nomination Agreement with the Company upon the terms and conditions described below.

➢ The two initial Paulson nominees will be nominated by Paulson as set forth above - one of whom will be chosen from the pool of independent director candidates (the "***Independent Director***") and the other nominated by Paulson (the "***Holder Director***"). The initial Holder Director will be Sheru Chowdhry.

➢ Any vacancy in the Independent Director shall be nominated by Paulson in consultation with the Nominating Committee of the Board and will be subject to approval by a majority of the Board (excluding the Holder Director); any vacancy in the Holder Director will be nominated by Paulson and (i) filled with a full-time Paulson employee or (ii) selected in consultation with the Nominating Committee and approved by a majority of the Board (excluding the Independent Director).

➢ The right to nominate the Independent Director terminates if Paulson holds less than 20% of the issued and outstanding New Common Stock and the right to nominate the Holder Director terminates if Paulson holds less than 15% of the issued and outstanding New Common Stock. All nominating rights terminate upon an IPO.

➢ If Paulson transfers at least 20% of the issued and outstanding New Common Stock to a Transferee, the nominating rights with respect to only the Holder Director (and any successor in the event of a vacancy) may be assigned to the Transferee (subject to the same termination events – 15%

ownership threshold or an IPO).

➤ If any holder acquires 20% or more of the issued and outstanding New Common Stock (a "***Holder***"), such Holder will also be entitled to nominate one director to the Board immediately pursuant to a nomination agreement (which Holdings shall be required to enter into if the Holder so elects) in form and substance substantially similar to the Paulson nomination agreement. If the Holder became a Holder other than by acquiring the stock of an existing 20% Holder, the size of the Board will be increased in order to elect the director chosen by such Holder. As with the Paulson nomination agreement, the Holder nomination agreement will terminate upon an IPO or if the Holder owns less than 15% of the outstanding common stock.

➤ As long as Paulson or a Holder does not hold less than 20% of the issued and outstanding New Common Stock, respectively, the directors nominated by Paulson or such Holder, respectively, will be eligible for re-election at each annual meeting until an IPO.

***Board Committees:***

➤ The By-Laws will provide that the Board will have the following committees, whose members will comply with NYSE and SEC requirements:

- Audit
- Compensation
- Nominating Committee
- Ethics and governance

***Information Rights:***

➤ Holdings will make publicly available on a website the following information:

- Within 45 days after the end of the quarter, quarterly management reports and unaudited financial statements, all in reasonable detail, together with a "Management's Discussion and Analysis of Financial Condition and Results of Operations" that describes the financial condition and results of operations of Holdings and its consolidated subsidiaries similar to Form 10-Q information.

- Within 90 days after year end, audited GAAP financial statements all in reasonable detail, together with a "Management's Discussion and Analysis of Financial Condition and Results of Operations" that describes the financial condition and results of operations of Holdings and its consolidated subsidiaries similar to Form 10-K information.

- All current reports that would be required to be filed with the SEC on Form 8-K if Holdings were required to file such reports, in each case, within the time periods required for filing such forms and reports as specified in the SEC's rules and regulations; subject to customary carveouts from such reporting.

- Such reports need not be SOX compliant.

- Prior to the occurrence of an IPO, Holdings will use its commercially reasonable efforts to become a voluntary filer with the SEC (but not file a Form 10 with the SEC to register the New Common Stock) by March

B-3

31, 2013.  If Holdings does not become a voluntary filer by such date, it shall post on its website, the same information that it would be required to file if it was a voluntary filer with the SEC.

**Transfers:**

➢ Holders of shares of New Common Stock will not be subject to limitations on transferability, except to comply with applicable securities laws and except as described below regarding executing a joinder to the Registration Rights Agreement and the Board's ability to impose certain restrictions on trading to preserve certain tax attributes of Holdings and its subsidiaries. The New Common Stock will not be DTC eligible and be book-entry only, held on the records of Holdings transfer agent.  On or about the Effective Date, Holdings will use commercially reasonable efforts to obtain a market maker to have the New Common Stock quoted on the OTCQX so long as the New Common Stock remains in book-entry only form.  Prior to the New Common Stock becoming DTC eligible, any transferee will be required to execute a joinder to the registration rights agreement in order to complete a transfer of New Common Stock.  A transferor will be able to share material non-public information regarding Holdings with a prospective transferee if such transferee is not a competitor of Holdings and has entered into a confidentiality agreement with Holdings with terms that are reasonably acceptable to Holdings.  Holdings will cooperate with any holder of shares of New Common Stock to facilitate any permitted transfer, including entering into such confidentiality agreements with prospective transferees.

➢ There will be no tag, drag or rights of first refusal provisions and no stockholders' agreement.

➢ The Amended and Restated Certificate of Incorporation of Holdings will include provisions that, upon the occurrence of certain events, will permit the Board to meet on an expedited basis to impose trading restrictions on the New Common Stock and certain other securities of the Holdings if the Board determines to impose trading restrictions to protect certain tax assets of Holdings. The details of the trading restrictions (if they were imposed) will be described in the plan supplement.

**Preemptive Rights:**

➢ The Registration Rights Agreement will provide that, prior to Holdings becoming a '34 Act public reporting company, each holder of New Common Stock who holds at least 3% of the outstanding shares of New Common Stock and who is a party to the Registration Rights Agreement will receive the right to participate, with soak up rights, in equity financings of Holdings on a pro rata basis (subject to customary exceptions, such as issuance of options to employees) based on the number of shares of New Common Stock owned by such holder relative to the total number of shares of New Common Stock owned by all holders having pre-emptive rights.

**Registration Rights Agreement:**

➢ Anytime after January 1, 2013, any holder or holders who hold at least 25% of the outstanding shares of New Common Stock will be able to cause Holdings to consummate an underwritten initial public offering pursuant to a Form S-1 registration statement (or, if Holdings is eligible, a Form S-3 registration statement) after April 1, 2013 pursuant to the exercise of demand registration rights on a secondary basis so long as the total proposed offering size is at least $150 million (an "***IPO Demand Right***").

B-4

➤ If an IPO Demand Right is exercised, such holders may also, at their option, require all other stockholders to sell in such IPO their pro rata share of the New Common Stock being sold, not to exceed 15% (including any underwriters over-allotment option) of the shares of the New Common Stock held by such holder; but only if the IPO price of the New Common Stock equates to a total equity value of Holdings of not less than $1.5 billion (an "*IPO Drag Right*"). The IPO price of the New Common Stock to be issued pursuant to the IPO Demand Right and, if applicable, the IPO Drag Right will be determined by a pricing committee comprised of directors of Holdings.

➤ On October 1, 2013, unless an IPO (whether pursuant to an IPO Demand Right, IPO Drag Right or otherwise) has been consummated prior thereto, Holdings will (i) file a Form 10 to register the New Common Stock under the '34 Act, (ii) timely apply to list the New Common Stock on the New York Stock Exchange or Nasdaq and (iii) timely apply for the New Common Stock to be made DTC eligible (collectively, the "*'34 Act Registration Filings*"), such '34 Act Registration Filings to be effective in each instance, on but not before December 1, 2013; it being understood that at any time prior to such December 1, 2013 date (unless Holdings has consummated an IPO prior to such date), holders of a majority of the outstanding shares of New Common Stock (the "*Majority Holders*") may direct Holdings to withdraw or delay the effectiveness of all such applications relating to the '34 Act Registration Filings and have the New Common Stock remain book-entry only. If the Majority Holders direct Holdings to withdraw or delay the '34 Act Registration Filings, then such Majority Holders shall also determine a new date for proceeding with the '34 Act Registration Filings, at which time Holdings will proceed with and diligently pursue the effectiveness of the '34 Act Registration Filings unless prior to such date the Majority Holders determine to further extend the date of filing the '34 Act Registration Filings.

➤ Anytime after Holdings becomes a '34 Act public reporting company, Holdings shall use commercially reasonable efforts to cause to become effective a shelf registration statement (on Form S-3 if permitted) for the benefit of all holders party to the Registration Rights Agreement and any individual 15% or more holder can demand an unlimited number of "takedowns" off the shelf so long as the total offering size exceeds $100 million.

➤ Each holder or holders who hold at least 15% of the outstanding shares of New Common Stock will have, after an IPO:

- One S-1 demand registration right per annum, which may be an underwritten offering, and provided that any underwritten offering must have a total offering price of $100 million.
- Unlimited S-3 registration rights and S-3 shelf registration rights, which may be underwritten offerings if the total offering price is at least $100 million.

➤ Any holder's participation in one demand registration will not preclude such holder in participating in another demand registration.

➤ Each party to the Registration Rights Agreement will have unlimited

piggyback registration rights with respect to underwritten offerings (including with respect to the IPO Demand Right).

➢ Each Holder that holds greater than 15% of the outstanding shares of New Common Stock will have a second S-1 demand registration right per annum and will be entitled to unlimited S-3 registration rights, which may be underwritten offerings if the total offering size exceeds $100 million.

➢ Cutbacks on registration rights will reflect (i) Holdings having priority on the initial public offering and piggybacks on primary offerings; and (ii) the holders of New Common Stock exercising demand registration rights having priority on any secondary offerings (other than the initial public offering) on a *pro rata* basis based on ownership.

➢ Each party to the Registration Rights Agreement will be subject to lock-ups in connection with public offerings, not to exceed 180 days in the case of the initial public offering and 90 days in the case of other underwritten public offerings (but only for stockholders who exercise their piggyback rights to participate in such post-IPO offerings).

➢ Registration rights will contain customary suspension/blackout provisions.

➢ Rights under the Registration Rights Agreement will be transferable in connection with a transfer of shares of New Common Stock. Prior to the New Common Stock being made DTC eligible, any transferee of New Common Stock will be required to execute a joinder agreement to the Registration Rights Agreement. After the New Common Stock is made DTC eligible, no joinder shall be required.

➢ Information Rights will be contained in the Registration Rights Agreement.

➢ Holdings will pay the underwriting fees and commissions on the first two underwritten demand registrations.

*Renunciation of Corporate Opportunities:*

➢ The Certificate of Incorporation will provide for the renunciation of Holdings' interest in business opportunities that are presented to directors or holders of New Common Stock, other than such directors or holders that are employees, consultants or officers (other than any chairman of the board that is not otherwise an officer or consultant of Holdings or any subsidiary thereof) of Holdings or any subsidiary thereof.

## ANNEX C

### Principal Terms of the DIP Facility/New Credit Facility

| | |
|---|---|
| **Borrowers:** | Houghton Mifflin Harcourt Publishers Inc., HMH Publishers LLC, Houghton Mifflin Harcourt Publishing Company / successor entities |
| **Guarantors:** | Borrowers' direct and indirect domestic subsidiaries (excluding certain subsidiaries that are currently not guarantors or pledgors under the existing Indebtedness) and HMH Holdings (Delaware), Inc. |
| **Lead Arranger:** | Citigroup Global Markets Inc. |
| **Administrative Agent:** | An affiliate of Citigroup Global Markets Inc. |
| **Facility Structure:** | $500M Super-priority DIP Facility; conversion to Secured Exit Facility upon emergence |

- ABL Facility: $250M
- Term Loan Facility: $250M

| | |
|---|---|
| **Maturity Dates:** | DIP: Earlier of (i) 18 months from petition date and (ii) exit from bankruptcy |

Exit ABL: 5th anniversary of the Closing Date

Exit Term Loan: 6th anniversary of the Closing Date

| | |
|---|---|
| **LC Sub-Limit Facility:** | $40M ($25M for DIP) |
| **Swingline Facility:** | $20M |
| **DIP Interest Rates:** | ABL: L+325 bps (no floor) |

Term Loan: L+625 bps (150 bps floor)

| | |
|---|---|
| **Exit Interest Rates:** | ABL: L+ 225 – 275 bps (no floor; subject to availability grid) |

Term Loan: L+625 bps (150 bps floor)

| | |
|---|---|
| **Term Loan Amortization:** | 1% per annum |

**ABL Borrowing Base:**

- (i) Up to 85% of eligible accounts receivable, plus
- (ii) The lesser of (A) up to 85% of the Orderly Liquidation Value of eligible inventory and (B) up to 75% of the cost of eligible inventory, less
- (iii) Such reserves as the Administrative Agent determines

**Optional Prepayments:**   101 - Soft call premium for one year on Term Loan

**Mandatory Prepayments:**

- (a) If ABL Facility is overdrawn; pay down overdrawn amount
- (b) 100% proceeds from asset sales, debt issuance
  - a. 180 days reinvestment for asset sales if replacement assets
  - b. 100% for debt issuance (other than permitted debt)
- (c) 50% of 2013 excess cash flow and 50% of 2014+ excess cash flow if leverage is > 0.75x; 0% if leverage < 0.75x

**Security and Priority:**

DIP Facility: Super-priority claim status pursuant to section 364(c)(2)

ABL Facility: (a) first priority on inventory and accounts ("ABL Collateral") (b) second priority on Term Loan Collateral

Term Loan Facility: (a) first priority on all tangible and intangible assets of the Borrowers and Guarantors excluding ABL Facility Collateral ("Term Loan Collateral") (b) second priority on ABL Collateral

**Financial Covenants:**

Prior to Conversion:

- Minimum EBITDA test
- Minimum liquidity ($50M for three consecutive business days)
- Minimum availability ($20 million at any time)

After Conversion:

- ABL: If availability below Availability Limit, springing 1:0x Fixed Charge Coverage Ratio test
- Term Loan: max debt / EBITDA (TBD); min

EBITDA / Interest Expense (TBD)

**Select Negative Covenants:**                    Customary negative covenants

## ANNEX D

### Principal Terms of Management Incentive Plan

*Management Incentive Plan Reserve*
- 10 percent of the fully diluted equity to be reserved for management and directors.
- 6.65 percent to be allocated among named management upon emergence in the form of 7-year stock options with a per share exercise price equal to the FMV (i.e., based on plan value on emergence) of one share of common stock.
    - 3.35 percent of the reserve to be held back as "dry powder," and to be used for allocation to new hires, promotions, follow-on grants for management, directors, etc., as determined by the Board.

### REMAINDER OF ANNEX D INTENTIONALLY REDACTED

## ANNEX E

### Conditions Precedent to Closing

The following conditions precedent (to the extent applicable to such respective party) to the parties' respective obligations to participate in the Restructuring will have been satisfied on or prior to the Effective Date.  Certain capitalized terms used herein are defined in the Restructuring Term Sheet and the other Annexes thereto.

| | |
|---|---|
| <u>Regulatory</u> | All actions by or in respect of, or filings with, any court or governmental entity required to permit the consummation of the Restructuring will have been taken, made or obtained. |
| <u>Injunctions or Orders</u> | No court or governmental entity of competent jurisdiction will have enacted, issued, promulgated or entered any order that is in effect and restrains, enjoins or otherwise prohibits or materially impedes consummation of or impairs the benefits of the Restructuring, and no governmental entity will have instituted any proceeding seeking any such order. |
| <u>Representations and Warranties; Covenants</u> | The conditions to the effectiveness of the Pre-Packaged Chapter 11 Plan will have been satisfied and the Restructuring Support Agreement will not have been terminated. |
| <u>Third Party Consents</u> | The Company will have obtained the consent or approval of each person whose consent or approval will be required under any agreement, lease, contract, note, mortgage, indenture, arrangement or other obligation, whether written or oral, to which the Company is party in connection with the Restructuring. |
| <u>Fees</u> | The Company will have paid, or caused to be paid, all costs and expenses incurred by the parties to the Restructuring, including but not limited to payment in full, in cash, of all invoices for (i) reasonable fees and expenses that remain unpaid as of the Effective Date, incurred by Akin Gump, Houlihan Lokey, H&S and Benenson, in accordance with the agreements between the ad hoc group of lenders, the Company and such firm, and (ii) the reasonable and documented, out of pocket, travel-related expenses of the members of the ad hoc group of lenders, and in each case in accordance with the terms of the Restructuring Support Agreement. |

## ANNEX F

### Allocation of Adequate Protection Payments

| | |
|---|---|
| First Lien Revolving Loan Claims | $ 4.3 million |
| First Lien Term Loan Claims | $ 47.1 million |
| Senior Secured Notes Indenture Claims | $ 18.3 million |
| **TOTAL** | **$ 69.7 million** |

# **EXHIBIT B**

JOINDER

# JOINDER

The undersigned ("Transferee") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of May 10, 2012 (the "Agreement"), by and among Houghton Mifflin Harcourt Publishing Company, HMH Publishers LLC, Houghton Mifflin Harcourt Publishers Inc., HMH Holdings (Delaware), Inc., Houghton Mifflin Holding Company, Inc., Houghton Mifflin, LLC, Houghton Mifflin Finance, Inc., Houghton Mifflin Holdings, Inc., HM Publishing Corp., Riverdeep Inc., Broderbund LLC, RVDP, Inc., HRW Distributors, Inc., Greenwood Publishing Group, Inc., Classroom Connect, Inc., ACHIEVE! Data Solutions, LLC; Steck-Vaughn Publishing LLC, HMH Supplemental Publishers Inc., Sentry Realty Corporation, Houghton Mifflin Company International, Inc., The Riverside Publishing Company, Classwell Learning Group Inc., Cognitive Concepts, Inc., Edusoft, Advanced Learning Centers, Inc., Houghton Mifflin PLC, HMH Publishing Company, HMH Education Company, HMH IP Company, HMH Consumer Company, and Riverdeep UK Ltd., HMH Intermediate Holdings (Delaware), LLC, HMH Publishing Company (IOM) Unlimited, Houghton Mifflin Harcourt Foundation, Inc., Houghton Mifflin Harcourt (Asia) Pte. Ltd., and Foundation for Marine Animal Husbandry, Inc. (collectively, the "Participating Company Entities"), **[Transferor's Name]** ("Transferor"), and the other holders of claims against the Participating Company Entities signatory thereto, and agrees to be bound by the terms and conditions thereof to the extent Transferor was thereby bound, and shall be deemed a "Participating Lender" under the terms of the Agreement.

Date Executed: _____, 2012


**[Transferee's name]**

By:_____
    Name:_____
    Title:_____


Principal amount of First Lien Credit Agreement
Claims held: $_____

Principal amount of Senior Secured Notes Indenture
Claims held: $_____

Number of Equity Interests in HMH Holdings
(Delaware), Inc. held: _____

Date: _____


**[Address]**
Attention:
Fax: **[*]**
Email