PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Alan W. Kornberg
Jeffrey D. Saferstein
Philip A. Weintraub
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HOUGHTON MIFFLIN HARCOURT | ) | Case No. 12-12171 (REG) |
| PUBLISHING COMPANY, *et al.*, | ) | |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |
| | ) | |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING THE DEBTORS (A) TO OBTAIN POSTPETITION**
**SECURED SUPERPRIORITY FINANCING PURSUANT TO 11 U.S.C. §§ 105(a), 362,**
**364(c)(1), 364(c)(2), 364(c)(3) AND 364(d); (B) TO UTILIZE CASH COLLATERAL**
**PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION TO**
**PREPETITION SECURED CREDITORS PURSUANT TO 11 U.S.C. §§ 361, 363, 364**
**AND 507, (III) GRANTING CERTAIN PROTECTIVE RELIEF WITH REGARD TO**
**THE FEE LETTERS RELATING TO THE DIP/EXIT FACILITIES, AND**
**(IV) SCHEDULING A FINAL HEARING ON DEBTOR-IN-POSSESSION AND EXIT**
**FINANCING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Houghton Mifflin Harcourt Publishing Company (6030), Houghton Mifflin Harcourt Publishers Inc. (7305), HMH Publishers, LLC (7173), Houghton Mifflin Holding Company, Inc. (2898), Houghton Mifflin, LLC (2961), Houghton Mifflin Finance, Inc. (2812), Houghton Mifflin Holdings, Inc. (0674), HM Publishing Corp. (5843), Riverdeep Inc., a Limited Liability Company (9612), Broderbund LLC (6113), RVDP, Inc. (2557), HRW Distributors, Inc. (4902), Greenwood Publishing Group, Inc. (4537), Classroom Connect, Inc. (3282), ACHIEVE! Data Solutions, LLC (7499), Steck-Vaughn Publishing LLC (6929), HMH Supplemental Publishers Inc. (7571), HMH Holdings (Delaware), Inc. (6372), Sentry Realty Corporation (6742), Houghton Mifflin Company International, Inc. (9100), The Riverside Publishing Company (0173), Classwell Learning Group Inc. (9252), Cognitive Concepts, Inc. (5986), Edusoft (9992), and Advanced Learning Centers, Inc. (2861).

Houghton Mifflin Harcourt Publishing Company ("**HMCo**" or, the "**Company**"),

on behalf of itself and its affiliated debtors and debtors in possession in these chapter 11 cases

(collectively, the "**Debtors**"), respectfully represents:

## RELIEF REQUESTED[2]

1.     Pursuant to this motion (the "**Motion**"), the Debtors seek entry of (a) an

interim order (the "**Interim Order**"), substantially in the form attached as Exhibit A,

(i) authorizing the Debtors, on an interim basis, to (A) obtain postpetition financing facilities,

comprised of the DIP ABL Facility (as defined below) and the DIP Term Loan Facility (as

defined below) on a senior secured, priming, superpriority basis (collectively, the "**DIP**

**Facility**"), (B) use the funds on deposit with any Prepetition Secured Creditors as of the Petition

Date, any proceeds of prepetition collateral and any other cash collateral of the Prepetition

Secured Creditors (together, the "**Cash Collateral**") within the meaning of section 363(a) of

title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**");

(ii) granting adequate protection to the Prepetition Secured Creditors; (iii) granting certain

protective relief with regard to the Fee Letters (as defined herein) relating to the DIP/Exit

Facilities (as defined herein); and (iv) scheduling a hearing to consider entry of the Final Order

to approve the DIP Facility and obtain authorization for the Debtors to convert the DIP Facility

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in, as applicable, the
Superpriority Senior Secured Debtor-in-Possession and Exit Revolving Credit Agreement, attached hereto as
Exhibit C (as it may be amended or modified, from time to time, the "**DIP/Exit Revolving Credit Agreement**"
and together with the related security and loan documents, the "**DIP/Exit Revolving Loan Documents**") and
the Superpriority Senior Secured Debtor-in-Possession and Exit Term Loan Credit Agreement, attached hereto
as Exhibit D (as it may be amended or modified, from time to time, the "**DIP/Exit Term Loan Agreement**"
and together with the related security and loan documents, the "**DIP/Exit Term Loan Documents**") and the
Interim Order. The DIP/Exit Revolving Credit Agreement and the DIP/Exit Term Loan Agreement are
collectively referred to herein as the "**DIP/Exit Loan Agreements**" and the DIP/Exit Revolving Loan
Documents with the DIP/Exit Term Loan Documents are collectively referred to herein as the "**DIP/Exit**
**Documents**". This Motion is qualified in its entirety by reference to the provisions of the DIP/Exit Revolving
Credit Agreement, the DIP/Exit Term Loan Agreement and the Interim Order. To the extent of any
inconsistency between this Motion and the proposed DIP/Exit Loan Agreements, the DIP/Exit Loan
Agreements shall govern.

into a post-emergence exit financing facility (the "**Exit Facility**") that is part of the DIP Facility referenced above, and (b) a final order (the "**Final Order**," together with the Interim Order, the "**DIP Orders**") authorizing the relief granted in the Interim Order on a permanent basis as described in this Motion. More specifically, the Debtors seek authority to:

a.    obtain postpetition financing up to the aggregate principal amount of $500 million (the actual available principal amount at any time being subject to those conditions set forth in the DIP/Exit Loan Agreement), secured by liens on substantially all property of the Debtors' estates pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code;

b.    borrow and obtain, (i) upon entry of the Interim Order, initial extensions of credit from the DIP Lenders under the terms of the DIP/Exit Loan Agreements up to an aggregate principal amount of $250,000,000 in Availability under the DIP/Exit Revolving Credit Agreement and $150,000,000 under the DIP/Exit Term Loan Agreement pending the Final Hearing, and (ii) upon entry of the Final Order, a subsequent extension of credit of an additional $100,000,000 under the DIP/Exit Term Loan Agreement;

c.    convert, upon the occurrence of the Exit Facility Conversion Date,[3] the DIP Facility into the post-emergence Exit Facility (together with the DIP Facility, the "**DIP/Exit Facilities**"), subject to satisfaction of conditions set forth in the DIP/Exit Loan Agreements;

d.    enter into the DIP/Exit Loan Agreements and all related documents contemplated thereby and to perform such other and further acts as may be required in connection with the DIP/Exit Loan Agreements;

e.    use cash collateral (including cash and cash equivalent proceeds maintained in deposit and securities accounts subject to prepetition control agreements) and other collateral pursuant to section 363 of the Bankruptcy Code, Bankruptcy Rule 4001(b) and the Local Rules, including Local Rule 4001-2;

---

[3]   "Exit Facility Conversion Date" means the date on which the Approved Plan of Reorganization (as defined in the DIP/Exit Loan Agreements) becomes effective, the Exit Facility Option (as defined in the DIP/Exit Loan Agreements) is exercised and each of the conditions precedent set forth in the DIP/Exit Loan Agreements shall be satisfied or waived as provided therein. *See* DIP/Exit Revolving Credit Agmt. at definition of "Exit Facility Conversion Date" and DIP/Exit Term Loan Agmt. at definition of "Exit Facility Conversion Date".

f.  use the proceeds of the borrowings under the DIP Facility (i) to refinance the Prepetition Receivables Facility (as defined herein), (ii) to provide liquidity for working capital and for other general corporate purposes of the Loan Parties (including payment of fees and expenses in connection with the transactions contemplated hereby) and for costs and expenses associated with administration of the Cases, and (iii) to provide certain adequate protection payments to the Prepetition Secured Creditors, as described herein;

g.  maintain the letter of credit facility (and make any required payments thereunder) pursuant to which Wells Fargo Bank, National Association (“**Wells Fargo**” or the “**Prepetition L/C Bank**”) has agreed to issue up to $50 million of standby letters of credit under the Credit Agreement, dated as of October 26, 2010, by and among HMHP, as Borrower, and Wells Fargo, as Issuer (as amended, modified or supplemented, from time to time, the “**Prepetition L/C Facility**”), which letters of credit have been cash collateralized;

h.  grant allowed superpriority claims to the DIP Agent (for the ratable benefit of the DIP Agent and the DIP Lenders), subject to the Carve-Out, on the terms and conditions set forth herein and in the DIP/Exit Loan Agreements;

i.  grant to the DIP Agent (for the ratable benefit of the DIP Agent and the DIP Lenders) valid, enforceable, non-avoidable and fully perfected first priority priming liens on and senior security interests in substantially all of the prepetition and postpetition tangible and intangible property of the Debtors, other than the Excluded Assets (as defined in the DIP/Exit Documents), subject to the Carve-Out;

j.  grant adequate protection to the Prepetition Secured Creditors, whose liens and security interests are being primed by the DIP Facility, as provided for in the Interim Order, subject to the Carve-Out;

k.  modify the automatic stay pursuant to section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP/Exit Documents and the Interim Order;

l.  modify the automatic stay pursuant to section 362 of the Bankruptcy Code to the extent necessary to allow certain non-debtor subsidiaries to effectuate termination of the Prepetition Receivables Facility and related documents;

m.  grant certain protective relief with regard to the fee letter and the agency fee letter, each dated May 10, 2012 (collectively, the “**Fee Letters**”) relating to the DIP/Exit Facilities, by and among HMHP, Publishers,

HMCo and Citigroup Global Markets Inc., an affiliate of the DIP Agent;[4] and

n.    schedule a final hearing (the "**Final Hearing**") to consider the entry of the Final Order authorizing, among other things, (i) the balance of the borrowings under the DIP Facility on a final basis, as set forth in the DIP/Exit Loan Agreements, and (ii) conversion of the DIP Facility into the Exit Facility on terms substantially similar to those set forth herein, in the DIP/Exit Documents and in the Final Order.

2.    In further support of this Motion, the Debtors submit the Declarations of James H. Baird (the "**Baird Declaration**"), of Blackstone Advisory Partners L.P. ("**Blackstone**"), the Debtors' proposed financial advisor and investment banker in these chapter 11 cases, attached as Exhibit B and incorporated by reference herein, and the Declaration of William F. Bayers, Executive Vice President and General Counsel of HMCo Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First Day Pleadings dated May 21, 2012 (the "**Bayers Declaration**"), incorporated by reference herein.

## CONCISE STATEMENT PURSUANT TO LOCAL RULE 4001-2

3.    The Debtors submit this concise statement listing certain material terms set forth in the DIP/Exit Loan Agreements and the proposed DIP Orders.  Specifically, the Debtors believe that the following financing terms are required to be identified pursuant to Rules 4001(b) and (c) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Local Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**) and, as discussed in detail herein, are necessary and justified in the context of, and the circumstances relating to, these chapter 11 cases.

a.    Borrowing.  The Debtors seek to borrow an aggregate of up to $500 million under the DIP/Exit Facilities, as follows: (a) up to $250 million under the term loan facility under the DIP/Exit Facilities (the "**Term Loan**

---

[4]    The DIP Agent and its affiliates are collectively referred to herein as "Citi".

<u>Facility</u>"), evidenced by the DIP/Exit Term Loan Agreement, with $150 million to be immediately available upon entry of the Interim Order and an additional $100 million to be available after entry of the Final Order; and (b) up to $250 million under the revolving credit facility under the DIP/Exit Facilities (the "**ABL Facility**"), evidenced by the DIP/Exit Revolving Credit Agreement, to be immediately available (subject to Availability requirements). The ABL Facility under the DIP Facility (the "**DIP ABL Facility**") shall include a subfacility for letters of credit in the aggregate amount of $25 million and a discretionary swingline loan subfacility in the aggregate amount of $20 million. Interim Order at ¶ 1(c); DIP/Exit Revolving Credit Agmt. at Preliminary Statements, definitions of "L/C Commitment" and "Swingline Limit", and §§ 2.02, 2.22, and 2.23; DIP/Exit Term Loan Agmt. at Preliminary Statements, definitions of "L/C Commitment" and "Swingline Limit", and §§ 2.02.

b.  <u>Exit Facility</u>. Upon the Exit Facility Conversion Date, the Debtors seek to convert the DIP Facility into a post-emergence Exit Facility and convert the DIP Obligations into post-emergence exit Obligations (the "**Exit Obligations**"), whereupon (i) the DIP ABL Facility shall convert into a post-emergence secured asset backed revolving loan facility (the "**Exit ABL Facility**"); and (ii) the Term Loan Facility under the DIP Facility (the "**DIP Term Loan Facility**") shall convert into post-emergence exit term loans (the "**Exit Term Loan Facility**"). Interim Order at ¶ 1(a); DIP/Exit Revolving Credit Agmt. at definition of "Exit Facility Conversion Date" and § 4.03; DIP/Exit Term Loan Agmt. at definition of "Exit Facility Conversion Date" and §4.03.

c.  <u>Cash Collateral</u>. The Debtors seek authority to use Cash Collateral (including cash and cash equivalent proceeds maintained in deposit and securities accounts subject to prepetition control agreements), subject to permitted uses of the Cash Collateral and the granting of adequate protection as provided for in the Interim Order. The Interim Order provides that authority to use Cash Collateral shall cease, subject to the obligations with respect to the Carve-Out, on the earlier of (i) DIP Facility Maturity Date (as defined in the respective DIP/Exit Loan Agreements) and (ii) the date that is 60 days after the entry of the Interim Order (or such later date as approved by the Required Lenders) if the Final Order has not been entered on or prior to such date. Interim Order at ¶¶ 7, 22.

d.  <u>Conditions to Closing and Borrowing</u>. Among the conditions for borrowing under the DIP/Exit Facilities are: (i) the Debtors shall have begun solicitation in respect of the Approved Plan of Reorganization and the Plan Support Agreement shall be in full force and effect; (ii) entry of the Interim Order within five (5) days of the Debtors filing these chapter 11 cases (or such later date as agreed to by the Required Lenders); (iii) the DIP Agent shall have received and be reasonably satisfied with the Thirteen Week Forecast and have received a Borrowing Base Certificate

as of April 30, 2012; (iv) since December 31, 2011, there has been no event or occurrence that has had a Material Adverse Effect; (v) delivery of required guarantees and customary opinions of counsel to the Borrowers; and (vi) payment of all reasonable and documented fees and expenses due and owing pursuant to the DIP/Exit Loan Agreements.  DIP/Exit Revolving Credit Agmt. at § 4.01 and § 4.02; DIP/Exit Term Loan Agmt. at § 4.01 and § 4.02.

e.    Milestones or Deadlines.  The DIP/Exit Loan Agreements provide for certain milestones or deadlines (subject to Required Lenders' agreement to a later date), including:  (a) within 5 days following the Petition Date, entry by the Bankruptcy Court of the Interim Order; (b) within 60 days following the entry by the Bankruptcy Court of the Interim Order, entry by the Bankruptcy Court of the Final Order; (c) within 90 days following the Petition Date, entry by the Bankruptcy Court of the Confirmation Order; and (d) no later than 120 days following the Petition Date, the Approved Plan of Reorganization shall be effective.  DIP/Exit Revolving Credit Agmt. at § 5.16; DIP Term Loan Agmt. at § 5.15.

f.    Pricing, Economic Terms and Fees.  The DIP Facility contemplates the payment of fees and reimbursement of expenses to professionals of the Administrative Agent, the Collateral Agent and the Arrangers, and in certain circumstances, any Lender.  Interim Order at ¶¶ 1(e); DIP/Exit Revolving Credit Agmt. at § 9.05(a); DIP/Exit Term Loan Agmt. at § 9.05(a).  The DIP Facility also includes various commitment and agency fees and letter of credit fees. [5]  Interim Order at ¶ 1(e); DIP/Exit Revolving Credit Agmt. at § 2.05; DIP/Exit Term Loan Agmt. at § 2.05.  The provisions with respect to the Alternate Base Rate and Default Interest are set forth in § 2.06 and § 2.07 of the DIP/Exit Revolving Credit Agreement and the DIP/Exit Term Loan Agreement, respectively.

g.    Effect on Existing Liens/Adequate Protection.  The DIP Facility includes priming liens granted pursuant to section 364(d)(1) of the Bankruptcy Code that prime the liens under the Prepetition First Lien Credit Agreement and the Prepetition Senior Secured Notes Indenture (collectively, the "**Prepetition Secured Indebtedness**"), to the extent not repaid in full.  DIP/Exit Revolving Credit Agmt. at § 2.26; DIP/Exit Term Loan Agmt. at § 2.26.  The Debtors will provide adequate protection to the Prepetition Secured Creditors from any net diminution in value of their collateral resulting from, among other things, the sale, lease or use by the

---

[5]    In accordance with the terms of the DIP/Exit Documents, the Debtors have filed the Fee Letters (as hereinafter defined) in redacted form, as Exhibits E and F, attached hereto.  Unredacted copies of the Fee Letters (i) have been provided to the U.S. Trustee and the legal and financial advisors for the Informal Creditor Group, and any individual member of the Informal Creditor Group in accordance with the terms of the Fee Letters; and (ii) will be provided to counsel to the Committee (if any) and any other party as may be ordered by the Court or agreed by the Debtors and the DIP Agent.

Debtors (or other decline in value) of the Cash Collateral or any other Prepetition Loan Collateral or Prepetition Senior Secured Notes Collateral and the priming of their collateral by the DIP Agent and the DIP Lenders and the imposition of the automatic stay. As adequate protection of the interests of the Adequate Protection Parties in the Prepetition Secured Indebtedness Collateral, the Adequate Protection Parties will receive administrative claims, adequate protection liens, reimbursement of fees and expenses, and Adequate Protection Payments in the aggregate amount of $69,700,000, which will be allocated on a ratable basis and indefeasibly paid on the Closing Date (as defined in the DIP/Exit Loan Agreements) as follows: (i) 6.19% to the Prepetition Administrative Agent to adequately protect the interests of holders of the Revolving Loans (as defined in the Prepetition First Lien Credit Agreement (as defined below)) under the Prepetition First Lien Credit Agreement, (ii) 67.55% to the Prepetition Administrative Agent to adequately protect the interests of holders of the Term Loans (as defined in the Prepetition First Lien Credit Agreement) under the Prepetition First Lien Credit Agreement, and (iii) 26.26% to the Prepetition Senior Secured Notes Trustee to adequately protect the interests of the Prepetition Senior Secured Noteholders under the Prepetition Senior Secured Notes Indenture. Interim Order at ¶ 11(b).

h.  <u>Carve-Out</u>. The Carve-Out applies to U.S. Trustee fees, all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not exceeding $250,000, professional fees of the Debtors and the official committee of unsecured creditors, if any, incurred prior to the occurrence of an Event of Default and professional fees of the Debtors and the official committee of unsecured creditors incurred after an Event of Default up to $5 million. Cash or other amounts on deposit in the L/C Cash Deposit Account shall not be subject to the Carve-Out. Interim Order at ¶ 18; DIP/Exit Revolving Credit Agmt. at definitions of "Carve-Out"; DIP/Exit Term Loan Agmt. at definitions of "Carve-Out".

i.  <u>Termination of the Prepetition Receivables Facility</u>. The Interim Order authorizes the Debtors to immediately use proceeds of the DIP Facility to, simultaneously with the initial draw under the DIP Facility, repay in full obligations under the Prepetition Receivables Facility, and make Adequate Protection Payments, as described above. Interim Order at ¶ ¶ 6, 11; DIP/Exit Revolving Credit Agmt. at § 4.01(m); DIP Term Loan Agmt. at § 4.01(n).

j.  <u>Section 506(c) Waiver</u>. Upon entry of the Final Order, subject to the Carve-Out, no costs or expenses of administration of the Debtors' cases or any future proceedings shall be recovered from the DIP Collateral, the Cash Collateral or the Prepetition Secured Indebtedness Collateral pursuant to section 506(c) of the Bankruptcy Code. Interim Order at ¶ ¶ 19.

k.      No Marshaling/Section 552(b).  In no event shall the DIP Agent, the DIP
        Secured Parties, the Prepetition Agent, the Prepetition Senior Secured
        Notes Trustee or the Prepetition Secured Creditors be subject to the
        equitable doctrine of "marshaling" or any similar doctrine with respect to
        the DIP Collateral or the Prepetition Secured Indebtedness Collateral, as
        applicable.  Further, in no event shall the "equities of the case" exception
        of section 552(b) of the Bankruptcy Code apply to the Prepetition Existing
        Liens and security interest of the Prepetition Agent, the Prepetition Senior
        Secured Notes Trustee or the Prepetition Secured Creditors.  Interim Order
        at ¶ 25.

l.      Limitation on Challenge of Liens and Claims.  No party may, and no
        borrowings, proceeds of letters of credit, Cash Collateral, Prepetition
        Secured Indebtedness Collateral, DIP Collateral, portion of the proceeds
        of the DIP Facility or part of the Carve-Out may be used, without the prior
        written consent of (i) the DIP Agent and the DIP Lenders and/or (ii) the
        Prepetition Agent, the Prepetition Senior Secured Notes Trustee and the
        Prepetition Secured Creditors, as applicable to, among other things: (a)
        object, contest or raise any defense to the validity, perfection, priority,
        extent or enforceability of any amount due under any of the DIP/Exit
        Documents or the Prepetition Secured Debt Documents, or the Liens or
        Prepetition Existing Liens (as applicable) or claims granted under the
        DIP/Exit Documents, the Prepetition Secured Debt Documents or this
        Interim Order, (b) assert any claim or cause of action against the DIP
        Agent, any DIP Lender, the Prepetition Agent, the Prepetition Secured
        Notes Trustee or the Prepetition Secured Creditors, or any of their
        respective agents, affiliates, representatives, attorneys or advisors, (c)
        assert or prosecute any action for preferences, fraudulent conveyances,
        other avoidance power claims or any other claims, counterclaims or causes
        of action, objections, contests or defenses against the DIP Agent, any DIP
        Lender, the Prepetition Agent, the Prepetition Senior Secured Notes
        Trustee or the Prepetition Secured Creditors, or any of their respective
        agents, affiliates, representatives, attorneys or advisors in connection with
        matters related to the DIP/Exit Documents, the DIP Collateral, the
        Prepetition Secured Debt Documents, the Prepetition Secured
        Indebtedness Collateral, the RSA or the Cases.  Notwithstanding the
        foregoing, the Committee, if any, shall have a budget not to exceed
        $75,000 for the investigation, but not the prosecution, of claims and issues
        with respect to the Prepetition Existing Liens.  Interim Order at ¶ 30.

m.      Other Waivers and Limitations.  The DIP Liens and the Adequate
        Protection Liens shall not be subject or subordinate to (i) any lien or
        security interest that is avoided and preserved for the benefit of the
        Debtors and their estates under section 551 of the Bankruptcy Code or (ii)
        any liens arising after the Petition Date including, without limitation, any
        liens or security interests granted in favor of any federal, state, municipal
        or other domestic or foreign governmental unit (including any regulatory

body), commission, board or court for any liability of the Debtors. There is a 30-day period after the entry of the Final Order during which interested parties must bring an adversary proceeding or contested matter. Interim Order at ¶ ¶ 20, 33.

n.      Limitations on Funding. In addition to certain limits on asset dispositions, there are limitations on investments made by the Company in its Restricted Subsidiaries that are not Loan Parties under the DIP Facility in amounts exceeding $25 million in any fiscal year (determined net of any cash repayments, dividends or other distributions returned in respect of such investments), provided that (a) the aggregate amount of such investments made during any fiscal quarter (net of cash repayments in respect of such investments) cannot exceed $25 million and (b) no such investments are permitted to be made if at the time of their making any default under the DIP Facility exists or would result therefrom. DIP/Exit Revolving Credit Agmt. at § 6.04(b); DIP/Exit Term Loan Agmt. at § 6.04(b).

o.      Termination; Events of Default; Remedies. The DIP Facility sets forth a number of Events of Default, including, but not limited to (a) failure to pay principal, interest or any other amount when due under the DIP Facility within 3 business days, (b) representations and warranties incorrect in any material respect when given, (c) failure to comply with covenants, (d) cross-default (limited to non-Loan Parties when applied prior to the Exit Facility Conversion Date) to payment defaults, or default or event of default if the effect is to accelerate or permit acceleration with respect to indebtedness in excess of $35,000,000, (e) failure to satisfy or stay execution of judgments in excess of $35,000,000 (f) bankruptcy or insolvency (limited to the Borrowers' material subsidiaries that are not debtors in the Cases when applied prior to the Exit Facility Conversion Date), (g) the occurrence of certain ERISA events that result in liabilities that could reasonably be expected to have a Material Adverse Effect, (h) actual or asserted (by any Loan Party or any affiliate thereof) invalidity or impairment of any Loan Document (including the failure of any lien to remain perfected), (i) change of ownership or control, and (j) other Events of Defaults as set forth below and in the DIP/Exit Loan Agreements. DIP/Exit Revolving Credit Agmt. at § 7.01; DIP/Exit Term Loan Agmt. at § 7.01. Upon the occurrence of a DIP Order Event of Default and at any time thereafter during the continuance thereof, with five business days' prior written notice (an "**Enforcement Notice**") of any such occurrence, in each case given to the Debtors and their counsel, counsel to the Informal Creditor Group, the Prepetition Agent and its counsel, the Prepetition Senior Secured Notes Trustee and its counsel, counsel to the Committee, and the U.S. Trustee, the DIP Agent will be entitled to exercise the DIP Agent's rights and remedies as set forth in the DIP/Exit Documents or under applicable law. Any Enforcement Notice will also be filed with the Bankruptcy Court. The Interim Order will not prejudice the

rights of any party-in-interest to oppose the exercise of the DIP Agent's or the DIP Lenders' remedies; *provided* that the only issue that may be raised by any party in opposition thereto will be whether a DIP Order Event of Default has in fact occurred and is continuing, and the Debtors hereby waive their right to seek any relief, whether under section 105 of the Bankruptcy Code or otherwise, that would in any way impair, limit or restrict, or delay the exercise or benefit of, the rights and remedies of the DIP Agent or the DIP Lenders under the DIP/Exit Loan Agreements or the Interim Order. Interim Order ¶ 25.

p.   Change of Control. The occurrence of a "Change of Control," as defined in the respective DIP/Exit Agreements, constitutes an Event of Default thereunder. DIP/Exit Revolving Credit Agmt. at § 7.01(m); DIP/Exit Term Loan Agmt. at § 7.01(m).

q.   Joint Liability. In order to induce the DIP Lenders and the Issuing Bank to extend credit under the DIP Facility, each of Houghton Mifflin Harcourt Publishers Inc. ("**HMHP**"), HMH Publishers LLC ("**Publishers**") and HMCo agree that they will be jointly and severally liable for all the Obligations, including the principal of and interest on all Loans made to, and reimbursement obligations in respect of Letters of Credit issues for the accounts of, any Borrower. DIP/Exit Revolving Credit Agmt. at § 9.18; DIP/Exit Term Loan Agmt. at § 9.18.

r.   Avoidance Actions. DIP Lenders' superpriority liens grant them recourse, after the entry of the Final Order, to proceeds obtained as a result of Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code. Interim Order ¶ 4(d).

s.   Indemnification. The DIP Facility contains customary indemnification provisions whereby the Borrowers and HMH Holdings (Delaware), Inc. ("**Holdings**") agree, jointly and severally, to indemnify each Arranger, the Administrative Agent, the Syndication Agent, the Documentation Agent, the Collateral Agent, each Lender, the Issuing Bank, the Swingline Lender and each Related Party of any of the foregoing persons against, and to hold the Indemnitee from any and all losses, claims, damages, liabilities and related expenses incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of the execution of the DIP Facility, any of the transactions contemplated therein or the actual or proposed use of the proceeds of the Loans or Letters of Credit and, with certain provisos, the actual or alleged presence or Release of Hazardous Materials on any property of Holdings or any of its Subsidiaries or any Environmental Liability relating in any way to Holdings or any of its Subsidiaries. DIP/Exit Revolving Credit Agmt. at § 9.05(b); DIP/Exit Term Loan Agmt. at § 9.05(b).

t.      Repayment Provisions.  The Debtors may, upon notice and at the end of
        any applicable interest period (or at other times with the payment of
        applicable breakage costs), prepay in full or in part, without premium or
        penalty (other than such breakage costs), the Loans; provided that each
        such partial prepayment shall be in an amount that is an integral multiple
        of the Borrowing Multiple of $500,000 and not less than the Borrowing
        Minimum of $1 million.  DIP/Exit Revolving Credit Agmt. at § 2.12.
        DIP/Exit Term Loan Agmt. at § 2.12.

u.      Automatic Stay.  Upon five business days' notice, in the absence of a
        determination by the Bankruptcy Court that a DIP Order Event of Default
        has not occurred or is not continuing or unless otherwise ordered by the
        Court, the automatic stay is modified to permit the DIP Agent to exercise
        the DIP Agent's rights and remedies as set forth in the DIP/Exit
        Documents or under applicable law.  Interim Order at ¶ 25.

## BACKGROUND

4.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a
voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors
continue to operate their businesses and manage their properties as debtors in possession
pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      Contemporaneously with the filing of their petitions, the Debtors also filed
their Prepackaged Joint Plan of Reorganization (the "**Prepackaged Plan**") to implement a
restructuring of certain of the Debtors' outstanding indebtedness and existing equity interests.
Although the voting period remains open, as of the Petition Date, 90.3% in amount and 131 in
number of creditors and 76.2% in amount of equity holders voting on the Prepackaged Plan
voted in favor of the Plan.  No creditor or equity holder has voted against the Plan.  As a result of
the overwhelming support for the Prepackaged Plan, the Debtors intend to move forward with
confirmation of the Prepackaged Plan at the Court's earliest available date.  As of the date
hereof, no creditors' committee, trustee or examiner has been appointed in these cases.

6.      The Debtors comprise one of the leading educational publishers in the
U.S. public school market (known as kindergarten to grade 12 or "**K-12**").  The Debtors offer a

diverse portfolio of products and services, including textbooks, workbooks, supplemental

materials, technology-based products, teaching guides, various types of standardized and

customized tests, professional assessment products, and a wide range of trade and reference

titles. The Debtors are organized into the following two divisions: education and trade and

reference. The education division is the largest division and represents approximately 90% of

the Debtors' total revenue. The Debtors' revenue and EBITDA for the year ended December 31,

2011 were approximately $1.295 billion and $238 million, respectively.

7.      The global financial crisis over the past several years has negatively

affected the Debtors' recent financial performance. The Debtors' business depends largely on

state and local funding and the recession-driven decreases in state spending as well as significant

purchase deferrals in key states and territories resulted in material reductions in the overall size

of the Debtors' key K-12 market. Lack of anticipated federal stimulus support also contributed

to the Debtors' substantial revenue decline. As a result of the deteriorating macroeconomic

conditions, the Debtors, along with certain of their non-debtor affiliates, implemented a

consensual out-of-court restructuring in March 2010. Despite the out-of-court restructuring, due

to the continuing contraction of funds for state education spending and higher deferrals of

awarded business than expected, the Debtors have continued to experience financial difficulties.

On or about December 22, 2011 and December 29, 2011, the Debtors entered into amendments

to their first lien credit facility and receivables facility, respectively (collectively, the

"**Amendments**").

8.      Notwithstanding the Amendments, the Debtors have determined that a

complete delevering of their capital structure is now necessary. In or about March 2012

significant holders of claims under the Debtors' Prepetition First Lien Credit Agreement (as

defined herein) and the Prepetition Senior Secured Notes Indenture (as defined herein) formed an informal creditor group, representing over 66 2/3% of the aggregate indebtedness under the Prepetition First Lien Credit Agreement and the Prepetition Senior Secured Notes Indenture (the "**Informal Creditor Group**"). Since its formation, the Informal Creditor Group and its advisors have engaged in constructive dialogue with the Debtors regarding a comprehensive restructuring of the Debtors' outstanding debt and equity.

9.      After months of good faith, arm's length negotiations among the Debtors and the Informal Creditor Group and their respective advisors, the parties reached an agreement on the terms of a restructuring to completely delever the Debtors' balance sheet. The Debtors have commenced these cases to implement the terms of the agreement which has been embodied in the Prepackaged Plan and the accompanying Restructuring Support Agreement (as defined in the Prepackaged Plan).

10.      Additional information regarding the background of the Debtors' businesses and the commencement of these chapter 11 cases is set forth in the Bayers Declaration.

## JURISDICTION

11.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). The bases for the relief requested herein are sections 105(a), 361, 362, 363, 364, 1107(a) and 1108 of the Bankruptcy Code, Bankruptcy Rules 4001 and 6003, and SDNY Local Rule 9013-1.

## FACTS SPECIFIC TO THE RELIEF REQUESTED

### A.    Prepetition Capitalization

12.    On the Petition Date, the Debtors' outstanding secured funded debt was approximately $3.1 billion. This consists of approximately (a) $2.8 billion in aggregate principal amount outstanding under the Prepetition First Lien Credit Agreement (as defined below); and (c) $300 million in aggregate principal amount outstanding under the Prepetition Senior Secured Indenture (as defined below). Bayers Decl. ¶¶ 26-32.[6]

### i.    Prepetition Receivables Credit Agreement

13.    In connection with their accounts receivable securitization, the Debtors sold receivables (the "**Receivables Portfolio**") to certain non-debtor affiliates, as evidenced by (a) the Receivables Sale and Servicing Agreement, dated as of August 4, 2010 (as amended, supplemented, restated or otherwise modified from time to time, the "**Receivables Sale Agreement**"), by and among, HM Receivables Co., a non-debtor affiliate of the Debtors, as Buyer, certain of the Debtors, as originators thereunder (the "**Originators**"), and the other parties from time to time party thereto, and (b) the Receivables Funding and Administration Agreement, dated as of August 4, 2010 (as amended, supplemented, restated or otherwise modified from time to time, the "**Prepetition Receivables Facility**"), by and among HM Receivables Co., as borrower, JPMCB, as administrative agent and the lenders from time to time party thereto.

14.    As of the Petition Date, the principal amount outstanding under the Receivables Facility is $0. Bayers Decl. ¶ 30. The DIP/Exit Loan Agreements provide that, as a condition to the entry into the DIP Facility, the Prepetition Receivables Facility will be

---

[6]    The Debtors' complete prepetition capitalization and indebtedness is summarized in the Bayers Declaration. *See* Bayers Decl. ¶¶ 27-33.

concurrently terminated and repaid in full pursuant to the terms of the DIP Agreements.  Interim

Order ¶ 6, DIP/Exit Credit Agmt. at § 4.01(m); DIP Term Loan Agmt. at § 4.01(n).

### ii.    Prepetition First Lien Credit Agreement

15.    As of the Petition Date, the Debtors had approximately $2.8 billion

outstanding in prepetition secured loans arising under the First Lien Credit Agreement, dated as

of December 12, 2007 (as amended, modified or supplemented from time to time, the

"**Prepetition First Lien Credit Agreement**"), by and among Holdings, HMHP, Publishers,

HMCo, the guarantors party thereto, Citibank, N.A. (as successor in interest to Wilmington Trust

FSB), as Administrative Agent (the "**Prepetition Administrative Agent**"), Citibank, N.A. (as

successor in interest to Credit Suisse AG, Cayman Islands Branch), as Collateral Agent (the

"**Prepetition First Lien Collateral Agent**"; together with the Prepetition Administrative Agent,

the "**Prepetition Agent**") and the lenders party thereto (the "**Prepetition First Lien Bank

Lenders**").

16.    The financing under the Prepetition First Lien Credit Agreement is

comprised of the first lien term loan in the outstanding principal amount of $2.571 billion, which

matures on June 12, 2014 and the first lien revolving loans in the outstanding principal amount

of $235.8 million, which mature on December 12, 2013.  Bayers Decl. ¶ 27.

### iii.    Prepetition Senior Secured Notes

17.    Prior to the Petition Date, HMH Publishers, Inc. and HMCo issued $300

million in 10.5% Senior Secured Notes due 2019 (the "**Prepetition Senior Secured Notes**").

The Prepetition Senior Secured Notes are governed by that certain Indenture dated as of May 26,

2011 (the "**Prepetition Senior Secured Notes Indenture**"), by and among HMHP and HMCo,

as issuers, the other Debtors as guarantors, and the Bank of New York Mellon Trust Company,

N.A., as trustee and collateral agent (the "**Prepetition Senior Secured Notes Trustee**").

18.    The Prepetition Senior Secured Notes rank equally in right of payment with the obligations under the Prepetition First Lien Credit Agreement.  All obligations under the Prepetition Senior Secured Notes Indenture are guaranteed by Holdings, its subsidiary, HMHP, and all of the direct and indirect subsidiaries of HMHP that guarantee, or act as co-borrowers under, the Prepetition First Lien Credit Agreement, all of which are Debtors in these chapter 11 cases.  As of the Petition Date, the outstanding principal amount of the Prepetition Senior Secured Notes is $300 million.  Bayers Decl. ¶ 29.

### iv.    Prepetition Letter of Credit Facility

19.    The Debtors currently have a $50 million standby letter of credit facility pursuant to which Wells Fargo has agreed to issue up to $50 million of standby letters of credit under the Credit Agreement, dated as of October 26, 2010, by and among HMHP, as Borrower, and Wells Fargo, as Issuer, which letters of credit have been cash collateralized.  Wells Fargo has a first-priority security interest in, and exclusive control over, the account in which cash collateral is posted by the Debtors in connection with each letter of credit.  The current aggregate amount of letters of credit outstanding under the Prepetition L/C Facility is $26,829,718.53.  Bayers Decl. ¶ 31.

## B.    Existing Intercreditor Agreement and Adequate Protection

20.    The Prepetition Agent, the Prepetition Senior Secured Notes Trustee and the Company entered into an intercreditor agreement, dated May 26, 2011 (as amended, modified or supplemented from time to time, the "**Prepetition Intercreditor Agreement**") in connection with the Prepetition First Lien Credit Agreement and the Prepetition Senior Secured Notes Indenture.  The Prepetition Intercreditor Agreement provides, among other things, that the security interests for obligations under the Prepetition First Lien Credit Agreement and the Prepetition Senior Secured Notes Indenture rank equal in priority.  *See* Prepetition Intercreditor

- 17 -

Agreement, Article II. A copy of the Prepetition Intercreditor Agreement is attached hereto as

Exhibit G. The Prepetition Intercreditor Agreement remains in full force and effect.

21.      The Prepetition Secured Creditors will be provided, pursuant to sections

361, 363(e) and 364(d)(1) of the Bankruptcy Code, until indefeasible repayment of the remaining

obligations under the Prepetition First Lien Credit Agreement and the Prepetition Senior Secured

Notes Indenture, adequate protection in the form of a replacement security interest in and lien

upon all the DIP Collateral, subject and subordinate to (i) the DIP Liens, (ii) with respect to the

Prepetition Senior Secured Notes Collateral, except as otherwise provided by the Prepetition

Intercreditor Agreements, the Liens of the Prepetition Senior Secured Notes Trustee, (iii) with

respect to the Prepetition Loan Collateral, except as otherwise provided in the Prepetition

Intercreditor Agreement, the Liens of the Prepetition First Lien Collateral Agent, (iv) the lien of

the Prepetition L/C Bank securing the Prepetition L/C Bank Facility, (v) all valid, enforceable,

perfected and unavoidable liens on all of the Debtors' assets and property in existence as of the

Petition Date or duly perfected after the Petition Date as permitted by section 546(b) of the

Bankruptcy Code, and (vi) the Carve-Out.

22.      In addition, the Prepetition Secured Creditors will be provided with (i) an

administrative claim junior in priority and subordinate only to the Carve-out and the

Superpriority Claim of the DIP Agent and (ii) the right to receive the Adequate Protection

Payments in the aggregate amount of $69,700,000, which will be allocated on a ratable basis and

indefeasibly paid on the Closing Date (as defined in the DIP/Exit Loan Agreements) as follows:

(a) 6.19% to the Prepetition Administrative Agent to adequately protect the interests of holders

of the Revolving Loans (as defined in the Prepetition First Lien Credit Agreement) under the

Prepetition First Lien Credit Agreement, (b) 67.55% to the Prepetition Administrative Agent to

adequately protect the interests of holders of the Term Loans (as defined in the Prepetition First

Lien Credit Agreement) under the Prepetition First Lien Credit Agreement, and (c) 26.26% to the

Prepetition Senior Secured Notes Trustee to adequately protect the interests of the Prepetition

Senior Secured Noteholders under the Prepetition Senior Secured Notes Indenture.  In addition,

the Debtors will pay the reasonable and documented costs, fees and expenses of the Prepetition

Agent and its counsel, the Prepetition Senior Secured Notes Trustee and its counsel, and the

Informal Creditor Group and its advisors, in each case incurred in connection with the Debtors,

the chapter 11 cases or the transactions contemplated thereby.  Interim Order ¶ 11.

### NEED FOR POSTPETITION FINANCING AND
### THE DEBTORS' MARKETING EFFORTS

23.    The Debtors urgently require postpetition financing to continue their

operations during the pendency of these chapter 11 cases.  As set forth in the Bayers Declaration,

there are several key drivers for the Debtors' near-term liquidity issues.  First, global financial

crisis and market conditions since 2008 have caused a significant reduction in profitability at the

Company's businesses.  Second, significant purchase deferrals in key adoption states led to

material reductions in the overall size of the Company's K-12 market.  Third, sustained

weakness in the Company's  market and a lack of federal stimulus support has caused the

Company's financial outlook to become increasingly negative over the course of 2012.  Bayers

Decl. ¶¶ 33-35.

24.    Contemporaneously with negotiating a restructuring support agreement

with the Informal Creditor Group, the Debtors also engaged in negotiations with various

financial institutions, including potential arrangers and underwriters, with respect to the terms of

new financing the Debtors would require to consummate their restructuring, fund ongoing

working capital needs and successfully emerge from their chapter 11 cases.

25.    As set forth in the Baird Declaration, prior to the Petition Date, the Debtors attempted to procure debtor-in-possession and exit financing from numerous sources, including prepetition lenders, as well as new potential third party lenders. *See* Baird Decl. ¶ 15.

26.    Facing an increasing liquidity shortfall, the Debtors and Blackstone began good faith negotiations with parties who were viewed as qualified to provide the Debtors with fully committed debtor-in-possession and exit financing in the short timeframe required. *Id.* at ¶ ¶ 14, 15. The Debtors and Blackstone solicited interest from no less than seven potential lenders, including four banks that are Prepetition First Lien Bank Lenders and three other large global banks, regarding their willingness to provide postpetition and exit financing to the Debtors. *Id.* at ¶ 15. After active due diligence and management presentations, only a limited number of the potential lenders expressed interest in committing to any term financing, and none was willing to commit to postpetition financing on an unsecured or junior secured basis. *Id.* at ¶ 21.

27.    Specifically, party number one failed to respond to several attempts by both Blackstone and the Debtors to open discussions. Party number two pulled out of the process following an initial meeting with Blackstone. Parties number three and four considered participating in only the DIP ABL Facility and conducted moderate diligence but were unwilling to lead a committed transaction. Blackstone and the Debtors spent time with the remaining three parties and gave them additional information and materials with respect to the Debtors' operations and financial condition. These prospective providers also met with relevant management of the Debtors to facilitate the providers' diligence efforts. *Id.* ¶ 16.

28.    In March and April 2012, Blackstone ultimately received written indications of interest from these three prospective providers, all of whom were willing to arrange debtor-in-possession and exit financing to the Debtors and provided indicative, non-

- 20 -

binding proposals. Subsequent to the receipt of these financing proposals, the prospective

arrangers engaged in further business due diligence sessions with the Debtors and Blackstone,

leading to further negotiations with the Debtors and Blackstone in an attempt to improve the

proposals. Baird Decl. at ¶ 16.

29.    Of the three non-binding proposals that were submitted to the Debtors and

Blackstone, the proposals from parties five and six were based on the "best efforts" of the agent

to assemble a syndicate of lenders to finance the loans. The "best efforts" proposals left the

Debtors with uncertainty that the engagements would result in a funded credit facility and

presented potential challenges to confirmation and even the possibility of a lack of funding post-

confirmation. They further raised doubts as to the Debtors' ability to complete their efforts in a

timely manner. Party number six eventually became willing to consider providing a commitment

but was not particularly responsive throughout the process and, as a result, fell behind on

completing the diligence and documentation processes necessary to finalize the financing

process. Attempting to close a facility with this lender would have delayed the timeline for the

Debtors' restructuring process, which would have been detrimental to both the Debtors and their

creditors. The overall pricing of this and the other proposal was higher than the Citi proposal

and their terms were more restrictive. Further, Citi's commitment to the transaction far exceeded

all other contacted parties. Baird Decl. ¶¶ 18.

30.    At the end of April, upon attempting to improve these proposals, two of

the final three parties dropped out of the process. Ultimately, the Debtors decided to pursue

finalization of the debtor-in-possession and exit financing proposal from Citi - the only party to

submit a complete set of binding financing proposal documents, including a commitment letter

with associated term sheet, which evolved into the proposed DIP/Exit Facilities. *Id.* at ¶ 19.

31.    During the latter part of April and into early May 2012, Blackstone

continued negotiations with Citi in an effort to get the best possible debtor-in-possession and exit

financing under the extremely tight time constraints facing the Debtors.  On May 10, 2012, the

Debtors finalized their DIP/Exit Facilities proposal and signed commitment papers with Citi that

provided for a fully-committed $500 million new financing on very favorable terms.  *Id.* at ¶ 20.

32.    Citi's DIP/Exit Facilities proposal is the most advantageous to the Debtors

for a number of reasons, including that it is less expensive and provides for debtor-in-possession

and exit financing on more favorable terms than other comparable offers.  In addition, the fees

associated with the DIP/Exit Facilities compare favorably in rate and structure to other

financings that are presently available in this difficult credit market.  Moreover, based upon the

Debtors' familiarity and prior experience with Citi providing funding in tight timeframes on very

favorable terms, the execution risk, certainty of closing and likelihood of flexibility and

supportiveness in the future weighed in favor of Citi.  *Id.* at ¶ 21.

33.    As negotiated, the DIP/Exit Facilities will allow the Debtors to stabilize

their operations, establish prudent cash balances and meet their liquidity needs for the duration of

their stay in chapter 11.  Bayers Decl. ¶ 88.  The proceeds of the DIP Facility will be used to

refinance the Prepetition Receivables Facility, pay vendors and suppliers while minimizing

disruption to day-to-day operations, fund restructuring costs and necessary capital expenditures,

satisfy working capital requirements and make Adequate Protection Payments, as described

herein.  *Id.*

34.    The Debtors negotiated the terms of the DIP/Exit Facilities at arm's length

and in good faith, with all parties represented by counsel.  The Debtors believe that the

negotiated terms and conditions of the DIP/Exit Facilities are fair, reasonable and the best

available to the Debtors, particularly in light of the alternative proposals, the term of the

DIP/Exit Facilities, the exit aspect of the financing and the state of the credit markets generally.

Baird Decl. ¶ 26.    Indeed, the terms and conditions of the funding to be provided under the

proposed DIP/Exit Facilities are more favorable – or as favorable – to the Debtors (on the  basis

of price and economics and other factors) than those available from other lenders.  *Id.* ¶¶ 17-21.

In addition, in exchange for the adequate protection described above and as a component of the

Restructuring Support Agreement, the Informal Creditor Group does not object to the terms of

the DIP/Exit Facilities.  Bayers Decl. ¶ 89.

35.    The Debtors' business is affected by seasonal swings in liquidity, with

cash needs highest in the second and third quarters of each calendar year.  Bayers Decl. ¶ 88.

Attached as Schedule A to the Baird Declaration are the pro forma 13-week cash flow

projections for the Debtors (the "**Thirteen Week Forecast**"), prepared by the Debtors in

consultation with Blackstone.  The Thirteen Week Forecast reflects the Debtors' reasonable

judgment as to the cash needs of the business over the identified period.  Baird Decl. ¶ 14.  The

Debtors believe that the level of expenditures reflected in the Thirteen Week Forecast is prudent

for the preservation of the value of their estates.  The Thirteen Week Forecast demonstrates an

ending operating cash balance of $71.5 million as of the week ended August 17, 2012, which is

in excess of the initial DIP Facility minimum liquidity requirement of $50 million.  *Id.*   The cash

position of the Debtors after the period identified in the Thirteen Week Forecast will depend on a

number of factors, such as operational performance, asset dispositions, and liquidity needs.  *Id.*

36.    The Debtors have determined, in the exercise of their sound business

judgment, that the DIP/Exit Facilities, which permit the Debtors to obtain up to $500 million of

available postpetition and exit financing, are critical to their continued operation and ability to

demonstrate sufficient liquidity and effectuate a restructuring under chapter 11.  Without access

to the DIP/Exit facilities, the Debtors will be irreparably harmed.  Bayers Decl. ¶¶ 91-92.

## THE PROPOSED DIP FACILITY

37.    The significant terms of the DIP/Exit Facilities and the other DIP/Exit

Documents to be executed in connection therewith are as follows:

| OVERVIEW OF THE POSTPETITION AND EXIT FINANCING | |
|---|---|
| **Borrowers** | Prior to the Exit Facility Conversion Date, HMHP, Publishers and HMCo (each a "**DIP Borrower**" and, collectively, the "**DIP Borrowers**").<br><br>Following the Exit Facility Conversion Date, each of the DIP Borrowers and any other entity that constitutes a successor to a DIP Borrower (each an "**Exit Facility Borrower**" and, collectively the "**Exit Facility Borrowers**" and, together with each of the DIP Facility Borrowers, the "**Borrowers**" with each a "**Borrower**"). |
| **Guarantors** | Prior to the Exit Facility Conversion Date, all of the Borrowers' direct and indirect domestic subsidiaries (excluding certain subsidiaries that are currently not guarantors or pledgors under the Company's Pre-Petition Indebtedness), and Holdings (each a "**DIP Guarantor**" and, collectively, the "**DIP Guarantors**").<br><br>Following the Exit Facility Conversion Date, each of the DIP Guarantors and any other entity that constitutes a successor to a DIP Guarantor, in each case except to the extent such subsidiary is designated as an "unrestricted" subsidiary (each an "**Exit Facility Guarantor**" and, collectively the "**Exit Facility Guarantors**" and, together with each of the DIP Facility Guarantors, the "**Guarantors**" with each a "**Guarantor**"). |
| **Administrative Agent** | Citibank, N.A., an affiliate of Citigroup Global Markets Inc. |
| **Lenders** | An affiliate of Citigroup Global Markets Inc. (the "**Arranger**")  and other financial institutions or entities acceptable to the Arranger and consented to by the Borrowers (such consent not to be unreasonably withheld or delayed) (the "**Lenders**").<br><br>For the avoidance of doubt, any reference herein to a "Lender" shall refer to a lender under either the DIP Facility or the Exit Facility, as applicable. |

| OVERVIEW OF THE POSTPETITION AND EXIT FINANCING | |
|---|---|
| **DIP Facility Commitments** | Senior secured super-priority DIP Facility in an aggregate principal amount of up to $500,000,000 comprised of (a) subject to Availability, the non-amortizing DIP ABL Facility, providing for revolving credit loans in an aggregate principal amount of up to $250,000,000 (the "**DIP ABL Loans**"); and (b) the DIP Term Loan Facility, providing for a term loan in aggregate principal amount of up to $250,000,000 (the "**DIP Term Loan**" and, together with the DIP ABL Loans, the "**DIP Loans**"); *provided* that, prior to entry of the Final Order, and subject to the entry of the Interim Order, the aggregate amount of commitments available under the DIP Term Loan Facility shall not exceed $150,000,000.<br><br>The DIP ABL Facility will have (i) a subfacility for letters of credit ("**DIP Letters of Credit**") in an aggregate amount of $25,000,000 and (ii) a discretionary swingline loan subfacility in an aggregate amount of $20,000,000.<br><br>**(DIP/Exit Revolving Credit Agmt. at Preliminary Statements and definitions of "L/C Commitment" and "Swingline Limit"; DIP/Exit Term Loan Agmt. at Preliminary Statements and definitions of "L/C Commitment" and "Swingline Limit")** |
| **Exit Facility Commitments** | On the Exit Facility Conversion Date (defined below), the Borrowers may exercise an option pursuant to which the DIP Facility will be converted (the "**Exit Facility Option**") into senior secured credit facilities comprised of (a) subject to Availability, the Exit ABL Facility providing for revolving credit loans in an aggregate principal amount of up to $250,000,000 (the "**Exit ABL Loans**") and (b) Exit Term Loan Facility providing for term loans in an aggregate principal amount of up to $250,000,000 (the "**Exit Term Loan**" and, together with the Exit ABL Loans, the "**Exit Loans**").<br><br>The Exit ABL Facility will have (i) a letter of credit subfacility in an aggregate amount of $40,000,000, which may be used (among other things) to replace, roll over or backstop any outstanding DIP Letters of Credit and any outstanding letters of credit under the $50,000,000 cash collateralized pre-petition letter of credit facility with Wells Fargo Bank, N.A. (the "**Exit Letters of Credit**") and (ii) a discretionary swingline loan subfacility in an aggregate amount of $20,000,000.<br><br>**(DIP/Exit Revolving Credit Agmt. at § 4.03 and definitions of "L/C Commitment" and "Swingline Limit"; DIP/Exit Term Loan Agmt. at § 4.03 and definitions of "L/C Commitment" and "Swingline Limit")** |

| OVERVIEW OF THE POSTPETITION AND EXIT FINANCING | |
|---|---|
| **Maturity** | Prior to the Exit Facility Conversion Date, the earlier of (i) the date that is 18 months following the Petition Date, and (ii) the substantial consummation (as defined in section 1101 of the Bankruptcy Code) of a plan of reorganization filed in the Cases that is confirmed pursuant to an order entered by the Bankruptcy Court.<br><br>Following the Exit Facility Conversion Date, (i) in the case of the Exit ABL Facility, the date that is the 5th anniversary of the Closing Date and (ii) in the case of the Exit Term Loan Facility, the date that is the 6th anniversary of the Closing Date.<br><br>**(DIP/Exit Revolving Credit Agmt. at definitions of "DIP Facility Maturity Date" and "Revolving Credit Maturity Date"; DIP Term Loan Agmt. at definitions of "DIP Facility Maturity Date" and Term Loan Maturity Date")** |
| **Purpose/Cash Collateral** | **DIP Facility**:  Proceeds of the DIP Loans will be used to refinance the Loan Parties' Prepetition Receivables Facility and provide liquidity for working capital and for other general corporate purposes of the Loan Parties (including payment of fees and expenses in connection with the transactions contemplated thereby and adequate protection payments, which may include the payment of the fees and expenses of the Prepetition Agent, the Prepetition Senior Secured Notes Trustee and their respective counsels and Adequate Protection Payments (as described herein)).  **(DIP/Exit Revolving Credit Agmt. at § 3.13; DIP/Exit Term Loan Credit Agmt. at § 3.13; Interim Order at ¶ 1(d))**<br><br>**Cash Collateral**:  In accordance with the terms and conditions of the DIP/Exit Loan Agreements and the Interim Order, for working capital, other general corporate purposes of the Loan Parties and their Subsidiaries, and payment of the costs associated with administration of the Debtors' cases.  The Interim Order provides that authority to use Cash Collateral shall cease, subject to the obligations with respect to the Carve-Out, on the earlier of (i) DIP Facility Maturity Date (as defined in the respective DIP/Exit Loan Agreements) and (ii) the date that is 60 days after the entry of the Interim Order (or such later date as approved by the Required Lenders) if the Final Order has not been entered on or prior to such date. **(Interim Order at ¶ 7, 22)** |

## OVERVIEW OF THE POSTPETITION AND EXIT FINANCING

| | |
|---|---|
| **Interest Rates** | **Interest Rate**: DIP Loans and Exit Loans will bear interest, at the option of the Borrowers, at one of the following rates:<br><br>(i) the Applicable Margin (as defined below) plus the greater of (x) Citibank, N.A.'s fluctuating Base Rate (as defined below) and (y) 1% plus (I) in the case of the ABL Facility, the one-month LIBO Rate and (II) in the case of the Term Loan Facility, the greater of (A) 1.50% and (B) the one-month LIBO Rate, in each case payable monthly in arrears; or<br><br>(ii) the Applicable Margin plus (x) in the case of the ABL Facility, the current LIBO rate as quoted by the Administrative Agent, adjusted for reserve requirements, if any, and subject to customary change of circumstance provisions, for interest periods of one, two, three or six months (or, if made available by all participating Lenders, nine or twelve months) (the "**LIBO Rate**") and (y) in the case of the Term Loan Facility, the greater of (A) 1.50% per annum and (B) the LIBO Rate, in each case payable at the end of the relevant interest period, but in any event at least quarterly.<br><br>"**Applicable Margin**" means<br><br>(a) in the case of the ABL Facility, (I) prior to the Exit Facility Conversion Date, (i) 2.25% per annum, in the case of Base Rate Loans and (ii) 3.25% per annum, in the case of LIBO Rate Loans; (II) following the Exit Facility Conversion Date, the rate per annum determined by reference to the Availability grid set forth on Annex B hereto; and<br><br>(b) in the case of the Term Loan Facility, (i) 5.25% per annum, in the case of Base Rate Loans and (ii) 6.25% per annum, in the case of LIBO Rate Loans.<br><br>"**Base Rate**" means the highest of (i) Citibank, N.A.'s base rate and (ii) the Federal Funds Effective Rate plus 1/2 of 1%.<br><br>Interest shall be calculated on the basis of the actual number of days elapsed in a 360-day year (or a 365/366-day year, in the case of Base Rate Loans).<br><br>**Default Interest Rate**: During the continuance of a payment default or a bankruptcy event of default, or certain other bankruptcy related Events of Defaults occurring prior to the Exit Facility Conversion Date as described below, Loans will bear interest at an additional 2% *per annum*.<br><br>**(DIP/Exit Revolving Credit Agmt. at § 2.06 -2.08; DIP/Exit Term** |

| OVERVIEW OF THE POSTPETITION AND EXIT FINANCING | |
|---|---|
| | **Loan Agmt. at § 2.06 -2.08)** |
| **Letters of Credit** | The DIP ABL Facility has a letter of credit subfacility in an aggregate amount of $25 million.<br><br>The Exit ABL Facility has a letter of credit subfacility in an aggregate amount of $40 million.<br><br>**(DIP/Exit Revolving Credit Agmt. at definitions of "L/C Commitment" and § 2.23)** |
| **Funding Conditions** | Customary borrowing conditions, including: (i) the Debtors shall have begun solicitation in respect of the Approved Plan of Reorganization and the Plan Support Agreement shall be in full force and effect; (ii) entry of the Interim Order within five (5) days of the Debtors filing these chapter 11 cases (or such later date as agreed to by the Required Lenders); (iii) the DIP Agent shall have received and be reasonably satisfied with the Thirteen Week Forecast and have received a Borrowing Base Certificate as of April 30, 2012; (iv) since December 31, 2011, there has been no event or occurrence that has had a Material Adverse Effect; (v) delivery of required guarantees and customary opinions of counsel to the Borrowers; and (vi) payment of all reasonable and documented out-of-pocket fees and expenses due and owing pursuant to the DIP/Exit Loan Agreements.<br><br>**(DIP/Exit Revolving Credit Agmt. at §§ 4.01, 4.02; DIP/Exit Term Loan Agmt. at §§ 4.01, 4.02)** |
| **Fees** | **Unused Commitment**: A non-refundable unused commitment fee at the rate of (i) 0.375% per annum in the event that average Facility Usage is at least 50% of the ABL Facility and (ii) 0.50% in the event that average Facility Usage is less than 50% of the ABL Facility, which in each case, will accrue as a percentage of the daily average unused portion of the ABL Facility (whether or not then available), payable monthly in arrears and on the Maturity Date.<br><br>**Letter of Credit Fees**: A percentage per annum equal to the Applicable Margin for LIBO Rate Loans under the ABL Facility to the Lenders and 0.25% per annum to the applicable Issuer will accrue on the outstanding undrawn amount of any Letter of Credit, payable monthly in arrears and computed on a 360-day basis. In addition, the Borrowers will pay to the applicable Issuer standard opening, amendment, presentation, wire and other administration charges applicable to each Letter of Credit.<br><br>During the continuance of a payment default or a bankruptcy event of |

| OVERVIEW OF THE POSTPETITION AND EXIT FINANCING | |
| --- | --- |
| | default, the Letter of Credit Fees will increase by an additional 2% per annum. <br><br> **Upfront and Other Arrangement Fees**:  As provided for in the Fee Letters attached hereto in redacted form as Exhibits E and F. <br><br> **(DIP/Exit Revolving Credit Agmt. at § 2.05; DIP/Exit Term Loan Agmt. at § 2.05)** |
| **Liens and Priorities of DIP Obligations** | **Liens**:  The obligations under the DIP Facility will have, subject to the Carve-Out, a first priority senior security interest in and lien upon all pre- and post-petition property of the Debtors, other than Excluded Assets (as defined in the DIP/Exit Documents), whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (including, upon entry of the Final Order, proceeds from Avoidance Actions). <br><br> In addition, such obligations will have, subject to the Carve-Out, a first priority senior priming security interest in and lien upon substantially all pre- and post-petition property of the Debtors, other than Excluded Assets (as defined in the DIP/Exit Documents), whether now existing or hereafter acquired, that is subject to the existing liens presently held by any of the Prepetition Secured Creditors. <br><br> Lastly, such obligations will have a security interest in and lien, subject to the Carve-Out, upon all pre- and post-petition property of the Debtors, other than Excluded Assets (as defined in the DIP/Exit Documents), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date, or to any valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code. <br><br> **Priorities**:  The obligations under the DIP Facility will constitute superpriority administrative expenses in the Debtors' chapter 11 cases. <br><br> **(DIP/Exit Revolving Credit Agmt, at § 2.26; DIP/Exit Term Loan Agmt, at § 2.26; Interim Order at ¶ 4, 16)** |
| **Carve-Out** | **Carve-Out**:  The Carve-Out applies to U.S. Trustee fees, all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not exceeding $250,000, professional fees of the Debtors and the official committee of unsecured creditors (if any) incurred prior to the occurrence of an Event of Default and professional fees of the Debtors and the official committee of |

| **OVERVIEW OF THE POSTPETITION AND EXIT FINANCING** | |
|---|---|
| | unsecured creditors (if any) incurred after an Event of Default up to an additional $5 million. **(Interim Order at ¶ 18; DIP/Exit Revolving Credit Agmt. at definition of "Carve-Out"; DIP/Exit Term Loan Agmt. at definition of "Carve-Out")** |
| **Adequate Protection** | The Prepetition Secured Creditors whose liens will be primed as described above, and whose cash collateral will be authorized for use by the Loan Parties, will be entitled to receive as adequate protection the following:<br><br>(A) a replacement security interest in and lien upon all the DIP Collateral, subject and subordinate only to (i) the DIP Liens, (ii) with respect to the Prepetition Senior Secured Notes Collateral, except as otherwise provided by the Prepetition Intercreditor Agreement, the Liens of the Prepetition Senior Secured Notes Trustee, (iii) with respect to the Prepetition Loan Collateral, except as otherwise provided by the Prepetition Intercreditor Agreement, the Liens of the Prepetition Agent, (iv) a valid, enforceable, perfected and unavoidable Lien of Prepetition L/C Bank in connection with a cash collateral account with HMHP (the "**Prepetition L/C Bank Collateral**") pursuant to the Prepetition L/C Facility, (v) all valid, enforceable, perfected and unavoidable liens on all of the Debtors' assets and property in existence as of the Petition Date or duly perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and (vi) the Carve-Out (the "**Adequate Protection Liens**");<br><br>(B) administrative claims as provided for in section 507(b) of the Bankruptcy Code, junior to the Superpriority Claim and the Carve-Out;<br><br>(C) the payment, when due or as soon as practicable thereafter, of all reasonable and documented costs, fees and expenses incurred either prior to or after the Petition Date of (x) the Prepetition Agent and its counsel, (y) the Prepetition Senior Secured Notes Trustee and its counsel, and (z) the Informal Creditor Group and its advisors (in accordance with the terms of the applicable prepetition engagement letters), in each case, incurred in connection with the Debtors, the Cases or the transactions contemplated hereby; and<br><br>(D) Adequate Protection Payments in the aggregate amount of $69,700,000, which will be allocated on a ratable basis and indefeasibly paid on the Closing Date (as defined in the DIP/Exit Loan Agreements) as follows: (i) 6.19% to the Prepetition Agent to adequately protect the interests of holders of the Revolving Loans (as defined in the Prepetition First Lien Credit Agreement) under the Prepetition First Lien Credit Agreement, (ii) 67.55% to the Prepetition Agent to adequately protect the |

| OVERVIEW OF THE POSTPETITION AND EXIT FINANCING | |
| --- | --- |
| | interests of holders of the Term Loans (as defined in the Prepetition First Lien Credit Agreement) under the Prepetition First Lien Credit Agreement, and (iii) 26.26% to the Prepetition Senior Secured Notes Trustee to adequately protect the interests of the Prepetition Senior Secured Noteholders under the Prepetition Senior Secured Notes Indenture.<br><br>**(Interim Order at ¶ 11)** |
| **Covenants** | **Financial Covenants**: The DIP/Exit Documents contain the following financial covenants (which will be applicable to the Borrowers, the Guarantors and their respective restricted subsidiaries):<br><br>In the case of the ABL Facility:<br><br>Prior to the Exit Facility Conversion Date:<br><br>A. Consolidated EBITDA as of the end of each calendar month, shall not be less than (i) for each month that occurs during the fiscal quarter ending June 30, 2012, $180,000,000, and (ii) for each month that occurs thereafter, $200,000,000.<br><br>B. Liquidity (defined to include unrestricted cash, cash equivalents and Availability) shall not be less than $50,000,000 for three consecutive business days.<br><br>C. Availability shall not be less than $20,000,000 at any time.<br><br>After the Exit Facility Conversion Date:<br><br>In the case of the ABL Facility, at any time during the period that Availability is less than (x) the Availability Limit (defined as the greater of $31,250,000 and 15% of the lesser of the total commitments and borrowing base, with an exception during a certain season after the Exit Facility Conversion Date) for a period of at least three consecutive business days or (y) $20,000,000 until Availability is greater than $35,000,000 for 30 consecutive calendar days, a fixed charge coverage ratio of 1.0:1.0.<br><br>In the case of the Term Loan Facility:<br><br>Prior to the Exit Facility Conversion Date:<br><br>Consolidated EBITDA as of the end of each calendar month, shall not be less than (i) for each month that occurs during the fiscal quarter ending June 30, 2012, $180,000,000, and (ii) for each month that occurs |

## OVERVIEW OF THE POSTPETITION AND EXIT FINANCING

thereafter, $200,000,000.

After the Exit Facility Conversion Date:

A. A maximum ratio of total debt of the Borrowers and their subsidiaries to Consolidated EBITDA of the Borrowers and their subsidiaries (the "**Leverage Ratio**"), to be tested quarterly.

B. A minimum ratio of Consolidated EBITDA of the Borrowers and their subsidiaries to cash interest expense (net of cash interest income) of the Borrowers and their subsidiaries, to be tested quarterly.

**Affirmative Covenants**: Customary affirmative covenants, including, among other things: (i) preservation of corporate existence; (ii) compliance with laws (including ERISA and applicable environmental laws); (iii) conduct of business; (iv) payment of taxes; (v) maintenance of insurance; (vi) access to books and records and visitation rights and maintenance of books and records; (vii) maintenance of properties; (viii) use of proceeds; (ix) provision of additional collateral, guarantees and mortgages, (x) further assurances; (xi) satisfaction of Milestones; (xii) until the Exit Facility Conversion Date, maintenance of the effectiveness and compliance with any Plan Support Agreement, and use of commercially reasonable efforts to obtain Bankruptcy Court approval and confirmation of the Approved Plan or Reorganization and the consummation of the transactions therein; (xiii) until the Exit Facility Conversion Date, if an Event of Default shall have occurred and be continuing, at the request of the Administrative Agent, use of commercially reasonable efforts to consummate a sale of its assets and pay in full the outstanding obligations under the DIP/Exit Facilities and to obtain Bankruptcy Court approval thereof; (xiv) the Borrowers shall use commercially reasonable efforts to obtain, on or prior to the Exit Facility Conversion Date (or as soon as practicable thereafter), (a) a public corporate family rating from (i) Standard & Poor's rating service or Fitch Ratings service and (ii) Moody's Investor Services, Inc. and (b) in the case of the Exit Term Loan Facility, a public credit rating from (i) Standard & Poor's rating service or Fitch Ratings service and (ii) Moody's Investor Services, Inc., and (xv) delivery of financial statements and reports.

**Negative Covenants**: Among other things, there are limitations on debt, guarantees and liens, loans and investments, asset dispositions, dividends, redemptions and repurchases with respect to capital stock, and material changes in business, subject to exceptions set forth in the DIP/Exit Loan Agreements, as applicable. The Debtors also are limited

| OVERVIEW OF THE POSTPETITION AND EXIT FINANCING | |
| --- | --- |
| | in effecting mergers or transactions with affiliates, sales and sale leaseback transactions, and payments to subsidiaries.<br><br>**(DIP/Exit Revolving Credit Agmt. Article V and VI; DIP/Exit Term Loan Agmt. Article V and VI)** |
| **Events of Default** | The DIP/Exit Loan Agreements contain certain customary Events of Default, including the following: (a) failure to (i) pay principal or (ii) interest or any other amount when due under the DIP Facility within 3 business days, (b) representations and warranties false or misleading in any material respect when given, (c) failure to comply with covenants (subject to cure periods in the case of certain covenants), (d) cross-default to payment defaults, or default or event of default if the effect is to accelerate or permit acceleration with respect to indebtedness in excess of $35,000,000, (e) failure to satisfy or stay execution of judgments in excess of $35,000,000 or injunctive relief that could reasonably be expected to have a Material Adverse Effect, (f) bankruptcy or insolvency (limited to the Borrowers' material subsidiaries that are not debtors in the Cases when applied prior to the Exit Facility Conversion Date), (g) the occurrence of certain ERISA events that result in liabilities that could reasonably be expected to have a Material Adverse Effect, (h) actual or asserted (by any Loan Party or any affiliate thereof) invalidity or impairment of any Loan Document (including the failure of any lien to remain perfected), (i) change of ownership or control.<br><br>Events of Default prior to the Exit Facility Conversion Date include the following:<br><br>(a) the entry of an order dismissing any of the Cases or converting any of the Cases to a case under chapter 7 of the Bankruptcy Code;<br><br>(b) the entry of an order appointing a chapter 11 trustee in any of the Cases;<br><br>(c) the entry of an order in any of the Cases appointing an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code);<br><br>(d) the entry of an order in any of the Cases denying or terminating use of cash collateral by the Loan Parties;<br><br>(e) the filing of any pleading by any Loan Party seeking, or otherwise consenting to, any of the matters set forth in clauses (a) through (d) |

## OVERVIEW OF THE POSTPETITION AND EXIT FINANCING

above;

(f) (i) an amendment, supplement or other modification shall have been made to, or a consent or waiver shall have been granted with respect to any departure by any person from the provisions of, the Approved Plan of Reorganization, in each case, that is materially adverse to the Administrative Agent's or the Lenders' interests or inconsistent with the DIP/Exit Documents, (ii) the Loan Parties shall have commenced or participated in furtherance of any solicitation in respect of a proposed plan or reorganization other than the Approved Plan of Reorganization, (iii) the Bankruptcy Court shall terminate or reduce the period pursuant to section 1121 of the Bankruptcy Code during which the Loan Parties have the exclusive right to file a plan of reorganization and solicit acceptances thereof, (iv) the Bankruptcy Court shall grant relief that is inconsistent with the Approved Plan of Reorganization in any material respect and that is materially adverse to the Administrative Agent's or the Lenders' interests or inconsistent with the DIP/Exit Documents or (v) any of the Loan Parties or any of their affiliates shall file any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with the Approved Plan of Reorganization or any Plan Support Agreement and such motion or pleading has not been withdrawn prior to the earlier of (A) three business days of the Borrowers receiving notice from the Administrative Agent and (B) entry of an order of the Bankruptcy Court approving such motion or pleading;

(g) the entry of the Final Order shall not have occurred within 60 days after entry of the Interim Order (or such later date as approved by the Requisite Lenders), or there shall be a breach by any Loan Party of any material provisions of the Interim Order (prior to entry of the Final Order) or the Final Order, or the Interim Order (prior to entry of the Final Order) or Final Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any modification or amendment, without the prior written consent of Administrative Agent and Requisite Lenders;

(h) the entry of an order in the Cases charging any of the Collateral under section 506(c) of the Bankruptcy Code against the Lenders under which any person takes action against the Collateral or that becomes a final non-appealable order, or the commencement of other actions that are materially adverse to the Administrative Agent, the Lenders or their respective rights and remedies under the DIP/Exit Facilities in any of the Cases or inconsistent with the DIP/Exit Documents;

(i) the entry of an order granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third

## OVERVIEW OF THE POSTPETITION AND EXIT FINANCING

party to proceed with foreclosure (or granting of a deed in lieu of foreclosure) against any material assets of the Loan Parties in excess of $35,000,000;

(j) existence of any claims or charges, other than in respect of the DIP/Exit Facilities or as otherwise permitted under the DIP/Exit Documents, entitled to superpriority under section 364(c)(1) of the Bankruptcy Code *pari passu* or senior to the DIP Facility, or there shall arise (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code (other than the Carve-Out) or (ii) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except as expressly provided in the Credit Agreements or in the Interim Order or the Final Order (but only in the event specifically consented to by the Administrative Agent), whichever is in effect;

(k) the Loan Parties or any of their subsidiaries, or any person claiming by or through the Loan Parties any of their subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent or any of the Lenders relating to the DIP Facility, unless such suit or other proceeding is in connection with the enforcement of the DIP/Exit Documents against the Administrative Agent or Lenders, and the order confirming the Approved Plan of Reorganization provides that any such suit or proceeding shall be dismissed with prejudice;

(l) failure to satisfy any of the Milestones in accordance with the terms relating to such Milestone;

(m) after the entry thereof by the Bankruptcy Court, the Confirmation Order shall cease to be in full force and effect, or any Loan Party shall fail to satisfy in full all obligations under the DIP Facility (or convert the DIP Facility into the Exit Facility) on or prior to the effective date of the Approved Plan of Reorganization or fail to comply in any material respect with the Confirmation Order, or the Confirmation Order shall have been revoked, remanded, vacated, reversed, rescinded or modified or amended in any manner that is adverse to the Administrative Agent's or the Lenders' interests or inconsistent with the DIP/Exit Documents; or

(n) any Plan Support Agreement (i) shall be terminated or breached by any party thereto or shall otherwise cease to be in full force and effect

| OVERVIEW OF THE POSTPETITION AND EXIT FINANCING | |
|---|---|
| | such that, in each case, the Approved Plan of Reorganization is not capable of being confirmed by the Bankruptcy Court, or (ii) shall have been amended, supplemented or otherwise modified in any manner that materially adversely affects the interests, rights or remedies of any of the Administrative Agent, the Arranger and the Lenders. |
| | **Remedies Upon an Event of Default**:  Upon the occurrence of a DIP Order Event of Default and at any time thereafter during the continuance thereof, with five business days' prior written notice (an "**Enforcement Notice**") of any such occurrence, in each case given to the Debtors and their counsel, counsel to the Informal Creditor Group, the Prepetition Agent and its counsel, the Prepetition Senior Secured Notes Trustee and its counsel, counsel to the Committee, and the U.S. Trustee, the DIP Agent will be entitled to exercise the DIP Agent's rights and remedies as set forth in the DIP/Exit Documents or under applicable law.  Any Enforcement Notice will also be filed with the Bankruptcy Court.  The Interim Order will not prejudice the rights of any party-in-interest to oppose the exercise of the DIP Agent's or the DIP Lenders' remedies; *provided* that the only issue that may be raised by any party in opposition thereto shall be whether a DIP Order Event of Default has in fact occurred and is continuing, and the Debtors hereby waive their right to seek any relief, whether under section 105 of the Bankruptcy Code or otherwise, that would in any way impair, limit or restrict, or delay the exercise or benefit of, the rights and remedies of the DIP Agent or the DIP Lenders under the DIP/Exit Loan Agreements or the Interim Order.  **(DIP/Exit Revolving Credit Agmt. at § 7.01; DIP/Exit Term Loan Agmt. at § 7.01; Interim Order ¶ 25)** |
| **Change of Control** | The occurrence of certain changes to the ownership or control of the Company constitutes an Event of Default under the DIP Agreement.  **(DIP/Exit Revolving Credit Agmt. at § 7.01(m); DIP/Exit Term Loan Agmt. at § 7.01(m))** |
| **Milestones** | Compliance with restructuring milestones related to the Debtors' chapter 11 cases within the time periods set forth in DIP/Exit Loan Agreements (or such later dates as approved by the Required Lenders), as follows:  (a) within 5 days following the Petition Date, entry by the Bankruptcy Court of the Interim Order;  (b) within 60 days following the entry by the Bankruptcy Court of the Interim Order, entry by the Bankruptcy Court of the Final Order;  (c) within 90 days following the Petition Date, entry by the Bankruptcy |

| OVERVIEW OF THE POSTPETITION AND EXIT FINANCING | |
|---|---|
| | Court of the Confirmation Order; and<br><br>(d) no later than 120 days following the Petition Date, the Approved Plan of Reorganization shall be effective.<br><br>**(DIP/Exit Revolving Credit Agmt. at § 5.16; DIP/Exit Term Loan Agmt. at § 5.15)** |
| **Repayment** | Optional termination or reduction of the Commitments by the Debtors is permitted.<br><br>In the case of the Term Loan Facility, any optional prepayment in connection with a refinancing or repricing that occurs on or prior to the first anniversary of the Closing Date  is subject to a 1% prepayment premium.<br><br>In addition, Mandatory prepayments of the Loans (and cash collateralization of outstanding Letters of Credit) shall be required as follows:<br><br>(a) in the case of the ABL Facility, if the Facility Usage exceeds Availability, a prepayment of the ABL Facility in a corresponding amount (without a reduction in commitments under the ABL Facility);<br><br>(b) (i) with 100% of the net cash proceeds received from sales or casualty events of any Collateral (excluding sales of inventory in the ordinary course of business and other exceptions to be agreed) above a threshold to be agreed (net of amounts reinvested in replacement assets within 180 days), (ii) 100% of the net proceeds of issuances, offerings or placement of debt obligations of the Loan Parties (other than permitted debt), in the case of clauses (i) and (ii), other than proceeds received with respect to events prior to the Petition Date, and (iii) commencing with the first full fiscal year following the Closing Date, 50% of excess cash flow; *provided* that commencing with fiscal year 2014, if the Leverage Ratio at the end of a fiscal year is less than 0.75:1.00, no mandatory prepayment shall be required with respect to the excess cash flow of such fiscal year. Mandatory prepayments of the Credit Facilities as described in this clause (b) shall be applied to repay outstanding Term Loans ratably and to the scheduled amortization payments in respect thereof in order of maturity; and<br><br>(c) in the event that on or before the 60th day following the entry of the Interim Order, the Final Order has not been entered, a prepayment of the Credit Facilities in an amount equal to the aggregate amount of DIP Loans outstanding and all other amounts owed thereunder on such date |

| OVERVIEW OF THE POSTPETITION AND EXIT FINANCING | |
|---|---|
| | (the "**Final Order Prepayment**").<br><br>**(DIP/Exit Revolving Credit Agmt; §§ 2.12; 2.13; DIP/Exit Term Loan Agmt; §§ 2.12; 2.13)** |
| **Joint Liability** | Each of the Company and each US Subsidiary Guarantor, jointly and severally, agrees that they will be jointly and severally liable for all the Obligations, including the principal of and interest on all Loans made to, and reimbursement obligations in respect of Letters of Credit issues for the accounts of, any Borrower and Other Secured Obligations.<br><br>**(DIP/Exit Revolving Credit Agmt. at § 9.18; DIP/Exit Term Loan Agmt. at § 9.18)** |
| **Non-Debtor Affiliates** | Investments made by Loan Parties in Holdings or Restricted Subsidiaries of the Company that are not Loan Parties are not to exceed $25 million in any fiscal year; provided that, for purposes of determining compliance with the foregoing annual limitation as of any date, the amount of each Investment made on or prior to such date that is subject to such limitation shall be deemed reduced (to not less than zero) by the aggregate amount of cash, dividends or other distributions returned to the applicable Loan Party in respect of such Investment prior to the date of determination.<br><br>**(DIP/Exit Revolving Credit Agmt. at § 6.04; DIP/Exit Term Loan Agmt. at § 6.04)** |
| **Automatic Stay** | It is an Event of Default under the DIP Facility if the Bankruptcy Court enters an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code so as to allow a third party to proceed with foreclosure (or granting a deed in lieu of foreclosure) against any material assets of the Loan Parties in excess of $35,000,000 in the aggregate.<br><br>**(DIP/Exit Revolving Credit Agmt. at § 7.01(n)(ix); DIP/Exit Term Loan Agmt. at § 7.01(n)(ix))**<br><br>Upon five business days' notice, in the absence of a determination by the Bankruptcy Court that a DIP Order Event of Default has not occurred or is not continuing or unless otherwise ordered by the Court, the automatic stay is modified to permit the DIP Agent to exercise the DIP Agent's rights and remedies as set forth in the DIP/Exit Documents or under applicable law.<br><br>**(Interim Order at ¶ 25)** |

| OVERVIEW OF THE POSTPETITION AND EXIT FINANCING | |
|---|---|
| **Waivers and Consents** | **Estate Claims**: Debtors stipulate as to the validity of the Prepetition Secured Indebtedness and release all claims, defenses or causes of action pertaining to it, including any right to seek avoidance of the debt. Notwithstanding the foregoing, the Committee, if any, shall have a budget not to exceed $75,000 for the investigation, but not the prosecution, of claims and issues with respect to the Prepetition Existing Liens. **(Interim Order at ¶¶ F(iii), 30)** |
| | **Indemnification**: The Company agrees to indemnify and hold harmless the Administrative Agent, the Collateral Agent, each Issuing Bank and each Lender and each of their Related Parties (as such terms are defined in the DIP/Exit Loan Agreements) in connection with or as a result of the execution or delivery of the DIP/Exit Loan Agreements (as more fully described in the DIP/Exit Loan Agreements). **(DIP/Exit Revolving Credit Agmt. at § 9.05; DIP/Exit Term Loan Agmt. at § 9.05)** |
| | **Section 506(c)**: Upon entry of the Final Order, subject to the Carve-Out, no costs or expenses of administration of the Debtors' cases or any future proceedings shall be recovered from the DIP Collateral, the Cash Collateral or the Prepetition Secured Indebtedness Collateral pursuant to section 506(c) of the Bankruptcy Code. **(Interim Order at ¶ 19; DIP/Exit Revolving Credit Agmt. at § 2.26; DIP/Exit Term Loan Agmt. at § 2.26)** |
| | **No Marshaling/Section 552(b)**: In no event shall the DIP Agent, the DIP Secured Parties, the Prepetition Agent, the Prepetition Senior Secured Notes Trustee or the Prepetition Secured Creditors be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Secured Indebtedness Collateral, as applicable. Further, in no event shall the "equities of the case" exception of section 552(b) of the Bankruptcy Code apply to the Prepetition Existing Liens and security interest of the Prepetition Agent, the Prepetition Senior Secured Notes Trustee or the Prepetition Secured Creditors. **(Interim Order at ¶ 25)** |
| **Granting Liens on Certain Causes of Action** | The Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code are excluded from the Collateral, however, upon entry of the Final Order, the proceeds or property recovered by final judgment, settlement or otherwise is included in the lien granted to the DIP Agent for its own benefit and the benefit of the DIP Lenders.<br><br>**(Interim Order at ¶ 4(d))** |

## BASIS FOR RELIEF

38.     As set forth above and in the Bayers Declaration and the Baird Declaration

filed in support of the Motion, the Debtors believe that DIP/Exit Facilities are the best financing

available to the Debtors at this time.  The Debtors have been unable to procure sufficient

financing (a) in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy

Code, or (b) solely as an administrative expense under section 364(a)-(b) of the Bankruptcy

Code.  *See* Baird Decl. ¶ 22.  Moreover, the other financing alternatives considered had either

more onerous terms, less certainty, or both.  Therefore, for the reasons stated herein, the Debtors

submit that they have satisfied the requirements to access postpetition financing on a

superpriority, secured basis pursuant to section 364 of the Bankruptcy Code.  Importantly, the

Informal Creditor Group has consented to the terms of the DIP/Exit Facilities.

39.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining

unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the

ordinary course of business and (c) obtaining credit with specialized priority or with security.  If

a debtor in possession cannot obtain sufficient postpetition credit on an unsecured basis, section

364(c) of the Bankruptcy Code permits a bankruptcy court to authorize a debtor to obtain credit

or incur debt, repayment of which is (x) entitled to superpriority administrative expense status or

(y) is secured by a senior lien on unencumbered property or a junior lien on encumbered

property, or both.  Furthermore, section 364(d) of the Bankruptcy Code permits a bankruptcy

court to authorize a debtor to obtain postpetition credit secured by a senior or equal lien on

encumbered property (*i.e.*, a priming lien) when a debtor is unable to obtain credit elsewhere and

the interests of existing lienholders are adequately protected.  11 U.S.C. §§ 364(c), (d).

40.     As discussed, the DIP/Exit Facilities are secured by substantially all of the assets of the Debtors' estates through superpriority claims, security interests, and secured liens pursuant to section 364.

**A.      The Debtors Should be Authorized to Obtain Postpetition
Financing Under Section 364(c) of the Bankruptcy Code**

41.     Section 364(c) of the Bankruptcy Code provides that if a debtor is unable to obtain unsecured credit allowable as an administrative expense, the court may authorize the debtor to obtain credit or incur debt (a) on a superpriority administrative basis, (b) secured by a lien on the debtor's unencumbered assets, or (c) secured by a junior lien on the debtor's already encumbered assets.  11 U.S.C. § 364(c).  Section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-29 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code).

42.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

(a)     the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative claim;

(b)     the credit transaction is necessary to preserve the assets of the estate; and

(c)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Ames Dep't Stores*, 115 B.R. at 37-39.

43.     The Debtors propose to obtain the financing set forth in the DIP/Exit

Agreements by providing, among other things, superpriority claims, security interests, and liens

pursuant to sections 364(c)(1) – (3) and section 364(d) of the Bankruptcy Code.  For the reasons

set forth below, the Debtors submit that entry into the DIP/Exit Facilities satisfies each of these

factors.

      i.     **The Debtors Could Not Obtain Unsecured Financing**

44.     To show that the credit required is not obtainable on an unsecured basis, a

debtor need only demonstrate "by a good faith effort that credit was not available without" the

protections of sections 364(c) of the Bankruptcy Code.  *Bray v. Shenandoah Fed. Sav. And Loan

Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes

no duty to seek credit from every possible lender before concluding that such credit is

unavailable." *Id., see also In re Ames Dep't Stores*, 115 B.R. at 40 (holding that debtor made a

reasonable effort to secure financing where it approached four lending institutions, was rejected

by two, and selected the least onerous financing option from the remaining two lenders).

45.     As set forth above and in the Baird Declaration, prepetition, the Debtors

endeavored to identify potential sources of postpetition financing.  In the months leading up to

the Petition Date, the Debtors and Blackstone discussed debtor-in-possession and exit financing

with the Debtors' existing constituents and also approached several additional lenders active in

the debtor-in-possession and exit financing market, all of which have more than adequate

financial resources to make a debtor-in-possession and exit financing facility available to the

Debtors.  Through these efforts, the Debtors and Blackstone effectively approached many of the

major institutions that have experience providing financing in a distressed context.

46.     After discussions with several potential lenders, consideration of the three

proposals for debtor-in-possession and exit financing, and consultation with the Debtors'

financial advisor, the Debtors have determined that adequate postpetition financing of the type

and magnitude required for these chapter 11 cases is not available on an unsecured basis or on a

junior priority basis to the Prepetition Secured Creditors. Baird Decl. ¶ 22.  Given the magnitude

of the financing required, the complexity of the Debtors' businesses, their restructuring efforts

and the immediacy of the Debtors' financing needs, the Debtors determined that it would not be

productive to solicit interest from additional lenders.

47.    Without postpetition financing, the Debtors would be unable to operate

their businesses as a going concern, which would significantly impair the value of the Debtors'

assets to the detriment of all constituents.   Bayers Decl. ¶¶ 91-92.  Furthermore, by obtaining

postpetition financing, the Debtors will be in a position to preserve the value of their assets for

the benefit of all of the Debtors' stakeholders. *Id.*  The Informal Creditor Group, representing

over 66 2/3% of the aggregate Prepetition Secured Indebtedness, agrees with the Debtors'

assessment that approval of the DIP/Exit Documents is in the best interests of the Debtors and

their creditors, in exchange for the adequate protection to be provided to the Prepetition Secured

Creditors, and has consented to the relief requested herein.  *Id.* at ¶ 89.  Finally, the terms of the

DIP/Exit Facilities, including various commitment and agency fees thereunder, are fair,

reasonable and adequate given the Debtors' circumstances, as more fully set forth below.  *Id.*;

Baird Decl. ¶ 26.

### ii.    Entry Into the DIP/Exit Facilities Is Necessary to Preserve Assets of the Estates and Is In the Best Interests of Creditors.

48.    A debtor's decision to enter into a postpetition lending facility under

section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See In re*

*Barbara K. Enters., Inc.*, 2008 WL 2439649 at *14 (Bankr. S.D.N.Y.  Mar. 5, 2009) (explaining

that courts defer to a debtor's business judgment); *Ames Dep't Stores*, 115 B.R. at 38 (noting that

financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment). Courts grant a debtor considerable deference in acting in accordance with its sound business judgment. *See, e.g., Barbara K. Enters.,* 2008 WL 2439649 at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to any party in interest.").

49.     To determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Dura Auto. Sys., Inc.,* No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (*quoting In re Exide Techs.,* 340 B.R. 222, 239 (Bankr. D. Del. 2006).

50.     The Debtors' decision to enter into the DIP/Exit Loan Agreements is the culmination of an extensive process the goal of which was to procure the best available financing under the circumstances. Ultimately, the Debtors' decision to enter into the DIP/Exit Loan Agreements is clearly the best option available to the Debtors and entry of the DIP Orders is in the best interests of the Debtors, their estates and their stakeholders.

51.     The Debtors' decision to enter into the proposed DIP/Exit Loan Agreements is an exercise of their sound judgment that warrants approval by the Court. The Debtors' management, Board of Directors and professionals have reviewed their restructuring alternatives in detail over the past several months and have explored various alternative sources of capital and financing as part of this process, including the DIP/Exit Facilities. The Debtors' management took the steps they deemed necessary and exercised their best business judgment in negotiating the DIP/Exit Facilities. The Debtors management and the Board of Directors

ultimately concluded that the DIP/Exit Facilities will provide immediate access to capital to pay

vendors and employees, establish the prudent cash balances for a business of the Debtors' size

and stabilize operations, all on more favorable terms than any other reasonably available

alternative. Bayers Decl. ¶ 90. A portion of the proceeds from the DIP/Exit Facilities will be

used to repay in full the obligations under the Prepetition Receivables Facility, satisfy working

capital requirements, and fund restructuring costs and capital expenditures. *Id.* at ¶ 88.

52.    Moreover, entry into the DIP/Exit Agreements and securing financing

thereunder is absolutely necessary to the preservation of estate assets and is in the best interest of

the Debtors' creditors and all parties in interest. Given the Debtors' significantly constrained

liquidity, the DIP/Exit Facilities is of critical importance to operating the Debtors' businesses

and preserving going concern value.

    **iii.**    **The Terms of the DIP/Exit Facilities Are Fair and Reasonable Under the Circumstances.**

53.    In determining whether the terms of postpetition financing are fair and

reasonable, courts consider the relative circumstances of both the debtor and the potential lender.

*In re Farmland*, 294 B.R. at 886-89; *see also Unsecured Creditors' Comm. Mobil Oil Corp.* v.

*First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.*), 65 B.R. 358, 364-65 n.7

(W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds

for its reorganization). Judged from that perspective, the terms of the DIP Facility are fair and

reasonable. The DIP Facility provides the Debtors the liquidity they need to operate their

business during these chapter 11 cases, thus permitting the Debtors to effectively restructure,

while establishing an appropriate cash balance for a company of this size. Bayers Decl. ¶¶ 90,

91. After thorough analysis by the Debtors and their advisors, they have concluded that the

terms of the DIP Facility are reasonable and appropriate under the circumstances. *Id.* ¶ 89; Baird Decl. ¶ 26.

54.    In that regard, the various fees and charges associated with obtaining the DIP/Exit Facilities are within the range of reasonableness. Courts recognize that lender fees often are the only way to obtain financing, and routinely approve them. *See, e.g., Resolution Trust Corp.* v. *Official Unsecured Creditors' Comm.* (*In re Defender Drug Stores, Inc.*), 145 B.R. 312, 316-19 (B.A.P. 9th Cir. 1992) (approving financing facility pursuant to section 364 of the Bankruptcy Code that included a lender "enhancement fee").

55.    Likewise, the DIP/Exit Facilities do not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. Instead, the DIP Facility subjects the security interests and administrative expense claims granted to the DIP Lenders to the Carve Out for certain administrative and professional fees, including (i) fees required to be paid to the Court and to the United States Trustee, (ii) reasonable fees and expenses incurred by a trustee up to $250,000, any allowed unpaid fees of the Debtors or the statutory committee of unsecured creditors appointed in these chapter 11 cases prior to a default and up to $5 million more following default. *See* DIP/Exit Agmts. at definition of "Carve-Out". Carve-outs for professional fees have been found to be reasonable and necessary to ensure that statutory creditors' committees and debtors' estates are adequately assisted by counsel and other professionals. *See In re Ames*, 115 B.R. at 38.

56.    For these reasons, in the Debtors' prudent business judgment, the terms of the DIP Facility are fair and reasonable in the circumstances of these cases and the Debtors could not obtain postpetition and exit financing from any other lending source.

**B.      Financing Under Section 364(d) of the Bankruptcy Code**

57.      Section 364(d)(1) of the Bankruptcy Code provides that a court may authorize a debtor to incur postpetition debt on a senior or "priming" basis if (a) the debtor is unable to obtain credit otherwise and (b) there is "adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." *See* 11 U.S.C. § 364(d)(1); *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010).

**i.      Any Available Financing Requires Priming Pursuant to Section 364(d)(1).**

58.      Courts require that a debtor have made a reasonable effort to seek credit from other sources available under section 364(a) and (b), but section 364(d) does not require an exhaustive search. *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) ("Section 364(d)(1) does not require the debtor to seek alternate financing from every possible lender. However, the debtor must make an effort to obtain credit without priming a senior lien."); *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) ("Courts have found 20 attempts [to secure funding] and 2 attempts [to secure funding] to be sufficient under the particular circumstances of each case but . . . one attempt is not sufficient.").

59.      The Debtors contacted seven potential lenders regarding debtor-in-possession financing.  Baird Decl. ¶ 16.  As detailed in the Baird Declaration, the Debtors and Blackstone engaged in vigorous arm's length negotiations that produced the best available financing option under the circumstances. *Id.* ¶¶ 16-20.  Nevertheless, none of the potential lenders was willing to commit to postpetition financing on an unsecured or junior secured basis. *Id.* ¶ 22.  Indeed, the DIP Lenders have insisted upon secured liens pursuant to section 364(d)(1).

60.     The Debtors have succeeded in securing both a fully committed term
financing and ABL revolver that meet their needs, both postpetition and after emergence from
these chapter 11 cases and, to continue their operations and preserve and maximize the value of
their estates.  The DIP/Exit Facilities are also essential to provide the Debtors' various
stakeholders, including global customers, employees, vendors, service providers and other key
constituencies, with confidence in the Debtors' ability to successfully reorganize.  *See* Bayers
Decl. ¶ 90.  Indeed, the Informal Creditor Group concurs with the Debtors' assessment that the
Debtors' entry into the DIP/Exit Documents is important to the success of the Debtors'
restructuring.  Accordingly, the Debtors submit that the priming liens contained in the DIP
Facility are appropriate under the circumstances here.

**ii.      The Debtors' Proposed Grant of Adequate Protection is Appropriate.**

61.     Adequate protection is decided on a case-by-case basis and can be
provided in various forms, including providing lump sum cash payments, periodic cash payments
and granting additional or replacement liens and administrative claims.  *In re Mosello*, 195 B.R.
277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific
inquiry . . . left to the vagaries of each case.");  *see also In re Realty Sw. Assocs.*, 140 B.R. 360
(Bankr. S.D.N.Y. 1992);  *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the
application of adequate protection "is left to the vagaries of each case, but its focus is protection
of the secured creditor from diminution in the value of its collateral during the reorganization
process") (citation omitted), *rev'd on other grounds*, 89 B.R. 336 (S.D.N.Y. 1988); *In re
Gallegos Res. Grp.*, 193 B.R. 577, 584 (Bankr. D. Colo. 1995) (stating that section 361 of the
Bankruptcy Code provides a list of nonexclusive examples of adequate protection, including
"lump sum cash payments"); *In re Pullins*, 65 B.R. 560, 563 (Bankr. S.D. Ohio 1986) (court
authorized a lump-sum adequate protection payment, emphasizing that the statute "provides that

adequate protection may take the form of *a cash payment* or periodic cash payments).   "A

finding of adequate protection should be premised on facts, or on projections grounded on a firm

evidentiary basis." *In re Mosello*, 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996).

62.     The Informal Creditor Group has consented to being primed and has

agreed to the Debtors' use of Cash Collateral and the Debtors' entry into the DIP/Exit Loan

Agreements in consideration for the adequate protection  proposed by this Motion. *See Anchor*

*Savs.  Bank* v. *Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) (consenting to imposition of a

priming lien "relieved the debtor of having to demonstrate that [the lienholders] were adequately

protected").   In accordance with section 364(d) of the Bankruptcy Code, and consistent with the

purposes underlying the provision of adequate protection, the proposed Interim Order provides

the Prepetition Secured Creditors with adequate protection, including (a) the Adequate Protection

Liens, (b) the Section 507(b) Claim, (c) payment of the fees and expenses of the Prepetition

Agent and the Prepetition Senior Secured Notes Trustee and their respective counsel and the

Informal Creditor Group and its advisors (in accordance with the terms of the applicable

engagement letters), and (d) the Adequate Protection Payments in the amount of $69.7 million,

to be paid on the Closing Date (as defined in the DIP/Exit Loan Agreements), as set forth herein

and in the Interim Order.

63.     In determining the amount of the Adequate Protection Payments, the

Debtors took into consideration, among other things, the following factors: (i) the Prepetition

First Lien Bank Lenders' agreement to forbear on interest payments in the amount of

approximately $15.1 million due on May 10, 2012, to alleviate the liquidity pressures facing the

Debtors; (ii) the amount of accrued and unpaid interest through June 30, 2012 with respect to the

Prepetition Secured Debt, which is approximately $59 million (including the $15.1 million

interest payment noted above); (iii) the Informal Creditor Group's consent to being primed by the DIP Facility and agreement to forego receipt of periodic payments during these chapter 11 cases; and (iv) the Prepetition Secured Creditors' overall consent under the Prepackaged Plan to the complete equitization of the Prepetition Indebtedness. Bayers Decl. ¶ 88. Accordingly, the Adequate Protection Payments in addition to replacement liens, the payment of reasonable and documented professional fees and expenses and the grant of administrative expense claims will sufficiently protect their interest in any Prepetition Secured Indebtedness Collateral, which is provided as security under the DIP Facility and for the use of Cash Collateral. In addition, the Interim DIP Order provides that nothing therein will, or will be deemed to, alter the rights, remedies and obligations of the Participating Company Entities (as defined in the Restructuring Support Agreement) and the Informal Creditor Group (or its members) under the Restructuring Support Agreement.

64.    Accordingly, the adequate protection proposed herein is fair and reasonable under the circumstances of these cases and is sufficient to satisfy the requirements of the Bankruptcy Code sections 363(c)(2) and (e).

**iii.    Use of Cash Collateral.**

65.    Section 363 of the Bankruptcy Code governs the Debtors' use of property of the estates. [7]  Section 363(c)(a) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under Section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

---

[7]    Pursuant to section 1107 of the Bankruptcy Code, a debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363 of the Bankruptcy Code. See 11 U.S.C. § 1107(a).

11 U.S.C. § 363(c)(1).

66.    Section 363(c)(2) of the Bankruptcy Code, however, provides an

exception with respect to "cash collateral" to the general grant of authority to use property of the

estate in the ordinary course set forth in section 363 of the Bankruptcy Code. Specifically, a

trustee or debtor-in-possession may not use, sell, or lease "cash collateral" under subsection

(c)(1) unless:

> (A)    each entity that has an interest in such collateral
> consents; or
>
> (B)    the court, after notice and a hearing, authorizes such
> use, sale, or lease in accordance with the provisions
> of this section.

11 U.S.C. § 363(c)(2).

67.    The Debtors submit that, under the circumstances here, their request to use

Cash Collateral should be approved. The Prepetition Secured Creditors and the DIP Lenders

have consented to the use of Cash Collateral provided that the relief requested herein is granted.

Absent such authority, the Debtors would not have access to any additional liquidity, which

would imperil their ability to reorganize. Accordingly, the Debtors believe that the adequate

protection proposed herein and in the Interim Order is fair and reasonable and is sufficient to

satisfy the requirements of sections 363(c) and 364(d) of the Bankruptcy Code.

**C.    The DIP Facility was Negotiated in Good Faith and Should be
Afforded the Protection of Section 364(e) of the Bankruptcy Code.**

68.    Pursuant to section 364(e) of the Bankruptcy Code, any reversal or

modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a

lien under section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred

or priority or lien granted as long as the entity that extended credit "extended such credit in good

faith." *See* 11 U.S.C. § 364(e).

69.    Courts generally hold that "good faith" in the context of postpetition

financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct

or transaction concerned. *See Unsecured Creditors' Comm.* v. *First Nat'l Bank & Trust Co. (In

re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)).

Additionally, "[g]ood faith is measured with respect to the good faith of the lender as contrasted

to that of the borrower." Transcript of Record *(Court Decision)* at 736:24-25, *In re Lyondell

Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009).  Moreover, a lender's desire to ensure

that it is repaid, to make money on interest and fees and to protect prepetition positions are

understandable and acceptable motivations for a postpetition lender in negotiating a deal. *Id.* at

737:6-14.

70.    As explained in detail herein, the terms of the DIP/Exit Facilities were

extensively negotiated at arm's length and reflect the most advantageous terms (including

availability, pricing, fees and covenant flexibility) available to the Debtors in light of their

financial circumstances and the current volatile credit market. *See* Bayers Decl. ¶ 89.

Ultimately, after difficult arm's length negotiations, the Debtors succeeded in obtaining the

DIP/Exit Facilities in an amount sufficient for the Debtors' working capital needs.  Bayers Decl.

¶¶ 90; Baird Decl. ¶ 20.

71.    All of the DIP/Exit Facilities obligations will be extended by the DIP

Lenders in good faith (as such term is used in section 364(e) of the Bankruptcy Code).  No

consideration is being provided to any party to, or guarantor of, obligations arising under the

DIP/Exit Facilities, other than as set forth herein and in the Interim Order.  Moreover, the

DIP/Exit Facilities have been extended in express reliance upon the protections offered by

section 364(e) of the Bankruptcy Code, and each DIP Lender should be entitled to the full

protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any

provision thereof is vacated, reversed, or modified on appeal or otherwise.

**D.    Approval of the DIP/Exit Facilities on an Interim Basis is
Necessary to Prevent Immediate and Irreparable Harm.**

72.    Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining

authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to
> obtain credit no earlier than 14 days after service of the motion. If the
> motion so requests, the court may conduct a hearing before such 14 day
> period expires, but the court may authorize the obtaining of credit only to
> the extent necessary to avoid immediate and irreparable harm to the estate
> pending a final hearing.

FED. R. BANKR. P. 4001(c)(2).

73.    Similarly, to the extent the Debtors are seeking authority to sell, use or

otherwise incur an obligation regarding property of their estates, Bankruptcy Rule 6003 provides

that the Court may only grant such relief to the extent it is necessary to avoid immediate and

irreparable harm. FED. R. BANKR. P. 6003(b).

74.    Generally, courts find "immediate and irreparable harm" exists where loss

of the business threatens the ability to reorganize. *See In re Ames Dep't Stores, Inc.*, 115 B.R.

34, 36 n.2 (Bankr. S.D.N.Y. 1990). Approval of a DIP facility on an interim basis under

Bankruptcy Rule 4001(c)(2) is left to the discretion of the court as informed by the facts of each

case. *See In re Pan Am Corp.*, No. 91-8319, 1992 WL 154200, at *6 (S.D.N.Y. June 18, 1992).

There is no limit to the amount of funding that the court can approve on an interim basis. *Id.*

After the 14-day period, the request for financing is not limited to those amounts necessary to

prevent the destruction of the debtor's business, and the debtor is entitled to borrow those

amounts that it believes are prudent to the operation of its business. *Ames Dept. Stores*, 115 B.R.

at 36.

75.    Immediate and irreparable harm would result if the relief requested herein were not granted on an interim basis. As described in the Bayers Declaration, the Debtors need to obtain immediate access to liquidity under the DIP/Exit Facilities in order to, among other things, continue the operation of their businesses, maintain business relationships with vendors and customers, make payroll and capital expenditures, satisfy other working capital and operational needs, and make the Adequate Protection Payments required under the terms of the Restructuring Support Agreement. Bayers Decl. ¶ 88. Without immediate financing, stakeholders would likely lose confidence in the Debtors, thereby causing irreparable harm to the Debtors' brand. *Id.* at ¶ 92. Funding each of these expenditures is necessary to the Debtors' ability to preserve and maintain their going-concern value for the benefit of all parties in interest. *Id.*

76.    The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this District in similar circumstances. *See, e.g.*, *In re Hostess Brands*, No. 12-22052 (Bankr. S.D.N.Y. Jan. 12, 2012) (order approving postpetition financing on an interim basis); *In re Chemtura Corp.*, No. 09-11233 (Bankr. S.D.N.Y. March 20, 2009) (same); *In re Tronox Inc.*, No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009) (same); *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009) (same); *In re Lenox Sales, Inc.*, No. 08-14679 (Bankr. S.D.N.Y. Nov. 25, 2008) (same); *In re Wellman, Inc.*, No. 08-10595 (Bankr. S.D.N.Y. Feb. 27, 2008) (same).

77.    Accordingly, the Debtors believe that, under the circumstances, entry of the Interim Order is necessary to prevent immediate and irreparable harm to the estates and therefore is justified under Bankruptcy Rule 4001(c)(2).

**E.**  **Request to File Fee Letters in Redacted Form.**

78.    As consideration for the DIP Agent's agreements in connection with the

DIP Facility, the Debtors have agreed to pay the fees set forth in the following Fee Letters:  (i) a

fee letter dated May 10, 2012, by and among HMHP, Publishers, HMCo and Citigroup Global

Markets Inc. ("**CGMI**"), an affiliate of the DIP Agent; and (ii) an agency fee letter, dated May

10, 2012, by and among HMHP, Publishers, HMCo, and CGMI.  See <u>Exhibit E</u> and <u>F</u>, attached

hereto.  The Fee Letters contain sensitive, confidential commercial information regarding, *inter*

*alia*, the "flex rights" relating to the DIP/Exit Facilities.  *See* Baird Decl. ¶ 28.  In addition,

Exhibit E contains sensitive, confidential commercial information in the form of certain specific

formulas for calculating CGMI's arrangement fees for the DIP Term Loan Facility and the DIP

ABL Facility (which will not exceed $12 million in the aggregate) relating to the DIP/Exit

Facilities (the "**Arrangement Fee Formulas**").

79.    Accordingly, the Debtors request, pursuant to sections 105(a) and 107(b)

of the Bankruptcy Code, Bankruptcy Rule 9018 and the Local Rule 9077-1(b), authorization to

file copies of the Fee Letters in redacted form as to "flex rights" and the Arrangement Fee

Formulas, with unredacted copies to be provided solely to (i) the U.S. Trustee, (ii) counsel to the

Committee (if any), (iii) the legal and financial advisors for the Informal Creditor Group, and

any individual member of the Informal Creditor Group in accordance with the terms of the Fee

Letters, and (iv) any other party as may be ordered by the Court or agreed by the Debtors and the

DIP Agent.  *See In re Global Crossing Ltd.*, 295 B.R. 720, 724-25 (Bankr. S.D.N.Y. 2003)

(stating that the purpose of Bankruptcy Rule 9018 is to "protect business entities from disclosure

of information that could reasonably be expected to cause the entity commercial injury."); *Video*

*Software Dealers Ass'n* v. *Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24, 27-28

(2d Cir. 1994) (stating that section 107(b) creates an exception to the general rule that court

records are open to public inspection and that under this exception, an interested party has to

show only that the information it wishes to seal is "confidential and commercial" in nature).

80.    The Debtors submit that good cause exists to authorize the Debtors to file

the Fee Letters in redacted form, redacting (i) the information regarding "flex rights" and (ii) the

Arrangement Fee Formulas, which arrangement fees will not exceed $12 million in the

aggregate.  The Fee Letters contain commercially sensitive information, thus meeting one of the

standards enumerated in section 107(b) of the Bankruptcy Code for sealing documents.

Additionally, full disclosure of the Fee Letters could increase the costs of financing for the

Debtors' and would violate the Debtors' agreement with CGMI.

81.    It is imperative that CGMI's methodology for calculating fees and the

contents of the Fee Letters remain confidential.  Specifically, disclosing the "flex rights" within

the fee arrangement described in the Fee Letters, which remains particularly relevant as the

syndication process is beginning, would severely limit CGMI's ability to effectively market and

syndicate the DIP Financing to the marketplace and could increase the cost of the DIP Financing

to the Debtors' estates.  *See* Baird Decl. ¶ 29.  In addition, while the Arrangement Fee Formulas

have been redacted from the Fee Letter, the Debtors can disclose that such arrangement fees will

not exceed $12 million in the aggregate and submit that such disclosure should be sufficient

under the circumstances.

82.    The relief requested in this Motion is similar to relief granted in recent

chapter 11 cases in this and other Districts that have granted even more comprehensive sealing

motions with respect to similar fee letters.  *See, e.g., In re Eastman Kodak Co.*, Case No. 12-

10202, Dkt. No. 297 (Bankr. S.D.N.Y. Feb. 10, 2012) (authorizing debtors to file a fee letter

under seal in connection with debtors' motion for approval of a debtor-in-possession financing

facility); *In re United Retail Grp.*, Case No. 12-10405, Dkt. No. 30 (Bankr. S.D.N.Y. Feb. 1,

2012) (same); *In re Great Atl. & Pac. Tea Co., Inc.*, Case No. 10-24549, Dkt. No. 3184 (Bankr.

S.D.N.Y. Jan. 18, 2012) (same); *In re Borders Grp., Inc.*, Case No. 11-10614 (Bankr. S.D.N.Y.

Feb. 16, 2011) (approving debtors' debtor-in-possession financing motion that proposed to keep

the fee letters confidential, providing them only to the court, the U.S. Trustee, and the

professionals of any official creditors' committee); *In re American Media, Inc.*, Case No. 10-

12140, Dkt. No. 74 (Bankr. S.D.N.Y. Nov. 29, 2010) (authorizing the debtors to file fee letters

under seal in connection with debtors' motion to assume or enter into agreements in connection

with new debtor-in-possession financing and backstop commitment); *In re Metro-Goldwyn-

Mayer Studios*, Case No. 10-15774, Dkt. No. 89 (Bankr. S.D.N.Y. Nov. 9, 2010) (authorizing the

debtors to file fee letter under seal in connection with the debtors' motion seeking to enter into a

commitment letter and fee letter related to exit financing); *In re Calpine Corp.*, Case No. 05-

60200, Dkt. No. 3494 (Bankr. S.D.N.Y. Jan. 29, 2007) (authorizing debtors to file copy of fee

letter underlying proposed replacement financing facility under seal); *In re Northwest Airlines

Corp.*, Case No. 05-17930, Dkt. No. 3876 (Bankr. S.D.N.Y. Nov. 22, 2006) (authorizing the

debtors to file the fee letter and commitment letter in connection with the debtors' motion for

approval of postpetition financing); *In re Delphi Corp.*, Case No. 05-44481 (Bankr. S.D.N.Y.

Oct. 8, 2005) (approving debtors' debtor-in-possession financing extension motion that proposed

to keep the fee letter confidential, providing it only to the court and on request to counsel to the

statutory committees and the U.S. Trustee).

　　　　83.　　The Debtors therefore submit that good cause exists to authorize the

Debtors to file the Fee Letters in redacted form as to "flex rights" and the Arrangement Fee

Formulas described in the Fee Letters because of the harm that would ensue if the sensitive and

confidential commercial information contained in the Fee Letters became public information. Nonetheless, the Debtors have disclosed that the amount of the arrangement fees will not exceed $12 million in the aggregate and submit that such disclosure, without disclosure of the Arrangement Fee Formulas, should be sufficient. The Debtors also submit that providing the Fee Letters in unredacted form to the U.S. Trustee and the Committee (if any) will subject the Fee Letters to sufficient scrutiny on the merits, while at the same time, minimizing any impact on the Debtors' or CGMI's ongoing business objectives.

## F.    Modification of the Automatic Stay Provided Under Section 362 of the Bankruptcy Code is Appropriate Under the Circumstances.

84.    Paragraph 5 of the proposed Interim Order provides that the automatic stay imposed under section 362(a) of the Bankruptcy Code is lifted to the extent contemplated by the provisions of the DIP/Exit Loan Agreements as described above. Stay modification provisions of this sort are ordinary and usual features of debtor-in-possession financing facilities and are reasonable under the present circumstances. *See, e.g., In re Innkeepers USA Trust, et al.,* Case No. 10-13800 (Bankr. S.D.N.Y. Sept. 2, 2010); *Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Jan. 15, 2010); *In re Gen. Growth Props. Inc.*, Case No. 09-01197 (Bankr. S.D.N.Y. May 14, 2009); *In re Chemtura Corp.*, Case No. 09-11233 (Bankr. S.D.N.Y. Apr. 29, 2009). Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP/Exit Loan Agreements and the proposed DIP Orders.

## REQUEST FOR A FINAL HEARING

85.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date, which is no sooner than 14 days after the date of this Motion and no later than 30 days after the entry of the Interim Order, to hold a hearing to consider entry of the Final Order and the permanent approval of the relief requested in this Motion. The

Debtors also request authority to serve a copy of the signed Interim Order, which fixes the time

and date for the filing of any objections to entry of the Final Order, by first class mail upon the

notice parties listed below, and further request that the Court deem service thereof sufficient

notice of the hearing on the Final Order under Bankruptcy Rule 4001(c)(2).

## BANKRUPTCY RULE 6003 IS SATISFIED

86.    Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is

necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the

filing of the petition, issue an order granting . . . (b) a motion to use, sell, lease, or otherwise

incur an obligation regarding property of the estate, including a motion to pay all or part of a

claim that arose before the filing of the petition . . . ." Fed. R. Bankr. P. 6003(b).

87.    The Debtors have demonstrated that they will suffer "immediate and

irreparable harm" if the Interim Order is not entered and the Debtors are not provided immediate

access to the DIP/Exit Facilities. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr.

S.D.N.Y. 1990) (finding that "immediate and irreparable harm" exists where loss of the business

threatens ability to reorganize).  Accordingly, the Debtors respectfully submit that they have

satisfied Bankruptcy Rule 6003 as it relates to the relief requested herein.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

88.    Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use,

sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after

entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Given the

nature of the relief requested herein, the Debtors respectfully request a waiver of (i) the notice

requirements under Bankruptcy Rule 6004(a), and (ii) the 14-day stay under Bankruptcy Rule

6004(h).  As set forth above, the DIP/Exit Facilities are essential to prevent irreparable damage

to the Debtors' operations, value and ability to reorganize.  Accordingly, the Debtors submit that

ample cause exists to justify a waiver of the requirements under Bankruptcy Rule 6004(a) and

14-day stay imposed by Bankruptcy Rule 6004(h), to the extent they apply.

## DEBTORS' RESERVATION OF RIGHTS

89.     Except as provided herein or in the DIP Orders, (i) nothing contained

herein is intended or should be construed as an admission as to the validity of any claim against

the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of

any agreement, contract or lease under section 365 of the Bankruptcy Code; (ii) the Debtors

expressly reserve their rights to contest any claims related to any obligations that are the subject

of this Motion under applicable non-bankruptcy law; and (iii) if the Court grants the relief sought

herein, any payment made pursuant to the DIP Orders is not intended to be, and should not be

construed as, an admission as to the validity of any claim or a waiver of the Debtors' rights to

dispute such claim subsequently.

## NOTICE

90.     Notice of this Motion has been provided to:  (a) the United States Trustee,

Attention:  Andrea B. Schwartz; (b) counsel for the DIP/Exit Agent; (c) the parties identified on

the Debtors' consolidated list of twenty (20) largest unsecured creditors; (d) counsel for the

Informal Creditor Group; (f) counsel for the Prepetition Senior Secured Notes Trustee;

(g) counsel for the Prepetition Agent; (h) counsel for the Prepetition L/C Bank; (i) the Securities

and Exchange Commission; (j) the United States Attorney for the Southern District of New

York; (k) the Internal Revenue Service; (l) the Environmental Protection Agency; (m) the

Pension Benefit Guaranty Corporation; (n) the New York State Department of Taxation; (o) the

New York City Tax Department; and (p) such other parties entitled to notice pursuant to Local

Rule 9013-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no

other or further notice is necessary.  Due to the urgency of the circumstances surrounding this

Motion and the nature of the relief requested herein, the Debtors respectfully submit that further

notice of this Motion is neither required nor necessary.

## NO PRIOR REQUEST

91.     The Debtors have not previously sought the relief requested herein from

this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the DIP

Orders and grant such other and further relief to the Debtors as is appropriate.

Dated: May 21, 2012
     New York, New York

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP


By: /s/ Jeffrey D. Saferstein
Alan W. Kornberg
(akornberg@paulweiss.com)
Jeffrey D. Saferstein
(jsaferstein@paulweiss.com)
Philip A. Weintraub
(pweintraub@paulweiss.com)
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Proposed Counsel for the Debtors and
Debtors-in-Possession