# **<u>EXHIBIT G</u>**

FIRST LIEN INTERCREDITOR AGREEMENT

dated as of

May 26, 2011

among

HMH HOLDINGS (DELAWARE), INC.
HMH PUBLISHING COMPANY,
HOUGHTON MIFFLIN HARCOURT PUBLISHERS INC.,
HMH PUBLISHERS LLC,
HOUGHTON MIFFLIN HARCOURT PUBLISHING COMPANY,
THE OTHER GRANTORS PARTY HERETO,

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
as First Lien Credit Agreement Collateral Agent
and Authorized Representative for the First Lien Credit Agreement Secured Parties,

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,
as the Initial Additional Authorized Representative,

and

each additional Authorized Representative from time to time party hereto

FIRST LIEN INTERCREDITOR AGREEMENT (as amended or supplemented from time to time, this "*Agreement*") dated as of May 26, 2011, among HMH Holdings (Delaware), Inc., a company organized under the laws of the State of Delaware ("*HMH Holdings*"), HMH PUBLISHING COMPANY, a company organized under the laws of the Republic of Ireland ("*HMH Publishing*"), HOUGHTON MIFFLIN HARCOURT PUBLISHERS INC., a corporation organized under the laws of the State of Delaware ("*HMHP*"), HMH PUBLISHERS LLC, a limited liability company organized under the laws of the State of Delaware ("*Publishers*"), HOUGHTON MIFFLIN HARCOURT PUBLISHING COMPANY, a corporation organized under the laws of the Commonwealth of Massachusetts ("*HMCo*", and together with HMHP and Publishers, collectively, the "*Company*"), the other Grantors party hereto, CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as collateral agent for the First Lien Credit Agreement Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "*First Lien Credit Agreement Collateral Agent*") and as Authorized Representative for the First Lien Credit Agreement Secured Parties, THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Authorized Representative and Collateral Agent for the Initial Additional First Lien Secured Parties (in such capacity and together with its successors in such capacity, the "*Initial Additional Authorized Representative*"), and each additional Authorized Representative from time to time party hereto for the Additional First Lien Secured Parties of the Series with respect to which it is acting in such capacity.

In consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the First Lien Credit Agreement Collateral Agent (for itself and on behalf of the First Lien Credit Agreement Secured Parties), the Initial Additional Authorized Representative (for itself and on behalf of the Initial Additional First Lien Secured Parties) and each additional Authorized Representative (for itself and on behalf of the Additional First Lien Secured Parties of the applicable Series) agree as follows:

## ARTICLE I

### Definitions

SECTION 1.01 *Construction; Certain Defined Terms*.

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument, other document, statute or regulation herein shall be construed as referring to such agreement, instrument, other document, statute or regulation as from time to time amended, supplemented or otherwise modified, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, but shall not be deemed to include the subsidiaries of such Person unless express reference is made to such subsidiaries, (iii) the words "herein", "hereof and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections and Annexes

shall be construed to refer to Articles, Sections and Annexes of this Agreement and (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    It is the intention of the First Lien Secured Parties of each Series that the holders of First Lien Obligations of such Series (and not the First Lien Secured Parties of any other Series) bear the risk of (i) any determination by a court of competent jurisdiction that (x) any of the First Lien Obligations of such Series are unenforceable under applicable law or are subordinated to any other obligations (other than another Series of First Lien Obligations), (y) any of the First Lien Obligations of such Series do not have an enforceable security interest in any of the Collateral securing any other Series of First Lien Obligations and/or (z) any intervening security interest exists securing any other obligations (other than another Series of First Lien Obligations) that ranks prior to the security interest of such Series of First Lien Obligations but junior to the security interest of any other Series of First Lien Obligations or (ii) the existence of any Collateral for any other Series of First Lien Obligations that is not Shared Collateral (any such condition referred to in the foregoing clauses (i) or (ii) with respect to any Series of First Lien Obligations, an "***Impairment***" of such Series). In the event of any Impairment with respect to any Series of First Lien Obligations, the results of such Impairment shall be borne solely by the holders of such Series of First Lien Obligations, and the rights of the holders of such Series of First Lien Obligations (including, without limitation, the right to receive distributions in respect of such Series of First Lien Obligations pursuant to Section 2.01) set forth herein shall be modified to the extent necessary so that the effects of such Impairment are borne solely by the holders of the Series of such First Lien Obligations subject to such Impairment. Additionally, in the event the First Lien Obligations of any Series are modified pursuant to applicable law (including, without limitation, pursuant to Section 1129 of the Bankruptcy Code), any reference to such First Lien Obligations or the First Lien Security Documents governing such First Lien Obligations shall refer to such obligations or such documents as so modified.

(c)    Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the First Lien Credit Agreement. As used in this Agreement, the following terms have the meanings specified below:

"***Additional First Lien Agreement***" shall mean any indenture, credit agreement or other agreement under which Additional First Lien Obligations of any Series are issued or incurred and any other instrument, agreement or other document evidencing or governing Additional First Lien Obligations of such Series or providing any guarantee, Lien or other right in respect thereof.

"***Additional First Lien Collateral Agent***" shall mean any collateral agent with respect to any Additional First Lien Obligations.

"***Additional First Lien Obligations***" shall mean all Obligations of the Company and the other Grantors that shall have been designated as such pursuant to Article VI.

"**Additional First Lien Secured Parties**" shall mean the holders of any Additional First Lien Obligations and any Additional First Lien Collateral Agent or Authorized Representative with respect thereto.

"**Agreement**" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Applicable Authorized Representative**" shall mean, with respect to any Shared Collateral, (i) until the earlier of (x) the Discharge of First Lien Credit Agreement Obligations and (y) the Non-Controlling Authorized Representative Enforcement Date, the First Lien Credit Agreement Collateral Agent and (ii) from and after the earlier of (x) the Discharge of First Lien Credit Agreement Obligations and (y) the Non-Controlling Authorized Representative Enforcement Date, the Major Non-Controlling Authorized Representative.

"**Authorized Representative**" shall mean (i) in the case of any First Lien Credit Agreement Obligations or the First Lien Credit Agreement Secured Parties, the First Lien Credit Agreement Collateral Agent, (ii) in the case of the Initial Additional First Lien Obligations or the Initial Additional First Lien Secured Parties, the Initial Additional Authorized Representative and (iii) in the case of any Series of Additional First Lien Obligations or Additional First Lien Secured Parties that become subject to this Agreement after the date hereof, the Authorized Representative named for such Series in the applicable Joinder Agreement.

"**Bank Products**" means any services or facilities on account of credit or debit cards, purchase cards or merchant services constituting a line of credit, and any agreement or arrangement to provide cash management services, including treasury, depository, overdraft, electronic funds transfer and any other cash management arrangement.

"**Bankruptcy Case**" shall have the meaning assigned to such term in Section 2.05(b).

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, as amended.

"**Bankruptcy Law**" shall mean the Bankruptcy Code and any similar Federal, state or foreign law for the relief of debtors.

"**Cash Management Obligations**" means Obligations under any Bank Products.

"**Collateral**" shall mean all assets and properties subject to Liens created pursuant to any First Lien Security Document to secure one or more Series of First Lien Obligations.

"**Company**" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Control Collateral**" shall mean any Shared Collateral in the possession of, or controlled by, the Applicable Authorized Representative (or its agents or bailees), to the extent that possession or control thereof perfects a Lien thereon under the Uniform Commercial Code of any jurisdiction or any other applicable law. Control Collateral includes, without limitation, any Certificated Securities, Promissory Notes, Instruments, Investment Property, Deposit Ac-

counts and Chattel Paper, in each case, delivered to, in the possession of, or controlled by, the Applicable Authorized Representative under the terms of the First Lien Security Documents. All capitalized terms used in this definition and not defined elsewhere in this Agreement have the meanings assigned to them in the New York UCC.

"*Controlling Secured Parties*" shall mean, with respect to any Shared Collateral, the Series of First Lien Secured Parties whose Authorized Representative is the Applicable Authorized Representative for such Shared Collateral.

"*Default*" means a "Default" (or similar defined term) as defined in any Secured Credit Document.

"*DIP Financing*" shall have the meaning assigned to such term in Section 2.05(b).

"*DIP Financing Liens*" shall have the meaning assigned to such term in Section 2.05(b).

"*DIP Lenders*" shall have the meaning assigned to such term in Section 2.05(b).

"*Discharge*" shall mean, with respect to any Shared Collateral and any Series of First Lien Obligations, the date on which such Series of First Lien Obligations is no longer secured by such Shared Collateral. The term "*Discharged*" shall have a corresponding meaning.

"*Discharge of First Lien Credit Agreement Obligations*" shall mean, subject to Section 2.06 of this Agreement, the payment in full in cash of all outstanding First Lien Credit Agreement Obligations (other than (x) any Hedging Obligations included therein and not yet due and payable, (y) any Cash Management Obligations included therein and not yet due and payable and (z) contingent indemnification obligations not yet accrued and payable), but including, with respect to amounts available to be drawn under outstanding letters of credit issued thereunder (or indemnities or other undertakings issued pursuant thereto in respect of outstanding letters of credit), the cancellation of such letters of credit or the delivery or provision of money or back-stop letters of credit in respect thereof in compliance with the terms of the First Lien Credit Agreement; provided that the Discharge of First Lien Credit Agreement Obligations shall not be deemed to have occurred in connection with a Refinancing of such First Lien Credit Agreement Obligations with additional First Lien Obligations secured by such Shared Collateral under an Additional First Lien Agreement which has been designated in writing by the Authorized Representative (under the First Lien Credit Agreement so Refinanced) to the Applicable Authorized Representative and each other Authorized Representative as the "First Lien Credit Agreement" for purposes of this Agreement.

"*Event of Default*" means an "Event of Default" (or similar defined term) as defined in any Secured Credit Document.

"*First Lien Credit Agreement*" shall mean that certain Amended and Restated Credit Agreement, dated as of December 12, 2007, as amended as of March 12, 2009, as further amended as of August 13, 2009, as further amended and restated as of March 9, 2010, as further amended on May 26, 2011, and as otherwise amended, amended and restated, extended, other-

-4-

wise modified, refinanced, replaced or supplemented from time to time, among HMH Holdings, the Company, the lenders from time to time party thereto, Citibank, N.A., as administrative agent, the First Lien Credit Agreement Collateral Agent and the other parties thereto.

"*First Lien Credit Agreement Collateral Agent*" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"*First Lien Credit Agreement Obligations*" shall mean the "Obligations" as defined in the First Lien Credit Agreement.

"*First Lien Credit Agreement Secured Parties*" shall mean the "Secured Parties" as defined in the First Lien Credit Agreement Security Agreement.

"*First Lien Credit Agreement Security Agreement*" shall mean that certain First Lien Guarantee and Collateral Agreement, dated as of December 12, 2007 as amended as of August 13, 2009, March 9, 2010 and May 26, 2011, by and among the Company, the other Grantors party thereto and First Lien Credit Agreement Collateral Agent, as amended, restated, extended, otherwise modified, replaced or supplemented from time to time.

"*First Lien Obligations*" shall mean, collectively, (i) the First Lien Credit Agreement Obligations and (ii) each Series of Additional First Lien Obligations.

"*First Lien Secured Parties*" shall mean, collectively, (i) the First Lien Credit Agreement Secured Parties, (ii) the Initial Additional First Lien Secured Parties, and (iii) the Additional First Lien Secured Parties with respect to each Series of Additional First Lien Obligations.

"*First Lien Security Documents*" shall mean each Security Agreement and any other agreement, document or instrument pursuant to which a Lien is granted or purported to be granted securing First Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"*Grantors*" shall mean the Company and each subsidiary or direct or indirect parent company of the Company which has granted a security interest pursuant to any First Lien Security Document to secure any Series of First Lien Obligations.

"*Hedging Obligations*" means, with respect to any Person, the obligations of such Person under (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any

International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "*Master Agreement*"), including any such obligations or liabilities under any Master Agreement.

"*Impairment*" shall have the meaning assigned to such term in Section 1.01(b).

"*Initial Additional Authorized Representative*" shall have the meaning assigned to such term in the introductory paragraph to this Agreement.

"*Initial Additional First Lien Agreements*" shall mean the Indenture, dated as of May 26, 2011 and as amended, restated, supplemented or otherwise modified from time to time, among the Company, the Guarantors party thereto and The Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent, and any other instrument, agreement or other document evidencing or governing Obligations of the Company and the Grantors thereunder or providing any guarantee, Lien or other right in respect thereof.

"*Initial Additional First Lien Obligations*" shall mean the Additional First Lien Obligations pursuant to the Initial Additional First Lien Agreements.

"*Initial Additional First Lien Secured Parties*" shall mean the holders of any Initial Additional First Lien Obligations and the Initial Additional Authorized Representative.

"*Insolvency or Liquidation Proceeding*" shall mean:

(1)    any case commenced by or against the Company or any other Grantor under any Bankruptcy Law, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of the Company or any other Grantor, any receivership or assignment for the benefit of creditors relating to the Company or any other Grantor or any similar case or proceeding relative to the Company or any other Grantor or its creditors, as such, in each case whether or not voluntary;

(2)    any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to the Company or any other Grantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(3)    any other proceeding of any type or nature in which substantially all claims of creditors of the Company or any other Grantor are determined and any payment or distribution is or may be made on account of such claims.

"*Intervening Creditor*" shall have the meaning assigned to such term in Section 2.01(a).

"*Joinder Agreement*" shall mean a supplement to this Agreement substantially in the form of Exhibit A hereto, appropriately completed.

"*Lien*" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory, judgment or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including

any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capital Lease (as defined in the First Lien Credit Agreement) having substantially the same economic effect as any of the foregoing); provided, that in no event shall an operating lease in and of itself be deemed a Lien.

"*Major Non-Controlling Authorized Representative*" shall mean, with respect to any Shared Collateral, the Authorized Representative of the Series of First Lien Obligations that constitutes the largest outstanding principal amount of any then outstanding Series of First Lien Obligations, other than the First Lien Credit Agreement Obligations, with respect to such Shared Collateral.

"*New York UCC*" shall mean the Uniform Commercial Code as from time to time in effect in the State of New York.

"*Non-Controlling Authorized Representative*" shall mean, at any time with respect to any Shared Collateral, any Authorized Representative that is not the Applicable Authorized Representative at such time with respect to such Shared Collateral.

"*Non-Controlling Authorized Representative Enforcement Date*" shall mean, with respect to any Non-Controlling Authorized Representative, the date (x) on which the First Lien Credit Agreement Obligations do not constitute the largest outstanding principal amount of any then outstanding Series of First Lien Obligations and (y) which is 90 days (throughout which 90 day period such Non-Controlling Authorized Representative was the Major Non-Controlling Authorized Representative) after the occurrence of both (i) an Event of Default (under and as defined in the Initial Additional First Lien Agreements or the Additional First Lien Agreements under which such Non-Controlling Authorized Representative is the Applicable Authorized Representative) and (ii) each other Authorized Representative's receipt of written notice from such Non-Controlling Authorized Representative certifying that (x) such Non-Controlling Authorized Representative is the Major Non-Controlling Authorized Representative and that an Event of Default (under and as defined in the Initial Additional First Lien Agreements or the Additional First Lien Agreements under which such Non-Controlling Authorized Representative is the Applicable Authorized Representative) has occurred and is continuing and (y) the First Lien Obligations of the Series with respect to which such Non-Controlling Authorized Representative is the Applicable Authorized Representative are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Additional First Lien Agreement; provided that the Non-Controlling Authorized Representative Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred with respect to any Shared Collateral (1) at any time the Applicable Authorized Representative has commenced and is diligently pursuing any enforcement action with respect to such Shared Collateral or (2) at any time the Grantor which has granted a security interest in such Shared Collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding.

"*Non-Controlling Secured Parties*" shall mean, with respect to any Shared Collateral, the First Lien Secured Parties which are not Controlling Secured Parties with respect to such Shared Collateral.

"***Notes Security Agreement***" shall mean that certain First Lien Collateral Agreement, dated as of May 26, 2011, by and among the Company, the other Grantors party thereto and The Bank of New York Mellon Trust Company, N.A., as collateral agent, as amended, amended and restated, extended, otherwise modified, replaced or supplemented from time to time.

"***Obligations***" means (i) any principal, interest (including any interest accruing on or subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable state, federal or foreign law), premium, penalties, fees, indemnifications, reimbursements (including reimbursement obligations with respect to letters of credit and banker's acceptances), damages and other liabilities, and guarantees of payment of such principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities, payable under the documentation governing any Indebtedness and (ii) Hedging Obligations and Cash Management Obligations.

"***Proceeds***" shall have the meaning assigned to such term in Section 2.01(a).

"***Refinance***" shall mean, in respect of any indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace, restate or repay, or to issue other indebtedness or enter into alternative financing arrangements, in exchange or replacement for such indebtedness (in whole or in part), including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated and including, in each case, through any credit agreement, indenture or other agreement. "***Refinanced***" and "***Refinancing***" shall have correlative meanings.

"***Related Person***" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, attorneys-in-fact, trustees and advisors of such Person and of such Person's Affiliates.

"***Secured Credit Documents***" shall mean, collectively, (i) the First Lien Credit Agreement and the other Loan Documents (as defined in the First Lien Credit Agreement), (ii) the Initial Additional First Lien Agreements and (iii) each Additional First Lien Agreement.

"***Security Agreements***" means (i) the First Lien Credit Agreement Security Agreement, (ii) the Notes Security Agreement and (iii) any security agreement with respect to any Additional First Lien Agreement.

"***Series***" shall mean (a) with respect to the First Lien Secured Parties, each of (i) the First Lien Credit Agreement Secured Parties (in their capacities as such), (ii) the Initial Additional First Lien Secured Parties (in their capacities as such) and (iii) the Additional First Lien Secured Parties that become subject to this Agreement after the date hereof that are represented by a common Authorized Representative (in its capacity as such for such Additional First Lien Secured Parties) and (b) with respect to any First Lien Obligations, each of (i) the First Lien Credit Agreement Obligations, (ii) the Initial Additional First Lien Obligations and (iii) the Additional First Lien Obligations incurred pursuant to any Additional First Lien Agreements,

which, pursuant to any Joinder Agreement, are to be represented hereunder by a common Authorized Representative (in its capacity as such for such Additional First Lien Obligations).

"*Shared Collateral*" shall mean, at any time, Collateral in which the holders of two or more Series of First Lien Obligations (or their respective Authorized Representatives) hold a valid and perfected security interest at such time.  If more than two Series of First Lien Obligations are outstanding at any time and the holders of less than all Series of First Lien Obligations hold a valid and perfected security interest in any Collateral at such time, then such Collateral shall constitute Shared Collateral for those Series of First Lien Obligations that hold a valid security interest in such Collateral at such time and shall not constitute Shared Collateral for any Series which does not have a valid and perfected security interest in such Collateral at such time.

ARTICLE II

**Priorities and Agreements with Respect to Shared Collateral**

SECTION 2.01 *Priority of Claims*.

(a)    Anything contained herein or in any of the Secured Credit Documents to the contrary notwithstanding (but subject to Section 1.01(b) of this Agreement), if an Event of Default has occurred and is continuing, and the Applicable Authorized Representative or any First Lien Secured Party is taking action to enforce rights in respect of any Shared Collateral, or any distribution is made in respect of any Shared Collateral in any Bankruptcy Case of any Grantor or any First Lien Secured Party receives any payment pursuant to any intercreditor agreement (other than this Agreement) with respect to any Shared Collateral, the proceeds of any sale, collection or other liquidation of any such Shared Collateral by any First Lien Secured Party are received by the Applicable Authorized Representative or any First Lien Secured Party pursuant to any such intercreditor agreement with respect to such Shared Collateral and proceeds of any such distribution (subject, in the case of any such distribution, to the sentence immediately following) to which the First Lien Obligations are entitled under any intercreditor agreement (other than this Agreement) (all proceeds of any sale, collection or other liquidation of any Shared Collateral and all proceeds of any such distribution being collectively referred to as "*Proceeds*"), shall be applied (i) FIRST, to the payment of all amounts owing to any Authorized Representative, as applicable (in its capacity as such) pursuant to the terms of any Secured Credit Document, (ii) SECOND, subject to Section 1.01(b), to the payment in full of the First Lien Obligations of each Series on a ratable basis in accordance with the terms of the applicable Secured Credit Documents and (iii) THIRD, any balance of such Proceeds remaining after the application pursuant to preceding clauses (i) and (ii), to the Grantors, their successors or assigns, or as a court of competent jurisdiction may otherwise direct.  Notwithstanding the foregoing, with respect to any Shared Collateral for which a third party (other than a First Lien Secured Party) has a lien or security interest that is junior in priority to the security interest of any Series of First Lien Obligations but senior (as determined by appropriate legal proceedings in the case of any dispute) to the security interest of any other Series of First Lien Obligations (such third party an "*Intervening Creditor*"), the value of any Shared Collateral or Proceeds which are allocated to such Intervening Creditor shall be deducted on a ratable basis solely from the Shared Collateral or Proceeds to

be distributed in respect of the Series of First Lien Obligations with respect to which such Impairment exists.

(b)    The First Lien Secured Parties hereby acknowledge that the First Lien Obligations of any Series may, subject to the limitations set forth in this Agreement and the then extant Secured Credit Documents, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded, Refinanced or otherwise amended or modified from time to time, all without affecting the priorities set forth in Section 2.01(a) or the provisions of this Agreement defining the relative rights of the First Lien Secured Parties of any Series.

(c)    Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing any Series of First Lien Obligations granted on the Shared Collateral and notwithstanding any provision of the Uniform Commercial Code of any jurisdiction, or any other applicable law or the Secured Credit Documents or any defect or deficiencies in the Liens securing the First Lien Obligations of any Series or any other circumstance whatsoever (but, in each case, subject to Section 1.01(b)), each First Lien Secured Party hereby agrees that the Liens securing each Series of First Lien Obligations on any Shared Collateral shall be of equal priority.

(d)    Notwithstanding anything in this Agreement or any other First Lien Security Documents to the contrary, Collateral consisting of cash and cash equivalents pledged to secure First Lien Credit Agreement Obligations consisting of reimbursement obligations in respect of Letters of Credit or otherwise held by the First Lien Credit Agreement Collateral Agent pursuant to Section 2.23(j) or Article VII of the First Lien Credit Agreement (or any equivalent successor provisions) shall be applied as specified in the First Lien Credit Agreement and will not constitute Shared Collateral.

SECTION 2.02 *Actions With Respect to Shared Collateral; Prohibition on Contesting Liens*.

(a)    With respect to any Shared Collateral, (i) only the Applicable Authorized Representative shall act or refrain from acting with respect to the Shared Collateral (including with respect to any other intercreditor agreement with respect to any Shared Collateral), (ii) the Applicable Authorized Representative shall not follow any instructions with respect to such Shared Collateral (including with respect to any other intercreditor agreement with respect to any Shared Collateral) from any Non-Controlling Authorized Representative (or any Non-Controlling Secured Party) and (iii) no Non-Controlling Authorized Representative or other First Lien Secured Party (other than the Applicable Authorized Representative and the Controlling Secured Parties) shall or shall instruct the Applicable Authorized Representative to, commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, any Shared Collateral (including with respect to any other intercreditor agreement with respect to any Shared Collateral)), whether under any First Lien Security Document, applicable law or otherwise, it being agreed that only the Applicable Authorized Representative shall be entitled to take any such actions or exercise any such remedies with respect to Shared Collateral. Notwithstand-

-10-

ing the equal priority of the Liens, the Applicable Authorized Representative may deal with the Shared Collateral as if such Applicable Authorized Representative had a senior Lien on such Collateral. No Non-Controlling Authorized Representative or Non-Controlling Secured Party will contest, protest or object to any foreclosure proceeding or action brought by the Applicable Authorized Representative or Controlling Secured Party or any other exercise by the Applicable Authorized Representative or Controlling Secured Party of any rights and remedies relating to the Shared Collateral, or to cause the Applicable Authorized Representative to do so. The foregoing shall not be construed to limit the rights and priorities of any First Lien Secured Party, Applicable Authorized Representative or any Authorized Representative with respect to any Collateral not constituting Shared Collateral.

(b)    Each of the Authorized Representatives agrees that it will not accept any Lien on any Collateral for the benefit of any Series of First Lien Obligations (other than funds deposited for the discharge or defeasance of any Additional First Lien Agreement to the extent permitted by the First Lien Credit Agreement) other than Liens on Collateral also granted pursuant to the First Lien Credit Agreement Security Agreement, and by executing this Agreement (or a Joinder Agreement), each Authorized Representative and the Series of First Lien Secured Parties for which it is acting hereunder agree to be bound by the provisions of this Agreement and the other First Lien Security Documents applicable to it.

(c)    Each of the First Lien Secured Parties (by accepting the benefits of this Agreement) agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity or enforceability of a Lien held by or on behalf of any of the First Lien Secured Parties in all or any part of the Collateral, or the provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any Authorized Representative to enforce this Agreement.

SECTION 2.03 *No Interference; Payment Over.*

(a)    Each First Lien Secured Party (by accepting the benefits of this Agreement) agrees that (i) it will not challenge or question in any proceeding the validity or enforceability of any First Lien Obligations of any Series or any First Lien Security Document or the validity, attachment, perfection or priority of any Lien under any First Lien Security Document or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement; (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Shared Collateral by the Applicable Authorized Representative, (iii) except as provided in Section 2.02, it shall have no right to (A) direct the Applicable Authorized Representative or any Controlling Secured Party to exercise any right, remedy or power with respect to any Shared Collateral (including pursuant to any other intercreditor agreement) or (B) consent to the exercise by the Applicable Authorized Representative or any Controlling Secured Party of any right, remedy or power with respect to any Shared Collateral, (iv) it will not institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against the Applicable Authorized Representative or any Controlling Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to any Shared Collateral, and none of the Applicable Authorized Rep-

-11-

resentative or any Controlling Secured Party shall be liable for any action taken or omitted to be taken by the Applicable Authorized Representative or Controlling Secured Party with respect to any Shared Collateral in accordance with the provisions of this Agreement, (v) it will not seek, and hereby waives any right, to have any Shared Collateral or any part thereof marshaled upon any foreclosure or other disposition of such Collateral and (vi) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of the Applicable Authorized Representative or any Controlling Secured Party to enforce this Agreement.

(b)     Each First Lien Secured Party (by accepting the benefits of this Agreement) hereby agrees that if it shall obtain possession of any Shared Collateral or shall realize any proceeds or payment in respect of any such Shared Collateral, pursuant to any First Lien Security Document or by the exercise of any rights available to it under applicable law or in any Insolvency or Liquidation Proceeding or through any other exercise of remedies (including pursuant to any other intercreditor agreement), at any time prior to the Discharge of each of the First Lien Obligations, then it shall hold such Shared Collateral, proceeds or payment in trust for the other First Lien Secured Parties and promptly transfer such Shared Collateral, proceeds or payment, as the case may be, to the Applicable Authorized Representative, to be distributed by the Applicable Authorized Representative in accordance with the provisions of Section 2.01 hereof.

SECTION 2.04 *Automatic Release of Liens; Amendments to First Lien Security Documents.*

(a)     If at any time the Applicable Authorized Representative forecloses upon or otherwise exercises remedies against any Shared Collateral, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of the Authorized Representatives for the benefit of each Series of First Lien Secured Parties upon such Shared Collateral will automatically be released and discharged; provided that any proceeds of any Shared Collateral realized therefrom shall be applied pursuant to Section 2.01 hereof.

(b)     If at any time the Applicable Authorized Representative releases a Foreign Subsidiary from its guarantee of the applicable First Lien Obligations, releases its Lien on the property and assets of such Foreign Subsidiary, releases its Lien on the voting capital stock of such Foreign Subsidiary to the extent in excess of 66% of the outstanding voting capital stock of such Foreign Subsidiary or releases the pledge of the capital stock of any Foreign Subsidiary's direct parent entity if such parent entity is a disregarded entity for United States tax purposes, corresponding releases shall be effected automatically and immediately, without any action on the part of any Non-Controlling Authorized Representative or any Non-Controlling Secured Party (other than the First Lien Credit Agreement Collateral Agent), under the corresponding First Lien Security Document (other than the First Lien Credit Agreement Security Agreement) and related guarantee for each Series of First Lien Obligations.

(c)     Until the Discharge of First Lien Credit Agreement Obligations has occurred, the holders of the Liens securing the First Lien Credit Agreement Obligations may change, waive, modify or vary the security documents of such holders and corresponding changes shall be effected automatically and immediately, without any action on the part of any

-12-

Non-Controlling Authorized Representative or any Non-Controlling Secured Party (other than the First Lien Credit Agreement Collateral Agent), under the corresponding First Lien Security Document; *provided* that any such change, waiver, modification or variance that is prejudicial to the rights of any Non-Controlling Authorized Representative or any Non-Controlling Secured Party and does not affect the holders of the Liens securing the First Lien Credit Agreement Obligations in a like or similar manner shall not apply to the First Lien Security Documents for the applicable Series of First Lien Obligations without the consent of the Authorized Representative of such Series of First Lien Obligations. Notice of such amendment, waiver or consent shall be given to the Authorized Representatives by the Company, but any failure to provide such notice will not affect the validity or effectiveness of any such amendment, waiver or consent.

(d)    Each First Lien Secured Party agrees that each Authorized Representative may enter into any amendment (and, upon request by the Applicable Authorized Representative, each Authorized Representative shall sign a consent to such amendment) to any First Lien Security Document, so long as such amendment is permitted by the terms of each then extant Secured Credit Document and each Authorized Representative receives a certificate of the Company stating that such amendment is permitted by the terms of each then extant Secured Credit Document. Additionally, each First Lien Secured Party agrees that each Authorized Representative may enter into any amendment (and, upon request by the Applicable Authorized Representative, each Authorized Representative shall sign a consent to such amendment) to any First Lien Security Document solely as such First Lien Security Document relates to a particular Series of First Lien Obligations so long as (x) such amendment is in accordance with the Secured Credit Document pursuant to which such Series of First Lien Obligations was incurred and (y) such amendment does not adversely affect the First Lien Secured Parties of any other Series.

(e)    Each Authorized Representative agrees to execute and deliver (at the sole cost and expense of the Grantors) all such authorizations and other instruments as shall reasonably be requested by the Applicable Authorized Representative to evidence and confirm any release of Shared Collateral or amendment to any First Lien Security Document provided for in this Section.

SECTION 2.05 *Certain Agreements With Respect to Bankruptcy or Insolvency Proceedings*.

(a)    This Agreement shall continue in full force and effect notwithstanding the commencement of any proceeding under the Bankruptcy Code or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law by or against the Company or any of its subsidiaries.

(b)    If any Grantor shall become subject to a case (a "***Bankruptcy Case***") under the Bankruptcy Code and shall, as debtor(s)-in-possession, move for approval of financing ("***DIP Financing***") to be provided by one or more lenders that is a First Lien Secured Party (the "***DIP Lenders***") under Section 364 of the Bankruptcy Code or the use of cash collateral under Section 363 of the Bankruptcy Code, each First Lien Secured Party (other than any Controlling Secured Party or the Applicable Authorized Representative (to the extent such Controlling Secured Party is part of the majority or such greater amount referred to below)) (by accepting the benefits of this Agreement) agrees that it will raise no objection to any such financing or to the

-13-

Liens on the Shared Collateral securing the same ("**DIP Financing Liens**") or to any use of cash collateral that constitutes Shared Collateral, unless a majority in interest of the Controlling Secured Parties (or such greater amount as is necessary to take action under the applicable Secured Credit Document), or the Applicable Authorized Representative, shall then oppose or object to such DIP Financing or such DIP Financing Liens or use of cash collateral (and (i) to the extent that such DIP Financing Liens are senior to the Liens on any such Shared Collateral for the benefit of the Controlling Secured Parties, each Non-Controlling Secured Party will subordinate its Liens (other than any Liens of any First Lien Secured Parties constituting DIP Financing Liens) with respect to such Shared Collateral on the same terms as the Liens of the Controlling Secured Parties are subordinated thereto, and (ii) to the extent that such DIP Financing Liens rank *pari passu* with the Liens on any such Shared Collateral granted to secure the First Lien Obligations of the Controlling Secured Parties, each Non-Controlling Secured Party will confirm the priorities with respect to such Shared Collateral as set forth herein), in each case so long as (A) the First Lien Secured Parties of each Series retain the benefit of their Liens on all such Shared Collateral pledged to the DIP Lenders, including proceeds thereof arising after the commencement of such proceeding, with the same priority vis-a-vis all the other First Lien Secured Parties (other than any Liens of the First Lien Secured Parties constituting DIP Financing Liens) as existed prior to the commencement of the Bankruptcy Case, (B) the First Lien Secured Parties of each Series are granted Liens on any additional collateral pledged to any First Lien Secured Parties as adequate protection or otherwise in connection with such DIP Financing or use of cash collateral, with the same priority vis-a-vis the First Lien Secured Parties as set forth in this Agreement, (C) if any amount of such DIP Financing or cash collateral is applied to repay any of the First Lien Obligations, such amount is applied pursuant to Section 2.01 of this Agreement, and (D) if any First Lien Secured Parties are granted adequate protection (other than any Liens of any First Lien Secured Parties constituting DIP Financing Liens), including in the form of periodic payments, in connection with such DIP Financing or use of cash collateral, the proceeds of such adequate protection are applied pursuant to Section 2.01 of this Agreement; provided that the First Lien Secured Parties of each Series shall have a right to object to the grant of a Lien to secure the DIP Financing over any Collateral subject to Liens in favor of the First Lien Secured Parties of such Series or its Authorized Representative that shall not constitute Shared Collateral; and provided, further, that the First Lien Secured Parties receiving adequate protection shall not object to any other First Lien Secured Party receiving adequate protection comparable to any adequate protection granted to such First Lien Secured Parties in connection with a DIP Financing or use of cash collateral.

> SECTION 2.06 **Reinstatement**. In the event that any of the First Lien Obligations shall be paid in full and such payment or any part thereof shall subsequently, for whatever reason (including an order or judgment for disgorgement of a preference under Title 11 of the United States Code, or any similar law, or the settlement of any claim in respect thereof), be required to be returned or repaid, the terms and conditions of this Article II shall be fully applicable thereto until all such First Lien Obligations shall again have been paid in full in cash.

> SECTION 2.07 **Insurance**. As between the First Lien Secured Parties, the Applicable Authorized Representative shall have the right to adjust or settle any insurance policy or claim covering or constituting Shared Collateral in the

event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Shared Collateral.

SECTION 2.08 *Refinancings*. The First Lien Obligations of any Series may, subject to the limitations set forth in the then extant Secured Credit Documents, be Refinanced, in whole or in part, or otherwise amended or modified from time to time, in each case, without notice to, or the consent (except to the extent a consent is otherwise required to permit the Refinancing transaction under any Secured Credit Document) of any First Lien Secured Party of any other Series, all without affecting the priorities provided for herein or the other provisions hereof; <u>provided</u> that to the extent such Refinancing indebtedness is not already subject to this Agreement or an existing Joinder Agreement, the Authorized Representative of the holders of any such Refinancing indebtedness shall have executed a Joinder Agreement on behalf of the holders of such Refinancing indebtedness.

SECTION 2.09 *Control Collateral Agent as Gratuitous Bailee for Perfection*.

(a)    The Applicable Authorized Representative agrees to hold any Shared Collateral constituting Control Collateral that is part of the Collateral in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee for the benefit of each other First Lien Secured Party and any assignee solely for the purpose of perfecting the security interest granted in such Control Collateral, if any, pursuant to the applicable First Lien Security Documents, in each case, subject to the terms and conditions of this Section 2.09. Pending delivery or transfer of control to the Applicable Authorized Representative, each other Authorized Representative agrees to hold any Shared Collateral constituting Control Collateral, from time to time in its possession or control, as gratuitous bailee for the benefit of each other First Lien Secured Party and any assignee, solely for the purpose of perfecting the security interest granted in such Control Collateral, if any, pursuant to the applicable First Lien Security Documents, in each case, subject to the terms and conditions of this Section 2.09. Notwithstanding the equal priority of the Liens on such Control Collateral securing First Lien Obligations, the Applicable Authorized Representative may deal with such Collateral as if the Liens thereon in favor of the First Lien Secured Parties of any other Series do not exist; provided that the Proceeds arising therefrom shall be subject to application in accordance with Section 2.01(a) hereof.

(b)    The duties or responsibilities of the Applicable Authorized Representative and each other Authorized Representative under this Section 2.09 shall be limited solely to holding any Shared Collateral constituting Control Collateral as gratuitous bailee for the benefit of each other First Lien Secured Party for purposes of perfecting the Lien held by such First Lien Secured Parties therein. Beyond the exercise of reasonable care in the custody of Collateral in its possession, the Applicable Authorized Representative will have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto. The Applicable Authorized Representative will be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property, and the Applicable Authorized Representative will not be liable or responsible for any loss or diminution in the value of any of the Collateral by

-15-

reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Applicable Authorized Representative in good faith.

(c)    If any provision of any Secured Credit Document requires the Company or any other Grantor to provide any Authorized Representative or First Lien Secured Party with possession or control of any Shared Collateral, the Company or other Grantor shall be deemed to have satisfied such requirement if it shall have provided the Applicable Authorized Representative with possession or control of such Shared Collateral.

ARTICLE III

**Existence and Amounts of Liens and Obligations**

Whenever the Applicable Authorized Representative or any Authorized Representative shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any First Lien Obligations of any Series, or the Shared Collateral subject to any Lien securing the First Lien Obligations of any Series, it may request that such information be furnished to it in writing by each other Authorized Representative and shall be entitled to make such determination on the basis of the information so furnished; provided, however, that if an Authorized Representative shall fail or refuse reasonably promptly to provide the requested information, the requesting Authorized Representative or Applicable Authorized Representative shall be entitled to make any such determination or not make any determination by such method as it may, in the exercise of its good faith judgment, determine, including by reliance upon a certificate of the Company. The Applicable Authorized Representative and each Authorized Representative may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to any Grantor, any First Lien Secured Party or any other person as a result of such determination.

ARTICLE IV

**The Applicable Authorized Representative**

SECTION 4.01 *Appointment and Authority*.

(a)    Each of the First Lien Secured Parties (by accepting the benefits of this Agreement) hereby irrevocably appoints the Applicable Authorized Representative to act on its behalf as the Applicable Authorized Representative hereunder and under each of the other First Lien Security Documents and authorizes the Applicable Authorized Representative to take such actions on its behalf and to exercise such powers as are delegated to the Applicable Authorized Representative by the terms hereof or thereof, including for purposes of enforcing any and all Liens on Collateral granted by any Grantor to secure any of the First Lien Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Applicable Authorized Representative and any co-agents, sub-agents and attorneys-in-fact appointed by the Applicable Authorized Representative pursuant to Section 4.05 for purposes of enforcing any Lien on the Collateral (or any portion thereof) granted under any of the First Lien

-16-

Security Documents, or for exercising any rights and remedies thereunder, shall be entitled to the benefits of all provisions of this Article IV and Section 9.05 of the First Lien Credit Agreement and the equivalent provision of any Additional First Lien Agreement (as though such co-agents, sub-agents and attorneys-in-fact were the "Collateral Agent" under the First Lien Security Documents) as if set forth in full herein with respect thereto.

(b)    Each Non-Controlling Secured Party acknowledges and agrees that the Applicable Authorized Representative shall be entitled, for the benefit of the First Lien Secured Parties, to sell, transfer or otherwise dispose of or deal with any Shared Collateral as provided herein and in the First Lien Security Documents, without regard to any rights to which any Non-Controlling Secured Party would otherwise be entitled to as a holder of any First Lien Obligations (whether before or after the commencement of any Insolvency or Liquidation Proceeding). Without limiting the foregoing, each Non-Controlling Secured Party agrees that neither the Applicable Authorized Representative nor any other First Lien Secured Party shall have any duty or obligation first to marshal or realize upon any type of Shared Collateral (or any other Collateral securing any of the First Lien Obligations), or to sell, dispose of or otherwise liquidate all or any portion of such Shared Collateral (or any other Collateral securing any First Lien Obligations), in any manner that would maximize the return to the Non-Controlling Secured Parties, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by the Non-Controlling Secured Parties from such realization, sale, disposition or liquidation. Except with respect to any actions expressly prohibited or required to be taken by this Agreement, each of the First Lien Secured Parties waives any claim it may now or hereafter have against the Applicable Authorized Representative or any other First Lien Secured Party of any other Series arising out of (i) any actions which the Applicable Authorized Representative or any First Lien Secured Party takes or omits to take (including, actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the First Lien Obligations from any account debtor, guarantor or any other party) in accordance with the First Lien Security Documents or any other agreement related thereto or to the collection of the First Lien Obligations or the valuation, use, protection or release of any security for the First Lien Obligations, (ii) any election by the Applicable Authorized Representative or any holders of First Lien Obligations, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code or (iii) subject to Section 2.05, any borrowing by, or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code by, the Company or any of its subsidiaries, as debtor-in-possession. Notwithstanding any other provision of this Agreement, no Authorized Representative shall accept any Shared Collateral in full or partial satisfaction of any First Lien Obligations pursuant to Section 9-620 of the Uniform Commercial Code of any jurisdiction, without the consent of the Applicable Authorized Representative.

SECTION 4.02 *Rights as a First Lien Secured Party*.

(a)    The First Lien Secured Parties (excluding any Authorized Representative) shall indemnify upon demand the Applicable Authorized Representative and each of its Related Persons (to the extent not reimbursed by or on behalf of any Grantor and without limiting the obligation of any Grantor to do so), pro rata, and hold harmless each such Related Person from

-17-

and against any and all liabilities incurred by it in connection with the performance of its duties under this Agreement and any Secured Credit Document such First Lien Secured Parties benefit from; *provided* that no First Lien Secured Party shall be liable for the payment to any Related Person of any portion of such indemnified liabilities resulting from such Related Person's own gross negligence or willful misconduct, as determined by the final, non-appealable judgment of a court of competent jurisdiction. In the case of any investigation, litigation or proceeding giving rise to any indemnified liabilities, this applies whether any such investigation, litigation or proceeding is brought by any First Lien Secured Party or any other Person. Without limitation of the foregoing, each First Lien Secured Party (excluding any Authorized Representative) shall reimburse the Applicable Authorized Representative upon demand for its ratable share of any costs or out-of-pocket expenses (including attorney costs) incurred by the Applicable Authorized Representative in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Secured Credit Document, or any document contemplated by or referred to herein, to the extent that the Applicable Authorized Representative is not reimbursed for such expenses by or on behalf of the Grantors. The undertaking in this Section 4.02 shall survive termination of this Agreement and the resignation of the Applicable Authorized Representative.

SECTION 4.03 *Exculpatory Provisions*.

(a)    The Applicable Authorized Representative shall not have any duties or obligations to the First Lien Secured Parties except those expressly set forth herein. Without limiting the generality of the foregoing, the Applicable Authorized Representative:

(i)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing;

(ii)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby; provided that the Applicable Authorized Representative shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Applicable Authorized Representative to liability or expense or that is contrary to this Agreement, any First Lien Security Document or applicable law;

(iii)    shall not, except as expressly set forth herein, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Company or any of its Affiliates that is communicated to or obtained by the Person serving as the Applicable Authorized Representative or any of its Affiliates in any capacity;

(iv)    shall not be liable for any action taken or not taken by it (A) in the absence of its own gross negligence or willful misconduct (as determined in the final non-appealable judgment of a court of competent jurisdiction) or (B) in reliance on a certificate of an authorized officer of the Company stating that such action is permitted by the terms of this Agreement. The Applicable Authorized Representative shall be deemed not to have knowledge of any Default or Event of Default under any Series of First Lien Obligations unless and until written notice describing such Default or Event of Default is

-18-

given to the Applicable Authorized Representative by the Authorized Representative of such First Lien Obligations or any Grantor; and

(v)    shall not be responsible for or have any duty to ascertain or inquire into (A) any statement, warranty or representation made in or in connection with this Agreement or any other Secured Credit Document, (B) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (C) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (D) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Secured Credit Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the First Lien Security Documents, (E) the value or the sufficiency of any Collateral for any Series of First Lien Obligations, or (F) the satisfaction of any condition set forth in any Secured Credit Document.

SECTION 4.04 *Reliance by Applicable Authorized Representative*.

The Applicable Authorized Representative shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Applicable Authorized Representative also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. The Applicable Authorized Representative may consult with legal counsel (who may be counsel for the Company or any Affiliate thereof), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 4.05 *Delegation of Duties*.

The Applicable Authorized Representative may perform any and all of its duties and exercise its rights and powers hereunder by or through any one or more sub-agents appointed by the Applicable Authorized Representative. The Applicable Authorized Representative and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Affiliates of the Applicable Authorized Representative and any such sub-agent.

SECTION 4.06 *Non-Reliance on Applicable Authorized Representative and other First Lien Secured Parties*.

Each First Lien Secured Party (by accepting the benefits of this Agreement) acknowledges that it has, independently and without reliance upon the Applicable Authorized Representative, any Authorized Representative or any other First Lien Secured Party or any of their Affiliates and based on such documents and information as it has deemed appropriate, made its

own credit analysis and decision to enter into this Agreement and the other Secured Credit Documents. Each First Lien Secured Party (by accepting the benefits of this Agreement) also acknowledges that it will, independently and without reliance upon the Applicable Authorized Representative, any Authorized Representative or any other First Lien Secured Party or any of their Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Secured Credit Document or any related agreement or any document furnished hereunder or thereunder.

SECTION 4.07 *Collateral and Guaranty Matters*.

Each of the First Lien Secured Parties irrevocably authorizes the Applicable Authorized Representative, at its option and in its discretion,

(a)    to release any Lien on any property granted to or held by the Applicable Authorized Representative under any First Lien Security Document in accordance with Section 2.04 hereof or upon receipt of a written request from the Company stating that the releases of such Lien is permitted by the terms of each then extant Secured Credit Document; and

(b)    to release any Grantor from its obligations under any First Lien Security Documents under which the Applicable Authorized Representative is the Authorized Representative for the applicable First Lien Secured Parties thereunder upon receipt of a written request from the Company stating that such release is permitted by the terms of each then extant Secured Credit Document.

ARTICLE V

**Miscellaneous**

SECTION 5.01 *Notices*. All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

(a)    if to the First Lien Credit Agreement Collateral Agent, to:

Credit Suisse AG, Cayman Islands Branch
Eleven Madison Avenue
New York, NY 10010
Attention: Agency Group Manager
Facsimile no: 212-994-0961-
E-Mail Address: didier.siffer@credit-suisse.com

(b)    if to the Initial Additional Authorized Representative, to:

The Bank of New York Mellon Trust Company, N.A.
525 William Penn Place, 38th Floor
Pittsburg, PA 15259

-20-

Attention:  Corporate Trust Administration, Raymond K. O'Neal
Facsimile no:  (412) 234-7535
E-Mail Address: Raymond.K.O'Neil@bnymellon.com

(c)    if to any other Authorized Representative, to it at the address set forth in the applicable Joinder Agreement.

Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt (if a Business Day) and on the next Business Day thereafter (in all other cases) if delivered by hand or overnight courier service or sent by facsimile or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 5.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 5.01.  As agreed to in writing by each Authorized Representative from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable person provided from time to time by such person.

SECTION 5.02 *Waivers; Amendment; Joinder Agreements*.

(a)    No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement nor any provision hereof may be terminated, waived, amended or modified (other than pursuant to any Joinder Agreement) except pursuant to an agreement or agreements in writing entered into by each Authorized Representative and, with respect to any such termination, waiver, amendment or modification which by the terms of this Agreement requires the Company's consent or which increases the obligations or reduces the rights of the Company or any other Grantor, the Company.

(c)    Notwithstanding the foregoing, without the consent of any First Lien Secured Party, any Authorized Representative may become a party hereto by execution and delivery of a Joinder Agreement in the form of Exhibit A hereto and upon such execution and delivery, such Authorized Representative and the Additional First Lien Secured Parties and Additional First Lien Obligations of the Series for which such Authorized Representative is acting shall be subject to the terms hereof.

-21-

(d)    Notwithstanding the foregoing, without the consent of any other Authorized Representative or First Lien Secured Party, the Applicable Authorized Representative and the Company may effect amendments and modifications to this Agreement to the extent necessary to reflect any incurrence of any Additional First Lien Obligations in compliance with the First Lien Credit Agreement and the other Secured Credit Documents or to implement the replacement or succession of any Authorized Representative.

SECTION 5.03 *Parties in Interest*.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, as well as the other First Lien Secured Parties, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement.

SECTION 5.04 *Survival of Agreement*.  All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

SECTION 5.05 *Counterparts*.  This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract.  Delivery of an executed signature page to this Agreement by facsimile or electronic transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 5.06 *Severability*.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 5.07 *Governing Law; Jurisdiction; Consent to Service of Process*.

(a)    This Agreement shall be construed in accordance with and governed by the law of the State of New York.

SECTION 5.08 *Submission To Jurisdiction Waivers*.  Each Authorized Representative, on behalf of itself and the First Lien Secured Parties of the Series for whom it is acting, irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the courts of the State of New York in the County of New York, Borough of Manhattan, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(b)    consents that any such action or proceeding shall be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same and agrees not to commence or support any such legal action or proceeding in any other jurisdiction;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person (or its Authorized Representative) at the address referred to in Section 5.01;

(d)    agrees that nothing herein shall affect the right of any other party hereto (or any First Lien Secured Party) to effect service of process in any other manner permitted by law; and

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 5.08 any special, indirect, exemplary, punitive or consequential damages.

SECTION 5.09 *WAIVER OF JURY TRIAL*.  EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.

SECTION 5.10 *Headings*.  Article, Section and Annex headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 5.11 *Conflicts*.  In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of any of the other Secured Credit Documents or First Lien Security Documents, the provisions of this Agreement shall control.  By accepting the benefits of this Agreement, each First Lien Secured Party hereby waives any right to assert that any provision of any Secured Credit Document or First Lien Security Document that is inconsistent with the terms of this Agreement shall govern or control with respect to such inconsistency.

SECTION 5.12 *Provisions Solely to Define Relative Rights*.  The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Secured Parties in relation to one another. None of the Company, any other Grantor or any other creditor thereof shall have any rights or obligations hereunder, except as expressly provided in this Agreement, and none of the Company or any other Grantor may rely on the terms hereof (other than Sections 2.04, 2.05, 2.08, 2.09 and Articles V and VI).  Nothing in this Agreement is intended to or shall impair the obligations of any Grantor, which are

absolute and unconditional, to pay the First Lien Obligations as and when the same shall become due and payable in accordance with their terms.

SECTION 5.13 *Integration*. This Agreement represents the agreement of each of the Grantors and the First Lien Secured Parties with respect to the subject matter hereof and there are no promises, undertakings, representations or warranties by the Applicable Authorized Representative, any Authorized Representative or any other First Lien Secured Party relative to the subject matter hereof not expressly set forth or referred to herein.

SECTION 5.14 *Incorporation by Reference*. In connection with its execution and acting hereunder, the Initial Additional Authorized Representative is entitled to all rights, benefits, protections, immunities, privileges and indemnities provided to it as trustee under the Initial Additional First Lien Agreements. In addition, it is understood and agreed that The Bank of New York Mellon Trust Company, N.A. is entering into this Agreement in its capacity as trustee and collateral agent under the Initial Additional First Lien Agreements and not in its individual capacity and in no event shall The Bank of New York Mellon Trust Company, N.A. incur any liability in connection with this Agreement or be personally liable for or on account of the statements, representations, warranties, covenants or obligations stated to be those of the Initial Additional Authorized Representative or any Initial Additional First Lien Secured Parties hereunder, all such liability, if any, being expressly waived by the parties hereto and any person claiming by, through or under such party.

## ARTICLE VI

### Additional First Lien Obligations

SECTION 6.01 *Additional First Lien Obligations*. The Company may from time to time, subject to any limitations contained in any Secured Credit Documents in effect at such time, designate additional indebtedness and related obligations that are secured by Liens on any assets of the Grantors that would constitute Shared Collateral as Additional First Lien Obligations by delivering to each Authorized Representative party hereto at such time a certificate of an authorized officer of the Company:

(a)    describing the indebtedness and other obligations being designated as Additional First Lien Obligations, and including a statement of the maximum aggregate outstanding principal amount of such indebtedness as of the date of such certificate;

(b)    setting forth the Additional First Lien Agreements under which such Additional First Lien Obligations are issued or incurred or the Guarantees of or Liens securing such Additional First Lien Obligations are, or are to be, granted or created, and attaching copies of such Additional First Lien Agreements as each Grantor has executed and deliv-

ered to the Person that serves as the collateral agent, collateral trustee or a similar representative for the holders of such Additional First Lien Obligations (such Person being referred to as the "*Additional Authorized Representative*") with respect to such Additional First Lien Obligations on the closing date of such Additional First Lien Obligations, certified as being true and complete by an authorized officer of the Company;

(c)    identifying the Person that serves as the Additional Authorized Representative;

(d)    certifying that the incurrence of such Additional First Lien Obligations, the creation of the Liens securing such Additional First Lien Obligations and the designation of such Additional First Lien Obligations as "*Additional First Lien Obligations*" hereunder do not violate or result in a default under any provision of any Secured Credit Document in effect at such time; and

(e)    attaching a fully completed Joinder Agreement executed and delivered by the Additional Authorized Representative.

(f)    Upon the delivery of such certificate and the related attachments as provided above, the obligations designated in such notice shall become Additional First Lien Obligations for all purposes of this Agreement.

SECTION 6.02 *Junior Intercreditor Agreements*.  Each of the First Lien Secured Parties (by accepting the benefits of this Agreement) hereby authorizes the Applicable Authorized Representative to enter into additional intercreditor agreements on terms reasonably satisfactory to the Applicable Authorized Representative to establish that the Liens on any Collateral securing Indebtedness shall be junior and subordinated to Lien securing the First Lien Obligations to the extent such Indebtedness and Liens are permitted by First Lien Credit Agreement and each Additional First Lien Agreement (including the Initial Additional First Lien Agreement).  The Company may from time to time request that the Applicable Authorized Representative enter into such additional intercreditor agreements by delivering to each Authorized Representative party hereto at such time a certificate of an authorized officer of the Company:

(a)    describing the indebtedness and other obligations that shall be secured by such junior and subordinated Liens on the Collateral (the "*Junior Lien Obligations*");

(b)    setting forth the agreements under which such Junior Lien Obligations are issued or incurred or the Guarantees of or Liens securing such Junior Lien Obligations are, or are to be, granted or created, and attaching copies of such agreements as each Grantor has executed and delivered to the Person that serves as the collateral agent, collateral trustee or a similar representative for the holders of such Junior Lien Obligations (such Person being referred to as the "*Junior Lien Representative*") with respect to such Junior Lien Obligations, certified as being true and complete by an authorized officer of the Company;

(c)    identifying the Person that serves as the Junior Lien Representative; and

(d)    certifying that the incurrence of such Junior Lien Obligations and the creation of the Liens securing such Junior Lien Obligations do not violate or result in a default under any provision of any Secured Credit Document in effect at such time.

[Remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH (F/K/A CREDIT SUISSE, CAYMAN ISLANDS BRANCH),**
as First Lien Credit Agreement Collateral Agent and Authorized Representative for the First Lien Credit Agreement Secured Parties

By: _____

Name:
Title:      Didier Siffer
            Authorized Signatory

By: _____

Name:
Title:      Ad    Zausmer
            Auth    d Signatory

SIGNATURE PAGE TO FIRST LIEN INTERCREDITOR AGREEMENT

**THE BANK OF NEW YORK MELLON
TRUST COMPANY, N.A.,**
as Initial Additional Authorized
Representative

By: _____

    Name:

    Title:      Raymond K. O'Neil
                Senior Associate

SIGNATURE PAGE TO FIRST LIEN INTERCREDITOR AGREEMENT

**HMH HOLDINGS (DELAWARE), INC.**

By: _____
Name: William F. Bayers
Title:  Executive Vice President,
        Secretary and General Counsel

**HOUGHTON MIFFLIN HARCOURT
PUBLISHERS INC.**

By: _____
Name: William F. Bayers
Title:  Executive Vice President,
        Secretary and General Counsel

**HOUGHTON MIFFLIN HARCOURT
PUBLISHING COMPANY**

By: _____
Name: William F. Bayers
Title:  Executive Vice President,
        Secretary and General Counsel

**HMH PUBLISHERS LLC**

By: Houghton Mifflin Harcourt Publishers Inc.,
    *its sole member*

By: _____
Name: William F. Bayers
Title:  Executive Vice President,
        Secretary and General Counsel

SIGNATURE PAGE TO FIRST LIEN INTERCREDITOR AGREEMENT

**ACHIEVE! DATA SOLUTIONS, LLC**

By: HMH Publishers LLC,
　*its sole member*

　　By: Houghton Mifflin Harcourt Publishers Inc.,
　　　*its sole member*

　　　By: _____
　　　　Name: William F. Bayers
　　　　Title:  Executive Vice President,
　　　　　Secretary and General Counsel

**STECK-VAUGHN PUBLISHING LLC**

By: HMH Publishers LLC,
　*its sole member*

　　By: Houghton Mifflin Harcourt Publishers Inc.,
　　　*its sole member*

　　　By:_____
　　　　Name: William F. Bayers
　　　　Title:   Executive Vice President,
　　　　　Secretary and General Counsel

**RIVERDEEP UK LIMITED**

By: _____
    Name: William F. Bayers
    Title:   Secretary and Director

**HOUGHTON MIFFLIN PLC**

By: _____
    Name: William F. Bayers
    Title:   Executive Vice President, Secretary
          and General Counsel

SIGNATURE PAGE TO FIRST LIEN INTERCREDITOR AGREEMENT

**HMH PUBLISHING COMPANY**

By:_____
    Name: William F. Bayers
    Title:  Secretary and Director

**HMH EDUCATION COMPANY**

By:_____
    Name: William F. Bayers
    Title:  Secretary and Director

**HMH IP COMPANY**

By:_____
    Name: William F. Bayers
    Title:  Secretary and Director

**HMH CONSUMER COMPANY**

By:_____
    Name: William F. Bayers
    Title:  Secretary and Director

SIGNATURE PAGE TO FIRST LIEN INTERCREDITOR AGREEMENT

**EACH OF THE SUBSIDIARY GRANTORS
LISTED ON <u>SCHEDULE 1</u> HERETO**

By: _____

    Name: William F. Bayers
    Title:  Executive Vice President,
           Secretary and General Counsel

SIGNATURE PAGE TO FIRST LIEN INTERCREDITOR AGREEMENT

## Schedule 1

## Subsidiary Grantors

Advanced Learning Centers, Inc.

Broderbund LLC

Classroom Connect, Inc.

Classwell Learning Group Inc.

Cognitive Concepts, Inc.

Edusoft

Greenwood Publishing Group, Inc.

HM Publishing Corp.

HMH Supplemental Publishers Inc.

Houghton Mifflin Company International, Inc.

Houghton Mifflin Finance, Inc.

Houghton Mifflin Holding Company, Inc.

Houghton Mifflin Holdings, Inc.

Houghton Mifflin, LLC

HRW Distributors, Inc.

Riverdeep Inc., a Limited Liability Company

RVDP, Inc.

Sentry Realty Corporation

The Riverside Publishing Company

EXHIBIT A

[FORM OF] JOINDER AGREEMENT NO. [ ] dated as of [          ], 20[ ] (the "Joinder Agreement") to the FIRST LIEN INTERCREDITOR AGREEMENT dated as of May 26, 2011 (the "Intercreditor Agreement"), among HMH Holdings (Delaware), Inc., a company organized under the laws of the State of Delaware, HMH PUBLISHING COMPANY, a company organized under the laws of the Republic of Ireland, HOUGHTON MIFFLIN HARCOURT PUBLISHERS INC., a corporation organized under the laws of the State of Delaware, HMH PUBLISHERS LLC, a limited liability company organized under the laws of the State of Delaware, HOUGHTON MIFFLIN HARCOURT PUBLISHING COMPANY, a corporation organized under the laws of the Commonwealth of Massachusetts, the other Grantors (as defined therein), CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as the First Lien Credit Agreement Collateral Agent and as Authorized Representative for the First Lien Credit Agreement Secured Parties, [THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.], as the Initial Additional Authorized Representative, and each ADDITIONAL AUTHORIZED REPRESENTATIVE from time to time party thereto.

A.    Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

B.    The Company proposes to issue or incur Additional First Lien Obligations and the Person identified in the signature pages hereto as the "Additional Authorized Representative" (the "Additional Authorized Representative") will serve as the collateral agent, collateral trustee or a similar representative for the Additional Secured Parties. The Additional First Lien Obligations are being designated as such by the Company in accordance with Article VI of the First Lien Intercreditor Agreement.

C.    The Additional Authorized Representative wishes to become a party to the First Lien Intercreditor Agreement and to acquire and undertake, for itself and on behalf of the Additional First Lien Secured Parties, the rights and obligations of an "Additional Authorized Representative" thereunder. The Additional Authorized Representative is entering into this Joinder Agreement in accordance with the provisions of the First Lien Intercreditor Agreement in order to become an Additional Authorized Representative thereunder.

Accordingly, the Additional Authorized Representative and the Company agree as follows, for the benefit of the Additional Authorized Representative, the Company and each other party to the First Lien Intercreditor Agreement:

SECTION 1. Accession to the Intercreditor Agreement. The Additional Authorized Representative (a) hereby accedes and becomes a party to the First Lien Intercreditor Agreement as an Additional Authorized Representative for the Additional First Lien Secured Parties from time to time in respect of the Additional First Lien Obligations, (b) agrees, for itself and on behalf of the Additional First Lien Secured Parties from time to time in respect of the Additional First Lien Obligations, to all the terms and provisions of the First Lien Intercreditor Agreement and (c) shall have all the rights and obligations of an Additional Authorized Representative under the First Lien Intercreditor Agreement.

Exhibit A-1

SECTION 2. Representations, Warranties and Acknowledgement of the Additional Authorized Representative. The Additional Authorized Representative represents and warrants to the Authorized Representatives and the other parties to the First Lien Intercreditor Agreement that (a) it has full power and authority to enter into this Joinder Agreement, in its capacity as the Additional Authorized Representative, (b) this Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of this Joinder Agreement and (c) the Additional First Lien Agreements relating to such Additional First Lien Obligations provide that, upon the Additional Authorized Representative's entry into this Joinder Agreement, the secured parties in respect of such Additional First Lien Obligations will be subject to and bound by the provisions of the First Lien Intercreditor Agreement as Additional First Lien Secured Parties.

SECTION 3. Counterparts. This Joinder Agreement may be executed in multiple counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Joinder Agreement shall become effective when each Authorized Representative shall have received a counterpart of this Joinder Agreement that bears the signature of the Additional Authorized Representative. Delivery of an executed signature page to this Joinder Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually signed counterpart of this Joinder Agreement.

SECTION 4. Benefit of Agreement. **The agreements set forth herein or undertaken pursuant hereto are for the benefit of, and may be enforced by, any party to the First Lien Intercreditor Agreement.**

SECTION 5. Governing Law. **THIS JOINDER AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6. Severability. Any provision of this Joinder Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof or of the First Lien Intercreditor Agreement; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7. Notices. All communications and notices hereunder shall be in writing and given as provided in Section 5.01 of the First Lien Intercreditor Agreement. All communications and notices hereunder to the Additional Authorized Representative shall be given to it at the address set forth under its signature hereto, which information supplements Section 5.01 of the First Lien Intercreditor Agreement.

Exhibit A-2

IN WITNESS WHEREOF, the Additional Authorized Representative has duly executed this Joinder Agreement to the First Lien Intercreditor Agreement as of the day and year first above written.

[NAME OF ADDITIONAL AUTHORIZED REPRESENTATIVE], as ADDITIONAL AUTHORIZED REPRESENTATIVE for the ADDITIONAL FIRST LIEN SECURED PARTIES

By: _____
     Name:
     Title:


Address for notices:

_____
_____

_____
_____

attention of: _____

Telecopy: _____

Exhibit A-3

Acknowledged by:

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as
First Lien Credit Agreement Collateral Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,
as Initial Additional Authorized Representative

By: _____
    Name:
    Title:

[EACH OTHER ADDITIONAL
AUTHORIZED REPRESENTATIVE, as Additional
Authorized Representative

By: _____
    Name:
    Title:

HMH HOLDINGS (DELAWARE), INC.

By: _____
    Name:
    Title:

HMH PUBLISHING COMPANY

By: _____
    Name:
    Title:

Exhibit A-4

HOUGHTON MIFFLIN HARCOURT PUBLISHERS INC.

By: _____
   Name:
   Title:


HMH PUBLISHERS LLC

By: _____
   Name:
   Title:


HOUGHTON MIFFLIN HARCOURT PUBLISHING COMPANY

By: _____
   Name:
   Title:


[GRANTORS]

By: _____
   Name:
   Title: