UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| HOUGHTON MIFFLIN HARCOURT | ) | Case No. 12-12171 (REG) |
| PUBLISHING COMPANY, *et al.*, | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

### DECISION ON U.S. TRUSTEE MOTION TO TRANSFER VENUE OF THESE CASES

APPEARANCES:

TRACY HOPE DAVIS
*Office of the United States Trustee*
33 Whitehall Street, 21st Floor
New York, New York 10004
By:    Andrea B. Schwartz, Esq. (argued)
       Susan D. Golden, Esq.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
*Counsel for the Debtors*
1285 Avenue of the Americas
New York, New York 10019
By:    Alan W. Kornberg, Esq.
       Jeffrey D. Saferstein, Esq. (argued)
       Philip A. Weintraub, Esq.

AKIN GUMP STRAUSS HAUER & FELD LLP
*Counsel for the Informal Creditor Group*
One Bryant Park
New York, New York 10036
By:    Ira Dizengoff, Esq.
       Philip C. Dublin, Esq. (argued)
       Rachel Ehrlich Albanese, Esq.

SHEARMAN & STERLING LLP
*Counsel for Citibank, N.A., as Administrative Agent under the DIP Credit Facility*
599 Lexington Avenue
New York, New York 10022
By:    Fredric Sosnick, Esq.
       Edmund M. Emrich, Esq. (argued)

BEFORE:        ROBERT E. GERBER
               UNITED STATES BANKRUPTCY JUDGE

In this contested matter in the jointly administered chapter 11 cases of debtor

Houghton Mifflin Harcourt Publishing Company ("**Publishing**") and 24 affiliates, who

filed these cases with a prepackaged plan of reorganization that secured the unanimous

support of their creditors, the United States Trustee Program ("**UST**") moves, pursuant to

28 U.S.C. § 1406 and Fed.R.Bankr.P. 1014(a)(2), to transfer the venue of these cases

elsewhere.

The UST, over the objection of the Debtors and all of the creditors who have

weighed in on the matter, contends that venue in this district never was proper, for failure

to satisfy the requirements of the relevant statute, 28 U.S.C. § 1408.  Under these

circumstances, the UST contends, dismissal or transfer is mandatory under § 1406.  The

UST further contends that the fact that a transfer would be much more expensive and

much less convenient for the Debtors' creditors—especially since we here have a

prepack, where the case otherwise would be over in 30 days—does not matter.

For the latter reason, the UST's prosecution of this motion has been perplexing to

the Court—not because it is in any way improper, but as a matter of prosecutorial

discretion, since venue concerns can be waived, by creditors and the UST alike, and here

any venue deficiencies were not a matter of concern to the Debtors' creditors.  Venue

objections of course should be raised, by the UST and creditors alike, when a debtor's

venue choice is prejudicial to the creditor community.  But here the venue choice was

exactly what the creditors wanted; the case, if not slowed down by the UST's motion,

would be over in 30 days; and the UST's motion was opposed by every party in the case with money on the line.

But with that said, the Court acts in accordance with the requirements of law. Once a § 1406 motion has been filed, § 1406 and its related caselaw leave the Court with no discretion. Here the Court must find, as a mixed question of fact and law, that the statutory requirements for venue in this district were not satisfied. The UST's motion having been filed, it thus must be granted, subject only to determining when and where to effect the transfer.

But while the Court has no discretion to retain the case, it still has the ability to reduce the prejudice to the creditors that an immediate transfer would entail. Venue, even if improper, is not jurisdictional. While § 1406 mandates transfer or dismissal when statutory venue requirements have not been met, it does not dictate *when* the transfer must take place, nor does it foreclose steps in the interim to protect the creditors who might be harmed thereby.

Thus the Court will effect the transfer at a time that decreases the resulting prejudice to creditors, the Debtors, and the Debtors' employees. The case will be transferred on the first to occur of the Effective Date or three weeks from the date of entry of the confirmation order, if for some reason the Plan has not gone effective by then.

The Court's Findings of Fact, Conclusions of Law, and bases for the exercise of its discretion follow.

-2-

Facts[1]

*1. Background*

The Debtors are in the publishing business, most significantly in textbooks used in elementary and secondary schools.  Their enterprise is large.  At the time of filing, the Debtors' combined assets (at book value) were reported to be $2.68 billion, and their total liabilities were said to be $3.54 billion.[2]  They had combined revenues of approximately $1.3 billion, and adjusted EBITDA of $238 million, in calendar year 2011.[3]  As described in their first day papers (and as unchallenged by the UST), the Debtors' financial difficulties were occasioned by excessive debt and a sharp decrease in demand for their product, particularly as a consequence of financial stress on their customers—state and municipal governments who were victims of the financial crisis of 2007-2008 and decreases in financial assistance from the federal government.[4]

To address their difficulties, the Debtors engaged in prepetition discussions with their creditors to restructure their debt, leading to prepetition agreement on a consensual reorganization plan.  Acceptances of a prepackaged[5] plan of reorganization were sought and obtained before the filing of the Debtors' chapter 11 cases.

---

[1]   Under this Court's Case Management Order #1, factual representations in each side's motion papers are taken as true, except to the extent disputed by the party's opponent(s).  To avoid unnecessarily lengthening this decision, record citations are limited to the most important matters.

[2]   Debtors 1007-2 Decl. at Exh. E, as docketed in 12-12171 (REG) (ECF #3).

[3]   *Id.* at ¶ 25.

[4]   *Id.* at ¶¶ 23, 33.

[5]   A "prepackaged" plan of reorganization—referred to colloquially in the bankruptcy community as a "prepack"—is one where acceptances of the plan have been sought and obtained before the bankruptcy case is even filed.  It is to be contrasted with a "pre-arranged" plan of reorganization (under which deal points of a reorganization plan have been negotiated with many (though not necessarily all) interested parties with acceptances to be solicited *after* the chapter 11 filing), and of course a "free-fall" chapter 11, under which one or more debtors files a chapter 11 case with no clear way out.

The prepackaged plan emerged from an agreement between the Debtors and an informal creditor group ("**Informal Creditor Group**") of holders of secured debt, which is one of the several parties that, along with the Debtors, oppose the UST's motion.  The ultimately successful negotiations led to a plan support agreement (the "**Plan Support Agreement**") embodying the deal points that found their way into the ultimately accepted prepackaged plan.  Though it is not relevant to matters that are purely questions of law (and is relevant only to matters of discretion, if that), the Plan Support Agreement *required* that the chapter 11 cases be filed in the Southern District of New York.[6]

In its simplest terms, the prepackaged plan provided for the conversion of billions of dollars of secured debt into equity.  Significantly, the plan left general unsecured claims—most significantly, trade claims from the vendor community and tort claims—unimpaired.  The idea, to be implemented by a confirmation hearing based on the plan acceptances that had been obtained prepetition, was to make the Debtors' chapter 11 cases as quick and painless for their creditors (especially their trade creditors) as possible. The plan was unanimously accepted by the Debtors' creditors.  A confirmation hearing on the already-accepted plan was scheduled for a date only slightly after the earliest date permissible under the Federal Rules of Bankruptcy Procedure.  Unless delayed as a consequence of the UST's motion, the case could be over in about 30 days.

---

The importance of the fact that here we have a *prepack*—already approved by creditors, and intended to speed through the bankruptcy system—cannot be overemphasized.

[6]    Apart from choice of law issues that were articulated by Debtors' counsel in oral argument, the desire for a filing in New York is partly explained by a point made by the Informal Creditor Group.  The latter notes that the agent for the DIP Credit Facility and proposed exit facility, Citibank, N.A. ("**Citibank**") (which likewise opposes the UST's motion), and substantially all of the senior creditors who are parties to the Plan Support Agreement are located in New York—as are the attorneys for each of the Debtors, the Informal Creditor Group, the first lien secured debt agents and the DIP lenders.  The Informal Creditor Group points out that "transferring venue to a different district would appreciably increase professional fees and expenses in these cases." (Informal Creditor Group Br. at 4).  That point is not disputed by the UST, but is argued to be irrelevant.

While the UST was free to solicit membership in an official committee of unsecured creditors, no creditors' committee was formed, as there was insufficient interest in forming one. The unsecured creditors who, in another case, would form the natural constituency for such a creditors' committee here would be unimpaired.

## 2. *The Debtors' Chapter 11 Filings*

On May 21, 2012, the 25 Debtors commenced these chapter 11 cases, one after another in quick succession. The first of the cases to be filed on the Court's docket (assuming that it matters) was Publishing, the Debtors' primary operating company. Publishing is a Delaware corporation, with its principal place of business in Boston, Massachusetts.[7] The fourth of the Debtors to file was Houghton Mifflin Holding Company ("**HoldCo**"), also a Delaware corporation, the location of whose principal assets is a matter of dispute between the parties, but whose principal place of business is indisputably in Boston, Massachusetts. The Debtors assert that venue in New York was proper for each of Publishing and HoldCo, and thus that venue in New York for their debtor affiliates was proper as well.

To the extent that the principal places of business of the other Debtors are relevant (though the Court does not believe that they are), they are likewise in Massachusetts, or at least in places other than New York. None of the Debtors is organized under the laws of New York. Most of the Debtors (15 of the 25) are Delaware corporations.

---

[7]     It is undisputed that Publishing's "Education" division, which accounted for about 90% of the Debtors' total revenue in 2011, has offices in Massachusetts, Florida, Illinois, Texas, New Hampshire and Ireland, but not, evidently, in New York. Publishing also has a "Trade and Reference" division, whose main offices are located in New York City and Boston. But the Debtors do not contend that the latter's New York City presence is sufficient to make New York the principal place of business for the Trade and Reference division, much less for Publishing as a whole.

To the extent that the "nerve center" of the entire corporate enterprise—as contrasted to that of any individual Debtor—is relevant (though again, given the underlying basis for the motion here, the Court does not believe that it is),[8] the "nerve center" of the entire corporate enterprise is in Boston, Massachusetts—where "Houghton Mifflin Harcourt Publishing" (without being more specific as to what individual corporations were encompassed under that appellation) was identified by the Boston Redevelopment Authority as one of Boston's largest employers.

### 3. Facts as to Publishing and HoldCo

The first of the two key debtors, Publishing, has an office at 215 Park Avenue South in Manhattan, where Publishing leases the 12th floor and a portion of the 11th floor.  At that office, Publishing employs 60 full-time employees; it also has 15 sales representatives associated with its New York office who work from their homes.  That is enough for the Court to find that Publishing does business in the state of New York.  But the Court does not understand the Debtors to argue, and in any event does not find, that such is sufficient for the Court to find that Publishing's principal place of business is in New York.[9]

---

[8]    The Court might consider that relevant to a motion to transfer venue for the convenience of the parties or the interest of justice, but the UST bases its motion not on those grounds, but on the enumerated bases for venue under 28 U.S.C. § 1408, which lists five separate bases for venue that are applicable to a particular debtor.

[9]    The Court understands the Debtors to argue instead that Publishing's New York presence warrants a finding that Publishing has a "residence" in New York within the meaning of 28 U.S.C. § 1408(a).  That contention calls for a determination of another mixed question of fact and law, and it is thus addressed below.

The Debtors also note that Publishing maintains two investment accounts with Morgan Stanley in Manhattan, but the Debtors do not make much of this, nor does the Court see why anyone would.  Venue for Publishing is not premised on location of principal assets, and there is no suggestion that the investment accounts with Morgan Stanley outweigh Publishing's assets in Massachusetts or elsewhere.

The second of the two key debtors, HoldCo, identified its basis for venue as the presence of its corporate affiliates when it first filed its petition on May 21.[10] Eleven days later, HoldCo filed an amended petition, changing its stated basis for venue to its "domicile, residence, principal place of business or principal assets."[11] HoldCo also changed the location of its principal assets from "N/A" to an address in Manhattan. Later, in their brief in opposition to the motion, the Debtors made clear that HoldCo was relying on the "principal assets" basis, premised on leased and subleased space in New York City.

HoldCo premised its venue assertions on space it leased and then subleased—described on the lease as "Room 815, 1350 Avenue of the Americas" (the "**Sixth Avenue Space**")—in Manhattan. The Sixth Avenue Space formerly served as the domestic office of a previous parent company, Education Media and Publishing Group International. However, HoldCo does not currently conduct operations in the Sixth Avenue Space or otherwise occupy it. Instead, it "is currently subleased *entirely* to an outside, nonaffiliated entity."[12]

HoldCo pays its lessor approximately $415,000 per year for the Sixth Avenue Space, while receiving only $220,000 per year from its sublessee. The prime lease is a net cash drain, which might nevertheless have value if benefits were being obtained from it, but there is no showing of benefits here. Based on the record before the Court, the Sixth Avenue Space is money losing on a cash flow basis. Nor does the Court have

---

[10]    *See* "Information Regarding the Debtor-Venue," on HoldCo's petition at 2, as docketed in 12-12175 (ECF #1).

[11]    *See* "Information Regarding the Debtor-Venue," on HoldCo's amended petition at 2, as docketed in 12-12175 (ECF #4).

[12]    Debtors' Opp. Br. (ECF #79) at 4 (emphasis added).

evidence from which it could find, if that were so, that the Sixth Avenue Space is at a below-market rate—and thus would have intrinsic economic value to HoldCo as a valuable asset to be retained or that could be put up for sale to a prospective purchaser. The Court can and does find that the lease and sublease are assets of the HoldCo estate, but it cannot find, on the record before it, that they have any material value.

Additionally, however, the Court is compelled to find that the Debtor's presentation of HoldCo's asset mix was, until corrected at oral argument, materially inaccurate. In the Debtors' objection, the Court was told that "[HoldCo] has no other assets besides its rights under the lease and sublease described herein."[13] But the Court cannot find that to be true. Rather, the Court finds that HoldCo was called a "Holding Company" for a reason. It had 15 direct and indirect subsidiaries. When HoldCo filed, it owned the stock of a subsidiary, Houghton Mifflin, LLC ("**LLC Sub**"), a Delaware corporation that also is a debtor in this case.[14] LLC Sub had two subsidiaries of its own, debtor Houghton Mifflin Finance, Inc. ("**Finance**"), a Delaware corporation, and debtor Houghton Mifflin Holdings, Inc. ("**Holdings**"), also a Delaware corporation.[15] And while Finance had no lower level subsidiaries,[16] Holdings did: HM Publishing Corp. ("**HM Publishing**"), which also is a debtor in this case.[17]

---

[13]     *Id.*

[14]     *See* HoldCo's Corporate Ownership Statement at 2, as docketed in 12-12175 (REG) ("Houghton Mifflin Holding Company, Inc. directly owns 100% of the equity interests in Houghton Mifflin, LLC"); *accord* "Company Structure Chart," Bayers Opp. Decl. Exh. F. LLC Sub is also a debtor in this case. Its petition, docketed separately before joint administration was ordered, appears under Docket No. 12-12176 (REG).

[15]     *See* LLC Sub's Corporate Ownership Statement at 2, as docketed in 12-12176 (REG) ("Houghton Mifflin, LLC directly owns 100% of the equity interests in Houghton Mifflin Finance, Inc. and Houghton Mifflin Holdings Inc."); *accord* "Company Structure Chart," Bayers Opp. Decl. Exh. F.

[16]     *See* Finance's Corporate Ownership Statement at 2, as docketed in 12-12177 (REG) ("Houghton Mifflin Finance, Inc. does not own an equity interest in any entity.").

[17]     HM Publishing's petition was docketed in 12-12179 (REG).

Then, HM Publishing had two subsidiaries, debtor Publishing (the first company

to file, as discussed above), and HM Receivables Co. II, LLC ("**Receivables**"),

apparently a nondebtor.

Finally, but importantly, one of the two subsidiaries of HM Publishing—debtor

Houghton Mifflin Harcourt Publishing Company (the same company that was defined

above as "Publishing")—which was the first of the 25 debtors to file, and which was

designated by the Debtors as the "lead" case (though such designation is of no

significance on this motion),[18] had *nine* subsidiaries (the "**Nine Subsidiaries**"),[19] seven

of which are debtors here.  Unlike the other debtors, Publishing showed very substantial

assets on its petition.  Publishing checked the "More than $1 billion" box for "Estimated

Assets."[20]  More significantly, assets of $2.407 billion were reported for Publishing in the

Debtors' Rule 1007-2 Declaration[21] (though these were at book value, which for most

businesses is not necessarily the same as market value), and Publishing was the source of

the overwhelming bulk of the Debtors' $238 million in 2011 EBITDA, an important

metric by which companies are valued.

---

[18]    *See* n.26 *infra*.

[19]    *See* Publishing's Corporate Ownership Statement at 2, as docketed in 12-12171 (REG)
("Houghton Mifflin Harcourt Publishing Company directly owns 100% of the equity interests in
Sentry Realty Corporation, Houghton Mifflin Company International, Inc., The Riverside
Publishing Company, Classwell Learning Group Inc., Cognitive Concepts, Inc., Edusoft,
Houghton Mifflin PLC, Houghton Mifflin Harcourt Foundation, Inc., and Advanced Learning
Centers, Inc.").

[20]    *See* Publishing's petition, as docketed in 12-12171 (REG).

[21]    *See* Rule 1007-2 Decl. at Exh. E.

-9-

All 12 of the direct and indirect subsidiaries of HoldCo that are debtors[22] showed a street address in Boston. There was no argument here that the locale of any of the Debtors' stock should be found to be anywhere other than in Boston.

No evidence was introduced as to the value of the LLC Sub stock, or (as such might affect the value of LLC Sub stock) the value of the stock of LLC Sub's direct and indirect subsidiaries Finance, Holdings, HM Publishing, Receivables, Publishing, or the Nine Subsidiaries. Nor was evidence submitted as to the extent to which HoldCo had other contractual rights or intangible assets, like tax attributes, such as net operating losses ("**NOLs**"), though it appears that at least some of these subsidiaries, or their predecessors, at least once had business operations, and lost money, requiring a restructuring of their operations—facts that tend to telegraph the presence of NOLs, though of course any NOLs might belong to another entity. HoldCo reported "Estimated Assets" of "$100,001 to $500,000" on its amended petition (a change from "$0 to $50,000" on its original petition), but was otherwise silent as to their nature or value. However, since competent debtor counsel do not put entities into chapter 11 for no reason, the Court must infer, and finds, that one or more of LLC Sub, Finance, Holdings, HM Publishing, the Nine Subsidiaries, and, of course, Publishing had significant assets to protect. They generated nearly a quarter of a billion dollars in EBITDA.

In any event, the Court is not in a position to find, and cannot find, that HoldCo's money-losing contractual rights for the Sixth Avenue Space were worth more than its direct and indirect ownership of no less than 15 separate subsidiaries, one of which

---

[22]    Three of HoldCo's 15 direct or indirect subsidiaries—Receivables, Houghton Mifflin PLC, and Houghton Mifflin Harcourt Foundation, Inc.—are nondebtors.

represented its assets as worth more than a billion dollars,[23] and was the source of nearly all of the Debtors' $238 million in EBITDA.

### 4. Procedural Matters

During the first day hearings on May 22, the UST articulated venue as a concern. The UST's rights were reserved; findings in the proposed orders that venue was proper were removed; and the Debtors' first day motions were otherwise granted.

One of those motions was to set a date for the confirmation hearing with respect to the previously solicited, and unanimously accepted, plan. Another was a routine motion for joint administration of the Debtors' 25 separate chapter 11 cases. As the Debtors put it, "[Publishing] initially was selected by the Debtors as the lead-filing entity and the lead-captioned entity in the Debtors' motion for joint administration."[24] As the UST put it, the joint administration motion was granted, "under the caption, 'In re Houghton Mifflin Publishing Company, et al.;' thus identifying the first-filed debtor, [Publishing], as the 'lead debtor' of these mega cases."[25] Each statement is true, but irrelevant.[26]

---

[23]     The Court recognizes, of course, that no matter how large a corporation's assets may be, if its liabilities exceed the value of its assets, its stock may be worthless. Nevertheless, the Court struggles to believe, or find, that a subsidiary corporate family of 15 companies (one of which had assets of over $1 billion) was of such minimal value that it was worth less than a money-losing lease for space HoldCo no longer occupied, and a sublease that would recoup only about half of the costs incurred under the prime lease. Additionally, a § 1408 "principal assets" determination is a factual inquiry, establishing the predicate for what ultimately is a mixed question of fact and law. *See, e.g., In re Shelton*, 2001 Bankr. LEXIS 2213, *17, 2001 WL 35814440, *5 (Bankr. D. Idaho Oct. 12, 2001) (Myers, J.) ("It appears to the Court that the question [location of principal assets, which there included intangible ones] is, at bottom, a factual one."). In engaging in such a factual inquiry, the Court believes that it may also consider the presence and nature of those subsidiaries—one of which has assets running into the billions—in qualitative terms.

[24]     Debtors Opp. Br. at 4, referring to their earlier motion for joint administration, ECF #4.

[25]     UST Reply Br. (ECF #100) at 4.

[26]     The Debtors and the UST each seem to find some significance in Publishing's having been designated as the lead debtor. But the Court finds none. Joint administration is nothing more than a procedural device to avoid duplicative filings, facilitate finding papers in the docket, avoid the

On May 30, with confirmation scheduled for June 21, the UST moved to transfer these cases.  The UST sought to file its motion on shortened notice.  By endorsed order, the Court denied the request for a shortening of time, stating, among other things, that "[t]his matter is too important to be heard without giving the stakeholders in this case, whose money is on the line, the normal opportunity to respond."[27]

## Discussion

## I.

## Statutory & Rule Provisions

Venue for cases—as contrasted to proceedings[28]—under the Bankruptcy Code is addressed under 28 U.S.C. § 1408, one of the several provisions of chapter 87 of the Judicial Code (which starts with § 1390 and goes on to § 1413) that address venue for matters in the federal district courts.

Section 1408 provides:

---

need for duplicative official committees and professionals, and otherwise to coordinate activities for related debtors.  Neither the name given to the jointly administered case, nor the particular debtor on whose docket subsequent papers are filed, has any substantive significance whatever. Sometimes (as in the case of *General Motors*, whose chapter 11 filing followed the filing of its affiliate Saturn of Harlem), the name given to the jointly administered case is that of the debtor most familiar to the public.  Sometimes (as in the cases of *Chateaugay*, for LTV, or *Ionosphere Clubs*, for Eastern Airlines), it is simply the name of the first-filing debtor in the group.

[27]    Endorsed Order dated May 31, 2012 (ECF #62).

[28]    As the Court has previously explained, *see, e.g.*, *Buena Vista Television v. Adelphia Communications Corp. (In re Adelphia Communications Corp.)*, 307 B.R. 404, 413 n.22 (Bankr. S.D.N.Y. 2004), "case" as used in bankruptcy parlance is a word of art—referring to that which is commenced by the filing for a petition for relief under the Bankruptcy Code, and refers to the umbrella case under which many individual proceedings—applications, motions, contested matters and adversary proceedings—are heard.  "Case" is the modern way of referring to what was commonly referred to as a "proceeding" under the former Bankruptcy Act.  Though many unfamiliar with bankruptcy practice still refer to a bankruptcy "proceeding" when they should be referring to a bankruptcy "case," it should be understood that a "proceeding" as used in the Judicial Code, 28 U.S.C., is a matter that comes up in a "case," or is a separate proceeding (like an adversary proceeding) brought in connection with a "case."  The appropriate venue for "proceedings" under the Bankruptcy Code is governed by a different provision of the Judicial Code, 28 U.S.C. § 1409.

Except as provided in section 1410 of this title,[29]
a case under title 11 may be commenced in the
district court for the district—

> (1) in which the domicile, residence,
> principal place of business in the United
> States, or principal assets in the United
> States, of the person or entity that is the
> subject of such case have been located for
> the one hundred and eighty days
> immediately preceding such
> commencement, or for a longer portion of
> such one-hundred-and-eighty-day period
> than the domicile, residence, or principal
> place of business, in the United States, or
> principal assets in the United States, of such
> person were located in any other district; or

> (2) in which there is pending a case
> under title 11 concerning such person's
> affiliate, general partner, or partnership.

Thus a non-chapter 15 case under the Bankruptcy Code may properly be brought

in a district passing muster under one of the four enumerated bases for venue set forth in

§ 1408(1) (*i.e.*, domicile, residence, principal place of business or principal assets), or

under the fifth basis, set forth in § 1408(2), a district "in which there is pending" a case

"concerning such person's affiliate, general partner, or partnership."

From time to time, a case under the Bankruptcy Code may be filed in a district

that passes muster under one of the five bases just noted, but is less convenient for parties

or otherwise less than optimum in the interests of justice. Also, from time to time, a case

under the Bankruptcy Code may be filed in a district where none of the five enumerated

bases has been satisfied. Two of the Judicial Code's venue provisions deal with changes

---

29      The exception addressed in § 1410 is for cases, in aid of foreign insolvency proceedings, that are
brought under chapter 15 of the Bankruptcy Code.

-13-

in the venue for bankruptcy cases under such circumstances—one plainly, and one under the bulk of the applicable authority.

Without doubt, 28 U.S.C. § 1412 applies to transfers of cases (and also, though not relevant here, proceedings) under the Bankruptcy Code.  It provides:

> A district court[30] may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.

Notably, § 1412 is permissive; it says that a district court "*may*" transfer a case "in the interest of justice or for the convenience of the parties."  It does not say that the court *must* do so.  In light of that language, many cases hold, not surprisingly, that decisions under § 1412 are within the court's discretion.  And § 1412 does not expressly address situations in which venue is unsupportable under § 1408.

Additionally, a second provision of the Judicial Code, 28 U.S.C. § 1406 (which does not mention bankruptcy, but which does expressly address cases in which venue is unsupportable), has been held, though not universally, to apply to transfers of cases under the Bankruptcy Code.  Section 1406 provides:

> (a) The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.

> (b) Nothing in this chapter shall impair the jurisdiction of a district court of any matter involving a party who does not interpose timely and sufficient objection to the venue.

---

30    It will be remembered that bankruptcy courts are arms of the district court, with bankruptcy judges presiding over cases under the Bankruptcy Code under orders of reference from their respective district courts.  Thus, as a practical matter, while district judges occasionally preside over bankruptcy cases and may be called upon to make like decisions when sitting as bankruptcy courts of original jurisdiction, most decisions under 28 U.S.C. § 1412 are made by bankruptcy judges.

Finally, one of the Federal Rules of Bankruptcy Procedure applies to the matters here before the Court. Rule 1014 provides, in relevant part:

> (a) Dismissal and Transfer of Cases
>
> ### (1) Cases Filed in Proper District
>
> If a petition is filed in the proper district, the court, on the timely motion of a party in interest or on its own motion, and after hearing on notice to the petitioners, the United States trustee, and other entities as directed by the court, may transfer the case to any other district if the court determines that the transfer is in the interest of justice or for the convenience of the parties.
>
> ### (2) Cases Filed in Improper District
>
> If a petition is filed in an improper district, the court, on the timely motion of a party in interest or on its own motion, and after hearing on notice to the petitioners, the United States trustee, and other entities as directed by the court, may dismiss the case or transfer it to any other district if the court determines that transfer is in the interest of justice or for the convenience of the parties.

Of course, under the Bankruptcy Rules Enabling Act,[31] a Bankruptcy Rule cannot trump inconsistent provisions of statutory law. A Bankruptcy Rule cannot "abridge, enlarge, or modify any substantive right."[32] Advisory Committee commentary that accompanied the 1987 amendment to Rule 1014 is helpful in the analysis of the underlying statutory law, but the Court otherwise does not consider Rule 1014 to be substantively significant.

---

[31] 28 U.S.C. § 2075.

[32] *Id.*

In 1987, Rule 1014 was amended to address statutory changes by which retention of an improperly venued case was removed as a judicial option.  The 1987 Advisory Committee Notes provided:

> Both paragraphs 1 and 2 of *subdivision (a)* are amended to conform to the standard for transfer in 28 U.S.C. § 1412.  Formerly, 28 U.S.C. § 1477 authorized a court either to transfer or retain a case which had been commenced in a district where venue was improper.  However, 28 U.S.C. § 1412, which supersedes 28 U.S.C. § 1477, authorizes only the transfer of a case.  The rule is amended to delete the reference to retention of a case commenced in the improper district.  Dismissal of a case commenced in the improper district as authorized by 28 U.S.C. § 1406 has been added to the rule.  If a timely motion to dismiss for improper venue is not filed, the right to object to venue is waived.[33]

Though § 1406 is not a model of clarity insofar as it applies to cases under the Bankruptcy Code as contrasted to cases (*i.e.*, plenary actions) in which "case" is not a bankruptcy word of art; though persuasive arguments can be made that § 1406 should not be construed to apply to cases under the Bankruptcy Code, as matters of statutory interpretation and sound bankruptcy policy; and though the cases are split, the Court believes that it here must conclude that where the statutory requirements for venue have not been satisfied; where a timely objection to venue has been made by a party with standing to make it; and where those requirements have not been duly waived, one or the other of dismissal or transfer is mandatory.

The majority view is that § 1406 applies to cases under the Bankruptcy Code, and that a bankruptcy court lacks authority to retain a case that fails to satisfy § 1408

---

[33]    *See* Fed.R.Bankr.P. 1014, "Advisory Committee Note-1987 Amendment" (italics in original).

requirements over the timely objection of an interested party.[34]  The wisdom of such a

rule is subject to fair debate, since venue is not jurisdictional; venue so easily can be

waived; and since it can subject the entire creditor community to the actions of a gadfly

or an entity with a private or political agenda, even if creditor convenience, avoiding

unnecessary expense, and the interests of justice cry out for keeping the case where it is.

Nevertheless, the Court concludes, reluctantly, that it should follow the majority

on this issue.  The Court comes to that view not by counting noses, but by an amalgam of

textual analysis;[35] comparison of former § 1477 with § 1406 and § 1412;[36] Bankruptcy

Rule 1014(a)'s 1987 Advisory Committee comment;[37] and respect for precedent in the

Southern District of New York.[38]

---

[34]    *See Thompson v. Greenwood*, 507 F.3d 416, 422 (6th Cir. 2007) ("***Thompson***") (speaking through Boggs, C.J.); *In re Sorrells*, 218 B.R. 580, 585 (B.A.P. 10th Cir. 1998) (speaking through Glen Clark, J.); *Swinney v. Turner*, 309 B.R. 638, 640-641 (M.D. Ga. 2004) ("***Swinney***") (Land, J.); *In re Peachtree Lane Associates, Ltd.*, 188 B.R. 815, 831-832 (N.D. Ill. 1995) (Castillo, J.); *In re Frame*, 120 B.R. 718, 722 (Bankr. S.D.N.Y. 1990) (Abram, now Beatty, J.); *In re Suzanne de Lyon, Inc.*, 125 B.R. 863, 866 (Bankr. S.D.N.Y. 1991) ("***Suzanne de Lyon***") (Beatty, J.); *In re Sporting Club at Illinois Ctr.*, 132 B.R. 792, 798 (Bankr. N.D. Ga. 1991) (Drake, J.); *In re Washington, Perito & Dubuc*, 154 B.R. 853, 858 (Bankr. S.D.N.Y. 1993) (Beatty, J.).

For contrary views, see *In re Lazaro*, 128 B.R. 168, 173-175 (Bankr. W.D. Tex. 1991) (Leif Clark, J.); *In re Capital Hotel Group, Inc.*, 206 B.R. 190, 192-193 (Bankr. E.D. Mo. 1997) (Barta, J.); *In re Brazzle*, 321 B.R. 893, 899-900 (Bankr. W.D. Tenn. 2005) (Boswell, J.), *later abrogated by Thompson*.

[35]    The text of § 1406 is ambiguous or unambiguous depending on one's willingness to disregard the double entendre in the use of the word "case."  But applying § 1406 in accordance with its literal terms to impose a mandatory requirement is not inherently unreasonable, nor can it be said to be demonstrably at odds with the purposes of the statute.

[36]    As more fully explained in *Swinney*, n.34 *supra*, now-repealed § 1477 had expressly provided authority to a bankruptcy court to retain a case for which venue otherwise was improper, but after § 1477's repeal, no comparable provision exists anywhere in the present U.S.C. to allow a court to *retain* a case in which venue is improper.  *See Swinney*, 309 B.R. at 641 n.2.

[37]    In particular:

        Formerly, 28 U.S.C. § 1477 authorized a court either to transfer or retain a case which had been commenced in a district where venue was improper.  However, 28 U.S.C. § 1412, which supersedes 28 U.S.C. § 1477, authorizes only the transfer of a case.  The rule is amended to delete the reference to retention of a case commenced in the improper district.  Dismissal of a case commenced in the improper

Thus the Court concludes that § 1406 applies, at least in the first instance, if the Court cannot find one of § 1408's five bases for venue to have been satisfied.

## II.

## Compliance with § 1408

Turning then to consideration of those prospective bases for venue, the Court is compelled to find that none here has been satisfied.

The Debtors base venue for the 25 cases in their corporate enterprise on an amalgam of § 1408(2) (providing venue for corporate affiliates if venue is proper for any of them), and § 1408(1) compliance by either Publishing or HoldCo. But the Court cannot find satisfaction of any of the four bases under § 1408(1) for either of those two key Debtors.

*(A) Publishing*

Turning first to Publishing, the Debtors at least implicitly recognize that Publishing's principal place of business is in Massachusetts; that its principal assets are in Massachusetts (or at least not in New York); and that as a Delaware corporation, Publishing's domicile is in Delaware. They argue, instead, that venue is proper because New York can be found to be a "residence" under § 1408(1).

---

district as authorized by 28 U.S.C. § 1406 has been added to the rule.

[38] This Court has repeatedly gone on record in stating its views as to the importance of commercial predictability in this district, and of its personal view that it should follow the decisions of other bankruptcy judges in the Southern District of New York except in those very rare instances where the earlier decision was clearly mistaken. *See, e.g.*, *In re Adelphia Communications Corp.*, 359 B.R. 65, 72 n.13 (Bankr. S.D.N.Y. 2007) ("This Court has been on record for many years as having held that the interests of predictability in this District are of great importance, and that where there is no controlling Second Circuit authority, it follows the decisions of other bankruptcy judges in this district in the absence of clear error."). Even if this Court might come to a different view on construction of § 1406 if writing on a clean slate, it cannot say that the three decisions in this district come even close to clear error, and it is not of a mind to disregard three separate decisions in this district on this exact issue.

Unfortunately, the Court cannot agree, for reasons flowing from textual analysis and precedent.  For such an argument to have merit, the Court would have to find that "residence" has applicability to a business entity like a corporation (as contrasted to a human being) and that, for a business entity, "residence" has meaning as something different from (and less than) principal place of business and principal assets.  From a textual analysis perspective, it is obvious that Congress regarded principal place of business and principal assets as of great importance, and there is no reason to believe that Congress intended residence to provide an exception for business entities that would undercut the principal place of business and principal assets standards it had expressly articulated.  Using "residence" as an alternative for corporations would create an exception that would dilute the other two bases effectively beyond recognition.  Also (and again from a textual analysis perspective), little purpose would be served by making "residence" synonymous with either principal place of business or principal assets, and statutory construction doctrine causes us to proceed with the presumption that each provision in a statute exists for its own purpose.  Thus textual analysis causes the Court to conclude that "residence" as used in § 1408 has a wholly different meaning and purpose.  Residence is the place where a natural person (a human being) lives.

Precedent causes the Court to come to the same view.  A decision in this district has addressed this exact issue, concluding that "residence" applies only to natural persons and not business entities.[39]  The Debtors have cited no case, nor is the Court aware of

---

[39]    *See Suzanne de Lyon*, 125 B.R. at 866 ("Domicile and residence generally apply to individuals and not to corporations.").  *See* n.38 *supra*, speaking to this Court's views as to its respect for decisions of other bankruptcy judges in this district except in cases of clear error.  With respect to what constitutes "residence," the Court affirmatively agrees with the *Suzanne de Lyon* view, and certainly cannot find that aspect of the ruling in *Suzanne de Lyon* to be clear error.

one, holding that the "residence" basis for venue in § 1408(1) can be satisfied by a

corporation's doing business in a particular state.

Thus, while the Court can and does find that Publishing does business in New

York, the Court cannot rule that Publishing has a "residence" in New York within the

meaning of § 1408(1).

*(B) HoldCo*

The Court likewise is compelled to find that HoldCo fails to satisfy any of the

bases for venue under § 1408(1). Here too the Debtors at least impliedly acknowledge

the inapplicability of all but one of the bases for venue under § 1408(1). They base their

venue contentions solely on the "principal assets" prong of § 1408(1), contending that

HoldCo's lease and sublease for the Sixth Avenue Space, which are said to be its only

assets, provide a basis for finding that HoldCo's principal assets are here.

Of course each of the lessee interest in the prime lease and the sublessor interest

in the sublease is an asset within the broad definitions of property under the Bankruptcy

---

However, with respect to another observation in that sentence in *Suzanne de Lyon*—that "domicile" likewise does not apply to corporations—the Court believes that whether or not that observation was true 21 years ago, it no longer is true. The Court considers it now to be settled that the jurisdiction in which a corporation or other business entity is organized constitutes its "domicile" for § 1408(1) purposes. *See, e.g.*, *In re EB Capital Management LLC*, 2011 Bankr. LEXIS 2764, *9, 2011 WL 2838115, *3 (Bankr. S.D.N.Y. 2011) ("***EB Capital Management***") (Glenn, J.) ("A corporation's domicile is generally held to be its state of incorporation."); 1 *Collier* ¶ 4.02[2][b] & n.19 (16th Ed. 2011) (same).

The Debtors cite Judge Glenn's decision in *EB Capital Management* as having held that the "residence" of a corporation can provide a separate basis for venue. The Court does not read *EB Capital Management* the same way, or indeed as having addressed the issue in any substantive way at all. Consistent with the language Judge Glenn used, at most *EB Capital Management* is authority for an implication that if a showing of residence in New York had been made *or* a showing of principal place of business in New York had been made, venue might be proper under § 1408(1). Even this implication was, as the Debtors admit (Debtor Opp. Br. at 6), *dicta*, since Judge Glenn decided the transfer motion under § 1412, ruling that venue had to be transferred to South Dakota in any event.

-20-

Code and related caselaw, most obviously section 541 of the Code.[40]  But the issues here are whether they were HoldCo's *principal* assets, and what the Court should do if the asserted principal assets have no value, or if the debtor (here, HoldCo) has other assets that have greater value or are more important.

As noted above in the Court's Findings of Fact,[41] the Debtors' presentation of the facts until later corrected was materially inaccurate.  HoldCo was and is a holding company—holding at the time of the petition, in addition to the lessee interest in a lease and the sublessor interest in a sublease with respect to the Sixth Avenue Space, the stock of a subsidiary—LLC Sub—which in turn had 14 direct and indirect subsidiaries of its own, including one (Publishing) with assets of more than a billion dollars, and which accounted for the great bulk of EBITDA of almost a quarter billion dollars.  The assets and liabilities of all of those subsidiaries would not be mechanically added to those of LLC Sub to determine the value of LLC Sub's stock, of course, but they would be relevant to the value of LLC Sub stock.  Any of these companies might also have tax attributes, such as NOLs, which have been held to be property of a debtor, including by the Second Circuit.[42]  Assets worth more than a billion dollars at indirect subsidiary Publishing would not necessarily translate into a comparable value for the LLC Sub stock, but the Court cannot find that HoldCo's lease rights exceeded the value in those 15 subsidiaries, either.  Nor can the Court find that the lease rights are more important.

---

[40]    Section 541 provides, in relevant part, that the estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case."  The Court doubts that anyone would quarrel with the idea that rights under a lease and a sublease would constitute such.

[41]    *See* nn.13-15 and accompanying text, *supra*.

[42]    *See In re Prudential Lines Inc.*, 928 F.2d 565 (2d Cir. 1991).

Suggestions that HoldCo's money-losing lease and sublease assets are worth more than 15 subsidiaries, generating close to a quarter billion dollars in EBITDA, strain the Court's credulity. The Court is unwilling to believe that, and cannot find that. Likewise, as part of its heavily factual determination on what ultimately is a mixed question of fact and law, the Court believes that it can consider the assets from a qualitative perspective as well, focusing on the *importance* of the assets in question. And the Court considers 15 subsidiaries, especially when one of them is the largest company in the corporate family, contributing nearly a quarter billion dollars in EBITDA, to be much more important in qualitative terms than the pair of leases for the Sixth Avenue Space.

After quantitative and qualitative analysis (each of which individually leads to the same conclusion here, though the Court considers looking at them together to be preferable), the Court is not in a position to find that those Sixth Avenue Space lease rights within the state of New York were the principal assets of the HoldCo estate. The Court therefore must conclude that the "principal assets" basis for venue under § 1408(1) has not been satisfied, and that venue in this district cannot be justified on that basis.[43]

### III.

### Convenience of Parties and Interests of Justice

The Debtors and their creditors speak at length as to how transfer would be destructive to creditor interests, to the great expense and inconvenience of the parties

---

[43]    Under these circumstances, the Court does not need to decide, and does not decide, whether the *first* of many individual debtor filings in an enterprise chapter 11 filing must be of a debtor that satisfies one of the bases for venue under § 1408(1) in order to then utilize § 1408(2). To be sure, in every enterprise case this Court has ever seen before this one, debtors' counsel first filed the case for a debtor in which venue in this district was clear under § 1408(1)—*e.g.*, in *General Motors*, by first filing Saturn of Harlem and then filing the remaining debtors. And "best practices" dictate such a course, if for no reason other than to avoid litigation over the issue. But it is not clear, given the language of § 1408(1), that the case for such a debtor *must* be filed first, so long as there is at least one debtor in the corporate enterprise group satisfying one of the bases under § 1408(1). That issue can be left for another day.

(especially creditors), and the exact opposite of the interests of justice. Their showing in that regard is overwhelming. They would win in a heartbeat if this were a motion under § 1412.

But the problem is that this motion is under § 1406. On a § 1406 motion, the Court's hands are tied by statutory and case law when venue is unsupportable under § 1408. That is the exact point of the majority in the split between the majority and minority courts construing § 1406.[44] The parties, and the Court, are ultimately subject to the good sense of parties who have standing to make § 1406 motions, including the UST, which has the power to make a motion like this under section 307 of the Bankruptcy Code,[45] and the ability, like any other party, to waive any deficiencies that might otherwise lie.[46] The answer, to the extent there is an answer, is for the UST to exercise prosecutorial discretion in deciding when to make motions like this one, keeping in mind the interests of the creditors who would be affected by the motion's outcome.

## IV.

### Timing of Transfer

As is apparent from the foregoing, the Court acts in accordance with the requirements of law. With the UST having made this motion, and the Court having found insufficient compliance with § 1408, the Court will order the requested transfer. But § 1406 requires only that the Court dismiss or transfer. It does not say when, and

---

[44]   *See* n.34 *supra*.

[45]   Section 307 provides:

> The United States trustee may raise and may appear and be heard on any issue in any case or proceeding under this title but may not file a plan pursuant to section 1121(c) of this title.

[46]   *See* nn.48-50 and accompanying text, *infra*.

does not tie the hands of a court in mitigating the resulting damage to the creditor community.

The UST has cited no case, nor is the Court aware of one, that has determined that the Court must effect any required dismissal or transfer under any particular timetable dictated by law.  Undoubtedly, any required action cannot be pocket vetoed or delayed for an indefinite period, but everything in the venue jurisprudence emphasizes the goal, and ability, of judges to protect the creditors and other stakeholders in the cases on those judges' watch.  The Court will implement the decision it is required to make under a timetable that minimizes (though it may not wholly eliminate) the harm to the creditors and other stakeholders that this motion engendered.

As it announced that it would at the conclusion of oral argument on the UST's motion, the Court went forward with the confirmation hearing that was scheduled for this week, denying a UST request (in its objection to confirmation) that the confirmation hearing not be held.[47]  Similarly, the Court believes that it should not stay the Plan's Effective Date by reason of the UST's venue concerns.  Venue objections, even if valid, are not jurisdictional.[48]  *Collier* notes that "[a]s is true with respect to venue generally,

---

[47]    The Court did, of course, consider the UST's objections to confirmation on the merits, and if the Debtors had not agreed to changes to meet the UST's concerns, would have sustained them in part.

[48]    *See Hoffman v. Blaski*, 363 U.S. 335, 360 (1960) ("A venue statute merely accords to the defendant a personal privilege respecting the venue, or place of suit, which he may assert, or may waive, at his election."), *quoting Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 168, (1939) (internal quote marks omitted), which in turn had cited *Commercial Casualty Insurance Co. v. Consolidated Stone Co.*, 278 U.S. 177, 179 (1929).  The *Hoffman* Court noted that in *Neirbo*, the Court was merely reiterating considerations "already forcefully set out" in *General Investment Co. v. Lake Shore R. Co.*, 260 U.S. 261 (1923), and *Lee v. Chesapeake & Ohio R. Co.*, 260 U.S. 653 (1923).  The *Neirbo* Court noted further that "[t]his basic difference 'between the court's power and the litigant's convenience is historic in the federal courts.'" 308 U.S. at 168.

venue of a case can be waived by express agreement or by conduct."[49]  And the venue

statute upon which the UST moves, § 1406, effectively says the same thing.[50]

It was shown, without dispute by the UST, that delaying the confirmation hearing,

or the Effective Date if the Plan were confirmed, would materially prejudice the creditors

in this case (who, it will be recalled, unanimously approved the prepackaged plan) and

the Debtors and their employees—whose understandable goal was, as Citibank notes, to

achieve their reorganization quickly and without the resulting damage of a lengthy

chapter 11 case.[51]  Delaying that confirmation hearing would have been materially

prejudicial to the interests of the creditors whose money here is on the line.

The case will be transferred on the first to occur of the Effective Date or three

weeks from the date of entry of the confirmation order,[52] if for some reason the Plan has

not gone effective by then.  The Court understands and will respect the desires of the

stakeholders here to conclude this case quickly, but will have doubts as to their

commitment to that goal if the Plan has not gone effective by that time.

---

[49]     1 *Collier* ¶ 4.02[1] (16th Ed. 2011); *accord id.* at ¶ 4.06[3].

[50]     *See* § 1406(b), which provides:

> (b) Nothing in this chapter shall impair the jurisdiction of a district court of any matter involving a party who does not interpose timely and sufficient objection to the venue.

[51]     In its decision in *General Motors*, the Court noted, repeatedly, how debtors and their stakeholders can be grievously injured, and value can be destroyed, when chapter 11 cases are not concluded quickly.  *See In re General Motors Corp.*, 407 B.R. 463, 479, 480, 484, 485, 491, 493 (Bankr. S.D.N.Y. 2009), *stay pending appeal denied*, 2009 WL 2033079 (S.D.N.Y. 2009) (Kaplan, J.), *appeal dismissed and aff'd*, 428 B.R. 43 (S.D.N.Y. 2010) (Buchwald, J.) and 430 B.R. 65 (S.D.N.Y. 2010) (Sweet, J.), *appeal dismissed*, No. 10–4882–bk (2d Cir. Jul. 28, 2011).  Those concerns are even more applicable with respect to prepacks, which are agreed to by creditors on the assumption that they will proceed through bankruptcy with the unusual speed for prepackaged plans for which the Bankruptcy Code provides.

[52]     Though requirements for a final order are very often waived when the order in question is a confirmation order, this time frame respects any needs for a final order, by providing one week to go effective after the time for filing an appeal would have come to an end.  *See* Fed.R.Bankr.P. 8002.

V.

Future Proceedings

Though the Court has determined that it must transfer this case, another question remains: to where? The leading contender might well be Massachusetts. But any other district in which the cases could properly have been filed (as the Court now knows the facts, the Districts of Colorado, Delaware, New Hampshire or Wyoming, or one of the districts in California, Illinois or Texas) would also appear to be permissible.

The Debtors, the Informal Creditor Group, Citibank and the UST (if it cares) are to consult with each other to reach agreement, if possible, on the particular district to which these cases will be transferred. In the event of an inability to agree, they are to submit simultaneous letters to the Court, explaining the bases for their preferences, after which the Court will decide.

Conclusion

For the foregoing reasons, the Court determines that the requirements for venue in the Southern District of New York, as set forth in 28 U.S.C. § 1408, were not satisfied. Though a transfer would here be prejudicial to the interests of creditors, the Court has sworn to comply with the law. The Court thus will transfer these cases to a district where venue would be proper under § 1408.

The Court will, however, effect the transfer at a time that minimizes the resulting prejudice to creditors, the Debtors, and the Debtors' employees. The case will be transferred on the first to occur of (x) the Effective Date or (y) three weeks from the date of entry of the confirmation order, if for some reason the Plan has not gone effective by then.

Provisions consistent with the foregoing may appear in the confirmation order, if the Debtors desire, or in a separate order if they prefer.  In either case, decretal language implementing this ruling must be submitted promptly.  If the plan supporters and the UST cannot agree upon the form of the order or any implementing decretal provisions, either side may settle an order.

Dated: New York, New York
       June 22, 2012

                                        _/s/ Robert E. Gerber_____
                                        United States Bankruptcy Judge